# 15-1645-cr(L), 15-1716-cr(CON)

# United States Court of Appeals

*for the*

# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ALLEN BRYANT, AKA Boo, AKA Boo Flare, JAMES SESSOMS, AKA Popsie, AKA Doc, ERIC MOORE, AKA E Bay, DWAYNE MEYERS, AKA Thor, KENWAYNE JONES, AKA Stro, AKA Nathaniel Stowe, AKA Kodie Jones, ABUBAKR RAHEEM, AKA Kim Crandall, ZAREH SARKISSIAN, AKA Puff, ROBERT FOOTMAN, AKA Troub, CARL DAVIS, AKA Big Jim, JAMES FARRIOR, AKA Jimbo, LAMONT JOHNSON, AKA Sambo, DJEBARA MCMILLIAN, AKA DJ, ISHEEN CAMPBELL, AKA Sha, AKA Green Eyes, AKA LeSean Campbell, KEITH SMITH,

*Defendants,*

AARON GRANTON, AKA Eric Moore, AKA E Bay, DAMION HARDY, AKA World,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT AARON GRANTON

ROBERT M. BEECHER
LAW OFFICE OF ROBERT M. BEECHER, ESQ.
*Attorney for Defendant-Appellant*
  *Aaron Granton*
15 Barberry Lane
New Providence, New Jersey 07974
(908) 771-0095

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF JURISDICTION (INCLUDING SUBJECT-MATTER
  AND APPELLATE JURISDICTION) . . . . . . . . . . . . . . . . 1

STATEMENT OF RELATED CASES AND PROCEEDINGS . . . . . . . . . . 1

STATEMENT OF THE ISSUES PRESENTED (AND STANDARDS OF REVIEW) . . 1

STATEMENT OF ADOPTION . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . 3

  I.  COURSE OF THE PROCEEDINGS BELOW . . . . . . . . . . 3

  II. STATEMENT OF FACTS . . . . . . . . . . . . . . . . 6

  THE GOVERNMENT'S CASE AS TO EACH COUNT —

    I - Count One: RICO (Substantive) — Racketeering Act
    One (Distribution of Cocaine Base): A) Conspiracy
    to Distribute Cocaine Base; B) Distribution of
    Cocaine Base); Racketeering Act Five (Murder of
    Darryl Baum: A) Conspiracy to Murder Darryl
    Baum; B) Murder of Darryl Baum); Racketeering
    Act Six (Murder of James Hamilton: A) Conspiracy
    Murder James Hamilton; B) Murder of James
    Hamilton); Racketeering Act Seven (Murder of
    Ivery Davis: A) Conspiracy to Murder Ivery Davis;
    B) Murder of Ivery Davis) . . . . . . . . . . . . . . 6

    II - Count Two: RICO (Conspiracy) — Racketeering Act
    One: (A) Conspiracy to Distribute Cocaine Base; B)
    Distribution of Cocaine Base); Racketeering Act
    Five: (A) Conspiracy to Murder Darryl Baum; B) Murder
    of Darryl Baum); Racketeering Act Six: (A) Conspiracy
    Murder James Hamilton; B) Murder of James Hamilton);
    Racketeering Act Seven: A) Conspiracy to Murder
    Ivery Davis; B) Murder of Ivery Davis) . . . . . . . . 16

    III — Count Four: Murder in Aid of Racketeering
    (Darryl Baum) . . . . . . . . . . . . . . . . . . . . 16

i

IV – The Murder of James "J.R." Hamilton . . . . . . . 21

Count Five: Conspiracy to Commit Murder
in Aid of Racketeering (James Hamilton) . . . . . . . . 21

Count Six: Murder in Aid of Racketeering
(James Hamilton) . . . . . . . . . . . . . . . . . . . 21

Count Sixteen: Unlawful Use of a Firearm
(James Hamilton) . . . . . . . . . . . . . . . . . . . 21

Count Seventeen: Firearm-Related Murder
(James Hamilton) . . . . . . . . . . . . . . . . . . . 21

V - Count Nine: Murder in Aid of Racketeering
(Johan Camitz) . . . . . . . . . . . . . . . . . . . . 25

VI – The Murder of Ivery Davis . . . . . . . . . . . . 26

Count Seven: Conspiracy to Commit Murder
in Aid Of Racketeering (Ivery Davis) . . . . . . . . . 26

Count Eight: Murder in Aid of Racketeering
(Ivery Davis) . . . . . . . . . . . . . . . . . . . . 26

Count Eighteen: Unlawful Use of a Firearm
(Ivery Davis) . . . . . . . . . . . . . . . . . . . . 26

Count Nineteen: Firearm-Related Murder
(Ivery Davis) . . . . . . . . . . . . . . . . . . . . 26

VII - Count Twenty-Three: Conspiracy to Distribute
Cocaine Base (50 grams or more) . . . . . . . . . . . 32

Count Twenty-Four: Distribution of Cocaine
Base (50 grams or more) . . . . . . . . . . . . . . . 32

VIII – The Murder of Troy Singleton . . . . . . . . . 34

Count Twenty-Five: Murder-For-Hire Conspiracy
(Troy Singleton) . . . . . . . . . . . . . . . . . . 34

Count Twenty-Six: Murder-For-Hire (Troy
Singleton) . . . . . . . . . . . . . . . . . . . . . 34

THE DEFENSE CASE . . . . . . . . . . . . . . . . . . . . . .  39

SUMMARY OF ARGUMENT  . . . . . . . . . . . . . . . . . . . .  42

LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . .  43

    POINT I

    THE DISTRICT COURT ABUSED ITS DISCRETION IN
    GRANTING THE GOVERNMENT'S MOTION FOR AN ANONYMOUS
    JURY AND FOR A PARTIALLY SEQUESTERED JURY IN
    VIOLATION OF DEFENDANT GRANTON'S FIFTH AMENDMENT
    DUE PROCESS RIGHT AND SIXTH AMENDMENT
    RIGHT TO A FAIR AND IMPARTIAL JURY. . . . . . . . . . .  43

    POINT II

    THE DISTRICT COURT ABUSED ITS DISCRETION IN
    ADMITTING OVER DEFENDANT'S OBJECTION NUMEROUS
    ALLEGED PRIOR BAD ACTS OF THE DEFENDANT (ALONG
    WITH THE "BAD ACTS" OF OTHER INDIVIDUALS) AND
    SUCH ERROR WAS NOT "HARMLESS;" THE EVIDENCE WAS
    IRRELEVANT UNDER FEDERAL RULES OF EVIDENCE 401
    AND UNFAIRLY PREJUDICIAL UNDER FEDERAL RULE OF
    EVIDENCE 403 AND RESULTED IN A DENIAL OF
    DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL . . . . .  49

    POINT III

    IMPROPER COMMENTS AND QUESTIONING OF WITNESSES
    BY THE TRIAL JUDGE DEPRIVED DEFENDANT OF HIS
    FIFTH AND SIXTH AMENDMENT RIGHT TO DUE PROCESS
    AND A FAIR TRIAL . . . . . . . . . . . . . . . . . . . .  53

    POINT IV

    THE DISTRICT COURT ERRED IN DENYING
    THE MOTION FOR JUDGMENT OF ACQUITTAL
    AS TO EACH OF THE COUNTS AGAINST GRANTON . . . . . . .  57

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . .  59

CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)(7)(C) . . . . .  60

## TABLE OF AUTHORITIES

**Page(s)**

### Cases Cited

*Coffin v. United States*, 156 U.S. 432, 15 S.Ct. 394,
39 L.Ed. 481 (1895) . . . . . . . . . . . . . . . . . . . . . 44

*Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691,
48 L.Ed.2d 126 (1976) . . . . . . . . . . . . . . . . . . . 44

*State of New Jersey v. Anthony Accetturo*, 261 N.J. Super.
487 (Law Div. 1992) . . . . . . . . . . . . . . . . . . . . 44

*United States v. Antar*, 53 F.3d 568 (3d Cir. 1995) . . . . . 55

*United States v. Bejasa*, 904 F.2d 137 (2d Cir.),
*cert. denied*, 498 U.S. 921, 111 S.Ct. 299, 112
L.Ed.2d 252 (1990) . . . . . . . . . . . . . . . . . . . . 55

*United States v. Bellomo*, 954 F.Supp. 630 (S.D.N.Y. 1997) . . 45

*United States v. Briseno*, No. 2:11-cr-77 PPS (dated
September 30, 2014) . . . . . . . . . . . . . . . . . . . 46, 48

*United States v. Concepcion*, 983 F.2d 369 (2d Cir. 1992),
*cert. denied*, 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d
124 (1993) . . . . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999) . . . . . . 49

*United States v. Hassan,* 578 F.3d 108 (2d 2008) . . . . . . . 2,57

*United States v. Holland*, 381 F.2d 80, 86 (2d Cir. 2004),
*cert. denied*, 543 U.S. 1075, 125 S.Ct. 921, 160 L.Ed.
2d 814 (2005) . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Mostafa*, 7 F.Supp.3d 334 (S.D.N.Y. 2014) 44, 45

*United States v. Nazzaro*, 472 F.2d 302 (2d Cir. 1973) . . . . 56

*United States v. Persico*, 645 F.3d 85 (2d Cir. 2011), *cert.
denied*, 132 S.Ct. 1637, 182 L.Ed.2d 246 (2012). . . . . . 57

*United States v. Pica*, 692 F.3d 79 (2d Cir. 2012) . . . . . 1,43

*United States v. Thai*, 29 F.3d 785 (2d Cir.), *cert. denied*, 513 U.S. 977 (1994) . . . . . . . . . . . . . . . . . 49

*United States v. Thomas*, 757 F.2d 1359 (2d Cir.), *cert. denied*, 474 U.S. 819, 106 S.Ct. 67, 88 L.Ed.2d 54 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

*United States v. Tomero*, 486 F.Supp.2d 320 (S.D.N.Y 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Vario*, 943 F.2d 236 (2d Cir. 1991), *cert. denied*, 502 U.S. 1036, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992) . . . . . . . . . . . . . . . . . 44, 45, 46

## STATUTES AND RULES

18 U.S.C. § 924(c) . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 924(j)(1) . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 1958 . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 1959(a)(1) . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 1959(a)(5) . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 1962(c) . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 1962(d) . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . 1

21 U.S.C. § 841 . . . . . . . . . . . . . . . . . . . . . . . 5

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . 4

## STATEMENT OF JURISDICTION (INCLUDING SUBJECT-MATTER AND APPELLATE JURISDICTION)

This appeal is of a final judgment of criminal convictions as to the defendant-appellant Aaron Granton ("Granton") entered by the Honorable Frederic Block, U.S.D.J. on May 19, 2015. (A154-160).  A timely Notice of Appeal was filed on May 19, 2015. (A161).  The district court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231.  This Court has jurisdiction in this direct appeal pursuant to 18 U.S.C. § 1291.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This appeal has been consolidated with Granton's co-defendant/appellant Damion Hardy (No. 15-1716).

## STATEMENT OF THE ISSUES PRESENTED (AND STANDARDS OF REVIEW)

1) Did the district court err abuse its discretion in granting the government's request for an anonymous and partially sequestered jury in violation of defendant's Fifth Amendment Due Process and Sixth Amendment right to a fair trial?

   Standard of review: Abuse of discretion. *United States v. Pica*, 692 F.3d 79 (2d Cir. 2012).

2) Did the district court abuse its discretion in admitting numerous alleged prior "bad acts" of the defendant (along with "bad acts" of other individuals)?

1

Standard of review: An evidentiary ruling is reviewable for abuse of discretion; if errors were not objected to, then plain error.

3) Did improper comments and questioning by the trial judge deprive defendant of his Fifth and Sixth Amendment right to due process and a fair trial?

Standard of Review: Abuse of discretion.

4) Did the District Court err in denying the motion for judgment of acquittal as to each of the counts against Granton?

Standard of Review: *De novo*, viewing the evidence in the light most favorable to the government. *United States v. Hassan*, 578 F.3d 108 (2d Cir. 2008).

## STATEMENT OF ADOPTION

The appellant Aaron Granton, pursuant to Federal Rule of Appellate Procedure 28(i), hereby adopts the initial brief and any reply brief of co-appellant Damion Hardy (15-1716), in this consolidated case.  Granton adopts Hardy's statements of facts, all claims of error, and all arguments as his own.  This statement of adoption also applies to all issues raised that do not directly apply to the defendant, but may nonetheless may have a prejudicial spillover effect that indirectly harms him.

2

## STATEMENT OF THE CASE

### I. COURSE OF THE PROCEEDINGS BELOW

Following his Superseding Indictment for RICO and other violations (A110-146), the defendant-appellant Aaron Granton (with co-defendant/appellant Damion Hardy) was tried to a jury before the Honorable Frederic Block in the United States District Court for the Eastern District of New York.

The government moved pretrial for an anonymous jury and partially sequestered which defendants opposed. A competency hearing regarding Hardy was held on March 24, 2015. At the end of the competency hearing, Judge Block advised that there would be an anonymous jury. (Tr. 3/24/15; pp. 117-22 to 118-1).

On March 31, 2015, Judge Block issued his formal ruling granting the government's request as to the anonymous and partially sequestered jury. (Tr. 3/31/15; pp. 253-2 to 254-6; A245-247). On April 1, 2015, the district court denied Hardy's motion to be declared incompetent to stand trial. (A188-192).

The jury was sworn on April 1, 2015 (Tr. 344-5).

On April 22, 2015, the government rested. (Tr. 2687-10 to 11).

On April 23, 2015, the district court denied judgment of acquittal motions as to each count. (Tr. 2687-20 to 23; 2706-25 to 2707-25; 2758-20 to 2759-2; 2765-10 to 2766-7; 2912-10 to

3

2914-8).  A renewed Rule 29 motion was denied at sentencing on May 11, 2015. (ST44-21 to 23).

On April 29, 2015, Granton was found guilty of RICO, contrary to 18 U.S.C. § 1962(c) (Count One); RICO Conspiracy, contrary to 18 U.S.C. §  1962(d) (Count Two); Murder in aid of Racketeering (Daryl Baum), contrary to 18 U.S.C. § 1959(a)(1) (Count Four); Conspiracy to Commit Murder in aid of Racketeering (James Hamilton), contrary to 18 U.S.C. § 1959(a)(5) (Count Five); Murder in aid of Racketeering (James Hamilton), contrary to 18 U.S.C. § 1959(a)(1) (Count Six); Conspiracy to Commit Murder in aid of Racketeering (Ivery Davis) (Count Seven); Murder in aid of Racketeering (Ivery Davis) (Count Eight); Murder in aid of Racketeering (Johan Camitz) (Count Nine); Unlawful use of a Firearm During a Crime of Violence (James Hamilton), contrary 18 U.S.C. § 924(c) (Count Sixteen); Causing Death Through the Use of a Firearm (James Hamilton), contrary to 18 U.S.C. § 924(j)(1)) (Count Seventeen); Unlawful use of a Firearm During a Crime of Violence (Ivery Davis), (Count Eighteen); Causing Death through the Use of a Firearm (Ivery Davis), contrary to 18 U.S.C. § 924(j)(1) (Count Nineteen); Conspiracy to Distribute and Possess with Intent to Distribute At Least 50 Grams of Cocaine Base, contrary to 21 U.S.C. § 846 (Count Twenty-Three); Distribution and Possession with Intent to

4

Distribute at Least 50 Grams of Cocaine Base, contrary to 21 U.S.C. § 841 (Count Twenty-Four); Conspiracy to Commit Murder for Hire Resulting in Death (Troy Singleton), contrary to 18 U.S.C. § 1958 (Count Twenty-Five); and Murder-For-Hire: (Troy Singleton), contrary to 18 U.S.C. § 1958) (Count Twenty-Six) (Verdict Sheet at A147-153).

On May 11, 2015, Granton was sentenced to life imprisonment on Counts 1, 2, 4, 6, 8, 9, 17, 19, 25 and 26. Granton was sentenced to 40 years on Counts 23 and 24, 25 years on Count 18, and 10 years on Counts 5, 7 and 16. The sentences imposed on Counts 16 and 18 are to run consecutively to each count and the sentence imposed on all other counts are to run concurrently for a total of life plus 35 years. (A156).

A timely Notice of Appeal was filed. (A161).

## II. STATEMENT OF FACTS

### I

### Count One: RICO (Substantive) – Racketeering Act One (Distribution of Cocaine Base): A) Conspiracy to Distribute Cocaine Base; B) Distribution of Cocaine Base); Racketeering Act Five (Murder of Darryl Baum: A) Conspiracy to Murder Darryl Baum; B) Murder of Darryl Baum); Racketeering Act Six (Murder of James Hamilton: A) Conspiracy Murder James Hamilton; B) Murder of James Hamilton); Racketeering Act Seven (Murder of Ivery Davis: A) Conspiracy to Murder Ivery Davis; B) Murder of Ivery Davis)

**THE GOVERNMENT'S CASE**

The Cash Money Brothers (CMB) were a group of 20 to 25 individuals formed in 1991 (named after the movie "New Jack City") who operated mostly out of the Lafayette Gardens (LG), a large public housing project in Bedford Stuyvesant, Brooklyn, New York. As in the movie, the CMB "sold crack cocaine" in "crack vials." (Tr. 117-1 to 3; 131-14 to 20; 564-17 to 567-12; 607-16 to 18; 1788-6 to 17; 2293-17 to 23).

Damion "World" Hardy was the leader. (Tr. 89-25 to 91-10; 565-8 to 11; 1037-25 to 1038-4; 1329-15 to 17; 1789-11; 2267-15 to 18). Hardy "was into selling drugs." (Tr. 91-19 to 24). To be a member of the CMB one had to sell drugs, "[c]arry guns . . . shoot people." (Tr. 1788-22 to 1789-1). The drugs would be cooked, bagged, and then distributed hand-to-hand to customers by workers in shifts. After hand-to-hand drug sales were made, the money would go to a lieutenant, who would "give it to World

**6**

when they finish, when he want it." (Tr. 1793-3 to 1795-11; 1795-12 to 22). Hardy would obtain additional drugs ("the re-up") from Harlem. (Tr. 1792-8 to 18). Members always carried guns obtained from Hardy "[f]or protection" and included ".9's, 4/5s, TECS, Macs, Deserts, .357s, .44s" kept in different apartments. (Tr. 613-1 to 3; 1805-2 to 20). If someone tried to sell drugs at LG without Hardy's permission they would be shot at or shot. (Tr. 1806-22 to 1807-7).

Granton[1] went by the nicknames "E-Bay"[2], "Eric Moore" and "Cyrus the Virus" (Tr. 514-15 to 25; 566-15 to 16). He was a CMB member (Tr. 566-1 to 16; 1281-24 to 25) and initially was "a worker" or "someone who sold crack cocaine . . . for the

---

[1] The following stipulations were read into the record: "On November 28th, 1992, Aaron Granton was arrested at 433 Lafayette Avenue on drug charges. On December 3rd, 1993 Granton was convicted of criminal possession of a controlled substance in the fifth degree, possession of over 500 milligrams of cocaine. In connection with that arrest and conviction, Granton was incarcerated from November 28th, 1992 to December 10th, 1992, and November 5th, 1993 to August 22nd, 199[4]." (Tr. 2385-17 to 2386-1). A second stipulation reads: "On April 18th, 1995, Aaron Granton, also known as Eric Moore, was arrested on robbery charges. On November 9th, 1995 Granton was convicted of attempted robbery in the first degree causing serious injury during a robbery. In connection with that arrest and conviction, Granton was incarcerated from April 18th, 1995 to April 13th, 1999. Granton successfully completed his parole and was discharged on January 10th, 2003." (Tr. 2389-6 to 15).

[2] Footman testified that one day Hardy told Granton that his new name was "E-Bay" and "it stuck with him." (Tr. 2001-1 to 11).

organization." (Tr. 570-20 to 24). When Granton did not want to deal drugs, Allen "Boo" Bryant and "Deezo" put revolvers to his head ("spinning and click at him") and told him that he had better deal drugs. (Tr. 1980-20 to 1982-3). Granton became "a lieutenant" who "gave out bombs [bundles of crack cocaine]." (Tr. 570-18 to 571-3). He was "an enforcer" (Tr. 570-19) who would "protect" the organization with a gun. (Tr. 572-10 to 20).

Dwayne Meyers, a/k/a "Thor," was "an enforcer for World" who "would sell heroin for him in the projects" and sell crack cocaine. (Tr. 857-6 to 11; 657-22 to 658-3; 1281-7 to 12; 2565-18 to 25). Meyers[3] testified that there were two different

---

[3]   Meyers, a cooperator seeking a "5K" letter (Tr. 2596-3 to 6) and self-described "thug" (Tr. 2589-8 to 10), was nicknamed Thor for his ability to knock people out during the "knock-out" game. (Tr. 2281-20 to 2282-13; 2607-4 to 20; 2328-7 to 2329-3). Meyers originally faced the death penalty but after his cooperation only faced a time-served sentence. (Tr. 2568-3 to 2568-24). Meyers pleaded guilty to murder (related to Ivery Davis, Tyrone Baum, Michael Colon and "Kojack"), racketeering, robbery and assorted related crimes. (Tr. 2595-17 to 24). He would not be charged with conspiracy to murder Michael Colon, murder and conspiracy to murder Gerard Mackens, murder and conspiracy to murder Ivery Davis, carjacking, robbery and felony murder of Prince Osua, murder and conspiracy to murder Tyrone Baum, attempted murder of the medical clinic individual, conspiracy to commit kidnapping and robbery impersonating New York City police officers, distribution and conspiracy to distribute cocaine base from 1992 to 1993 and from 1996 to 2004, distribution and conspiracy to distribute heroin between 2000 and 2005, unlawful possession of firearms from 1995 through 2004, robbery and conspiracy to commit armed robberies between 2000 and 2002. (Tr. 2597-17 to 2600-4).

crews: one that dealt with Myron "Wise" Hardy (Damion Hardy's older brother and a CMB member) and one that dealt with Hardy. (Tr. 568-5 to 20; 2566-1 to 4). Damion and Myron "were partners [and] close." (Tr. 569-4 to 7). If one were incarcerated, the other brother would control everything. (Tr. 569-15 to 20).[4]

On June 12, 1999, Meyers[5] had a brief conversation with Myron and Ivery "Peanut" Davis at the LG. Meyers later heard a

---

[4] Meyers was "very close friends" with Myron (Tr. 2314-13 to 15; 2333-14 to 15). When Hardy was locked up, the "guys would answer to Wise." (Tr. 2314-25 to 2315-7). Meyers began transporting drugs for Myron. (Tr. 2315-25 to 2316-11).

[5] Meyers' prior convictions included trespassing (stealing from school lockers; Tr. 2600-9 to 25), armed robbery, "snatching jewelry," "chain snatching," "purse snatching" (Tr. 2601-8 to 2604-5) and he used marijuana and crack cocaine. He served eight months on Riker's Island for the robbery, and was arrested within days of his release for making a crack cocaine sale. (Tr. 2274-11 to 2281-3; 2601-8 to 2601-8 to 2604-52). He was sentenced to one year for committing another armed robbery while on probation. (Tr. 2604-6 to 2605-14). When released in 1989 he began committing drug crimes involving the sale of heroin and crack cocaine, along with robberies. (Tr. 2605-15 to 2607-3). He was released towards the end of 1991 and saw Myron, returning to drug dealing. (Tr. 2292-19 to 24). Meyers was arrested for trespassing (Tr. 2286-17 to 2287-19), was charged with attempted murder of police officers (dismissed), and pleaded guilty to a robbery involving clothing stores (a shoplifting ring) that occurred in 1992, for which he was sentenced in 1993 to "[t]wo to four." (Tr. 2291-7 to 2292-15; 2296-17 to 2297-1; 2582-20 to 2585-6). He robberies while out on bail in 1992 (Tr. 2297-7 to 14) and regularly committed armed robberies from when he was 15 years old through his 30's.

9

shot and he saw Myron lying on the ground.  Myron was taken to a hospital and died. (Tr. 2404-8 2412-8).  Lamont Johnson[6] saw

_____

(Tr. 2570-17 to 2571-2).  Upon his release in 1995 Meyers returned to LG, where he committed robberies and burglaries, with no connection "with Wise on the hustling side, at that time." (Tr. 2311-3 to 2313-14; 2587-4 to 2588-16).  Meyers admitted to extorting prostitutes and robbing individuals with Sarkissian while pretending to be police officers. (Tr. 2560-21 to 2563-15).  He was involved in the extortion of honest businesses, threatening violence if they did not pay. (Tr. 2610-10 to 2611-8).  He initially lied to detectives about the Ivery Davis murder (Tr. 2576-15 to 2577-5; 2577-15 to 2578-5).  He lied to his parole officer. (Tr. 2577-8 to 9).  He admitted lying "on people" and framing them. (Tr. 2588-24 to 2589-7).  He used numerous false names. (Tr. 2590-21 to 2592-8).  When arrested for the murder of Troy Davis he got his girlfriend to give a false alibi. (Tr. 2593-13 to 2594-14).

[6] Johnson was released in May 2005 and arrested after 72 days. He pleaded guilty (with a cooperation agreement) to federal racketeering, murder and drug conspiracies, facing from zero time to life.  At the time of trial he had served nine years and nine months. (Tr. 684-3 to 687-6).  Johnson would not be prosecuted for the murder of Steven Brewer, numerous attempted murders, shootings, shootouts, armed robberies, weapons offenses and drug dealing. (Tr. 696-18 to 701-4).  Johnson once falsely stated that an individual named "Rab" had shot him and falsely stated "Rab" had murdered an individual named Zach. (Tr. 630-10 to 634-7).  Johnson was considered "a snitch" earning the nickname "Sammy the Bull." (Tr. 635-18 to 636-1; 644-12 to 21). He left school in the eleventh grade after firing a gun into a crowd, striking two people.  He was arrested for joyriding when he was fifteen years old.  He "[c]omitted robberies in midtown Manhattan . . . strong-arm robberies" with and without weapons. He would "pickpocket" and steal clothes.  He sold drugs in "1987, 1988" prior to CMB.  (Tr. 585-12 to 589-13). In 1989 Johnson and Myron shot an individual named "Forever" who had robbed a friend of Johnson's. (Tr. 591-16 to 592-2).  Johnson fled to Connecticut (where he sold drugs) as he had committed "[a]bout 30 or 40" robberies and did not appear for sentencing. (Tr. 592-2 to 20).  Johnson was arrested for the robberies in

10

Myron shake hands with Meyers and Davis, and asked Johnson if he wanted to have breakfast with him. Johnson said "no" and Myron walked off. Johnson heard gunshots and saw Myron laying on the ground "with his eyes rolling behind the back of his head, and he seemed to be fighting for his life." (Tr. 658-9 to 660-25). Myron died and Johnson subsequently heard that "Nino", who was "a cousin of Peanut's" had killed Myron. (Tr. 661-7 to 19).

The day after Myron was murdered the CMB had a meeting and Edward "Taz" Cooke, a non-testifying cooperating witness, advised that Hardy sent him "to take control" (Tr. 662-10 to 663-10). Keith a/k/a "Bro-Man" took over as lieutenant until his incarceration in October of 1999. (Tr. 665-6 to 22). The role of lieutenant was taken by "Boo [Bryant]," "E-Bay Granton]" and "Thor [Meyers]" (Tr. 666-7 to 10). It was believed Nino had been given the gun that killed Myron by "Kojack" (Jerard

---

1989 and served about two years. (Tr. 593-14 to 594-8). Johnson was arrested in the spring of 1993 for possessing crack cocaine and resisting arrest and served eight months in jail. (Tr. 641-4 to 24). Johnson was arrested again for buying drugs and served 60 days in jail. (Tr. 643-1 to 12). Johnson went to Maryland to sell crack cocaine. (Tr. 595-20 to 25). When it became "hot" from law enforcement, Johnson returned to Brooklyn and began selling drugs for the CMB. (Tr. 599-21 to 601-23). He was arrested in May 2000 for an assault on his girlfriend; Johnson "smacked her" with his fist and hurt her (Tr. 680-11 to 16; 721-6 to 13) and in October 2001 was arrested for crack cocaine. He pleaded guilty in early 2002 and received 5 to 10 years in a state correctional facility. (Tr. 681-4 to 683-4).

11

Mackins); Kojack was murdered by Meyers two days after Myron's murder. (Tr. 667-10 to 668-5; 2621-22 to 2624-10).

In the late 1980's "the Hamiltons" were in charge. (Tr. 590-1 to 11). In 1992 Stack Hasting was shot by "Terry and Jeff" (two Hamilton workers). This upset Hardy; in retaliation, a CMB member shot Jeff. (Tr. 606-4 to 608-1). Bryant "was smacked" and "knifed in the face" by Ulysses Hamilton; this also upset Hardy, who believed something had to be done. (Tr. 608-2 to 27).

Allen Bryant[7] (a/k/a "Boo" and "Boo Flare" for "shooting guns;" Tr. 131-3 to 6; 452-9 to 16) grew up in LG, was a CMB

---

[7] At the time of trial Bryant, another cooperator, had been in prison for eleven years after pleading guilty to a racketeering (CMB) and narcotics distribution count. (Tr. 423-4 to 14; 186-2 to 15). He cooperated with the promise of a 5K1.1 letter. (Tr. 190-1 to 21; 407-24 to 405-7). Bryant pleaded guilty to participating in the murders of Darryl "Homicide" Baum and Tyrone "T-Rock" Baum on the orders of Hardy for the CMB. (Tr. 188-1 to 13; 386-14 to 396-4). Bryant also pleded guilty to the attempted murder of Theresa Gregory. (Tr. 189-10 to 12). He faced not only life sentences but a potential death penalty sentence. (Tr. 414-7 to 415-4). Bryant is seeking time served. (Tr. 415-22 to 23). He would not be prosecuted for the conspiracy to murder Tyrone, his role in the murder of Darryl, his role in the conspiracy to murder James Hamilton, the conspiracy to murder Ivery Davis in 2000, the murder of Vincent "Butchie" Berry in 1991, the manslaughter of Richard "Murph" Mathias in 1991, the death of Steven Brewer in 1992, the attempted murder of a drug dealer known as Supreme, the attempted murder of Theresa Gregory in 1994, the attempted murder of William Wells in 1993, the attempted murder of Gus in 1992, the shooting of a female crack user, the robbery and

member and sold drugs with Granton and Hardy. (Tr. 132-9 to 133-4; 1281-16 to 22).  One day in 1991 Hardy told Bryant[8] to "join the winning team" (CMB) with Hardy in charge. (Tr. 144-24 to 146-2; 747-13 to 16; 750-3 to 8).

Bryant testified that Granton was a member of the CMB and moved from the Coney Island section of Brooklyn to LG. (Tr. 147-3 to 10; 197-8 to 13).  Bryant testified that Granton joined the

---

shooting of a Spanish male in 2002, and not charged with various kidnappings, armed robberies, and drug distribution in New York, North Carolina, and Pennsylvania, the conspiracy to assault and rob people in Rhode Island, the home invasion and robbery in New Jersey, nor the extortion and robbery of narcotics traffickers between 1990 and 2003. (Tr. 420-16 to 423-10).

[8] Bryant admitted to the contract killing of his girlfriend's uncle Vincent "Butchie" Berry by shooting him in the back of the head from behind (Tr. 142-18 to 144-6; 198-13 to 18; 418-7 to 419-1).  When he was 14 years old he shot a "female crack user" he thought was "trying to beat" him for money (Tr. 200-6 to 16; 417-21 to 418-4).  In 1992 he participated in the shooting of individuals (one killed) involved in the shooting of his girlfriend. (Tr. 200-19 to 201-21).  These three shootings had nothing to do with the CMB. (Tr. 202-2 to 4).  Bryant served "[a] city year" for drug dealing. (Tr. 206-2 to 207-1).  Bryant was involved in shooting a member of the Deuces named Baby Ellie (Tr. 212-12 to 25) and in 1993 he shot in the head a Bedford Avenue crew member named William. (Tr. 220-3 to 19).  Bryant served 5 years and 10 months for the William shooting, including "one and a half to three" years for promoting prison contraband (a razor) (Tr. 232-9 to 233-3).  Bryant was arrested on February 18, 2004 by federal authorities and charged with drug conspiracy and with a parole violation. (Tr. 403-25 to 405-8).  Bryant thought it would be more lucrative and easier to become a full-time hit-man rather than deal drugs. (Tr. 429-1 to 16).  Bryant admitted a lot of his testimony has little corroboration and the jury has to take his "word." (Tr. 434-7 to 18).

CMB in 1992 and "[h]e sold drugs for us." (Tr. 147-18 to 22; 184-11 to 14). Granton "became a shooter for us." (Tr. 147-23 to 148-1). Bryant testified: "He used to hustle ("sell drugs for us") and he became an enforcer." (Tr. 340-10 to 15). This began when Granton wanted a gun "so he could stand out there and hustle." Granton later shot at individuals from a rival gang and "had proven himself to be a shooter after that." (Tr. 184-16 to 185-2).

Bryant would pick "up the money and [drop] off the drugs." (148-6 to 7). Other individuals would sell and package the drugs; Hardy would buy the drugs. (Tr. 148-8 to 11). Bryant estimated in the early 1990's the CMB made "between eight to 10,000 [dollars] a day." (Tr. 345-3 to 7). In 1992 a friend named Peter Rabbit and Wendy (a girlfriend of Bryant) were shot. Johnson, accompanied by "Wayno, Ron K., Fruitquan and Boo" shot the two individuals, with one dying. (Tr. 614-18 to 617-21).

Robert "Troub" (for "always trouble") Footman (Tr. 1777-21 to 25) knew Granton when both lived in Coney Island.[9] Granton lived with Footman's family in LG. (Tr. 1775-2 to 1776-25). Footman and Granton were "like brothers." (Tr. 1846-10 to 1974-

---

[9] Footman, a cooperator, pleaded guilty to racketeering and drug charges and faces ten years to life. (Tr. 1940-1 to 1950-22; 1959-7 to 21). He was released on bail in May of 2011 (Tr.

14

1). Granton shot and killed an individual named Troy [Crazy Troy Davis; not Troy Singleton]. (Tr. 1839-15 to 1840-6; 1844-18 to 1845-8). Granton told Footman he killed Troy because "World [Hardy] had a problem with him." (Tr. 1821-9 to 1822-17). Granton's reputation changed and "they respected him more and

---

1988-3 to 5) after serving a little over five years. (Tr. 2042-3 to 5). He initially lied to the federal authorities (Tr. 1958-11 to 1959-1) and lied many times to judges, the FBI, police and assistant United States attorneys. (Tr. 2024-13 to 2026-15; 2034-23 to 2035-11). He used phony identifications. (Tr. 2031-23 to 2033-23). While in Coney Island he sold cocaine "to customers hand-to-hand" (Tr. 1778-16 to 1779-4) though he would not be prosecuted for any illegal activity on Coney Island. (Tr. 1984-16 to 1985-4). He was arrested for drugs and gun charges in 1993, pleaded and served sixteen months. (Tr. 1827-15 to 1829-13; 2026-25 to 2027-3; 2028-4 to 2029-18). He shot an individual named Marcel Kenny in 1995 at the behest of Hardy, paralyzing Kenny. (Tr. 1856-7 to 1865-2; 1961-6 to 1962-13). He was tried for the Kenny shooting and acquitted when Kenny did not identify him. (Tr. 1871-2 to 16). Footman asked his "baby-mother" to provide a false alibi. (Tr. 1888-10 to 20). He was jailed for a drug conviction in 1999. (Tr. 1892-1 to 10; 1893-14 to 17; 2030-21 to 2031-2). He was arrested for possession with intent to distribute crack in 2006. (Tr. 2031-18 to 22). He received immunity for trying to kill Davis "two, three times." (Tr. 1965-8 to 1966-11). He would have killed the narcotics traffickers Kelly and Hood had he found them (Tr. 1966-12 to 1967-15) and would have killed the narcotics trafficker Cain if able. (Tr. 1967-16 to 1968-4; 1971-12 to 1972-5). He shot at people from the Bedford Avenue Crew and Dekalb Avenue people in 1992. (Tr. 1972-14 to 1973-1). He was ready to kill Funkmaster Flex if signaled to by Hardy. (Tr. 1973-2 to 13). He robbed (with a Tec-9) Wayne-O of his $30,000 Rolex, jewelry and money. (Tr. 1973-14 to 1974-16). He conspired to kill Black James in 1992 (Tr. 1906-25 to 1908-7; 1976-18 to 1977-22) and tried to kill a different Wayno on orders of Hardy. (Tr. 1977-23 to 1979-1).

15

they was afraid." (Tr. 1822-21 to 1823-1). Hardy told Footman to rob a friend named Wayno and he did, giving the Rolex to Hardy. (Tr. 1833-16 to 1834-24). When Footman moved to LG he sold crack for Hardy. (Tr. 1780-3 to 9; 1782-25 to 1783-24).

## II

### Count Two: RICO (Conspiracy) – Racketeering Act One: (A) Conspiracy to Distribute Cocaine Base; B) Distribution of Cocaine Base); Racketeering Act Five: (A) Conspiracy to Murder Darryl Baum; B) Murder of Darryl Baum); Racketeering Act Six: (A) Conspiracy Murder James Hamilton; B) Murder of James Hamilton); Racketeering Act Seven: A) Conspiracy to Murder Ivery Davis; B) Murder of Ivery Davis)

Defendant incorporates Section I, supra.

## III

### Count Four: Murder in Aid of Racketeering (Darryl Baum) June 10, 2000

Daryl "Hommo" ("Homicide") Baum[10] was a feared street gangster with a reputation as a killer. (Tr. 2581-8 to 15). Edward "Taz" Cooke believes Baum was one of the persons responsible for the murder of his father, Patrick Cooke. Meyers admitted Cooke had a motive for wanting Baum dead. Baum had also robbed a gambling spot Cooke was running and Cooke had been shot by Black-O-Mack-O (Tr. 2581-21 to 2582-9; 2657-1 to 9).

---

[10] Darryl Baum's brother was Tyrone "T-Rock" Baum. (Tr. 2582-6 to 12). Cooke hired Bryant (for $4,000) to kill T-Rock (Tr. 2552-20 to 23; 2557-20 to 2558-1) and Bryant shot and killed T Rock. (Tr. 2554-13 to 2555-19; 2164-14 to 19).

16

Darryl Baum admitted involvement in Myron's murder: "he told World he says, 'Yo, son, I didn't know Wise was your brother.'" After Baum left, Hardy stated "He should never had told me that" meaning Hardy "figured out that Homicide had something to do with" Myron's death." (Tr. 1302-17 to 1303-6).

Bryant testified that he and Granton murdered Baum. (Tr. 188-25 to 189-2; 489-7 to 21; 493-23 to 24). Bryant testified that Hardy wanted to kill Baum because Baum was friendly with Davis. Cooke and Meyers called Bryant and advised "they had a line on Hommo meaning that they see him and they asked me do I have a gun on me. I told them yeah." It was decided "we going to get E-Bay." (Tr. 257-1 to 261-17).

Bryant saw Granton approach Baum by "skipping" (Tr. 269-4; 493-13 to 16) to the corner of Marcy and Quincy and saw "E-Bay firing." When Bryant asked if he had hit Baum, Granton "said yeah. I asked him where. He said in the head." (Tr. 266-4 to 20).

Meyers testified Granton admitted the Baum murder. Granton "went inside of Puffy's vehicle and was staking out Hommo." (Tr. 2468-12 to 13). As Granton described it, Baum was speaking to some individuals on the corner of Quincy and Marcy, and when he bent to tie his shoe, Granton shot him in the head. (Tr. 2468-20 to 2469-16).

17

Zareh "Puff" Sarkissian,[11] a cooperating witness, pleaded guilty to a "RICO murder" (the murder of Daryl Baum; Tr. 865-5 to 7), and "a carjacking that led to a murder" and was awaiting sentencing. Though facing a mandatory minimum of life, due to his cooperation the judge could "break the mandatory minimum during sentencing." (Tr. 835-7 to 13; 837-5 to 838-25). Sarkissian was hoping for time served. (Tr. 974-23 to 975-3).

Sarkissian was "an associate," and not a member, of the CMB. (Tr. 1377-18 to 23). On June 10, 2000, Edward "Taz" Cooke told him that Baum was "down the street" and that he, Cooke, wanted Sarkissian to kill Baum. Sarkissian, who had lent Cooke $30,000 and wanted to stay in his good graces, agreed. Sarkissian, who had a gun on him, approached Baum, and the two "nodded to each other." Sarkissian returned to Cooke without killing Baum, advising that he could not get a good shot at him.

---

[11] Sarkissian botched a robbery with Meyers during which Sarkissian shot the victim while driving away and the victim (named Prince Ozua, who died) jumped on the car. (Tr. 904-12 to 908-7; 909-23 to 910-6; 932-14 to 24). Sarkissian would impersonate a police officer to rob individuals and to have sex with prostitutes. (Tr. 922-8 to 924-23). Sarkissian would not be prosecuted for conspiracy to commit robbery and extortion of prostitutes by impersonating police officers, conspiracy to commit health care fraud and to extort clinics, distribution of cocaine and cocaine base, check fraud, unlawful possession of firearms, and conspiracy to commit armed robberies. (Tr. 967-19 to 968-15).

(Tr. 940-2 to 6; 946-13 to 949-13). Cooke got on the phone, and Sarkissian "understood that E-Bay would be appearing." (Tr. 868-7 to 870-6). Sarkissian was told to get in his car with Bryant and to drive to a certain location. Bryant spoke on the phone with Cooke, and said "E-bay is coming." A few minutes later Sarkissian heard a shot and Granton ran into the car. The car drove a few blocks away, and Bryant and Granton left. (Tr. 870-13 to 871-15; 950-25 to 953-15). Sarkissian did not see who shot Baum. (Tr. 954-15 to 21).

Henderson testified that on the night that Daryl Baum was murdered, he saw "E-Bay . . . Taz [and] Zach," all members of CMB and they passed him a gun. One of the three stated to Henderson: "we got busy" with the gun. This meant to Henderson that they "either killed somebody or they robbed somebody." (Tr. 1292-24 to 1295-4). Henderson testified that Cooke described the murder of Baum: "He said that E-Bay had –– was dressed in a hoodie, and that he was acting like a –– like a young boy, he was skipping. And then when he came upon Darryl Baum, Darryl Baum was tieing (sic) his shoelaces and he pumped him in the head twice." (Tr. 1304-20 to 1305-5).

Footman testified that Granton spoke about Hommo: "He said, yo, you got to be careful, Tyson put money on. He said, Tyson put money on they's heads. I'm like, who Tyson? He

19

said Mike Tyson. So, I was like . . . how the hell we get beef with Mike Tyson? He was like, yo, man, listen, he say we killed his boy Hommo." (Tr. 1912-5 to 19). Granton was warning Footman about possible retaliation. (Tr. 2009-12 to 16). Meyers testified that Abubakr Raheem "found out from the individuals that Mohammed, JR, and Mike Tyson each put up $50,000 . . . [f]or the murder of Taz and World." (Tr. 2473-18 to 23).

At a meeting of the CMB at Hardy's mother's house, Hardy advised Granton, Bryant, Meyers (Thor), Cooke Taz and Moo that "there was money on his head for killing Hommo [Darryl Baum; a/k/a "Homicide"]. And Mike Tyson put the money up, and he wanted to kill Mike Tyson." (Tr. 361-21 to 363-1). Baum had been Mike Tyson's childhood friend and bodyguard. (Tr. 363-11 to 16). There were objections to killing Tyson and "Moo probably spoke the loudest saying Mike Tyson was Muslim and we shouldn't kill a Muslim." (Tr. 363-23 to 364-1). Hardy did not agree, stating "I'm Muslim and he put that money up." (Tr. 364-3 to 4). Nothing happened to Tyson. (Tr. 364-11 to 12).

Dr. Yvonne Milewski, Deputy Chief Medical Examiner, testified that Baum's "[i]mmediate cause of death is a single gunshot wound to the head." (Tr. 2147-7 to 14; 2156-4 to 9).

## IV

### THE MURDER OF JAMES "J.R." HAMILTON

### Count Five: Conspiracy to Commit Murder in Aid of Racketeering (James Hamilton)

### Count Six: Murder in Aid of Racketeering (James Hamilton) (August 1, 2000)

### Count Sixteen: Unlawful Use of a Firearm (James Hamilton)

### Count Seventeen: Firearm-Related Murder (James Hamilton)

J.R. Hamilton "had supposedly transported Neno (sic) outside of the projects when he shot Wise." (Tr. 2447-24 to 2448-1). Hardy decided that J.R. Hamilton had to be murdered. (Tr. 2449-2 to 9). Several attempts were made to kill Hamilton. (Tr. 250-5 to 19; 272-19 to 275-24; 2447-18 to 2449-125). Hardy called Bryant and advised him that Hamilton was on the corner of DeKalb and Bedford, and that Bryant should send someone over to kill him. However, Hamilton was surrounded by "a bunch of guys" with guns so no attempt was made. (Tr. 272-25 to 273-24).

Footman heard Hardy and Granton arguing about Granton not yet killing Hamilton. (Tr. 1913-20 to 1914-9). Granton told Hardy: "I'm on top of it. I'm handling it." (Tr. 1915-6 to 12).

Shelby "Moo" Henderson testified pursuant to a cooperation agreement. Henderson testified members of the CMB had received information "[t]hat a bounty had been placed upon World [Hardy]

21

and Taz' [Cooke's] head of $50,000 . . . by Muhammad Noor, Mike Tyson and JR Hamilton." (Tr. 1315-14 to 1316-5).[12]

On the night Hamilton was murdered, Henderson was with Granton and Cooke. Cooke drove past "JR's eatery, which was a fish and chip." (Tr. 1309-20 to 1310-1). They returned to where Cooke's "other family was at" and Granton "change[d] his outfit and put a bulletproof vest and a cap of some sort. And then Taz [Cooke] had passed him a weapon" which was a "TEC-9." (Tr. 1312-15 to 1313-22). They went downstairs; Henderson saw Granton enter a car and Henderson remained behind. (Tr. 1314-10 to 20). A few days after the Hamilton murder, Granton advised Henderson he had shot Hamilton "right through the window. And then he said the gun jammed, and so he went inside, there was some

---

[12] Henderson pleaded guilty to conspiracy to murder JR Hamilton, facing a sentence of from zero to ten years maximum. (Tr. 1259-23 to 1261-13; 1314-24 to 1315-9). He murdered a man when he was 19 years old ("I stabbed him in the heart";" Tr. 1356-13), for which he served a 22 month sentence. (Tr. 1263-10 to 1264-4). He collected welfare while working. (Tr. 1265-7 to 10). He committed check fraud (Tr. 1265-19 to 21), credit card fraud (Tr. 1266-6 to 7), numerous violent assaults, including assault with a black jack and beating a woman with a car jack. (Tr. 1267-10 to 1268-14; 1278-20 to 25; 1363-12 to 1364-4; 1364-18 to 1365-22). Pursuant to his cooperation agreement, Henderson would not be prosecuted for credit card fraud, bank fraud, conspiracy to possess and possess forged traveler's checks, corporate and personal checks, illegal possession of a firearm, selling copyrighted movies, conspiracy to burglarize an electronics store, and conspiracy to murder Tyrone Baum in aid of racketeering. (Tr. 1405-24 to 1407-24).

people around JR, and he said he had . . . no beef with them, so he didn't do anything to them, and then he continued and finished him off." (Tr. 1331-14 to 1332-5). Henderson had no personal knowledge that Granton shot Hamilton as he "was not there and . . . did not see what happened." (Tr. 1400-1 to 9). Henderson admitted "people have lied to me." (Tr. 1402-8 to 9).

Bryant testified that Granton and he had "a few conversations about" Hamilton's death; he was with Granton in a bar when they pulled next to a car in which Ulysses Hamilton was seated with "a, like, wide-eyed stare" and Granton told Bryant "that's how he was looking when I ran up on his Brother," meaning "that that's how Ulysses (present when Hamilton killed) is looking when he killed JR." (Tr. 277-9 to 20).

Bryant testified that "Taz and Thor told me . . . E-Bay killed him." (Tr. 348-2 to 3). They said Granton ran into a restaurant and shot Hamilton, his "gun jammed, so he ran back out and he unjammed it, and he ran back in and shot him again, and he ran back out and unjammed the gun again, and ran back in." (Tr. 348-5 to 15). The "gun jamming" story enhanced Granton's reputation "tremendously" as it "takes a lot of heart to shoot like that." (Tr. 349-7 to 13; 350-5 to 6). Sarkissian overheard Meyers and Cooke talking: "that E-Bay had ambushed

23

somehow JR in a restaurant." (Tr. 880-11 to 25). One day Granton stated to Footman: " . . . be on point. We just knocked J.R. off." (Tr. 1916-3 to 13). Meyers testified that he, Cooke, Abubakr, Granton[13] and Abdul Azziz went to the Galaxy Diner

(joined by World and "some young ladies"), and Abdul Aziz described the JR Hamilton murder: "He was being boastful about the fact that he had a shotgun, and he was standing in the middle of the street, holding E-Bay down, which is backing him up, and E-Bay went into the establishment and shot JR." (Tr. 2479-2 to 25; 2481-9 to 22). The next day, Granton again described the J.R. Hamilton murder to Meyers: "how he went inside the establishment with the firearm. He said he fired, and people started running, and JR fell to the floor, and the gun jammed, and he unjammed it by . . . [f]ired again until the gun jammed a second time. Then he unjammed it, and then fired again, and then ran out of the store." (Tr. 2482-7 to 23). The autopsy of Hamilton concluded "[t]he cause of death was gunshot wounds." (Tr. 2153-7 to 17).

---

[13] Meyers testified as to Granton's murder of "Crazy Troy" Davis. (Tr. 2298-4 2299-16; 2392-19 to 2393-9). This is described in Argument, *Point II, 6), infra*. Granton's stature increased after this: "he was more revered as an individual who would get the job done." (Tr. 2310-11 to 16).

24

Defendant incorporates the preceding sections as to the firearm-related counts (Counts Sixteen and Seventeen).

V

<u>Count Nine: Murder in Aid of<br>Racketeering (Johan Camitz) (August 9, 2000)</u>

On the evening of August 9, 2000, Sarah Justine Kurland, a photographer and teacher, met Johan Camitz at a bar on Spring Street. (Tr. 1121-19 to 1122-24; 1123-21 to 23). The bar closed and they left at around 3:00 to 4:00 a.m. (Tr. 1125-25 to 1126-12). While on Spring Street, Camitz was struck by a car and killed. (Tr. 1127-24 to 1128-3). A few minutes before they had heard what sounded like shots. (Tr. 1129-20 to 22). Kurland left in a panic but spoke with police the following day. (Tr. 1132-5 to 14).

On August 9, 2000, Dale Simon had gone to a nightclub called NV and left the club at around 3:30 a.m. Simon recognized a friend of his, Ivery Davis, when he left. (Tr. 2115-19 to 2116-9). Simon and Davis conversed, with Davis sitting in his Range Rover and Simon standing on the sidewalk, when Simon heard three shots. Simon "ducked to the left side of the wall where the club was and hopped in my truck." The Range Rover pulled off "very, very, very, fast" and Simon noticed that the vehicle "halfway down the block . . . had flipped over."

25

(Tr. 2117-10 to 2118-7; 2120-17). Davis "was hanging out the window, and there were people trying to rob him" of "his jewelry, his watch . . . people are trying to take his watch and jewelry off." (Tr. 2121-15 to 21).

Jamal Ashby exited NV around 4:00 a.m. and was standing outside while his friend Dale was speaking with Davis seated in a black Range Rover. (Tr. 2462-3 to 2463-25). Ashby "just heard shooting, and [he] ducked." They drove down the street "because the guy that got shot, he drove down the street." (Tr. 2464-21 to 2465-25). He saw the Range Rover flipped and Camitz "laying in the street . . . in bad shape." (Tr. 2466-4 to 24). The autopsy of Camitz concluded that "[t]he cause of death is blunt force trauma to the neck, which resulted in a fracture of the cervical column and complete transection of the spinal cord." (Tr. 2160-12 to 2161-14).

## VI

### THE MURDER OF IVERY DAVIS

#### Count Seven: Conspiracy to Commit Murder in Aid of Racketeering (Ivery Davis)

#### Count Eight: Murder in Aid of Racketeering (Ivery Davis) (August 10, 2000)

#### Count Eighteen: Unlawful Use of a Firearm (Ivery Davis)

#### Count Nineteen: Firearm-Related Murder (Ivery Davis)

On August 10, 2001, Davis was shot in his vehicle at Hudson

26

and Spring Streets, and he proceeded to drive until he crashed, striking and killing pedestrian Johan Camitz. (Tr. 57-22 to 58-21).  By way of background, after Myron was killed Hardy (incarcerated at the time), told Meyers they needed "[t]o kill Peanut [Davis]." (Tr. 2420-12 to 2420-25).  James "Jimbo" Farrior had told Footman that Davis was responsible for Myron's murder. (Tr. 1905-14 to 1906-7).  In the ensuing months, Meyers had conversations with Bryant and Granton about killing Davis for "[r]evenge" for Myron's death. (Tr. 2434-11 to 23).

On one occasion, Granton, Bryant and Meyers were walking and Davis was spotted.  Granton "pulled out a firearm and went . . . towards the vehicle" but Davis drove away. (Tr. 2435-2 to 13).  A short while later, Davis returned and began shooting at them, but "[n]o one was hit." (Tr. 2436-19 to 2438-3).

Meyers, Granton, and others heard Davis was "on Willoughby, between Kent and Taffy" and as they approached they heard gunfire and returned to LG. (Tr. 2439-14 to 2440-21).  Another shooting occurred at a nightclub; (Tr. 2440-22 to 25); another involved Bryant and Meyers exchanging gunfire with Davis on the street, with no one hit. (Tr. 2441-5 to 2442-16).

After Myron was killed Footman was with Hardy outside of a nightclub in Manhattan when Davis pulled up and asked Hardy "What's up?"  Hardy answered "my brother what's up" and Davis

27

said "you keep playing, you going to be where your brother at." Hardy wanted "to shoot Nut through the window as he pulled up to his truck" but was talked out of it. (Tr. 1902-10 to 1903-13). After this incident, Hardy told Footman that Davis was going to be killed. (Tr. 1904-7 to 12).

Bryant testified that one night Hardy called him and advised "that he ran into Peanut [Ivery]" at a club. Davis had "two guys" with him who both had guns that were "visible." Bryant kept trying to speak with Hardy, who was too angry to speak. Hardy asked "where my brother at?" and "I want to go where my brother at" to which Davis replied "that could be arranged." (Tr. 354-9 to 355-22). Bryant took this to mean "That World [Hardy] could be killed, too." (Tr. 356-2 to 4). Bryant advised Hardy that he should avoid going to night clubs since Davis would frequent them. (Tr. 356-10 to 21).

Footman testified that Granton said, prior to Davis being killed, "That Nut have to get it." (Tr. 1920-14 to 22). Footman testified that Granton would also say "Son [Hardy] was bugging. You got to get this done." (Tr. 1921-12 to 17). Footman had tried to kill Davis "two or three times" but could not find him. (Tr. 1906-13 to 24). Footman agreed to kill Davis with the CMB not only because Davis tried to kill Footman, but because "he have Wise [Hardy] killed." (Tr. 2049-19 to 2050-19).

28

Uasia "Plum" Davis (Tr. 749-21 to 22), a drug dealer and cousin of Ivery Davis, testified that in the early 1990's Myron Hardy knocked on Davis's door looking for him. Hardy and Davis exited the hallway and when Davis returned "his face was gashed up with blood." Hardy had "set him up." (Tr. 745-2 to 746-19).

Bryant testified that once when he "was standing on the side of 433 with Thor and E-Bay" Davis fired his gun at them and after one shot, the gun jammed. They gave chase and returned fire. Bryant later heard that Granton had shot at a truck with Davis inside. Davis contacted Bryant who "wanted E-Bay" for shooting at him. (Tr. 245-13 to 246-12).

Johnson testified that there were two shootings between the CMB and Davis. The first witnessed by Johnson "in the LaFayette Gardens projects in front of 433. Peanut [Ivery] came through, and he came through shooting, as well as Troub telling me that they shot at Peanut of Grand Avenue." (Tr. 669-24 to 670-14).

On the night Davis was murdered, Meyers received a call from Hardy who advised that he was at Club NV and right behind Davis. Meyers contacted Granton who came to Meyer's apartment. Meyers gave Granton two guns, and Granton left for Manhattan without Meyers. (Tr. 2485-15 to 23; 2490-20 to 2494-18). Meyers decided to join Granton after about 15 to 20 minutes and took the train to Manhattan. As Meyers approached the club, he

29

called Hardy on his cell phone and Hardy described a black truck. Meyers saw the black truck and saw Granton exit the back passenger door. Meyers heard "the loud report of gunfire, and saw the flash from behind the vehicle" but he could not see Granton. He then went home. (Tr. 2494-19 to 2498-24). Meyers could not see where Granton was firing ("I couldn't see which direction he was pointing;" Tr. 2559-18 to 21). Meyers spoke with Granton later that night and Granton was angry at Hardy for not letting him get into the vehicle. Granton had to take a train and was concerned since "a young guy by the name of Shay [Black] from the projects, who was working in New Jersey . . . was coming home" and saw Granton. (Tr. 2499-15 to 2500-14).

Bryant received a phone call from Granton who stated: "I caught Tito last night." ("Tito" was a name used for Davis). (Tr. 357-8 to 16). Granton told Bryant how he killed Davis: "Nut was parked, and he was talking to somebody. And he walked up and started shooting him . . . from behind while he was in the driver's side of his truck." (Tr. 359-4 to 14). The shooting occurred near a nightclub. (Tr. 359-20 to 24). Hardy "grabb[ed] Granton playfully" and told him not to tell Bryant about it; but Bryant stated he already knew. (Tr. 361-12 to 16).

On the day that Davis was murdered (August 10, 2000), Uasia Davis was coming out of the front of LG and a group of men

30

(including Granton and Hardy) were taunting her saying "We won, we got him." (Tr. 798-12 to 25). Uasia testified that a month after Davis's murder, she asked about her cousin Ivery, and Hardy replied: "that's big boy's business, mind your business, yeah, my nigger E-Bay popped that." (Tr. 765-3 to 23). Henderson testified that Granton stated he had killed Davis: "Without mentioning any name, he mentioned it clear (sic) that he shot in a triangle fashion; ahead, right left." (Tr. 1335-25 to 1336-17). Granton shot this way "because he could not see him [Ivery] clearly, because he's in a car." (Tr. 1337-6 to 8).

Footman testified that after Davis was killed, Granton said "we just knocked your boy Tito off." "Tito" was a nickname for Davis; this meant the CMB had killed Davis. (Tr. 1923-14 to 1924-2). Footman saw Granton with a weapon (a 40-calber gun) after the Ivery killing and Granton stated he had to get rid of the gun. (Tr. 1924-3 to 1925-15; 2010-20 to 2011-14).

Footman testified that Granton described the Davis murder: "He did it the smooth way. He crept up on the truck. He said he shot Nut and Nut took off. Took off crazy and crashed." (Tr. 1926-4 to 6). Footman also heard Granton arguing with Hardy over money not being paid to Granton: "He [Granton] was yelling. He said I got this niggas (sic) who killed your brother and mentioned something else and that was it." (Tr. 1928-4 to 6).

31

After the Davis murder, there was "a celebration of the killing of Peanut" at Hardy's mother's apartment. Granton, Hardy, Bryant, Meyers, and Henderson were present and "[t]here was a conversation . . . to kill Mike Tyson." (Tr. 1337-15 to 1338-8).

Meyers testified that Davis would slap and abuse women and that conduct made enemies of their husbands, fathers and brothers. (Tr. 2579-23 to 2580-3).

The autopsy of Ivery Davis with the following result: "[c]ause of death are gunshot wounds to the torso that injured the heart, lung and diaphragm." (Tr. 2157-19 to 24).

## VII

### Count Twenty-Three: Conspiracy to Distribute Cocaine Base (50 grams or more)

### Count Twenty-Four: Distribution of Cocaine Base (50 grams or more)

Defendant incorporates the preceding sections and adds the following. Bryant testified that they would use various LG apartments to "cook" ("turn the coke into crack") and bag crack cocaine, which would then be sold by various workers. (Tr. 162-13 to 164-1). The crack cocaine would be packaged in small vials which would be sold for $3.00 a piece (called "treys"); a worker would be given 100 vials (a bundle of 10 was called a "pack" or "bomb") to sell and receive $20.00 for selling, with

32

the remaining money going to Hardy. (Tr. 165-25 to 166-16). During the late 1980's they "sold a whole lot . . . We got rid of probably a 300 pack in probably like 20 minutes, 20, 30 minutes maybe." (Tr. 166-20 to 167-1). Customers would buy "[f]ive, ten" vials. (Tr. 167-2 to 3). In the early 1990's they made between $8,000 to $10,000 per day. (Tr. 345-3 to 7).

Lamont Johnson testified that in 1991 Granton sold drugs working "the graveyard shift" or "12 to 8." (Tr. 603-17 to 22). James "Jimbo" Farrior, "Keith" and Bryant sold drugs in 1998. (Tr. 657-3 to 13). Henderson held drugs for CMB; and on one occasion was given drugs by Hardy and passed them to Granton. (Tr. 1295-23 to 1296-4; 1334-15 to 1335-7).

Uasia "Plum" Davis (Tr. 749-21 to 22) "never seen [Granton] sell drugs. I never seen that." (Tr. 751-21 to 23). Sarkissian never saw Granton sell drugs. (Tr. 938-7 to 8).

Djebara McMillian[14] sold drugs for the CMB from 1993 through 1999 in front of the LG building. (Tr. 1033-13 to 17). McMillian was paid $10 for every $150 bag he sold. (Tr. 1048-9 to 13). As to Granton's role in the CMB, McMillian testified:

---

[14] In 2006, a year after his arrest, McMillian entered a cooperation agreement and pleaded guilty to conspiracy to distribute and distribution; he faces a minimum of ten years and a maximum of life. (Tr. 1033-18 to 1034-7; 1098-23 to 1099-3).

"I really didn't see E-Bay much during my time." (1039-3 to 4).
McMillian sold drugs through 2005. (Tr. 1112-5 to 13). Hardy
would cook the crack cocaine in the apartments. Footman and
Jones would "re-up." (Tr. 1931-4 to 1932-6).

## VIII

### MURDER OF TROY SINGLETON

#### Count Twenty-Five: Murder-For-Hire Conspiracy (Troy Singleton)

#### Count Twenty-Six: Murder-For-Hire
#### (Troy Singleton) (October 27/28, 2001)

Emanuel Mosley, a cooperator who pleaded guilty to two
contract murders,[15] was hired by Supreme McGriff to kill Troy
Singleton. Mosley testified that he killed Singleton with

---

[15] Mosley had faced the death penalty but, per his plea and
cooperation, has a chance at having his life sentence reduced.
(Tr. 1481-6 to 1483-7; 1577-4 to 9). He pleaded guilty to gun
possession at age 16. (Tr. 1484-20 to 1485-7). When he was
eighteen he began selling powdered cocaine in Pennsylvania,
which he did for several years. (Tr. 1485-23 to 1488-2). He was
arrested with 150 grams of coke in New York in 1989. (Tr. 1488-
14 to 22). He received a bench warrant and never appeared. (Tr.
1489-1 to 5). In 1992, when he was 20 years old, he was
arrested in Pennsylvania for selling drugs, cooperated, and
received a sentence of "eighty-something months." (Tr. 1492-9 to
1494-11). He was released from federal prison in 1998 at age
27, and after a short stint as a personal trainer went back to
drug dealing while still on probation (lying to his probation
officer). (Tr. 1495-13 to 1497-8). Mosley dealt drugs up until
his arrest for the contract killings on January 20, 2006. (Tr.
1497-16 to 22). Mosley never paid taxes on the $600,000 plus he
earned selling drugs. (Tr. 1584-2 to 1585-11). Mosley committed
"hundreds" of crimes between the ages of 13 and 35 (when
incarcerated for the federal case). (Tr. 1594-11 to 1595-7).

Granton's assistance. (Tr. 1479-21 to 1481-5).

Around the year 2001 Mosley met Supreme McGriff, the boss of "the Supreme Team," a group of "[d]rug dealers, killers" located in Queens. (Tr. 1506-23 to 1507-15; 1513-13 to 14). Mosley met McGriff a month or two later and McGriff asked Mosley if he "would be able to put any kind of work for him" which meant "selling drugs or help protect him or something." (Tr. 1507-21 to 1509-1). McGriff advised Mosley that there were people who wanted to kill him and McGriff wanted Mosely to kill someone. (Tr. 1509-3 to 13). Mosley had a street reputation as a killer. (Tr. 1510-2 to 9). Mosley agreed and he and McGriff exchanged numbers. (Tr. 1510-16 to 22). McGriff called Mosley a few weeks later and they met in Queens. McGriff explained that the men he wanted killed were "trying to kill Irv Gotti, was trying to actually rob him and extort him." Irv Gotti ran a music company called Murder, Inc. (Tr. 1511-11 to 1512-13). McGriff wanted four men dead: "Big Nose Troy [Singleton], E Money Bags, a guy named Homicide and . . . Green Eyed Born." (Tr. 1513-5 to 12). The contact was $25,000 per person. (Tr. 1514-5 to 10). Mosley hired four individuals to assist him: "TJ" [Clemente Jordan], Barry Broughton, [Alvin] Smiley and "Les" [Russell Allen]." (Tr. 1516-14 to 18; 1671-5 to 6; 1665-4 to 6).

After "a few months. Maybe a month and a half or so"

35

Mosley's crew killed E Money Bags on July 16, 2001. (Tr. 1528-11 to 1532-7; 1534-15 to 17). McGriff paid Mosley $25,000 in cash. (Tr. 1532-12 to 1533-1). Mosley paid Allen, Barry Broughton and Smiley $4,500 each, and $3,000 to TJ, because he had not fired any shots. (Tr. 1533-5 to 10).

Mosley then recruited Granton to assist in killing Big Nose Troy. Mosley met Granton through "a guy named Kiddo [Crawford]." (Tr. 1533-14 to 1536-2). Kiddo Crawford had told Mosley "that E-Bay was one of the guys that put a lot of work in this neighborhood." (Tr. 1537-22 to 25). Mosley asked Granton to participate in the murder and Granton accepted, and joined the others in looking for Singleton. (Tr. 1537-24 to 1538-7). Mosley eventually killed Singleton after he received a two-way page from McGriff that the targets were at a certain club. At the time he received this page from McGriff, Mosley was in a car with Granton, Broughton and Smiley, with Mosley driving. (Tr. 1540-3 to 1541-11). They found the club (the Van Wyck Sports Bar on Liberty Avenue in Queens; Tr. 1698-6 to 8; 1700-15 to 18), noticed the truck he had been told about, and waited to see who went to the truck. The truck started without them seeing who got in, and Mosley then saw an individual approaching the truck who resembled Singleton. Mosley "told the shooters that that was him. I was almost positive that was him. I was

36

not sure, but I was almost positive." (Tr. 1542-1 to 1544-7).

Mosley told them "to shoot him.  E-Bay got out the car first."
(Tr. 1544-17).  Granton then "shot him in his head." (Tr. 1545-6
to 8).  Broughton shot Singleton after Granton, and Singleton
fell on the street.  Smiley then also shot Singleton. (Tr. 1546-
3 to 21).  The three men got into the car, and Granton was
driven to Brooklyn.  Mosley asked Granton if he could get rid of
all the guns, Granton told him "yes," and Granton took all of
the guns. (Tr. 1547-17 to 1548-10).  A few days later McGriff
paid Mosley $25,000, and McGriff gave each of the men, including
Granton, $5,000. (Tr. 1549-1 to 21).

The men looked for Homicide "for a small while" but did not
locate him. (Tr. 1550-1 to 12).  After McGriff was locked up
they stopped looking for the others. (Tr. 1550-22 to 25).

Mosley continued to sell "[k]eys of cocaine" from 2001
until his arrest on January 20, 2006. (Tr. 1551-6 to 13).

Alvin Smiley[16] pleaded guilty in December of 2006 to murder
for hire (victims Eric Smith and Troy Singleton) (Tr. 1599-14 to

---

[16]  Smiley initially faced the death penalty (Tr. 1673-5 to 8),
but per his cooperation was seeking a 5K letter. (Tr. 1673-21 to
24).  Smiley dropped out of high school and began selling drugs
("[c]rack and cocaine").  He did so for several years eventually
selling only cocaine since "[i]t was an easier clientele." (Tr.
1603-2 to 1607-3).  Smiley would sometimes beat up his crack
cocaine clients. (Tr. 1674-13 to 24).  He shot a man (who had

37

19; 1600-21 to 25). Smiley faced a maximum of life and was seeking a reduction in sentence for his cooperation. (Tr. 1601-1 to 14). Smiley committed the Singleton murder with Granton, Trip, and Mosley, (being hired by Mosley). (Tr. 1600-1 to 7).

Smiley met Mosley through Russell Allen, and Mosley offered him money to participate in a murder. Eventually, when told the money involved would be "between 175 and 250,000" Smiley "agreed to be involved with the murders." (Tr. 1611-15 to 1614-2).

Smiley, along with Devine (Dennis Crosby, a/k/a How About; Tr. 1664-18 to 21), Russell "Les" Allen (Tr. 1665-4 to 6), Barry "Trip" Broughton and TJ, murdered "E Money Bags." Smiley shot with a TEC-9 "[a]round 15 times." (Tr. 1620-22 to 1623-24). Mosley saw them later and paid them $25,000, with Smiley getting $7,500. (Tr. 1624-25 to 1625-13).

Smiley saw Mosley a few months later in October 2001 after Broughton told him "we got to go put in some work." (Tr. 1625-20

---

tried to steal his bike) in the chest with a shotgun in 1996 (Tr. 1607-16 to 1609-23). Smiley sold cocaine from 1997 to 2003. (Tr. 1610-19 to 22). Smiley pleaded guilty in Maine to having a fake ID and served four months in jail for that. (Tr. 1638-12 to 1639-7). Smiley was arrested in February of 2003 after a search of his house uncovered an assault rifle. He pleaded guilty and was sentenced to three years, being released on October 29, 2005. (Tr. 1639-14 to 1640-24). Upon release, Smiley worked "in an after-hours spot" until his arrest in June of 2006. (Tr. 1641-3 to 15). He decided to cooperate with the government in December of 2006. (Tr. 1642-1 to 3).

38

to 1627-2).  Broughton took Smiley to a car in which Granton and Mosley were seated.  Smiley had never seen Granton before. (Tr. 1627-6 to 17).  Mosley made a call and then advised "where the guy was at that we needed to go murder." (Tr. 1628-9 to 13). They went to a club, parked, and after a few minutes saw Singleton walking towards his Jeep.  The men left their car, with Granton leaving first.  Granton had given a gun to Smiley and a gun to Broughton.  Singleton was not paying attention and they "snuck around the Jeep . . . And then E-Bay ran up on him and shot him, and then Trip shot him, and then I shot him." (Tr. 1629-9 to 1631-10).

Singleton fell and they drove to Brooklyn.  Smiley fired "[t]o earn my money." (Tr. 1632-8 to 1633-15).  They gave the guns to Granton, dropped him off in Brooklyn, and then Broughton, Smiley and Mosley went back to Harlem. (Tr. 1634-4 to 18).  Smiley was paid "[m]aybe a day later" "[b]etween 65 and 6800" dollars. (Tr. 1636-2 to 15).

The autopsy of Troy Singleton listed as the cause of death a "[s]ingle gunshot wound to the head that injured the brain and fractured the skull." (Tr. 2162-17 to 22).

THE DEFENSE CASE

New York State Division of Parole (75th Precinct; East New York, Brooklyn) Senior Parole Officer Hal Wilkerson began

39

supervising Granton in 1999. (Tr. 2690-9 to 17; 2693-6 to 7).

Wilkerson testified that Granton's "overall adjustment to parole

was fair.  He reported to Parole as instructed, he abided by the

state mandates and we really didn't have any problems with him

during his supervision period." (Tr. 2695-4 to 9).  Wilkerson

believes that Granton was released "a little bit earlier than

his maximum expiration date." (Tr. 2695-10 to 14).

Also admitted were the criminal history of Edward Cooke,

a/ka Taz (Exhibit DH 30; Tr. 2708-9 to 16), along with DH32

(cooperation agreement of Edward Cooke, pursuant to which "he

faces a maximum term of imprisonment of life and zero on the

first count, and a maximum term of up to life on the second

count which is a narcotics charge." (Tr. 2708-18 to 23).  "DH

33" is the transcript of Cooke's guilty plea which was entered

on April 14, 2005. (Tr. 2708-24 to 2709-1).

DH 37 is a stipulation which reads:

> In 2010 the government became aware of
> the circumstances that cooperating witness
> Edward Cooke, a/k/a Taz, had engaged in
> sexual relations and was corresponding with
> a female corrections officer, CO, at his
> place of confinement, the Metropolitan
> Detention Center in Brooklyn.  When
> interviewed about this on July 1, 2010 by
> Special Agents of the Office of Inspector
> General and the FBI, Mr. Cooke made a
> materially false statement and told the
> agents that he had not engaged in sexual

**40**

relations with the CO and had not corresponded with her.

On March 16, 2015 Mr. Cooke was charged by information with a violation of 18, United States Code, Section 1001, making a false statement in a matter within the jurisdiction of the executive branch of the government of the United States. That charge carries a maximum penalty of up to five years.

The cooperation agreement that Mr. Cooke entered into in 2005 remains in effect. Whether a cooperation agreement remains in effect involves a number of considerations including in this case that Mr. Cooked (sic) already served the mandatory minimum sentence and the lack of a 5K motion does not affect the statutory minimum penalties provided and Mr. Cooke remains incarcerated. (Tr. 2709-6 to 2710-4).

41

<u>**SUMMARY OF ARGUMENT**</u>

1) The district court abused its discretion in granting the government's motion for an anonymous and partially sequestered jury.

2) The district court abused its discretion (or committed plain error) in admitting over defendant's objection numerous alleged prior bad acts of the defendant (along with the "bad acts" of other individuals) and such error was not harmless.

3) Improper comments and questioning by the trial judge deprived defendant of his due process right to a fair trial.

4) The district court erred in denying the motion for judgment of acquittal as to each of the counts.

**LEGAL ARGUMENT**

**POINT I**

**THE DISTRICT COURT ABUSED ITS DISCRETION IN
GRANTING THE GOVERNMENT'S MOTION FOR AN ANONYMOUS
JURY AND FOR A PARTIALLY SEQUESTERED JURY IN
VIOLATION OF DEFENDANT GRANTON'S FIFTH AMENDMENT
DUE PROCESS RIGHT AND SIXTH AMENDMENT
RIGHT TO A FAIR AND IMPARTIAL JURY**

The standard of review for this issue is abuse of
discretion. *United States v. Pica*, 692 F.3d 79, 88 (2d Cir. 2012)
(the basic law on this issue is unchanged since the 1990's; an
anonymous jury may only be empaneled when a district court finds
a "strong reason to believe the jury needs protection." Id.)

The government moved for an anonymous and partially
sequestered jury which defendants opposed.  At the end of the
competency hearing for Hardy, the district court advised: "we're
going to go forward with the anonymous jury, but I'm not going
to require any form of sequestration or overreaching by marshals
bringing the jurors in and out and taking them home and back in
certainly the first instance.  I want the jurors to feel that
this is a normal process" (Tr. 3/24/15; pp. 117-22 to 118-1).
On March 31, 2015, the district court put its ruling on record:

> I have concluded based on the serious
> nature of the charges, which include a
> charge of attempted murder of a cooperating
> witness, and Mr. Hardy's prior conviction
> for witness tampering that an anonymous jury
> is warranted here.  I reject defense

**43**

> counsel's suggestion that the charged
> enterprise no longer poses a threat of
> violence; whether or not Cash Money Brothers
> is a going concern, I am satisfied that the
> defendants still have the means of juror
> intimidation at their disposal.
>
> To protect against any possible
> prejudice to the defendants, I have told the
> prospective jurors that we are using the
> "number" system to protect their privacy
> because of the media coverage the case might
> generate –– which is, in fact, a real
> concern. (Tr. 3/31/15; pp. 253-17 to 254-5).

As explained in *United States v. Mostafa*, 7 F.Supp.3d 334 (S.D.N.Y. 2014), the principle that a shield of innocence surrounds a defendant extends back to ancient times. *See Coffin v. United States*, 156 U.S. 432, 453-54, 15 S.Ct. 394, 39 L.Ed. 481 (1895). Any practice that may impact that shield of innocence requires close scrutiny in light of reason, principle and common sense. *See Estelle v. Williams*, 425 U.S. 501, 504, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). The empaneling of an anonymous jury is such a practice and should be taken only in limited circumstances. *See United States v. Vario*, 943 F.2d 236, 239, 241 (2d Cir. 1991) *cert. denied*, 502 U.S. 1036, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992); *United States v. Thomas*, 757 F.2d 1359, 1365 (2d Cir.), *cert. denied*, 474 U.S. 819, 106 S.Ct. 67, 88 L.Ed.2d 54 (1985). *See State of New Jersey v. Accetturo*, 261 N.J. Super. 487 (Law Div. 1992) (in prosecution of alleged Lucchese organized crime family, the facts presented did not

44

support the request for an anonymous jury).

This Circuit has set forth three factors that a district court should examine: (1) whether the charges against the defendant are serious, (2) whether there is a substantial potential threat of corruption to the judicial process, and (3) whether considerable media coverage of the trial is anticipated. *See United States v. Tomero*, 486 F.Supp.2d 320, 322 (S.D.N.Y. 2007); *see also Thomas*, 757 F.2d at 1365. As stated in *Mostafa*:

> Among the reasons that courts have found to warrant protection are threats to the judicial process by way of jury tampering or jury safety. *See Vario*, 943 F.2d 236; *United States v. Bellomo*, 954 F.Supp. 630, 654 (S.D.N.Y. 1997). The fact that a case may receive press attention—even a great deal of press attention--is itself insufficient to justify the impact on a defendant's trial that empaneling an anonymous jury may have. *See Vario*, 943 F.2d at 240. Similarly, the mere incantation of words such as "terrorist," "terrorism," "al Qaeda," "Bin Laden," and "9/11" is insufficient to require an anonymous jury. *See Vario*, 943 F.2d at 241; *Tutino*, 883 F.2d at 1132-33. *Mostafa*, *supra*, 7 F.Supp.3d at 337.

As also explained, "The Second Circuit has found that a district court erred in empaneling an anonymous jury based on the fact that the case involved assertions that defendants were members of the Mafia rather than based on 'the question of juror fears or safety in the trial at hand, beyond the innuendo that

45

this connection conjures up.'" *Vario*, 943 F.2d at 241.

In *United States v. Briseno*, No. 2:11-cr-77 PPS (ECF 1077, decided September 30, 2014)[17], the Honorable Philip P. Simon, the Chief Judge of the Northern District of Indiana found that empaneling an anonymous jury in that gang-related (the Imperial Gangsters) case would be an abuse of discretion. (*Briseno*, page 6; A209). Judge Simon suggested that the factors that apply to almost every gang prosecution where someone is charged with violence and is facing a lengthy prison sentence if convicted "would make empaneling an anonymous jury the rule rather than the very narrow exception that it ought to be." (*Id*. at page 3; A206). Judge Simon denied the motion though defendant Briseno faced the death penalty and was charged with 22 counts including 6 murders and 4 attempted murders.

When the trial in *Granton* began in April of 2015, the alleged RICO enterprise in this case (the CMB) had been out of business and defunct since 2004. In spite of the government's protestations, no proof was ever presented that anyone in the organization was in position to tamper with the jury or likely

---

[17] The *Briseno* Order/Opinion is attached to Document 895 filed 2/09/15; Hardy's "Memorandum and Appendix Opposing Motion In Limine For an Anonymous and Partially Sequestered Jury" filed below on February 9, 2015 is annexed at A193-210.

46

to do so. Hardy had disappeared into the haze of a serious and debilitating mental illness with anti-psychotic medication. Neither Granton nor Hardy had the money nor wherewithal to attempt to improperly influence the jury.

Moreover, in two prior trials the government prosecuted three members of the CMB in the Eastern District. Specifically, Kenwayne Jones and James Sessoms, alleged CMB members, stood trial before the late Judge Trager in the Fall of 2006. Mr. Sessoms was sentenced by Judge Block to 35 years. (ECF 729). Mr. Jones, whom the government described in its sentencing memorandum as Hardy's "most trusted confidant" and "right-hand man" (ECF 306 at p. 3) received a sentence of 13 years. (ECF 444, 445). In the summer of 2008, the government prosecuted alleged CMB member Abubakr Raheem for murder and related offenses. He was convicted on all counts and sentenced by this Court to a term of life imprisonment. (ECF 734). Neither of those juries were anonymous, and neither of the juries was subject to any special protective measures. The trials of both cases yielded guilty verdicts and lengthy sentences.

At both the *Jones/Sessoms* and *Raheem* trials, the government called, and thus exposed, many of its cooperating witnesses and numerous "civilian" witnesses. No harm ever came to any of those witnesses, nor were there any reports of harm to their

47

family members.   Important parallels can be seen between *Granton*

and *Briseno*, as the following quote makes clear:

> Briseno also persuasively responds that
> the East Chicago gang has been largely
> demolished by this prosecution, in which 23
> other defendants have already been convicted
> and are incarcerated.  Juan Briseno is, in
> effect, the last man standing from a group
> that now includes a number of former
> associates cooperating against him (rather
> than interested in plotting juror
> intimidation on his behalf).  The prospect
> of Chicago or Florida IG's coming to
> Northwest Indiana to intimidate jurors is of
> course possible but has not been
> demonstrated to be at all likely.  I note
> also that I have already conducted the trial
> of Briseno's co-defendant Richard Reyes, for
> which an anonymous jury was not requested,
> and during which there was no attempt at
> intimidation of the jurors.  There is no
> persuasive demonstration of a likelihood of
> an attempt to interfere with the judicial
> process by intimidating jurors in the
> Briseno's trial. (A203).

Similarly, in *Granton*, Hardy and Granton were the last men

standing, and the government failed to make the requisite

showing that there was a strong reason to believe that the jury

needed protection.  More to the point and most telling, there

were no instances of actual or even perceived jury tampering or

attempted tampering.

The district court abused its discretion by granting the

motion for an anonymous jury in deprivation of Granton's due

process right to a fair trial.

48

## POINT II

THE DISTRICT COURT ABUSED ITS DISCRETION IN ADMITTING OVER DEFENDANT'S OBJECTION NUMEROUS ALLEGED PRIOR BAD ACTS OF THE DEFENDANT (ALONG WITH THE "BAD ACTS" OF OTHER INDIVIDUALS) AND SUCH ERROR WAS NOT "HARMLESS;" THE EVIDENCE WAS IRRELEVANT UNDER FEDERAL RULES OF EVIDENCE 401 AND UNFAIRLY PREJUDICIAL UNDER FEDERAL RULE OF EVIDENCE 403 AND RESULTED IN A DENIAL OF DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL

An evidentiary ruling is reviewable for abuse of discretion. To the extent any of the following grounds were not objected to, the standard is one of plain error.

Generally, Fed. R. Evid. 404(b) is not applicable to bar evidence that is in furtherance of a charged RICO conspiracy. *See, e.g., United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (affirming admission of evidence of violence committed on behalf of drug conspiracy because it explained the mutual trust between coconspirators; "Although defendants-appellants conceded that they were associated with the Latin Kings [gang], several issues still remained in dispute, including the existence, nature and operations of the [charged] RICO enterprise, and the related racketeering and drug conspiracies"); *United States v. Thai*, 29 F.3d 785, 812-13 (2d Cir.), *cert. denied*, 513 U.S. 977 (1994); *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992) *cert. denied*, 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993).

Granton submits that the following uncharged inadmissible "bad act" evidence was improperly admitted:

1) Robert Footman testified as to a shoot-out involving Granton in "a block called Skillman." Neither Granton nor anyone he shot at were struck. (Tr. 1811-13 to 1812-24).

2) Footman saw Granton shoot an individual named Jeff. (Tr. 1820-23 to 1821-8).

3) Meyers testified that Granton told him that he had killed someone named Troy for an individual named Dog and had done it for $200.00. Meyers said "What is wrong with you? Like, why would you do that?" and Granton replied: "It's not about what I got paid now. It's what I get in the future. They see my work." (Tr. 2538-21 to 2539-16).

4) Lamont Johnson testified that, in the summer of 1992, he and Granton committed an armed robbery of "[m]oney, jewelry" at a dice game. (Tr. 613-19 to 614-15).

5) Henderson testified Granton's sister was robbed and he, Granton, Azziz, Abubakr Raheem and Cooke "whooped their ass" in retaliation. (Tr. 1295-8 to 22).

6) Footman testified that Granton shot and killed an individual named Troy ["Crazy" Troy Davis; not Troy

Singleton]. (Tr. 1839-15 to 1840-6; 1844-18 to 1845-8). Granton told Footman that he killed Troy because "World [Hardy] had a problem with him." (Tr. 1821-9 to 1822-17). Bryant testified that Granton admitted to him that he had killed "Crazy Troy" Davis ("an enforcer for the Hamiltons"). (Tr. 203-16 to 20; 208-5 to 7). Johnson testified Myron told him in 1993 that "E-Bay" had shot and killed Davis, which "boosted his reputation." (Tr. 638-6 to 639-10). Meyers testified that, in the lobby of LG, he and saw "Troy on the floor and Ebay over him [Davis], firing a weapon." (Tr. 2305-11 to 2307-6).

7) In 1992 Granton was involved in a fight with "Dub Dub" and Dub Dub's brother Wilbert stated "you're not the only person that has guns." A CMB member named "Fonzo" then shot and killed Wilbert. (Tr. 621-18 to 623-20).

8) Theresa Gregory testified that after witnessing Fruitquan Bailey kill her friend Sean in 1992, Gregory was alone in an elevator with Granton when Granton asked Gregory if she was going to testify at Bailey's trial. Granton "kept saying, he needed to know. He needed to know this" and she "told him that I wasn't." (Tr. 104-11 to 105-4). Gregory did testify at Bailey's

51

1994 murder trial. (Tr. 476-21 to 25). In the year 1994 Gregory was shot "in [her] butt" after she observed Hardy on a bicycle with another individual on the back. (Tr. 205-22 to 106-19; 107-20 to 108-1; 115-2 to 14). Gregory never saw who shot her. (Tr. 112-4 to 6).

9) Footman attended a party in 1999 with other persons from LG and Granton advised him afterwards that he had shot an individual at the party who was about to pull out a gun. (Tr. 1897-9 to 1901-1). Meyers testified that in 1999 he loaned a .40-calber gun to Granton and later that night Granton advised Meyers that he had shot someone at a party with Meyer's gun. Granton wanted to give Meyers the gun back but Meyers did not want it. (Tr. 2483-6 to 2484-23).

Defendant Granton submits that these prior bad acts deprived him of his due process right to a fair trial, mandating a reversal of his convictions and a new trial.

## POINT III

**IMPROPER COMMENTS AND QUESTIONING OF WITNESSES
BY THE TRIAL JUDGE DEPRIVED DEFENDANT OF HIS
FIFTH AND SIXTH AMENDMENT RIGHT TO DUE PROCESS**

The standard of review is abuse of discretion.

During the direct examination of Allan Bryant concerning the murder of J.R. Hamilton by Granton, Bryant testified that he had heard that Granton's gun jammed at first, with Granton then unjamming the gun and shooting Hamilton. (Tr. 347-18 to 348-25). The following occurred:

> Q What did that gun jamming story do, if anything, for E-Bay's reputation?
> A Oh, it raised his reputation up tremendously.
> Q Tremendously?
> A Yeah.
> Q Why is that?
> A Because it takes a lot of heart to shoot like that. And the gun jams and you step outside of that situation and unjam the gun and go back again, not once, but twice. I mean, it takes a lot of heart to do that.
> Q When you say it "takes a lot of heart," what did you do (sic) mean?
>     MR. BEECHER: Objection.
>     THE COURT: No, overruled. It takes a lot of heart, <u>they're not very sensitive about killing somebody. You don't mean that, do you? That's heart when you care about another human being.</u>
>     THE WITENSS: No. I'm using in the slang term. Courage.
>     THE COURT: <u>The slang term means that they don't care about whether they kill somebody or not, right?</u>
>     THE WITNESS: No.
>     THE COURT: It took him a lot of courage to kill somebody?

53

THE WITNESS: No.  For the gun.
THE COURT: To unjam it?
THE WITNESS: To unjam it and go back to the scene.
THE COURT: To unjam it and go back and shoot somebody?
THE WITNESS: Yes.
THE COURT: Next question. (Tr. 349-7 to 350-16; emphasis supplied).

Judge Block erred with his comments "they're not very sensitive about killing somebody" and "they don't care whether they kill somebody" as he telegraphed his belief not only in Granton's guilt but that Granton was a remorseless killer.

Another error by Judge Block occurred when Robert Footman testified during redirect examination that he shot Munchie, Kelly and Hood, Wayne-O, people on Bedford and Grand, people at 470 Dekalb and Black at the behest of Hardy (and he had no problem with any of those individuals). (Tr. 2050-20 to 2051-3). The Court asked Footman: "Well, if World told you to shoot somebody, you would do it; right?" to which Footman replied, "Yes." (Tr. 2051-14 to 16). Judge Block then asked Footman: "I just want to get clarification that you would just shoot people if somebody told you to shoot people; right?  No compunctions about that.  You are not going to do that today, are you?" to which Footman replied: No."  The following occurred in Court:

THE COURT: That is in the past; right?
THE WITNESS: Yes.
THE COURT: You are out there, we do not

**54**

have to worry about you; right?

THE WITNESS: No. (Tr. 2051-22 to 2052-6).

Counsel for Hardy objected under R. 614(c) to the two questions posed by Judge Block as the first question (would Footman shoot someone if ordered to do so by Hardy) was "very prejudicial" (Tr. 2059-4 to 21) and the second question (implying that Footman is "completely rehabilitated") was improper. The Court overruled the objections. (Tr. 2060-21 to 2061-13).

In *United States v. Antar*, 53 F.3d 568 (3rd Cir. 1995), the Third Circuit Court of Appeals reversed defendants' RICO and other convictions (and 151 months and 51 months sentences, with $121 million in restitution) due to the trial judge's statement at the sentencing that his goal from the first day had been to get back to the public that which was taken from it as a result of the fraudulent activities of the defendant and others. This statement required recusal even though no motion for recusal was made below and even though the comments had occurred after defendants were found guilty. *Id*.

This Court will reverse when "it appears clear to the jury that the [district] court believes the accused is guilty." *United States v. Bejasa*, 904 F.2d 137, 141 (2d Cir.), *cert. denied*, 498 U.S. 921, 111 S.Ct. 299, 112 L.Ed.2d 252 (1990)

55

(citing *United States v. Nazzaro*, 472 F.2d 302, 303 (2d Cir. 1973)). "The vital question is not whether the trial judge's conduct left something to be desired but 'whether his behavior was so prejudicial that it denied . . . appellant[] a fair, as distinguished from a perfect, trial." *Id*. (citation omitted). The Court "must make an examination of the entire record . . . in order to determine whether the defendant received a fair trial." *Id*.

For the foregoing reasons and authorities cited the defendant Granton's convictions must be reversed.

56

POINT IV

THE DISTRICT COURT ERRED IN DENYING
THE MOTION FOR JUDGMENT OF ACQUITTAL
AS TO EACH OF THE COUNTS AGAINST GRANTON

This Court reviews the sufficiency of the evidence *de novo*. *United States v. Hassan*, 578 F.3d 108 (2d Cir. 2008); *United States v. Holland*, 381 F.2d 80, 86 (2d Cir. 2004), *cert. denied*, 543 U.S. 1075, 125 S.Ct. 921, 160 L.Ed. 2d 814 (2005); *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011), *cert. denied*, 132 S.Ct. 1637, 182 L.Ed.2d 246 (2012). The defendants moved for a judgment of acquittal as to each count, which the Court denied on April 23, 2015. (Tr. 2687-20 to 23; 2706-25 to 2707-25; 2758-20 to 2759-2; 2765-10 to 2766-7; 2912-10 to 2914-8; 2912-10 to 2914-8).

A criminal conviction cannot be based upon conjecture, speculation, suspicion, prejudice, or unrelated inferences based upon unrelated inferences. Even an aura of guilt is insufficient to convict. There must be an unbroken chain with no missing links to convict. Maybe's or could be's are insufficient.

Granton incorporates by reference the "Statement of Facts" portion of this brief, particularly the unsavory backgrounds and incredibility of the government witnesses.

As to Granton there was no incriminating physical,

57

videotaped, photographic, scientific, DNA, documentary or wiretap evidence (containing Granton's voice), nor any admissions by Granton (except for the alleged statements attested to by the cooperating witnesses).  The government's case boiled down to the testimony of cooperating witnesses, career criminals with the greatest motives to falsely implicate Granton; namely, lengthy, if not life sentences in federal prison as opposed to the start of a new life in the Witness Protection Program.  All of the government witnesses who implicated Granton were career violent offenders who, to use the vernacular, cut deals seeking the 5K1.1 letters.  They all had a motive to testify falsely.

Sarkissian testified that during all the time with Meyers, Granton and Hardy he never heard them referred to as the "Cash Money Brothers."  He testified: "After the indictment I understood it for Cash Money Brothers, but I hadn't heard of that name beforehand." (Tr. 920-18 to 921-4).  When Footman was asked if "Jimbo, DJ and other people" were selling drugs for Hardy or someone else, he testified: "No.  Everybody was their own work." (Tr. 1930-22 to 1931-1).

The district court erred in denying the judgment of acquittal motions. (Tr. 2912-10 to 2914-8; ST44-21 to 23).

## CONCLUSION

Defendant-Appellant Aaron Granton respectfully submits that his convictions under Counts One, Two, Four, Six, Eight, Nine, Seventeen, Eighteen, Nineteen, Twenty-Three, Twenty-Four, Twenty-Five and Twenty-Six.

In the alternative, the convictions must be reversed and the appellant Granton granted a new trial.

Respectfully submitted,

ROBERT M. BEECHER, ESQ.
15 Barberry Lane
New Providence, NJ 07974
TEL. AND FAX: 1-(908)-771-0095
E-MAIL: BEECHBOB@COMCAST.NET
Attorney for Defendant-
Appellant Aaron Granton
 /s/ Robert M. Beecher
Robert M. Beecher, Esq.

59

<u>**CERTIFICATION OF COMPLIANCE PURSUANT TO**</u>
<u>**FED. R. APP. P. 32(a)(7)(B) and (C)**</u>

The undersigned hereby certifies that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and (C) because the brief contains 13,998 words of text.

<u>*/s/ Robert M. Beecher*</u>
Robert M. Beecher, Esq.

The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6).

Dated: October 7, 2016                     <u>*/s/ Robert M. Beecher*</u>
Robert M. Beecher, Esq.

60