# 15-1645 (L),
## 15-1716 (con)

## United States Court of Appeals

*for the*

## Second Circuit

———

UNITED STATES OF AMERICA,

*Appellee,*

- v. -

ALLEN BRYANT, AKA BOO, AKA BOO FLARE, JAMES SESSOMS, AKA POPSIE, AKA DOC, ERIC MOORE, AKA E BAY, DWAYNE MEYERS, AKA THOR, KENWAYNE JONES, AKA STRO, AKA NATHANIEL STOWE, AKA KODIE JONES, ABUBAKR RAHEEM, AKA KIM CRANDALL, ZAREH SARKISSIAN, AKA PUFF, ROBERT FOOTMAN, AKA TROUB, CARL DAVIS, AKA BIG JIM, JAMES FARRIOR, AKA JIMBO, LAMONT JOHNSON, AKA SAMBO, DJEBARA MCMILLAN, AKA DJ, ISHEEN CAMPBELL, AKA SHA, AKA GREEN EYES, AKA Liseran CAMPBELL, KEITH SMITH,

*Defendants*,

AARON GRANTON, AKA ERIC MOORE, AKA E BAY, DAMION HARDY, AKA WORLD,

*Defendants – Appellants.*

———

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

———

APPENDIX OF DEFENDANT-APPELLANT
DAMION HARDY

———

Brendan White
WHITE & WHITE
148 East 78th Street
New York, NY 10075
(212) 861-9850
brendan@whiwhi.com

*Attorney for Defendant-Appellant
Damion Hardy*

## Appendix Table of Contents

Page

Relevant Docket Entries ................................... 1

Superseding Indictment ................................... 46

Transcript of March 24, 2015,
 Competency Proceeding ................................... 83

March 27, 2015, Letter of David Ruhnke ................. 204

April 1, 2015, Order, Denying Motion
 To Declare Defendant Incompetent ...................... 208

Relevant Excerpts of Trial Transcript .................. 213

Judgment ............................................... 267

Notice of Appeal ....................................... 274

APPEAL,NISDP

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CRIMINAL DOCKET FOR CASE #: 1:04-cr-00706-FB-2

Case title: USA v. Bryant et al

Magistrate judge case number: 1:04-mj-01108-VVP

Date Filed: 08/04/2004

Date Terminated: 05/21/2015

| Date Filed | # | Docket Text |
|---|---|---|
| 08/16/2004 | 1 | COMPLAINT as to Damion Hardy (1). (Polanco, Marcelina)[1:04-mj-01108-VVP] (Entered: 08/17/2004) |
| 08/16/2004 | 2 | Minute Entry for proceedings held before Viktor V. Pohorelsky :Initial Appearance as to Damion Hardy held on 8/16/2004, Defendant present with counsel, Francisco Celedonio,CJA, no bail package presented, permanent order entered. (Tape #04/167 (2325[1:04 -2892).) (Polanco, Marcelina)[1:04-mj-01108-VVP] (Entered: 08/17/2004) |
| 08/16/2004 | 3 | CJA 20 as to Damion Hardy : Appointment of Attorney Francisco E. Celedonio for Damion Hardy. . Signed by Judge Viktor V. Pohorelsky on 08/16/04. (Polanco, Marcelina)[1:04-mj-01108-VVP] (Entered: 08/17/2004) |
| 08/16/2004 | 4 | ORDER OF DETENTION as to Damion Hardy . Signed by Judge Viktor V. Pohorelsky on 8/16/04. (Polanco, Marcelina)[1:04-mj-01108-VVP] (Entered: 08/17/2004) |
| 08/16/2004 | 5 | CJA 23 Financial Affidavit by Damion Hardy (Polanco, Marcelina)[1:04-mj-01108-VVP] (Entered: 08/17/2004) |
| 08/27/2004 | 6 | Letter from AUSA Carolyn Pokorny to Mag Judge Pohorelsky dtd 8/16/04 Regarding request for the detention of the dft. (Yuen, Sui-May)[1:04-mj-01108-VVP] (Entered: 08/27/2004) |
| 08/27/2004 | 7 | SUPERSEDING INDICTMENT (S-1) as to Allen Bryant (1) count(s) 1s, Damion Hardy (2) count(s) 1. (Greene, Donna) (Additional attachment(s) added on 6/23/2014: # 1 Indictment with foreperson signature) (Tabb, Dominique). (Entered: 09/01/2004) |
| 09/09/2004 | 8 | Minute Entry for proceedings held before Lois Bloom :Status Conference as to Damion Hardy held on 9/9/2004 (Tape #04/184(1926-2065).) Government ordered by court to submit application for defts. mental evaluation. (Greene, Donna) (Entered: 09/14/2004) |
| 09/22/2004 | 13 | Minute Entry for proceedings held before David G. Trager :Status Conference as to Allen Bryant, Damion Hardy held on 9/22/2004, Plea entered by Allen Bryant (only) Not Guilty on counts 1s. Psychological evaluation being prepared by MDC for dft Hardy. Speedy Trial, 9/22/04 Stop 11/8. Further Status Conference 11/8/04 at 9:45. AUSA Carolyn Pokorny; Defense Counsel, Bruce McIntyre for Bryant; Francisco Celedonio for Hardy. (Court Reporter Gene Rudolph.) (Piper, Francine) (Entered: 01/11/2005) |
| 09/23/2004 | 9 | ORDER as to Damion Hardy. Ordered that a full psychiatric or psychological examination of the deft. be conducted for purposes of evaluating the competency of the deft. and determining the appropriate treatment . Signed by Judge Lois Bloom on 9/9/04. (Greene, Donna) (Entered: 09/23/2004) |
| 11/04/2004 | 10 | SEALED Competency Report of deft. Damion Hardy. (Greene, Donna) (Marziliano, |

APP. 1

Eastern District of New York - LIVE Database V6.1.1

| | | August). (Entered: 11/04/2004) |
|---|---|---|
| 11/08/2004 | 14 | Minute Entry for proceedings held before David G. Trager: Status Conference as to Allen Bryant, Damion Hardy held on 11/8/2004. AUSA Carolyn Pokorny, Bruce McIntyre for deft Bryant, Francisco Celedonio for deft Hardy. Speedy trial info for deft: start 11/8/04, stop 12/7/04. Further status conference set for 12/7/04 at 4 PM. (Court Reporter : ESR.) (Chee, Alvin) (Entered: 01/12/2005) |
| 12/06/2004 | 11 | Letter from Sean Haran, AUSA to Francisco Celedonio, Esq. and Bruce McIntyre, Esq. dated 12/3/04, furnishing initial discovery and advising that the government will provide additional discovery in the following weeks. (Greene, Donna) (Entered: 12/09/2004) |
| 12/07/2004 | 15 | Minute Entry for proceedings held before David G. Trager : AUSA Carolyn Pokorny/Sean Haran. Bruce McIntyre for deft. Bryant and Francisco Celedonio for deft. Hardy.Status Conference as to Allen Bryant, Damion Hardy held on 12/7/2004. Speedy trial info for deft. start 12/7 stop 1/19 ent'd on record. In the interest of justice as stated on the record, and with consent of the parties. Further status set for 1/19/05 at 12:00. (Greene, Donna) (Entered: 02/22/2005) |
| 12/21/2004 | 12 | TRANSCRIPT of Status as to Allen Bryant, Damion Hardy held on 9/22/04 before Judge Trager. AUSA's Carolyn Pokorny and Sean Haran. Bruce McIntyre, Esq. for deft. Bryant. Francisco Celedonio, Esq. for deft. Hardy. Court Reporter: Gene Rudolph. (Greene, Donna) (Entered: 12/21/2004) |
| 01/18/2005 | 651 | Letter dated 1/18/05 from Francisco Celedonio, Esq., to Judge Trager, informing the Court of defendant Hardy's desire to be absent from any future court proceedings. (Chee, Alvin) (Entered: 01/26/2011) |
| 01/19/2005 | 17 | Minute Entry for proceedings held before David G. Trager :Status Conference as to Allen Bryant, Damion Hardy held on 1/19/2005. Speedy Trial, Start 1/19 Stop 3/14. Further Status Conference 3/14/05 at 4:45. AUSA Carolyn Pokorny/Sean Haran. Defense Counsel, Francisco Celedonio for Hardy; Bruce McIntyre for Bryant. (Court Reporter B. Sulzer.) (Piper, Francine) (Entered: 03/24/2005) |
| 03/14/2005 | 16 | Minute Entry for proceedings held before David G. Trager :Status Conference as to Allen Bryant, Damion Hardy held on 3/14/2005. Status Conference 4/11/05 at 3:30. AUSA C. Rose; Defense Counsel, Fracisco Celedonio for Hardy; Bruce McIntyre for Bryant. (Court Reporter Diana Pereira.) (Piper, Francine) (Entered: 03/16/2005) |
| 04/11/2005 | 18 | NOTICE *Government Discovery Letter* by Damion Hardy (Haran, Sean) (Entered: 04/11/2005) |
| 04/11/2005 | 19 | NOTICE *government discovery* by Allen Bryant, Damion Hardy (Haran, Sean) (Entered: 04/11/2005) |
| 04/11/2005 | 20 | Letter from AUSA Sean Haran to Francisco Celedonio Regarding Discovery (Haran, Sean) (Entered: 04/11/2005) |
| 04/11/2005 | 21 | Minute Entry for proceedings held before David G. Trager: Status Conference as to Allen Bryant, Damion Hardy held on 4/11/2005. AUSA Sean Haran and Bryan Rose, Francisco Celedonio for deft Hardy, Bruce McIntyre for deft Bryant. Speedy trial info: start 4/11/05, stop 6/9/05. Further status conference set for 6/9/05 at 12:30 PM. Deft Hardy has permission not to be present for the next status conference. (Court Reporter: M. Brymer.) (Chee, Alvin) (Entered: 05/02/2005) |
| 06/02/2005 | 22 | SEALED TRANSCRIPT placed in vault. (Hunter-Hicks, Tara) (Entered: 06/02/2005) |
| 06/09/2005 | 23 | Minute Entry for proceedings held before David G. Trager :Status Conference as to |

|  |  |  |
|---|---|---|
|  |  | Damion Hardy held on 6/9/2005. Status Conference 7/18/05 at 11:00. AUSA Charlie Rose; Defense Counsel, Francisco Celadonia. (Court Reporter Ogoro Francis.) (Piper, Francine) (Entered: 07/13/2005) |
| 07/07/2005 | 24 | SUPERSEDING INDICTMENT (S-2) as to Damion Hardy (2) count(s) 1s, 2s, 4s, 5s, 6s, 7s, 8s, 9s, 10s, 11s-12s, 13s-14s, 15s-20s, 21s, 22s, James Sessoms (3) count(s) 1, 2, 11-12, 13-14, 20, 21, 22, Eric Moore (4) count(s) 1, 2, 4, 5, 6, 7, 8, 15-17, 21, 22, Dwayne Meyers (5) count(s) 1, 2, 3, 7, 9, 10, 18-19, 21, 22, Kenwayne Jones (6) count(s) 1, 2, 11-12, 13-14, 20, 21, 22, Abubakr Raheem (7) count(s) 1, 2, 5, 6, 9, 10, 15-16, 18-19, Zareh Sarkissian (8) count(s) 4, Robert Footman (9) count(s) 21, 22, Carl Davis (10) count(s) 21, 22, James Farrior (11) count(s) 21, 22, Lamont Johnson (12) count(s) 21, 22, Djebara McMillian (13) count(s) 21, 22, Isheen Campbell (14) count(s) 11-12, 13-14, 20. (Greene, Donna) Additional attachment(s) added on 8/16/2005 (Greene, Donna). (Entered: 08/09/2005) |
| 07/20/2005 | 56 | Minute Entry for proceedings held before Robert M. Levy :AUSA Bryan Rose & Sean Haran. Francisco Celedonio for the deft.Arraignment as to Damion Hardy (2) Count 1,1s,2s,4s,5s,6s,7s,8s,9s,10s,11s-12s,13s-14s,15s-20s,21s,22s held on 7/20/2005, Initial Appearance as to Damion Hardy held on 7/20/2005, Plea entered by Damion Hardy Not Guilty on counts ALL. (Tape #05/140(3828-4153).)Status conference set for 8/4/05 at 3pm before Judge Trager. Previous order of detention remains in effect. (Greene, Donna) (Entered: 08/10/2005) |
| 08/04/2005 | 68 | Minute Entry for proceedings held before David G. Trager :AUA Sean HaranStatus Conference as to Damion Hardy, James Sessoms, Eric Moore, Dwayne Meyers, Kenwayne Jones, Abubakr Raheem, Zareh Sarkissian, James Farrior, Lamont Johnson, Djebara McMillian, Isheen Campbell held on 8/4/2005 (Court Reporter Burt Sulzer.) (Greene, Donna) (Entered: 08/19/2005) |
| 08/10/2005 | 63 | Letter from AUSA's Bryan J. Rose/Sean T. Haran to Mag. Azrack dated 7/19/05 submitted in support of its motion pursuant to the Bail Reform Act, 18 U.S.C. 3141 et seq., to detain the deft. on the grounds of dangerousness to the community and risk of flight. (Greene, Donna) (Entered: 08/10/2005) |
| 08/10/2005 | 64 | ORDER that the superseding indictment in the above-referenced case shall be unsealed. Ordered by Judge Joan M. Azrack on 7/19/05. (Greene, Donna) (Entered: 08/10/2005) |
| 08/19/2005 | 654 | Letter dated 8/19/05 from Francisco Celedonio, Esq., to Hon. David G. Trager, requesting the appointment of David Ruhnke,Esq., as learned counsel to Damion Hardy. (Chee, Alvin) (Entered: 01/26/2011) |
| 09/01/2005 | 76 | NOTICE OF ATTORNEY APPEARANCE: David A. Ruhnke appearing for Damion Hardy (Ruhnke, David) (Entered: 09/01/2005) |
| 09/02/2005 | 77 | NOTICE OF ATTORNEY APPEARANCE: David A. Ruhnke appearing for Damion Hardy *(Corrected copy)* (Ruhnke, David) (Entered: 09/02/2005) |
| 09/02/2005 | 78 | ORDER as to Damion Hardy. David A. Ruhnke, Esq. is hereby appointed learned counsel to assist in the defense of Damion Smith-Hardy . Ordered by Judge David G. Trager on 8/23/05. (Greene, Donna) (Entered: 09/02/2005) |
| 09/15/2005 | 91 | Letter from AUSA Haran to Francisco Celedonio, Esq. Regarding discovery of Damion Hardy's post-arrest statements (Haran, Sean) (Entered: 09/15/2005) |
| 09/22/2005 | 101 | Letter from AUSA Sean Haran to Counsel Regarding discovery (Haran, Sean) (Entered: 09/22/2005) |
| 09/22/2005 | 102 | Letter from AUSA Sean Haran to Counsel Regarding additional discovery (Haran, Sean) (Entered: 09/22/2005) |

| 10/02/2005 | 104 | Letter from AUSA Sean Haran to Counsel Regarding discovery relating to Ivory Davis and James Hamilton murders (Haran, Sean) (Entered: 10/02/2005) |
|---|---|---|
| 10/03/2005 | 105 | Letter from AUSA Sean Haran to Counsel Regarding discovery relating to gunpoint kidnaping/robbery charged in indictment (Haran, Sean) (Entered: 10/03/2005) |
| 10/05/2005 | 106 | ORDER endorsed on letter dated 9/28/05 from Richard E. Kwasnik to Judge Trager. Application that Richard Kwasnik be formally relieved in this case, that Collen Brady be relieved as Learned Counsel in this case, and the Evrard Williams, investigator cease all work on this case and submit a voucher for services previously rendered is Granted . Ordered by Judge David G. Trager on 9/28/05. (Greene, Donna) (Entered: 10/05/2005) |
| 10/11/2005 | 107 | Letter from David A. Ruhnke to Sean Haran, AUSA Regarding discovery re potential capital charges (Ruhnke, David) (Entered: 10/11/2005) |
| 10/12/2005 | 108 | SEALED ENVELOPE.(Vaughn, Terry) (Entered: 10/12/2005) |
| 10/14/2005 | 112 | Minute Entry for proceedings held before David G. Trager :AUSA Sean Haran.Status Conference as to Damion Hardy, James Sessoms, Eric Moore, Dwayne Meyers, Kenwayne Jones, Abubakr Raheem, Zareh Sarkissian, James Farrior, Lamont Johnson, Djebara McMillian, Isheen Campbell held on 10/14/2005 (Court Reporter M. Brymer.)Further status set for 2/13/06 at 12:00. (Greene, Donna) (Entered: 11/03/2005) |
| 10/26/2005 | 110 | Letter from AUSA Sean Haran to Francisco Celedonio and David Ruhnke Regarding supplemental discovery (Haran, Sean) (Entered: 10/26/2005) |
| 01/03/2006 | 116 | INTERIM ORDER as to Damion Hardy, David A. Ruhnke is authorized to submit interim vouchers for the representation of his/her client. ( Ordered by Judge David G. Trager on 11/17/05) (Piper, Francine) (Entered: 01/03/2006) |
| 02/07/2006 | 123 | Letter *requesting brief adjournment of status conference* as to Allen Bryant, Damion Hardy, James Sessoms, Eric Moore, Dwayne Meyers, Kenwayne Jones, Abubakr Raheem, Zareh Sarkissian, Robert Footman, Carl Davis, James Farrior, Lamont Johnson, Djebara McMillian, Isheen Campbell (Haran, Sean) (Entered: 02/07/2006) |
| 02/07/2006 | 124 | Letter *requesting death penalty submissions within 30 days* as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem, Zareh Sarkissian (Haran, Sean) (Entered: 02/07/2006) |
| 02/14/2006 | 125 | Minute Entry for proceedings held before David G. Trager :AUSA Sean Haran.Status Conference as to Damion Hardy, James Sessoms, Eric Moore, Dwayne Meyers, Kenwayne Jones, Abubakr Raheem, Zareh Sarkissian, Carl Davis, James Farrior, Lamont Johnson, Djebara McMillian, Isheen Campbell held on 2/14/2006 (Court Reporter Burt Sulzer.) Jury selection set for 9/18/06. Trial scheduled for 9/19/06. Further status set for 6/1/06 at 11am. (Greene, Donna) (Entered: 02/21/2006) |
| 02/22/2006 | 126 | SEALED Order/Letter placed in vault.(Greene, Donna) (Entered: 02/22/2006) |
| 02/23/2006 | 127 | ORDER as to Damion Hardy, that Mr. Melvin Mays is appointed to assist in the defense of Mr. Damion Hardy, for the reasons indicated in the letter of defense counsel dated 2/16/06 at the rate of $95 per hour for 50 hours. Ordered by Judge David G. Trager on 2/17/06. (Greene, Donna) (Entered: 02/23/2006) |
| 02/23/2006 | 128 | Letter dated 2/16/06 from Francisco E. Celedonio, Esq. to Judge Trager as to Damion Hardy, seeks the court authorize the appointment of a private investigator to assist in the reprsentation of Mr. Damion Hardy, the above-named deft. currently awaiting trial. (Greene, Donna) (Entered: 02/23/2006) |
| 03/13/2006 | 131 | Sealed document placed in vault. (Chee, Alvin) (Entered: 03/16/2006) |

| 04/10/2006 | 139 | INTERIM ORDER as to Damion Hardy. Royce L. Hawkins, Mitigation Specialists for the deft., is authorized to submit interim vouchers for the representation of his/her client . Ordered by Judge David G. Trager on 2/24/06. (Greene, Donna) (Entered: 04/10/2006) |
|---|---|---|
| 05/05/2006 | 143 | NOTICE *government's request for written submissions relating to death penalty issues by May 23, 2006* by Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem, Zareh Sarkissian (Haran, Sean) (Entered: 05/05/2006) |
| 05/11/2006 | 144 | ORDER endorsed on letter dated 5/9/06 from Paul Madden to Judge Trager. Application requesting an extension of time to submit pre-trial motions is granted. Ordered by Judge David G. Trager on 5/9/06. (Greene, Donna) (Entered: 05/11/2006) |
| 05/16/2006 | 145 | Letter *Extension of Time to File Motions* as to Allen Bryant, Damion Hardy, James Sessoms, Eric Moore, Dwayne Meyers, Kenwayne Jones, Abubakr Raheem, Zareh Sarkissian, Robert Footman, Carl Davis, James Farrior, Lamont Johnson, Djebara McMillian, Isheen Campbell (Kellman, Susan) (Entered: 05/16/2006) |
| 06/23/2006 | 157 | Letter *notifiying counsel for defendants facing murder charges of new schedule* as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem, Zareh Sarkissian (Haran, Sean) (Entered: 06/23/2006) |
| 06/23/2006 | 158 | Letter *providing discovery of crime scene photographs* as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem, Zareh Sarkissian (Haran, Sean) (Entered: 06/23/2006) |
| 06/28/2006 | 163 | EX PARTE ORDER as to Damion Hardy. Order that Bobbi C. Sternheim, Esq. is authorized to retain the services of Joseph P. Dwyer at the rate of $85.00 per hour. Ordered that investigative services are limited to 200 hours unless further authorization is approved by the court . Ordered by Judge David G. Trager on 6/21/06. (Greene, Donna) (Entered: 06/28/2006) |
| 06/28/2006 | 164 | ORDER that the Metropolitan Detention Center is directed to adhere to the name change order and henceforther, for all purposes, address and refer to Damion Hardy by the name Isa Ibn Jabril . Ordered by Judge David G. Trager on 6/26/06. (Greene, Donna) (Entered: 06/28/2006) |
| 07/25/2006 | 169 | Minute Entry for proceedings held before David G. Trager :AUSA Sean Haran.Status Conference as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem, Zareh Sarkissian held on 7/25/2006 (Court Reporter F. Guerino.)Juery selection set for 3/19/07. Trial scheduled for 3/19/07. Further status set for 1/12/07 at 12:00. Competancy hearing for Eric Moore 12/18/06 at 10:00. (Greene, Donna) (Entered: 08/01/2006) |
| 08/10/2006 | 173 | ORDER that Mr. Melvin Mays is approved to continue assisting in the defense of Mr. Damion Hardy, for the reasons indicated in the letter of defense counsel dated 8/2/06 at the rate of $95 per hour for an additional 150 hours. Ordered by Judge David G. Trager on 8/7/06. (Greene, Donna) (Entered: 08/10/2006) |
| 08/10/2006 | 174 | Letter *providing additional discovery* as to Allen Bryant, Damion Hardy, James Sessoms, Eric Moore, Dwayne Meyers, Kenwayne Jones, Abubakr Raheem, Zareh Sarkissian, Robert Footman, Carl Davis, James Farrior, Lamont Johnson, Djebara McMillian, Isheen Campbell (Haran, Sean) (Entered: 08/10/2006) |
| 08/22/2006 | 175 | Letter *providing additional discovery* as to Damion Hardy, James Sessoms, Kenwayne Jones, Robert Footman, Carl Davis, James Farrior, Lamont Johnson, Djebara McMillian (Haran, Sean) (Entered: 08/22/2006) |
| 11/14/2006 | 200 | ORDER as to Damion Hardy: The court reporters are directed to provide Mr. Francisco |

| | | E. Celedonio, the entirety of the trial transcript on minuscript, including the associated floppies or computer disks. Ordered by Judge David G. Trager on 11/14/06. (Chee, Alvin) (Entered: 11/16/2006) |
|---|---|---|
| 01/12/2007 | 202 | Minute Entry for proceedings held before David G. Trager :AUSA Sean Haran.Status Conference as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem, Zareh Sarkissian held on 1/12/2007. Further status set for 4/9/07 at 12:30. (Greene, Donna) (Entered: 01/19/2007) |
| 01/25/2007 | 203 | Letter *providing discovery of gov't exhibits 227 through 234* as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem, Zareh Sarkissian (Haran, Sean) (Entered: 01/25/2007) |
| 03/12/2007 | 209 | SUPERSEDING INDICTMENT (S-4) as to Damion Hardy (2) count(s) 1ss, 2ss, 4ss-10ss, 11ss-12ss, 13ss-14ss, 15ss-18ss, 19ss, 20ss, 21ss, 22ss, Eric Moore (4) count(s) 1s, 2s, 4s-8s, 15s-17s, 21s, 22s, 23s-24s, Dwayne Meyers (5) count(s) 1s, 2s, 3s, 7s, 9s-10s, 18s, 19s, 21s, 22s, Abubakr Raheem (7) count(s) 1s, 2s, 5s-6s, 9s-10s, 15s-16s, 18s, 19s, Zareh Sarkissian (8) count(s) 4s. (Greene, Donna) (Entered: 03/15/2007) |
| 03/14/2007 | 208 | Letter *notifying defendants of superseding indictment returned on March 12, 2007* as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem, Zareh Sarkissian (Attachments: # 1 Superseding Indictment S-4) (Haran, Sean) (Entered: 03/14/2007) |
| 03/15/2007 | 210 | Letter *providing additional discovery* as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem, Zareh Sarkissian (Haran, Sean) (Entered: 03/15/2007) |
| 04/09/2007 | 212 | Minute Entry for proceedings held before David G. Trager :AUSA Sean Haran. Status Conference as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem, Zareh Sarkissian held on 4/9/2007 (Court Reporter A. Frisolone.)Further status set for 6/18/07 at 3:00pm. (Greene, Donna) (Entered: 04/27/2007) |
| 04/13/2007 | 211 | Letter *re trial date conflict* as to Damion Hardy (Ruhnke, David) (Entered: 04/13/2007) |
| 05/25/2007 | 214 | Letter *providing additional discovery* as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem, Zareh Sarkissian (Haran, Sean) (Entered: 05/25/2007) |
| 05/25/2007 | 215 | Letter *providing additional discovery of telephone records* as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem, Zareh Sarkissian (Haran, Sean) (Entered: 05/25/2007) |
| 06/04/2007 | 216 | Letter *providing additional discovery for Ivory Davis homicide* as to Damion Hardy, Eric Moore, Dwayne Meyers, Kenwayne Jones, Abubakr Raheem (Haran, Sean) (Entered: 06/04/2007) |
| 06/04/2007 | 217 | Letter *confirming additional discovery made available today* as to Damion Hardy, Eric Moore (Haran, Sean) (Entered: 06/04/2007) |
| 06/08/2007 | 218 | Letter *providing additional discovery concerning MDC records and transcript of 4/15/98 state court trial* as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem, Zareh Sarkissian (Haran, Sean) (Entered: 06/08/2007) |
| 06/08/2007 | 219 | Letter *providing discovery relating to NYPD Firearms Analsysis documents* as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem, Zareh Sarkissian (Haran, Sean) (Entered: 06/08/2007) |
| 06/18/2007 | 222 | Minute Entry for proceedings held before David G. Trager :AUSA Sean Haran.Status Conference as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem, Zareh Sarkissian held on 6/18/2007 (Court Reporter Fred Guerino.)Further status set for 7/11/07 at 3:00. (Greene, Donna) (Entered: 06/22/2007) |

APP. 6

| 06/22/2007 | 220 | ORDER endorsed on letter dated 6/6/07 from Francisco E. Celedonio, Esq. to Judge Trager as to Damion Hardy. Application requesting the court authorize expenditures as reasonble and necessary in furtherance of the representation of Mr. Damion Hardy is granted. Ordered by Judge David G. Trager on 6/6/07. (Greene, Donna) (Entered: 06/22/2007) |
|---|---|---|
| 06/22/2007 | 221 | ORDER as to Damion Hardy that Mr. Melvin Mays is approved to travel to South Carolina (travel to begin on 6/6/07) and to incur reasonable expenses attendant to the investigation, in accordance with the proposed budge outline by counsel in his letter to the court dated 6/6/07. Ordered by Judge David G. Trager on 6/6/07. (Greene, Donna) (Entered: 06/22/2007) |
| 07/11/2007 | 229 | Minute Entry for proceedings held before David G. Trager :Status Conference as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem held on 7/11/2007. Status Conference 10/9/07 at 4:00. AUSA Sean Haran; Defense Counsel, F. Celedonio for Hardy; R. Beecher for Moore; G. Goeltzer for Myers and B. Sternheim for Raheem. (Court Reporter Loan Hong.) (Piper, Francine) (Entered: 07/18/2007) |
| 07/13/2007 | 226 | Letter *providing information pursuant to Brady v. Maryland* as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem, Zareh Sarkissian (Haran, Sean) (Entered: 07/13/2007) |
| 07/18/2007 | 230 | ORDER as to Damion Hardy, that the Metropolitan Detention Center is to provide Dr Richard Dudly access to Mr. Damion Hardy.)rdered by Judge David G. Trager on 7/16/07) (Piper, Francine) (Entered: 07/18/2007) |
| 07/25/2007 | 232 | ORDER as to Damion Hardy that Mr. Melvin Mays is approved to continue assisting in the defense of Mr. Damion Hardy, for the reasons indicated in the letter defense counsel dated 7/20/07, at the rate of $95 per hour for an addition 100 hours. Ordered by Judge David G. Trager on 7/23/07. (Greene, Donna) (Entered: 07/25/2007) |
| 08/03/2007 | 235 | MOTION for Psychiatric Exam *and hearing pursuant to 18 USC Sec. 4241* by Damion Hardy. (Ruhnke, David) (Entered: 08/03/2007) |
| 08/07/2007 | 236 | Letter *providing requested discovery concerning murders of Lamel Lawson and Michael Colon* as to Damion Hardy, Eric Moore (Haran, Sean) (Entered: 08/07/2007) |
| 08/22/2007 | 237 | Letter *Requesting Expert Notice from Government* as to Allen Bryant, Damion Hardy, James Sessoms, Eric Moore, Dwayne Meyers, Kenwayne Jones, Abubakr Raheem, Zareh Sarkissian, Robert Footman, Carl Davis, James Farrior, Lamont Johnson, Djebara McMillian, Isheen Campbell, Keith Smith (Celedonio, Francisco) (Entered: 08/22/2007) |
| 09/04/2007 | 238 | Letter *Seeking Gov't Expert Notice and Further Discovery* as to Damion Hardy (Celedonio, Francisco) (Entered: 09/04/2007) |
| 09/06/2007 | 239 | Letter *re Ballistics Evidence* as to Damion Hardy (Celedonio, Francisco) (Entered: 09/06/2007) |
| 09/16/2007 | 240 | Letter *re Gov't disclosure re putative exculpatory witnesses* as to Damion Hardy (Celedonio, Francisco) (Entered: 09/16/2007) |
| 09/21/2007 | 241 | MOTION for Psychiatric Exam *or psychological evaluation to determine competency to stand trial pursuant to 18 USC sec. 4241* by Damion Hardy. (Ruhnke, David) (Entered: 09/21/2007) |
| 10/05/2007 | | NOTICE as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem. The conference scheduled for 10/9/07 has been rescheduled. Next Status Conference set for 10/19/2007 at 11:00 AM before Senior-Judge David G. Trager. (Ketcham, Brian) (Entered: 10/05/2007) |

| | | |
|---|---|---|
| 10/11/2007 | | NOTICE as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem . Because several attorneys have contacted the Court to inquire about rescheduling the next appearance in this case, and in an effort to prevent confusion, this Notice is to confirm that the next status conference REMAINS SCHEDULED for 10/19/07 at 11:00 am. (Ketcham, Brian) Modified on 10/11/2007 (Ketcham, Brian). (Entered: 10/11/2007) |
| 10/17/2007 | 245 | Letter *re status conference issues* as to Damion Hardy (Ruhnke, David) (Entered: 10/17/2007) |
| 10/18/2007 | 246 | Letter *Re Discovery, Brady and Expert Notice/Access* as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem, Zareh Sarkissian (Celedonio, Francisco) (Entered: 10/18/2007) |
| 10/18/2007 | 249 | SUPERSEDING INDICTMENT (S-5) as to Damion Hardy (2) count(s) 1sss-2sss, 4sss, 5sss, 6sss, 7sss, 8sss, 9sss, 10sss, 11sss, 12sss, 13sss-14sss, 15sss, 16sss, 17sss, 18sss, 19sss, 20sss, 21sss, 22sss, 23sss, Dwayne Meyers (5) count(s) 1ss-2ss, 3ss, 7ss, 9ss, 10ss, 19ss, 20ss, 22ss, 23ss, Abubakr Raheem (7) count(s) 1ss-2ss, 5ss, 6ss, 9ss, 10ss, 15ss, 16ss, 19ss, 20ss, Aaron Granton (16) count(s) 1-2, 4, 5, 6, 7, 8, 15, 16, 17, 18, 22, 23, 24-25. (Attachments: # 1 information sheet# 2 Indictment with foreperson signature) (Greene, Donna) (Entered: 11/01/2007) |
| 10/19/2007 | 250 | Minute Entry for proceedings held before David G. Trager :AUSA Sean Haran & Steve D'Alessando.Status Conference as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem held on 10/19/2007. Jury selection set for 5/12/08 at 10:00. Trial scheduled for 5/12/08. Raheem motion to sever denied at this time. Briefing schedule on constitutional issues: Motion by 12/21/07; opposition by 1/17/08; reply by 2/1/08. Hearing on Hardy competency issues scheduled for 1/7/08 at 11:00. (Court Reporter L. Hong.) (Greene, Donna) (Entered: 11/02/2007) |
| 10/23/2007 | 247 | Letter *Seeking Discovery and Brady material* as to Damion Hardy, Eric Moore, Abubakr Raheem (Celedonio, Francisco) (Entered: 10/23/2007) |
| 11/06/2007 | 251 | Letter *to Hon. David G. Trager (USDJ/EDNY) enclosing proposed order for competency evaluation* as to Damion Hardy (Attachments: # 1 Proposed Order) (D'Alessandro, Steven) (Entered: 11/06/2007) |
| 11/14/2007 | | Per the 11/14/07 e-mail from AUSA Haran: Attorney James Patrick Loonam for USA, Steven Leo D'Alessandro for USA, added. (Vaughn, Terry) (Entered: 11/14/2007) |
| 11/17/2007 | 254 | Letter *regarding procedures for competency examination* as to Damion Hardy (Ruhnke, David) (Entered: 11/17/2007) |
| 11/26/2007 | 256 | Letter *Seeking Donference re Discovery Issues* as to Allen Bryant, Damion Hardy, James Sessoms, Eric Moore, Dwayne Meyers, Kenwayne Jones, Abubakr Raheem, Zareh Sarkissian, Robert Footman, Carl Davis, James Farrior, Lamont Johnson, Djebara McMillian, Isheen Campbell, Keith Smith, Aaron Granton (Celedonio, Francisco) (Entered: 11/26/2007) |
| 12/05/2007 | 258 | ORDER TO SHOW CAUSE why it should not be adjudged that the writ of habeas corpus testificandum that brought Mr. Agness into the federal system should not be deemed issued and satisfied, and why he should not be returned forthwith to the custody of the California Department of Corrections and Rehabilitation. Ordered by Senior Judge David G. Trager on 11/14/07. (Greene, Donna) (Entered: 12/05/2007) |
| 12/05/2007 | 259 | ORDER as to Damion Hardy that the Federal Bureau of Prisons shall conduct a psychiatric examination of the deft. for purposes of determining whether the deft. is presently suffering from a mental disease or defect rendering him mentally incompetent to understand the nature and consequences of the charges against him. The Federal |

| | | |
|---|---|---|
| | | Bureau of Prisons shall file a psychiatric report with the court no later than 30 days from the date of this order. Ordered by Senior Judge David G. Trager on 11/14/07. (Greene, Donna) (Entered: 12/05/2007) |
| 12/10/2007 | 260 | NOTICE OF INTENT TO SEEK THE DEATH PENALTY as to Allen Bryant, Damion Hardy, James Sessoms, Eric Moore, Dwayne Meyers, Kenwayne Jones, Abubakr Raheem, Zareh Sarkissian, Robert Footman, Carl Davis, James Farrior, Lamont Johnson, Djebara McMillian, Isheen Campbell, Keith Smith, Aaron Granton *Notice of Intent to Seek Against Damion Hardy* (Haran, Sean) (Entered: 12/10/2007) |
| 12/10/2007 | 262 | Letter *Seeking Discovery Never Previoulsy Produced* as to Allen Bryant, Damion Hardy, James Sessoms, Eric Moore, Dwayne Meyers, Kenwayne Jones, Abubakr Raheem, Zareh Sarkissian, Robert Footman, Carl Davis, James Farrior, Lamont Johnson, Djebara McMillian, Isheen Campbell, Keith Smith, Aaron Granton (Celedonio, Francisco) (Entered: 12/10/2007) |
| 12/14/2007 | 266 | Minute Entry for proceedings held before Senior Judge David G. Trager:AUSA James Loonam to Michael Hueston for the deft.Show Cause Hearing as to Damion Hardy held on 12/14/2007. Adj'd to 1/11/08 at 11:30 by consent. (Greene, Donna) (Entered: 12/28/2007) |
| 12/16/2007 | 264 | Consent MOTION for Extension of Time to File *pre-trial motions by all defendants* by Damion Hardy as to Damion Hardy, Eric Moore, Abubakr Raheem. (Ruhnke, David) (Entered: 12/16/2007) |
| 12/28/2007 | 267 | ORDER granting 264 Motion for Extension of Time to File as to Damion Hardy (2) (Ordered by Senior Judge David G. Trager on 12/17/07) (Piper, Francine) (Entered: 12/28/2007) |
| 01/03/2008 | 268 | Consent MOTION for Extension of Time to File *pre-trial motions* by Damion Hardy as to Damion Hardy, Eric Moore, Abubakr Raheem. (Ruhnke, David) (Entered: 01/03/2008) |
| 01/03/2008 | 269 | ENDORSED ORDER granting 268 Motion for Extension of Time to File pre-trial motions as to Damion Hardy (2), Eric Moore (4) and Abubakr Raheem (7). Ordered by Senior Judge David G. Trager on 1/3/2008. (Abdallah, Fida) (Entered: 01/04/2008) |
| 01/12/2008 | 271 | Consent MOTION for Extension of Time to File *pre-trial motions by all defendants* by Damion Hardy. (Ruhnke, David) (Entered: 01/12/2008) |
| 01/14/2008 | 272 | ENDORSED ORDER granting 271 Motion for Extension of Time to File as to Damion Hardy (2). Ordered by Senior Judge David G. Trager on 1/14/2008. (Abdallah, Fida) (Entered: 01/17/2008) |
| 01/22/2008 | 273 | Letter dated 1/11/08 from Michael O. Hueston to Judge Trager, confirming that the government and Mr. Agness have mutually agreed to adjourn Mr. Agness hearing concerning his application for an order to show cause from 1/11/08 to 2/8/08 at 12:00. (Greene, Donna) (Entered: 01/22/2008) |
| 01/22/2008 | 274 | MOTION to Dismiss *capital aspects of prosecution* by Damion Hardy. (Attachments: # 1 Brief in support of capital motions) (Ruhnke, David) (Entered: 01/22/2008) |
| 01/23/2008 | 275 | MOTION for Bill of Particulars, MOTION for Release of Brady Materials, MOTION for Discovery, MOTION to Suppress by Damion Hardy. (Attachments: # 1 Supplement Memorandum in Support of Motion) (Celedonio, Francisco) (Entered: 01/23/2008) |
| 01/24/2008 | 278 | SUPERSEDING INDICTMENT (S-6) as to Damion Hardy (2) count(s) 1ssss, 2ssss, 3ssss-4ssss, 5ssss, 6ssss, 7ssss, 8ssss-9ssss, 10ssss, 11ssss, 12ssss-13ssss, 14ssss-15ssss, 16ssss-18ssss, 19ssss, 20ssss, 21ssss, 22ssss, 23ssss, 24ssss, Abubakr Raheem (7) |

|            |     |                                                                                                                                                                                                                                                                                                                                                            |
|------------|-----|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|            |     | count(s) 1sss, 2sss, 5sss, 6sss, 10sss, 11sss, 16sss-17sss, 20sss, 21sss, Aaron Granton (16) count(s) 1s, 2s, 4s, 5s, 6s, 7s, 8s-9s, 16s-18s, 19s, 23s, 24s, 25s-26s. (Attachments: # 1 Information Sheet, # 2 Superseding Indictment with foreperson) (Greene, Donna) (Entered: 02/04/2008)                                                                     |
| 01/25/2008 | 276 | Letter *requesting date for arraignment on Sixth Superseding Indictment* as to Damion Hardy, Eric Moore, Abubakr Raheem (Attachments: # 1 Sixth Superseding Indictment) (Haran, Sean) (Entered: 01/25/2008)                                                                                                                                                   |
| 02/07/2008 | 280 | MOTION to Seal *report of 4241 examination* by Damion Hardy. (Ruhnke, David) (Entered: 02/07/2008)                                                                                                                                                                                                                                                          |
| 02/11/2008 | 281 | Letter *confirming new date of February 22 at 3:00 p.m. for arraignment on 6th Superseding Indictment* as to Damion Hardy, Eric Moore, Abubakr Raheem (Haran, Sean) (Entered: 02/11/2008)                                                                                                                                                                    |
| 02/12/2008 | 282 | Letter *correcting docket entry 281, arraignment date is 2/29/08 @ 3:00 p.m.* as to Damion Hardy, Eric Moore, Abubakr Raheem (Haran, Sean) (Entered: 02/12/2008)                                                                                                                                                                                            |
| 02/13/2008 | 283 | ORDER as to Damion Hardy that Mr. Melvin Mays is approved to continue assisting in the defense of Mr. Damion Hardy, for the reasons indicated in the letter of defense counsel dated 1/31/08 at the previously set rate of $95 per hour for an additional 200 hours. Ordered by Senior Judge David G. Trager. (Greene, Donna) (Entered: 02/13/2008)         |
| 02/13/2008 | 284 | Letter *providing excel spread sheet of Mosley text messages* as to Damion Hardy, Eric Moore, Abubakr Raheem (Haran, Sean) (Entered: 02/13/2008)                                                                                                                                                                                                            |
| 02/14/2008 | 285 | ORDER as to Damion Hardy that counsel may expend CJA funds to obtain the transcript of the state-court trial of Ramal Davis. Specifically counsel are authorized to expend CJA funds in the amount of $1,085.70 in order to obtain the transcript from the Brooklyn Court reporters, specifically Mr. Eric Pollyea. Ordered by Senior Judge David G. Trager on 2/5/08. (Greene, Donna) (Entered: 02/14/2008) |
| 02/14/2008 | 286 | Letter *enclosing discovery relating to Troy Singleton murder* as to Damion Hardy, Eric Moore, Kenwayne Jones (Haran, Sean) (Entered: 02/14/2008)                                                                                                                                                                                                          |
| 02/20/2008 | 290 | ORDER application granted. Arraignment on 6th superseding indictment for defts. Hardy, Granton, and Raheem scheduled for 2/29/08 at 3:00. Ordered by Senior Judge David G. Trager on 2/8/08. (Greene, Donna) (Entered: 02/20/2008)                                                                                                                           |
| 02/20/2008 | 291 | Minute Entry for proceedings held before Senior Judge David G. Trager:AUSA James Loonam.Status Conference as to Damion Hardy held on 2/20/2008. (Greene, Donna) (Entered: 02/20/2008)                                                                                                                                                                        |
| 02/23/2008 | 293 | Letter *furnishing duplicate copies of discovery materials previously produced* as to Damion Hardy (Haran, Sean) (Entered: 02/23/2008)                                                                                                                                                                                                                      |
| 02/28/2008 | 294 | Letter as to Damion Hardy (Herman, Carl) (Entered: 02/28/2008)                                                                                                                                                                                                                                                                                              |
| 02/29/2008 | 295 | Letter *re status conference issues* as to Damion Hardy (Ruhnke, David) (Entered: 02/29/2008)                                                                                                                                                                                                                                                               |
| 02/29/2008 | 296 | Letter *proposed order for examination at Butner FMC* as to Damion Hardy (Haran, Sean) (Entered: 02/29/2008)                                                                                                                                                                                                                                                |
| 02/29/2008 | 297 | Minute Entry for proceedings held before Senior Judge David G. Trager:AUSA S. Haran/J. Loonam. Status Conference as to Damion Hardy, Abubakr Raheem, Aaron Granton held on 2/29/2008. (Court Reporter A. Frisolone.) (Greene, Donna) (Entered: 03/05/2008)                                                                                                    |

| 03/05/2008 | 298 | ORDER as to Damion Hardy for Psychiatric Examination Pursuant to Title 18, U.S.C., Section 4241. Ordered by Senior Judge David G. Trager on 3/3/08. (Greene, Donna) (Entered: 03/06/2008) |
|---|---|---|
| 03/06/2008 | 299 | Letter dated 1/22/08 from Francisco E. Celedonio, Esq. to Judge Trager as to Damion Hardy, seeking the court direct the Federal Bureau of Prisons to transfer Mr. Hardy to the Metropolitan Correction Center ("MCC") where Mr. Hardy was recently housed incident to the competency evaluation order by this court. (Greene, Donna) (Entered: 03/06/2008) |
| 03/12/2008 | 301 | Letter dated March 4, 2008, from Atty Francisco E. Celedonio for Damion Hardy to Judge Dearie, requesting that docket entry # 23 in *Davis v. Filion*, 04cv3714 (RJD) be "redacted" or otherwise "corrected" and that the Clerk of the Court provide counsel w/the *Davis* transcript. (Abdallah, Fida) (Entered: 03/12/2008) |
| 03/27/2008 | 304 | Letter *Seeking Conference on Gov't'* as to Allen Bryant, Damion Hardy, James Sessoms, Eric Moore, Dwayne Meyers, Kenwayne Jones, Abubakr Raheem, Zareh Sarkissian, Robert Footman, Carl Davis, James Farrior, Lamont Johnson, Djebara McMillian, Isheen Campbell, Keith Smith, Aaron Granton (Celedonio, Francisco) (Entered: 03/27/2008) |
| 04/01/2008 | 305 | Letter dated March 24, 2008, from Federal Bureau of Prisons to Judge Trager, informing the Court that they have designated Dft Hardy to FMC Devens, Massachusetts, where Dft Hardy will receive a comprehensive evaluation. (Abdallah, Fida) (Entered: 04/01/2008) |
| 04/09/2008 | | NOTICE OF HEARING as to Damion Hardy and Aaron Granton Pretrial Conference concerning defense claims regarding non-disclosure of Brady material is set for 4/11/2008 at 10:45 AM in 8D South before Senior Judge David G. Trager. Government is to have available list of documents previously provided to defense. To the extent practicable, defense is to be prepared to specify material that it believes the government should have, but did not, turn over. (Meyers, Jane) (Entered: 04/09/2008) |
| 04/10/2008 | 309 | Letter *providing discovery concerning murder of Troy Davis* as to Damion Hardy, Eric Moore, Abubakr Raheem (Haran, Sean) (Entered: 04/10/2008) |
| 04/10/2008 | 310 | Letter *providing supplemental "Brady" material concerning Ivery Davis murder and kidnaping of Ashabudeen Shakoor* as to Damion Hardy, Eric Moore, Abubakr Raheem (Haran, Sean) (Entered: 04/10/2008) |
| 04/14/2008 | 312 | NOTICE *pursuant to F.R.Crim.P. 12.2* by Damion Hardy (Ruhnke, David) (Entered: 04/14/2008) |
| 04/16/2008 | 314 | Letter dated 3/4/08 from Francisco E. Celedonio, Esq. to Judge Dearie as to Damion Hardy, submitted in order to correct a filing that occurred on 2/25/08. (Greene, Donna) (Entered: 04/16/2008) |
| 04/17/2008 | 316 | Transcript of Criminal Cause for Status Conference as to Damion Hardy held on 6/9/2005, before Judge David G. Trager. Official Transcriber Rosalie Lombardi L.F. (Drayton, Lorraine) (Entered: 04/17/2008) |
| 04/17/2008 | 317 | Transcript of Criminal Cause for Arraignment as to Damion Hardy held on 7/20/05, before Judge Robert M. Levy. Official Transcriber: Rosalie Lombardi. L.F. (Drayton, Lorraine) (Entered: 04/17/2008) |
| 04/17/2008 | 318 | Transcript of Criminal Cause for Status Conference as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem, Zareh Sarkissian held on 7/11/07, before Judge |

| | | David G. Trager. Officaial Transcriber: Rosalie Lombardi L.F. (Drayton, Lorraine) (Entered: 04/17/2008) |
|---|---|---|
| 04/17/2008 | 319 | Transcript of Criminal Cause for Status Conference as to Damion Hardy, Eric Moore, Dwayne Meyers, Abubakr Raheem held on 10/19/07, before Judge David G. Trager. Official Transcriber: Rosalie Lombardi. L.F. (Drayton, Lorraine) (Entered: 04/17/2008) |
| 04/18/2008 | 321 | ORDER the application requesting a 15 day extension of the 30 day study period is granted. Ordered by Senior Judge David G. Trager on 4/14/08. (Coleman, Laurie) (Entered: 04/24/2008) |
| 05/09/2008 | 323 | Letter *providing discovery of recorded prison calls* as to Damion Hardy, Aaron Granton (Haran, Sean) (Entered: 05/09/2008) |
| 05/12/2008 | 324 | Letter *providing discovery of draft telephone summary* as to Damion Hardy, Eric Moore, Abubakr Raheem, Aaron Granton (Attachments: # 1 Exhibit Draft Phone Summary 2000 to 2004) (Haran, Sean) (Entered: 05/12/2008) |
| 05/13/2008 | 332 | ORDER granting the request of a 30 day extension of the study period. So ordered. Ordered by Senior Judge David G. Trager on 5/13/2008. (Zoupaniotis, Evan) (Entered: 05/15/2008) |
| 05/14/2008 | 331 | Letter *providing discovery concerning California robbery and government exhibits 289-292* as to Damion Hardy, Eric Moore, Abubakr Raheem, Aaron Granton (Haran, Sean) (Entered: 05/14/2008) |
| 05/19/2008 | 334 | Letter *providing supplemental Brady disclosures* as to Damion Hardy, Eric Moore, Abubakr Raheem, Aaron Granton (Haran, Sean) (Entered: 05/19/2008) |
| 05/19/2008 | 335 | Letter *to the Court relating to the government's satisfaction of its Brady obligations* as to Damion Hardy, Eric Moore, Abubakr Raheem, Aaron Granton (Haran, Sean) (Entered: 05/19/2008) |
| 07/06/2008 | 392 | STATUS REPORT *and request for conference* by Damion Hardy (Ruhnke, David) (Entered: 07/06/2008) |
| 07/08/2008 | | NOTICE OF HEARING as to Damion Hardy<br><br>Status Conference set for 7/16/2008 01:30 PM in Courtroom 8D South before Senior Judge David G. Trager. (Spilke, Ezra) (Entered: 07/08/2008) |
| 07/14/2008 | 416 | Letter *requesting committment pursuant to 18 USC 4241(d) and status conference issues* as to Damion Hardy (Ruhnke, David) (Entered: 07/14/2008) |
| 07/16/2008 | 418 | Minute Entry for proceedings held before Senior Judge David G. Trager: Status Conference as to Damion Hardy, Aaron Granton held on 7/16/2008. Appearances: AUSA James Loonam, Steve D'Alessandro, Sean Haran & Def. Counsels Francisco Celedonio, David Ruhnke for DH/Carl Herman for AG. Further Status Conference set for 7/29/2008 at 10:30 AM before Senior Judge David G. Trager. Status Conference to be held on the issue of severance of defendant's trial. Attorneys for Damion Hardy and Aaron Granton are to attend. (ESR Michele Nardone.) (Zoupaniotis, Evan) (Entered: 07/17/2008) |
| 07/28/2008 | 420 | Letter *Regarding 7/29 Status Conf. Agenda* as to Damion Hardy, Aaron Granton (Beecher, Robert) (Entered: 07/28/2008) |
| 07/29/2008 | 421 | Letter *concerning status* as to Damion Hardy, Eric Moore, Aaron Granton (Haran, Sean) (Entered: 07/29/2008) |
| 07/29/2008 | 422 | Order Committing Defendant For Further Study as to Damion Hardy: The Court has |

| | | |
|---|---|---|
| | | before it two separate findings by the BOP that Mr. Hardy is incompetent to stand trial, and neither party having requested a hearing on the issue, the Court finds, by a preponderance of the evidence, pursuant to 18 USC Section 4241(d), that Mr. Hardy is presently incompetent to stand trial and, pursuant to 18 USC Section 4241(d)(1), hereby commits Mr. Hardy to the custody of the Attorney General who shall hospitalize the defendant the defendant for a period of 120 days (measured from the defendant's arrival at an appropriate hospital-type facility) in order to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward. Ordered by Senior Judge David G. Trager on 7/29/2008. (Zoupaniotis, Evan) (Entered: 07/29/2008) |
| 07/29/2008 | 423 | Minute Entry for proceedings held before Senior Judge David G. Trager: Status Conference as to Damion Hardy, Aaron Granton held on 7/29/2008. Appearances: AUSA James Loonam, Steve D'Alessandro and Sean Haran & Def. Counsels Francisco Celedonio, David Ruhnke, Carl Herman and Bob Beecher. Excludable start 7/29/2008, Excludable stop 12/2/2008. Further Status Conference set for 12/2/2008 at 11:00 AM before Senior Judge David G. Trager, regarding rehabilitation of Damion Hardy. (ESR Shelly Silverman.) (Zoupaniotis, Evan) (Entered: 07/30/2008) |
| 09/10/2008 | 426 | Letter *requesting implementation of order transferring defendant to hospital facility* as to Damion Hardy (Ruhnke, David) (Entered: 09/10/2008) |
| 10/07/2008 | 437 | CJA 30: Authorization to Pay David Ruhnke in Death Penalty Proceedings as to Damion Hardy Voucher # 081003000005.. Ordered by Senior Judge David G. Trager on 09/29/08. (Rios, Laura) (Entered: 10/07/2008) |
| 10/15/2008 | 442 | Letter *discovery of GX 250, 251 and 252* as to Damion Hardy, Eric Moore, Aaron Granton (Haran, Sean) (Entered: 10/15/2008) |
| 10/17/2008 | 443 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Damion Hardy, Aaron Granton held on July 29, 2008, before Judge Trager. Court Reporter/Transcriber S. Silverman, Telephone number 718.613.2537. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/7/2008. Redacted Transcript Deadline set for 11/17/2008. Release of Transcript Restriction set for 1/15/2009. (Silverman, Shelly) (Entered: 10/17/2008) |
| 11/13/2008 | 449 | Letter dated 10/24/2008 from JM Roberts of the Bureau of Prisons to Senior Judge David G. Trager RE: Damion Hardy. (Siegfried, Evan) (Entered: 11/13/2008) |
| 11/26/2008 | 456 | Letter *to Hon. David G. Trager (USDJ/EDNY) requesting adjournment of status conference (on consent from all parties)* as to Damion Hardy, Eric Moore (D'Alessandro, Steven) (Entered: 11/26/2008) |
| 12/01/2008 | | NOTICE OF HEARING as to Damion Hardy, Eric Moore, Aaron Granton Status Conference set for 1/26/2009 01:00 PM in Courtroom 8D South before Senior Judge David G. Trager. (Spilke, Ezra) (Entered: 12/01/2008) |
| 12/23/2008 | 670 | ORDER as to Damion Hardy: Francisco E. Celedonio and Mr. David Ruhnke are approved to expend reasonable expenses to visit their client. Ordered by Senior Judge David G. Trager on 12/23/08. (Chee, Alvin) (Entered: 01/28/2011) |
| 01/23/2009 | 466 | Letter *on consent of the parties regarding adjournment of status conference to March 2, 2009 and requesting an order of excludable delay until March 2, 2009* as to Damion Hardy, Eric Moore, Aaron Granton (D'Alessandro, Steven) (Entered: 01/23/2009) |
| 02/20/2009 | | Attorney update in case as to Allen Bryant, Damion Hardy, James Sessoms, Eric Moore, |

APP. 13

Eastern District of New York - LIVE Database V6.1.1

| | | |
|---|---|---|
| | | Dwayne Meyers, Kenwayne Jones, Abubakr Raheem, Zareh Sarkissian, Robert Footman, Carl Davis, James Farrior, Lamont Johnson, Djebara McMillian, Isheen Campbell, Keith Smith, Aaron Granton. Attorney Beth Farber for Kenwayne Jones added. (Marziliano, August) (Entered: 02/20/2009) |
| 02/26/2009 | 486 | Letter *re adjournment of status conference* as to Damion Hardy, Aaron Granton (Ruhnke, David) (Entered: 02/26/2009) |
| 02/27/2009 | | NOTICE OF HEARING as to Damion Hardy, Eric Moore, Aaron Granton Status Conference set for 3/25/2009 04:30 PM in Courtroom 8D South before Senior Judge David G. Trager. (Spilke, Ezra) (Entered: 02/27/2009) |
| 03/17/2009 | 490 | Forensic Report Received (Sealed) as to Damion Hardy (Marziliano, August) (Entered: 03/17/2009) |
| 03/22/2009 | 492 | Letter *re issues for March 25 status conference* as to Damion Hardy (Ruhnke, David) (Entered: 03/22/2009) |
| 03/24/2009 | 498 | Letter *As Damion Hardy's conditions of confinement* as to Damion Hardy (Celedonio, Francisco) (Entered: 03/24/2009) |
| 03/25/2009 | 499 | Minute Entry for proceedings held before Senior Judge David G. Trager: Status Conference as to Damion Hardy, Aaron Granton held on 3/25/2009. Status Conference set for 6/3/2009 09:30 AM in Courtroom 8D South before Senior Judge David G. Trager. (Court Reporter Shelly Silverman) (Siegfried, Evan) (Entered: 03/26/2009) |
| 05/18/2009 | 522 | CJA 30: Authorization to Pay David Ruhnke in Death Penalty Proceedings as to Damion Hardy Voucher # 090507000006.. Ordered by Senior Judge David G. Trager on 5/05/2009. (Rios, Laura) (Entered: 05/18/2009) |
| 06/02/2009 | | NOTICE OF HEARING Sell Hearing as to Damion Hardy set for 8/24/2009 09:30 AM in Courtroom 8D South before Senior Judge David G. Trager. Status Conference as to Aaron Granton set for 8/24/2009 04:00 PM before Senior Judge David G. Trager. (Spilke, Ezra) (Entered: 06/02/2009) |
| 06/03/2009 | 524 | Letter dated 5/2/2009 to Senior Judge David G. Trager from Damion Hardy RE: defendant provides the Court with records from the Supreme Court. NOTE: As the first page of the attached document cannot be scanned to the point that one can read it, the following is the exact text of the letter- "My name is Damion Hardy number 63258-053 FBI number 968638502-B. Please find enclosed in the case Hardy v. United States (1902) 186 US 224, 46 L Ed 1137, S Ct 889 inserted in semicolons the statement as to my release from prison as to the Au Bell Composition Process according to the Legality Temptrol Process." (Siegfried, Evan) (Entered: 06/03/2009) |
| 08/18/2009 | 542 | Letter as to Damion Hardy (Loonam, James) (Entered: 08/18/2009) |
| 08/24/2009 | 547 | ORDER as to Damion Hardy. ORDERED, pursuant to 28 U.S.C. § 1651, that the Bureau of Prisons, the United States Marshals Service, or any federal officer, shall use all necessary force to secure the appearance of DAMION HARDY on August 25, 2009, in connection with the above-captioned indictment. Ordered by Senior Judge David G. Trager on 8/24/2009. (Siegfried, Evan) (Entered: 08/24/2009) |
| 08/24/2009 | 548 | Letter as to Allen Bryant, Damion Hardy, James Sessoms, Eric Moore, Dwayne Meyers, Kenwayne Jones, Abubakr Raheem, Zareh Sarkissian, Robert Footman, Carl Davis, James Farrior, Lamont Johnson, Djebara McMillian, Isheen Campbell, Keith Smith, Aaron Granton (Loonam, James) (Entered: 08/24/2009) |
| 08/25/2009 | 564 | Minute Entry for proceedings held before Senior Judge David G. Trager: Status Conference as to Damion Hardy held on 8/25/2009. (Court Reporter Nicole Warren) |

|  |  | (Siegfried, Evan) (Entered: 11/30/2009) |
|---|---|---|
| 08/26/2009 | 549 | Consent MOTION for Hearing *to re-open Sell hearing* by Damion Hardy. (Ruhnke, David) (Entered: 08/26/2009) |
| 08/31/2009 |  | NOTICE OF HEARING as to Damion Hardy. Sell Hearing set for 9/23/2009 09:30 AM in Courtroom 8D South before Senior Judge David G. Trager. (Spilke, Ezra) (Entered: 08/31/2009) |
| 11/24/2009 | 576 | Minute Entry for proceedings held before Senior Judge David G. Trager: Status Conference as to Damion Hardy held on 11/24/2009. (Court Reporter Victoria Torres-Butler) (Siegfried, Evan) (Entered: 02/04/2010) |
| 11/30/2009 | 567 | CJA 30: Authorization to Pay David Ruhnke in Death Penalty Proceedings as to Damion Hardy Voucher # 091113000001. Ordered by Senior Judge David G. Trager on 11/9/2009. (Rios, Laura) (Entered: 11/30/2009) |
| 01/06/2010 | 574 | CJA 24 as to Damion Hardy: Authorization to Pay Victoria Torres Voucher # 091231000009. Ordered by Senior Judge David G. Trager on 12/22/09. (Rios, Laura) (Entered: 01/06/2010) |
| 03/11/2010 | 590 | NOTICE OF ATTORNEY APPEARANCE Melissa Marrus appearing for USA. (Marrus, Melissa) (Entered: 03/11/2010) |
| 05/23/2010 | 603 | MOTION for Psychiatric Treatment *pursuant to Sell v. United States* by USA as to Damion Hardy. (Loonam, James) (Entered: 05/23/2010) |
| 06/17/2010 | 609 | Letter *, with consent, requesting extension to file Sell memo reply* as to Damion Hardy (Ruhnke, David) (Entered: 06/17/2010) |
| 06/18/2010 | 610 | ORDER as to Damion Hardy re 609 Letter. Application granted. Ordered by Senior Judge David G. Trager on 6/17/2010. (Siegfried, Evan) (Entered: 06/18/2010) |
| 08/06/2010 | 613 | Letter *, with consent, to extend time to file reply* as to Damion Hardy (Ruhnke, David) (Entered: 08/06/2010) |
| 08/09/2010 | 614 | ORDER as to Damion Hardy re 613 Letter. Application granted. Ordered by Senior Judge David G. Trager on 8/9/2010. (Siegfried, Evan) (Entered: 08/09/2010) |
| 09/07/2010 | 617 | Letter *, wtih consent, requesting extension for Sell reply* as to Damion Hardy (Ruhnke, David) (Entered: 09/07/2010) |
| 09/08/2010 | 619 | ORDER, Endorsed on 617 Letter as to deft. Damion Hardy, granting counsel D. Ruhnke's application for an add'l 30 day extension for the filing of defse. reply to govt's memorandum. (So Ordered by Senior Judge David G. Trager on 9/7/2010). (Layne, Monique) (Entered: 09/08/2010) |
| 10/11/2010 | 631 | Letter *, with consent, requesting final extension re Sell memorandum* as to Damion Hardy (Ruhnke, David) (Entered: 10/11/2010) |
| 10/13/2010 | 632 | ORDER as to Damion Hardy re 631 Letter. Application granted. Ordered by Senior Judge David G. Trager on 10/12/2010. (Siegfried, Evan) (Entered: 10/13/2010) |
| 10/19/2010 | 635 | MEMORANDUM in Opposition re 603 MOTION for Psychiatric Treatment *pursuant to Sell v. United States* (Ruhnke, David) (Entered: 10/19/2010) |
| 12/13/2010 | 645 | CJA 30: Authorization to Pay David Ruhnke in Death Penalty Proceedings as to Damion Hardy Voucher # 101110000001.. Ordered by Senior Judge David G. Trager on 11/10/2010. (Rios, Laura) (Entered: 12/13/2010) |
| 12/14/2010 | 648 | CJA 20 as to Damion Hardy: Authorization to Pay Michael Hueston. Voucher # |

APP. 15

| | | |
|---|---|---|
| | | 101025000260.. Ordered by Senior Judge David G. Trager on 08/11/2010. (Rios, Laura) (Entered: 12/14/2010) |
| 01/11/2011 | 650 | Letter *reply in response to defendant's opposition to the government's motion to medicate the defendant and render him fit for trial* as to Damion Hardy (Loonam, James) (Entered: 01/11/2011) |
| 01/14/2011 | | Judge update in case as to Allen Bryant, Damion Hardy, James Sessoms, Eric Moore, Dwayne Meyers, Kenwayne Jones, Abubakr Raheem, Zareh Sarkissian, Robert Footman, Carl Davis, James Farrior, Lamont Johnson, Djebara McMillian, Isheen Campbell, Keith Smith, Aaron Granton. Senior Judge Frederic Block added. Senior Judge David G. Trager no longer assigned to case. (Marziliano, August) (Entered: 01/14/2011) |
| 01/24/2011 | 664 | Sealed document as to Damion Hardy containing ex-parte application and order of Judge David G. Trager dated 9/29/05 as to investigative assistance. (Chee, Alvin) (Entered: 01/27/2011) |
| 01/26/2011 | 679 | Sealed document as to Damion Hardy containing ex parte application and order dated 1/29/07 by Judge Trager for a mitigation specialist. (Chee, Alvin) (Entered: 02/03/2011) |
| 01/26/2011 | 681 | Sealed document as to Damion Hardy containing ex parte application and order dated 8/16/07 by Judge Trager for a forensic firearms examiner. (Chee, Alvin) (Entered: 02/03/2011) |
| 03/24/2011 | | SCHEDULING ORDER: A status conference as to Damion Hardy and Aaron Granton, a/k/a/ Eric Moore is schedule for April 8, 2011 @ 2:30PM to discuss the status of this newly re-assigned case. By April 1, 2011 counsel shall notify the Court by ECF letter as to whether they all consent to waive the appearance of defendant Damion Hardy. There will be no formal order mailed to counsel. Upon receipt of this email counsel shall confirm with each other the date and time of this conference. Ordered by Senior Judge Frederic Block on 3/24/2011. (Innelli, Michael) (Entered: 03/24/2011) |
| 03/25/2011 | | SCHEDULING ORDER: Counsel's joint E-mail application on 3/24/11 is GRANTED. The status conference as to Damion Hardy and Aaron Granton a/k/a Eric Moorescheduled for April 8, 2011 is adjourned to April 29, 2011 at 12:00 Noon. There will be no formal order mailed to counsel. Upon receipt of this email counsel shall confirm with each other the new date and time of this conference. Ordered by Senior Judge Frederic Block on 3/25/2011. (Innelli, Michael) (Entered: 03/25/2011) |
| 04/27/2011 | 698 | Letter *In Opposition to Government Motion for Forcible Medication* as to Damion Hardy (Celedonio, Francisco) (Entered: 04/27/2011) |
| 04/28/2011 | 699 | STATUS REPORT by Damion Hardy (Ruhnke, David) (Entered: 04/28/2011) |
| 04/29/2011 | | Minute Entry for proceedings held before Senior Judge Frederic Block: AUSA Melissa Marrus; David Ruhnke, Esq. and Francisco Celedonio, Esq. for Mr. Hardy; Robert Beecher, Esq. and Carl Herman, Esq. for Mr. Granton, all present.Status Conference as to Damion Hardy, Aaron Granton held on 4/29/2011. The outstanding Sell issue ( forced medical issue) is discussed. The government shall notify the Court as to a timeline for an updated evaluation of Mr. Hardy by the BOP. The Court will notify counsel whether it will require any further testimony or evidence as to the Sell issue. Within 2 weeks the BOP will notify the Court by letter as to whether Mr. Hardy can be transferred to a BOP medical facility. The next conference for Mr. Hardy is June 16, 2011 @ 11AM. (Court Reporter: Marsh Diamond (718) 613-2489) (Innelli, Michael) Modified on 5/2/2011 (Innelli, Michael). (Entered: 04/29/2011) |
| 05/12/2011 | 701 | ORDER that the defendant DAMION HARDY will be examined pursuant to Title 18, |

| | | United States Code, Section 4241(b). IT IS FURTHER ORDERED that a psychiatric orpsychological report be filed with the Court pursuant to Title 18, United States Code, Section 4247(b). So Ordered by Senior Judge Frederic Block on 5/11/2011. (Lee, Tiffeny) (Entered: 05/12/2011) |
|---|---|---|
| 05/21/2011 | 704 | Letter *providing status update* as to Damion Hardy (Marrus, Melissa) (Entered: 05/21/2011) |
| 06/08/2011 | 709 | ORDER as to Damion Hardy: Defendant to be examined pursuant to 18 U.S.C. 4241(b) at the MDC in Brooklyn, New York, by Dr. Robert Sarrazin or Dr. Lea Ann Preston-Baecht for the purpose of updating the findings presented to the Court at the Sell hearing, which was held on 8/25 and 11/24/09. A psychiatric or psychological report to be filed with the Court pursuant to 18 U.S.C. 4247(b). Ordered by Senior Judge Frederic Block on 6/7/2011. (Chee, Alvin) (Entered: 06/09/2011) |
| 06/14/2011 | 711 | AFFIDAVIT in Opposition re 603 MOTION for Psychiatric Treatment *pursuant to Sell v. United States* (Attachments: # 1 Affidavit in Opposition of Xavier F. Amador, Ph.D., # 2 Appendix C.V. of Xavier F. Amador, Ph.D.) (Ruhnke, David) (Entered: 06/14/2011) |
| 06/15/2011 | | SCHEDULING ORDER: The status conference as to Damion Hardy scheduled for June 16, 2011 is being adjourned by the Court to August 23, 2011 @ 11:00 AM to allow time for the BOP to prepare and issue an updated psychiatric or psychological report pursuant to T. 18 U.S.C. 4241(b). The Court will enter an order waiving speedy trial until August 23, 2011 in the interest of justice. There will not be a formal order mailed to counsel. Upon receipt of this email counsel shall confirm with each other the new date and time of this conference. Ordered by Senior Judge Frederic Block on 6/15/2011. (Innelli, Michael) Modified on 6/15/2011 (Innelli, Michael). (Entered: 06/15/2011) |
| 06/15/2011 | | ORDER TO CONTINUE - Ends of Justice as to Damion Hardy. Time excluded from 6/16/11 until 8/23/11 in the interest of justice. Ordered by Senior Judge Frederic Block on 6/15/2011. (Innelli, Michael) (Entered: 06/15/2011) |
| 07/20/2011 | 721 | Letter dated 7/6/11 from Paul Celestin, Acting Warden at the U.S. Medical Center, to Judge Frederic Block, regarding medical evaluation as to Damion Hardy, (Chee, Alvin) (Entered: 07/20/2011) |
| 08/16/2011 | | SCHEDULING ORDER: Counsel's joint E-mail application on 8/16/11 is GRANTED. The status conference as to Damion Hardy scheduled for August 23, 2011 is adjourned to September 14, 2011 at 2:30 P.M. There will be no formal order mailed to counsel. Upon receipt of this email counsel shall confirm with each other the new date and time of this conference. Ordered by Senior Judge Frederic Block on 8/16/2011. (Innelli, Michael) (Entered: 08/16/2011) |
| 09/13/2011 | | SCHEDULING ORDER: Defendant's telephone application on 9/13/11, with the consent of the government is GRANTED. The status conference as to Damion Hardy scheduled for September 14, 2011 is adjourned to September 26, 2011 at 2:30 P.M. There will be no formal order mailed to counsel. Upon receipt of this email counsel shall confirm with each other the new date and time of this conference. Ordered by Senior Judge Frederic Block on 9/13/2011. (Innelli, Michael) (Entered: 09/13/2011) |
| 09/22/2011 | 737 | Sealed document as to Damion Hardy containing letter dated 9/19/09 from Richard Dudley, M.D., to David Ruhnke, Esq., regarding competency of defendant. (Chee, Alvin) (Entered: 09/22/2011) |
| 09/28/2011 | 738 | Letter *with proposed order for psychological re-examination* as to Damion Hardy (Attachments: # 1 Proposed Order) (Marrus, Melissa) (Entered: 09/28/2011) |
| 09/28/2011 | 739 | Letter *with amended proposed order for psychiatric re-evaluation* as to Damion Hardy |

| | | (Attachments: # 1 Proposed Order) (Marrus, Melissa) (Entered: 09/28/2011) |
|---|---|---|
| 09/30/2011 | 740 | ORDER as to Damion Hardy: Defendant to be examined, pursuant to 18 U.S.C. § 4241(d), at the United States Medical Center for Federal Prisoners in Springfield, Missouri by Dr. Robert Sarrazin and Dr. Lea Ann Preston-Baecht, for the purpose of updating the findings presented to the Court at the hearing, which was held on August 25 and November 24, 2009. See document for further details. Ordered by Senior Judge Frederic Block on 9/29/2011. (Chee, Alvin) (Entered: 09/30/2011) |
| 09/30/2011 | 741 | Letter dated 9/28/11 from Damion Hardy, pro se, to Hon. Frederic Block, requesting that the Court look into the matter of his release date. (Chee, Alvin) (Entered: 10/11/2011) |
| 10/24/2011 | 744 | CJA 30: Authorization to Pay David Ruhnke in Death Penalty Proceedings as to Damion Hardy Voucher # 110926000007.. Ordered by Senior Judge Frederic Block on 09/20/2011. (Rios, Laura) (Entered: 10/24/2011) |
| 11/10/2011 | 749 | TRANSCRIPT of Proceedings as to Damion Hardy held on 9/9/2004, before Judge Bloom. Court Transcriber ARIA TRANSCRIPTIONS, Telephone number 845-260-1377. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/1/2011. Redacted Transcript Deadline set for 12/12/2011. Release of Transcript Restriction set for 2/8/2012. (Hong, Loan) (Entered: 11/10/2011) |
| 11/15/2011 | 751 | TRANSCRIPT of Proceedings as to Damion Hardy held on 11/8/04, before Judge Trager. Court Transcriber TRANSCRIPTION PLUS II, Telephone number 718-987-4285. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/6/2011. Redacted Transcript Deadline set for 12/16/2011. Release of Transcript Restriction set for 2/13/2012. (Hong, Loan) (Entered: 11/15/2011) |
| 11/15/2011 | 752 | TRANSCRIPT of Proceedings as to Damion Hardy held on 12/7/04, before Judge Trager. Court Transcriber TRANSCRIPTION PLUS II, Telephone number 718-987-4285. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/6/2011. Redacted Transcript Deadline set for 12/16/2011. Release of Transcript Restriction set for 2/13/2012. (Hong, Loan) (Entered: 11/15/2011) |
| 11/15/2011 | 753 | TRANSCRIPT of Proceedings as to Damion Hardy held on 6/9/05, before Judge Trager. Court Transcriber TRANSCRIPTION PLUS II, Telephone number 718-987-4285. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/6/2011. Redacted Transcript Deadline set for 12/16/2011. Release of Transcript Restriction set for 2/13/2012. (Hong, Loan) (Entered: 11/15/2011) |
| 11/17/2011 | 754 | TRANSCRIPT of Proceedings as to Damion Hardy held on July 20, 2005, before Judge Levy. Court Transcriber: Aria Transcriptions, Telephone number 845-260-1377. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/8/2011. Redacted Transcript Deadline set for 12/19/2011. Release of Transcript Restriction set for 2/15/2012. (Rocco, Christine) (Entered: 11/17/2011) |
| | | |

| 11/17/2011 | 755 | Letter dated 11/6/11 from Sharon Bennett, Mental Health Unit Manager at the U.S. Medical Center for Federal Prisoners, to Hon. Frederic Block, advising that defendant Hardy will remain at this facility for up to four months in an attempt to restore competency for trial. (Chee, Alvin) (Entered: 11/17/2011) |
| --- | --- | --- |
| 11/17/2011 | | SCHEDULING ORDER: A status conference as to Damion Hardy is schedule for November 18, 2011 @ 2:30PM to discuss the letter 755 dated 11/6/11 from the Bureau of Prisons. The defendant's appearance is waived, since he has been transferred to the Springfield facility. There will be no formal order mailed to counsel. Upon receipt of this email counsel shall confirm with each other the date and time of this conference. Ordered by Senior Judge Frederic Block on 11/17/2011. (Innelli, Michael) (Entered: 11/17/2011) |
| 11/18/2011 | 756 | STATUS REPORT *re involuntary medication* by Damion Hardy (Ruhnke, David) (Entered: 11/18/2011) |
| 11/18/2011 | | Minute Entry for proceedings held before Senior Judge Frederic Block: AUSA James Loonam & Mellisa Marrus; David Ruhnke, Esq. & Francisco Celedonio, Esq. for Mr. Hardy, all present Status Conference as to Damion Hardy held on 11/18/2011. The defendant's appearance is waived, since he is located in the Springfield Facility. The BOP's letter dated 11/6/11 and the recent forensic report dated 11/17/11 are discussed. The BOP will conduct a Harper hearing and issue a report by the next conference which is scheduled for 11/29/11 @ 11AM. By November 21, 2011 counsel will submit a joint proposed order as to what other issues were discussed at the conference.(Court Reporter: Gene Rudolph (718) 613-2538) (Innelli, Michael) (Entered: 11/18/2011) |
| 11/21/2011 | | SCHEDULING ORDER: Counsel's joint telephone application on 11/21/11 is GRANTED. The status conference as to Damion Hardy scheduled for November 29, 2011 is adjourned to December 15, 2011 at 3:00 P.M. There will be no formal order mailed to counsel. Upon receipt of this email counsel shall confirm with each other the new date and time of this conference. Ordered by Senior Judge Frederic Block on 11/21/2011. (Innelli, Michael) (Entered: 11/21/2011) |
| 11/21/2011 | 757 | Letter *concerning proposed order* as to Damion Hardy (Attachments: # 1 Proposed Order) (Loonam, James) (Entered: 11/21/2011) |
| 11/21/2011 | 758 | Letter *concerning the proposed order* as to Damion Hardy (Loonam, James) (Entered: 11/21/2011) |
| 11/23/2011 | 759 | Letter *to Carlos Tomelleri, MD, MCFP/Springfield* as to Damion Hardy (Ruhnke, David) (Entered: 11/23/2011) |
| 11/23/2011 | 760 | Letter *to Warden MCFP/Springfield* as to Damion Hardy (Ruhnke, David) (Entered: 11/23/2011) |
| 11/23/2011 | 761 | ORDER as to Damion Hardy: The United States Medical Center for Federal Prisoners in Springfield, Missouri shall proceed with the administrative hearing pursuant to 28 C.F.R. § 549.46(a), which is currently scheduled to be held on or about 11/29/11. A copy of the written report of the administrative hearing to be prepared and shall be provided to the Court as soon as practicable after the administrative hearing, and in any event, no later than 12/6/11. Defendant shall not be subjected to involuntary medication pursuant to the procedures set forth in 28 C.F.R. § 549.46(a), unless so ordered by this Court and after notice to, and an opportunity to be heard by, the parties, including defense counsel Ruhnke and Celedonio. See document for further details. Ordered by Senior Judge Frederic Block on 11/23/2011. (Chee, Alvin) Modified on 11/23/2011 (Chee, Alvin). (Entered: 11/23/2011) |
| 12/09/2011 | 766 | Letter dated 11/26/11 from Damion Hardy, pro se, to Clerk of Court, requesting copies |

| | | |
|---|---|---|
| | | of the orders to be released from detention issued by Judge Trager in 2004 or the beginning of 2005. (Chee, Alvin) (Entered: 12/12/2011) |
| 12/09/2011 | 767 | Letter dated 11/25/11 from Damion Hardy, pro se, to Clerk of Court, advising the Court that he has authorized for $3.5 million dollars to be paid as to his release from the New York City Comptroller's Office. Mr. Hardy requests a copy of the docket sheet once this document has been entered. (Chee, Alvin) (Entered: 12/12/2011) |
| 12/12/2011 | 768 | Sealed document as to Damion Hardy containing BOP Involuntary Medication Report dated 11/29/11. (Chee, Alvin) (Entered: 12/14/2011) |
| 12/12/2011 | 769 | Sealed document as to Damion Hardy containing the BOP's Amended Involuntary Medication Report dated 12/6/11. (Chee, Alvin) (Entered: 12/14/2011) |
| 12/12/2011 | 773 | Sealed document as to Damion Hardy containing BOP's letter dated 12/8/11 as to amended involuntary medication report. (Chee, Alvin) (Entered: 12/14/2011) |
| 12/14/2011 | 770 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Damion Hardy held on January 19, 2005, before Judge Trager. Court Reporter/Transcriber Burt Sulzer, Telephone number 718 613-2481. Email address: bsulzer@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/4/2012. Redacted Transcript Deadline set for 1/17/2012. Release of Transcript Restriction set for 3/13/2012. (Sulzer, Burt) (Entered: 12/14/2011) |
| 12/14/2011 | 771 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Allen Bryant, Damion Hardy, James Sessoms, Eric Moore, Dwayne Meyers, Kenwayne Jones, Abubakr Raheem, Zareh Sarkissian, Robert Footman, Carl Davis, James Farrior, Lamont Johnson, Djebara McMillian, Isheen Campbell, Keith Smith, Aaron Granton held on August 4, 2005, before Judge Trager. Court Reporter/Transcriber Burt Sulzer, Telephone number 718 613-2481. Email address: bsulzer@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/4/2012. Redacted Transcript Deadline set for 1/17/2012. Release of Transcript Restriction set for 3/13/2012. (Sulzer, Burt) (Entered: 12/14/2011) |
| 12/14/2011 | 772 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Allen Bryant, Damion Hardy, James Sessoms, Eric Moore, Dwayne Meyers, Kenwayne Jones, Abubakr Raheem, Zareh Sarkissian, Robert Footman, Carl Davis, James Farrior, Lamont Johnson, Djebara McMillian, Isheen Campbell, Keith Smith, Aaron Granton held on February 14, 2006, before Judge Trager. Court Reporter/Transcriber Burt Sulzer, Telephone number 718 613-2481. Email address: bsulzer@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/4/2012. Redacted Transcript Deadline set for 1/17/2012. Release of Transcript Restriction set for 3/13/2012. (Sulzer, Burt) (Entered: 12/14/2011) |
| 12/15/2011 | 775 | Letter *Relating to 12/15/2011 Conference* as to Damion Hardy (Celedonio, Francisco) (Entered: 12/15/2011) |
| 12/15/2011 | 776 | Letter *in response to the defense letter dated December 15, 2011* as to Damion Hardy (Loonam, James) (Entered: 12/15/2011) |
| 12/15/2011 | | Minute Entry for proceedings held before Senior Judge Frederic Block: AUSA's James Loonam and Melissa Marrus; Francisco Celedonio, Esq. and David Ruhnke, Esq. for |

APP. 20

| | | |
|---|---|---|
| | | Mr. Hardy, all present. Status Conference as to Damion Hardy held on 12/15/2011. The defendant's present is waived, because he is still located in the Medical Center located in Springfield, Missouri. The BOP's involuntary medication report and amended involuntary medication report are discussed. A Sell/ Harper hearing is scheduled for 1/11/12 @ 10AM. The defendant shall particiapte by video conferencing from the Springfield, Missouri Facility(Court Reporter: Henry Shapiro (718) 613-2509) (Innelli, Michael) (Entered: 12/15/2011) |
| 12/15/2011 | | ORDER TO CONTINUE - Ends of Justice as to Damion Hardy. Time excluded from 12/15/11 until 1/11/12 in the interest of justice. Ordered by Senior Judge Frederic Block on 12/15/2011. (Innelli, Michael) (Entered: 12/15/2011) |
| 12/27/2011 | 777 | SCHEDULING ORDER: The Sell and Harper Hearings as to defendant Damion Hardy is scheduled for January 26 & 27, 2012 and if needed January 30, 2012 from 10AM to 4PM Eastern Time. The defendant shall participate by video conferencing from the Medical Center in Springfield, Missouri. All of the BOP treating doctors shall tesify in person, except Dr. Tomelleri who will testify by video conferencing, because he is not able to travel to New York on the above dates. Ordered by Senior Judge Frederic Block on 12/27/2011. (Innelli, Michael) (Chee, Alvin). (Entered: 12/27/2011) |
| 01/25/2012 | 778 | Ex parte letter order dated 1/25/12 re CJA funds as to Damion Hardy. (Chee, Alvin) (Entered: 01/26/2012) |
| 01/26/2012 | | Minute Entry for proceedings held before Senior Judge Frederic Block: AUSAs James Loonam & Melisa Marrus; Francisco Celedonio, Esq. & David Ruhnke, Esq. for Mr. Hardy, all present. Competency Hearing as to Damion Hardy held on 1/26/12. The defendant participates by video conferencing from the Medical Facility in Springfield, Missouri. The defendants competency, forced medication & danger issues are discussed. Witnesses are sworn & testify and exhibits are offered & entered into evidence. The hearing is continued on 1/27/12 @ 10AM. The transcript is ordered by counsel & the Court. (Court Reporter: Michelle Nardone (718) 613-2601) (Innelli, Michael) (Entered: 01/26/2012) |
| 01/26/2012 | 779 | Sealed document as to Damion Hardy containing government's letter dated 1/25/12 as to hearing witness. (Chee, Alvin) (Entered: 01/30/2012) |
| 01/26/2012 | 780 | Letter dated 1/20/12 from Damion Hardy, pro se, enclosing a "statement as to his release according to U.S.C.S. federal statute 1514§." (Chee, Alvin) (Entered: 02/01/2012) |
| 01/27/2012 | | Minute Entry for proceedings held before Senior Judge Frederic Block: AUSAs James Loonam & Melisa Marrus; Francisco Celedonio, Esq. & David Ruhnke, Esq. for Mr. Hardy, all present. Competency Hearing as to Damion Hardy held on 1/27/12. The defendant participates by video conferencing from the Medical Facility in Springfield, Missouri. The defendants competency, forced medication & danger issues are discussed. Witnesses are sworn & testify and exhibits are offered & entered into evidence. The hearing is concluded. Further papers to be submitted 3 weeks after counsel receive the transcripts of this hearing. The transcript is ordered by counsel and the Court. (Court Reporter: Mary Agnus Drury (718) 613-2615) (Innelli, Michael) (Entered: 01/27/2012) |
| 02/08/2012 | | SCHEDULING ORDER: By February 29, 2012 counsel shall serve and ECF their further submissions with respect to the Sell & Harper hearing held on 1/26-27/12 as to Damion Hardy. Ordered by Senior Judge Frederic Block on 2/8/2012. (Innelli, Michael) (Entered: 02/08/2012) |
| 02/14/2012 | 781 | Letter dated 2/7/12 from Damion Hardy, pro se, to Hon. Frederic Block regarding a 2009 release date stated in the New York Law Journal and the Criminal Law Reporter. |

| | | (Chee, Alvin) (Entered: 02/14/2012) |
|---|---|---|
| 02/15/2012 | 782 | Sealed document containing ex parte letter application dated 1/31/12 and so ordered letter dated 2/15/12 as to CJA funds to travel as to Damion Hardy. (Chee, Alvin) (Entered: 02/16/2012) |
| 03/06/2012 | 783 | MEMORANDUM in Opposition re 603 MOTION for Psychiatric Treatment *pursuant to Sell v. United States and/or for forcible medication on the basis of danger to others* (Attachments: # 1 Jackson Study, # 2 Kane Study) (Ruhnke, David) (Entered: 03/06/2012) |
| 03/07/2012 | 784 | MOTION for Psychiatric Treatment by USA as to Damion Hardy. (Loonam, James) (Entered: 03/07/2012) |
| 03/07/2012 | | Motions terminated, docketed incorrectly. Motion 784 for psychiatric treatment is not a formal motion, but rather a second memorandum in support of their pending motion 603 for psychiatric treatment. (Innelli, Michael) (Entered: 03/07/2012) |
| 04/18/2012 | 787 | Ex-Parte document as to Damion Hardy containing letter dated 4/17/12 and order of Judge Block dated 4/18/12 as to CJA funds. (Chee, Alvin) (Entered: 04/26/2012) |
| 06/06/2012 | 791 | CJA 24 as to Damion Hardy: Authorization to Pay Michele Nardone. Voucher # 120424000012. Ordered by Senior Judge Frederic Block on 4/5/12. (Chee, Alvin) (Entered: 06/06/2012) |
| 06/06/2012 | 793 | CJA 30: Authorization to Pay David Ruhnke in Death Penalty Proceedings as to Damion Hardy. Voucher # 120112000015. Ordered by Senior Judge Frederic Block on 1/10/12. (Chee, Alvin) (Entered: 06/06/2012) |
| 06/07/2012 | 797 | CJA 30: Authorization to Pay David Ruhnke in Death Penalty Proceedings as to Damion Hardy. Voucher # 120411000024. Ordered by Senior Judge Frederic Block on 4/3/12. (Chee, Alvin) (Entered: 06/07/2012) |
| 06/07/2012 | 798 | CJA 30: Authorization to Pay David Ruhnke in Death Penalty Proceedings as to Damion Hardy. Voucher # 120411000023. Ordered by Senior Judge Frederic Block on 4/3/12. (Chee, Alvin) (Entered: 06/07/2012) |
| 06/08/2012 | 799 | CJA 30: Authorization to Pay David Ruhnke in Death Penalty Proceedings as to Damion Hardy. Voucher # 120424000008. Ordered by Senior Judge Frederic Block on 4/18/12. (Chee, Alvin) (Entered: 06/08/2012) |
| 06/08/2012 | 800 | CJA 30: Authorization to Pay Francisco Celedonio in Death Penalty Proceedings as to Damion Hardy. Voucher # 120430000001. Ordered by Senior Judge Frederic Block on 4/18/2012. (Chee, Alvin) (Entered: 06/08/2012) |
| 06/11/2012 | 803 | CJA 24 as to Damion Hardy: Authorization to Pay Henry Shapiro. Voucher # 111227000035. Ordered by Senior Judge Frederic Block on 12/19/11. (Chee, Alvin) (Entered: 06/11/2012) |
| 06/11/2012 | 804 | CJA 30: Authorization to Pay David Ruhnke in Death Penalty Proceedings as to Damion Hardy. Voucher # 120328000008. Ordered by Senior Judge Frederic Block on 3/22/12. (Chee, Alvin) (Entered: 06/11/2012) |
| 07/02/2012 | 808 | Letter dated 6/20/12 from Damion Hardy, pro se, to Judge Frederic Block, regarding release date. (Chee, Alvin) (Entered: 07/11/2012) |
| 07/19/2012 | 810 | MEMORANDUM & ORDER: The BOP is authorized to implement Dr. Tomelleris decision to involuntarily medicate Hardy to reduce the danger he poses to staff. It is further authorized to involuntarily medicate Hardy in accordance with the treatment plan set out in Dr. Sarrazins February 2009 report for the purpose of restoring Hardys |

APP. 22

| | | |
|---|---|---|
| | | competency to stand trial. The Courts prior order prohibiting involuntary medication shall, however, remain in effect long enough to allow Hardy to file and expeditiously pursue an appeal. Terminating motions 280 ; 549 and 603 . Counsel shall provide a copy this memorandum and order to the BOP forthwith. Ordered by Judge Frederic Block on 7/19/2012. (Innelli, Michael) (Entered: 07/19/2012) |
| 07/23/2012 | 811 | NOTICE OF APPEAL (Interlocutory) by Damion Hardy re 810 Order on Motion to Seal, Order on Motion for Hearing, Order on Motion for Psychiatric Treatment. No fee paid, as appellant is represented by CJA Panel counsel. Service done electronically. (Manuel, Germaine) (Entered: 07/23/2012) |
| 07/23/2012 | | Electronic Index to Record on Appeal as to Damion Hardy sent to US Court of Appeals 811 Notice of Appeal - Interlocutory. Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (Manuel, Germaine) (Entered: 07/23/2012) |
| 07/24/2012 | | Minute Entry for proceedings held before Judge Frederic Block: AUSA James Loonam and David Ruhnke, Esq. and Francisco Celedonio, Esq. for Mr. Hardy by telephone. Status Conference as to Damion Hardy held on 7/24/2012. The recent incident report of Mr. Hardy on prison guards is discussed. Drs. Sarrazin & Preston-Baecht are sworn and testify by telephone. The matter will be continued on 8/3/12 @ 2:30PM so the prison guards can testify and counsel can address the issue as to whether this Court still has jurisdiction since an appeal has been filed as to the Court's 7/19/12 memorandum & order. (Court Reporter: Lisa Schwam (718) 613-2268) (Innelli, Michael) (Entered: 07/24/2012) |
| 08/03/2012 | | Minute Entry for proceedings held before Judge Frederic Block: AUSA James Loonam and David Ruhnke, Esq. and Francisco Celedonio, Esq. for Mr. Hardy, all present. Status Conference as to Damion Hardy held on 8/3/2012. Witnesses are sworn & testify and exhibits are offered & entered into evidence. The parties agree to an expedited briefing schedule and jointly apply to the Second Circuit for an expedited oral argument. The government withdraws its application to lift the stay on the Court's order of 7/19/12, without prejudice to renewal should circumstances warrant. (Court reporter: Michelle Nardone (718) 613-2601) (Innelli, Michael) Modified on 8/6/2012 (Innelli, Michael). (Entered: 08/06/2012) |
| 08/20/2012 | 814 | Letter dated 8/16/12 from Damion Hardy, pro se, to Hon. Frederic Block, regarding release date. (Chee, Alvin) (Entered: 09/18/2012) |
| 08/23/2012 | 813 | Letter dated 8/18/12 from Damion Hardy, pro se, to Hon. Frederic Block, regarding release date. (Chee, Alvin) (Entered: 08/27/2012) |
| 02/28/2013 | 830 | CJA 30: Authorization to Pay David Ruhnke in Death Penalty Proceedings as to Damion Hardy. Voucher # 01025000001. Ordered by Judge Frederic Block on 10/21/11. (Chee, Alvin) (Entered: 02/28/2013) |
| 03/20/2013 | 831 | CJA 24 as to Damion Hardy: Authorization to Pay Michele Nardone Voucher # 121119000049.. Ordered by Judge Frederic Block on 11/08/2012. (Rios, Laura) (Entered: 03/20/2013) |
| 05/14/2013 | 836 | CJA 24 as to Damion Hardy: Authorization to Pay Lisa Schwam Voucher # 121211000045.. Ordered by Judge Frederic Block on 11/30/12. (Rios, Laura) (Entered: 05/14/2013) |
| 06/24/2013 | 838 | Letter dated 6/19/13 from Damion Hardy, pro se, to Hon. Frederic Block regarding release date. (Chee, Alvin) (Entered: 06/26/2013) |

| | | |
|---|---|---|
| 07/22/2013 | 842 | Letter dated 7/17/13 from Damion Hardy to Clerk of Court, re: $3,500,000 and seeking to have "this Court look into the matters discussed in this letter, so that the deft may be released from prison immediately." (Galeano, Sonia) (Entered: 07/25/2013) |
| 08/16/2013 | | SCHEDULING ORDER: A status conference as to defendants Damion Hardy and Aaron Granton is schedule for September 25, 2013 @ 11AM to discuss any pre-trial matters and a possible trial date. There will be no formal notice mailed to counsel. Upon receipt of this email counsel shall confirm with each other the date and time of this conference. Ordered by Judge Frederic Block on 8/16/2013. (Innelli, Michael) (Entered: 08/16/2013) |
| 09/25/2013 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs James Loonam; Francisco Celedonio, Esq. & David Ruhnke,,Esq. for Mr. Hardy and Robert Beecher, Esq. & Carl Herman, Esq. for Mr. Granton, all present. Status conference as to Damion Hardy and Aaron Granton held on 9/25/13. Defendant Hardy is present by video conference from the BOP Medical Facility in Springfield Missouri and Mr. Granton is present. The mandate has not issued yet, because defendant Hardy has a application for an en banc hearing pending in the Second Circuit as to their 8/2/13 decision as to forced medication. Counsel have submitted further mitigation factors to the DOJ to reconsider the death penalty in this case as to both defendants. For the reasons stated on the record by 2/1/14 the Court would like a decision from the DOJ as to whether this case will still be death penalty eligible as to both defendants. Once the mandate is issued the Court will then schedule another conference to discuss and pre-trial matters. Counsel will submit under seal the total current CJA costs spent on this case. (Court Reporter: Lisa Schmid (718) 613-2644) (Innelli, Michael) (Entered: 09/25/2013) |
| 10/07/2013 | | SCHEDULING ORDER: The status conference as to Damion Hardy and Aaron Granton scheduled for October 9, 2013 @ 11AM is canceled until a mandate is issued from the Circuit. Ordered by Judge Frederic Block on 10/7/2013. (Innelli, Michael) (Entered: 10/07/2013) |
| 10/28/2013 | 848 | Letter dated 10/19/13 from Damion Hardy to Judge Block, addressing criminal case #04-cr-706. Deft Hardy request that this Court obtain the documents he seeks and look into all of the matters discussed herein, so that he can be released from prison immediately. (Galeano, Sonia) (Entered: 10/29/2013) |
| 11/12/2013 | 849 | MANDATE of USCA (certified copy) as to Damion Hardy re: 811 Notice of Interlocutory Appeal. IT IS HEREBY ORDERED, ADJUDGED and DECREED that the order of the District Court is AFFIRMED in accordance with the opinion of this Court.Mandate issued: 11/12/13. (Attachments: # 1 Opinion) (McGee, Mary Ann) (Entered: 11/12/2013) |
| 11/19/2013 | | SCHEDULING ORDER: A status conference as to defendants Damion Hardy and Aaron Granton is schedule for November 25, 2013 @ 11AM to discuss the most recent 2nd Circuit Mandate and the medication proceedure as to Damion Hardy, any pre-trial matters and a possible jury trial date. There will be no formal notice mailed to counsel. Upon receipt of this email counsel shall confirm with each other the date and time of this conference. Ordered by Judge Frederic Block on 11/19/2013. (Innelli, Michael) (Entered: 11/19/2013) |
| 11/19/2013 | 850 | Letter *concerning the Court's previously entered forcible medication order* as to Damion Hardy (Attachments: # 1 Proposed Order) (Loonam, James) (Entered: 11/19/2013) |
| 11/21/2013 | 856 | ORDER as to Damion Hardy. That the stay of the Court's 7/19/12 order is lifted insofar as the BOP is authorized to medicate the deft Damion Hardy involuntarily pursuant to Washington v. Harper, 494 U.S. 2010 (1990) to reduce the danger he poses to prison |

staff. IT IS FURTHER ORDERED that if at present or if a time comes when the BOP determines that it is no longer appropriate to medicate the deft Damion Hardy involuntarily pursuant to Harper, 494 US 2010, to reduce the danger he poses to prison staff, the BOP shall promptly notify this Court. The BOP is not authorized to medicate Hardy pursuant to Sell to render Hardy competent to stand trial without further authorization from this Court. (Ordered by Judge Frederic Block on 11/21/2013) c/m by chambers. (Galeano, Sonia) (Entered: 11/26/2013)

| Date | No. | Description |
|---|---|---|
| 11/22/2013 | 853 | Letter MOTION to Compel *visit*, Letter MOTION to Travel *pursuant to CJA* by Damion Hardy as to Damion Hardy. (Attachments: # 1 Sealing Cover Sheet) (Marziliano, August) (Entered: 11/25/2013) |
| 11/22/2013 | 854 | ORDERgranting 853 Motion to Compel as to Damion Hardy (2). Signed by Judge Frederic Block on 11/22/2013. (Marziliano, August) (Entered: 11/25/2013) |
| 11/22/2013 | 855 | ORDERgranting 853 Motion to Travel as to Damion Hardy (2). Signed by Judge Frederic Block on 11/22/2013. (Marziliano, August) (Entered: 11/25/2013) |
| 11/24/2013 | 851 | Letter *regarding 11/25 status conference* as to Damion Hardy (Ruhnke, David) (Entered: 11/24/2013) |
| 11/25/2013 | | Minute Entry for proceedings held before Judge Frederic Block: AUSA James Loonam; Francisco Celedonio, Esq. & David Ruhnke,,Esq. for Mr. Hardy and Robert Beecher, Esq. & Carl Herman, Esq. for Mr. Granton, all present. Status conference as to Damion Hardy and Aaron Granton held on 11/25/13. Defendant Hardy is present by video conference from the BOP Medical Facility in Springfield Missouri and Mr. Granton is present in person. Dr. Sarrazin is present and appears by video conference. The recent mandate was discussed as well as the governments letter 850 and joint proposed order as to forced medication. The Court approves the joint proposed order as to medication copies were given to counsel in open court and the Court will provides copies to the Springfield Medical Facility. Mr. Hardys motion for reconsideration filed with the DOJ as to the death penalty eligibility is still pending and the governments opposition is due in February 2014. Defendant Hardys letter 851 dated 11/24/13 is discussed and a conference is scheduled for 2/21/14 @ 11AM to continue to update the Court with respect to defendant Hardys medication and how it is working to rendering him competent to stand trial and whether he is a danger to himself or others. Jury selection and trial as to both defendant Hardy & Granton is scheduled for January 5, 2015. If Hardy is not fit for trial by 2015, then the Court will sever defendant Granton who shall be prepared to go forward on January 5, 2015 with jury selection & trial. Upon the consent of counsel and in the interest of justice and this being a complex case for speedy trial purposes the Court will enter an order waiving speedy trial until the next video conference date scheduled for 2/21/14 @ 11:00AM. (Court Reporter: Gene Rudolph (718) 613-2538) (Innelli, Michael) (Entered: 11/25/2013) |
| 11/25/2013 | | ORDER TO CONTINUE - Ends of Justice as to Damion Hardy and Aaron Granton. Time excluded from 11/25/13 until 2/21/14 in the interest of justice and a finding by the Court that this is a complex case for speedy trial purposes. Ordered by Judge Frederic Block on 11/25/2013. (Innelli, Michael) (Entered: 11/25/2013) |
| 02/21/2014 | | Minute Entry for proceedings held before Judge Frederic Block: AUSA James Loonam; Francisco Celedonio, Esq & David Ruhnke, Esq for Mr. Hardy and Robert Beecher, Esq & Carl Herman, Esq for Mr. Granton, all present. Status conference as to Damion Hardy & Aaron Granton held on 2/21/14. Mr. Hardy participated by video from the Springfield Medical Facility along with Dr. Sarrazin and Mr. Granton did hot appear, because he was not feeling well. The Government updates the Court as to the status of Mr. Hardys medication program. The defendants motions for reconsideration as to the death penalty for both defendants is still pending before the DOJ. The Government expects a decision |

| | | |
|---|---|---|
| | | from the DOJ by mid-May 2014. The 1/5/15 trial date was discussed further. Upon the consent of counsel and in the interest of justice the Court will enter an order waiving speedy trial until the next conference date which is 5/29/14 @ 11AM. (Court Reporter: Charisse Kitt (718) 613-2606) (Innelli, Michael) (Entered: 02/21/2014) |
| 02/21/2014 | | ORDER TO CONTINUE - Ends of Justice as to Damion Hardy and Aaron Granton. Time excluded from 2/21/14 until 5/29/14 in the interest of justice and the Court's finding that this is a complex case for speedy trial purposes. Ordered by Judge Frederic Block on 2/21/2014. (Innelli, Michael) (Entered: 02/21/2014) |
| 03/14/2014 | 862 | PRO SE MOTION to Dismiss *the Indictment* by Damion Hardy. (Lee, Tiffeny) (Entered: 03/20/2014) |
| 05/29/2014 | | Minute Entry for proceedings held before Judge Frederic Block: AUSA James Loonam; Francisco Celedonio, Esq & David Ruhnke, Esq for Mr. Hardy and Robert Beecher, Esq and Carl Herman, Esq. for Mr, Granton, all present. Status conference as to Damion Hardy and Aaron Granton held on 5/29/14. Mr. Hardy is participating by video from the Springfield Medical Facility and Mr. Granton refused to appear in Court as reported by the Marshall. The Government updates the Court and counsel on the progress of Mr. Hardy medication and his ability to be present for his jury trial scheduled in January 2015. Counsel update the Court as to the progress of their application to the DOJ in Washington D.C. to reconsider their determination to seek the death penalty as to both defendants and other pre-trial matters were discussed. The Government informs the Court that the DOJ is no longer seeking the death penalty as to both defendants in this case. Learned counsels oral application to remain on the case was discussed and the Court reserves decision for the reasons stated on the record. Mr. Ruhnke and Mr. Herman will submit a letter via ECF with respect to learned counsel's application to remain on this case and the costs involved. Upon the consent of counsel and in the interest of justice and this being designated a complex case for speedy trial purposes the Court will enter an order waiving speedy trial until the next conference date which is 9/12/14 @ 11:00AM. (Court Reporter: Allan Sherman (718) 613-2529) (Innelli, Michael) (Entered: 05/29/2014) |
| 05/29/2014 | | ORDER TO CONTINUE - Ends of Justice as to Damion Hardy and Aaron Granton. Time excluded from 5/29/14 until 9/12/14 in the interest of justice and the Court designating this case complex for speedy trial purposes. Ordered by Judge Frederic Block on 5/29/2014. (Innelli, Michael) (Entered: 05/29/2014) |
| 06/03/2014 | 865 | MOTION to Appoint Counsel *continuing Learned Counsel* by Damion Hardy. (Attachments: # 1 Appendix District Court opinion, # 2 Appendix CJA capital guidelines) (Ruhnke, David) (Entered: 06/03/2014) |
| 06/27/2014 | | ELECTRONIC ORDER: During the last conference held on 5/29/14 the Court instructed learned counsel to submit letters as to why they should remain on this case now that it is no longer a death penalty case. The Court has reviewed the motion 865 of learned counsel David Ruhnke. Esq for Mr. Hardy and the ex-parte sealed letter application of Carl Herman, Esq. learned counsel for Mr. Granton as to whether they should remain on this case now that the DOJ has determined not to seek the death penalty. The Court has decided that both counsel can remain on the case at the CJA counsel rate of $126.00 an hour commencing as of 5/29/14 and not at the hourly rate for learned counsel. Ordered by Judge Frederic Block on 6/27/2014. (Innelli, Michael) Modified on 7/1/2014 (Innelli, Michael). (Entered: 06/27/2014) |
| 07/07/2014 | 867 | "NOTICE OF MOTION" seeking an order pursuant to Rule 12a and 12b of the FRCP granting "Hard Time Status" to Damion Hardy. (Galeano, Sonia) (Entered: 07/09/2014) |
| 07/09/2014 | 868 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Damion |

APP. 26

Case 15-1645, Document 117, 10/28/2016, 1895494, Page29 of 280

| | | |
|---|---|---|
| | | Hardy held on 02/21/2014, before Judge Block. Court Reporter/Transcriber Charisse Kitt, Telephone number 718-613-2606. Email address: FCTranscripts@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/30/2014. Redacted Transcript Deadline set for 8/11/2014. Release of Transcript Restriction set for 10/7/2014. (Kitt, Charisse) (Entered: 07/09/2014) |
| 07/09/2014 | 869 | ORDER as to Damion Hardy: A video status conference is scheduled for 9/12/14 at 11:00 a.m., before Judge Block in courtroom #10C South. Accordingly, it is HEREBY ORDERED that the facility shall make the deft available by video conferencing. (Ordered by Judge Frederic Block on 7/09/2014) (Galeano, Sonia) (Entered: 07/10/2014) |
| 09/12/2014 | | Minute Entry for proceedings held before Judge Frederic Block: AUSA James Loonam & Matthew Amatruda; Francisco Celedonio, Esq & David Ruhnke, Esq for defendant Hardy and Robert Beecher, Esq. & Carl Herman, Esq. for defendant Granton, all present. Status conference as to Damion Hary & Aaron Granton held on 9/12/14. Mr. Hardy participated by video from the Medical Facility in Springfield, Missouri. The January 5, 2015 jury selection & trial date were discussed further. Counsel jointly request: 1) a BOP report in 60 days as to Mr. Hardys competence & 2) a BOP report in 60 days as to whether Mr. Hardy still needs to be medicated due to dangerousness. Counsel will submit a proposed order as to the BOP reports. Counsel expect this trial to now last a month. Upon the consent of counsel and in the interest of justice the Court will enter an order waiving speedy trial until the next conference date which is 11/12/14 @ 11:30AM.(Court Reporter: Michelle Nardone (718) 613-2601) (Innelli, Michael) Modified on 9/12/2014 (Innelli, Michael). (Entered: 09/12/2014) |
| 09/12/2014 | | ORDER TO CONTINUE - Ends of Justice as to Damion Hardy & Aaron Granton. Time excluded from 9/12/14 until 11/12/14 in the interest of justice. Ordered by Judge Frederic Block on 9/12/2014. (Innelli, Michael) (Entered: 09/12/2014) |
| 09/30/2014 | 871 | Letter *joining request for April trial date* as to Damion Hardy (Ruhnke, David) (Entered: 09/30/2014) |
| 10/08/2014 | | SCHEDULING ORDER: Defendant Hardy's letter application 871 dated 9/30/14 and defendant Granton's letter application dated 9/29/14 with the consent of the Government are GRANTED. The defendants jury selection and trial date scheduled for January 5, 2015 will be discussed at the next conference date scheduled on November 12, 2014 @ 11:30AM. Counsel shall be prepared to set a April 2015 trial date. There will be no formal notice mailed to counsel. Ordered by Judge Frederic Block on 10/8/2014. (Innelli, Michael) (Entered: 10/08/2014) |
| 10/17/2014 | 874 | ORDER as to Damion Hardy. Deft. will be re-examined, pursuant to Title 18, United States Code, Section 4241(d) at the United States Medical Center for Federal Prisoners in Springfield, Missouri, for the purpose of updating the findings presented to the Court previously. It is further Ordered that a psychiatric or psychological report be filed with the court no later that 11/11/14. It is further Ordered that the United States Medical Center for Federal Prisoners in Springfield shall update the Court in writing no later than 11/11/14 as to whether it remains appropriate to medicate the deft involuntarily pursuant to Washington v. Harper, 494 U.S. 2010, (1990), to reduce the danger he poses to prison staff. Ordered by Judge Frederic Block on 10/16/2014. (Greene, Donna) (Entered: 10/17/2014) |
| 10/17/2014 | 877 | Letter *re Springfield report and status conference* as to Damion Hardy (Ruhnke, David) (Entered: 10/17/2014) |

APP. 27

| 10/20/2014 | | ELECTRONIC ORDER: Defendant Damion Hardy's letter application 877 dated 10/17/14 with the consent of co-defendant Aaron Granton and the Government is GRANTED. The BOP reports as to Damion Hardy are now due on 11/18/14 and the status conference scheduled for November 12, 2014 is adjourned to November 26, 2014 @ 11AM. There will be no formal notice mailed to counsel. Upon receipt of this email counsel shall confirm with each other the new date and time of this conference. Ordered by Judge Frederic Block on 10/20/2014. (Innelli, Michael) (Entered: 10/20/2014) |
| --- | --- | --- |
| 10/31/2014 | 878 | NOTICE OF ATTORNEY APPEARANCE Matthew S. Amatruda appearing for USA. (Amatruda, Matthew) (Entered: 10/31/2014) |
| 11/18/2014 | | SCHEDULING ORDER: Defendant Damion Hardy's E-mail application on 11/18/14 with the consent of co-defendant Aaron Granton and the Government is GRANTED. The status conference as to Damion Hardy & Aaron Granton scheduled for November 26, 2014 is adjourned to December 8, 2014 at 11:00A.M. Since the parties consent to waive speedy trial in the interest of justice the Court will enter an order waiving speedy trial until December 8, 2014. There will be no formal notice mailed to counsel. Upon receipt of this email counsel shall confirm with each other the new date and time of this conference. ORDER TO CONTINUE - Ends of Justice as to Damion Hardy & Aaron Granton. Time excluded from 11/26/14 until 12/8/14 in the interest of justice. Ordered by Judge Frederic Block on 11/18/2014. (Innelli, Michael) (Entered: 11/18/2014) |
| 11/21/2014 | 879 | MOTION to Dismiss *Criminal Complaint* by Damion Hardy. (Piper, Francine) (Entered: 11/24/2014) |
| 11/24/2014 | 880 | MOTION to Dismiss *Indictment* by Damion Hardy. (Greene, Donna) (Entered: 11/24/2014) |
| 12/05/2014 | 881 | First MOTION to Appoint Counsel *And Relieve Francisco E. Celedonio* by Damion Hardy. (Celedonio, Francisco) (Entered: 12/05/2014) |
| 12/08/2014 | | Minute Entry for proceedings held before Judge Frederic Block: AUSA James Loonam & Rena Paul; Francisco Celedonio, Esq & David Ruhnke, Esq for defendant Hardy and Robert Beecher, Esq. & Carl Herman, Esq. for defendant Granton, all present. Status conference as to Damion Hary & Aaron Granton held on 12/8/14. Mr. Hardy most recent report from the BOP finding him competent to stand trial was discussed. Counsel for Mr. Hardy requests that Mr. Hardy be transferred back to the EDNY so defense experts can meet with him & prepare a report. Francisco Celedonio, Esq letter application 881 dated 12/5/14 to be relieved was discussed and GRANTED. Mr. Celedonio is relieved and CJA counsel Jean Barrett, Esq is appointed. The jury trial date of 1/5/15 was discussed and adjourned to 3/26/15 @ 10am and jury questionnaires will be handed out on 3/23/15. A pre-trial conference is set for 3/16/15 @ 11am and any further motions shall be served and ECF filed by 3/2/15. Counsel will submit a joint letter informing the Court as to what motions are still pending. The Government will be filing a motion requesting an anonymous jury. Upon the consent of counsel and in the interest of justice the Court will enter an order waiving speedy trial until the next conference date which is 3/16/15 @ 11AM.(Court Reporter: Nicole Canales (718) 613-2509) (Innelli, Michael) (Entered: 12/08/2014) |
| 12/08/2014 | | ORDER TO CONTINUE - Ends of Justice as to Damion Hardy & Aaron Granton. Time excluded from 12/8/14 until 3/16/15 in the interest of justice & this being designated a complex case for speedy trial purposes. Ordered by Judge Frederic Block on 12/8/2014. (Innelli, Michael) (Entered: 12/08/2014) |
| 12/08/2014 | | ELECTRONIC ORDER: Granting Francisco Celedonio's letter motion 881 to be relieved as CJA counsel. See minute entry dated 12/8/14. CJA counsel Jean Barrett will |

APP. 28

| | | be appointed to replace him. Ordered by Judge Frederic Block on 12/8/2014. (Innelli, Michael) (Entered: 12/08/2014) |
|---|---|---|
| 12/08/2014 | 882 | CJA 20 as to Damion Hardy: Appointment of Attorney Jean D. Barrett for Damion Hardy. Ordered by Judge Frederic Block on 12/8/2014. (Greene, Donna) (Entered: 12/09/2014) |
| 12/23/2014 | 884 | Letter *requesting the Court to enter an order* as to Damion Hardy (Attachments: # 1 Proposed Order) (Loonam, James) (Entered: 12/23/2014) |
| 12/30/2014 | 885 | ORDER as to Damion Hardy, that dft be transferred forthwith from the U.S. Medical Center for Federal Prisoners in Springfield, Missouri to the Metropolitan Correctional Center, New York. Ordered by Judge Frederic Block on 12/23/2014. (Piper, Francine) (Entered: 12/30/2014) |
| 01/08/2015 | 886 | NOTICE OF ATTORNEY APPEARANCE Rena Paul appearing for USA. (Paul, Rena) (Entered: 01/08/2015) |
| 01/09/2015 | 888 | NOTICE OF ATTORNEY APPEARANCE Soumya Dayananda appearing for USA. (Dayananda, Soumya) (Entered: 01/09/2015) |
| 01/09/2015 | 889 | First MOTION in Limine *Requesting an Anonymous/Partially Sequestered Jury* by USA as to Allen Bryant, Damion Hardy, James Sessoms, Eric Moore, Dwayne Meyers, Kenwayne Jones, Abubakr Raheem, Zareh Sarkissian, Robert Footman, Carl Davis, James Farrior, Lamont Johnson, Djebara McMillian, Isheen Campbell, Keith Smith, Aaron Granton. (Dayananda, Soumya) (Entered: 01/09/2015) |
| 02/09/2015 | 895 | MEMORANDUM in Opposition re 889 First MOTION in Limine *Requesting an Anonymous/Partially Sequestered Jury* (Attachments: # 1 Appendix) (Ruhnke, David) (Entered: 02/09/2015) |
| 02/19/2015 | 899 | STIPULATION & PROTECTIVE ORDER as to Damion Hardy, Aaron Granton. Ordered by Judge Frederic Block (Piper, Francine) (Entered: 02/19/2015) |
| 02/19/2015 | 900 | REPLY TO RESPONSE to Motion re 889 First MOTION in Limine *Requesting an Anonymous/Partially Sequestered Jury* (Dayananda, Soumya) (Entered: 02/19/2015) |
| 02/27/2015 | 904 | MOTION in Limine *TO Introduce Certain Evidence* by USA as to Damion Hardy. (Dayananda, Soumya) (Entered: 02/27/2015) |
| 03/01/2015 | 905 | Letter *re status of pre-trial motions* as to Damion Hardy (Ruhnke, David) (Entered: 03/01/2015) |
| 03/03/2015 | | SCHEDULING ORDER: Defendant Damion Hardy's E-mail application on 3/2/15, with the consent of the parties is GRANTED. The status conference as to Damion Hardy & Aaron Granton scheduled for March 16, 2015 is advanced to March 13, 2015 at 12:00 Noon. There will be no formal notice mailed to counsel. Upon receipt of this email counsel shall confirm with each other the new date and time of this conference. Ordered by Judge Frederic Block on 3/3/2015. (Innelli, Michael) (Entered: 03/03/2015) |
| 03/04/2015 | 909 | Letter *Providing DIscovery* as to Damion Hardy, Aaron Granton (Amatruda, Matthew) (Entered: 03/04/2015) |
| 03/05/2015 | 910 | RESPONSE in Opposition re 275 MOTION for Bill of Particulars MOTION for Release of Brady Materials MOTION for Discovery MOTION to Suppress (Amatruda, Matthew) (Entered: 03/05/2015) |
| 03/05/2015 | 911 | Proposed Jury Instructions by USA as to Damion Hardy, Aaron Granton (Dayananda, Soumya) (Entered: 03/05/2015) |

| 03/06/2015 | 913 | RESPONSE in Opposition re 889 First MOTION in Limine *Requesting an Anonymous/Partially Sequestered Jury addressing jury questionnaire* (Ruhnke, David) (Entered: 03/06/2015) |
| --- | --- | --- |
| 03/10/2015 | 918 | Letter *Providing Rule 3500 Material* as to Damion Hardy, Aaron Granton (Amatruda, Matthew) (Entered: 03/10/2015) |
| 03/10/2015 | 919 | Letter *Providing Discovery* as to Damion Hardy, Aaron Granton (Amatruda, Matthew) (Entered: 03/10/2015) |
| 03/12/2015 | 922 | NOTICE *re: Enterprise Evidence* as to Damion Hardy, Aaron Granton (Amatruda, Matthew) (Entered: 03/12/2015) |
| 03/12/2015 | 923 | Letter *in response to defendant Granton's motions in limine filed March 4, 2015 (Docket Entry No. 908)* as to Damion Hardy, Aaron Granton (Attachments: # 1 Exhibit) (Paul, Rena) (Entered: 03/12/2015) |
| 03/13/2015 | 924 | Writ of Habeas Corpus ad Testificandum Issued as to James R. Barnett for 3/27/15 in case as to Damion Hardy, Eric Moore. (Greene, Donna) (Entered: 03/13/2015) |
| 03/13/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq. for Damion Hardy and Robert Beecher, Esq. & Carl Herman, Esq. for Aaron Granton, all present. Status conference as to Damion Hardy & Aaron Granton held on 3/13/2015. The Governments motion 889 for an anonymous and semi-sequestered jury, defendant Hardys motion 921 for a competency hearing and defendant Grantons motion 906 for pre-trial hearings were all discussed. A competency hearing for Mr. Hardy is scheduled for March 25, 2015 @ 11am, subject to the availability of the defense doctor. By March 20, 2015 defendant Hardy will serve and ECF file their reply to the Governments letter 922 dated 3/12/15. The jury will be selected by questionnaire and be anonymous, but not semi-sequestered at this time and the Court will issue a written decision.(Court Reporter: Lisa Schmidt (718) 613-2644) (Innelli, Michael) (Entered: 03/13/2015) |
| 03/16/2015 | 925 | Letter *re: Supplemental Briefing concerning the governent's request for an anonymous/partially sequestered jury* as to Damion Hardy (Dayananda, Soumya) (Entered: 03/16/2015) |
| 03/17/2015 | 926 | Letter *Supplemental response to the government's request for an anonymous/partially sequestered jury with Attachment* as to Damion Hardy (Attachments: # 1 Exhibit) (Dayananda, Soumya) (Entered: 03/17/2015) |
| 03/18/2015 | 929 | MEMORANDUM in Opposition re 889 First MOTION in Limine *Requesting an Anonymous/Partially Sequestered Jury* (Attachments: # 1 Appendix NYDOC re Keith Smith) (Ruhnke, David) (Entered: 03/18/2015) |
| 03/19/2015 | 930 | Letter *correcting typo and alerting court and parties to pro se motion to discharge counsel* as to Damion Hardy (Ruhnke, David) (Entered: 03/19/2015) |
| 03/19/2015 | | ELECTRONIC ORDER: Granting Damion Hardy's motion 921 for psychiatric exam. A competency hearing is scheduled for March 24, 2015 @ 2:30pm. Ordered by Judge Frederic Block on 3/19/2015. (Innelli, Michael) (Entered: 03/19/2015) |
| 03/20/2015 | 931 | RESPONSE in Opposition re 904 MOTION in Limine *TO Introduce Certain Evidence* (Herman, Carl) (Entered: 03/20/2015) |
| 03/20/2015 | 933 | MEMORANDUM in Opposition re 904 MOTION in Limine *TO Introduce Certain Evidence and aslo opposing DE 922* (Ruhnke, David) (Entered: 03/20/2015) |
| 03/20/2015 | 934 | RESPONSE in Support re 275 MOTION for Bill of Particulars MOTION for Release of |

APP. 30

| | | Brady Materials MOTION for Discovery MOTION to Suppress *in reply to DE 910* (Ruhnke, David) (Entered: 03/20/2015) |
|---|---|---|
| 03/22/2015 | 935 | Letter *re: Motion to Preclude defendant Hardy from raising any legal defense concering his mental disease pursuant to Federal Rules of Crim Procedure 12.2(a) and 12.2(b)* as to Damion Hardy (Dayananda, Soumya) (Entered: 03/22/2015) |
| 03/23/2015 | 938 | MOTION to Appoint Counsel by Damion Hardy. (Piper, Francine) (Entered: 03/25/2015) |
| 03/24/2015 | | Minute Entry for proceedings held before Judge Frederic Block: All counsel & defendants not present. Jury selection as to Damion Hardy & Aaron Granton held on 3/24/2015. The panel of jurors are sworn the Court gives preliminary statements and the jurors fill out jury questionnaires. Jury selection continued on 3/31/15 @ 10am. (Court Reporter: Mary Agnes Drury (718) 613-2615.) (Innelli, Michael) (Entered: 03/24/2015) |
| 03/24/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs James Loonam, Matthew Amatruda, & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy, all present. Competency hearing as to Damion Hardy held on 3/24/2015. Preliminary matters were discussed. The BOPs report was discussed. The BOP doctor & the defendants doctor both testify and exhibits were offered and entered into evidence. Decision reserved. Further letter briefs to be served and ECF filed by March 27, 2015. Other rulings were placed on the record. (Court Reporter: Sherry Bryant (718) 613-2636) (Innelli, Michael) (Entered: 03/24/2015) |
| 03/25/2015 | 937 | Bureau of Prisons Forensic Report as to Damion Hardy. (Greene, Donna) (Entered: 03/25/2015) |
| 03/25/2015 | 939 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Damion Hardy held on 03/24/15, before Judge Block. Court Reporter/Transcriber Mary Agnes. Email address: mad78910@yahoo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 4/15/2015. Redacted Transcript Deadline set for 4/27/2015. Release of Transcript Restriction set for 6/23/2015. (Drury, Mary) (Entered: 03/25/2015) |
| 03/25/2015 | 940 | Letter *re: Giglio dislosure* as to Damion Hardy (Dayananda, Soumya) (Entered: 03/25/2015) |
| 03/25/2015 | 941 | Letter *Motion to limit cross-examination (Bryant)* as to Damion Hardy (Attachments: # 1 Exhibit) (Dayananda, Soumya) (Entered: 03/25/2015) |
| 03/26/2015 | 942 | ORDER as to Damion Hardy, that the Metropolitan Correctional Center allow the following clothing be admitted to the property management department for Damion Hardy, to wear during his trial which will begin 3/31/15: 2 slacks, 2 shirts, 3 pairs of socks, 1 pair of shoes, and 1 belt. Ordered that dirty items of clothing may be retrieved and replaced with clean items Mondays through Fridays throughout the course of this trial until further order of the court. Ordered by Judge Frederic Block on 3/25/2015. (Greene, Donna) (Entered: 03/26/2015) |
| 03/26/2015 | 943 | MOTION to Appoint Counsel *(New Counsel), Affirmation in support and Affirmation of Service attached* by Damion Hardy. (Greene, Donna) (Entered: 03/26/2015) |
| 03/27/2015 | 945 | MEMORANDUM in Support re 921 MOTION for Psychiatric Exam *and to declare defendant Hardy incompetent to proceed* (Ruhnke, David) (Entered: 03/27/2015) |
| 03/27/2015 | 946 | Letter *in opposition to the defense motion to have Hardy declared incompetent* as to |

APP. 31

| | | |
|---|---|---|
| | | Damion Hardy (Loonam, James) (Entered: 03/27/2015) |
| 03/31/2015 | 947 | Proposed Voir Dire by Damion Hardy (Ruhnke, David) (Entered: 03/31/2015) |
| 03/31/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy and Robert Beecher, Esq. & Carl Herman, Esq. for Aaron Granton, all present. Jury trial as to Damion Hardy & Aaron Granton held on 3/31/2015. Jury selection by questionnaire continues. Jurors are questioned by the Court, counsel exercise their challengers and a jury of 12 is selected. Jury selection as to alternates is continue on 4/1/15 @ 10am. For the reasons stated on the record the jury will be anonymous and the Clerk is permitted to unseal the 6th superseding indictment as to all parties and counts. (Court Reporter: Alan Sherman (718) 613-2529.) (Innelli, Michael) Modified on 4/1/2015 (Innelli, Michael). (Entered: 03/31/2015) |
| 03/31/2015 | | SUPERSEDING INDICTMENT(6) UNSEALED as to Damion Hardy, Aaron Granton. Case unseal as directed in minute entry dated 3/31/15. (Greene, Donna) (Entered: 04/01/2015) |
| 04/01/2015 | 949 | MEMORANDUM & ORDER: Damion Hardys motion 921 to be declared incompetent to stand trial is denied. See attached memorandum and order for details. Ordered by Judge Frederic Block on 4/1/2015. (Innelli, Michael) (Entered: 04/01/2015) |
| 04/01/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy and Robert Beecher, Esq., Carl Herman, Esq. & Kendra Pannitti, Esq. for Aaron Granton, all present. Jury selection and trial as to Damion Hardy & Aaron Granton held on 4/1/2015. Juror questionnaires #7 is excused by the Court and replaced with #125. Jury selection by questionnaire as to alternates continues. Jurors are selected and sworn. Preliminary statements are given by the Court and counsel give their opening statements. Witnesses are sworn & testify and exhibits are offered and entered into evidence. Jury trial continued on 4/2/15 @ 10am. (Court Reporter: Alan Sherman (718) 613-2529) (Innelli, Michael) (Entered: 04/01/2015) |
| 04/02/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy and Robert Beecher, Esq., Carl Herman, Esq. & Kendra Pannitti, Esq. for Aaron Granton, all present. Jury trial as to Damion Hardy & Aaron Granton held on 4/2/2015. Witnesses are sworn & testify and exhibits are offered and entered into evidence. Jury trial continued on 4/6/15 @ 10am. (Court Reporter: Richard Barry (718) 613-2505) (Innelli, Michael) (Entered: 04/02/2015) |
| 04/06/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy and Robert Beecher, Esq., Carl Herman, Esq. & Kendra Pannitti, Esq. for Aaron Granton, all present. Jury trial as to Damion Hardy & Aaron Granton held on 4/6/2015. Witnesses are sworn & testify and exhibits are offered and entered into evidence. Jury trial continued on 4/7/15 @ 10am. (Court Reporter: Mary Agnes Drury (718) 613-2615) (Innelli, Michael) (Entered: 04/06/2015) |
| 04/07/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy and Robert Beecher, Esq., Carl Herman, Esq. & Kendra Pannitti, Esq. for Aaron Granton, all present. Jury trial as to Damion Hardy & Aaron Granton held on 4/7/2015. Witnesses are sworn & testify and exhibits are offered and entered into evidence. Jury trial continued on 4/8/15 @ 10am. (Court Reporter: Mary Agnes Drury (718) 613-2615) (Innelli, Michael) (Entered: 04/07/2015) |

| 04/08/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy and Robert Beecher, Esq., Carl Herman, Esq. & Kendra Pannitti, Esq. for Aaron Granton, all present. Jury trial as to Damion Hardy & Aaron Granton held on 4/8/2015. Witnesses are sworn & testify and exhibits are offered and entered into evidence. Jury trial continued on 4/9/15 @ 10am. (Court Reporter: Mary Agnes Drury (718) 613-2615) (Innelli, Michael) (Entered: 04/08/2015) |
| --- | --- | --- |
| 04/09/2015 | | ELECTRONIC ORDER: 889 Motion in Limine as to Damion Hardy; 904 Motion in Limine as to Damion Hardy; 938 Motion to Appoint Counsel as to Damion Hardy and 943 Motion to Appoint Counsel as to Damion Hardy. These motion were ruled on during trial. See trial transcript for details as to the Court's rulings. Ordered by Judge Frederic Block on 4/9/2015. (Innelli, Michael) (Entered: 04/09/2015) |
| 04/09/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy and Robert Beecher, Esq., Carl Herman, Esq. & Kendra Pannitti, Esq. for Aaron Granton, all present. Jury trial as to Damion Hardy & Aaron Granton held on 4/9/2015. Witnesses are sworn & testify and exhibits are offered and entered into evidence. Jury trial continued on 4/10/15 @ 10am. (Court Reporter: Mary Agnes Drury (718) 613-2615) (Innelli, Michael) (Entered: 04/09/2015) |
| 04/10/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy and Robert Beecher, Esq., Carl Herman, Esq. & Kendra Pannitti, Esq. for Aaron Granton, all present. Jury trial as to Damion Hardy & Aaron Granton held on 4/10/2015. Witnesses are sworn & testify and exhibits are offered and entered into evidence. Jury trial continued on 4/14/15 @ 10am. (Court Reporter: Mary Agnes Drury (718) 613-2615) (Innelli, Michael) (Entered: 04/10/2015) |
| 04/13/2015 | 950 | Proposed Jury Instructions by Damion Hardy (Ruhnke, David) (Entered: 04/13/2015) |
| 04/14/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy and Robert Beecher, Esq., Carl Herman, Esq. & Kendra Pannitti, Esq. for Aaron Granton, all present. Jury trial as to Damion Hardy & Aaron Granton held on 4/14/2015. Witnesses are sworn & testify and exhibits are offered and entered into evidence. Jury trial continued on 4/15/15 @ 10am. (Court Reporter: Victoria Butler (718) 613-2607) (Innelli, Michael) (Entered: 04/14/2015) |
| 04/15/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy and Robert Beecher, Esq., Carl Herman, Esq. & Kendra Pannitti, Esq. for Aaron Granton, all present. Jury trial as to Damion Hardy & Aaron Granton held on 4/15/2015. Witnesses are sworn & testify and exhibits are offered and entered into evidence. Jury trial continued on 4/16/15 @ 10am. (Court Reporter: Victoria Butler (718) 613-2607) (Innelli, Michael) (Entered: 04/15/2015) |
| 04/16/2015 | 955 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Damion Hardy held on 03/24/15, before Judge Block. Court Reporter/Transcriber Mary Agnes Drury. Email address: mad78910@yahoo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 5/7/2015. Redacted |

| | | |
|---|---|---|
| | | Transcript Deadline set for 5/18/2015. Release of Transcript Restriction set for 7/15/2015. (Drury, Mary) (Entered: 04/16/2015) |
| 04/16/2015 | 956 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Damion Hardy, Aaron Granton held on 04/06/15 to 04/10/15, before Judge Block. Court Reporter/Transcriber Mary Agnes Drury. Email address: mad78910@yahoo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 5/7/2015. Redacted Transcript Deadline set for 5/18/2015. Release of Transcript Restriction set for 7/15/2015. (Attachments: # 1 Transcript 4/7/15, # 2 Transcript 4/8/15, # 3 Transcript 4/9/15, # 4 Transcript 4/10/15) (Drury, Mary) (Entered: 04/16/2015) |
| 04/16/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy and Robert Beecher, Esq., Carl Herman, Esq. & Kendra Pannitti, Esq. for Aaron Granton, all present. Jury trial as to Damion Hardy & Aaron Granton held on 4/16/2015. Witnesses are sworn & testify and exhibits are offered and entered into evidence. Jury trial continued on 4/20/15 @ 10am. (Court Reporter: Victoria Butler (718) 613-2607) (Innelli, Michael) (Entered: 04/16/2015) |
| 04/19/2015 | 958 | MOTION to Strike *Testimony and Exhibits* by Damion Hardy. (Attachments: # 1 Exhibit A) (Barrett, Jean) (Entered: 04/19/2015) |
| 04/20/2015 | 959 | Proposed Jury Instructions by Damion Hardy (Ruhnke, David) (Entered: 04/20/2015) |
| 04/20/2015 | 960 | NOTICE *re Giglio Material* as to Damion Hardy, Aaron Granton (Amatruda, Matthew) (Entered: 04/20/2015) |
| 04/20/2015 | 961 | NOTICE *re Gilio Material pt 2* as to Damion Hardy, Aaron Granton (Amatruda, Matthew) (Entered: 04/20/2015) |
| 04/20/2015 | 962 | SUSTENANCE ORDER during trial/ deliberations as to Damion Hardy & Aaron Granton dated 4/20/15. Ordered by Judge Frederic Block on 4/20/2015. (Innelli, Michael) (Entered: 04/20/2015) |
| 04/20/2015 | | ELECTRONIC ORDER: Counsel withdrawing the motion 958 to strike for reasons stated on the record. Ordered by Judge Frederic Block on 4/20/2015. (Innelli, Michael) (Entered: 04/20/2015) |
| 04/20/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy and Robert Beecher, Esq., Carl Herman, Esq. & Kendra Pannitti, Esq. for Aaron Granton, all present. Jury trial as to Damion Hardy & Aaron Granton held on 4/20/2015. Witnesses are sworn & testify and exhibits are offered and entered into evidence. Jury instructions were discussed. Jury trial continued on 4/21/15 @ 10am. (Court Reporter: Nicole Canalas (718) 613-2509) (Innelli, Michael) Modified on 4/21/2015 (Innelli, Michael). (Entered: 04/20/2015) |
| 04/20/2015 | 963 | Letter *requesting amendments to the Court's proposed charge* as to Damion Hardy, Aaron Granton (Paul, Rena) (Entered: 04/20/2015) |
| 04/21/2015 | 964 | Proposed Jury Instructions by Damion Hardy (Ruhnke, David) (Entered: 04/21/2015) |
| 04/21/2015 | 965 | MOTION to Strike *Testimony* by Damion Hardy. (Attachments: # 1 Exhibit) (Barrett, Jean) (Entered: 04/21/2015) |

| | | |
|---|---|---|
| 04/21/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy and Robert Beecher, Esq., Carl Herman, Esq. & Kendra Pannitti, Esq. for Aaron Granton, all present. Jury trial as to Damion Hardy & Aaron Granton held on 4/21/2015. Witnesses are sworn & testify and exhibits are offered and entered into evidence. Jury instructions discussed further. Jury trial continued on 4/22/15 @ 10am. (Court Reporter: Nicole Canales (718) 613-2509) (Innelli, Michael) Modified on 4/21/2015 (Innelli, Michael). (Entered: 04/21/2015) |
| 04/21/2015 | | ELECTRONIC ORDER: Denying defendant Damion Hardy's motion 965 to strike for the reasons stated on the record. Ordered by Judge Frederic Block on 4/21/2015. (Innelli, Michael) (Entered: 04/21/2015) |
| 04/22/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy and Robert Beecher, Esq., Carl Herman, Esq. & Kendra Pannitti, Esq. for Aaron Granton, all present. Jury trial as to Damion Hardy & Aaron Granton held on 4/22/2015. Witnesses are sworn & testify and exhibits are offered and entered into evidence. The government rest, the defendants make their Rule 29 motions. Defendant Granton presents a case. The defendants rest and the Court preliminarily instructs the jury on the law. Jury trial continued on 4/23/15 @ 10am with summations. (Court Reporter: Nicole Canales (718) 613-2509) (Innelli, Michael) (Entered: 04/22/2015) |
| 04/23/2015 | 966 | Letter *regarding charge* as to Damion Hardy, Aaron Granton (Paul, Rena) (Entered: 04/23/2015) |
| 04/23/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy and Robert Beecher, Esq., Carl Herman, Esq. & Kendra Pannitti, Esq. for Aaron Granton, all present. Jury trial as to Damion Hardy & Aaron Granton held on 4/23/2015. The Court denies the defendants Rule 29 motions for the reasons stated on the record. Alternate juror #2 is excused and thanked for his service. Counsel begin their closing arguments. Closing continued on 4/24/15 @ 10am.(Court Reporter: Nicole Canales (718) 613-2509) (Innelli, Michael) Modified on 4/23/2015 (Innelli, Michael). Modified on 4/24/2015 (Innelli, Michael). (Entered: 04/23/2015) |
| 04/24/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy and Robert Beecher, Esq., Carl Herman, Esq. & Kendra Pannitti, Esq. for Aaron Granton, all present. Jury trial as to Damion Hardy & Aaron Granton held on 4/24/2015. Closing arguments conclude. The Court instructs the jury on the law. Alternate jurors 3 & 4 are discharged with thanks from the Court. Deliberations begin on 4/27/15 @ 10am.(Court Reporter: Mary Agnes Drury (718) 613-2516) (Innelli, Michael) (Entered: 04/24/2015) |
| 04/24/2015 | 967 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Damion Hardy, Aaron Granton held on 04/14/2015 through 04/16/2015, before Judge FB. Court Reporter/Transcriber V. Torres Butler. Email address: VButlerRPR@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 5/15/2015. Redacted Transcript Deadline set for 5/25/2015. Release of Transcript Restriction set for 7/23/2015. (Attachments: # 1 Supplement, # 2 Supplement) (Torres-Butler, Victoria) (Entered: 04/24/2015) |

| 04/27/2015 | 968 | EXHIBIT LIST by Damion Hardy (Ruhnke, David) (Entered: 04/27/2015) |
|---|---|---|
| 04/27/2015 | 969 | SUSTENANCE ORDER during deliberations as to Damion Hardy & Aaron Granton dated 4/27/15. Ordered by Judge Frederic Block on 4/27/2015. (Innelli, Michael) (Entered: 04/27/2015) |
| 04/27/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy and Robert Beecher, Esq., Carl Herman, Esq. & Kendra Pannitti, Esq. for Aaron Granton, all present. Jury trial as to Damion Hardy & Aaron Granton held on 4/27/2015. The Court finishes instructing the jury on the law. Alternate juror 1 is discharged with thanks from the Court. Deliberations begin & continue on 4/28/15 @ 10am.(Court Reporter: Fred Guerino (718) 613-2503) (Innelli, Michael) (Entered: 04/27/2015) |
| 04/28/2015 | 970 | SUSTENANCE ORDER during deliberations as to Damion Hardy & Aaron Granton dated 4/28/15. Ordered by Judge Frederic Block on 4/28/2015. (Innelli, Michael) (Entered: 04/28/2015) |
| 04/28/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy and Robert Beecher, Esq., Carl Herman, Esq. & Kendra Pannitti, Esq. for Aaron Granton, all present. Jury trial as to Damion Hardy & Aaron Granton held on 4/28/2015. Jury deliberations continue. Deliberations continue on 4/29/15 @ 10am. (Court Reporter: Fred Guerino (718) 613-2503) (Innelli, Michael) (Entered: 04/28/2015) |
| 04/29/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew Amatruda, Soumya Dayananda & Rena Paul; David Ruhnke, Esq & Jean Barrett, Esq. for Damion Hardy and Robert Beecher, Esq., Carl Herman, Esq. & Kendra Pannitti, Esq. for Aaron Granton, all present. Jury trial as to Damion Hardy & Aaron Granton held on 4/29/2015. The jury returns a guilty verdict as to both defendants on all counts of the superseding (S-6) indictment. The jury is discharged with thanks from the Court. The defendants renewed Rule 29 motion is denied for the reasons stated on the record. Sentencing as to both defendants is set for 5/11/15 @ 11am and the Court is requesting expedited PSRs. Counsel will serve and ECF file any post trial motions prior to the sentence date with leave to supplement their motions after sentencing. All court exhibits can be found in the court file located in the file room of the Clerks Office.(Court Reporter: Fred Guerino (718) 613-2503) (Innelli, Michael) (Entered: 04/29/2015) |
| 04/29/2015 | 976 | JURY VERDICT: As to Damion Hardy: Guilty on Count 1ssss,2ssss,3ssss-4ssss,5ssss,6ssss,7ssss,8ssss-9ssss,10ssss,11ssss,12ssss-13ssss, 14ssss-15ssss,16ssss-18ssss,19ssss,20ssss,21ssss,22ssss,23ssss,24ssss and Aaron Granton: Guilty on Count 1s,2s,4s,5s,6s,7s,8s-9s,16s-18s,19s,23s,24s,25s-26s. (Innelli, Michael) (Additional attachment(s) added on 4/30/2015: # 1 Verdict Sheet) (Piper, Francine). (Entered: 04/29/2015) |
| 04/29/2015 | 977 | Jury Notes as to Damion Hardy, Aaron Granton (Piper, Francine) (Entered: 04/30/2015) |
| 04/29/2015 | 978 | WITNESS LIST by USA as to Damion Hardy, Aaron Granton (Piper, Francine) (Entered: 04/30/2015) |
| 04/29/2015 | 979 | EXHIBIT LIST by USA as to Damion Hardy, Aaron Granton (Piper, Francine) (Entered: 04/30/2015) |
| 04/29/2015 | 980 | DEFENSE EXHIBITS IN EVIDENCE by Damion Hardy, Aaron Granton (Piper, Francine) (Entered: 04/30/2015) |

APP. 36

Case 15-1645, Document 117, 10/28/2016, 1895494, Page39 of 280

| 04/29/2015 | 981 | Jury Charge as to Damion Hardy, Aaron Granton (Piper, Francine) (Entered: 04/30/2015) |
|---|---|---|
| 04/30/2015 | 972 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Damion Hardy, Aaron Granton held on 04-20-15, before Judge Block. Court Reporter/Transcriber N. Canales, Telephone number 718-613-2509. Email address: cnlsnic@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 5/21/2015. Redacted Transcript Deadline set for 6/1/2015. Release of Transcript Restriction set for 7/29/2015. (Canales, Nicole) (Entered: 04/30/2015) |
| 04/30/2015 | 974 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Damion Hardy, Aaron Granton held on 04-22-15, before Judge Block. Court Reporter/Transcriber N. Canales, Telephone number 718-613-2509. Email address: cnlsnic@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 5/21/2015. Redacted Transcript Deadline set for 6/1/2015. Release of Transcript Restriction set for 7/29/2015. (Canales, Nicole) (Entered: 04/30/2015) |
| 04/30/2015 | 975 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Damion Hardy, Aaron Granton held on 04-23-15, before Judge Block. Court Reporter/Transcriber N. Canales, Telephone number 718-613-2509. Email address: cnlsnic@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 5/21/2015. Redacted Transcript Deadline set for 6/1/2015. Release of Transcript Restriction set for 7/29/2015. (Canales, Nicole) (Entered: 04/30/2015) |
| 05/04/2015 | 982 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Allen Bryant, Damion Hardy, James Sessoms, Eric Moore, Dwayne Meyers, Kenwayne Jones, Abubakr Raheem, Zareh Sarkissian, Robert Footman, Carl Davis, James Farrior, Lamont Johnson, Djebara McMillian, Isheen Campbell, Keith Smith, Aaron Granton held on 04-01-2015, before Judge FREDERIC BLOCK. Court Reporter/Transcriber ALLAN R SHERMAN, Telephone number 718-613-2529. Email address: asher99983@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 5/25/2015. Redacted Transcript Deadline set for 6/4/2015. Release of Transcript Restriction set for 8/3/2015. (Sherman, Allan) (Entered: 05/04/2015) |
| 05/10/2015 | 989 | MOTION to Set Aside Verdict *and enter judgments of acquittal* by Damion Hardy. (Ruhnke, David) (Entered: 05/10/2015) |
| 05/10/2015 | 990 | SENTENCING MEMORANDUM by Damion Hardy (Ruhnke, David) (Entered: 05/10/2015) |
| 05/11/2015 | | Minute Entry for proceedings held before Judge Frederic Block: AUSAs Matthew |

APP. 37

| | | |
|---|---|---|
| | | Amatruda, Soumya Dayananda & Rena Paul and Jean Barrett, Esq. for Damion Hardy, all present. Sentencing as to Damion Hardy held on 5/11/15. Statements of the defendant and counsel heard. Family & friends of the victims address the Court. The defendant is sentenced on counts: one (1s); two (2s); three (3s); four (4s); five (5s); six (6s); seven (7s); eight (8s); nine (9s); ten (10s); eleven (11s); twelve (12s); thirteen (13s); fourteen (14s); fifteen (15s); sixteen (16s); seventeen (17s); eighteen (18s); nineteen (19s); twenty (20s); twenty-one (21s); twenty-two (22s); twenty-three (23s); and twenty-four (24s) of the superseding indictment to: LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 13(s-6), 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT. The governments motion to dismiss any remaining counts is GRANTED. The defendants pending pre-trial and post trial motions are DENIED for the reasons stated on the record. The defendant is advised of his right to appeal and is remanded to the custody of the US Marshall for designation to a facility. (Court Reporter: Gene Rudolph (718) 613-2538) (Innelli, Michael) Modified on 5/21/2015 (Innelli, Michael). (Entered: 05/12/2015) |
| 05/12/2015 | | ELECTRONIC ORDER: DENYING 274 Motion to Dismiss, 275 Motion for Bill of Particulars, 275 Motion for Release of Brady Materials, 275 Motion for Discovery, 275 Motion to Suppress, 862 Motion to Dismiss, 879 Motion to Dismiss, 880 Motion to Dismiss, & 989 Motion to Set Aside Verdict for the reasons stated on the record at sentencing on May 11, 2015. Ordered by Judge Frederic Block on 5/12/2015. (Innelli, Michael) (Entered: 05/12/2015) |
| 05/12/2015 | 991 | MOTION to Appoint Counsel *and*, MOTION for New Trial by Damion Hardy. (Greene, Donna) (Entered: 05/12/2015) |
| 05/12/2015 | | ELECTRONIC ORDER: DENYING defendant Damion Hardy's pro se motions 991 for an appoint of new counsel and for a new trial for the reasons stated on the record at the sentencing on May 11, 2015. A copy of this electronic order will be mailed to Damion Hardy by regular mail from chambers. His attorneys are also directed to provide a copy to him. Ordered by Judge Frederic Block on 5/12/2015. (Innelli, Michael) (Entered: 05/12/2015) |
| 05/13/2015 | 992 | MOTION for New Trial *and*, MOTION to Appoint Counsel */Reassignment of Counsel filed* by Damion Hardy. (Galeano, Sonia) (Entered: 05/14/2015) |
| 05/15/2015 | | ELECTRONIC ORDER: DENYING defendant Damion Hardy's pro se motions 992 for an appoint of new counsel and for a new trial for the reasons stated on the record at the sentencing on May 11, 2015. A copy of this electronic order will be mailed to Damion Hardy by regular mail from chambers. His attorneys are also directed to provide a copy to him. Ordered by Judge Frederic Block on 5/15/2015. (Innelli, Michael) (Entered: 05/15/2015) |
| 05/21/2015 | 996 | JUDGMENT as to Damion Hardy (2), Count(s) 1, 10s, 10sss, 11s-12s, 11ss-12ss, 11sss, 12sss, 13s-14s, 13ss-14ss, 13sss-14sss, 15s-20s, 15ss-18ss, 15sss, 16sss, 17sss, 18sss, 19ss, 19sss, 1s, 1ss, 1sss-2sss, 20ss, 20sss, 21s, 21ss, 21sss, 22s, 22ss, 22sss, 23sss, 2s, 2ss, 4s, 4ss-10ss, 4sss, 5s, 5sss, 6s, 6sss, 7s, 7sss, 8s, 8sss, 9s, 9sss, Dismissed on the |

motion of the United States; Count(s) 10ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 11ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 12ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 13ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 14ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE

Case 15-1645, Document 117, 10/28/2016, 1895494, Page42 of 280

AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 15ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 16ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 17ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 18ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 19ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO

APP. 40

Case 15-1645, Document 117, 10/28/2016, 1895494, Page43 of 280

SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 1ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 20ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 21ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 22ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 23ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE

APP. 41

Case 15-1645, Document 117, 10/28/2016, 1895494, Page44 of 280

FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 24ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 2ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 3ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 4ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 5ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS

APP. 42

| | | |
|---|---|---|
| | | SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 6ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 7ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 8ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT.; Count(s) 9ssss, LIFE ON COUNTS 1(S-6) TO 4(S-6); 6(S-6); 8(S-6); 9(S-6); 11(S-6); 17(S-6); 19(S-6); & 21(S-6); 40 YEARS ON COUNTS 23(S-6) & 24(S-6); 25 YEARS ON COUNTS 18(S-6); 20(S-6) & 22(S-6); 20 YEARS ON COUNTS 14(S-6) & 15(S-6); & 10 YEARS ON COUNTS 5(S-6); 7(S-6); 10(S-6); 12(S-6) & 16(S-6). THE SENTENCE IMPOSED ON COUNTS 16(S-6); 18(S-6); 20(S-6) & 22(S-6) SHALL RUN CONSECUTIVELY TO EACH OTHER AND ALL OTHER COUNTS AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS TO BE FOLLOWED BY FOUR (4) YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED. RESTITUTION IS ORDERED IN THE AMOUNT OF $125,000.00. THE DEFENDANT SHALL PAY A $2,400.00 SPECIAL ASSESSMENT. Ordered by Judge Frederic Block on 5/14/2015. (Greene, Donna) (Entered: 05/22/2015) |
| 05/21/2015 | 998 | NOTICE OF APPEAL by Damion Hardy re 996 Judgment entered 5/22/15. No fee paid. Appellant represented by CJA Counsel. Service done electronically. Please Note: This notice of appeal was mistakenly filed directly at the USCA by Appellant on |

| | | 5/11/15. It was stamp filed there on 5/11/15 and then forwarded to the District Court where it was received 5/18/15. (McGee, Mary Ann) Modified on 5/26/2015 to correct filing date (McGee, Mary Ann). (Entered: 05/22/2015) |
|---|---|---|
| 05/21/2015 | 1000 | SUBSEQUENT/DUPLICATE NOTICE OF APPEAL by Damion Hardy re 996 Judgment. No fee paid. Service done electronically. Please Note: This Notice of Appeal was originally filed 5/11/15. (McGee, Mary Ann) (Entered: 05/26/2015) |
| 05/22/2015 | | Electronic Index to Record on Appeal as to Damion Hardy sent to US Court of Appeals 998 Notice of Appeal - Final Judgment, Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (McGee, Mary Ann) (Entered: 05/22/2015) |
| 05/24/2015 | 999 | MOTION for Reconsideration *seeking to withdraw pro se new trial motion and vacate order nunc pro tunc* by Damion Hardy. (Ruhnke, David) (Entered: 05/24/2015) |
| 05/26/2015 | | First Supplemental Electronic Index to Record on Appeal as to Damion Hardy sent to US Court of Appeals 1000 Subsequent/Duplicate Notice of Appeal - Final Judgment (McGee, Mary Ann) (Entered: 05/26/2015) |
| 05/26/2015 | 1001 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Damion Hardy, Aaron Granton held on 5/11/15, before Judge Block. Court Reporter/Transcriber Rudolph. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 6/16/2015. Redacted Transcript Deadline set for 6/26/2015. Release of Transcript Restriction set for 8/24/2015. (Rudolph, Gene) (Entered: 05/26/2015) |
| 05/26/2015 | 1002 | MOTION to Vacate *Order dated May 12, 2015* by Damion Hardy. (Piper, Francine) (Entered: 05/27/2015) |
| 06/25/2015 | 1005 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Damion Hardy, Aaron Granton held on 04/24/2015, before Judge Block. Court Reporter/Transcriber Mary Agnes Drury. Email address: mad78910@yahoo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 7/16/2015. Redacted Transcript Deadline set for 7/27/2015. Release of Transcript Restriction set for 9/23/2015. (Drury, Mary) (Entered: 06/25/2015) |
| 11/03/2015 | 1020 | Letter *Notice Concerning Reported Misconduct by Government Trial Witness and Related Evidence* as to Damion Hardy, Eric Moore (Amatruda, Matthew) (Entered: 11/03/2015) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/28/2016 14:02:41 | | | |
| **PACER Login:** | brendanwhite:2541792:0 | **Client Code:** | |

| Description: | Docket Report | Search Criteria: | 1:04-cr-00706-FB |
|---|---|---|---|
| Billable Pages: | 30 | Cost: | 3.00 |

APP. 45

CP:SH/JL
F.#2004R02065/OCDETF# NY-NYE-0437

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

DAMION HARDY, also known
  as "World,"
AARON GRANTON, also known
  as "E-Bay" and "Eric Moore," and
ABUBAKR RAHEEM, also known
  as "Kim Crandall,"

    Defendants.

- - - - - - - - - - - - - - - - - X

THE GRAND JURY CHARGES:

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 04-706 (S-6)(DGT)
(T. 18, U.S.C., §§
 924(c)(1)(A)(iii),
 924(j)(1), 1951(a), 1958,
 1959(a)(1), 1959(a)(5),
 1962(c), 1962(d), 1963,
 3591(a), 3592(c), 3593(a)(2),
 2 and 3351 et seq.; T. 21,
 U.S.C., §§ 841(a)(1),
 841(b)(1)(A)(iii) and 846)

**FILED**
IN CLERK'S OFFICE
U.S DISTRICT COURT E.D.N.Y

★   JAN 24 2008   ★

BROOKLYN OFFICE

INTRODUCTION TO ALL COUNTS

    At all times relevant to this Superseding Indictment:

The Cash Money Brothers

    1.  The defendants DAMION HARDY, also known as "World," AARON GRANTON, also known as "E-Bay" and "Eric Moore," and ABUBAKR RAHEEM, also known as "Kim Crandall," together with others, were members and associates of a criminal organization, referred to in this Superseding Indictment as the "Cash Money Brothers," the "CMB" or the "enterprise," whose members and associates engaged in acts involving murder, robbery, kidnapping and narcotics trafficking. The CMB operated in Brooklyn, New York and elsewhere.

2.   The defendant DAMION HARDY was the leader of the Cash Money Brothers, the defendant AARON GRANTON was a member of the CMB and the defendant ABUBAKR RAHEEM was an associate of the CMB. The defendants participated in unlawful activities and other activities in furtherance of the conduct of that enterprise's affairs.

3.   The Cash Money Brothers, including its leaders, members and associates, constituted an "enterprise" as defined by Title 18, United States Code, Sections 1959(b)(2) and 1961(4), that is, a group of individuals associated in fact.  The CMB engaged in, and its activities affected, interstate and foreign commerce.  The CMB constituted an ongoing organization whose leaders, members and associates functioned as a continuing unit for the common purpose of achieving the objectives of that enterprise.

The Purposes of the Cash Money Brothers

4.   The leaders, members and associates of the Cash Money Brothers sought, among other things, to:

a.   Enrich members and associates of the CMB through the distribution of narcotics, including cocaine base and heroin;

b.   Enrich members and associates of the CMB through the commission of robberies;

c.   Preserve and protect the CMB's drug trafficking operations and profits and its other criminal ventures through

Case 15-1645, Document 117, 10/28/2016, 1895494, Page59 of 280

3

the use of violence and threats of violence against rivals and members of rival criminal organizations, suspected informants and potential witnesses; and

d.   Promote and enhance the prestige, reputation and position of the CMB with respect to rival criminal organizations and narcotics traffickers.

Means and Methods of the Cash Money Brothers

5.   The defendants DAMION HARDY, AARON GRANTON and ABUBAKR RAHEEM and other members and associates of the Cash Money Brothers participated in and conducted the affairs of the CMB by the following means and methods, among others:

a.   Distributing retail quantities of narcotics, including cocaine base and heroin;

b.   Committing, attempting to commit, conspiring to commit and threatening to commit acts of violence, including murders, robberies and kidnappings, to protect and expand the CMB's criminal operations; and

c.   Using and threatening to use physical violence against various individuals, including rivals and members of rival criminal organizations, suspected informants and potential witnesses.

APP. 48

4

## COUNT ONE
### (Racketeering)

6.   The allegations contained in paragraphs 1 through 5 are realleged and incorporated as if fully set forth in this paragraph.

7.   In or about and between 1991 and August 2004, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAMION HARDY, also known as "World," AARON GRANTON, also known as "E-Bay" and "Eric Moore," and ABUBAKR RAHEEM, also known as "Kim Crandall," together with others, being persons employed by and associated with the Cash Money Brothers, an enterprise that engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of the racketeering acts set forth below.

## RACKETEERING ACT ONE
### (Distribution of Cocaine Base)

8.   The defendants DAMION HARDY and AARON GRANTON committed the following acts, either one of which alone constitutes Racketeering Act One:

APP. 49

5

**A.   Conspiracy to Distribute Cocaine Base**

9.   In or about and between 1991 and August 2004, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAMION HARDY and AARON GRANTON, together with others, did knowingly and intentionally conspire to distribute a controlled substance, which offense involved 50 grams or more of a substance containing cocaine base, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

**B.   Distribution of Cocaine Base**

10.   In or about and between 1991 and August 2004, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAMION HARDY and AARON GRANTON, together with others, did knowingly and intentionally distribute and possess with intent to distribute a controlled substance, which offense involved 50 grams or more of a substance containing cocaine base, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

RACKETEERING ACT TWO
(Attempted Murder of Jane Doe)

11.   The defendant DAMION HARDY committed the following acts, either one of which alone constitutes Racketeering Act Two:

APP. 50

6

A.  Conspiracy to Murder Jane Doe

12.  In or about April 1994, within the Eastern District of New York and elsewhere, the defendant DAMION HARDY, together with others, did knowingly and intentionally conspire to cause the death of Jane Doe, an individual whose identity is known to the Grand Jury, in violation of New York Penal Law Sections 125.25(1) and 105.15.

B.  Attempted Murder of Jane Doe

13.  On or about April 27, 1994, within the Eastern District of New York, the defendant DAMION HARDY, together with others, did knowingly and intentionally attempt to cause the death of Jane Doe, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

RACKETEERING ACT THREE
(Attempted Murder of John Doe #1)

14.  The defendant DAMION HARDY committed the following acts, either one of which alone constitutes Racketeering Act Three:

A.  Conspiracy to Murder John Doe #1

15.  In or about September 1995, within the Eastern District of New York and elsewhere, the defendant DAMION HARDY, together with others, did knowingly and intentionally conspire to cause the death of John Doe #1, an individual whose identity is known to the Grand Jury, in violation of New York Penal Law Sections 125.25(1) and 105.15.

APP. 51

7

B.    Attempted Murder of John Doe #1

16.    On or about September 8, 1995, within the Eastern District of New York, the defendant DAMION HARDY, together with others, did knowingly and intentionally attempt to cause the death of John Doe #1, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

RACKETEERING ACT FOUR
(Murder of Michael Colon)

17.    The defendant DAMION HARDY committed the following acts, either one of which alone constitutes Racketeering Act Four:

A.    Conspiracy to Murder Michael Colon

18.    On or about and between April 14, 1998 and April 15, 1998, both dates being approximate and inclusive, within the Eastern District of New York, the defendant DAMION HARDY, together with others, did knowingly and intentionally conspire to cause the death of Michael Colon, in violation of New York Penal Law Sections 125.25(1) and 105.15.

B.    Murder of Michael Colon

19.    On or about and between April 14, 1998 and April 15, 1998, both dates being approximate and inclusive, within the Eastern District of New York, the defendant DAMION HARDY, together with others, with intent to cause the death of Michael Colon, caused his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

APP. 52

8

## RACKETEERING ACT FIVE
### (Murder of Darryl Baum)

20.   The defendants DAMION HARDY and AARON GRANTON committed the following acts, either one of which alone constitutes Racketeering Act Five:

A.   Conspiracy to Murder Darryl Baum

21.   In or about June 2000, within the Eastern District of New York and elsewhere, the defendants DAMION HARDY and AARON GRANTON, together with others, did knowingly and intentionally conspire to cause the death of Darryl Baum, in violation of New York Penal Law Sections 125.25(1) and 105.15.

B.   Murder of Darryl Baum

22.   On or about June 10, 2000, within the Eastern District of New York, the defendants DAMION HARDY and AARON GRANTON, together with others, with intent to cause the death of Darryl Baum, caused his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

## RACKETEERING ACT SIX
### (Murder of James Hamilton)

23.   The defendants DAMION HARDY, AARON GRANTON and ABUBAKR RAHEEM committed the following acts, either one of which alone constitutes Racketeering Act Six:

A.   Conspiracy to Murder James Hamilton

24.   In or about and between June 2000 and August 2000, both dates being approximate and inclusive, within the Eastern

APP. 53

Case 15-1645, Document 117, 10/28/2016, 1895494, Page56 of 280

9

District of New York and elsewhere, the defendants DAMION HARDY, AARON GRANTON and ABUBAKR RAHEEM, together with others, did knowingly and intentionally conspire to cause the death of James Hamilton, also known as "JR," in violation of New York Penal Law Sections 125.25(1) and 105.15.

B.   Murder of James Hamilton

25.   On or about August 1, 2000, within the Eastern District of New York, the defendants DAMION HARDY, AARON GRANTON and ABUBAKR RAHEEM, together with others, with intent to cause the death of James Hamilton, also known as "JR," caused his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

RACKETEERING ACT SEVEN
(Murder of Ivery Davis)

26.   The defendants DAMION HARDY and AARON GRANTON committed the following acts, either one of which alone constitutes Racketeering Act Seven:

A.   Conspiracy to Murder Ivery Davis

27.   In or about and between June 1999 and August 2000, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAMION HARDY and AARON GRANTON, together with others, did knowingly and intentionally conspire to cause the death of Ivery Davis, also known as "Peanut," in violation of New York Penal Law Sections 125.25(1) and 105.15.

APP. 54

B.  Murder of Ivery Davis

28.  On or about August 10, 2000, within the Southern District of New York, the defendants DAMION HARDY and AARON GRANTON, together with others, with intent to cause the death of Ivery Davis, also known as "Peanut," caused his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

RACKETEERING ACT EIGHT
(Kidnapping/Robbery of John Doe #2)

29.  The defendant DAMION HARDY committed the following acts, any one of which alone constitutes Racketeering Act Eight:

A.  Conspiracy to Kidnap John Doe #2

30.  On or about February 27, 2002, within the Central District of California and elsewhere, the defendant DAMION HARDY, together with others, did knowingly and intentionally conspire to forcibly, and by other means of instilling fear, take, hold and detain John Doe #2, an individual whose identity is known to the Grand Jury, and carry John Doe #2 into another county or another part of the same county, in violation of California Penal Code Sections 207(a) and 182(a)(1).

B.  Kidnapping of John Doe #2

31.  On or about February 27, 2002, within the Central District of California and elsewhere, the defendant DAMION HARDY, together with others, did knowingly and intentionally take, hold and detain John Doe #2, by force and by other means of instilling fear, and carry John Doe #2 into another county or

11

another part of the same county, in violation of California Penal Code Sections 207(a) and 31.

C.  <u>Conspiracy to Rob John Doe #2</u>

32.  On or about February 27, 2002, within the Central District of California and elsewhere, the defendant DAMION HARDY, together with others, did knowingly and intentionally conspire to take personal property in the possession of John Doe #2, from his person and his immediate presence, and against his will, by means of force and fear, in violation of California Penal Code Sections 211, 212, 212.5(c) and 182(a)(1).

D.  <u>Robbery of John Doe #2</u>

33.  On or about and between February 27, 2002, within the Central District of California and elswewhere, the defendant DAMION HARDY, together with others, did knowingly and intentionally take personal property in the possession of John Doe #2, from his person and his immediate presence, and against his will, by means of force and fear, in violation of California Penal Code Sections 211, 212, 212.5(c) and 31.

<u>RACKETEERING ACT NINE</u>
(Kidnapping/Attempted Robbery of John Doe #3)

34.  The defendant DAMION HARDY committed the following acts, any one of which alone constitutes Racketeering Act Nine:

A.  <u>Conspiracy to Kidnap John Doe #3</u>

35.  In or about July 2002, within the Eastern District of New York and elsewhere, the defendant DAMION HARDY, together

APP. 56

12

with others, did knowingly and intentionally conspire to abduct John Doe #3, an individual whose identity is known to the Grand Jury, in violation of New York Penal Law Sections 135.20 and 105.15.

B. **Kidnapping of John Doe #3**

36. On or about and between July 10, 2002 and July 11, 2002, both dates being approximate and inclusive, within the Eastern District of New York, the defendant DAMION HARDY, together with others, did knowingly and intentionally abduct John Doe #3, in violation of New York Penal Law Sections 135.20 and 20.00.

C. **Conspiracy to Rob John Doe #3**

37. In or about July 2002, within the Eastern District of New York and elsewhere, the defendant DAMION HARDY, together with others, did knowingly and intentionally conspire to forcibly steal property from John Doe #3, in violation of New York Penal Law Sections 160.10(1) and 105.10.

D. **Attempted Robbery of John Doe #3**

38. On or about and between July 10, 2002 and July 11, 2002, within the Eastern District of New York, the defendant DAMION HARDY, together with others, did knowingly and intentionally attempt to forcibly steal property from John Doe #3 while aided by another person actually present, in violation of New York Penal Law Sections 160.10(1), 110.00 and 20.00.

RACKETEERING ACT TEN
(Murder of Tyrone Baum)

39. The defendants DAMION HARDY and ABUBAKR RAHEEM committed the following acts, either one of which alone constitutes Racketeering Act Ten:

A. Conspiracy to Murder Tyrone Baum

40. In or about July 2003, within the Eastern District of New York and elsewhere, the defendants DAMION HARDY and ABUBAKR RAHEEM, together with others, did knowingly and intentionally conspire to cause the death of Tyrone Baum, in violation of New York Penal Law Sections 125.25(1) and 105.15.

B. Murder of Tyrone Baum

41. On or about July 25, 2003, within the Eastern District of New York, the defendants DAMION HARDY and ABUBAKR RAHEEM, together with others, with intent to cause the death of Tyrone Baum, caused his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1962(c), 1963 and 3551 et seq.)

COUNT TWO
(Racketeering Conspiracy)

42. The allegations contained in paragraphs 1 through 5 are realleged and incorporated as if fully set forth in this paragraph.

14

43.   In or about and between 1991 and August 2004, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAMION HARDY, also known as "World," AARON GRANTON, also known as "E-Bay" and "Eric Moore," and ABUBAKR RAHEEM, also known as "Kim Crandall," together with others, being persons employed by and associated with the Cash Money Brothers, an enterprise that engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conspire to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5).

44.   The pattern of racketeering activity through which the defendants agreed to conduct the affairs of the Cash Money Brothers consisted of the racketeering acts set forth in paragraphs 8 through 41 of Count One, as Racketeering Acts One through Ten, which are realleged and incorporated as if fully set forth in this paragraph.  Each defendant agreed that a conspirator would commit at least two racketeering acts in the conduct of the affairs of the enterprise.

(Title 18, United States Code, Sections 1962(d), 1963 and 3551 et seq.)

APP. 59

Case 15-1645, Document 113, 10/28/2016, 1895494, Page62 of 280

15

## COUNT THREE
(Murder of Michael Colon)

45.    At all times relevant to this Superseding
Indictment, the Cash Money Brothers, as more fully described in
paragraphs 1 through 5, which are realleged and incorporated as
if fully set forth in this paragraph, constituted an enterprise
as defined in Title 18, United States Code, Section 1959(b)(2),
that is, a group of individuals associated in fact that was
engaged in, and the activities of which affected, interstate and
foreign commerce.  The CMB constituted an ongoing organization
whose members functioned as a continuing unit for the common
purpose of achieving the CMB's objectives.

46.    The above-described enterprise, through its members
and associates, engaged in racketeering activity, as defined in
Title 18, United States Code, Sections 1959(b)(1) and 1961(1),
namely, acts involving murder in violation of New York law;
narcotics trafficking, in violation of Title 21, United States
Code, Sections 841(a)(1) and 846; and acts involving robbery, in
violation of the laws of New York.

47.    On or about April 15, 1998, within the Eastern
District of New York, the defendant DAMION HARDY, also known as
"World," for the purpose of maintaining and increasing his
position in the Cash Money Brothers, an enterprise engaged in
racketeering activity, did knowingly and intentionally murder

16

Michael Colon, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

## COUNT FOUR
### (Murder of Darryl Baum)

48. The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

49. On or about June 10, 2000, within the Eastern District of New York, the defendants DAMION HARDY, also known as "World," and AARON GRANTON, also known as "E-Bay" and "Eric Moore," together with others, for the purpose of maintaining and increasing their positions in the Cash Money Brothers, an enterprise engaged in racketeering activity, did knowingly and intentionally murder Darryl Baum, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

## COUNT FIVE
### (Conspiracy to Murder James Hamilton)

50. The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

APP. 61

51.   In or about and between June 2000 and August 2000, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAMION HARDY, also known as "World," AARON GRANTON, also known as "E-Bay" and "Eric Moore," and ABUBAKR RAHEEM, also known as "Kim Crandall," together with others, for the purpose of maintaining and increasing their positions in the Cash Money Brothers, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder James Hamilton, also known as "JR," in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

## COUNT SIX
### (Murder of James Hamilton)

52.   The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

53.   On or about August 1, 2000, within the Eastern District of New York, the defendants DAMION HARDY, also known as "World," AARON GRANTON, also known as "E-Bay" and "Eric Moore," and ABUBAKR RAHEEM, also known as "Kim Crandall," together with others, for the purpose of maintaining and increasing their positions in the Cash Money Brothers, an enterprise engaged in racketeering activity, did knowingly and intentionally murder

18

James Hamilton, also known as "JR," in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

## COUNT SEVEN
(Conspiracy to Murder Ivery Davis)

54. The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

55. In or about and between June 1999 and August 2000, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAMION HARDY, also known as "World" and AARON GRANTON, also known as "E-Bay" and "Eric Moore," together with others, for the purpose of maintaining and increasing their positions in the Cash Money Brothers, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder Ivery Davis, also known as "Peanut," in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

APP. 63

19

## COUNT EIGHT
(Murder of Ivery Davis)

56.  The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

57.  On or about August 10, 2000, within the Eastern District of New York and elsewhere, the defendants DAMION HARDY, also known as "World," and AARON GRANTON, also known as "E-Bay" and "Eric Moore," together with others, for the purpose of maintaining and increasing their positions in the Cash Money Brothers, an enterprise engaged in racketeering activity, did knowingly and intentionally murder Ivery Davis, also known as "Peanut," in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

## COUNT NINE
(Murder of Johan Camitz)

58.  The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

59.  On or about August 10, 2000, within the Eastern District of New York and elsewhere, the defendants DAMION HARDY, also known as "World," and AARON GRANTON, also known as "E-Bay" and "Eric Moore," together with others, for the purpose of

20

maintaining and increasing their positions in the Cash Money Brothers, an enterprise engaged in racketeering activity, did knowingly and intentionally murder Johan Camitz, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

## COUNT TEN
### (Conspiracy to Murder Tyrone Baum)

60. The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

61. In or about July 2003, within the Eastern District of New York and elsewhere, the defendants DAMION HARDY, also known as "World," and ABUBAKR RAHEEM, also known as "Kim Crandall," together with others, for the purpose of maintaining and increasing their positions in the Cash Money Brothers, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder Tyrone Baum, in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

APP. 65

<u>COUNT ELEVEN</u>
(Murder of Tyrone Baum)

62.  The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

63.  On or about July 25, 2003, within the Eastern District of New York, the defendants DAMION HARDY, also known as "World," and ABUBAKR RAHEEM, also known as "Kim Crandall," together with others, for the purpose of maintaining and increasing their positions in the Cash Money Brothers, an enterprise engaged in racketeering activity, did knowingly and intentionally murder Tyrone Baum, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 <u>et</u> <u>seq</u>.)

<u>COUNT TWELVE</u>
(Conspiracy to Kidnap John Doe #3)

64.  The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

65.  In or about July 2002, within the Eastern District of New York and elsewhere, the defendant DAMION HARDY, also known as "World," together with others, for the purpose of maintaining and increasing his position in the Cash Money

APP. 66

Brothers, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to kidnap John Doe #3, in violation of New York Penal Law Sections 135.20 and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

COUNT THIRTEEN
(Kidnapping of John Doe #3)

66. The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

67. On or about and between July 10, 2002 and July 11, 2002, both dates being approximate and inclusive, within the Eastern District of New York, the defendant DAMION HARDY, also known as "World," together with others, for the purpose of maintaining and increasing his position in the Cash Money Brothers, an enterprise engaged in racketeering activity, did knowingly and intentionally kidnap John Doe #3, in violation of New York Penal Law Sections 135.20 and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

APP. 67

23

## COUNT FOURTEEN
### (Conspiracy to Rob John Doe #3)

68.   The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

69.   In or about July 2002, within the Eastern District of New York and elsewhere, the defendant DAMION HARDY, also known as "World," together with others, did knowingly and intentionally conspire to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by the robbery of John Doe #3, a narcotics trafficker in Queens, New York.

(Title 18, United States Code, Sections 1951(a) and 3551 et seq.)

## COUNT FIFTEEN
### (Attempted Robbery of John Doe #3)

70.   The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

71.   On or about and between July 10, 2002 and July 11, 2002, both dates being approximate and inclusive, within the Eastern District of New York, the defendant DAMION HARDY, also known as "World," together with others, did knowingly and intentionally attempt to obstruct, delay and affect commerce

and the movement of articles and commodities in commerce by the robbery of John Doe #3, a narcotics trafficker in Queens, New York.

(Title 18, United States Code, Sections 1951(a), 2 and 3551 <u>et</u> <u>seq.</u>)

COUNT SIXTEEN
(Use of a Firearm - Murder of James Hamilton)

72.  The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

73.  On or about August 1, 2000, within the Eastern District of New York and elsewhere, the defendants DAMION HARDY, also known as "World," AARON GRANTON, also known as "E-Bay" and "Eric Moore," and ABUBAKR RAHEEM, also known as "Kim Crandall," together with others, did knowingly and intentionally possess a firearm in furtherance of crimes of violence, to wit: the crimes charged in Counts Five and Six, and did knowingly and intentionally use and carry a firearm during and in relation to such crimes of violence.

(Title 18, United States Code, Sections 924(c)(1)(A)(iii), 2 and 3551 <u>et</u> <u>seq.</u>)

## COUNT SEVENTEEN
(Causing Death of James Hamilton Through the Use of a Firearm)

74. The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

75. On or about August 1, 2000, within the Eastern District of New York, the defendants DAMION HARDY, also known as "World," AARON GRANTON, also known as "E-Bay" and "Eric Moore," and ABUBAKR RAHEEM, also known as "Kim Crandall," in the course of a violation of Title 18, United States Code, Section 924(c), to wit: the crime charged in Count Fifteen, did knowingly and intentionally cause the death of a person through the use of a firearm, which killing is a first degree murder as defined in Title 18, United States Code, Section 1111(a), in that the defendants DAMION HARDY, AARON GRANTON and ABUBAKR RAHEEM, with malice aforethought, did unlawfully kill James Hamilton, also known as "JR," willfully, deliberately, maliciously and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2 and 3551 et seq.)

## COUNT EIGHTEEN
(Use of a Firearm - Murder of Ivery Davis)

76. The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

26

77.   On or about August 10, 2000, within the Eastern District of New York and elsewhere, the defendants DAMION HARDY, also known as "World" and AARON GRANTON, also known as "E-Bay" and "Eric Moore," together with others, did knowingly and intentionally possess a firearm in furtherance of crimes of violence, to wit: the crimes charged in Counts Seven and Eight, and did knowingly and intentionally use and carry a firearm during and in relation to such crimes of violence.

(Title 18, United States Code, Sections 924(c)(1)(A)(iii), 2 and 3551 et seq.)

### COUNT NINETEEN
(Causing Death of Ivery Davis Through the Use of a Firearm)

78.   The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

79.   On or about August 10, 2000, within the Eastern District of New York and elsewhere, the defendants DAMION HARDY, also known as "World," and AARON GRANTON, also known as "E-Bay" and "Eric Moore," in the course of a violation of Title 18, United States Code, Section 924(c), to wit: the crime charged in Count Eighteen, did knowingly and intentionally cause the death of a person through the use of a firearm, which killing is a first degree murder as defined in Title 18, United States Code, Section 1111(a), in that the defendants DAMION HARDY and AARON

APP. 71

Case 15-1645, Document 113, 10/28/2016, 1895494, Page74 of 280

27

GRANTON, with malice aforethought, did unlawfully kill Ivery Davis, also known as "Peanut," willfully, deliberately, maliciously and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2 and 3551 et seq.)

### COUNT TWENTY
(Use of a Firearm - Murder of Tyrone Baum)

80.   The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

81.   On or about July 25, 2003, within the Eastern District of New York and elsewhere, the defendants DAMION HARDY, also known as "World," and ABUBAKR RAHEEM, also known as "Kim Crandall," together with others, did knowingly and intentionally possess a firearm in furtherance of crimes of violence, to wit: the crimes charged in Counts Ten and Eleven, and did knowingly and intentionally use and carry a firearm during and in relation to such crimes of violence.

(Title 18, United States Code, Sections 924(c)(1)(A)(iii), 2 and 3551 et seq.)

### COUNT TWENTY-ONE
(Causing Death of Tyrone Baum Through the Use of a Firearm)

82.   The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

APP. 72

83.  On or about July 25, 2003, within the Eastern District of New York, the defendants DAMION HARDY, also known as "World," and ABUBAKR RAHEEM, also known as "Kim Crandall," in the course of a violation of Title 18, United States Code, Section 924(c), to wit: the crime charged in Count Twenty, did knowingly and intentionally cause the death of a person through the use of a firearm, which killing is a first degree murder as defined in Title 18, United States Code, Section 1111(a), in that the defendants DAMION HARDY and ABUBAKR RAHEEM, with malice aforethought, did unlawfully kill Tyrone Baum willfully, deliberately, maliciously and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2 and 3551 et seq.)

### COUNT TWENTY-TWO
(Use of a Firearm - Kidnaping/Robbery of John Doe #3))

84.  The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

85.  On or about and between July 10, 2002 and July 11, 2002, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant DAMION HARDY, also known as "World," together with others, did knowingly and intentionally possess a firearm in furtherance of crimes of violence, to wit: the crimes charged in Counts Twelve

APP. 73

through Fifteen, and did knowingly and intentionally use and carry a firearm during and in relation to such crimes of violence.

(Title 18, United States Code, Sections 924(c)(1)(A)(iii), 2 and 3551 et seq.)

## COUNT TWENTY-THREE
(Cocaine Base Distribution Conspiracy)

86. The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

87. In or about and between 1991 and August 2004, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAMION HARDY, also known as "World," and AARON GRANTON, also known as "E-Bay" and "Eric Moore," together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved 50 grams or more of a substance containing cocaine base, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(Title 21, United States Code, Sections 846 and 841(b)(1)(A)(iii); Title 18, United States Code, Sections 3551 et seq.)

## COUNT TWENTY-FOUR
(Distribution of Cocaine Base)

88. The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

89. In or about and between 1991 and August 2004, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants DAMION HARDY, also known as "World," and AARON GRANTON, also known as "E-Bay" and "Eric Moore," together with others, did knowingly and intentionally distribute and possess with intent to distribute a controlled substance, which offense involved 50 grams or more of a substance containing cocaine base, a Schedule II controlled substance.

(Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(iii); Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT TWENTY-FIVE
(Murder-for-Hire)

90. The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

91. On or about and between October 27, 2001 and October 28, 2001, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the

31

defendant AARON GRANTON, also known as "E-Bay" and "Eric Moore," together with others, knowingly and intentionally used and caused another to use facilities in interstate commerce, to wit: a telephone and two-way, text messaging pager, with intent that a murder be committed, in violation of Section 125.25 of the New York Penal Law, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value, and the death of Troy Singleton did result.

(Title 18, United States Code, Sections 1958, 2 and 3551 et seq.)

### COUNT TWENTY-SIX
(Conspiracy to Commit Murder-for-Hire)

92.  The allegations contained in paragraphs 1 through 5 and 45 and 46 are realleged and incorporated as if fully set forth in this paragraph.

93.  In or about October 2001, within the Eastern District of New York and elsewhere, the defendant AARON GRANTON, also known as "E-Bay" and "Eric Moore," together with others, knowingly and intentionally conspired to use and cause another to use facilities in interstate commerce, to wit: a telephone and two-way, text messaging pager, with intent that a murder be committed, in violation of Section 125.25 of the New York Penal Law, as consideration for the receipt of, and as consideration

32

for a promise and agreement to pay, something of pecuniary value, and the death of Troy Singleton did result.

(Title 18, United States Code, Sections 1958 and 3551 <u>et seq</u>.)

<u>NOTICE OF SPECIAL FINDINGS</u>
(Murders of Michael Colon, Ivery Davis and Johan Camitz)

94. The allegations contained in Paragraphs 1 through 93 are realleged and incorporated as if fully set forth in this paragraph.

95. The defendant DAMION HARDY was 18 years or older at the time he committed the offenses charged in Counts Three, Eight, Nine and Nineteen.

(Title 18, United States Code, Section 3591(a))

96. The defendant AARON GRANTON was 18 years or older at the time he committed the offenses charged in Counts Eight, Nine and Nineteen.

(Title 18, United States Code, Section 3591(a))

97. As to Counts Three, Eight and Nineteen, the defendant DAMION HARDY intentionally killed Michael Colon (Count Three) and Ivery Davis (Counts Eight and Nineteen).

(Title 18, United States Code, Section 3591(a)(2)(A))

98. As to Counts Eight and Nineteen, the defendant AARON GRANTON intentionally killed Ivery Davis.

(Title 18, United States Code, Section 3591(a)(2)(A))

defendant DAMION HARDY intentionally inflicted serious bodily

injury that resulted in the death of Michael Colon (Count Three) and Ivery Davis (Counts Eight and Nineteen).

(Title 18, United States Code, Section 3591(a)(2)(B))

100. As to Counts Eight and Nineteen, the defendant AARON GRANTON intentionally inflicted serious bodily injury that resulted in the death of Ivery Davis.

(Title 18, United States Code, Section 3591(a)(2)(B))

101. As to Counts Three, Eight, Nine and Nineteen, the defendant DAMION HARDY intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and Michael Colon (Count Three), Ivery Davis (Counts Eight and Nineteen) and Johan Camitz (Count Nine) died as a direct result of the act.

(Title 18, United States Code, Section 3591(a)(2)(C))

102. As to Counts Eight, Nine and Nineteen, the defendant AARON GRANTON intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and

APP. 78

34

Ivery Davis (Counts Eight and Nineteen) and Johan Camitz (Count Nine) died as a direct result of the act.

(Title 18, United States Code, Section 3591(a)(2)(c))

103. As to Counts Three, Eight, Nine and Nineteen, the defendant DAMION HARDY intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Michael Colon (Count Three), Ivery Davis (Counts Eight and Nineteen) and Johan Camitz (Count Nine) died as a direct result of the act.

(Title 18, United States Code, Section 3591(a)(2)(D))

104. As to Counts Eight, Nine and Nineteen, the defendant AARON GRANTON intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Ivery Davis (Counts Eight and Nineteen) and Johan Camitz (Count Nine) died as a direct result of the act.

(Title 18, United States Code, Section 3591(a)(2)(D))

105. As to Counts Eight and Nine, the defendant DAMION HARDY committed the offense after having been previously convicted of a State offense punishable by a term of

imprisonment of more than one year, involving the use or attempted or threatened use of a firearm (as defined in 18 U.S.C. § 921) against another person, to wit: on or about June 2, 1999, the defendant was convicted in the Supreme Court, Kings County, of attempted assault in the second degree, in violation of New York Penal Law Sections 120.05 and 110.00.

(Title 18, United States Code, Section 3592(c)(2))

101. As to Count Eights and Nine, the defendant AARON GRANTON committed the offense after having been previously convicted of a State offense punishable by a term of imprisonment of more than one year, involving the use or attempted or threatened use of a firearm (as defined in 18 U.S.C. § 921) against another person, to wit: on or about November 9, 1995, the defendant was convicted in the Supreme Court, Kings County, of attempted robbery in the first degree, in violation of New York Penal Law Sections 160.15 and 110.00.

(Title 18, United States Code, Section 3592(c)(2))

102. As to Counts Eight and Nineteen, the defendants DAMION HARDY and AARON GRANTON committed the offense and, in the commission of the offense, knowingly created a grave risk of death to one or more persons in addition to Ivery Davis.

(Title 18, United States Code, Section 3592(c)(5))

103. As to Counts Eight, Nine and Nineteen, the defendant AARON GRANTON committed the offense as consideration

for the receipt, or in the expectation of the receipt, of anything of pecuniary value.

(Title 18, United States Code, Section 3592(c)(8))

104. As to Counts Three, Eight, Nine and Nineteen, the defendant DAMION HARDY committed the offense after substantial planning and premeditation to cause the death of Michael Colon (Count Three) and Ivery Davis (Counts Eight, Nine and Nineteen).

(Title 18, United States Code, Section 3592(c)(9))

105. As to Counts Eight, Nine and Nineteen, the defendant AARON GRANTON committed the offense after substantial planning and premeditation to cause the death of Ivery Davis (Counts Eight, Nine and Nineteen).

(Title 18, United States Code, Section 3592(c)(9))

A TRUE BILL

FOREPERSON

BENTON J. CAMPBELL
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

# UNITED STATES   DISTRICT COURT

## EASTERN DISTRICT of NEW YORK

### Criminal Division

## THE UNITED STATES OF AMERICA

DAMION HARDY, also as "World,"
AARON GRANTON, also known as "E-Bay" and "Eric Moore,"
ABUBAKR RAHEEM, also known as "Kim Crandall,"
**Defendants.**

## S U P E R S E D I N G
## I N D I C T M E N T
### (S-6)

(T. 18, U.S.C., §§ 924(c)(1)(A)(iii), 924(j)(1),
1951(a), 1958, 1959(a)(1), 1959(a)(5), and 1962(c),
1962(d), 1963, 3591(a), 3592(c), 3593(a)(2),
2 and 3351 et seq.; T. 21, U.S.C., §§ 841(a)(1),
841(b)(1)(A)(iii) and 846)

*A true bill.*

_____
*Foreman*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
*Clerk*

*Bail, $* _____

*AUSA Sean Haran, (718) 254-6176*

Case 1:04-cr-01016-FB, Document 248, Filed 02/24/08, Page 84 of 280, PageID #: 1097

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,          :
                                   :    04-CR-706
                                   :    (FB)
                                   :
      -against-                    :
                                   :
                                   :    United States Courthouse
                                   :    Brooklyn, New York
                                   :
DAMION HARDY,                      :
                                   :
          DEFENDANT.               :    Tuesday, March 24, 2015
                                   :    3:00 p.m.
                                   :
                                   :

- - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR COMPETENCY HEARING
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES SENIOR DISTRICT COURT JUDGE

A P P E A R A N C E S:

| For the Government: | LORETTA E. LYNCH, ESQ. |
| | United States Attorney |
| | BY: **JAMES PATRICK LOONAM, ESQ.** |
| | **RENA PAUL, ESQ.** |
| | **MATTHEW S. AMATRUDA, ESQ.** |
| | Assistant United States Attorneys |

| For the Defendant Damion Hardy: | Ruhnke & Barrett |
| | BY: **DAVID A. RUHNKE, ESQ.** |
| | **JEAN BARRETT, ESQ.** |

Courtroom Deputy: **Michael Innelli**

Court Reporter:  **Mary Agnes Drury, RPR**
                 Official Court Reporter
                 Telephone: (718) 613-2615
                 E-mail:  Mad78910@yahoo.com

Proceedings recorded by computerized stenography.  Transcript produced by Computer-aided Transcription.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

Case 15-1645, Document 113, 10/28/2016, 1895494, Page86 of 280

PROCEEDINGS                                    2

(In open court.)

COURTROOM DEPUTY: All rise, the United States District Court for the Eastern District of New York is now in session, the Honorable Frederic Block is now presiding.

(Honorable Frederic Block takes the bench.)

COURTROOM DEPUTY: Calling Criminal Cause for Competency Hearing in Docket No. 04-CR-706, *United States of America against Damion Hardy*.

While Mr. Hardy is being brought into the courtroom, I'll ask the parties to state their appearances for the record.

MR. LOONAM:  James Loonam for the United States, together with Rena Paul and Matt Amatruda.  Good afternoon, your Honor.

MR. RUHNKE:  And David Ruhnke for the defendant, together with Jean Barrett.

THE COURT:  Good to see you here.

MS. BARRETT:  Good afternoon, your Honor.

(Defendant enters the courtroom.)

THE COURT:  Good afternoon.

All right.  The case has been called, and we're here today to listen to the two psychiatrists.

But I just want to make some comments here.  It's good to see Mr. Hardy here in court.

I spoke to the warden yesterday, as you may or may

Case 15-4645, Document 113, 10/28/2016, 1895494, Page87 of 280
Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 3 of 121 PageID #: 7140

not know.  And, you know, he's out of the SHU now.  He is supposed to be out of the SHU.

MR. RUHNKE:  I just found that out.

THE COURT:  I just want Mr. Hardy and everyone to know that I've been interactive here, because I didn't think it was appropriate for him to be in the SHU.  And I've had a lengthy conversation with the warden, I'll be speaking to her consistently to make sure that Mr. Hardy is properly taken care of while he's at the MCC.  And I just thought it was counterproductive to have to impose that kind of harsh treatment on him.

And I think after I spoke with the warden, she understands, and she's going to be fully compliant and work with me to make sure that Mr. Hardy is properly taken care of while he's at the MCC.  I just wanted you to know that, and the government to know that and Mr. Hardy to know that as well.

THE DEFENDANT:  I appreciate it.  Thank you.

THE COURT:  All right.  You will continue to let me know, preferably through your attorney, you have a very good attorney, how you're being treated form day-to-day.  I want to make sure you're properly being taken care of there, okay?  And I just wanted you to know that I did interact on your behalf here.

All right.  Having said that, let's hear from the

Case 15-1645, Document 113, 10/28/2016, 1895494, Page88 of 280

PROCEEDINGS                                    4

two sides.  Who is going to go first?

MR. LOONAM:  That's the question, your Honor, but -- and it's important that we make a record on this, not only for your Honor's benefit, but for, I believe the Second Circuit, in any event, we should have a full record here.

So the statute that provides for the competency determination 18 USC 4241 does not allocate the burden of proof.  And the Supreme Court and the Circuit have not definitely decided this issue.  And -- so the Second Circuit has recognized that it hasn't addressed this issue.

There is a split of authority between the Circuits, the Fourth and the Eleventh Circuit come down one way; the Ninth Circuit and some other circuits come down another way.  And the Supreme Court of the United States has stated in dicta that, "Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence."  And that's *Cooper v Oklahoma* at 517 US 348 at page 362.

Now, however, we don't believe that your Honor is going to need to address the issue of who actually bears the burden, because I think both parties agree that whoever bears the burden, the burden is a preponderance of the evidence.  And we believe that the government will be able to meet a preponderance of the evidence in any event.

However, we want to reserve our right on appeal to

Case 15-1645, Document 113, 10/28/2016, 1895494, Page89 of 280

argue that it's the defendant who bears the burden, and we believe that in this context, since this is a motion made by the defendant and the defendant is in sole possession of the facts, which give rise to this motion for incompetence, that the defendant should go first.

THE COURT:  All right.  So I'm glad you made the record and, you know, I suspect this was the first of a number of situations we may be talking about over the ensuing weeks that may be novel or things that we have to scratch our chins about and figure out how to sort it out.

But I think that for the present purposes, I'm just going to ask the government to go first without assigning any burdens at all for anybody right now. Somebody has to go first.  And we'll sort it out, it may be academic, depending on what transpires here.

So you're tooled up and I think your person will testify through the video, right?

MR. LOONAM:  That's correct, your Honor.

THE COURT:  So this is an accommodation with the doctor that you'll go forward with your video presentation now.  Mr. Ruhnke, anything you wish to say?

MR. RUHNKE:  Just this, your Honor:  I note for the report that our expert, Dr. Richard Dudley, is in the courtroom and will be observing the testimony, I want to be sure that the government doesn't have an objection to that.

Case 15-1645, Document 113, 10/28/2016, 1895494, Page90 of 280

PROCEEDINGS                                        6

MR. LOONAM:  We do object.

THE COURT:  And also your doctor, what's her name again, Doctor?

MR. RUHNKE:  Preston Baecht.

MR. LOONAM:  It's Preston Baecht, your Honor.

THE COURT:  Dr. Preston Baecht.  How are you?  You know, she can stay tuned, if she wants to, while the other doctor testifies, if you'd like her to do that.

MR. LOONAM:  Actually, your Honor, the government would seek to invoke sequestration in this instance.  When Dr. Dudley testified at the last hearing, he was not testifying with respect to his own examination of Mr. Hardy, he was, instead, testifying on -- he was commenting on the observations and opinions of the other doctors.

THE COURT:  Be that as it may, I'm going to let her be privy to the proceedings, and we'll worry about how that falls out if it needs to later, okay?

So let's go forward with the examination, and I guess you should be sworn, right?

MR. LOONAM:  Yes, your Honor.

MR. RUHNKE:  Your Honor, there is just one more issue I need to raise, and that is that I understand, and I've just gotten a copy, of a motion filed by Mr. Hardy to discharge me as counsel on the basis of ineffectiveness. Obviously the Court has just gotten it as well, it was filed

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 7 of 121 PageID #: 7144

by mail, not on ECF.  And I'm assuming Mr. Innelli is about to post it, but that will have to be dealt with at some point.

THE COURT:  We'll deal with that, but since everybody is ready to go here -- I haven't had a chance to look at it again, it's just been recently filed.  Let's get the testimony of the doctor in the first instance.

MR. LOONAM:  And, your Honor, I'm going to move on to the doctor's testimony very quickly, but just in the interest of speed, I've consulted with Mr. Ruhnke, and he has no objection to the admission of the Government's exhibits.

So at this time, the government moves Exhibits 1 through 8, and we've provided a copy to the Court.  We move Government Exhibit 1 through 8 into evidence at this time.

THE COURT:  I take it I have all of those in these black binders?

MR. LOONAM:  You do, sir.

MR. RUHNKE:  That's without objection.

THE COURT:  All right.  That's allowed in evidence for purposes of this hearing.

(Government Exhibits 1 to 8 are admitted into evidence.)

COURTROOM DEPUTY:  Good afternoon, Doctor.  Can you hear me?

Case 15-1645, Document 113, 10/28/2016, 1895494, Page92 of 280

PRESTON BAECHT - DIRECT/MR. LOONAM                    8

THE WITNESS:  Yes, I can.


**LEA ANN PRESTON BAECHT**, PhD, called by the Government, having been first duly sworn, was examined and testified as follows:


THE WITNESS:  I'm sorry, I'm not able to hear you right now.  Can you speak a little louder?

COURTROOM DEPUTY:  Do you affirm the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  It will be.

THE COURT:  Are you able to hear the Court now?  Can you hear me also?

COURTROOM DEPUTY:  She answered in the affirmative.

THE COURT:  Yes, you answered in the affirmative, but I want to know whether you can hear me also.

THE WITNESS:  I can hear you, your Honor.  I can hear Mr. Loonam very well.  I could barely hear Mr. Ruhnke when he was speaking.

THE COURT:  So it's important for us to know that so we can make sure we have proper amplification as needs be, so don't hesitate to interrupt, okay?

THE WITNESS:  Thank you, your Honor.

THE COURT:  Mr. Loonam, your witness.


*Mary Agnes Drury, RPR*
*Official Court Reporter*
APP. 90

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 5 of 121 PageID #: 7146

Case 15-1645, Document 113, 10/28/2016, 1895494, Page93 of 280

MR. LOONAM:  Yes, your Honor.  Thank you.

DIRECT EXAMINATION

BY MR. LOONAM:

Q    Good afternoon, Doctor.

A    Good afternoon.

Q    What is your current position?

A    I am currently a staff psychologist at the United States Medical Center for federal prisoners in Springfield, Missouri.

Q    And how long have you had that job?

A    I've been a full-time employee in that position since January of 2000.

Q    And you were previously qualified as an expert witness in this case, correct?

A    Yes, I was.

Q    And you were the primary clinical psychologist for Damion Hardy, correct?

A    Yes, I have been.

Q    Over what time period were you Hardy's primary clinical psychologist?

A    I believe I first met Mr. Hardy in October of 2008.  He was here for four months at competence restoration treatment.  He had to go back to New York for the court proceeding following that period of treatment.  He then returned in November of 2011, and he's been here at Spring

Case 1:04-cr-00706-PB Document 939 Filed 03/25/15 Page 10 of 121 PageID #: 7147

-- he was here at Springfield with me from November of 2011 until the end of 2014, I believe he left in the last week of December.

Q    So the last stretch that you saw Damion Hardy was for three years, and it ended -- when was that, in 2014?

A    Yes, in December of 2014.

Q    Okay.  And what were your job responsibilities as Hardy's primary clinical psychologist?

A    When I conducted his initial competency restoration evaluation, it was my opinion that he was mentally ill and in need of treatment, and recommended antipsychotic medication.

When he returned in November of 2011, he was here for a significant period of time while we were waiting the Court's decision as to whether or not medication would be authorized.

During that time period he was in a holdover status and my role was to simply monitor him, interact with him on a weekly basis to make sure that he was coping adequately at that time.

Once the Court authorized the administration of medication, then we moved into a more appropriable competency restoration where I was meeting with him routinely to monitor his response to medication.  Also, evaluating his educational needs and referred him for

Case 15-1645, Document 117, 10/28/2016, 1895494, Page95 of 280

PRESTON BAECHT - DIRECT/MR. LOONAM      11

competency restoration group.

And at the end of his stay, I conducted additional interviews to reassess his competency to go forward with his case.

Q    All right.  And you diagnosed Hardy with a mental illness, correct?

A    That's correct.

Q    And which mental illness did you diagnosis him with?

A    When we were still utilizing the DSM IV, which is the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, his diagnosis was paranoid type schizophrenia.  The Fifth Edition of the DSM no longer has specifiers for schizophrenia, and so at this point in time his diagnosis would simply be schizophrenia.

Q    And in February of 2009, you opined at that time that Hardy was not competent to proceed to trial, correct?

A    That's correct.

Q    Referring back to February 2009, you opined that Hardy was able to understand the nature of the charges in this case as well as the nature of the proceedings; is that correct?

A    He had a factual understanding of the those things.  At that time he had several delusions that prevented him from having a rational understanding of his legal case and the potential consequences.

PRESTON BAECHT - DIRECT/MR. LOONAM                12

Q    Pursuant to court order, Hardy was medicated with antipsychotic medication to treat his mental illness, correct?

A    Correct.

Q    Approximately when did this medication regiment begin?

A    I believe it was in December of 2013.

Q    And has Hardy been medicated continuously since that date?

A    While he was at our facility, yes.  In looking over the electronic medical records following his discharge from this facility and his transfer back to New York, there appears there were a handful of days where he was offered oral antipsychotic medication as opposed to the injectable medication every three weeks.  So he may have had one or two days where he refused oral medicine.

        However, in January, I think it was January 16th, 2015, they resumed to give him haldol decanoate, which is a long-acting injectable antipsychotic medication, and he's been receiving that 175 milligrams every three weeks since that time.  That is the same medication he received while he was at Springfield.

Q    So in your opinion, would those handful of days where he was offered oral medication had a material impact on the, I guess, the levels of medication in Hardy's body at the time in January of 2015?

Case 15-1645, Document 117, 10/28/2016, 1895494, Page97 of 280

A    No, it's unlikely that it would have a significant effect.  And if it had had some effect, it would have been back in January.  And as I've indicated, all the records that I've looked at, it appears he's been receiving his Haldol decanoate injection every three weeks since that date in January.

Q    Can you describe to the Court Hardy's response to the medication that you observed?

A    He improved.  It was a gradual improvement, but it was significant.  Early on he was out of touch with reality and insisting that he was Essa, a profit.  He also alleged at one point that he was Clifford Harris, that he was the president of the United States.  It was nearly impossible to have a conversation with him prior to the initiation of medication.

However, with time he became much less preoccupied with the belief that he was someone else.  He became much more pleasant and rationale.

It's also notable that prior to the initiation of medication he had multiple incidents where he was aggressive towards others.  However, once the medication was started, he no longer showed the aggressive and threatening behavior, and I was able to get him to a semi unlocked unit where he had more freedom to interact with others.

So in my opinion, he had a very good response to

PRESTON BAECHT - DIRECT/MR. LOONAM          14

the medication and it's now significant.

Q    In a report dated November 18th, 2014, which is in evidence as Government Exhibit 7, your Honor, you found that Hardy was competent to proceed to trial, correct?

A    That's correct.

Q    All right.  Please tell the Court why you found Hardy competent to proceed to trial.

A    Well, there are three main issues when it comes to competency.  One, do they have a rational and factual understanding of the nature of the charges against him.  And in my interviews with him, it was very clear that he did. He was fully aware of the charges against him.  The racketeering.  He was accused of ordering the murders of various individuals and being involved in a large drug enterprise.  He had a very good understanding of that.

The second piece is do they have a rational understanding and factual understanding of the potential consequences?  Again, Mr. Hardy was very much aware that these charges were serious.  He indicated he was facing life in prison.  He expressed an understanding that although initially he was facing the death penalty, that that had been taken off the table.

And then the third piece that's important to look at is does he have the ability to assist in his own defense. At that point in time we talked about what he intended to do

Case 1:04-cr-00706-PB   Document 939   Filed 03/25/15   Page 15 of 121 PageID #: 7152

when he returned to court.  He expressed no paranoid or delusional ideation regarding Mr. Ruhnke, his defense counsel.  He offered a defense strategy to me at that point that, although it may not have been realistic, it did not sound to be delusional in nature at all.

He indicated to me that he was interested in meeting with the prosecutors in this case and trying to obtain a deal.

Again, his expectations were what kind of deal he could have been offered may not have been reasonable, but he did indicate to me that at the time that he would be willing to accept a deal for 15 years.

So in my opinion, based upon what he was saying to me as well as how he presented in our conversation, I thought he demonstrated the ability to assist in his own defense.

Q    In the course of making your competency determination that's memorialized in your report of Government Exhibit 7, which, for your benefit, is the November 18th, 2014, report, did you review any material other than, you know, your interactions with Hardy directly?

A    Yes, I believe I have it listed in the beginning of my report.  But I also reviewed a motion that he had filed I belive in March of 2014.  I had reviewed various transcripts.  I had spoken to defense counsel, about their

PRESTON BAECHT - DIRECT/MR. LOONAM                16

interactions with him.

I had also reviewed several phone calls that Mr. Hardy made while he was at the facility. He made a large number of calls, and I wasn't able to review all of them, but I did review a sample of those phone calls.

Q   Can you tell the Court what the phone calls revealed to you?

A   It was very clear to me during those phone calls that Mr. Hardy was fully aware of what was going on. He was aware again of the nature and the potential consequences of his case. He talked in those conversations about possible defense strategies. At one point he talked about something he had learned from Mr. Ruhnke regarding the nature of the charge against him; under what number it fell under, and so he previously believed that they needed to have an overt act in order to indict him. But he was able to recall what Mr. Ruhnke had told him. And he indicated in the phone call that he had looked it up in a computer and that Mr. Ruhnke was correct, that actually they could charge him without having an overt act.

So in my reading of those or in my listening of those phone calls, it was apparent that he had, again, a good and rational and factual understanding of what was going on. He may not always agree with others. He may think his perceptions were accurate, sometimes they may or

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 17 of 121 PageID #: 7154

may not; however, it was fair that he did have the ability to hear the information and retain it and understand it.

Q     All right.  In the phone calls you listened to, did Hardy refer to himself as the President of the United States?

A     No, he did not.  He never referred to himself as anyone or a than Damion Hardy, a man who was being accused of some very serious crimes that he asserted innocence of.

Q     Go ahead.  I apologize.  I didn't mean to interrupt you.  I apologize.

A     I was going to say that he asserted he was innocent of.

Q     And do you recall whether the defendant made any representations to you about, you know, whether he had, you know, access to significant amounts of money and then what you later found on the phone calls?

A     Yes.  I remember that Mr. Ruhnke had mentioned him saying to him, Mr. Hardy told Mr. Ruhnke that he made $50.  And I ask did ask him about that, and he told me he had $5 million that he had won in a lawsuit.  But at the same time -- around the same time period when he told me that, I reviewed phone calls where he asked his mother, "we don't got no millionaires in the family, huh?"

So I think what I took from that was although he may have made statements saying that he believed himself to have millions of dollars, I don't think that he genuinely

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 189 of 121 PageID #: 7155

PRESTON BAECHT - DIRECT/MR. LOONAM                18

believed it, because when he spoke with his mother, he was not asking about that money and being able to access it; instead, he was asking, do you know of anybody who has the money that he could potentially use.

So in my view he was not generally delusional about that particular issue.

Q    Are you aware of other phone calls where the Defendant Damion Hardy is asking people for money to pay for his new lawyer?

A    I did not personally review that call, but I have been informed by another staff member that they had reviewed phone calls where he had asked another person for a large sum of money to help him in obtaining a new lawyer, yes.

Q    Directing your attention to March 20th, 2015, you met with the defendant on March 20th, 2015, correct?

A    Yes, I did.

Q    And you created a report as a result of your meeting with the defendant, correct?

A    That's correct.

MR. LOONAM:  And, your Honor, that report is in evidence as Government Exhibit 6.  And the date of the report is March 23rd, 2015.

Q    What did you observe about the defendant's demeanor during the course of your meeting with him on March 20th, 2015?

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/19, Page 19 of 121 PageID #: 7156

A    Mr. Hardy was calm, he was pleasant, he wasn't argumentative with me.  I think what struck me the most is that he appeared very dysphoric, that he appeared very upset about his circumstances.

Q    And --

THE COURT:  Whose phone call was that?

THE WITNESS:  I believe it was --

THE COURT:  Was that from your end?  Was that from your office?

THE WITNESS:  Yes.  It was the secretary's phone, they have another one in here and it was ringing.

THE COURT:  All right.  Maybe can you tell her if there is a possibility that we can sort of turn the phone off while you're testifying?

THE WITNESS:  Yes.  I can get up and find that out, certainly.

THE COURT:  Maybe we can do that.

THE WITNESS:  Certainly.

(Witness complies.)

THE WITNESS:  If I can figure out how to do this.  Excuse me one moment.  Let me double check with her.  I want to make sure I can unplug it.

MR. RUHNKE:  It made me realize my phone was on, your Honor, so...

THE COURT:  I didn't think it was your's.

Case 15-1645, Document 113, 10/28/2016, 1895494, Page104 of 280

PRESTON BAECHT - DIRECT/MR. LOONAM                    20

MR. LOONAM:  Mine's off.

MR. RUHNKE:  No, it wasn't, but it could have been.

THE COURT:  So thank you very much, Doctor.

Let me just clarify something.  You mentioned a phone call between Mr. Hardy and his mother, I guess a couple of months ago, did you listen to the phone call?

THE WITNESS:  All phone calls are recorded for a period of time.  And as part of my evaluation, I'll often review phone calls just to see if someone is --

THE COURT:  My question is whether you -- my question is whether you listened to that particular phone call?

THE WITNESS:  I did.  In my report I list which phone calls I reviewed, and I did listen to that phone call.

THE COURT:  You mentioned that.  All right.  So you heard him talk to his mother for some length of time, correct?

THE WITNESS:  Yes.  I believe the phone call was approximately 15 minutes.

THE COURT:  And you listened to the entire 15 minutes?

THE WITNESS:  Yes, I did.

THE COURT:  All right.  And based upon the conversation that was transpiring between Mr. Hardy and his

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/19, Page 21 of 121 PageID #: 7158

mother, how would you characterize that conversation in terms of whether it was one that was rapid?  Whether it was controlled?  Whether it was normal, for lack of a better word?  In your own professional words.

THE WITNESS:  He did not present with obvious symptoms of mental illness in that conversation.  He was -- and actually, I reviewed a number of phone calls in all of --

THE COURT:  I'm just talking about the one with his mother.

THE WITNESS:  Well, most of them were with his mother that I reviewed.  But he did not express any delusional ideation.  He talked in one of the phone calls about, like I said, leaving with Mr. Ruhnke, saying he was not charged under 371, but under 846 and 841.  He said he looked it up on the computer, and that it appears that he could be arrested under those statutes without an overt act.

He also discussed the civil commitment statute and explained it correctly to --

THE COURT:  All right.  So, you know, I know you are referring now to your notes about that, right?  But I just wanted to get the general tone; there were a number of phone calls, you listened to all of them, and they were all pretty consistent in terms of his communication skill and the conversation that was transpiring between mother and

PRESTON BAECHT - DIRECT/MR. LOONAM                22

son?

THE WITNESS:  Yes.  I mean, he, at times, would ask her to do something for him more than once, but it didn't -- to me, that wasn't out of the ordinary.  Nothing about those phone calls stood out to me as reflecting psychosis or mental illness.

THE COURT:  When was the most recent phone conversation you listened to between Mr. Hardy and his mother?

THE WITNESS:  I was provided with two phone calls that he made from MCC New York, and the dates of those calls -- I believe one was in January, and one was in February of this year, and I was -- and I listened to both of those.

THE COURT:  So the most recent one was perhaps a month or so ago?

THE WITNESS:  Correct.

THE COURT:  All right.  I just wanted to clarify that.  You can continue with your questioning, Mr. Loonam.

MR. LOONAM:  Thank you, sir.

BY MR. LOONAM:

Q    Actually, why don't you just tell the Court, and we'll get into more specific questions, but about your observations of Hardy when you saw him on March 20th, 2015, as compared to what you observed as to him in Springfield when you found him competent?

Case 15-1645, Document 113, 10/28/2016, 1895494, Page107 of 280

PRESTON BAECHT - DIRECT/MR. LOONAM                23

A     His mental state was not significantly changed in that he -- if anything, he mentioned fewer potentially odd things during my March 20th interview.  For example, he never claimed to be anyone other than Damion Hardy when I met with him on March 20th.  He answered all of my questions relevantly.

He, at times refused to answer my questions; however, again, he did not express any delusional strategies he didn't express any paranoid ideation.

If anything, he came across as someone very much in distress and worried about his current circumstances and the fact that he, you know, could potentially be going to trial in less than two weeks.

Q     And we'll discuss your observations concerning his stress.  But with respect to your observations of Mr. Hardy on March 20th, 2015, do you think he was basically the same as you observed him in Springfield, better than you observed him in Springfield, or worse than you had observed him in Springfield?

A     In some respects he actually presented as better.  You know, I noted in my November 18th report, you know, towards the end of my interview with him he claimed to be the President of the United States.  I don't think he believed it, but he still made that claim.  During my March 20th interview, he never made any of those claims at all.

PRESTON BAECHT - DIRECT/MR. LOONAM                24

At the very end of our interview, he did mention the Supreme Court. He did mention Ethou Law. However, his description of Ethou Law was that I said -- that he overheard me saying at one point years ago that the law said a person could not be forcibly medicated for competency restoration unless the judge ordered it.

He did not say that Ethou Law was a basis for him to be immediately released or for him to be out for his trial.

And in terms of any mentioning the Supreme Court in passing, he never made any statements to suggest that he thought that the Supreme Court had based a ruling that was going to prevent him from going to trial or result in his immediate release.

So even though he made brief mention of those two things, he did not perseverate or fixate on it in any way being related to his case or saying that he was not facing a trial in two weeks.

Q   And when he raised those instances that -- in a different way than he had in the past of the Supreme Court and Ethou Law, was that prompted by anything?

A   At the end of the interview I asked him if he believed he was competent. And at that he shrugged his shoulders and told me that that was my decision to make, not his. And then he made a comment that he was certain I would find him

Case 15-1645, Document 113, 10/28/2016, 1895494, Page109 of 280

to be competent. And then after that, he mentioned the Supreme Court and the Ethou Law.

Q    And just going back to your evaluation of Hardy in 2014, did he express a view to you as to whether he wished to be found competent or not competent or had he expressed any feeling about that issue?

A    He asked me to find him to be incompetent.

Q    Now, in your report you wrote that Hardy expressed some frustration with his counsel. What did he tell you about that?

A    There were two main issues. The one is that he felt as if Mr. Ruhnke was objecting to him sitting down with the prosecution and proffering testimony.

He indicated that he did not believe he could win at trial, and he thought that cooperating with the prosecution was his best option at getting out of jail, and so he was questioning why Mr. Ruhnke wouldn't allow him to do that.

The other statement that he made was that he believed that Mr. Ruhnke should have tried to get his case dismissed on, quote, a technicality.

With questioning, it was clear that he understood that no one else agreed with him, that the case should be dismissed on a technicality; nevertheless, he indicated that he thought Mr. Ruhnke should have tried harder.

Case 15-1645, Document 117, 10/28/2016, 1895494, Page110 of 280

PRESTON BAECHT - DIRECT/MR. LOONAM          26

Q   And with respect to Mr. Hardy's desire to meet with the government to cooperate as being his best chance to get out of jail, did Mr. Hardy describe for you in general terms what type of information he wanted to provide to the government?

A   Yes.  In general terms he indicated that he wanted to provide the government with information about how some of the cooperating witnesses were responsible for some of the acts that he has been accused of committing.  He also indicated that he had information on other individuals that are not currently known to the government to have been involved in this -- I guess you call it drug enterprise.

Q   And have you listened to any calls earlier where the defendant expressed any view of what he might want to do with respect to cooperating with the government?

A   I listened to one phone call where he proposed that he would tell the government -- this is while he was at Springfield -- he proposed that he would tell the government that his codefendant was responsible for much of the events that he had been accused of committing.

Q   And so during that call he suggested that he would cooperate against the Codefendant Aaron Granton or E-bay?

A   Correct.

Q   Did he raise that same possibility with you during the course of your meeting with him on March 20th, 2015?

Case 15-1645, Document 113, 10/28/2016, 1895494, Page 111 of 280

PRESTON BAECHT - DIRECT/MR. LOONAM                27

A    No, he did not.  Rather, he said that -- he identified one of the cooperating witnesses as being the true leader of the organization.

Q    And who did he identify as the true leader of the organization during your meeting with him on March 20th, 2015?

A    I'd have to look at my notes, because I didn't remember the name, but I have it in here somewhere.  Edward Cook, I think, I can't read my handwriting.

Q    With respect to the defendant's thoughts of coming in and providing information to the government, have you observed whether his thoughts are fixated in that respect or have they changed and evolved over time?

A    I would say they evolved.  He certainly, back in November of 2014, indicated he wanted to speak to the government and he reiterated that during my interview of March 20th.

However, it seems that the content of what he thought would be helpful to share has changed.  And so, no, it's not fixated.  It seems as if, like I said, it's evolved over time; probably to reflect what he thinks will be the most useful or helpful.

Q    Did the defendant ask you to do anything on his behalf during the course of your meeting with him on the 20th of March?

Case 15-1645, Document 113, 10/28/2016, 1895494, Page112 of 280

PRESTON BAECHT - DIRECT/MR. LOONAM        28

A    He did ask me on several occasions to let the prosecuting -- prosecutors associated with the case know that he wanted to sit down with him.  And I explained to him again that that was my not role.  Nevertheless, he probably asked me five or six times, as an estimate, to try to make that happen, that meeting happen.

Q    And did the defendant express any understanding of what it would take to obtain a cooperation agreement with the government?

A    I had indicated to him that it was my understanding that the defense counsel and others thought it was very unrealistic to expect that he would be exonerated, because apparently that's what he had repeatedly said; that if he just had an opportunity to speak to the prosecutors, he would be exonerated and let go.

And when I indicated that and I said most of the time individuals are expected to at least admit to some wrongdoing if they are going to want some sort of deal to be worked out, he said he would be willing to cop to something, but he did not indicate specifically what he would be willing to say that he was guilty of.  However, he did indicated that he would consider saying that he was guilty of something, if necessary.

Q    And you mentioned that, you know, the defendant has represented to others that he's, you know, he's innocent,

Case 15-1645, Document 113, 10/28/2016, 1895494, Page113 of 280

PRESTON BAECHT - DIRECT/MR. LOONAM               29

that he's not guilty of the charges, he wants to be

exonerated.

        Did the defendant say anything to you about the

actions of the cooperating witness and why he believes that

he is not guilty for the acts that he committed?

A    I'm not sure if that this will answer your question

directly, but when we did speak about the cooperating

witnesses, he indicated to me that they were lying.  That

they lied to try to get themselves out of jail or out of

trouble.  He said the accusations they made were rather

vague saying that he was the leader, but that there wasn't a

great deal of detail than what they alleged he had done.

        I did ask him, you know, have you reviewed the

transcripts of their testimony so that you can help

Mr. Ruhnke in cross-examination.  And he said that he

reviewed some of the transcripts, but that much of what they

were saying was just vague accusations that he was the

leader, that he ordered things as opposed to specific times

and dates of what he might have, you know, committed some

offense.

Q    And do you recall whether or not Hardy expressed any

view for who was responsible for the actions of the

cooperating witnesses?

A    He said that they're responsible for their own actions,

that each of those people and what they were saying, they

Case 15-1645, Document 113, 10/28/2016, 1895494, Page114 of 280

PRESTON BAECHT - DIRECT/MR. LOONAM                30

are responsible for their own behavior and their own

actions.

Q    Now, you also mentioned that Hardy expressed his view

to you that he didn't think he would win at trial, correct?

A    Correct.

Q    Has -- I guess you've already spoken to this, but has

Hardy described to you what his understanding is of the

nature of the Government's evidence against him?

A    He said that all the government had was cooperating

witnesses; I asked him how many, he said over ten.  And at

one point, you know, he said "it's my word against all of

their's."

Q    And has the defendant told you about anything he's done

to prepare for trial?

A    In my questioning he did say that he -- I asked him if

he thought of any witnesses that he could call on his own

behalf.  And he said he had thought about that, but that he

was not able to come up with any potential defense

witnesses.

       And like I mentioned earlier, he did say he

reviewed some of the transcripts from some of the

cooperating witnesses' testimony.  And he -- his observation

was their accusations were rather vague in nature and that

they were all lies.

Q    So in your opinion, based on your interactions with

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 31 of 121 PageID #: 7168

Hardy on, you know, March 20th, does Hardy continue to have a factual understanding of the case against him?

A     Yes.

Q     Does he continue to have an accurate understanding of roles of the prosecutors, defense counsel, the judge and jury?

A     Yes.

Q     And in your opinion, does he have a rational understanding of this case?

A     Yes.  I think he has a rational understanding of the seriousness of what he's facing if he goes to trial.

Q     In your opinion, if Hardy chose to do so, could he cooperate with his defense counsel?

A     Yes.  I think that at this point he is focused on an option that he views as being his best option, which is trying to cooperate with the government.  And as a result, he doesn't think that there is a point in trying to assist in preparing for trial.  However, I think that if he chose to do so, he has the ability to do so.

Q     And in your opinion is the conflict between the strategy of Mr. Hardy and the strategy of Mr. Ruhnke the product of mental illness?

A     At this point, no.  I think his mental illness is controlled with medication.  He's in touch with reality.  He knows he's Damion Hardy.  He knows what's going on.  He

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/19, Page 32 of 121 PageID #: 7169

doesn't allege that he's a prophet or the President of the United States.

I think that although it's probably very frustrating for his defense counsel to try to work with him, given his very stubborn fixation on this option, I don't think it's a result of an illness. I think it's more the result of his own weighing in that that's his best option.

He may not be correct. He may be unrealistic in his expectations, but I don't think that it's a function of psychosis.

Q    And in your opinion, is Hardy competent to proceed to trial?

A    I believe he is, yes.

THE COURT:  Let me ask you this question:  When was the last time or the first time he expressed any displeasure with Mr. Ruhnke's representation?

THE WITNESS:  On March 20th was when I interviewed him in MCC New York. And like I said earlier, he said he was frustrated that Mr. Ruhnke wouldn't facilitate him meeting with the prosecutors. And he also said he was frustrated that he did not try harder to get the case dismissed on a technicality.

THE COURT:  Did he ever express displeasure of Mr. Ruhnke's services before that time?

THE WITNESS:  I can't think of a specific instance

Case 15-1645, Document 113, 10/28/2016, 1895494, Page117 of 280

PRESTON BAECHT - DIRECT/MR. LOONAM                33

where he said anything negative about Mr. Ruhnke while he was at Springfield.

At the very end of his evaluation he was asking to speak to the prosecutor at that time, but I can't recall off the top of my head right now if he was upset with Mr. Ruhnke about that.

THE COURT:  All right.  Mr. Ruhnke, do you wish to inquire?

MR. RUHNKE:  Is Mr. Loonam finished?

MR. LOONAM:  I guess I am.  One moment.  Let me just check with co-counsel.

(Pause.)

MR. LOONAM:  Nothing further at this time, your Honor.

All right.  Dr. Preston Baecht, was the secretary able to print out a copy of the 3500 for you?

THE WITNESS:  Well, she printed something.  It appears to be a police report.  Is that what you guys sent? It's not the medical record of Mr. Hardy.

MR. LOONAM:  Okay.  There should be another package there, I'm told.  If you could check with her, that should be in her inbox.

THE WITNESS:  Okay.  I will check with her right now.  Did you guys mean to send police reports to me?

MR. LOONAM:  No, I think that was inadvertent.

Case 15-1645, Document 113, 10/28/2016, 1895494, Page118 of 280

PRESTON BAECHT - CROSS/MR. RUHNKE                    34

THE WITNESS:  Okay.  Let me check really quickly.  I'll be right back.

MR. LOONAM:  I apologize, your Honor.  At least she can print it and -- I mean, she has the reports, just without the stamps.

THE WITNESS:  Ms. Dixon just checked her inbox and saw the E-mail.  She'll start printing them now.

MR. LOONAM:  Okay.

THE WITNESS:  I'm not sure how many pages it is or how long it will take.

MR. RUHNKE:  Probably about 75 pages.  We can proceed, I think.  Dr. Preston, can you hear me okay?

THE WITNESS:  Yes, I can.  Thank you.

CROSS-EXAMINATION

BY MR. RUHNKE:

Q    Okay.  How are you?

A    I'm good.  Thank you.

Q    So I wanted to start with just basic principles.  Mr. Hardy has a lifelong mental health condition; is that correct?

A    Yes, schizophrenia is a chronic mental illness.

Q    There is no cure for schizophrenia, correct?

A    Not at this time; although, there are good treatments for schizophrenia.

Q    The symptoms can be put into abatement, but the

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/19, Page 35 of 121 PageID #: 7172

underlying illness is always there, correct?

A    I mean, yes.  What that essentially means is that if you stop taking your medication, the symptoms will return.  So, yes, the illness is always there, but the treatments can often eliminate the symptoms.

Q    And Mr. Hardy has been diagnosed with a serious mental illness by several different mental health professionals within the Bureau of Prisons itself, correct?

A    Correct.

Q    First at MCC, New York and then at FMC Devens, and then really several times at Springfield, correct?

A    That's correct.

Q    And I want to take you through some of your reports, and I want to know, do you have in front of you, your file that is headed, "Forensic Examination Interview?"  There is a category of reports called, "Forensic Examination Interview."  Do you have that?

A    I printed some of them, but I didn't print everything, because it was so voluminous.

Q    So take a look and see if you have a Forensic Examination Interview dated October 3, 2014?

A    No.  I printed all from October 31st on.  I did not print one that was that old.

Q    Let me ask you this question and see if you remember it or not remember it.

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 30 of 121 PageID #: 7173

A    Okay.

Q    Now, November 3rd, 2014 would be four or five weeks before you found him competent, correct?

A    Yes.

Q    And do you remember a conversation you had with him, and it's headed, "Forensic Examination Interview" where he was getting ready to make a phone call, and you spoke with him?

A    What was the date of the interaction?

Q    The date is October 3, 2014.

A    If you tell me, I might remember it, but off the top of my head unfortunately, I don't have the note printed.

Q    So let me ask you whether or not -- and perhaps we can stipulate to the language of the report with the government. It says the first page of 3500 LAPB2, Mr. Loonam, do you see it?

        MR. LOONAM:  I've got it.

        MR. RUHNKE:  I'm going to read the language to you and I'm going to ask if you remember saying that in the report.  I'm going to -- I'll just read it, it's just a paragraph.  "Mr. Hardy was getting ready to make a phone call before I spoke with him.  He reported that he was coping adequately and asked if I would need to complete a memo in order for him to move to open population.  When I stated that I would, he expressed irritation and

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 37 of 121 PageID #: 7174

frustration.  I informed him that I've been asked to provide the Court with an updated competency opinion by November 3. When asked if he believed he was competent to go to court currently, he stated, quote, I never thought I wasn't, closed quote.  However, he then stated there was no case against him and directed me to read his criminal complaint. When informed that he must be aware that he's been charged with several serious charges, he stated, quote, you know what the Supreme Court said, closed quote.  He then stated he needed to make the phone call.  We will discuss his current understanding of his legal situation next week.  No signs of thought disorganization.  No signs of depression or mania.  He specifically denied thoughts of self harm or harming others.  Will continue to evaluate."

Do you recall that now?

THE WITNESS:  It sounds like a note I would write. I don't have a clear recollection it was, but I guess that's what happened if that's what I reported in my note on that date.

Q    All right.  And the topic of Ethou Law has been a constant theme of Mr. Hardy's; is that correct?

A    Yes.  He's started talking about it several years ago.

Q    And do you remember when you testified in 2009 at a hearing in this courtroom on the issue of forced medication? Do you remember that, the first time?

A     The first time, yes.

Q     Okay.  That was August of 2009?  Yes, 2009.  It was in front of Judge Trager who has since passed away, but do you recall discussing Ethou Law at the time?

A     In vague terms.  His definition of Ethou Law has changed over the years.  But at that time I believe it may have been he should be released, but I don't recall specifically.

Q     Now, going back to your testimony in 2009 -- Mr. Loonam, is there a number on that?  Do we have a transcript of her prior testimony that has a number on it?

          MR. LOONAM:  I don't think I included the 2009 testimony here.

          MR. RUHNKE:  We both have it, I'm sure.

Q     But in any event, he was found to be -- he had been found to be incompetent by the evaluators at FMC Devens and that's what led to his transfer to Springfield after Judge Trager had signed an order declaring him incompetent.  Do you recall that sequence of events?

A     Yes.

Q     And in terms of a rational understanding of the charges against him, did you believe and did you express the opinion at that time that Ethou Law was an example of his not having a rational understanding of the charges against him?

A     At that point in time he was very fixated on the belief

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 39 of 121 PageID #: 7176

that he should be immediately released, and that there was no case against him, and he would cite the Supreme Court cases from the 1800's, and he would cite Ethou Law. That was prior to being treated with medication for a significant period of time.

Q    And in terms of what Ethou Law is, I'm going to read for you actually two pages of your testimony in 2009, and tell me if that accurately reflects how you viewed the situation in 2009, okay? It will take just a couple of minutes.

"QUESTION: Doctor, could you give us some insight into the explanation of Ethou Law that Mr. Hardy gave you on the various occasions that he referred to that?

ANSWER: Certainly."

I'm reading from page 28 of the transcript.

"ANSWER: In my report I note his description, because it was kind of difficult to follow. When I asked him to explain, he said George Washington established it. It comes from a saying that Jesus made to the apostles. It is a law that when someone is arrested and placed in jail and that person does not have a case, when that is made clear to the court, Ethou Law goes into effect. Courts have a certain time period to show that the person has a case. It goes into effect for four years and two months and 17 days from when the court learns there is no case. If

they don't do it, it's over, that's it.  If a person is not released on the day of the time limit, then the President of the United States signs an order for soldiers to go into the jail and get that person.  It's an unusual law.  No one can change it, not even the Supreme Court.  The person released is to be provided a driver's license and passport when released, and that person cannot be arrested, investigated or prosecuted for crimes known or unknown at any time period.  There also can be no strip search when released by Ethou Law.  He wanted to stay more specifically that the judge in his case stated in August of 2004, that he was to be released on November 3rd, 2008.  And when he told me that I need to look on the computer, he will be able to tell that Ethou Law was in effect in his case.

QUESTION:  Of course, the whole notion of Ethou Law demonstrates that he lacks a factual understanding and a rational understanding of what's going on; is that right?

ANSWER:  It certainly demonstrates that he lacked a rational understanding when I spoke to him about his case.

QUESTION:  Well, the notion that he could be deported today demonstrates a lack of factual understanding; is that right?

ANSWER:  It demonstrates a lack of rational understanding.  The factual piece of it, when people have been told the facts of what they're charged with, there may

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 41 of 121 PageID #: 7178
Case 15-1645, Document 113, 10/28/2016, 1895494, Page125 of 280

be some part of him that he still knows exactly what charges have been leveled against him.  I know he has a copy of his criminal complaint in this case, because he showed it to me, and I believe he has a copy of the indictment as well, so on some level he may have some factual understanding.  The key is rational understanding.  Does he understand the implications of the things that he's reading?  And in his case, no, he doesn't have a rational understanding of the charges against him."

I'll just ask the government, have I read that correctly?

MR. LOONAM:  No objection.

MR. RUHNKE:  Okay.  No objection.

THE COURT:  Go ahead.

Q    Do you remember that this is how you testified in 2009?

A    Yes.  He was very ill in 2009.

Q    But the subject of Ethou Law has not gone away, has it?

A    In the way he described it then, yes, it has gone away. He rarely mentions Ethou Law currently.  And when he did mention it to me on the 20th, it was to say he shouldn't be forcibly medicated without a judge ordering it.

As a matter of fact, I think I noted in my November report, he said the same thing.  And when I pointed out to him that that doesn't have anything to do with the fact that he's going to go to trial, he didn't say anything.

Case 15-1645, Document 113, 10/28/2016, 1895494, Page126 of 280

So I think over time he's -- he no longer has that really disorganized, difficult to understand definition of Ethou Law, and now he defines it differently. And he really, with me, has not focused on it for a reason for him to be released or not having to go to trial at all.

Q   Have you tried to press him on the issue or does he simply not bring it up?

A   He didn't bring it up. He brought it up one time, and when I asked him to define it, like I say, he said he overheard me to say that Ethou Law means that somebody cannot be forcibly medicated without the judge ordering it. And then I said well, that really doesn't have anything to do with you going to trial and being released, and he did not disagree with me. It wasn't something that he perseverated on or jargoned on about.

Q   And was it that he also --

MR. LOONAM:  Objection, your Honor.

THE COURT:  Sustained. Next question.

MR. RUHNKE:  I didn't hear anything. I didn't hear anybody object. Did anybody object?

THE COURT:  Yeah. Yeah. The objection is based upon the fact that what?

MR. LOONAM:  I was objecting over Mr. Ruhnke speaking over the --

THE COURT:  The fact that there was cross

Case 15-1645, Document 113, 10/28/2016, 1895494, Page127 of 280

PRESTON BAECHT - CROSS/MR. RUHNKE                    43

communication.

MR. RUHNKE:  I'm sorry.  I did not mean to do that.  If I interrupted you, go ahead.

THE WITNESS:  I was just going to say at this point in time he's not asserting Ethou Law as a basis for him to be released or for him not to face trial.  So his presentation is very, very different now with medications then what it was prior to him being treated.

THE COURT:  Has he recently explained to you what he means by Ethou Law?

THE WITNESS:  Yes, as I indicated now, he just says it means that a person can't be medicated for competency restoration against their will unless the judge orders it.  He said he heard me say that in the hallway.  And I said, well, you may have heard me say that, because that is what the case law says.  He wasn't willing to concede that I never said the word Ethou Law.

But again, he's not related Ethou Law to me to mean that he should be released or any of the really disorganized things that he said back to me in 2009.

BY MR. RUHNKE:

Q    And have you pressed him on the issue or are you simply observing that he has not brought it up?

MR. LOONAM:  Objection, asked and answered.

MR. RUHNKE:  Okay.  The answer was no?

PRESTON BAECHT - CROSS/MR. RUHNKE               44

MR. LOONAM:  No.  The answer was I did ask him and he said it was -- we can have a readback.

THE COURT:  All right.  Listen, don't have communication, all right?  I think she's explained it satisfactory.  Go on with the next question.

BY MR. RUHNKE:

Q    There was also the topic of the Supreme Court having actually ordered his release; is that correct?

A    Yes.  That was a common theme early on, prior to him being medicated and before -- when many -- I think he started that one maybe in 2009, and then through probably 2013 he was focused on that.

Q    On the topic of your speaking to the prosecutors for him he raised that half-a-dozen times during your March 20th interview, correct?

A    Yes.  I didn't count how many times, but I would estimate five or six times.

Q    And he's actually raised that with you before at Springfield, correct?

A    Yes, he's raised that back in November of 2014 during our interviews as well.

Q    And that's not your role; is that correct?

A    That's correct.

Q    And you reminded him of that the first time he raised it, correct?

Case 15-1645, Document 113, 10/28/2016, 1895494, Page129 of 280

PRESTON BAECHT - CROSS/MR. RUHNKE          45

A    That's correct.

Q    And you reminded him of that each of the five or six times he raised it on March 20th, correct?

A    Correct.

Q    And he still continued to raise it?

A    As I said, he raised it approximately five to six times, even after I told him that wasn't my role.  His assertion is that I'm the government doctor and you're in communication with him and you can make that happen.

          THE COURT:  Was he aware that the government did not want to speak to him?

          MR. LOONAM:  Well --

          THE WITNESS:  I told him that it was my understanding that they were no longer interested in speaking to him.  And he was aware of that; but again, he indicated that he was hopeful that if they learned that he had information that he could share with them, then perhaps they would reconsider that.

          THE COURT:  Okay.

Q    Did you discuss with him at all how rational it was to think that the government would offer him any kind of leniency or cooperation or exoneration?

A    Yes, I did.

Q    And in your view, did that seem to be a realistic goal for him to pursue?

Case 15-1645, Document 117, 10/28/2016, 1895491, Page130 of 280

PRESTON BAECHT - CROSS/MR. RUHNKE                46

MR. LOONAM:  Objection.

THE COURT:  Sustained.  Sustained as to the form of the question.

MR. RUHNKE:  In her view, your Honor, I'm asking. I'm asking what her view is.  She's opined about --

THE COURT:  No, I don't think it's a proper question.  Go on, ask another question.

Q   In your report finding him competent, the first one November 20th, you said that Mr. Hardy had had a strategy, it might not be a successful one, but he had a strategy for his defense.  Can you tell us what that strategy was?

A   He, in his conversation with his mother, had talked about wanting to testify against his codefendant and offered that to the prosecution, that the codefendant was the person who was actually responsible for being the leader and doing all of the things that he's accused of doing.

He also told me in the interview something slightly different which was that he was -- had learned through a third party that the codefendant may plead guilty and take responsibility for being the leader.

Q   And do you know if there is any basis in reality for those statements to him -- by him?

MR. LOONAM:  Objection.

THE COURT:  Well, I'll letter her answer it if she can.

PRESTON BAECHT - CROSS/MR. RUHNKE                47

THE WITNESS:  Well, that's what he was saying in November.  And now in March he's wanting to say something different, so it would seem to me that is slightly because maybe he thought that strategy wasn't going to be effective.

Q     All right.  And are you aware, and I just want to know if you've been aware that there have been two trials of members of this alleged enterprise in which a half-a-dozen cooperating witnesses have testified, all of whom have identified Mr. Hardy as the leader of the organization and that convictions were returned in both those cases, do you know that?

A     Mr. Hardy told me that there was over ten cooperating witnesses against him, but I have not followed those trials or read anything about them or was aware of anything from them.

Q     And Mr. Hardy has also said that he is innocent, that he's done nothing wrong.  And that actually speaking with the prosecutors, his main goal is to be exonerated, correct, and released?

A     Well, he indicated to me that he thought he could -- well, he said several things.  He said he thought he could demonstrate to the prosecutors that he was not guilty of the things that he was accused of.  And that if they were just in their role as prosecutors, they would not pursue trying to convict somebody that -- of a crime, if they knew that

Case 15-1645, Document 113, 10/28/2016, 1895494, Page132 of 280

somebody else actually committed the crime.  And he also --

I'm sorry and he also--

Q    I'm sorry.  I thought you were done.

A    No.  There is a delay with the camera thing.

But he also -- when I said to him it's my understanding that that is not believed to be realistic, that he be exonerated in light of everything, and that most individuals, if they want to cooperate, typically have to accept some responsibility for wrongdoing, is that something that you're willing to do and he said yes.

Again, he did not go into details on me with what he would be willing to say he did.

And in my November report I also noted at that time that he told me then he would be willing to do a deal if he would be offered 15 years.

Q    15 years?

A    15 years of incarceration, yes.

Q    With time served, correct?  Credit for time served?

A    I would image so, but he didn't say specifically.

Q    All right.  And his thought is all the government's cooperators are lying; is that correct?

A    Yes, that they're lying for secondary gain, that many of them were able to obtain better deals for themselves, because they pointed the finger at him.

Q    And to your knowledge, these government cooperators are

Case 15-1645, Document 113, 10/28/2016, 1895494, Page133 of 280

the same witnesses that the government relied upon to get convictions in earlier cases, correct, to your understanding?

A    I've been told that.

MR. LOONAM:  Objection, foundation.

THE WITNESS:  I haven't --

THE COURT:  Sustained.

Q    I want you to assume hypothetically that many of these cooperating witnesses testified at trials under oath, were presented by the government as truthful, as presented by the government as witnesses who should be relied upon by the jury.  And as a result of, in part their testimony, convictions were returned and defendants received major prison terms; in one case, life.

How realistic is it in your view that this is a rational strategy to go to the government and tell the government that their witnesses are all lying?

MR. LOONAM:  Objection.

THE COURT:  Sustained.  You know, he spoke to you, Doctor, about wanting to cooperate with the government is what I glean from your answers, correct?

THE WITNESS:  Correct.

THE COURT:  All right.  And that was recently as how long ago did he express that?  Was that back on March 20th?

Case 15-1645, Document 117, 10/28/2016, 1895494, Page134 of 280

PRESTON BAECHT - CROSS/MR. RUHNKE          50

THE WITNESS:  He expressed that March 20th, just a few days ago.  He also expressed it in November of 2014.

THE COURT:  All right.  So he told you that he knew there were a number of cooperators in other cases and he wished to become a cooperator also?  I just want to understand the thrust of what he said to you.

THE WITNESS:  Yes.  He said that he had information about some of the cooperating witnesses to show that they were culpable.  Some of the things that he has been accused of, he also said he had information on other individuals that the prosecution perhaps wasn't aware of.

THE COURT:  Now, you mentioned something about his mentioning 15 years.  He was hoping that with his cooperation he could cut a deal, so to speak, where he would get out of jail in 15 years time?

THE WITNESS:  Well, what he told me back in November is that he'd be willing to accept a deal if it was not too much time in prison.  And when I asked him, you know, what would be acceptable to him, he said 15 years.

THE COURT:  Did he discuss that with you again this past March 20th?

THE WITNESS:  He did not put a year on it.  On March 20th what he did say was that he would be willing to admit to some wrongdoing, if necessary.

THE COURT:  All right.  Any further --

Case 15-1645, Document 113, 10/28/2016, 1895494, Page135 of 280

THE WITNESS:  He did not tell me exactly what he would admit to.

THE COURT:  All right.  Any further questions, Mr. Ruhnke?

MR. RUHNKE:  Yes, sir.

BY MR. RUHNKE:

Q    Doctor, you're aware of the fact that -- and I'm exploring your statement that he had a theory of the defense and what that would entail.

Now, Mr. Hardy, as we know, was diagnosed as a schizophrenic?

A    Yes, he was diagnosed as --

Q    Over the years he's clamed to be the President of the United States?

THE COURT:  Yeah, we know all of that.  Go ahead.

Q    He's claimed to be Essa Son of Jesus.  He's claimed to have taken orders for being a star.  In your own general opinion, how good of a witness do you think he would make in a case?

MR. LOONAM:  Objection.

THE COURT:  Sustained.  Sustained.

MR. RUHNKE:  Your Honor, I'm exploring how rational --

THE COURT:  I understand, but I'm sustaining the objection.

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/19, Page 52 of 121 PageID #: 7189

MR. RUHNKE:  I understand the sustaining, I'm trying to understand the basis.

THE COURT:  No, I understand.  It's argument.  I don't think she has the competency to talk about that.  I think you want to know what the conversations were that she had with Mr. Hardy, what her assessment was in her professional point of view.  I don't think we have to go into trial strategy of whether she thinks he would be a good witness or whatever.

Q    Doctor, have they delivered those documents to you yet?

A    Yes, I have a stack of documents here.

Q    All right.  Terrific.  Let's look at the documents that are headed "3500 LAPB2," they are all Forensic Examination Interviews.

A    Yes, they are here.

Q    So I'm going to take you through some of them.  Since I didn't get them until just before the hearing marked up as exhibits, I'm going to refer you to the dates of the documents.

The first one -- do you see the first one in there dated October 3, 2014, it's the one we went over before, okay?

A    Yes, I do.

Q    On the next one dated November 9th, 2014, do you have that one?  It should be the next page, November -- or

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 53 of 121 PageID #: 7190

September 9th?

A     When I -- September 9th?

Q     September 9, 2014.

A     Okay.  Yeah, it's a couple pages back, but I have that one.

Q     Okay.  And during that interview he discussed his case continually insisted that he's being incarcerated for no reason and there was no evidence against him suggesting he committed a crime.  Those are things he told you on that date, correct?

A     Correct.

Q     Look to the -- well, there is another category of documents called "Clinical Interventions."  Is that in the same packet?

A     Yes, it is.

Q     Okay.  Would you look at the Clinical Intervention dated September 5th, 2014?  Do you see that?

A     Yes.

Q     Do you see the Clinical Intervention Clinical Contact?

A     Yes, I do.

Q     Okay.  And during that clinical intervention, clinical contact, did you write at the first paragraph, "When asked about his legal case and issues related to competency, he continued to assert he was arrested illegally and that he Ethou Law applied to his case."?

Case 15-1645, Document 113, 10/28/2016, 1895494, Page138 of 280

PRESTON BAECHT - CROSS/MR. RUHNKE          54

A     Yes.  Back in early September he did say that.

Q     On August 28, 2014, do you see a clinical forensic examination interview?

A     Yes, I do.

Q     Okay.  And this was -- tell me physically how do these take place?  Where are you and where is he when this happens?

A     Often times it's sitting at a table on his housing unit; sometimes it's at his door, it really depended on what he was doing at that point in time.

Q     During this particular interview -- and I think it's fair to say it's repeated several times throughout these interviews -- the following statement is made, "No psychotic symptoms were reported or observed during this interaction, but no attempt was made to elicit them."  Correct?

A     Correct.

Q     Okay.  So there is a difference between what he's saying to you in your efforts to actually draw them out, correct?

A     Yes.  And what we find is that as individuals are treated with medication early on, the delusions are very prominent, and they will just talk about them spontaneously. But as the medication starts to work, you find they are much less preoccupied with those beliefs and they don't discuss them spontaneously.  So it's harder and harder to see them,

PRESTON BAECHT - CROSS/MR. RUHNKE          55

because they are not as prominent and not as relevant to them day-to-day.

Q    And the delusions remain, correct?  I mean, the delusions are still there, he's just not talking about them, correct?

A    Sometimes.  And sometimes what you'll find is that with individuals that are restored competency, they often will have a hard time saying that they were wrong.  And so what may happen is if you were to ask them about the belief system they reported prior to being treated, they may still say that is what was happening back then.  They won't get up and say, you know, I was really ill and that never happened. But what we're looking for is are they able to still discuss their case without relying upon that delusional belief for the basis of their defense?

So I'm not surprised that Mr. Hardy may mention some of those beliefs that he used to have.  The key is, is he still fixated on them that he thinks that is his defense strategy?  And the good news in this case is that I don't think he does.  I don't think he thinks Ethou Law is his ticket to walking out the door.  He mentions it in passing, but with me anyway, he hasn't been focused on it.

Q    Speaking of insight, how much insight does Mr. Hardy have into the fact that he's mentally ill in your judgment?

A    He has poor insight into the fact that he's mentally

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 50 of 121 PageID #: 7193

ill.  It was curious to me back that in November, he asked me to find him incompetent.  And I said well, if I find you incompetent I have to say you have a mental illness.  So I said are you saying you have a mental illness?  He said, yeah, fine, go ahead and say I have a mental illness.

Q    His main goal was to get back to New York, right?

MR. LOONAM:  Objection.

MR. RUHNKE:  To find him incompetent, but send him back to New York?

THE COURT:  Objection overruled.  Let him ask his question.  Go ahead.

THE WITNESS:  It was twofold.  One was he wanted to be found competent, and one was to go back to New York.  He was really aware of what incompetency was and if his was found incompetent, it's something that we had discussed at length.

He also knew he could go to New York if he were found competent as well, so I don't think the whole goal was to get back to New York.  I think it was twofold; he wanted to be found incompetent and he wanted the opportunity to go back to New York for awhile.

But again, he -- at that time he would say -- he said I was mentally ill, but I think more than likely if you were to ask him today, do you have a mental illness, he would not want to say that he has one.

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 57 of 121 PageID #: 7194

BY MR. RUHNKE:

Q    So on another topic, while he was there, he took some classes in competency restoration.  Do you know what I'm talking about?

A    Yes, I do.

Q    He attended some of them and then he refused to attend a whole series of them, correct?

A    Correct.

Q    One of the topics that was taught at these classes, and let me just have some background, your Honor.  This is offered to inmates who are found incompetent to teach them about what the courts are, what the lawyers do, what the role of the judge is, et cetera, correct?

A    Correct.

Q    And one of the things he was doing and one of the classes he took was on being cooperative with counsel, and why that was a good idea.  Do you remember reading that note?

A    Could you refer me to specifically which one it was?

Q    I could find you the date in a second.

A    Okay.

Q    The date is a Forensic Examination administrative note dated April 29, 2014.

A    Okay.

Q    Do you got it?

Case 15-1645, Document 113, 10/28/2016, 1895494, Page142 of 280

PRESTON BAECHT - CROSS/MR. RUHNKE                58

A     I'll look at it in just one second.

          MR. LOONAM:  9 a.m.?

          MR. RUHNKE:  9 a.m.

          MR. LOONAM:  So it's within --

          THE WITNESS:  Here it is.

          MR. LOONAM:  You got it?  Okay.

BY MR. RUHNKE:

Q     In looking at the last paragraph where -- I guess this is an intern that prepares this, and you review it because your name is on it, that it discusses the attorney/client relationship and why it was important to tell your attorney everything he stated, "'To best help you and so there is no surprises in court.'  He also was able to describe how to talk with the attorney during the court, i.e. writing them a note.  And lastly, he was able to identify that appropriate behavior in court was important to maintain a good impression of yourself."  Am I reading that correctly?

A     Yes, you are.

Q     Okay.  Despite being able to recognize this is how he's supposed to behave, is it not fair to say that discussing his defense strategy, he has not shared with his defense attorney information about his cooperation or anything else would happen if he spoke to the government?

          MR. LOONAM:  Objection.

          THE WITNESS:  My understanding --

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 59 of 121 PageID #: 7196

Case 15-1645, Document 117, 10/28/2016, 1895494, Page143 of 280

THE COURT:  Well, if she can answer that, go ahead.

MR. RUHNKE:  It's in the report.  I mean...

THE COURT:  Go ahead.

MR. RUHNKE:  Go ahead.

THE WITNESS:  My understanding is that he has not discussed that with you; similar with me, he was vague in that.  And what he said to me was that essentially that he didn't want to talk about it at that point in time, he wanted to say it directly to the prosecutors.

Q    Okay.  So I want to go directly now to your interview with Mr. Hardy on March 20th, 2015, at MCC New York.  Do you have that, I think it's G-6, and it should be in front of you as Government Exhibit 6?

MR. LOONAM:  It's the report from the 20th?

MR. RUHNKE:  Yes, from the 20th.

THE WITNESS:  Are those my handwritten notes?

MR. LOONAM:  No, it's your most recent report.

THE COURT:  Your most recent report, I guess it was rendered yesterday.

THE WITNESS:  Oh, yes, I have that.

BY MR. RUHNKE:

Q    Okay.  You have it.  So you start to describe the interview at page 18 of the report that you spent approximately -- do you have that?  I just want to be sure.

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 60 of 121 PageID #: 7197

A     Yes, I have it now.

Q     So you spend approximately 90 minutes with him on that date?

A     That's correct.

Q     Okay.  And you asked him about the antipsychotic medication and state that he didn't report experiencing any significant side effects as a result.  Did you observe any side effects?

A     No, I did not.

Q     Did you ask him if he was having side effects?

A     I asked him if he was still taking his medication, he said yes.  I said, are you having any problems with it, and he just shrugged his shoulders.

Q     So then when you started talking about the case he said he was frustrated with his defense counsel; namely, me, because I objected to him speaking directly to the prosecutors.  And he then said he wished to speak to the prosecutors because, "After I tell them what I have to tell them, they'll see if I'm innocent or guilty."  And then you go on to note --

A     Correct.

Q     That's correct, right?  That's your quote from him in that interview, right?

A     Yep, that's correct.

Q     You then went on to ask him what information he could

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 61 of 121 PageID #: 7198

provide, and you said he could give names of people the government was not aware, and also information of individuals known to be involved in the case.  He said, I have a lot to offer, quote, unquote, correct?

A    Correct.

Q    Now, you're also aware Mr. Hardy has been incarcerated for the past almost 11 years, correct?

A    Correct.

Q    And he asked you on several occasions to facilitate such a meeting.  He also was unwilling to give any details regarding what he would tell the government, and he wanted to provide the information directly to them, correct?

A    Correct.

Q    When you asked him if he believed he would be exonerated and released if given the opportunity to meet with the prosecutors, he stated that he would be exonerated because quote, I am innocent, closed quote; is that correct?

A    That is correct.

Q    And then when you said that was not realistic because it was completely unrealistic and that typically individuals have to admit some wrongdoing in order to be offered a deal, he said he wanted to cooperate and he would be willing to cop to some things, closed quote.  Correct?

A    Yes.

Q    He never told you what those things were that he would

Case 15-1645, Document 113, 10/28/2016, 1895494, Page146 of 280

be willing to cop to?

A     No, he did not.

Q     You asked him if there were any defense strategies that he had discussed with defense counsel, any other strategies, and he said basically no, who is there to ask, what's there to talk about.  They don't have anything but cooperating witnesses, people that's lying.  It's my word against their word, that's enough for reasonable doubt, closed quote. Correct, that's what he told you?

A     Correct, that's what he said.

Q     And then you asked him if he had ever spoken to defense counsel and attempted to explain how these witnesses were lying or what lies they were telling, he said he had not, correct?

A     He said that they their allegations were fake statements, that he was the leader as opposed to anything specific that he could challenge.

Q     The topic then turned to the idea of his working relationship with me.  And it repeated at that point that he believes that I, as his defense lawyer, could get the case dismissed, quote, on a technicality, closed quote, but I am refusing to do so, correct?

A     Actually what he said was, I think "he" referring to you, "could have done much more than he did," and that you should have attempted to have his case dismissed a long time

Case 15-1645, Document 113, 10/28/2016, 1895494, Page147 of 280

PRESTON BAECHT - CROSS/MR. RUHNKE          63

ago.  And when I asked him how, he said on a technicality.

He did indicate that he was aware that others don't agree with him that it should be dismissed on a technicality, but his assertion was that you should have tried harder.

Q    Did he ever explain what this technicality is?

A    He said that -- at this point in time he said that -- he mentions the fact that you were focused on the indictment, he was focused on the complaint.  And then he started talking about something that was wrong in the criminal complaint.

Back in November he indicated to me that he thought there needed to be some overt individual act in order to be indicted under that specific statute, and he talked at that time that that was what he thought should have been the basis for a dismissal.

Q    You're not a lawyer, but are you aware just in your general knowledge, that a complaint, once its filed, as soon as there is an indictment, the complaint really has no further legal effect in the case, are you aware of that?

A    As you said, I'm not an attorney.  And he is aware that his contention is not agreed upon by you or others in the legal system.  And --

Q    Is he aware that it's flat out irrational?

A    I don't know that he would view it as irrational.  I

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 64 of 121 PageID #: 7201

think he would simply say that he's right and that he understands everybody disagrees with him, but I think he would still think he is right.

He is not focused on that any longer as being a basis for having no trial.  He recognizing that a trial is coming if he doesn't get the deal that he is offered.

I seem to recall -- I see people make mistakes like that in their interpretations all the time.  And the question is, is it a function of the mental illness?  In this regard, it doesn't appear to be a function of his mental illness.

As I discussed earlier, he had a lengthy conversation with the mother that he conceded that he had understood what you told him about it and looked it up and realized that you were right.

Q    And then you listened to another call with his mother the next day, correct?

A    I have to look.  There were several dates.  Which one are you referring to and I can look at it?

Q    I'm referring to a call that took place on November 12, 2014.

A    Okay.

Q    Do you remember that that's one of the calls that you listened to as well?

A    I did.  I did not put detail of what was discussed

Case 15-1645, Document 113, 10/28/2016, 1895494, Page149 of 280

PRESTON BAECHT - CROSS/MR. RUHNKE                65

beyond saying that he's -- he spoke in a coherent manner, he didn't express any delusional ideas of the case, but I didn't detail exactly what statements.

Q    If you remember, towards the end of that conversation, do you recall him saying, "I looked up those cases about not needing an overt act and all the cases involved somebody who got caught trying to do something, and I just got arrested at the airport, I didn't do anything, I got arrested at the airport."

So the next day he's back to the same -- do you remember that, that discussion?

A    It sounds familiar, but I don't remember it in detail, no.

Q    Okay.  And so as your conversation goes on, you asked him, even though there is a trial coming up, whether he's willing to discuss defense strategy, and he just keeps repeating he wants to meet with the prosecutors, correct, and I keep objecting, that's what he told you?

A    Yes.  He said that he would be meeting with you next week.  And I asked him if he would be willing to talk to you at that point, and he reiterated that he wanted to meet with the prosecuting attorneys and avoid having to go to trial.

Q    And he does not see why I don't believe it's in his best interest, because he thinks it's his best option, that's what he told you, correct?

Case 15-1645, Document 113, 10/28/2016, 1895494, Page150 of 280

PRESTON BAECHT - CROSS/MR. RUHNKE                66

A     Yes.  He told me he did not think he could win at trial.

Q     He went on to say, quote, not the way they're going about it, like, what they're doing is legal.  Why would Ruhnke do this?  What he did knowing this may be my only way out of jail, it's unbelievable.  I am innocent.  It's really crazy.  It's not realistic they think they can do something like this, closed quote.  That's what he told you, right?

A     Yes.

Q     Okay.  And then after you asked him about being competent, which you testified about earlier.  He commented later on, quote, they're trying to hide my case from the US Supreme Court.  Now nobody knows what Ethou Law is.

When asked to explain these statements he stated, quote, Ethou Law says it's illegal how they're trying to go about this, closed quote.

He then repeats that the case should have been dismissed over a technicality because there was no act identified.  And then he tells you that he remembers that you referred to Ethou Law in the hallway in Springfield outside his cell on one past occasion, correct?

A     Yes.  And that's where he --

Q     And I think you testified --

A     That's where he said that -- that's where he said that I said that someone couldn't be forcibly medicated for

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 67 of 121 PageID #: 7204

incompetency unless a judge ordered it.

Q    But he also -- I think in 2009 when you testified you also mentioned he told you at that time before he was medicated that he had heard you discussing Ethou Law outside his cell when you were having a conversation; is that correct?

A    Yes, he did as well.

Q    So in 2015 he repeats that statement that he knows you were discussing Ethou Law, because he heard you do it, correct?

A    Yes.  I don't recall how he -- what he said he heard me saying back in 2009.  I believe it was probably different than the way he described it 2015, and that would be consistent with the treatment that he received.

Q    And actually, the statement that he recalls you're saying is that, quote, Ethou Law says someone can't be medicated against their will to restore competency unless a judge orders it, correct?

A    Correct.

Q    Okay.  Mr. Loonam asked you earlier whether Mr. Hardy was fixated on his desire to meet with the prosecutors.  And in your report you so state, correct, at the top of page 23?

        MR. LOONAM:  Objection to foundation.

        THE COURT:  Well, I don't think the question is probative.

Case 15-1645, Document 113, 10/28/2016, 1895494, Page152 of 280

PRESTON BAECHT - CROSS/MR. RUHNKE          68

Let me ask you this, Mr. Ruhnke, we've been going a little over an hour and a half.  I'm ready to take a little break here.  I don't mean to rush you; if needs be, we can come back tomorrow, but how much more time do you anticipate your cross-examination will take?

MR. RUHNKE:  Your Honor, my witness is not available tomorrow, and that's known to the Court.

THE COURT:  Right.

MR. RUHNKE:  So do you want to approach and we'll talk about --

THE COURT:  I want to meet your witness today, if we can, but you're in charge now, you let me know what you plan.

MR. RUHNKE:  Well, I'm nearing the end of my cross-examination.

THE COURT:  Okay.  Let's take a ten-minute break to use the facilities now.  You'll come back and complete the cross-examination and we'll stay late, if needs be, to listen to your witness today.

MR. RUHNKE:  Thank you, your Honor.  I appreciate it.

THE COURT:  All right.

(Continued on the next page.)

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/19, Page 69 of 121 PageID #: 7206
Case 15-1645, Document 113, 10/28/2016, 1895494, Page153 of 280

(in open court.)

THE COURT:  All right.  Everyone is here.  Let's continue with the questioning, Mr. Ruhnke.

MR. RUHNKE:  Yes, Your Honor.

CROSS-EXAMINATION (Continued)

BY MR. RUHNKE:

Q    I am on page 21 of your report.  I said page 23 before, I was referring to the date.  So on page 21 of your report and where you render your opinion as to Mr. Hardy, you described this as a difficult and complex case; correct?

A    Correct.

Q    And I think fundamentally, your viewpoint is that Mr. Hardy's strategy and other ways of trying to defend this case are not the result of delusions, but are just simply unrealistic; is that correct?

A    Yes.  At this point, I think that his illness is adequately controlled with medication, that he's completely in touch with reality in the sense of not claiming to be someone other than Damion Hardy.  He recognizes the charges against him.  And I think he's very desperate right now and very much in denial and overwhelmed by the reality that he could be going to trial.

THE COURT:  He's aware of the reality that the trial is about to start; right?

THE WITNESS:  Yes.  And he was visibly upset while

we were discussing it.

THE COURT:  And he has hopes and expectations that perhaps if he can talk to the government and they will listen to him that better things could happen; right?

THE WITNESS:  That's what he expressed to me, yes.

Q    And in your bottom line in the final paragraph on page 21, you state:  "In my opinion, although his expectations may be unrealistic, they are not delusional in nature."  Is that correct?

A    That is correct.

Q    Among the items you took into consideration in writing your March 23 report was a motion that I filed and my partner filed on behalf of Mr. Hardy seeking this very hearing; correct?

A    Correct.

Q    And in the motion, statements are made that the government has expressed a willingness to speak with Mr. Hardy or had expressed a willingness to speak with Mr. Hardy under what's called a proffer agreement, but that in order to have that happen he had to take responsibility for all of his actions, including everything alleged in the indictment, and that they could not see a circumstance where he would be exonerated.  Do you remember that being in the motion?

A    Yes, I do.

Q    And that that information was communicated to Mr. Hardy

Case 1:04-cr-00706-FB Document 939 Filed 03/25/15 Page 71 of 121 PageID #: 7208
Case 15-1645, Document 113, 10/28/2016, 1895494, Page155 of 280

to no avail, in terms of his continuing desire to speak to the prosecutor; correct?

A    Correct.

Q    And, again, you're not an attorney, but are you aware of the fact that if a defendant does speak to the government and an agreement is not reached, that discussion may produce limitations on the ability of defense counsel to put on a defense at all?  Are you aware of that?

A    You have that in the motion.

Q    Are you aware of that?

A    Yes.  I read it in the motion.

Q    Do you accept that?  The government is not objecting.  Do you accept that as something that Mr. Hardy should have taken into consideration?

A    I accept that what you're saying is accurate, yes.

Q    And it's your view that he could assist in his defense if he wanted to, and it's your view that he just doesn't -- he chooses not to; is that correct?

A    He indicated to me that at this point in time, he doesn't think he can win at trial and he thinks that trying to work out an agreement with the prosecution is his only option.

Q    He still discusses Ethou Law; correct?

A    He did not discuss it in the manner that he did years ago prior to medication.  He mentioned it.  He mentioned it as being in relation to the fact that a defendant can't be

Case 1:04-cr-00706-FB Document 939 Filed 03/25/15 Page 72 of 121 PageID #: 7209

forcibly medicated.  He did not in any way describe to me now or in November of 2014 that it was the basis for a defense strategy or that he should be released.

Q    Does he continue to believe, in your view, that there's a U.S. Supreme Court case that has essentially ordered him to be released?

A    He mentioned that at this time the Supreme Court case couldn't be found.  He mentioned that previously.  But at the same time, just because someone says something, it doesn't mean they're -- they believe it wholeheartedly.  You want to look at their actions and their behavior.

And in this case, he may mention it, but his actions and behavior suggest that he does not believe that to be the case wholeheartedly; or even if he believes he is correct, he recognizes that other people do not.

Q    And you're aware certainly that he has filed motions with the Court asking the Court's assistance in locating this Supreme Court case that doesn't exist in the past?

A    I believe he has in the past.  I'm not aware of any recent motions for that.

Q    And are you aware that he's now seeking to discharge his defense counsel for not assisting him in meeting with the government?

A    I had heard that he might have filed something recently, but I haven't seen a copy of it.

Case 15-1645, Document 113, 10/28/2016, 1895494, Page157 of 280

PRESTON BAECHT - CROSS / RUHNKE 73

MR. RUHNKE: Just check with co-counsel.

(Pause.)

Q    You mentioned that you had listened to two MCC calls, one in January and one in February. Do you recall that the first call, the one in January between he and his mother, he sounds particularly depressed that he's in the box?

A    Yes, he did.

Q    But do you remember when the call ends he tells her again, I was never supposed to be arrested, I'm not supposed to be here?

A    Yes, I recall that.

Q    And then the second call in February, do you recall that he calls his mother and then he asks her to get her cell phone and call a friend, because he's got some questions he wants her to ask the friend? Do you remember that?

A    Yes, I do.

Q    And the thrust of that conversation is he has wanted the friend to go out to talk to a federal agent at the airport, an ICE agent at the airport, to tell the ICE agent that Hardy wants -- Mr. Hardy wants to meet with him. Do you remember that?

A    Yes, I do.

Q    And the response that's transmitted by Mrs. Hardy, who's talking to the friend on another phone, to Mr. Hardy is that the friend spoke to the agent and the agent said it's illegal

SHERRY BRYANT, RMR, CRR

APP. 155

PRESTON BAECHT - CROSS / RUHNKE                    74

for them to do that because he's represented by an attorney and, therefore, the agent cannot go see him.  Do you remember that being the information conveyed?

A     Yes, I do.

Q     And do you recall that even in the face of that information, Mr. Hardy persists in asking his mother, please tell him to make that happen, please tell him to come see me, I want you to make that happen, seven or eight times after being told that the agent has already said he won't come to see him?

A     Yes, but I believe at one point he said something about then contact my attorney if that's what's necessary.

Q     But he continued to press the point despite being told that the agent could not speak to him because he had an attorney; correct?

A     Yes.  And the quote that I have in my report on page 16 is:  "Tell him to go to my attorney then cause I need to speak to him."

        MR. RUHNKE:  I have nothing further, Your Honor.

        THE COURT:  Do we have any redirect?

        MR. LOONAM:  Very brief, Your Honor.

REDIRECT EXAMINATION

BY MR. LOONAM:

Q     Dr. Preston, after the call -- can you hear me?

A     Yes, I can.

SHERRY BRYANT, RMR, CRR

APP. 156

Case 15-1645, Document 117, 10/28/2016, 1895494, Page159 of 280

Q    After the call that Mr. Ruhnke was just referencing where the defendant had spoken with his mother about having a friend reach out to an ICE agent to set up a meeting with the government and whether or not the attorney was an impediment to that meeting, are you aware of whether the defendant subsequently filed or wrote a letter to the government?

A    Yes.  I have a copy of that that was provided to me, dated March 1st, 2015.

MR. LOONAM:  And that, Your Honor, is in evidence as Government Exhibit 8.

Q    And what does Mr. Hardy write to me in that letter?

A    It says:  "James Loonam, my name is Damion Hardy.  I have been trying to speak to you for approximately six years now, but the attorneys have been trying to stop it.  I waive my right as of now to have an attorney present during the meeting.  Would you call me in so I can speak to you immediately.  Again, I waive my right to have an attorney present during the meeting.  Sincerely, Damion Hardy."

Q    On the calls you listened to from 2014 or from 2015, did you ever hear the defendant make a reference on the call to Ethou Law?

A    No, I don't believe I do recall that.

Q    And when the defendant made a reference to Ethou Law in 2015, did he make any statements that he believed the origin of Ethou Law was George Washington or Jesus?

Case 15-1645, Document 113, 10/28/2016, 1895494, Page160 of 280

DUDLEY - DIRECT / RUHNKE                76

MR. LOONAM:  Are we frozen?

THE COURT:  We just lost her.

MR. LOONAM:  That what wasn't an important question anyway, so I'll withdraw the question.

THE COURT:  I think the record speaks for itself.

MR. LOONAM:  Sure, Your Honor.

THE COURT:  We do have to get on with the next witness and we're keeping everybody very late today.

MR. LOONAM:  No further questions.

THE COURT:  And if you need to have her called back at some later time, you can reflect upon that.  In the meantime, let's move on to the defendant's expert.

MR. RUHNKE:  I call Richard Dudley.

(Witness sworn.)

COURTROOM DEPUTY:  Please state and spell your name.

THE WITNESS:  Richard G. Dudley, D-u-d-l-e-y, Jr.

THE COURT:  Now, Dr. Dudley, we're keeping everybody here as an accommodation to you, but the matter is important, as you know, and if anybody feels any time pressures we'll just have to make arrangements for you to come back again at some time that's convenient for all of us.  I don't want to feel as if we're rushing to judgment.  Okay?  Let's see how we go today.

MR. RUHNKE:  Thank you, Your Honor.  I'm going to run very quickly through Dr. Dudley's qualifications.

Case 1:04-cr-00706-FB Document 939 Filed 03/25/15 Page 77 of 121 PageID #: 7214

Case 15-1645, Document 113, 10/28/2016, 1895494, Page161 of 280

THE COURT: I think I know his qualifications. I have seen them and I've read his reports in the past as well.

MR. LOONAM: And we stipulate to his expert status, Your Honor.

**RICHARD G. DUDLEY, JR., M.D.,**

Called by the Defendant, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. RUHNKE:

Q    Are you board certified in forensic psychiatry?

A    Board certified in psychiatry.

Q    Medical degree from Columbia University?

A    Medical degree from Temple University.

Q    Undergrad?

A    Medical degree from Temple University School of Medicine; and my internship and residency at Northwestern in Chicago.

Q    Have I asked you to undertake a forensic evaluation of the defendant in this case?

A    Yes.

Q    Did you review certain materials in the course of that evaluation, including transcripts, reports from the Bureau of Prisons, and records, a voluminous collection of documents reflecting to Mr. Hardy?

A    Yes.

THE COURT: Let me interject here. I'm not meaning

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 78 of 121 PageID #: 7215

to rush anybody, but I read the doctor's report.  I saw all the references to material that he has reviewed in it.  I just want the record to reflect that I've gone over it very carefully.

Let me hear now the basis once again for his opinions.  It's all in your report.  And now I'm having you here testify, and the primary reason is to give Mr. Ruhnke, defense counsel, an opportunity to question you about your report.  So you can just state for the record the opinion that you rendered in your report.  I think it was dated what, last week sometime?

THE WITNESS:  Yes.

THE COURT:  So just give the opinion, the basis for it, and we'll allow Mr. Ruhnke to have full opportunity to question you about it.  I don't think you have to go through everything that's in your comprehensive report again.  We know what that is.

So let me have your opinion and then as to whether you think he is capable of going to trial next week.  We start next week.  And I think your answer is that you don't think he is competent to do that, right?

THE WITNESS:  That is correct.

THE COURT:  And the basis for that?  You can explain it now on the record in court.

THE WITNESS:  Well, it's my opinion that he

Case 15-1645, Document 117, 10/28/2016, 1895494, Page163 of 280

continues to suffer from several delusions, and that when you explore these delusions with him you can understand how they influence his conduct and behavior in a way that renders him unable to rationally understand the charges against him, although he factually understands them unable to rationally understand the proceeding and the role of the players, including the judge and the prosecutor and everybody, and unable to assist his attorney in his own defense.

And those delusions, in my opinion, include a belief that he has -- that the charges against him, the case against him is an illegal one; number two, that it's already been dismissed; number three, that the prosecutor and you, the judge, are prepared to move forward with this case despite knowing that it's an illegal case that's already been dismissed, and that his attorney has not filed papers to bring this to the attention of the Court, papers that would talk about it being dismissed, other technicalities which he has enumerated.

That notwithstanding, he has another delusional belief that if he meets with the prosecutor and lays all of this out, including some of the facts that he knows, that he will be exonerated, that he'll be released.

And, therefore, given those beliefs, there's no reason to work with his attorney about some other defense, because the charges are illegal, the case has already been

Case 15-1645, Document 113, 10/28/2016, 1895491, Page164 of 280

DUDLEY - DIRECT / RUHNKE                    80

dismissed.

THE COURT:  Let me ask you this:  Now, you've been the psychiatrist here for some period of time; right?

THE WITNESS:  "Here" meaning on this case or "here" --

THE COURT:  In this case.

THE WITNESS:  Yes.

THE COURT:  And just correct me if I'm wrong, but there came a point in time after he was medicated where you opined that you thought he was capable of going to trial.  Am I correct or not correct about that?

THE WITNESS:  That's not correct.  I saw him early in -- I saw him in January, and in January he still had these same delusions that he had had -- you know, let me step back.

In January, I saw him.  He was clearly much better. He was less agitated.  The speech was less pressured.  His affect was less -- you know, he was some -- as was described earlier, he was somewhat dysthymic, but he didn't have the kind of inappropriate affect that he had before, so he was clearly much better.  Some of the thinking had calmed down.

But some core delusional beliefs that, in my opinion, had always affected his competency were still there. But my thought -- what I said to the attorney was, is that, you know, he's just come out of Springfield, they feel that he's much better.  We need to see whether these difficulties

SHERRY BRYANT, RMR, CRR
APP. 162

still interfere with his ability to --

THE COURT:  If the trial were to have started back then in January, when we speak of the date that you are now testifying about, do you think at that time he would have been capable of going forward with the trial?

THE WITNESS:  No.

THE COURT:  Not even at that time?

THE WITNESS:  Correct.

THE COURT:  You would have rendered the same opinion then that you're doing right now --

THE WITNESS:  Yes.

THE COURT:  -- if we had this hearing two months ago?

THE WITNESS:  Right.

THE COURT:  What we're going to do now is we'll let Mr. Ruhnke question you.

MR. LOONAM:  I apologize, Your Honor.  If I could just -- I know Dr. Preston Baecht has obligations.  If we can just release her.  She's back, so if the witness can be excused.

THE COURT:  Thank you.  I think you can be excused now.  We don't need you anymore.  All right.

MR. LOONAM:  Thank you, Your Honor.

THE COURT:  So what I want to do, Mr. Ruhnke, is I want Mr. Loonam to have the opportunity to question and then

Case 15-1645, Document 113, 10/28/2016, 1895494, Page166 of 280

you can come back and question him again.

MR. RUHNKE:  Your Honor, I'd like to lay a foundation for the opinion and the factual basis.

THE COURT:  I think we've done that.  I have his report and he's given his opinion.  He's given the basis for it.  I'm not going to preclude you.  I just want to give Mr. Loonam an opportunity to question him, and then you can come back and question him more.  I often do that when it comes to experts.

MR. RUHNKE:  Can I just elicit the encounters he's had with Mr. Hardy, Your Honor?

THE COURT:  Well, I'm not going to preclude you from doing that.  The question is doing it now or doing it after we hear from Mr. Loonam.  That's all I'm suggesting.

MR. RUHNKE:  Well, if I can get an opportunity to complete a direct, yes, sure, we'll let Mr. Loonam go.

THE COURT:  That's the way I like to conduct these types of expert matters.  Mr. Loonam, you question him.  And you're going to have all the time you need, Mr. Ruhnke, to question him afterwards.

MR. LOONAM:  Yes, sir.

CROSS-EXAMINATION

BY MR. LOONAM:

Q    Good afternoon, Doctor.

A    Good evening.

Case 15-1645, Document 113, 10/28/2016, 1895491, Page167 of 280

DUDLEY - CROSS / LOONAM                83

THE COURT:  Not quite yet.

Q    You told the judge that you've been the psychiatrist in this case for quite some time; correct?

A    Yes.

Q    When is the first time you conducted any evaluation of Damion Hardy?

A    You mean the first time I attempted to?

Q    No, the first time you actually conducted an evaluation of Damion Hardy.

A    The first time I was actually able to talk to him myself was in January.

Q    January of 2015?

A    Right.

Q    And, in fact, your other interactions with Mr. Hardy were not in the context of evaluations.  You sat in on meetings with Mr. Ruhnke and you were opining on the opinions of Dr. Sarrazin and Dr. Preston Baecht; correct?

A    That's not quite right.  I'm sorry.  The first time I went to see him, he wouldn't see me.  The second time, I sat in on his meetings with his attorneys.

And what I said at prior proceedings was, is that I had no reason to disagree with them, with the diagnoses that were put forward by those who then subsequently had an opportunity to evaluate him in the various settings that we've already talked about today.

SHERRY BRYANT, RMR, CRR

Case 15-1645, Document 113, 10/28/2016, 1895494, Page168 of 280

DUDLEY - CROSS / LOONAM                    84

And my memory is that the bulk of the focus of my testimony was whether he would -- whether the use of psychopharmacologic agents would return him to competency.

Q   Did you testify, sir, that during that time period you were not conducting your own evaluation of Damion Hardy?

A   Yes, that's what I'm saying.  I said, I think my testimony was that I had no reason, based on the information that was available to me, to disagree with them diagnostically, that I had not been able to do an evaluation of my own, and that the bulk of my testimony was not on that but was, instead, on the use of psychopharmacologic agents in a person with his history.

Q   Just to be clear, you were not conducting your own evaluation; right?

A   I just said that.

     MR. RUHNKE:  Your Honor, asked and answered several times.

Q   And so during your evaluation, have you ever reached your own diagnosis for Damion Hardy?

A   I agree now, based on my own sitting down and talking with him, that he suffers from schizophrenia.

Q   So the first time that you were able to meet with Damion Hardy and now have reached this diagnosis is after he's been medicated in January of 2015; is that correct?

A   That is correct.

Case 15-1645, Document 113, 10/28/2016, 1895494, Page169 of 280

DUDLEY - CROSS / LOONAM                    85

Q    Now, in your evaluation you met with Hardy twice; correct?

A    That is correct.

Q    And how did you conduct your evaluation?  Were you alone or were others in the room with you?

A    I was alone.

Q    And how long did you meet with Damion Hardy on the first occasion?

A    About two hours.

Q    And how long did you meet with Damion Hardy on the second occasion?

A    The same.

        THE COURT:  Ten hours?

        THE WITNESS:  Two hours.

Q    And did you advise Damion Hardy at the outset of your evaluation that whatever he told you could be reported in court?

A    Yes.  I mean, I told him -- we talked about why I was there and -- well, what I do is I say, do you know why I'm here and what the purpose of this examination is?  And then I have him describe to me what that is and what his understanding of that is.

Q    Okay.  And did he give you an accurate understanding as to why you were there and that he understood that whatever he told you could be discussed by you in open court?

SHERRY BRYANT, RMR, CRR

APP. 167

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/19, Page 86 of 121 PageID #: 7223

A    He understood that whatever he told me would be discussed between me and his attorney.  Then if it was decided that I would testify in open court, I would testify in open court.

Q    What's your basis -- where do you understand he came to that understanding?  Do you have any knowledge as to how he learned that?

A    It's my sense that his attorney told him I was coming to see him.

Q    And what about the idea that whatever he told you could be related in open court?

A    Where did he get that idea from?

Q    Yes.

A    From me.

Q    At what point?  I thought you said -- at what point did you tell him that?

A    No, I said that I don't begin with a lecture, I begin with asking them if they understand why I'm here and then engage them in a discussion.

Q    Okay.  And then in his response to you when you said, why am I here, and you're engaging him in discussion, did he volunteer that he understood that whatever he said could be shared in open court?  Did he volunteer that?

A    I explained the procedure that after I met with him that I would talk with his attorney and then there would be some decision as to whether I would go to court or not.

Case 15-1645, Document 113, 10/28/2016, 1895491, Page171 of 280

Q    Okay.  And did he acknowledge at least the possibility and consent to that?

A    I thought he understood what I said.

Q    Okay.  Now, did you go in --

THE COURT:  Let me interrupt.  Did he understood why you were there?  Did he ever tell you anything about the pending trial and that you were there to evaluate his mental competency?  Did you have any discussion about that at all?

THE WITNESS:  I think he was much more clear the second time that the issue was the competency.

THE COURT:  The second time.  That would just be recently, a few days ago?

THE WITNESS:  Right.

THE COURT:  So he knew that he was facing a trial?

THE WITNESS:  Well, he knew he was facing a trial when I saw him the first time.

THE COURT:  And the second time also?

THE WITNESS:  Right.

THE COURT:  Did he express any anxiety or concern about having to go to trial next week?

THE WITNESS:  He -- what he expressed to me was that that shouldn't happen.

THE COURT:  He didn't think that he should be going to trial?

THE WITNESS:  Right.

Case 15-1645, Document 113, 10/28/2016, 1895494, Page172 of 280

DUDLEY - CROSS / LOONAM                          88

THE COURT:  But he knew that it was scheduled to happen?

THE WITNESS:  He knew that it was scheduled to happen, and that he was anxious for these other steps that I've already described to you be taken instead of waiting around and going to trial.

THE COURT:  Namely what?  What other steps?  Speak to the government?

THE WITNESS:  Yes.

THE COURT:  Did he tell you he wanted to speak to the government?

THE WITNESS:  Yes.

THE COURT:  Did he tell you what he wanted to speak to them about?

THE WITNESS:  He -- as I indicated, he told me that the charges against him were illegal, they had already been dismissed; and despite the government's effort to move forward with this, knowing these things, that if he sat down with the government, talked about the truth of the matter, that they would see all of this.

THE COURT:  Did he ever say anything to you about any desire or willingness on his part to cooperate with the government in exchange for some leniency on sentencing?

THE WITNESS:  That's not the way it was presented to me.

SHERRY BRYANT, RMR, CRR
APP. 170

Case 15-1645, Document 113, 10/28/2016, 1895494, Page173 of 280

DUDLEY - CROSS / LOONAM                     89

THE COURT:  How was it presented to you?

THE WITNESS:  It was presented to me that if he had an opportunity to meet with the government and talk to the government about what really happened that the government would suddenly realize that there was really no case against him.

THE COURT:  Now, you heard Dr. Preston Baecht, as you were in Court --

THE WITNESS:  Yes, I did.

THE COURT:  -- relate the conversation that she had with him not too long ago where they discussed cooperating possibly with the government, working out some sort of a deal with the government.  You heard all of that.

THE WITNESS:  Yes, I did.

THE COURT:  Did that subject come up in the course of your conversation?

THE WITNESS:  Not working out a deal with the government.

THE COURT:  So he may have said that to Dr. Preston Baecht.  You don't question that, do you?

THE WITNESS:  I'm not -- I have no basis on which to question it.

THE COURT:  All right.  Any further questions, Mr. Loonam?

MR. LOONAM:  Just very briefly.

Case 15-1645, Document 113, 10/28/2016, 1895494, Page174 of 280

DUDLEY - CROSS / LOONAM 90

Q    Did Damion Hardy tell you that Mr. Ruhnke told him that he had a 90 percent chance of losing at trial?

A    Yes.

Q    And that he believes that Mr. Ruhnke was going to trial because Mr. Ruhnke wanted to gain some sort of publicity or notoriety by being associated with this trial?

A    He questioned whether that was a possibility.

Q    And that he wanted to meet with the government and that Mr. Ruhnke was not facilitating his desire to meet with the government; correct?

A    That is correct.

Q    And on January 15th, 2015, how many times did the defendant discuss Ethou Law with you?

A    None.

Q    March 5th, 2015, how many times did the defendant discuss Ethou Law with you?

A    None.

Q    You issued your report on March 10.  Mr. Ruhnke sent you some e-mails on March 4th expressing some things that he wanted you to explore; correct?

A    Correct.

Q    And so he gave you specific areas of his perception of Mr. Hardy that he wanted you to explore; correct?

A    Yes.  He laid out why he -- my understanding was he was laying out why he was concerned about the question of

SHERRY BRYANT, RMR, CRR

APP. 172

Case 15-1645, Document 113, 10/28/2016, 1895494, Page175 of 280

DUDLEY - CROSS / LOONAM                    91

competence.

Q    So during your evaluation, you didn't go in with just a blank slate and sort of look at Hardy and make your assessment of his competence, you were given information by Mr. Ruhnke with respect to Mr. Ruhnke's perceptions and then you went in to conduct your evaluation; correct?

A    I think it's a little bit more complicated than that.

Q    Explain it.

A    As I indicated, that when I saw him back in January I still thought that he had these delusional thoughts, but the question was would they interfere with his ability to rationally understand what was happening to him, participate with his attorneys in his defense.

So we had a discussion after the January evaluation that these are things we need to look at to see kind of how it's going to affect his behavior.  So what I understood his memo to be was a response to that.

Q    Apart from the March 4th e-mail, did Mr. Ruhnke share with you prior to your January meeting with Damion Hardy Mr. Ruhnke's perceptions of Mr. Hardy's competence and issues he was having with Mr. Ruhnke -- I mean, with Mr. Hardy?

A    Prior to the January meeting, what he asked me to do was, you know, he's now back from Springfield, he's -- they've opined that he's been -- his competency is restored, so I would like you to see him.

DUDLEY - CROSS / LOONAM                    92

Q    And didn't express that there were any issues, a conflict at that point, in January?

A    Not particularly.  He asked me to go see him.

Q    And then you saw him again in March; correct?

A    That is correct.

Q    But prior to March, did Mr. Ruhnke express to you that a conflict had developed and that the source of the conflict was Mr. Hardy's desire to meet with the government, among other things?

A    What I believe he expressed to me was what I just told you, which is that in response to the discussion, follow-up to the discussion that we had had back in January, he outlined to me a list of things that he thought were reflective of these -- his thinking interfering with his ability to work on his case.

Q    Okay.  And if you were to discuss that and summarize that for the Court very briefly, is it fair to summarize that as he wants to meet with the government and he thinks Mr. Ruhnke should move to dismiss his case on a technicality?

A    You have the memo.

Q    Fair enough.  You don't recall?

A    I don't recall without looking at it more.  I mean, I recall what I said; but to be more detailed than that, I haven't actually looked at that memo.

Q    Fair enough.  Phone calls, how many phone calls did you

SHERRY BRYANT, RMR, CRR

APP. 174

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/19, Page 93 of 121 PageID #: 7230

listen to of Damion Hardy's prior to issuing your March 10th report?

A     I listened to two of them and then some subsequent to that.

Q     Okay.  Did you listen to the call where the defendant Damion Hardy was speaking with Lil' Kim and asked for money to hire a lawyer?

A     I don't believe so.

Q     Did you listen to --

A     The ones that I -- there were some from since he's been released, two since he's -- two since he's been at -- back at MCC, and some of the prison ones I listened to subsequent to that, but I didn't listen to all of them.

Q     Sure.  I apologize.

A     I'm sorry.  I mean Springfield ones I listened to subsequently.

Q     Just to be clear, prior to the March 10th report, did you listen to any BOP calls?

A     I listened to -- I did not listen to the calls from Springfield until subsequent to that.

Q     So in reaching your report then, you didn't listen to any of the BOP calls?

A     That is correct.

Q     Okay.  And so if you had heard a discussion of the defendant wanting to hire Ben Brafman to represent him, would

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 94 of 121 PageID #: 7231

that have made any impact on your opinion?

A    No.

Q    If you had heard the defendant asking different people he knew for money, including Lil' Kim and Foxy Brown, so that he could hire a lawyer, would that have had any impact on your opinion?

A    No.

Q    You're aware that the government does cooperate people who are responsible for serious crimes; correct?

A    Am I aware of that?

Q    Yes.

A    Yes.

Q    Are you aware that the defendant in a call made a reference to Sammy "the Bull" Gravano?

A    I'm sorry?

Q    Are you aware on a call that the defendant made a reference to Sammy "the Bull" Gravano?

A    I'm not aware of that.

Q    Do you know who Sammy "the Bull" Gravano is?

A    No.

Q    Can I ask you why you wouldn't listen to the BOP calls prior to issuing an expert report concerning the defendant's competence when you have a lot of data of the defendant speaking with his mother, with his friends?  Isn't that information relevant to making a competence determination?

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/15, Page 95 of 121 PageID #: 7232

A    It depends on what's in it.  But I certainly listened to some of them subsequent to that.

Q    But I'm saying prior to the time you issued your report, you didn't.  Why did you deem it was not necessary to listen to the BOP calls that were available to you prior to rendering your opinion?

A    I don't think I made that deem.  I think that the -- there was a concern -- I -- this was a letter that I wrote to Mr. Ruhnke summarizing kind of what my opinion was.

Q    So this isn't an evaluation report; right?

A    Well, it certainly includes an evaluation opinion.  If I was writing a full report, it would have been much more detailed.

THE COURT:  Let me ask you this:  Did you listen at all at any time to the conversations Mr. Hardy had with his mother, and the most recent one I understand was in February?

THE WITNESS:  Yes, I did.

THE COURT:  Can you describe, in your own professional assessment, was it a rational conversation?  Was there anything remarkable about it?  Was there anything that the would support or, contrary-wise, not support your opinion?

THE WITNESS:  I think there's two things that characterize the conversations with his mother.  One is that, for the most part, they don't get into issues to which he is delusional about.  So, you know, if you're talking to him

Case 15-1645, Document 113, 10/28/2016, 1895494, Page180 of 280

DUDLEY - CROSS / LOONAM                    96

about something else, you know, how much I hate being in solitary, it sounds like a rational discussion.

When you get into something that he's delusional about, you -- his talking is consistent with what I'm saying. So, for example -- can I give an example?

THE COURT:  I'm sorry, go ahead.

THE WITNESS:  I'll give you two examples.  One of those is the example that we talked about a little earlier, whereby on the one hand he says, yes, my lawyer told me this about the charges and I looked it up on the computer, you know, and the computer -- what the computer says seems to be consistent with what my lawyer said about what -- you know, about what is the basis for an arrest.  Then he comes back the next day -- and this is the classic sort of thing you would see with somebody with a psychotic delusion -- I read the cases, clearly they are different from mine.  And he makes -- and so he is able to hold on and continue to not give up that belief.

Similarly, there's another conversation where he talks to his mother about wanting to meet with the government and testify.  She lams into him, saying, that's crazy, I can't believe you want to do that.  She really confronts him.  And despite that, she can't change his position.  That's how fixed his thinking is and irrational it is that he won't give it up.

THE COURT:  There's no question he wanted to meet

Case 1:04-cr-00706-FB, Document 939, Filed 03/25/19, Page 97 of 121 PageID #: 7234
Case 15-1645, Document 113, 10/28/2016, 1895494, Page181 of 280

with the government.  I think that's pretty clear.

THE WITNESS:  Right.

THE COURT:  But that in and of itself doesn't really qualify as a delusional thought.

THE WITNESS:  Well, that's why I made out a series. It's this package of delusions that's irrational, and it's even irrational one to the other.  I mean, that he would believe that -- that -- that you and the government are prepared to move forward on a case that you know is illegal and has been dismissed, and then at the same time have a belief that, however, if he sits down with the government that can be undone.  So they're even internally irrational, again, indicative of how disordered the thinking is.

THE COURT:  They're inconsistent.  But getting back to the conversation --

THE WITNESS:  Well, they're --

THE COURT:  Let me ask you this:  I get a sense that you're telling me that you can be delusional about certain things; otherwise, you can seem rational and coherent. There's sort of a dichotomy in terms of how people function.

THE WITNESS:  No, I'm not saying that.  What I'm saying is that when you have delusions, you know, and you talk about information that relates to those delusions, you're going to hear the delusions.  If you talk about who won the Mets game, you know, you're not going to have a delusional

Case 15-1645, Document 113, 10/28/2016, 1895494, Page182 of 280

DUDLEY - CROSS / LOONAM                    98

discussion about who won the Mets game if that's not part of your delusions.

THE COURT:  All right.  Well, but certainly the conversation he had with his mother in many respects was not delusional, I take it; right?

THE WITNESS:  That the topics they discussed were not part of his delusions.

THE COURT:  Did they discuss --

THE WITNESS:  But when they did, when they did talk about things that were part of his delusion system, then you could see.

THE COURT:  Well, his insistence that he wanted to speak to the government is what you're talking about now; right?

THE WITNESS:  Or the argument -- or the discussion, the subsequent discussion about whether his -- whether the charges against him were legal.

THE COURT:  And he used the word "legal" when he spoke to his mother?

THE WITNESS:  That's what he described when he spoke with me.

THE COURT:  How about the conversation with his mother?

THE WITNESS:  That they're nonsense.

THE COURT:  That they're nonsense?

SHERRY BRYANT, RMR, CRR

APP. 180

Case 15-1645, Document 113, 10/28/2016, 1895494, Page183 of 280

DUDLEY - CROSS / LOONAM                                    99

THE WITNESS:  And that they were not -- that he shouldn't have had those charges.

THE COURT:  Right.  He said he should not have been charged --

THE WITNESS:  And that it was nonsense.

THE COURT:  -- and that they were nonsense, but he didn't say that they were illegal at that time and that they were dismissed, he didn't say that to his mother?

THE WITNESS:  Well, he has said to his mother on numerous occasions that I shouldn't be here, that these were nonsense, that I shouldn't have been charged.

THE COURT:  I understand.  All right.  Any other questions, Mr. Loonam?

MR. LOONAM:  Yes.

Q    You opined that Hardy -- that it's a fixated ideation; correct?  That his desire to speak with the government irrationally and his desire -- that the case is illegal is a fixated ideation, is that your opinion?

A    Yes.

Q    The significance of the fact of a fixated ideation is any time that the topic comes up and that topic is discussed that fixated ideation should manifest itself; correct?

A    The idea is that he -- no, the idea is that he continues to believe it despite evidence to the contrary.  Now, I think there's an important piece here, right, that I should mention,

Case 15-1645, Document 117, 10/28/2016, 1895494, Page 184 of 280

DUDLEY - CROSS / LOONAM                    100

and anybody who treats people with schizophrenia or any other psychotic disorder knows this. That -- and you see this in the hospital. You know, so that if I tell you -- if I repeatedly tell you, that's crazy, that's crazy, you know, that's why you're in here and you're going to stay in here until you stop saying that, you know, eventually people just will stop saying it. That doesn't mean -- they won't stop believing it, but they'll stop volunteering it.

Q   So when the defendant is having conversations with his friends and his mother talking about his case and these beliefs don't manifest themselves, you don't place any significance on that?

A   Not if they don't come up.

Q   No, if the case is being discussed and his strategy for the case and his need for money for lawyers and what he's going to do going forward, if the case itself is discussed and he doesn't bring up what you are opining are fixated ideation, you don't place any significance on that?

A   No. I think it depends on -- it depends on how the case is discussed.

Q   And you referenced treating patients and you see this in the hospital. What percentage of your work right now is forensic as opposed to treating patients?

A   Right now?

Q   Yes.

SHERRY BRYANT, RMR, CRR
APP. 182

Case 15-1645, Document 117, 10/28/2016, 1895494, Page185 of 280

DUDLEY - CROSS / LOONAM                    101

A    Right now I'm almost retired, so I'm just doing a few forensic cases a year.

Q    A few forensic cases a year?

A    Yes.

Q    How many patients do you currently have?

A    I don't have any.  I stopped teaching.  I stopped seeing patients.

Q    So 100 percent of your work is forensic?

A    Well, 100 percent of the amount of work that I still do is forensic.

Q    And as of 2009, 90 percent of your work was forensic; correct?

A    No, I don't think that was --

Q    You had two patients in 2009 and they were leftover patients?

A    That's right, I had started to do that already in 2009.

Q    So 90 percent of your work in 2009 was forensic, not treating patients; right?

A    Correct.

        MR. LOONAM:  One moment, Your Honor.

        (Pause.)

Q    And just -- if Ethou Law was a fixated ideation, did you discuss the case in such a way that you would expect it to have come up in your two meetings with the defendant that lasted over four hours where Ethou Law didn't come up once?

APP. 183

DUDLEY - CROSS / LOONAM                    102

A    No.

Q    You wouldn't expect it to come up?

A    No.

Q    Why not?

A    I think it's important in understanding how delusional thinking works to go with it, to allow the person -- as opposed to challenging it, to allow them to talk about their thinking so that you can figure out and understand not only the depth of the thinking but how it relates to their behavior.  Then you go back after you've done that.

And that's why I feel so confident that this thinking influences his behavior in relevant ways to his competency.  Then you go back and you begin to challenge it. It's on the basis of challenging it that you become -- it becomes clear that this belief is fixed.

Q    And did you challenge the beliefs that Hardy expressed to you during the course of your evaluation of him?

A    Yes.

Q    And during the challenging of that, he never mentioned Ethou Law in the four hours that you met with him?

A    No.

Q    And you knew that Ethou Law was his previous delusion because you were present in the 2009 hearing where Dr. Preston Baecht testified, as Mr. Ruhnke read aloud, his delusion concerning Ethou Law.  So you were aware of his previous

Case 1:04-cr-00706-FB   Document 939   Filed 03/25/15   Page 103 of 121 PageID #: 7240

Case 15-1645, Document 117, 10/28/2016, 1895494, Page 187 of 280

delusion concerning Ethou Law; correct?

A    I was aware that that was part of his delusional system, yes.

Q    And despite the fact --

A    As was being President of the United States and a bunch of other stuff.

Q    And you were aware of those delusions and you challenged them, and yet still those delusions -- he didn't raise those delusions during your four hours with him; correct?

A    The delusions I challenged were the ones that he was presenting when I was with him.  I didn't go back and ask about delusions that he had reported years ago and did not appear to be reporting now.

MR. LOONAM:  No further questions.

THE COURT:  The floor is yours, Mr. Ruhnke.

MR. RUHNKE:  Thank you, Your Honor.  I'm going to try to lead Dr. Dudley somewhat.  If it gets objectionable, I'm sure the prosecution will put an end to it.

REDIRECT EXAMINATION

BY MR. RUHNKE:

Q    Just to backtrack a little bit, Dr. Dudley, you first saw Damion Hardy in approximately 2007; is that correct?

A    That is correct.

Q    And we, meaning former counsel Francisco Celedonio and I, asked you to go see him to evaluate him for competency, for

Case 15-1645, Document 117, 10/28/2016, 1895494, Page188 of 280

DUDLEY - REDIRECT / RUHNKE          104

mental condition.  What happened when you went to see him?

A    He wouldn't talk to me.

Q    Did he come into the room and just not talk, or do you remember?

A    I don't remember, but I remember I didn't walk away with....

Q    And then on another occasion in 2007, you sat in on a meeting between Mr. Hardy, Mr. Celedonio and myself in the Special Housing Unit at MDC.  Do you remember that?

A    That is correct.

Q    And then you didn't see -- then you saw him physically in 2009, in the sense that he was at a hearing in this courtroom. Do you remember that?

A    That is correct.  Yes, sir.

Q    And then the next time you saw him was January 15, 2015.

A    That is correct.

Q    Prior to seeing him, you were familiar with the BOP reports, you were familiar with the multiple findings of mental illness and incompetence; correct?

A    That is correct.

Q    Described his delusions in those reports; correct?

A    That is correct.

Q    Described Ethou Law; correct?

A    Right.

Q    President of the United States, TI the rapper, a whole

Case 15-1645, Document 117, 10/28/2016, 1895494, Page 189 of 280

DUDLEY - REDIRECT / RUHNKE                      105

series of delusions.  When you saw him on January 15, 2015 at MCC, did you notice any difference in him from when you had seen him four or five years, six years earlier?

A     Yes.

Q     And what were those differences?

A     He was calmer.  He did not appear to be particularly agitated.  He did not appear to be particularly pressured in his speech.  And he seemed to be -- I would say that's primarily it.

Q     And although you started to move towards retirement in 2009, prior to 2009 had you had an active private caseload of patients who had mental illnesses?

A     Yes.  Prior to that, my practice was 50 percent patients and 50 percent forensic, plus the teaching at the medical school and the law.

Q     And would many of those patients have schizophrenia?

A     They had psychotic, either psychotic disorders or disorders with psychotic symptoms.  So some had schiz -- you know, there were some with schizophrenia, there were some with bipolar disorder, with other psychotic features.

Q     And when somebody receives antipsychotic medication, is it common that the more florid symptoms, if I can refer to it that way, the pressured speech, the irritability, the agitation, the inability to keep focused, those tend to diminish under antipsychotic medication?

SHERRY BRYANT, RMR, CRR

APP. 187

Case 15-1645, Document 117, 10/28/2016, 1895494, Page190 of 280

DUDLEY - REDIRECT / RUHNKE                    106

A     Pretty much always, yes.

Q     Not always, but --

A     I said pretty much always.

Q     Oh, pretty much always.  And does that mean that the underlying delusions are necessarily gone?

A     It kind of depends on when they start treatment, but they may or may not.

Q     And after seeing him on January 15, did you and I have a telephone conversation where you said, in essence, he's obviously better and we need to see if he can cooperate in getting ready for a defense?

A     That is correct.

Q     So let's put it on hold for the time being?

A     That is correct.

Q     And I then asked you to see him again about a month before the trial was scheduled to start.  Did you notice any difference between how he appeared on March 5th as opposed to how he appeared to you on January 15, about three months earlier, two months earlier?

A     The -- I mean, he was essentially -- I mean, he was somewhat more agitated, he was somewhat more depressed, but the -- with regard to his thought process, it was basically unchanged.

Q     And were the delusions present?

A     The delusions were present both times.

Case 1:04-cr-00706-PB, Document 939, Filed 03/25/15, Page 107 of 121 PageID #: 7244

Q   And is it your opinion, to a reasonable degree of medical certainty, that his delusions interfere with his ability to have a rational understanding of the charges, the process, and to assist in his own defense?  What is your opinion on that?

A   Yes.

        MR. LOONAM:  Judge, objection.  If we could just have defense counsel lay a foundation very briefly for when he's saying delusions what he's referring to, because there's been a lot of discussion of TI, the President, whatever, just so the record is clear.

        THE COURT:  He gave his opinion.  We have his report.  It's all right.  Objection overruled.  Next question.

Q   Did he have a delusion that there was no case to begin with?

        THE COURT:  I think you testified.  I don't want to be repetitious necessarily, if there's something else you want to add, but I think you focused on the fact that he thought that the case was dismissed, right, and that was the primary reason for you to conclude that he was delusional?

        THE WITNESS:  No, that there was no legal case against him in the first place, one; number two, that the case has then subsequently been dismissed.

        THE COURT:  Dismissed.  He used the word "dismissed"?

        THE WITNESS:  Right.  That number three, those

SHERRY BRYANT, RMR, CRR

APP. 189

DUDLEY - REDIRECT / RUHNKE                    108

number one and number two notwithstanding, that the case was never legal in the first place, and number two, it has been dismissed, that the prosecutor, in cooperation with the judge, are prepared to try to present this case as if it is, in fact, a legal legitimate case to a jury.

THE COURT:  All right.  So what I'm thinking about is he didn't say that to Dr. Preston Baecht, at least according to her testimony.  I don't recall her saying that she was told by him recently that the case was dismissed.  She told about how he wanted to speak to the government and that there's no basis for the lawsuit against him, he was willing to maybe cop a plea or take a plea if he would not be incarcerated for a long period of time.  She disclosed all that information when she testified.

And you're telling me now that when he spoke to you, he was not saying the same things to you, he was saying something totally opposite to that?  I just want to get a feel of whether he gave two different versions of events, one when he spoke to her, one when he spoke to you.

THE WITNESS:  I'm saying that when he spoke to me, he said to me what I just told you.  I'm saying that my approach to doing an examination with someone who has a thought disorder is to entertain the thought disorder, to not begin the discussion by challenging it or questioning it or avoiding it.  And in that way, I get a better understanding

SHERRY BRYANT, RMR, CRR

APP. 190

Case 1:04-cr-00706-PB, Document 939, Filed 03/25/15, Page 109 of 121 PageID #: 7246

about what is the content of the disorder, of the thought disorder and how it influences their behavior, and then I go back and challenge it.

THE COURT:  Did you ever ask him whether he ever said anything contrary to anybody else about wanting to work out a deal, meeting with the government, work out a cooperation arrangement, anything of that nature?  Did you ever discuss that with him?

THE WITNESS:  I discussed with him -- well, first of all, he met with her after he met with me, and so I couldn't have asked him.

THE COURT:  That's correct.

THE WITNESS:  The -- but I asked him -- when he kept asking this and asking me to set it up, asking me to ask his attorney to set it up, that he had asked his attorney to set it up, I asked him what did he think would happen and why did he want to do it, and that's the way I approached it.

Then after he -- after I allowed him to discuss that, then I went back and began to challenge each level of the thinking, to see whether it was -- because, by definition, it's a fixed belief despite evidence to the contrary.  So I tried to suggest to him what other people had said, that the lawyer already told him, my understanding.

THE COURT:  So the fact that he said something contrary to Dr. Preston Baecht, he spoke to her after your

DUDLEY - REDIRECT / RUHNKE                    110

report, that's not inconsistent with your conclusion that he still has these delusional beliefs?

THE WITNESS:  Well, as you know, I didn't get a chance to question her.  I'm not sure whether it's actually contrary.

THE COURT:  I mean, I'm just going on what she said.

THE WITNESS:  No, no, but I'm not sure whether it's contrary.  I'm not sure that her approach to confrontation, which is that, well, if you're going to talk to the attorney they're going to, you know, expect -- I mean, to the prosecutor, they're going to expect some sort of, you know --

THE COURT:  I understand that.

THE WITNESS:  That may have elicited a different sort of response.

THE COURT:  I guess what I'm focusing on is the part of her testimony after you had read your report where she communicated that he was willing to talk to the government, to work out a deal, and even he would be even willing to plead to some deal if he could work out a proper plea arrangement.  I think she testified, in sum and substance, like that after you rendered your report.

THE WITNESS:  That is correct.

THE COURT:  That doesn't strike me as delusional at that particular time.  That sounds like somebody who wants to try to work out a cooperation deal with the government to save

SHERRY BRYANT, RMR, CRR
APP. 192

DUDLEY - REDIRECT / RUHNKE                    111

his own neck.  I mean, that's not an uncommon thing.

THE WITNESS:  And what I'm saying is that I didn't have an opportunity to question her to find out whether subsequent to that, you know, like -- I mean, I think given what he has said historically, there's a reasonable set of questions, like, well, will you ever serve this time, you know, will it ever really happen or, you know, are you really still believing that you will be released, which is what he's been saying.

THE COURT:  When he spoke to you, he was calm, he was communicative, he answered your question, by and large.  Do I have a correct sense of that?

THE WITNESS:  When I saw him the first time, he was more calm.

THE COURT:  The last time.

THE WITNESS:  The last time I saw him, he was much more anxious, much more distressed.  The -- in fact, the -- I actually -- I mean, I don't know if I should say this, but I actually told the attorney that I thought that he was so fixed on these things and so distressed, when asked what did I think was going to happen, I think the next thing that's going to happen is he's going to get rid of you.

THE COURT:  Get what?

THE WITNESS:  Get rid of you, the attorney.

THE COURT:  But he knew he was scheduled to go to

SHERRY BRYANT, RMR, CRR

APP. 193

Case 15-1645, Document 117, 10/28/2016, 1895494, Page196 of 280

DUDLEY - RECROSS / LOONAM                    112

trial, that he was aware of; right?

THE WITNESS:  That's right.

THE COURT:  Do you consider it unusual or somewhat of any psychological significance or psychiatric significance that a person who was on the eve of trial would be anxious and be concerned about things?

THE WITNESS:  I don't find it unusual that a person on the eve of trial would be anxious.  I find it unusual that a person on the eve of trial would be psychotic.

THE COURT:  Any further questions you wish to ask?

Q    Just to dot the i and cross the t, what is your opinion as to whether Mr. Hardy is competent to go to trial?

A    That he's not.

MR. RUHNKE:  Thank you.  I don't have anything further.

THE COURT:  Any further questions, Mr. Loonam?

RECROSS-EXAMINATION

BY MR. LOONAM:

Q    One point of clarification.  There was something inconsistent, that I perceived as inconsistent.  I thought you told the judge in the judge's questions that when you saw Hardy in January you did not believe he was competent and you had the same incompetent opinion in January.  Is that what you told the judge?

A    I told the judge that -- let me go back.  What I told Mr.

SHERRY BRYANT, RMR, CRR

APP. 194

Case 15-1645, Document 117, 10/28/2016, 1895494, Page193 of 280

DUDLEY - RECROSS / LOONAM                    113

Ruhnke after January, because I still thought that he had the same delusional system that he had before, but that we should wait and see whether it was going to interfere with his ability to function in the ways that were important to competency. That we hadn't had a chance -- he had just come back, you haven't tried to work with him yet, we should wait and see what's going to happen.

The judge asked me if the trial was going to be back in January, what would have been my opinion.

Q    Okay.

A    And that would have been my opinion.

Q    And your opinion in January would have been that he was not competent?

A    Right.

Q    Okay. And then I thought on direct examination by Mr. Ruhnke, the direct after my cross, that you told Mr. Ruhnke that he was better and that he was competent in January, and that you should wait and --

A    I told Mr. Ruhnke that he was better, that he still had the same delusional system, but in order to be able to be clear that he's unable to function, we have to wait and see whether he's unable to function.

MR. LOONAM: Okay. Your Honor, we'll rely on the record.

THE COURT: Anything further, Mr. Ruhnke?

SHERRY BRYANT, RMR, CRR

APP. 195

Case 15-1645, Document 117, 10/28/2016, 1895494, Page198 of 280

PROCEEDINGS                                    114

MR. RUHNKE:  No, Your Honor.

THE COURT:  Thank you, Dr. Dudley, you may step down.  It's 10 to 6 and I think we've accomplished what we want to accomplish today in getting the expert testimony.

Here's my present thinking.  It's Tuesday.  I'll give you folks an opportunity if you want to give me letter submissions to address the issues here as a result of this testimony.  If you don't wish to do that, then I'll just render my decision in due course.  It's up to you, but why don't you think about it and maybe we'll take probably the rest of the week before I render my decision.

But we should be prepared to go forward as scheduled for the next week's events, selection of the jury and the trial to follow thereafter, on the assumption that I will determine that he is capable of going forward.  But I'll keep an open mind until I get what your submissions will be and give you a chance to do that.

If that's satisfactory to everybody, can you have them in by Thursday afternoon?  Mr. Ruhnke, do you want the opportunity to give me anything in writing?

MR. RUHNKE:  Yes, Your Honor, that would be fine.

THE COURT:  All right.

MR. LOONAM:  Your Honor, I would beg the Court's indulgence.  I have to be in D.C. tomorrow through Thursday, and so if I could just have till sometime on Friday.

PROCEEDINGS                                    115

THE COURT:  Friday is okay.

MR. LOONAM:  Thanks, Judge.

THE COURT:  We put in seven-day workdays.

MR. LOONAM:  I appreciate it.

THE COURT:  So by the end of Friday, whatever you want me to consider, submit it to me by Friday 5:00, and then we'll render the decision that we have to render certainly before the trial is scheduled to happen.  And everyone plan on going forward, though.  That's the right thing to do in the meantime, in anticipation that we will be doing that.  Okay?

MR. LOONAM:  Yes, sir.

MR. RUHNKE:  Your Honor, just one brief point Mr. Hardy has asked me to raise with the Court, which is better than having him shout out to the Court, that he doesn't believe he requires medication any longer and I'm communicating that to the Court.

THE COURT:  I'm not competent to make that assessment, obviously.  Mr. Loonam?

MR. LOONAM:  Look, I mean, Mr. Hardy has raised his coherent argument repeatedly that the basis for the medication order is dangerousness and that he doesn't believe that -- since there hasn't been an incident in quite some time that he's no longer a danger and, therefore, there's no basis to medicate him.

Dr. Preston Baecht and I believe Dr. Sarrazin have

SHERRY BRYANT, RMR, CRR

APP. 197

Case 15-1645, Document 117, 10/28/2016, 1895494, Page200 of 280

PROCEEDINGS                               116

submitted letters to the Court in response to the Court's request and Mr. Ruhnke's request some time ago, explaining that Mr. Hardy's dangerousness emanates from his mental illness and that if they were to remove the medication, he then would be a danger to BOP staff members and, therefore, there's no -- therefore, the basis for the order remains in effect.

THE COURT:  I think it's important to err on the side of caution.  I'm concerned about how he's being medically treated in the MCC.  I assume that there's medical supervision and that he's taking the medicine that he has been prescribed to take and somebody is attending to that.

MR. LOONAM:  Yes, Your Honor.  That's my understanding and --

MR. RUHNKE:  My understanding as well is that he is being appropriately medicated and if there's any issues on that, we'll raise it.

THE COURT:  I think his own best interests and also it's a safety valve so that he can stay out of the SHU.  I'm concerned about that.  I'd like to see him have the freedom that he's entitled to have, albeit that he's not at liberty, but I'm going to continue to talk to the warden about that and see how his behavior is.  And if his behavior continues to be appropriate, then he can be treated appropriately at the MCC.

I mean, and so I think that if you were to err on

Case 1:04-cr-00706-FB Document 939 Filed 03/25/15 Page 1196 of 121 PageID #: 7254

the side of caution to continue the medication, it would really be in his best interests, because it would minimize the risk of him being returned to the SHU, which we all want to make sure does not happen.  So that's my take on it.

MR. LOONAM:  Even beyond that, Your Honor, just to make sure that the record is clear, that it's the government's position that if he wasn't medicated that he would pose a risk of physical harm to BOP staff members.

THE COURT:  We don't know about these things, but I think we're going to stay the course here and there's good reasons to do that.  Mr. Ruhnke, anything else today?

MR. RUHNKE:  Nothing, Your Honor.  Thank you.

THE COURT:  All right.  So we're scheduled to meet again I guess is it Tuesday for a jury selection?

MR. RUHNKE:  Tuesday is jury selection.

THE COURT:  You'll hear from me before then, in terms of the decision which we have to render.

As far as the application that he would like you to be relieved, I'll look at his papers.  I haven't had a chance to look at it yet.  It's not likely to happen, but, of course, we'll give him due diligence.

And we're going to go forward with the anonymous jury, but I'm not going to require any form of sequestration or overreaching by marshals bringing the jurors in and out and taking them home and back in certainly the first instance.  I

Case 15-1645, Document 117, 10/28/2016, 1895494, Page202 of 280

PROCEEDINGS                                        118

want the jurors to feel that this is a normal process.  I'm
going to be telling them that it is a normal process and that
if anything untoward happens, we'll deal with it.  But let's
err -- let's in the first instance not put this initial burden
upon the jurors.  I think that's the right way to proceed.
And I'll deliver some comments on the record in terms of why
we're going to have this anonymous jury but no sequestration
before the trial starts.  I think that's pretty much all I
have to do.

         You're all squared away with your questionnaires.
You're going to be working very diligently I'm sure, as I
suspect you will be.  I guess by Tuesday, we'll have winnowed
down the group to -- how many are we hopeful to have here,
Mike?

         COURTROOM DEPUTY:  We're hoping about 120, a list on
Monday of 120 they agree upon to come back on Tuesday.

         THE COURT:  If we can produce 120 to come back here,
that would be a good thing to do.

         Then the other thought I am having is that I'm a
great believer in allowing lawyers to participate in voir
dire, and we're going to allow Mr. Loonam to do that and Mr.
Ruhnke.

         MR. RUHNKE:  And Ms. Barrett.

         THE COURT:  Yes, and co-counsel as well.  So we'll
have a mix of my questions, and I'm going to -- you may want

Case 15-1645, Document 117, 10/28/2016, 1895494, Page 203 of 280

PROCEEDINGS                                          119

to eyeball certain things that you'd like me to question about in the normal course of questioning without fear that you're going to be precluded from following up as well, and we'll give you a reasonable amount of time to ask follow-up questions, I suspect.

MR. LOONAM:  Just to be clear on the procedure, Your Honor, do you anticipate all the questions flowing through you?

THE COURT:  No.

MR. LOONAM:  So you anticipate the government and defense counsel asking questions directly of the jurors?

THE COURT:  Yes.  But I want you to first give me a heads-up on each juror that I would possibly question them about.  If you can eyeball certain things in their responses, then I will use that as the vehicle for the judge to talk to the jurors, but I will not preclude you from after that.

You may be perfectly happy with the way I do it all, but I want you to feel that you can have some follow-up opportunities within a reasonable period of time if you'd like to do that.

MR. LOONAM:  Very glad.  There are some former DAs on this case.

THE COURT:  It's a good balance.  Well, we're dealing with highly skilled attorneys, such as Mr. Ruhnke, and Mr. Loonam is catching up to you, but you have some more gray

Case 15-1645, Document 117, 10/28/2016, 1895494, Page204 of 280

PROCEEDINGS                                    120

hair than he has.

MR. RUHNKE:  A few more years to catch up.

THE COURT:  I've had the opportunity of having Mr. Ruhnke before me in court in a death penalty case, and I was very impressed with the ability that he showed to the Court of being a professional and being very, very aggressive and effective on behalf of representing his client.

MR. LOONAM:  Oh, I watched him, Your Honor.

THE COURT:  So Mr. Hardy may not truly appreciate that, because he wasn't here as I was watching Mr. Ruhnke perform on prior occasions, but I'm just telling him that you have a very, very fine counsel.  I can tell you this from my own personal observations and experiences with him.  It would probably be in your best interests to cooperate with him, if you can do so, because he's a very skilled lawyer and you're going to get a very, very good defense if the matter goes to trial with you as a defendant, which I suspect it might.

MR. RUHNKE:  In the interest of domestic tranquility, he has a very talented partner.

THE COURT:  A very talented partner also, there's no question about it.  So, in any event, we'll see you all Tuesday I guess at 10:00.  Is that what the schedule is for?

COURTROOM DEPUTY:  Yes.

THE COURT:  Okay.  Thanks a lot.

(Whereupon, the matter was adjourned at 5:57 p.m.)

Case 15-1645, Document 117, 10/28/2016, 1895494, Page205 of 280

121

**INDEX**

**LEA ANN PRESTON BAECHT**

DIRECT EXAMINATION BY MR. LOONAM          9

CROSS-EXAMINATION BY MR. RUHNKE          34

REDIRECT EXAMINATION BY MR. LOONAM          74


**RICHARD G. DUDLEY, JR., M.D.**

DIRECT EXAMINATION BY MR. RUHNKE          77

CROSS-EXAMINATION BY MR. LOONAM          82

REDIRECT EXAMINATION BY MR. RUHNKE          103

RECROSS-EXAMINATION BY MR. LOONAM          112


**EXHIBITS**

Government Exhibits 1 to 8          7

---oOo---

Mary Agnes Drury, RPR
Official Court Reporter
APP. 203

**RUHNKE & BARRETT**

ATTORNEYS AT LAW

47 PARK STREET
MONTCLAIR, N.J. 07042
973-744-1000
973-746-1490 (FAX)

29 BROADWAY, SUITE 1412
NEW YORK, N.Y. 10006
212-608-7949

DAVID A. RUHNKE (davidruhnke@ruhnkeandbarrett.com)   ◊   JEAN D. BARRETT (jeanbarrett@ruhnkeandbarrett.com)

REPLY TO MONTCLAIR OFFICE

March 27, 2015

Via ECF
Hon. Frederic Block, Senior Judge
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Damion Hardy,
           04-cr-00706 (S6)(FB)

Dear Judge Block

This letter is respectfully submitted to urge the Court to conclude that Mr. Hardy is incompetent to proceed to trial. At the present time, as a result of a mental disease or defect – schizophrenia – he lacks a rational understanding of the legal process, of the charges against him, and is unable to assist in his own defense.

A.     Introduction.

Competency is a transient phenomena. Accordingly, courts must remain "alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." Drope v. Missouri, 420 U.S. 162, 181 (1975). Thus the circumstance that five months ago Mr. Hardy could carry on a calm conversation with his mother on a subject unrelated to his delusions has little bearing on whether he is competent in the days immediately leading up to his trial. Competnecy, as noted, can wax and wane.

In their March 11, 2015 memorandum (DE to the Court on the topic, defense counsel presented the following reasons suggesting that Mr. Hardy is no longer (if he ever was) competent to proceed. These will be discussed individually below.

1.     Mr. Hardy's belief that he be "exonerated" and/or strike a deal with the Government.

Mr. Hardy's views on this topic are not only "unrealistic," as Dr. Preston-Baecht put it, but delusional. Mr. Hardy simultaneously entertains the following beliefs: (1)

APP. 204

the Government knowingly, intentionally and deliberately put forward false evidence, in the form of lying cooperators, in the two past trials related to his case; (2), the Government is presently engaged in a conspiracy involving the prosecutors, Your Honor and defense counsel to put on an "illegal" case that also happens to involve many of the same lying witnesses from the earlier trials; but (3), once Mr. Hardy speaks with the Government he will be exonerated or otherwise set free. Mr. Hardy refuses to listen to advice from his counsel that a proposed proffer agreement in fact offers little protection against further use of any information he does provide and that statements made at such a meeting could compromise defense counsel's ability to defend him at trial.[1]

The idea that the Government would actually offer Mr. Hardy exoneration or a cooperation agreement is a delusion on a par with Mr. Hardy's belief that he is the President of the United States, the rapper Clifford Harris (T.I.) or that he is Jesus the Son of Mary. Mr. Hardy was the alleged leader of the RICO enterprise and is virtually the last man standing. He has accused the Government of deliberately putting on false testimony. He has a history of schizophrenic delusional thinking. He claims he is innocent of all wrongdoing but might "cop to something" if that's what it took. He ignores counsels' information that the Government has stated it cannot imagine the circumstances under which Mr. Hardy would be exonerated or freed and that any effort to cooperate would mean accepting responsibility for all past misdeeds, defined by the Government as all the crimes alleged against him in the present indictment as well as by the cooperators whom Mr. Hardy accuses of being liars. While the government might make a deal with Sammy the Bull Gravano in order to prosecute John Gotti, the situations are hardly analogous.

Mr. Hardy has asked his counsel hundreds of times to set up a meeting with the Government. He asked Dr. Dudley to do the same. He asked Dr. Preston-Baecht to do the same. He wrote a letter to the Government offering to waive his right to counsel at such a meeting. He refuses to let it go. Mr. Hardy's "fixation" on this topic (Dr. Preston-Baecht's description) prevents him from assisting counsel in the preparation of a defense.

2.   Mr. Hardy's continued belief in "Ethou Law" and, relatedly, the Supreme Court decision that ordered his release.

It is respectfully recalled that Mr. Hardy's belief that the Supreme Court has ordered his release under Ethou Law was the very premise on which it was determined by the Second Circuit that he could be forcibly medicated. Those beliefs have not gone away and virtually every conversation between Mr. Hardy and his counsel feature a

---

[1] See, e.g., United States v. Barrow, 400 F.3d 111 (2d Cir. 2006).

discussion of the fact that he should not be in jail and that the case cannot go ahead because the supreme Court ordered the dismissal of all charges. These beliefs prevent him from assisting counsel in preparing a defense.

3.       The "conspiracy" to proceed with an illegal case.

Mr. Hardy continues to believe that "there is no case" against him based on his fixation with the significance of the initial complaint against him. He further believes that defense counsel – should they only choose to do so – could have the case dismissed on an unspecified "technicality." He also believes that the Government, the Court and defense counsel (by failing to move for a dismissal on a technicality) have all conspired to have an illegal case presented to the jury. These beliefs prevent him from assisting counsel in preparing a defense.

4.       His co-defendant will plead guilty and Mr. Hardy will have his case dismissed.

There is no basis in reality for Mr. Hardy to think that his co-defendant will enter a guilty plea. And even were that to happen, there is no basis in reality that the charges against him would somehow be dismissed. Mr. Hardy is and has long been the Government's primary target of this RICO prosecution. These beliefs prevent him from assisting counsel in preparing a defense.

B.       Conclusion.

For the above stated reasons, and for all of the examples in the hundreds of pages of reports, hearing transcripts and other documents that illuminate Mr. Hardy's thought-disordered and delusional assessment of his case and the world around him, this Court should enter an order declaring that he remains incompetent.

Your Honor's attention to this matter is appreciated.

Respectfully yours,

Jean D. Barrett
David A. Ruhnke
Co-counsel to Damion Hardy

By:     /s/ David A. Ruhnke

C:\Case Files\Hardy\Competency\Memo (post-heairng) re competency (03-27-2015).wpd

**RUHNKE & BARRETT**
ATTORNEYS AT LAW

HON. FREDERIC BLOCK, SENIOR JUDGE
March 27, 2015
Page 4

Via ECF:     All parties

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x
UNITED STATES OF AMERICA,

      -against-

DAMION HARDY, also known as
"World,"

           Defendant.
--------------------------------------------------x

**MEMORANDUM AND ORDER**
No. 04-CR-706-FB-2

**BLOCK, Senior District Judge:**

Damion Hardy moves for an order declaring him incompetent to stand trial

pursuant to 18 U.S.C. § 4241.  Having considered the testimony and other evidence

adduced at a hearing held on March 24, 2015, as well as the parties' post-hearing

submissions, the Court finds Hardy competent by a preponderance of the evidence.

Accordingly, the motion is denied.[1]

To be competent to stand trial, a defendant must have "sufficient present

ability to consult with his lawyer with a reasonable degree of rational

understanding" and a "rational as well as factual understanding of the proceedings

---

[1]The Court's finding makes it unnecessary to decide whether the government
bears the burden of proving competency or whether the defendant bears the burden
of proving incompetency.  *See United States v. Nichols*, 56 F.3d 403, 410 (2d Cir.
1995) ("The federal statute providing for competency hearings does not allocate
the burden of proof, and neither the Supreme Court nor this court has decided as a
matter of statutory construction whether the government or defendant bears the
burden.").

APP. 208

against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960).  In 2008, both the government and defense counsel agreed that Hardy did not meet that standard as a result of paranoid schizophrenia.  In 2012, the Court authorized the Bureau of Prisons ("BOP") to involuntarily administer antipsychotic medication, both to address the danger he posed to others and to attempt to restore his competency. *See United States v. Hardy*, 878 F. Supp. 2d 373, 386-87 (E.D.N.Y. 2012). Addressing only the first of those two grounds, the Second Circuit affirmed.  *See United States v. Hardy*, 724 F.3d 280, 296-97 (2d Cir. 2013).

Status updates from BOP reflected improvements in Hardy's conditions, and defense counsel raised no objection to a November 2014 report from BOP psychologist Lea Ann Preston Baecht concluding that Hardy was competent to stand trial.  Last month, however, defense counsel reported continued difficulties communicating with Hardy.  Those concerns centered around Hardy's demand to speak with the government's attorneys, and his insistence that the charges against him would be dismissed once he did so.

The Court declines to infer from Hardy's conduct that he is unable rationally to understand the charges against him or to consult with counsel in preparing a defense.  To the contrary, Dr. Preston Baecht's report of March 23, 2015, paints an entirely logical picture:

2

> [Hardy] stated that he wishes to speak to the prosecutors because "after I tell them what I have to tell them, they'll see if I'm innocent or guilty." When asked exactly what information he could provide them, he stated he could give them names of new people they were not aware of as well as information on indiciauls already known to be involved in the case. He stated, [I have] a lot to offer." . . . When I asked him if he believed he would be exonerated and released if given the opportunity to meet with prosecutors, he stated that he would be exonerated because "I am innocent." At that point, it was explained that it was my understanding that his expectation of being released was completely unrealistic, and that typically individuals have to admit some wrongdoing in order to be offered a deal. At that point, he nodded and stated he wanted to cooperate and would be willing to "cop to some things."
>
> When asked if he has discussed other defense strategies with his defense counsel, he stated, "No, what's there to talk about?" He went on to say, "They don't have anything but cooperating witnesses. People that's lying . . . It's my word against their word. That's enough for reasonable doubt."

Gov't Ex. 6 at 18. This colloquy demonstrates that Hardy insists that he is innocent and that the case against him is based on the testimony of witnesses who are lying to secure more lenient treatment for themselves. It further demonstrates Hardy's rational—even sophisticated—understanding that it might be in his best interest to cooperate himself. Such beliefs are hardly delusional.

Other aspects of Dr. Preston Baecht's report, as elaborated by her hearing testimony, bolster the Court's conclusion that Hardy is competent. She reported that Hardy "may still endorse some delusional beliefs" concerning, for example,

3

his identity and the existence of a Supreme Court case ordering his release under "Ethou law." *Id.* at 15. She noted, however, that "he is no longer preoccupied with these beliefs to the extent that he cannot be re-directed or consider other possibilities." *Id.* Given Dr. Preston Baecht's extensive interactions with Hardy, the Court finds her opinion more persuasive than the contrary opinion of defense psychiatrist Richard Dudley, who met with Hardy for a total of four hours beginning in January 2015.

In addition, Dr. Preston Baecht's report and testimony are corroborated by other evidence. Hardy has filed *pro se* motions to dismiss the indictment and to have new counsel appointed. Both filings reflect Hardy's ability to present logical (if incorrect) legal arguments in an articulate manner. Although the motion to dismiss the indictment does mention the nonexistent Supreme Court case ordering his release, it does not—consistent with Dr. Preston Baecht's observation—so dominate Hardy's reasoning as to prevent him from making other, more rational points.

Finally, the Court has observed Hardy in person and by video. Previously obstreperous, Hardy was respectful during the March 24th hearing and in subsequent proceedings. The Court is confident that the change in Hardy's behavior betokens an improved rational understanding of the case and ability to

4

consult with counsel should he choose to do so.

For the foregoing reasons, Hardy's motion to be declared incompetent to stand trial is denied.

**SO ORDERED**.


/S/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge


Brooklyn, New York
April 1, 2015

5

APP. 212

Gardens?

A    Yes.

Q    And about how much time had passed from the trial until you learned she was back in Lafayette Gardens?

A    It was a little while, I don't remember the exact time span, but it was after Fruit had blew trial.  It was-- we wasn't really thinking about her.

Q    When you say, blew trial, was he convicted?

A    Yes.

Q    Did you learn at some point that Theresa was back in Lafayette Gardens?

A    Yes.

Q    Who did you learn it from?

A    World.

Q    Can you tell us what happened?

A    I was in the back of the projects one evening with-- watching Dante, he was working for us.  And World came back there and told me that Theresa is in the front of the projects.  She is selling a coat or sweater or something.  She walking back this way, with I think her mother and her sister and I should have Dante hit her when she get back there.

Q    So what did you do?

A    I got Dante a hoodie, I believe.  I gave him a gun and I told him that she was coming down DeKalb and I-- he should hit her once she get to DeKalb and Kent.

RB    OCR

Q    Do you remember where that initial conversation was with World?

A    I believe it was in the middle of the projects in the back, on the strip basically.

Q    And can you describe his demeanor?

A    He was like he was in a rush telling me she coming back here right now.  Have Dante hit her.  Let me get in the car and leave before you do it.  You know, that was it.

Q    How soon after that did you give Dante a gun?

A    I didn't have the gun on me.  I had to take him in the building and give him the gun.  I think I gave him a hoodie too and--

Q    What kind of gun did you give him?

A    A 380.

Q    Where did he go?

A    He went towards DeKalb where she was-- where he was standing before and where she was walking.

Q    Do you know if he shot her?

A    Yes.

Q    Were you present when it happened?

A    No.

Q    Now, when you had that conversation with World, this was after the trial, correct?

A    Yes.

Q    After the conviction?

RB    OCR

A    Yes.

Q    Why was it important to shoot at Theresa at that time?

A    To show that she couldn't get away with what she did.

Q    Which was what?

A    She testified against a member of CMB.

Q    And was the intent to shoot her to injure her or kill her?

A    He was supposed to kill her.

Q    Now, Mr. Bryant soon after this incident with Theresa, did you get arrested for the shooting of William?

A    Yes.

Q    And, did you plead guilty to that?

A    Yes.

Q    What did you plead guilty to?

A    I believe it was weapons possession.

Q    How much time did you get?

A    Two and a half to five.

Q    Did you serve two and a half to five?

A    No, I served 5 years and 10 months.

Q    Why was that?

A    I caught another charge in jail.

Q    Which was what?

A    Promoting prison contraband.

Q    What does that actually mean?

A    I got caught with a razor.

RB    OCR

Q    As a result of having a razor in jail, did you get additional time to the original sentence?

A    A one and a half to three.

Q    When did you-- while you were in jail, did you stay in touch with World?

A    Sometime.  I spoke to him a few times.

Q    Did he ever discuss the Bloods with you during that time?

A    Yes.

Q    Can you tell the jury what that conversation was about?

A    I was hearing on the street that he had gotten down with the Bloods, that he was the leader of the Bloods in Bed Sty Brooklyn, and I thought it was stupid and I told him so.  I told him that, the Bloods is like an automatic RICO in the Feds, and that he should leave it alone.  He act surprised, like he didn't know that, and I heard he left it alone.

Q    Before you went into jail, had he had any litigation with the Bloods?

A    No.

Q    And did he tell you about what if anything he had done with Bloods members?

A    After I came home?

Q    Yeah.

A    Yes.

Q    What was that?

A    He told me that they was praising him and so he ran with

RB    OCR

Bryant - Direct - Dayananda                242

BY MS. DAYANANDA:

Q    Mr. Bryant, when you were out of jail in November of 1999, did you hear of what happened to a person by the name of Kojak?

A    Yes.

Q    Can you tell the jury what you learned and who did you speak to about that?

A    I spoke to a few people about it. I heard that he was killed because he-- it was his gun that killed Wise.

Q    Did you learn who killed him?

A    Yes.

Q    Who was that?

A    Thor.

Q    Now, again this happened while you were in jail; is that right?

A    Yes.

Q    Is this while World was in jail as well?

A    Yes.

Q    And, why was Kojak killed?

A    Because it was his gun that he passed around and that killed Wise.

Q    Where was Wise killed?

A    In LG.

Q    You mentioned that you learned of the cousin of Peanut that killed Wise; is that right?

RB    OCR

Bryant - Direct - Dayananda                243

A    Yes.

Q    Did you learn that person's name?

A    Yes, but I don't remember it today.

Q    Nickname, do you remember?

A    No.

Q    Now, when you first got out of jail, did you learn, or did you have any concerns about what role Thor had, if any, in the death of Wise?

A    Say again.

Q    What role Thor had, if there were any rumors about what role he might have played in the death of Wise?

A    Did I hear of any?

Q    Yes.

A    No.

Q    And, do you know where Kojak was killed?

A    In 456.

Q    Now, you had mentioned before we took our afternoon break that you also knew Peanut; is that correct?

A    Yes.

Q    Now, once World stated to you that he had to go, did this get back to Peanut?

A    Not that I know of. I mean I didn't tell him that.

Q    Did you have any conversations with Peanut about what World had mentioned?

A    No, I didn't. I had conversations with him but I didn't

RB    OCR

Bryant - Direct - Dayananda                244

tell him what World mentioned.

Q    Did he already know?

A    I think he was suspicious of that.

Q    What were your conversations with Peanut?

A    He was calling me when I first came home and telling me that-- he know I was in contact with World. He know World would be calling me. He was telling me that like to relay to World that he didn't have nothing to do with that.

Q    Nothing to do with what?

A    World's brother getting killed.

Q    And did you tell World that Peanut was saying he had nothing to do with his brother's death?

A    Yeah, I told him.

Q    What was World's response?

A    It didn't matter.

Q    Meaning what?

A    It didn't matter if he knew he didn't stop it. He was responsible.

Q    And that is what World stated?

A    Yes.

Q    Even if he didn't have anything to do with it, meaning Peanut, if he didn't stop it. He is just as liable?

A    Yes.

Q    Now, did you make any attempts to shoot at Peanut?

A    Yes.

RB    OCR

Bryant - Direct - Dayananda                245

Q    Can you tell the jury about that.

A    Well, I heard that he was on DeKalb and Bedford one night. So I went over there to try to catch him. He wasn't there.

Q    How did you learn about that?

A    I can't remember who told me but somebody told me he was over there.

Q    Is World out of jail or still in jail at this time?

A    World is in jail.

Q    Did Peanut ever make any attempts to shoot at you?

A    Yes.

Q    Can you tell the jury what happened?

A    Probably a couple of weeks after that, I was standing on the side of 433 with Thor and E-Bay and Peanut came from behind 433, and he fired, he fired at us. His gun jammed up after it went off one time. He started running. One of the guys that was with me, was running too, he knocked me down. Thor was started firing back at Peanut. When I got up, I really could not see where he was, but I started firing in the direction that Thor was firing.

Q    Let me back up. Before this attempt where Nut is shooting at you guys at 433, were there other attempts that had been made at Nut shooting wise?

A    Before I came home, I heard E-Bay and he had somebody else with him, he shot a truck up or something that was in --

RB    OCR

Q That Peanut was in?

A Yes.

Q And, did Nut ever speak to you about E-Bay?

A Yeah, when he was calling me at the same time he was telling me that to tell World he had nothing to do with it, he telling me he wanted E-Bay.

Q Why is that?

A He just was cussing about how E-Bay wasn't nobody and he had shot at him and he-- like he had no business shooting at him. He wanted E-Bay for that.

Q Meaning Peanut wanted E-Bay for that?

A Yes.

Q So that conversation you had with Peanut was after E-Bay had taken a shot at him; is that right?

A Yes.

Q Why was Peanut having these discussions with you?

A Like I said, I knew him, I grew up with him. He knew how close I was to World. He knew that World was calling me. So he wanted World to know what he was telling me.

Q Getting back to the incident where Peanut shot at you guys. I will show you Government Exhibit 108-D.

Are the T.V. screens?

COURTROOM DEPUTY: There you go.

Q Can you tell us what we see here.

A You see where me, E-Bay and Thor were standing when

RB    OCR

A Peanut shot at us. We were standing right here leaning against this fence.

Q Can you show us how you were leaning against the fence, can you demonstrate it?

A Leaning against the fence like this, facing in the parking lot.

Q So for the record, the witness just put both of his hands across his chest horizontally, is that right, Mr. Bryant?

A Yes.

Q That is how you were leaning with who?

A E-Bay and Thor.

Q And, who started shooting first?

A Peanut shot at us.

Q How many times?

A Once.

Q Did anyone get injured?

A No, it hit the fence.

Q Which fence?

A The fence we were leaning against.

Q Is that what we see there in Government Exhibit 108-D?

A Yes, this black fence.

Q Did you fire back?

A Yes.

Q What gun did you have at that time?

A A 380, I believe.

RB    OCR

Q Do you remember if Thor fired?

A Yes.

Q Do you know what kind of gun he had?

A A 40-caliber.

Q Did E-Bay fire?

A No.

Q Did he have a gun?

A No.

Q None of you were injured; is that right?

A Correct.

Q Now, at some point, does World get out of jail?

A Yes.

Q Do you remember when that was?

A A few months after me, I don't remember the month.

Q So is this in 2000?

A Yes, I believe so.

Q Do you see him on the day he gets out of jail?

A Yes.

Q Can you tell us what happened?

A Taz went to pick him up and I met him downtown on the side of the mall where I was with his mother. And Taz pulled up and he got out.

Q You say, downtown, where do you mean?

A Downtown Brooklyn.

Q You said Taz picked him up?

RB    OCR

A Yes.

Q So who was all there when you first met with him?

A Me, his mother, Taz, I believe Thor.

Q What did you guys talk about then?

A Nothing in particular I can remember.

Q Did you meet up with him after that?

A Yeah, all of them.

Q Where was he living at that time?

A In Manhattan.

Q Where?

A In Harlem, Manhattan.

Q Why was he living in Harlem?

A He had parole stipulations that banned him from Brooklyn.

Q Did he still come to Brooklyn?

A Yeah.

Q Now, you had mentioned that Taz had been put in charge to manage Lafayette Gardens; is that right?

A Yes.

Q What happened once World returned home, who took over?

A World.

Q Once World gets out of jail, how often are you seeing him?

A Every other day.

Q Were there discussions to-- about Wise's death?

A Yes.

RB    OCR

Q   What about Thor?

A   He had a 40-caliber.

Q   Why do you remember that?

A   I know guns.

Q   Did you meet up with World after that?

A   Yes.

Q   Did you tell him what happened?

A   Yes.

Q   What was his response?

A   He started getting on me about missing.

Q   Meaning what?

A   He told me, I must be rusty, I missed and I blew my cover like, because before that, Peanut didn't know to look for me. He was never supposed to know, I would come for him, and I blew that.

Q   Up until that point you had been still talking to Peanut; is that right?

A   Yes.

Q   After that shootout, did you speak to Peanut again?

A   No.

Q   How did World feel about you missing?

A   He was mad.

Q   How did you feel?

A   I felt mad too.  I started to tell him it was Thor's fault.

RB     OCR

Q   Why is that?

A   Because I sent Thor around to cut Peanut off so he would not be able to run around the truck like he did.  If he did what I told him, he would have got him there.

Q   Thor didn't do what you asked him to do?

A   No.

Q   Were you ever present with World when he saw Peanut during this time period?

A   Yes.

Q   Tell the jury that time?

A   Somebody said that Peanut was parked on Franklin and Gates and World came and got me.  He was being driven by his cousin and I had a 380 on me, and we got in the car and we rode down there.  We rode passed Peanut.  He turned the corner, stopped.  Whoever told us he was over there, said that he had a 40-caliber sitting on his lap, and he was dressed up, like dress pants, suit attire.

And, World was like, he wanted to go over there and hit him right there.  I told him it was not a good idea, he had a gun on his lap.  He could not make it around that corner without being noticed.  And he was upset and he said, they don't even got to change him, they can put him in the box how he is right now.  Give me the gun.

Q   Did you give him the gun?

A   I told him it wasn't a good idea and I didn't give him

RB     OCR

the gun.

Q   Who was in the car with you at that time?

A   Me, him and Heimie.

Q   Who is that?

A   His cousin.

Q   What did he mean when he said he didn't have to go change him?

A   Meaning that he was dressed for a funeral right there.

Q   Is there any attempt made at Nut by World on that day, any shooting?

A   No.

Q   Now, in addition to Nut, did World hold-- you mentioned JR, you mentioned Nut.  Did World hold anyone else responsible for the death of Wise?  Later on, did you learn?

A   Not holding responsible, but if you was a friend of the enemy, you were the enemy.

Q   Did you learn about a new friend of the enemy from World?

A   Yes.

Q   Who was that?

A   Hommo.

Q   H-O-M-M-O.

What was Hommo's real name?

A   Darryl Baum.

Q   Can you explain how he became a friend of the enemy as you said?

RB     OCR

A   The word in the street, he was being seen with Peanut and World said he ran into him at the barber shop and Hommo told him, I ain't know Wise was your brother.  World said, so he took it as, now you know Wise is my brother, and you running with Peanut so you got to go too.

(Transcript continues on next page.)

RB     OCR

A. BRYANT - DIRECT BY MS. DAYANANDA                345

Q     And who would the balance go to?

A     World.

Q     And you described that in your testimony last week. Can you tell us by your estimate about what you saw; how much money was Cash Money Brothers making?

A     Well, it varied at different times.  In the early 90's, between eight to 10,000 a day.

            THE COURT:  Who were most of your customers?

            THE WITNESS:  What do you mean by "who"?

            THE COURT:  Who was buying all this dope?  You were selling to somebody.

            THE WITNESS:  Yeah.

            THE COURT:  Where did they come from?

            THE WITNESS:  The neighborhood.

            THE COURT:  All people in the neighborhood?

            THE WITNESS:  Yeah, and the outskirts of the neighborhood.

            THE COURT:  And they took it and sold it who knows where.

            THE WITNESS:  No, they used.

            THE COURT:  They used it?

            THE WITNESS:  Yeah.

            THE COURT:  These are people from the neighborhood?

            THE WITNESS:  Yeah.

*Mary Agnes Drury, RPR*
*Official Court Reporter*
APP. 217

A. BRYANT - DIRECT BY MS. DAYANANDA          346

THE COURT:  They are buying your drugs and using it?

THE WITNESS:  Yes.

THE COURT:  All right.  Next question.

BY MS. DAYANANDA:

Q    Just to clarify the Judge's question:  Were these individuals buying a certain amount of weight from Cash Money Brothers or buy them as users of crack?

A    Users, trays.

Q    Trays.  And you described what a vial was, less than an inch of crack cocaine; is that right?

A    Yes.

Q    Now, you said eight to $10,000 a day; is that right?

A    In the early 90's.

Q    And did that change?

A    Yes.

Q    And why was that?

A    Why?  Well, I went to jail.  When I came home, it wasn't making as much as it used to.

Q    When you are saying eight to $10,000 a day, you're talking about from the early 90's until -- you went to jail in 1994?

A    '94.

Q    Now, you mentioned that -- the story of when you told Damion Hardy that you fell short by counting the money by

A. BRYANT - DIRECT BY MS. DAYANANDA        355

Q    This was a three-way conversation then?

A    Yes.

Q    And at that point, was Hood speaking on behalf of World?

A    Yes.

Q    Can you tell us what happened, what you learned happened at that club?

A    He said when they came out the club, they seen Peanut standing, like, in the street in front of his truck, and he had two guys with him.

He said their guns was visible, like, he knew they had guns on them, the two guys that was with Peanut.

So he said Peanut kept asking World, let me talk to you. And World was like, like, standing there, like, blank. And he kept saying, let me talk to you. Where we can go talk at? And World replied, where my brother at?

Q    And what was -- why was world so angry about this confrontation?

A    Because he wasn't able to do nothing to Peanut.

Q    And what happened as a result of that?

A    At that time World said, "I want to go where my brother at." And Peanut replied, "that could be arranged." And World told Hood -- Hood is telling me this. World told Hood, "Let me get the gun." And Hood said, "We have a small caliber gun," and I didn't want to give it to him, and they

A. BRYANT - DIRECT BY MS. DAYANANDA          356

left.

Q    And when Peanut responded "that could be arranged," what did you take that to mean?

A    That World could be killed, too.

Q    Now, you said that World couldn't speak.  Why was that or --

A    He was very angry.

Q    And what was your response to this conversation?  How did you feel?

A    I told him.  I told him not to go out until we get this dude, because the dude got a slick mouth, and when you see him, he's going to talk slick.  So you shouldn't went out when you ran into him and heard that.

Q    The dude you're talking about, is that Peanut?

A    Yes.

Q    And had you asked World to not go out to night clubs during this time?

A    Yes.

Q    Why was that?

A    Because Peanut frequented all the night clubs in Manhattan at the time.

Q    Did you ever go out to the clubs?

A    Once or twice.

Q    Did World go more often?

A    Yes.

*Mary Agnes Drury, RPR*
*Official Court Reporter*
APP. 220

A. BRYANT - DIRECT BY MS. DAYANANDA          363

wanted to kill Mike Tyson.

Q    Let me just back up.  When you say "money" -- when he said there was money on his head, what does that mean?

A    That somebody was paying for a contract on him.

Q    To kill World?

A    Yes.

Q    Who did he say was paying that contract?

A    Mike Tyson.

Q    And which murder was he referring to?

A    Homicide.

Q    Now, did you learn there was a relationship between Mike Tyson and Homicide?

A    Yes.

Q    What was that?

A    That that was a childhood friend and his bodyguard, I guess.

Q    Who was present when World mentioned that Mike Tyson had a --

A    Say again.

Q    Who was present for this conversation?

A    All the names I just named; me, E-Bay, World, Taz, Thor, and Moo.

Q    And was there any concern about what World wanted to do?

A    Yes.  We all was -- but Moo probably spoke the loudest

A. BRYANT - DIRECT BY MS. DAYANANDA          364

saying Mike Tyson was Muslim and we shouldn't kill a Muslim.

Q    Did World agree?

A    No.  World said, you know, I'm Muslim and he put that money up.

Q    Was there any decision made at that time as far as what to do concerning the Mike Tyson threat?

A    I mean, you can say we were split, because Moo was saying don't do it because he's Muslim, but World was saying it doesn't matter.  So, I mean, if World would have called us and we synced with him, we would have did it.

Q    Did anything happen concerning Mike Tyson?

A    No.

Q    Now, you said that you had -- were in Schenectady before this.  Did you go to Schenectady after Peanut's murder?

A    I believe so.

Q    And you said you were selling drugs there; is that correct?

A    Yes.

Q    Who were you selling drugs with?

A    With?

Q    With.

A    Myself, a guy -- it was different guys selling up there, but I was mainly selling for myself.  And if I get drugs on consignment, I would sell those.

*Mary Agnes Drury, RPR*
*Official Court Reporter*
APP. 222

A. BRYANT - DIRECT BY MS. DAYANANDA        365

Q    Who were you getting the drugs from?

A    I would get drugs from World, and I would buy drugs also.

Q    What was the reason to go to Schenectady?

A    It was a lot more money being made, to be made than in Brooklyn.

Q    Why is that?

A    Because the coke prices are higher.

Q    And you said you would get your drugs from World at times; is that right?

A    Yes.

Q    Can you explain how that worked?

A    He would give me some weight in drugs and would tell me how much to bring back.

Q    When you say "weight" can you explain that to the jury?

A    Wholesale, like, if he gave me a wholesale amount of drugs for 8,000 and he told me to bring back 16,000, I would bring it back, because I would probably be making about 24,000.

Q    And that's because the prices were higher in Schenectady?

A    Yes.

Q    When he gave it to you, would it be on consignment?

A    Yes.

Q    Was he able to make money off the higher prices as

A. BRYANT - DIRECT BY MS. DAYANANDA        366

well?

A    Yes.

Q    Now, you had told us that there was parole violation for you; is that right, at this time?

A    Yes.

Q    And at some point did you get arrested for that parole violation?

A    Yes.

Q    And what -- did you get stopped in a vehicle?

A    Yes.

Q    And what happened as a result?

A    They stopped me and I had a fake driver's license.  And they took me down for the driver's license and found that I had a warrant and they locked me up.  I did a year.

Q    What year was that?

A    '01/'02.

Q    Now, while you were in prison for that parole violation, were you interviewed by the New York Police Department concerning the death of Peanut?

A    Yes.

Q    And were you asked questions?

A    Yes.

Q    Were you asked about your involvement?

A    Yes.

Q    And did you tell them the truth on that?

Mary Agnes Drury, RPR
Official Court Reporter
APP. 224

A. BRYANT - DIRECT BY MS. DAYANANDA          367

A    No.

Q    When did you get out after that year, do you remember?

A    '02, around summer.

Q    Summertime of 2002?

A    Yeah.

Q    Where did you go at that time?

A    I paroled to my mother-in-law's house.

Q    Where was that?

A    345 Classon.

Q    That's back in LaFayette Gardens; is that right?

A    Yes.

Q    Now, what's the -- what's kind of the state of Cash Money Brothers at that time?

A    It's kind of divided.

Q    What do you mean by that?

A    Everybody's kind of breaking off into their own little thing.

Q    Was there anyone who was in LaFayette Gardens on behalf of World?

A    Yes, I believe it was Stro.

Q    Who is Stro?

A    Some new guy World started bringing around.

Q    Did you know him before you went to jail?

A    No.

Q    Let me show you what's been marked for identification

*Mary Agnes Drury, RPR*
*Official Court Reporter*
APP. 225

A. BRYANT - DIRECT BY MS. DAYANANDA          368

as -- I don't believe it's in evidence yet.  This is
Government Exhibit 13.

MR. RUHNKE:  That's fine.

THE COURT:  You want 13 in evidence at this time?

MS. DAYANANDA:  Yes, your Honor.

THE COURT:  No objection.  In evidence.

(Government Exhibit 13 is admitted into evidence.)

BY MS. DAYANANDA:

Q    Do you recognize that photo, Mr. Bryant?

A    Yes.

Q    Who is that a photo of?

A    Stro.

Q    And just to clarify, this is now the summer of 2002; is
that right?

A    Yes.

Q    That you meet Stro?

A    Yes.

Q    And who would set up Stro in LaFayette Gardens?

A    World.

Q    Did he have workers there as well?

A    Yes.

Q    Where was World living at that time?

A    I think in Jersey.

Q    In Jersey?

A    I believe so.

A. BRYANT - DIRECT BY MS. DAYANANDA                369

Q    With who?

A    With his girlfriend.

Q    Who was his girlfriend at that time?

A    Kim.  Lil' Kim.

Q    And did you -- what, if anything -- did you speak to World when you got out of jail?

A    Yes.

Q    And what, if anything, was he doing concerning Lil' Kim and her profession?

A    He was trying to promote her and trying to start his own label at the same time.

Q    What -- was she a musician?

A    Yeah, she's a rapper.

Q    And you said he tried to start his own music label?

A    Yes.

Q    Did you, in any way, help World with Lil' Kim's career?

A    Well, if he asked me to do something, I would do it. If he asked me to go to the radio station and make sure that the disc jockey get a vinyl, I went.

Q    Can you explain what that means, "the disc jockey gets the vinyl"?

A    A vinyl is an album.  He had one of his artists had an album and he wanted the disc jockey to play it.

          I went up there -- first he called me to the car, I didn't know where I was going, but he drove around the

A. BRYANT - DIRECT BY MS. DAYANANDA          370

corner from me and told me to go out and give it to the guy. And I waited in front of the place with Stro and I gave it to the radio disc jockey. And the radio disc jockey was saying, "Tell World I can't play it as much as he wants me to play it, he'll just have to kill me."

Q     What radio station was that?

A     Hot 97.

Q     Did you learn from World concerning going to Source Magazine?

A     Yeah, he told me he was going up there.

Q     What is Source Magazine?

A     It's a hip hop magazine.

Q     Why did he tell you he was going there?

A     He told me he was going to give the cover to Source Magazine.

Q     Did he ask for anything at that time?

A     Yeah, he wanted jewelry.

Q     Did you have jewelry?

A     Yes.

Q     And why did he say he needed jewelry?

A     He said that's what they understand, that's what they respect.

Q     So you gave him your jewelry?

A     No.

Q     And did you go with him at that time?

A. BRYANT - DIRECT BY MS. DAYANANDA          386

Ms. Hardy's after Peanut's death?

A    Yes.

Q    And who was Moo friends with?

A    Taz.

Q    Did you at some point become close with Taz?

A    Yes.

Q    I'm directing your attention to 2003 now.  Where were you living at that time?

A    Virginia.

Q    And before Virginia, I'm going to direct your attention to August of 2003.  Did you have a conversation with World about a person by the name of T-Rock?

A    Yes.

Q    Who is T-Rock?

A    Homicide's brother.

Q    Do you know his real name?

A    Whose real name?

Q    T-Rock's real name?

A    Tyrone Baum.

Q    And did you know Tyrone Baum?

A    Not personally.  I seen him.

Q    And can you tell us what you learned in that conversation that you had with World?

A    World told me that he was home and that he wanted to kill him, and that people in jail was betting that he was

A. BRYANT - DIRECT BY MS. DAYANANDA          387

going to be the one that was going to kill him.

Q    When you say "he was home" who are you referring to?

A    T-Rock.

Q    Where was T-Rock at the time of his brother's death?

A    In jail.

Q    And what did -- where did this conversation take place, do you remember?

A    In front of 433.

Q    And what was his concern about T-Rock getting out of jail?

A    That he would try to revenge his brother.

Q    Meaning, he would come after World?

A    Yes.

Q    And as a result, what was World's response?

A    World said he had the gun.

Q    What was your response?

A    I just agreed.  And he was like, yeah, there is some money involved, too.

Q    When you say there was money involved, that was different from the other murders that you participated in?

A    Yes.

Q    Did he tell you at that time why there was money involved?

A    No.  I just -- I brung up the fact that instead of the hustle and bustle of selling drugs, I said I'd rather just

A. BRYANT - DIRECT BY MS. DAYANANDA          388

do hits.  And he said, yeah, there is money involved with

T-Rock.

Q    The hustle and bustle of selling drugs, what did you

mean by that?  Had things changed in the terms of drug

activity?

A    Yeah, it was slow in Brooklyn, and it was a headache.

There was a lot of losses, and I didn't want to deal with

that.

Q    And you felt it was easier to be a hitman; is that

correct?

A    Yeah.

Q    Now, did he mention how much money was involved at that

time?

A    No.

Q    Did you later learn how much money would be involved?

A    No, not exact number.  I don't remember.

Q    Now, I'm going to show you what's been marked as

Government Exhibit 1009.

          MR. RUHNKE:  I'm not sure what it is.

          MS. DAYANANDA:  It's a photo of the victim.

          THE COURT:  Another photo?

          MS. DAYANANDA:  You have it.

          MR. RUHNKE:  May we see it?

          MS. DAYANANDA:  Sure.

          THE COURT:  1009 is a photo.  That's the photo of

BRYANT - DIRECT - DAYANANDA                    405

Q    At some point did federal agents come talk to you?

A    Yes.

Q    And did they -- at some point were you arraigned here in Brooklyn in the federal court?

A    Yes.

Q    What were you arraigned on, what charges?

A    It was a drug conspiracy, 50 grams or more drug conspiracy.

Q    Were you charged with any murders at that time?

A    No.

Q    And who was present for that arraignment?

A    Me and World.

Q    I just wanted to go back to one thing concerning that van, Mr. Bryant.  Did you learn what had happened?  Whose van was that?

A    Abu Bakr's.

Q    And did you learn what, if anything, happened to that van?

A    We met up with him, and he said that they was looking for it.  He had detailed it, he said, but then he decided to get rid of it.

Q    And did you learn where he got rid of it at?

A    In Pennsylvania.

Q    I also want to go back to T-Rock's murder.  Did you learn from Taz if he had any motive in terms of T-Rock?

BRYANT - DIRECT - DAYANANDA                406

A    Yes.

Q    What was that?

A    That T-Rock was supposedly somehow involved with his father's death.

Q    And do you remember who you learned that from?

A    Moo.

Q    And in terms of -- do you remember when you learned that?

A    No.

MS. DAYANANDA:  Can I have a minute, your Honor?

THE COURT:  Do you think we can finish before our lunch break?  It would be a good thing to do if we could.

How much more do you have?

MS. DAYANANDA:  Probably ten minutes, your Honor. I just need to gather my thoughts.

THE COURT:  It's not that it's critical, but it's an actual break.

MS. DAYANANDA:  I agree.  One second.

(Brief pause.)

BY MS. DAYANANDA:

Q    I just wanted to clarify one thing that you mentioned before concerning a shootout that occurred in front of 433 with Peanut.

A    Yes.

Q    Do you remember that?  You described it as being the

L. JOHNSON - DIRECT BY MS. PAUL                652

Q    So what did he tell you about what was the result of the fight with the bouncer?

A    Just that his brother got beat up and that the bouncer was killed.

Q    Did he tell you by whom?

A    Yes.

Q    Who was that?

A    He said by Tookie.

Q    Do you know Tookie?

A    I met him before.

Q    Who did you know him to be?

A    A young guy coming up in the community.  He was a young guy, much younger than me.

Q    When you were around in the early 90's, was he in the CMB?

A    No, he wasn't.

Q    Was he that much younger than you?

A    Yes, he was.

Q    Did there ever come a point that you heard about anyone being Blood that was in CMB, a member of the Bloods street gang?

A    Yes.

Q    What did you learn about that?

A    I learned that a few members of the crew had turned Blood.

L. JOHNSON - DIRECT BY MS. PAUL                653

Q    When?  Around what time did you learn that?

A    Around 1995, '96.

Q    Who were some of the members that you learned turned Blood?

A    Hastings, World, Popsie, I think that's it.

Q    Did that somehow -- being a member of the Bloods, did that end the relationship with CMB or were these people a member of both groups?

A    They were a member of both.

Q    You told us before we broke you went back in around 1998, that you started selling drugs in LaFayette Gardens while World was in jail?

A    Yes, I did.

Q    When that happened where was Wise?

A    He was in LaFayette Gardens.

Q    Did there come a point that you began to sell at LaFayette Gardens that you had a conversation with Peanut?

A    Yes, I did.

Q    What happened?

A    He -- Peanut asked me did I want to sell drugs with him again.

Q    Was he working alone or with other people?

A    He was actually working alone, but he was hanging around other people.

Q    Who were some of those people?

*Mary Agnes Drury, RPR*
*Official Court Reporter*
APP. 235

Z. SARKISSIAN - CROSS BY MR. HERMAN          920

it be equally true that you joined a particular crowd, right?

A    Yes, of course.

Q    I mean, you weren't from Brooklyn, right?

A    No.

Q    You didn't grow up in LaFayette Gardens, right?

A    No.

Q    You had a pretty middle class upbringing; is that right?

A    Yes.

Q    And at some point you chose to associate yourselves with individuals who were committing crimes around LaFayette Gardens, right?

A    Yes.

Q    And you were living in Queens at the time; is that right?

A    Right.

Q    And you come from Queens to Brooklyn, the area of LaFayette Gardens, to associate with certain individuals; is that right?

A    Right.

Q    And did they have a name, this group?

A    No.  Back then they didn't -- not to my knowledge.  I never heard of CMB before.  I just knew, like, World and his boys.

Z. SARKISSIAN - CROSS BY MR. HERMAN        921

Q    Well, you said CMB.  Do you know what that stands for?

A    Now I do.  After the indictment I understood it for Cash Money Brothers, but I hadn't heard of that name beforehand.

Q    And you were -- the indictment that you speak about, when did that take place?

A    In 2005 when I was arrested.  Well, that was my first knowledge of the indictment, when I got arrested.

Q    All right.  So is it fair to say -- you tell me if I'm right or wrong -- the whole time you're hanging out at LaFayette Gardens and doing all these criminal activities, you never heard of Cash Money Brothers?

A    Not that name, no.

Q    Any name?

A    No.

Q    So this was just a group of guys that you hung out with around LaFayette Gardens; is that right?

A    Yes.

Q    And Cash Money Brothers, that never even got mentioned to you, right?

A    Nope.

Q    All right.  Let me just take you up to -- you get arrested July of 2005, and at that point for about three years you've been going straight, right?

A    Yes.

Footman - direct - Paul                    1888

**R O B E R T   F O O T M A N,**

    called as a witness, having been previously duly

    affirmed, was examined and testified as follows:

DIRECT EXAMINATION (Continuing)

BY MS. PAUL:

Q    Good morning, Mr. Footman.

A    Good morning.

Q    Just follow-up on two things yesterday we spoke about. You spoke about Munchie and shooting Munchie yesterday.

    Did there come a time when you were charged with that crime that you asked anybody to tell a lie for you about what happened?

A    Yes.

Q    Who was that?

A    That was my baby-mother.

Q    What did you ask her to do?

A    She testified that I was with her on the night it happened.

Q    Instead of shooting Munchie?

A    Yes.

Q    All right.  Also, you spoke about members of the CMB. Did there come a time when anyone in the CMB became a Blood, part of the Bloods street gang?

A    Yes, a couple.

Q    Who were some of the people that became Bloods?

VB    OCR    CRR

APP. 238

Footman - direct - Paul                1889

A    Popsie, World, I believe Big Jims, but I'm not really sure. I don't remember.

THE COURT: Keep your voice up.

THE WITNESS: Not too clear on that.

Q    Okay. So, you said Popsie, World and Big Jims you're not too clear on?

A    No, on Big Jims.

Q    Okay. So, Popsie was one?

A    World.

Q    World was the second. An you're not sure whether Big Jims did or not?

A    Right.

Q    Okay. All right. Going back to where we left off when you were selling drugs for Wise after you came home from jail in 1996. You told us that you almost got shot by Nut.

After that, did you do anything to retaliate?

A    Yes.

Q    What happened?

A    When Nut came, when he came to the projects, he went in the building -- I tried, I went in the building and I tried to find him, couldn't find him.

Q    What was your intention when you went into the building to find him?

A    I went to shoot him.

Q    But you never got the chance to?

VB     OCR     CRR

APP. 239

Footman - direct - Paul                    1929

A      No.

Q      You said that during this time you were selling drugs in Coney Island?

A      Yes.

Q      Did you ever give World any money around this time?

A      Not at this time.

Q      Did there come a time where you were saving money to buy a car?

A      Yes.

Q      What happened to that money?

A      Well, World asked me to borrow it.  He said that when he get his money back from his girl he'd give it back to me.

Q      How much money was it?

A      $3,000.

Q      You gave it to him?

A      Yes.

Q      Did he give it back to you?

A      No.

Q      When you said this girl is going to gift back to him, who was it talking about?

A      Little Kim.

Q      Who is Little Kim?

A      Rapper; it was his girlfriend.

Q      Sometime after Peanut died, did you start selling drugs for World again?

GR        OCR        CM        CRR        CSR

APP. 240

Footman - direct - Paul                    1930

A    Yes.

Q    How did that happen?

A    I saw him and he's with Stro.  That's when I first met Stroe.  He was like yo, I want you to hold Stro down while we get the fees back pumping.

Q    The fees of the project?

A    Right.

I was like, all right.

Q    Was that the first time you met Stro?

A    Yes.

Q    What happened after that?

A    He started selling drugs in the project.

Q    When you did so, when you went back to Lafayette Gardens, was anybody else selling there?

A    Yes.

Q    Who?

A    Jimbo, Deezo -- I mean, excuse me.  DJ.  I believe Popsie.

Q    I am going to show you Government Exhibit 13, which is in evidence.

A    Stro.

Q    You said that Jimbo, DJ and other people were selling drugs at that time?

A    Yes.

Q    Were they selling for World or for someone else?

GR        OCR        CM        CRR        CSR

APP. 241

Footman - direct - Paul                    1931

A    No.  Everybody was their own work.

Q    When you started to sell, how did that start?

Who were the workers?

A    It was me, Stro and Popsie.  Popsie had got some workers from the first floor.  He was selling the work for us.

Q    You were the lieutenants?

A    Yes.

Q    Where were the workers selling drugs?

A    In the front of 433 and around the building also.

Q    Again, it was crack cocaine?

A    Yes.

Q    Was it the same way when you had been a lieutenant back in 1995 or a worker in the early nineties, was it done the same way?

A    No.

Q    What was different?

A    We didn't have as much.  We -- we bagged up different places.

Q    Where did you bag up?

A    Either bag up at Stro house or -- or time we bagged up at my house.  Stuff like that.

Q    How about cooking, was cooking the same?

A    World cook it.  He cooked it at Stro house before.  We cooked it in -- in another place.  Somewhere in one of the apartments.

GR    OCR    CM    CRR    CSR

APP. 242

Myers - Direct - Amatruda                     2310

THE JUROR:  World.  When I finally saw him, I remember him explaining to me that Troy had to go.  He was describing how he was mentally off, and how dude was going to try to use him to basically assault someone in the team.

Q    And did you have an understanding based on your participation in the drug-dealing from CMB and other activities as to what, if any, effect killing somebody who have on your status within the group?

A    It would definitely make -- lift the individual's status up in that organization.

Q    In fact, did you observe anything about Ebay's status after the murder of Crazy Troy?

A    Yes.

Q    What was that?

A    I mean, he was more revered as an individual who would get the job done.

Q    When World said to you that Troy had to go, what did you understand that to mean, based on your --

A    That he had to die.

Q    You went -- now, so that was in December of 1992. Eventually you went to state prison; is that correct?

A    Yes.

Q    And that was on the charges -- I guess, it was the robbery charge; is that right?  You've been on bail for that?

A    Yes.

NICOLE CANALES, CSR, RPR
APP. 243

Myers - Direct - Amatruda                    2311

Q    And how long were you sentenced to, at that point?

A    Two to four.

Q    Okay.  So do you remember what year you got out in from that?

A    '95.

Q    And where did you go when you got out?

A    To Lafayette Gardens.

Q    Do you remember where you lived at that time when you were released?

A    Yes, sir, 456.

Q    At some point did you move to Queens?

A    Come again?

Q    At some point did you move to Queens?

A    Yes, sir.

Q    When was that?

A    Probably a year after I was home.

Q    Okay.  And when you came home, where was Wise?

A    When I first came home, Wise was hustling upstate New York.

Q    And was -- who was selling, if anybody, in Lafayette Gardens hustling?

A    There was a slew of individuals, but I knew that World was the one controlling.

Q    And when you say control, what does that mean to you, as far as drug deals goes?

NICOLE CANALES, CSR, RPR

APP. 244

Myers - Direct - Amatruda                    2312

A    I came home from prison, and I remember seeing him, and he was basically -- he didn't explain to me verbatim that he was controlling the projects.  But through casual conversation, when we were just talking, and at the time he had on a lot of jewelry, and nice clothes, and I recall asking him to give me some money.  And he laughed, and he said to me you don't fuck with me like that.  Excuse my language.  And I was shocked, you know.  Because, I mean, I've known him for a long time.  I didn't expect that reaction from him, but it wasn't out of any type of malice, because what he did was he took his phone out, and he said hold on a second.  And he started dialing the number, and I'm standing there bewildered, wondering what is he doing.  What does that have to do with me asking you for a couple of dollars and you're telling me no?  And he gets on the phone, and he goes, yeah, talk to your boy, and he passes me the phone.  And I say who is this?  And it was Wise.

Q    And what happened with Wise that day?

A    Oh, he was very excited about the fact that I had came home and told me to stay where I was at.  He was coming to pick me up.  I didn't realize that he was in way upstate New York at the time, so I was standing in front of the projects for three to four hours.

Q    So what happened?

A    He came.  He picked me up, and immediately we jumped on

Myers - Direct - Amatruda                    2313

the road.  We're talking, and reminiscing, and the next thing I know I'm seeing the highway, and I'm, like, what are you doing?  He's like I'm taking you to where I hustle at.  I said I'm on parole.  I got to report to parole.  He was telling me it's Friday, man; you ain't got to report until Monday.  So he basically took me upstate with him.

Q     Okay.  Did you go back to Lafayette Gardens, then?

A     Yes.

Q     Okay.  And what did you do when you went back to Lafayette Gardens for money?

A     From time to time, I would get up with Wise.  At that time, I was doing my own thing, as far as robberies, and burglaries, and things like that, so I wasn't -- I didn't have any connection with Wise on the hustling side, at that time.

Q     Did you see people selling drugs in Lafayette Gardens?

A     Yes.

Q     Who was that?

A     There were younger guys in the projects, at that time. It wasn't the same old regimen of dudes, like Popsie, or Ebay, or Boo and those buys.  It was the next generation of guys coming up that were actually selling drugs.

Q     Did you know what, if any, role World had in that drug-dealing?

A     Everybody was --

        MR. RUHNKE:  Your Honor, I'm going to object,

Myers - Direct - Amatruda                    2314

because he's not a part of it.

THE COURT:  I think it's too general a question.

MR. AMATRUDA:  Okay.

Q    Well, during that time, did you spend time with the drug
dealers in Lafayette Gardens?

A    Yes, I did.

Q    Did you see what they were doing?

A    Yes.

Q    And did you also speak to World during that time?

A    I spoke with him generally.

Q    And based on -- did you get involved in the drug-dealing
at Lafayette Gardens?

A    No.  When I got involved with the drug-dealing myself,
like I said, me and Wise were very close friends, and there
was a time when World actually got locked up.

Q    What, if any, role did you take on when World got locked
up?

A    Well, once World got locked up, it was obvious to
everyone that Wise would be the one to take over in his steed.

Q    Is that something that had happened before?

A    Yes.

Q    Was there any pattern to the change in leadership?

A    Faintly, because, like I said, a lot of these guys were
World's peers.  For Wise, they were more so younger guys.

Q    What was the interaction between when -- if World wasn't

NICOLE CANALES, CSR, RPR

APP. 247

Myers - Direct - Amatruda 2315

there, what would happen?

A   Well, the same guys would answer to Wise.

Q   How about when Wise wasn't there?

A   Vice versa.

Q   So you said that at some point World got locked up.  Who took charge of the drug-dealing?

A   Wise.

MR. RUHNKE:  I don't mean to interrupt, but could we have a year?

THE COURT:  Wait a second.  It's an objection.  Overruled.  If you know, who took over?

MR. AMATRUDA:  Okay.

Q   Okay.  And do you remember about when this was?

A   Not exactly.

Q   You were involved in the conspiracy to kill Michael Colon, correct?

A   Yes.

Q   That was at the roller-skating rink?

A   Yes.

Q   Was this before, or after, or during the period that you were involved in that conspiracy?

A   This was, like, in the beginning more so.

Q   You mean it was before?

A   Yes.

Q   All right.  And during that time, can you explain what,

NICOLE CANALES, CSR, RPR

APP. 248

Myers - Direct - Amatruda                    2323

from prison.

Q    Meaning before or after Wise was killed?

A    After.

Q    All right.  I'm going to focus back now on 1998, during the time, again, around the time that the roller rink murder happened?

A    Yes, sir.

Q    Can you explain what was going on in terms of the drug activity at LG?

A    You had younger guys, like I said, who were basically -- at the time, it wasn't the shift dynamic.  It was more so of guys would get what was called a bomb, at the time.  And it was just every man for himself, but not in the sense that these individuals selling drugs for themselves.  These drugs came from one particular source, and that source was --

Q    Go ahead.

A    -- was World.

Q    Could somebody who wasn't associated with World at that time sell drugs in LG?

A    No.

Q    Did you ever witness anybody try?

A    I've seen instances where guys who didn't know the area and may have heard about how much drugs could be sold in that area try to come in the area, but immediately realize that there was an organization there that wasn't allowing that to

Myers - Direct - Amatruda                    2324

happen.

Q    Did you ever get involved in informing anybody that they couldn't sell?

A    I never had to.

Q    What do you mean by that?

A    Like I said, you had individuals that used to come from different neighborhoods, looking to get rid of their drugs in a quick fashion.  But when they would get to the projects, they would realize that it was no room for anyone outside of the CMB organization.

Q    And they would leave?

A    Yes.

Q    In 1998, did you become a Blood?

A    Yes, sir.

Q    Can you -- do you remember the day that you decided to become Blood?

A    I remember the day.  I couldn't tell you the date, but I remember the day.

Q    That's fine.  Did you have a conversation with anybody about that on the day you made that decision?

A    Yes, sir.

Q    Who is that?

A    World.

Q    And where did you talk to World about that?

A    We were standing on the corner of Lafayette and Clausen,

Myers - Direct - Amatruda                    2325

in front of the rent building attached to Lafayette Gardens.

Q    Looking at the map, where was that?  Lafayette and Clausen?  Okay.  So you were standing there.  What was the -- was anybody else talking with you, or was it just you and World?

A    There was other people around, but I just remember me and him speaking.

Q    Okay.  And what was the conversation -- what do you remember about the conversation?

A    He brought up to me the fact that there were a lot of young guys who were under the impression that he was what the Bloods call a big homie.  He had did a stint on Riker's Island, so some guys who had been on Riker's Island during the time that he was there, seem to have been under the impression that he was a high-ranking member of the Blood organization.  And that word started fluctuating around, and he didn't deny it.  He would laugh about it.  And that particular day, we were standing there.  We were talking, and I remember him expressing to me that these young dudes is willing to do anything to be part of this organization.

Q    Okay.  And did World express anything about that, then?

A    Yes, he explained his plan to me about -- because initially I told him -- I said, listen, I don't want to be part of no gang.  That's corny.  And he was, like, well, you're not going to be a part of gang.  You know, we just

Myers - Direct - Amatruda                    2326

going to act like we -- they want to put me in that position saying I'm the big homie, saying that -- the phrase was what's called 101.  So it's 101, 102, to 103, 101 being the highest ranging, 102 being second in command.  He said to me they think I'm the big homie, so I'm going to make you my 102, and what's going to happen is these dudes is going to fall in line, and blindly just be obeying commands.

Q    And what was -- what did you say in response to that?

A    I thought it was a hell of a plan.  I agreed to it.

(Proceedings continued on the following page.)

NICOLE CANALES, CSR, RPR

APP. 252

*Meyers - direct - Amatruda*                           2327

DIRECT EXAMINATION (CONT'D.)

BY MR. AMATRUDA:

Q    And did you and World decide whether or not you would have to do anything to be a Blood?

A    Yeah, at that time it was well known that --

MR. RUHNKE:  I object to what was well known.

THE COURT:  Yes, objection sustained.

Q    Okay.  Let me ask you this, generally speaking, what was your understanding that someone had to do at that time to become part of the Bloods?

MR. RUHNKE:  I think it is the same question.

THE COURT:  Well, I think he can answer that.

Was there a general understanding that you had at that time as to what somebody needed to do to become a member of this gang?

THE JUROR:  At that time --

THE COURT:  This is of your own knowledge, what you understood.

THE JUROR:  At that time it was known that to be initiated into the Bloods organization, if you were a man you had to commit some act of violence, whether it was a robbery, assault, a cutting, something like that.

Q    Now, did you decide, you and World decide for yourself that you would have to do some act of violence to now become a Blood leader?

*Meyers - direct - Amatruda*                                        2328

A    Yes, one of the things, one of the other things was it's called being jumped in where they take a group of individuals and pit them against one person.

Q    So, they get a group of people who fight someone who wants to be a member of the Bloods?

A    Yes, for 31 seconds.

Q    All right.  And could you find anybody that wanted to fight you?

A    Well, that was the thing about it, when the younger guys that was around, I had said, well, let them jump me in and the younger kids, they didn't want to try that.

Q    Can you explain just physically what you were like back then, your size?

A    250.

Q    And you used to box, is that right?

A    Yes, sir.

Q    And you were an experienced fighter, correct?

A    Yes, sir.

Q    All right.  What did you end up doing, if anything?

A    World decided -- we laughed about it and there was a guy that walked past and he was like, you know what, just knock him out.

Q    Was that somebody that you knew?

A    It was just an individual I had never saw before.

Q    Somebody walking down the street?

*Meyers - direct - Amatruda*                                    2329

A    Yes.

Q    What did you do?

A    I knocked them out.

        MR. RUHNKE:  Can we have a time frame?

        THE COURT:  I didn't hear you.  What is the objection?

        MR. RUHNKE:  We just need to know when this was.

        THE COURT:  So, the time frame, it is a reasonable request so we know what we're talking about.

        MR. AMATRUDA:  That's fine, Your Honor.

Q    Michael Colon, you pled guilty to that murder, correct?

A    Yes, sir.

Q    And that was in 1998, right?

A    Yes.

Q    And was this before the murder of Michael Colon that this happened?

A    Yes, sir.

Q    Did anything else happen as far as the plan to become Blood as that went forward?

A    I went through with, you know, assaulting the individual. From that point he elected a younger kid by the name of Buddha --

Q    "He" being World?

A    Yes.

Q    Okay.

HOLLY DRISCOLL, CSR
*OFFICIAL COURT REPORTER*
APP. 255

*Meyers - direct - Amatruda*                                    2330

A    As another high ranking official within the organization, he had actually already been Blood but he did what's called -- he switched sets at that time.

Q    You're talking about Buddha?

A    Yes.

Q    When you say a set, that's what?

A    There's different factions within the Blood organization.

Q    Okay.  Was there a particular set that you and World decided that you would say you were part of?

A    Yes.

Q    What set was that?

A    Sex Money Murder.

Q    Were there any other people who joined your set?

A    Yes, Popsie, Tion, I knew that Big Jim was Blood but when he came home from prison he was already Blood so I didn't know whether he was part of the Sex Money Murder or not.

Q    How about younger people, did you know if any of those people joined under you?

A    A lot of the younger guys did.

Q    Okay.  And when you say "younger guys," how old are you talking about?

A    They were around the age of my nephew who is approximately 36 at this time so.

Q    What, if anything, did you witness World have the young people do anything like you said or like he had said before?

Meyers - direct - Amatruda          2334

A     Yes.

Q     What happened?

A     There were other individuals standing downstairs who had witnessed him coming to the building that knew that he was coming to get me so they were waiting on him to come downstairs.  Whether their intention was to get involved or not or just be nosy, I don't know, but I remember there was a young kid there at the time who was a member of the Blood organization.

Q     Do you know what set -- who is this person, what did you call him?

A     His name was Tookie.

Q     Do you know what set Tookie was a part of?

A     He was part of Sex Money Murder.

Q     That's your set, is that right?

A     Yes.

Q     What, if anything, did you see happen with Tookie then?

A     Him and World went off to the side and had a brief conversation and then Tookie went towards the elevator and World came back over to me and the individual that he had came to my apartment with and explained that Tookie was going to get what's called a hammer which is a firearm.

Q     And what was your understanding at that point that World told you about the gun?

A     At that particular time he was like he's going to get the

Meyers - direct - Amatruda                    2399

A    Yes.

Q    Who did?

A    When World was arrested, during the time that he was in prison Wise was in control of the area.

Q    All right.  And who was selling drugs for CMB at the time?

A    An assortment of young guys, Bernie Mack, Keith, Popsie, individuals like that.

Q    Okay.  I'm just going to show you Government Exhibit 6 which is in evidence, ask you if you recognize who that is?

A    That's Keith.

Q    And what was your relationship with Wise at that time?

A    We were very close friends.  At this time we had known each other for decades and when he would come to the neighborhood more than likely he would come to see me.

Q    Okay.  And how did you support yourself during that time?

A    During that time I was doing robberies but it came a time where Wise was paying individuals to transport drugs from Manhattan to Brooklyn after he purchased the drugs, so being that I would be with him every day and I would be with him initially when he would get with these individuals, we just decided that instead of him paying someone else he would just pay me and that became my primary source of income at the time.

Q    Was being paid to take those trips enough to support

*Meyers - direct - Amatruda*                                    2417

A    He said that E-Bay was gonna be one that re-up and that they was gonna have to turn the money into and things like that.

Q    All right.  And did anybody in CMB tell you whether that was a successful venture?

A    Yeah, I was hearing from the guys that were working, they were saying that things wasn't working out, they were finding it hard to find E-Bay when they needed him and things like that.

Q    Okay.  So, what happened after that?

A    I found out that Taz was called and was supposed to come and take over the operation.

Q    Do you remember who told you about that?

A    Jimbo.

Q    Okay.  And did Taz or did Jimbo explain to you anything about how Taz got appointed to this job?

A    He said he knew that Taz wasn't from the projects and he would be met with questions as far as why he was trying to set up shop, so it was letting it be known that he had the go ahead from World to take over the operation.

Q    I'm going to show you Government Exhibit 19 that's in evidence.  Who is that?

A    That's Taz.

Q    And did you see Taz at that point?

A    Coming and going.

Myers - Direct - Amatruda                    2446

Q    And when you say World felt this way, was this something that World said?

A    Yes.

Q    And did World express anything at all about the efforts that had been made before he came home?

A    He basically said that whatever was going down, dudes was bullshitting -- excuse my language -- but he was home now, and we was going hard.  The complaint was, you know, different people in the neighborhood that -- like guys that we knew was coming at individuals, would see people and not let us know that they saw, and he was saying that was going to change. And from this point on, being he was home, if somebody saw him, they were going to give us a call.

Q    Somebody saw who?

A    Peanut.

Q    Did any other names come up during those early discussions after World came home?

A    Yes.

Q    What names were those?

A    Hommo, JR, and then eventually Black-O Mack-O.

Q    And what did members of CMB discuss about Hommo?

A    At the time, it was trying to be understood what part he played in all this, and everyone knew his reputation as being, you know, this revered tough guy in the neighborhood.  And we knew that him and Peanut had a close affiliation with one

NICOLE CANALES, CSR, RPR
APP. 260

Proceedings                                    2687

MS. PAUL:  Yes.

THE COURT:  That's it?

MR. PAUL:  That's it.  Okay.  Anything else?

MR. AMATRUDA:  Judge, can we talk for one minute?  I think we're ready to rest.  I just want to make sure --

THE COURT:  Go ahead.  You're seeing the wrap up, you see, now, of many many days of the government's case.  So let's hear what Mr. Amatruda has to say.

Want to read more stipulations?

MR. AMATRUDA:  No, Judge, at this point, the government rests.

THE COURT:  The rest is sort of a work of art. Nobody has rested very much over the last month.  They're still not resting, but that means that the government has presented to you folks all of the evidence it wishes for you to consider on its direct case.  And so we've reached that point in the trial that we started on March 31st, and you've been very patient, and now we turn to the defendant to hear what the defendant wishes to do.

Now, you're going to make a motion.

MR. REHNKE:  I'm going to make motions, your Honor, and there's going to be a little bit of discussion with the government.

THE COURT:  You haven't completed your discussions with the government yet?

NICOLE CANALES, CSR, RPR
APP. 261

Proceedings                                    2688

MR. REHNKE:  Not yet.

THE COURT:  So, then, what you're going to did now is -- the record will reflect you're making appropriate Rule 29 motions, and you're going to be able to talk to me about it without the jurors being here, since these are matters of law. So at the end of the government's case, the defendants have right to make certain motions.  They involve issues which are not your concern.  The record will reflect that this is the time where the defendants will have the need to make these motions, and then we'll be discussing what those motions are all about without you're being here.  But we'll do that when we send you home tonight, and then the lawyers will have the opportunity to speak to Court without you being here on these legal matters.  All right.

Now, I'm understanding that the defense counsel wishes to have a moment to reflect upon a few things before you tell me how you're going to proceed.  You need ten minutes or so?

MR. REHNKE:  We're talking about a stipulation, your Honor.  That has not been resolved.

THE COURT:  Talking about a stipulation.  How much more time do you need?  Do you have anything you can do in the meantime?

MR. REHNKE:  Yes.  I can offer some documents without objection, and then we can discuss --

NICOLE CANALES, CSR, RPR
APP. 262

Proceedings                                    2765

(Outside the presence of the jury.)

THE CLERK:  Criminal Cause on Trial, United States of America versus Damion Hardy and Aaron Granton.  All counsel and parties are present.

MR. RUHNKE:  Your Honor, can I address a brief issue before we start?

THE COURT:  Okay.

MR. RUHNKE:  I don't know if your mike is on.

THE COURT:  It's on.

MR. RUHNKE:  Okay.  I just want to be assured of the position of -- or the status of the Rule 29 motion in this case.  The Court has deemed that we made a Rule 29 motion at the end of the government's case.  Did the Court deny it or defer decision?

THE COURT:  We moved a little quickly, because I was anxious to get the jurors out by 5:00 o'clock.  I'm going to deny it.

MR. RUHNKE:  Okay.

THE COURT:  But I'm not going to preclude you from putting on the record that what you wish to do.  But, you know, even if I were to ultimately agree with whatever you're going to say, I would still give it to the jury.

MR. RUHNKE:  Okay.  So you would defer to the jury, in any event?

THE COURT:  I guess I can say I can reserve

NICOLE CANALES, CSR, RPR

APP. 263

Summation by Ms. Dayananda                2776

THE COURT:  Feel free to move around, if you'd like, and walk around, and look at it.  I don't know any other way for you see, frankly.

MS. DAYANANDA:  Is that better?

MS. BARRETT:  That's better.

MS. DAYANANDA:  So if you look at that timeline, ladies and gentlemen, that's essentially what we're going to be going through over the next hour or so.  But it shows you that this began in '91 and ended in 2004.  That's the timeline of the racketeering enterprise.

There are five elements that we have to prove to prove the count of racketeering.  We have a multimedia presentation going on here.  It's going to be amazing.  Now you see on the screen here the five elements that we have to prove.  First the enterprise existed.  Now, what does that mean?  In this case, the enterprise is the Cash Money Brothers, a violent street gang that sold drugs, dominated Lafayette Gardens.  There's overwhelming evidence that's been presented to you that proves the existence of this enterprise. They existed to make money through drug-dealing, robberies, and they did whatever it took to keep the enterprise going, including, as you know, several acts of violence.

The second element is what we stipulated to, the selling of crack cocaine effects interstate commerce. Ms. Paul read a stipulation about that yesterday.  Third

NICOLE CANALES, CSR, RPR

APP. 264

PROCEEDINGS 2985

THE COURT: All right. Let's bring the jurors in.

(Jury is in the courtroom at 2:13 p.m.)

COURTROOM DEPUTY: You can all be seated.

THE COURT: All right, folks. So someone in this building thought I said 2:15, but don't speculate, you can ask me afterwards who the guilty party was. But things inadvertently happen.

But we're here now to listen to the final parts of the charge and I'm going to talk to you about the counts of indictment.

So the first one, not surprisingly, is called RICO, all right. And it's going to be a little bit long. I'm going to take some breaks and have some water breaks, and we'll get through it all in the meantime.

So Count One of the indictment reads as follows, "In or about and between 1991 and August of 2004, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the Defendants Damion Hardy and Aaron Granton, together with others, being persons employed by and associated with the Cash Money Brothers, an enterprise that engaged in and the activities of which affected interstate and foreign commerce, did knowingly and intentionally conduct and participate, directly and indirectly in the conduct of the affairs of the enterprise through a pattern of racketeering."

PROCEEDINGS                                          2986

So the language is kind of formal, you might say, right? But we're going to break it down and tell you about these elements. So Section 1962(c) of Title 18 of the United States Code, commonly known Racketeer Influence and Corrupt Organizations or the acronym RICO as we go, provides "it shall be unlawful for any person employed by or associated with any enterprise engaged in or the activities of which affect interstate commerce, to conduct or participate directly or indirectly in the conduct of such enterprises' affairs through a pattern of racketeering activity."

Now, you've heard a lot of these phrases bandied about, but now I'm going to explain to you what it all means. Now, the word "racketeering" has certain implications in our society. Use of that term in this statute or in this courtroom should not be regarded as having anything to do with our determination of the charges against the defendants. The term is just a term chosen by Congress to define the offense.

In order to prove that a defendant is guilty of this offense, the government must prove each of the following five elements beyond a reasonable doubt.

First, that been approximately 1991 and August 2004, an enterprise existed.

Second, that the enterprise was engaged in

AO 245B    (Rev. 10/2011 EDNY) Judgment in a Criminal Case
           Sheet 1

# UNITED STATES DISTRICT COURT

EASTERN District of NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| Damion Hardy | Case Number:    CR-04-706(S-6)-1(FB) |
| | USM Number:    63258-053 |
| | David Ruhnke, Esq. 47 Park Street, Montclair, NJ 07042 |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

✓ was found guilty on count(s)    1(s-6) to 12(s-6) and 14(s-6) to 24(s-6)
   after a plea of not guilty.

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ MAY 21 2015 ★

**BROOKLYN OFFICE**

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| T. 18 U.S.C. 1962(c) | RACKETEERING | | 1(s-6) |
| T. 18 U.S.C. 1962(d) | RACKETEERING CONSPIRACY | | 2(s-6) |

The defendant is sentenced as provided in pages 2 through _____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

✓ Count(s)    ALL OPEN COUNTS            ☐ is    ✓ are    dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

MAY 11, 2015
Date of Imposition of Judgment

s/Frederic Block

Signature of Judge

FREDERIC BLOCK, U.S.D.J.
Name and Title of Judge

_May 14, 2015_

Date

A TRUE COPY
ATTEST 5/15/15
DATE _____
DOUGLAS C. PALMER
                                    CLERK
BY _____
                              DEPUTY CLERK

APP. 267

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 1A

Judgment—Page _____ of _____

DEFENDANT:     Damion Hardy
CASE NUMBER:    CR-04-706(S-6)-1(FB)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| T 18 U.S.C. 1959(a)(1) | MURDER IN AID OF RACKETEERING | | 3(s-6), 4(s-6), 6(s-6), 8(s-6), 9(s-6), 11(s-6), |
| T. 18 U.S.C. 1959(a)(5) | CONSPIRACY TO COMMIT MURDER IN AID OF RACKETEERING | | 5(s-6), 7(s-6) 10(s-6), |
| T. 18 U.S.C. 1959(a)(5) | CONSPIRACY TO KIDNAP JOHN DOE #3 IN AID RACKETEERING | | 12(s-6), |
| T. 18 U.S.C. 1959(a)(5) | KIDNAPPING OF JOHN DOE #3 IN AID OF RACKETEERING | | 13(S-6) |
| T. 18 U.S.C. 1951(a) | CONSPIRACY TO ROB JOHN DOE #3 | | 14(s-6) |
| T. 18 U.S.C. 1951(a) | ATTEMPTED ROBBERY OF JOHN DOE #3 | | 15(s-6) |
| T. 18 U.S.C. 924 (c) | USE OF A FIREARM DURING A CRIME OF VIOLENCE | | 16(s-6), 18(s-6), 20(s-6), 22(s-6), |
| T. 18 U.S.C. 924(j)(1) | CAUSING DEATH THROUGH THE USE OF A FIREARM | | 17(s-6), 19(s-6). 21(s-6) |
| T. 21 U.S.C. 846 | CONSPIRACY TO DISTRIBUTE COCAINE BASE | | 23(s-6) |
| T. 21 U.S.C. 841(a) | DISTRIBUTION OF COCAINE BASE | | 24(s-6) |

AO 245B    (Rev. 09/11) Judgment in Criminal Case
           Sheet 2 — Imprisonment

Judgment — Page _____ of _____

DEFENDANT:        Damion Hardy
CASE NUMBER:      CR-04-706(S-6)-1(FB)

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a
total term of:      LIFE ON CTS. 1(s-6) to 4(s-6); 6(s-6); 8(s-6); 9(s-6); 11(s-6); 13(s-6), 17(s-6); 19(s-6); & 21(s-6), 40YRS
ON CTS

23(s-6) & 24(s-6), 25 YRS ON CTS. 18(s-6); 20(s-6) & 22(s-6), 20 YRS ON CTS.: 14(s-6) & 15(s-6), & 10YRS ON CTS.:
5(s-6); 7(s-6); 10(s-6); 12(s-6) & 16(s-6). THE SENTENCES IMPOSED ON COUNTS 16(s-6), 18(s-6), 20(s-6) & 22(s-6)
SHALL RUN CONSECUTIVELY TO EACH COUNT AND THE SENTENCE IMPOSED ON ALL OTHER COUNTS
SHALL RUN CONCURRENTLY FOR A TOTAL OF LIFE + 85 YEARS.

☐   The court makes the following recommendations to the Bureau of Prisons:

✓   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

   ☐   at _____    ☐ a.m.   ☐ p.m.   on   _____ .

   ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐   before 2 p.m. on   _____ .

   ☐   as notified by the United States Marshal.

   ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____

APP. 269

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
            Sheet 3 — Supervised Release

Judgment—Page _____ of _____

DEFENDANT:         Damion Hardy
CASE NUMBER:     CR-04-706(S-6)-1(FB)

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :
4 YEARS ON COUNTS 23(s-6) & 24(s-6). THE TERM IMPOSED ON EACH COUNT SHALL RUN CONCURRENTLY TO EACH OTHER FOR A TOTAL TERM OF 4 YEARS OF SUPERVISED RELEASE WITH NO SPECIAL CONDITIONS IMPOSED.

        The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. *(Check, if applicable.)*

☐    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. *(Check, if applicable.)*

☐    The defendant shall cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable.)*

☐    The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901,*et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. *(Check, if applicable.)*

☐    The defendant shall participate in an approved program for domestic violence. *(Check, if applicable.)*

        If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

        The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)    the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)    the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3)    the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)    the defendant shall support his or her dependents and meet other family responsibilities;

5)    the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)    the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
     or if such prior notification is not possible, then within forty eight hours after such change;

7)    the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)    the defendant shall not associate with any persons engaged in criminal activity and shall notassociate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)   the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)   the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)   the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)   as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

APP. 270

Judgment—Page _____ of _____

DEFENDANT:        Damion Hardy
CASE NUMBER:      CR-04-706(S-6)-1(FB)

## SPECIAL CONDITIONS OF SUPERVISION

NO SPECIAL CONDITIONS OF SUPERVISED RELEASE WERE IMPOSED.

Judgment — Page _____ of _____

DEFENDANT:          Damion Hardy
CASE NUMBER:        CR-04-706(S-6)-1(FB)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|        | **Assessment** | **Fine** | **Restitution** |
|--------|----------------|----------|-----------------|
| **TOTALS** | $ 2,400.00 | $ 00.00 | $ 125,000.00 |

☐  The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

✓  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|-------------------|------------------|-------------------------|----------------------------|
| JHOAN CAMITZ FAMILY |  | $125,000.00 |  |

| **TOTALS** | $ _____ | $ _____ $125,000.00 |
|------------|---------------------|--------------------------|

☐  Restitution amount ordered pursuant to plea agreement   $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

✓  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ✓  the interest requirement is waived for the   ☐ fine  ✓ restitution.

   ☐  the interest requirement for the   ☐ fine  ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

APP. 272

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 5A — Criminal Monetary Penalties

Judgment—Page _____ of _____

DEFENDANT:        Damion Hardy
CASE NUMBER:   CR-04-706(S-6)-1(FB)

## ADDITIONAL TERMS FOR CRIMINAL MONETARY PENALTIES

RESTITUTION SHALL BE PAID JOINTLY AND SEVERALLY WITH CO-DEFENDANT AARON GRANTON A/K/A/ ERIC MOORE. PAYMENTS SHALL BE AT THE RATE OF $25.00 PER QUARTER WHILE IN CUSTODY AND PAYMENTS SHALL COMMENCE ONE (1) MONTH FROM THE DATE OF THIS JUDGMENT. PAYMENTS SHALL BE SENT TO THE CLERK OF THE COURT WHO PERIODICALLY REMIT SUCH MONIES PROPORTIONALLY TO THE VICTIM.

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**
**OFFICE OF THE CLERK**
**THURGOOD MARSHALL COURTHOUSE**
**40 CENTRE STREET- ROOM 150**
**NEW YORK, N.Y. 10007**
**212 857-8500**

ROBERT A. KATZMANN
CHIEF JUDGE

CATHERINE O'HAGAN WOLFE
CLERK

May 13, 2015

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
225 Cadman Plaza East
Brooklyn, N.Y. 11201
Attn: Appeals

FILED
US DISTRICT COURT E.D.N.Y.
★ MAY 18 2015 ★
BROOKLYN OFFICE

Re: **Hardy v. USA**
Dkt.No : **04-cr-706 S-6**

Dear Appeals Clerk:

The enclosed are Pro se NOA papers, which was first received in our court on May 11, 2015 and mistakenly sent to the U.S. Court of Appeals.

In accordance with **Rule 4(d) of the Federal Rules of Appellate Procedure,** I have noted thereon the date it was received, and transmit it to you for filing. In the event that this notice of appeal was also filed directly with you, it need not be filed again.

CATHERINE O'HAGAN WOLFE,
Clerk of the Court

By: _Richard Alcantara_
Richard Alcantara
Administrative Manager

Enc.

cc: Damion Hardy

APP. 274

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

_____

United States Of America                 "
                        Appellee
                                                    NOTICE   OF   APPEAL
         - Against -                      "

D a m i o n     H a r d y                            CR. No. 2004-706 )S-6) (DGT)
                        Appellant         "
_____

 

 

**PLEASE TAKE NOTICE,** that Appellant, Damion Hardy, hereby appeal the unconstitutional decision and conviction of the jury on twenty six counts of **duplicitous superseding indictment** on the 29th Day(s) of April, 2015, before the United States Court of Appeals for the Second Circuit. The conviction order is not appended hereto because the Clerk of the United States District Court for the Eastern District will submit all the record in this case in conformity with the Rule of Criminal Procedure.

 

**Dated:** May ⅂ , 2015

 

                                   Respectfully  Submitted,

                                   _____
                                          Damion  Hardy
                                   A p p e l l a n t

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

United States Of America              "
                    Appellee

        - Against -                   "

D a m i o n   H a r d y
                    Appellant         "

_____

CERTIFICATE   OF   SERVICE

CR. NO. 2004-706 (S-6) (DGT)

This is to certify that, Appellant, Damion Hardy, hereby state that he is serving copy of his motion for appeal on the 7 Day(s) of May, 2015, by placing same in the U.S. Mail Postage Paid, addressed to the below listed persons in conformity with the Rule of Appellate Procedure.

Mr. James Loonan
Assistant United States Attorney
United States Attorney Office
271 Cadman Plaza, East
Brooklyn, New York 11201

Mr. David Ruhnke, Esquire
Counsel
47 Park Street
Montclair, New Jersey 0704

The Clerk Of Court
United States District Court
Eastern District Of New York
225 Cadman Plaza, East
Brooklyn, New York 11201

Damion   Hardy

APP. 276

Case 15-1645 Document 117 10/28/2016 1895494 Page 279 of 280

Mr. Damion Hardy
No. 63258-053
Metropolitan Correctional Center
150 Park Row
New York, NY 10007

FILED
US DISTRICT COURT E.D.N.Y.
★ MAY 18 2015 ★
BROOKLYN OFFICE

**Dated:** May 7 , 2015

The Clerk of Court
United States District Court
For The Eastern District Of New York
225 Cadman Plaza, East
Brooklyn, New York 11201

**Re:** United States V. Hardy

**CR. No.** 04-706 (S-6) (DGT)

Dear Clerk,

Hi, Could you kindly file my **Notice of Appeal** with the United
States Court of Appeals for the Second Circuit and sent me a stamp
copy for my file.

Thanks very much for your kind assistance and cooperation.

Mr. Damion Hardy
A p p e l l a n t

cc: Mr. James Loonan/AUSA

APP. 277

