# 15-1645(L)

## 15-1716(CON)

*To Be Argued By*:
MATTHEW S. AMATRUDA

# United States Court of Appeals

## For the Second Circuit

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

ALLEN BRYANT, also known as BOO, also known as BOO FLARE, JAMES SESSOMS, also known as POPSIE, also known as DOC, ERIC MOORE, also known as E BAY, DWAYNE MEYERS, also known as THOR, KENWAYNE JONES, also known as STRO, also known as NATHANIEL STOWE, also known as KODIE JONES, ABUBAKR RAHEEM, also known as KIM CRANDALL, ZAREH SARKISSIAN, also known as PUFF, ROBERT FOOTMAN, also known as TROUB, CARL DAVIS, also known as BIG JIM, JAMES FARRIOR, also known as JIMBO, LAMONT JOHNSON, also known as SAMBO, DJEBARA McMILLIAN, also known as DJ, ISHEEN CAMPBELL, also known as SHA, also known as GREEN EYES, also known as LESEAN CAMPBELL, KEITH SMITH,

*Defendants,*

AARON GRANTON, also known as ERIC MOORE, also known as E BAY, DAMION HARDY, also known as WORLD,

*Defendants-Appellants.*

**On Appeal From The United States District Court For The Eastern District of New York**

---

### BRIEF AND APPENDIX FOR THE UNITED STATES

---

PETER A. NORLING,
MATTHEW S. AMATRUDA,
*Assistant United States Attorneys,*
*Of Counsel.*

ROBERT L. CAPERS,
*United States Attorney,*
*Eastern District of New York*
*271-A Cadman Plaza East*
*Brooklyn, New York 11201*
*(718) 254-7000*

i

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.............................................iv

PRELIMINARY STATEMENT.............................................2

STATEMENT OF FACTS...............................................3

    I.      Introduction..........................................3

          A.    The Origins of the Cash Money Brothers............................................3

          B.    The Murder of Steven Brewer.....................9

          C.    The Attempted Murder of a Witness...............9

          D.    Violence Against Rival Drug Organizations..................................11

          E.    The Murder of Troy Davis.......................16

          F.    Hardy's Threats to a Witness...................18

          G.    The Attempted Murder of Marcel Kennedy..................................18

          H.    The Murder of Michael Colon....................19

          I.    The Shooting at Uniformed Police Officers.................................21

          J.    The Murder of Myron Hardy......................22

          K.    The Murder of Jerrod Mackens...................23

          L.    Efforts to Kill Ivory Davis....................24

          M.    Hardy's Return from Prison.....................25

          N.    The Murder of Lamel Lawson......................27

          O.    The Murder of Daryl Baum.......................27

          P.    The Murder of James JR Hamilton................29

ii

Q.  The Murders of Ivory Davis
    and Johann Camitz.............................32

R.  The Conspiracy to Extort
    From Medical Clinics..........................34

S.  The Plot to Kill "Metly".......................35

T.  The Kidnapping Of Ashbudeen Sakoor..............36

U.  The Murder of Tyrone Baum.......................37

V.  The Murder of Troy Singleton....................38

ARGUMENT.................................................43

POINT ONE - THE EVIDENCE WAS SUFFICENT TO
            SUSTAIN THE CONVICTIONS ON ALL COUNTS..............43

POINT TWO - THE DISTRICT COURT'S FINDING THAT
            HARDY WAS COMPETENT SHOULD BE AFFIRMED.............56

I.   The Factual Background..............................56

     A.   Initial Stages.................................56

     B.   The Hearing....................................57

          1.   Dr. Preston-Baecht........................57

          2.   Dr. Dudley................................64

          3.   The Court's Decision......................64

II.  The District Court's Finding that
     Hardy Was Competent Should Be Affirmed...............65

POINT THREE - THE DISTRICT COURT PROPERLY
              EMPANELED AN ANONYMOUS AND
              PARTIALLY-SEQUESTERED JURY........................73

I.   The Factual Background..............................73

II.  Argument............................................74

          1.   Seriousness of the Charges................76

          2.   The Defendants' Dangerousness.............77

iii

3.    The Defendants' Interference
            with the Judicial Process..................77

      4.    Media Attention...........................79

      5.    Procedural Protections....................80

POINT FOUR - THE DISTRICT COURT'S EVIDENTIARY
            RULINGS WERE NOT AN ABUSE OF DISCRETION...........86

POINT FIVE - THE DISTRICT COURT DID NOT ERR IN
            POSING QUESTIONS TO GOVERNMENT WITNESSES..........94

CONCLUSION...................................................103

iv

TABLE OF AUTHORITIES

Page

CASES

Dusky v. United States,
  362 U.S. 402 (1960) ...................................... 65, 66

Godinez v. Moran,
  509 U.S. 389 (1993) ......................................... 66

Jackson v. Virginia,
  443 U.S. 307 (1979) ......................................... 43

Medina v. California,
  505 U.S. 437 (1992) ......................................... 65

Oppenheim v. United States,
  241 F. 625 (2d Cir. 1917) ................................... 94

United States v. Amuso,
  21 F.3d 1251 (2d Cir. 1994) ................................. 75

United States v. Aulicino,
  44 F.3d 1102 (2d Cir. 1995) ............................. 74, 75

United States v. Brady,
  26 F.3d 282 (2d Cir. 1994) .................................. 87

United States v. Cacace,
  321 F. Supp. 2d 532 (E.D.N.Y. 2004) ........................ 75

United States v. Coonan,
  938 F.2d 1553 (2d Cir. 1991) ...................... 51, 86, 87

United States v. Diaz,
  176 F.3d 52 (2d Cir. 1999) .................................. 43

United States v. DiNome,
  954 F.2d 839 (2d Cir. 1992) ................................. 87

United States v. DiTommaso,
  817 F.2d 201 (2d Cir. 1987) ................................. 95

United States v. Filani,
  74 F.3d 378 (2d Cir. 1996) .................................. 94

v

United States v. Gotti,
  459 F.3d 296 (2d Cir. 2006) ............................. 74, 75

United States v. Guglielmini,
  384 F.2d 602 (2d Cir. 1967) ................................. 94

United States v. Hardy,
  724 F.3d 280 (2d Cir. 2013) ................................. 57

United States v. Hemsi,
  901 F.2d 293 (2d Cir. 1990) ................................. 66

United States v. Morrison,
  153 F.3d 34 (2d Cir. 1998) ............................. 66, 67

United States v. Nichols,
  56 F.3d 403 (2d Cir. 1995) ......................... 65, 66, 67

United States v. Oliver,
  626 F.2d 254 (2d Cir. 1980) ................................. 66

United States v. Paccione,
  949 F.2d 1183 (2d Cir. 1991) ........................... 74, 81

United States v. Payton,
  159 F.3d 49 (2d Cir. 1998) ................................. 43

United States v. Pisani,
  773 F.2d 397 (2d Cir. 1985) ................................. 94

United States v. Quinones,
  511 F.3d 289 (2d Cir. 2007) ................................. 74

United States v. Quintieri,
  306 F.3d 1217 (2d Cir. 2002) ............................... 65

United States v. Thai,
  29 F.3d 785 (2d Cir. 1994) ............................. passim

United States v. Turkette,
  452 U.S. 576 (1981) ........................................ 51

United States v. Tutino,
  883 F.2d 1125 (2d Cir. 1989) ........................... 81, 82

United States v. Vamos,
  797 F.2d 1146 (2d Cir. 1986) ........................... 66, 67

vi

United States v. Vario,
  943 F.2d 236 (2d Cir. 1991) ............................. passim

United States v. Villegas,
  899 F.2d 1324 (2d Cir. 1990) ............................... 67

United States v. Wong,
  40 F.3d 1347 (2d Cir. 1994) ......................... 74, 75, 86

United States v. Zhou,
  428 F.3d 361 (2d Cir. 2005) ................................ 69

STATUTES

18 U.S.C. § 1959.............................................. 87

18 U.S.C. § 1959(a)(1)...................................... 2, 76

18 U.S.C. § 1959(a)(5)......................................... 2

18 U.S.C. § 1962(c)........................................... 2

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 15-1645; 15-1716(CON)

UNITED STATES OF AMERICA,

<u>Appellee</u>,

-against-

ALLEN BRYANT, also known as BOO, also known as BOO FLARE, JAMES SESSOMS, also known as POPSIE, also known as DOC, ERIC MOORE, also known as E BAY, DWAYNE MEYERS, also known as THOR, KENWAYNE JONES, also known as STRO, also known as NATHANIEL STOWE, also known as KODIE JONES, ABUBAKR RAHEEM, also known as KIM CRANDALL, ZAREH SARKISSIAN, also known as PUFF, ROBERT FOOTMAN, also known as TROUB, CARL DAVIS, also known as BIG JIM, JAMES FARRIOR, also known as JIMBO, LAMONT JOHNSON, also known as SAMBO, DJEBARA MCMILLIAN, also known as DJ, ISHEEN CAMPBELL, also known as SHA, also known as GREEN EYES, also known as LESEAN CAMPBELL, KEITH SMITH,

<u>Defendants</u>,

AARON GRANTON, also known as ERIC MOORE, also known as E BAY, DAMION HARDY, also known as WORLD,

<u>Defendants-Appellants</u>.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

2

## PRELIMINARY STATEMENT

Aaron Granton and Damion Hardy appeal from judgments of conviction entered on May 19, 2015 and May 21, 2015, respectively, in the United States District Court for the Eastern District of New York (Block, J.), convicting them of, inter alia, racketeering (18 U.S.C. §§ 1962(c), 1963)), racketeering conspiracy (18 U.S.C. §§ 1962(d), 1963), murder (18 U.S.C. § 1959(a)(1)), murder conspiracy (18 U.S.C. § 1959(a)(5)), kidnapping (18 U.S.C. § 1959(a)(1)), and use of a firearm in furtherance of crimes of violence (18 U.S.C. § 924(c)(1)(A)(iii)), and sentencing them principally to life terms of imprisonment.

On appeal, Granton contends that the district court erred in ordering an anonymous and partially-sequestered jury, in admitting proof of bad acts, and in making comments to (and asking questions of) the jury. Hardy challenges the district court's ruling after several competency evaluations and an evidentiary hearing that he was competent to stand trial. Both defendants contend that there was insufficient evidence to convict them of any count in the indictment.

As set forth below, the defendants' claims are without merit and the judgments of the district court should be affirmed.

3

STATEMENT OF FACTS

I.   Introduction

Granton's and Hardy's convictions stem from their joint participation in at least six homicides as part of the activities of the Cash Money Brothers ("CMB"), a violent street gang that controlled a portion of the Bedford-Stuyvesant neighborhood of Brooklyn, New York, for over ten years.  Hardy served as the gang's leader.  Granton was a hit man and enforcer.  Granton was also convicted of a contract killing he committed for Kenneth McGriff, the leader of a different street gang.[1]

II.   The Evidence at Trial

A.   The Origins of the Cash Money Brothers

After serving an apprenticeship under the direction of brothers Ullyses, J.R. and Derrick Hamilton, who controlled the drug trade in the Lafayette Gardens public housing development in the late 1980s, Hardy decided to fulfill his ambition to become a drug kingpin by recreating the organized drug distribution system put in place by the Hamiltons.  (T 133-36,

---

[1]   CMB members James Sessoms and Kenwayne Jones were convicted of various offenses, including narcotics trafficking and kidnapping.  Their convictions were affirmed.  See United States v. Sessoms, 11-3422 (Nov. 29, 2012); United States v. Jones, 08-5929 (Apr. 29, 2010).

4

589-91, 595, 601-03, 1806, 2282-86).[2]  Hardy was exceptionally shrewd, was an excellent negotiator and, even at the age of 15 years old, earned the respect of older drug dealers in the neighborhood.  (T 136-37, 145-47, 565-67).  He began selling drugs on his own and asked his longtime friend, cooperating defendant Allen Bryant, ("Boo") to "join the winning team," meaning selling drugs with Hardy.  (T 144-45).

The partnership flourished, and Hardy and Bryant were joined by Myron Hardy and certain boyhood friends.  (T 90-91, 127, 145, 541-42, 2292-93).  The group called itself the "Cash Money Brothers" from the popular film "New Jack City," which portrayed New York City drug dealers in a housing project. (T 145, 566-67, 750, 1788).

In 1991, cooperating defendant Robert Footman, also known as "Trouble," moved to Lafayette Gardens from Coney Island, Brooklyn, with his family and Granton, who was like a brother to Footman.  (T 147, 566, 570, 1775-76).  During Footman's first few days at Lafayette Gardens, CMB member James Sessoms, also known as "Popsie," recruited him and Granton to sell drugs with the CMB.  (T 1780-82, 2002-03).

---

[2]  Numbers preceded by "T" refer to pages in the trial transcript, "GRBr." to Granton's brief, "GRA" to Granton's appendix, "HBr." to Hardy's brief, "HA" to Hardy's appendix, "GA" to the government's appendix, and "GX" to government exhibits.

5

From the outset, Hardy was the gang's leader, but when he was incarcerated, his brother Myron took control. (T 91, 145-46, 565-67, 582, 747, 1038, 1082, 1329, 2314-15). Damion Hardy had the final say as to who could join the CMB, and if a problem arose with anyone outside the gang, then everyone in the CMB would become involved in the dispute. (T 174, 567, 1043, 1808).

Hardy had connections for obtaining guns and drugs. (T 146-47). He obtained cocaine from the Harlem neighborhood of Manhattan, brought it back to Lafayette Gardens, and produced crack cocaine in the apartment in which Hardy's mother left the teenagers to live. (T 163-64, 196-97, 573, 1038, 1792).

The gang's drug dealing was structured. Street-level drug sellers worked in eight-hour shifts in a section of Lafayette Gardens known as "the strip." (T 167-68, 584, 603, 751, 1795). The CMB maintained apartments for making and packaging the crack cocaine for retail sales. (T 162-63, 1038, 1040, 1804). Lieutenants gave packages of drugs to the street sellers and collected money from them. (T 163-65, 571-81, 712-13, 1037, 1047, 1053, 1789, 1794-95).

The lieutenants gave street sellers packages, called "bombs," of 100 crack vials that sold for $3 each. (T 165-66, 571-72, 750, 1037, 1044, 1784-85). The flow of customers was nearly constant, and it took only 20 to 30 minutes to sell 100

6

vials. (T 166-67, 750). At times traffic was so intense that a worker would sell a "bomb" in the time it took to walk through the lobby of one of the apartment buildings in Lafayette Gardens right after being resupplied. (T 1854). Street-level dealers sold eight to ten "bombs" per day, containing a total of over 30 grams of cocaine base. (T 1089).

Of the $300 in sales from each "bomb," certain workers were paid $20 while the lieutenant would collect the rest and give it to Hardy. (T 166, 171-72, 572, 575, 751). Other workers were paid a weekly salary of $150, regardless of the quantity of drugs they sold. (T 1790).

Granton began working the "graveyard" shift, from 11:00 p.m. to 7:00 a.m., but eventually worked his way up to become a "lieutenant" and an enforcer. (T 147-48, 344, 461, 572, 712, 1795).

The gang's business was lucrative. (T 173-74 (Hardy told Bryant not to worry about losing $30,000), 610 (Hardy had a safe containing $10,000 to $20,000 in currency), 1796-97). After collecting the money in an apartment on one end of Lafayette Gardens, which in the beginning of the gang's operations totaled as much as $8,000 to $10,000 per day, CMB members delivered the money to Hardy in Hardy's apartment. (T 172, 345-46, 609-10). As a show of strength to establish

7

that the development was "our turf," six armed CMB members accompanied the person carrying the money. (T 172).

The drug activity was reflected in police seizures. On January 11, 1993, in response to a complaint, Officer Miguel Machicote proceeded to Damion and Myron Hardy's apartment in Lafayette Gardens. (T 1733-36). The officers arrested Myron Hardy. (T 1735-36). While the arrest was taking place, an officer positioned below the window of the apartment recovered two firearms and a bag of narcotics. (T 1738-39, 2376-77). Damion Hardy was inside the apartment at the time. (T 1740). On the kitchen table inside the apartment were a number of bullets and a bag containing $1,377. (T 1745).

On December 19, 1996, police officers executed a search warrant at 433 Lafayette, Apartment 16D, a CMB drug apartment, resulting in the seizure of a gun, 87 vials of crack, and equipment used to make and package crack cocaine and the arrest of three individuals. (T 551-55, 604, 752). On February 5, 1997, police officers executed another warrant at the premises, resulting in two arrests. (T 556-57). On October 1, 1999, officers executed a search warrant at 456 Dekalb Avenue, Apartment 15F, seizing a firearm, ammunition, 20 ziplock bags of cocaine base and a large amount of packaging materials, including vials and small ziplock bags, and arresting CMB member Keith Smith. (T 1463-565). On October 21, 2001, police

8

officers executed a search warrant on CMB member Lamont Johnson's apartment, seizing a large amount of cocaine base, including approximately 118 vials that belonged to the CMB. (T 535-36, 681-82, 706).

Even in the violent illegal drug trade, the CMB stood out for its extreme willingness to harm others. Most CMB members carried a firearm and maintained additional guns in Hardy's apartment or the apartment of another CMB member. (T 174-75, 613, 1045-46, 1805, 1975-76). Under the gang's rules, Hardy had first access to any gun that the gang acquired and only Hardy, Bryant and another trusted lieutenant had access to the gang's stash of guns. (T 174-75, 477-78, 1805).

Anyone who attempted to sell drugs in Lafayette Gardens without Hardy's permission would be shot, and the gang members followed Hardy's orders concerning whom to shoot. (T 1806, 1907-08, 1966-67, 1976-77, 1983). As Footman explained with respect to his efforts to murder a former CMB member named "Wayno," who had defected to a rival crew, "That was World's order, that Wayno get it too" . . . "All I knew is that World say he's with Grand." (T 1977-79; see also T 1980 (Footman describing shooting at drug dealers at 470 Dekalb Avenue in Lafayette Gardens because, "whatever the case was, that's what was the order at the time")). As CMB lieutenant Allen Bryant explained, "We wanted Lafayette Gardens, we took it. We ran the

9

older guys out. . . [W]e took it . . . If we needed to shoot, we shoot. And if not, just the reputation that we would shoot and that we've shot before was – was enough." (T 187).

B.    The Murder of Steven Brewer

On February 9, 1992, Bryant's girlfriend and CMB member "Peter Rabbit" were shot at a party. (T 200-01, 471-72, 615-16, 685). Later that night, Bryant and fellow CMB members Lamont Johnson, Fruitquan Bailey and Ron King returned to the scene in Brooklyn, located the shooters, and fired gunshots at them, killing Steven Brewer. (T 201, 471-72, 616-17, 685).

C.    The Attempted Murder of a Witness

On May 15, 1992, CMB member Fruitquan Bailey murdered a young woman, Lashawn Johnson. (T 94-95, 109, 222, 618, 1823). The incident occurred when Hardy and the CMB were attempting to remove other drug dealers from Lafayette Gardens. (T 222). As part of the effort, Hardy approached a drug dealer named "Quan" in Lafayette Gardens, while CMB members stood guard with firearms. (T 222). One Francine May ("Red") happened to pass by and make fun of the CMB. (T 223-24). Hardy spit in May's face, and, after learning that May intended to have her boyfriend, Lawrence Sumpter ("Rab"), avenge the insult, he instructed the CMB to arm themselves and gather. (T 224). Hardy led the gang in an attempt to surprise Rab and his group, but a young woman, a friend of May's, had alerted Rab to Hardy's

10

intent. (T 224-25). Hardy told Bryant to order the CMB members to assault May's friend if they saw her again. (T 225).

Later that day, Fruitquan Bailey, a top member of CMB who had received Hardy's order, told Bryant, "I saw them bitches and I beat the shit out of them." (T 96, 226-27). As Bailey was speaking, Sessoms entered the apartment and informed Bailey that Bailey had shot a young woman named Lashawn Johnson, also a friend of May's, in the head when pistol-whipping her. (T 96-99, 226). Theresa Gregory, Francine May and another friend witnessed the murder.

Despite being upset that Bailey had murdered Lashawn Johnson, the gang determined that "we got to protect him," meaning discouraging witnesses from testifying at Bailey's trial, because "he was part of CMB, so we was going to protect each other, period." (T 228-29, 476, 618). Hardy sent Bailey to hide in Harrisburg, Pennsylvania and began a campaign of witness intimidation. (T 619).

Testifying against a CMB member "was something you shouldn't do, something you couldn't do, something you['d] better not do." (T 620, 1826, 2320-21). The CMB hid one witness from authorities so she would not testify. (T 228, 476). Around the time of the trial, Myron Hardy approached Theresa Gregory and said something to the effect of, "You're

11

still alive," which made Gregory feel threatened. (T 100-01, 122-23).

In another incident, Damion Hardy and two associates also approached Gregory in her building. (T 101). One of Hardy's friends took Gregory's four-year-old daughter outside the building, but Hardy blocked Gregory from the exit and asked Gregory whether she intended to testify at Bailey's trial. (T 102-03). Granton also questioned Gregory about her intent to testify. (T 104-05).

In approximately 1993, Gregory testified against Bailey, who was then convicted of murdering Lashawn Johnson. (T 100, 105, 476-77). After the trial, on April 27, 1994, Gregory was visiting her mother in Lafayette Gardens with her newborn. Hardy saw her and instructed Bryant to have a lower-level CMB member, "Dante," shoot Gregory to "show [her] that she couldn't get away with what she did," meaning "testif[y] against a member of CMB." (T 230, 232). Bryant gave Dante one of the gang's guns and instructed him to shoot Gregory. (T 230, 477). Dante shot her in the buttocks. (T 106-08, 110, 115, 124-25, 1824).

D. Violence Against Rival Drug Organizations

Throughout the CMB's existence, the organization engaged in violent disputes with drug dealing organizations that occupied the neighborhoods immediately surrounding Lafayette

12

Gardens. (T 176). During the disputes, Hardy decided who the CMB would attempt to shoot, supplied the firearms for gang members to use, and determined when the feud had ended. (T 185).

One such rival organization, led by Sumpter ("Rab"), controlled an area a block away from Lafayette Gardens on Grand Avenue in Brooklyn ("the Grand Avenue Crew"). (T 176-77, 1813-14). Hardy suspected that Sumpter was supporting armed conflict in Lafayette Gardens to draw police to the area and prevent the CMB from operating its drug business. (T 178). After a fistfight failed to resolve the conflict, the CMB and Sumpter's crew "went to war," meaning that "[w]e were trying to kill them and they were trying to kill us." (T 179). During the war, in 1993, a CMB member known as "Peter Rabbit" was shot and paralyzed, eventually dying from his injuries. (T 179-80). Members of Sumpter's crew also shot CMB member Lamont Johnson ("Sambo") twice during the conflict. (T 179-80, 624-29, 1814).

Johnson cooperated with the police investigation of the second shooting. (T 180-81). Hardy disapproved because cooperation with police, even for someone who was the victim of a shooting, was contrary to the "code [of] the streets." (T 181). Hardy instructed Bryant to have a young CMB member shoot Johnson in retaliation as a way of "put[ting] in work," or proving that he would engage in acts of violence on behalf of

13

the gang. (T 181-82). The young CMB member shot at Johnson, but missed. (T 182). Johnson was treated suspiciously after he cooperated.

The CMB had a number of additional shootouts with Sumpter's crew. (T 1813-14). Another CMB member, known as "Wayno," left the gang to associate with Sumpter's gang. (T 1815). Hardy ordered CMB members to shoot Wayno for this treachery. (T 1815-16). Another individual, known as "Black," was selling artificial drugs in the CMB's territory, which could have damaged the CMB's reputation for quality product. (T 202-03, 1816-17). Hardy warned Black to stop, and CMB member Sessoms shot him on Bryant's instructions. (T 203, 1817). The act of violence increased Sessoms's status in the gang. (T 203).

In approximately 1993, Hardy declared war on another group based on Bedford Avenue ("the Bedford Avenue Crew"), which consisted of one "Sherrod" and others, and ordered CMB members to shoot Bedford Avenue Crew associates on sight. (T 1809). On May 7, 1994, CMB member Alan Bryant shot Bedford Avenue crew member William Wells. (T 220, 474-75). Hardy was upset at Bryant for risking arrest when there were lower-level gang members who could have performed the shooting for Bryant. (T 221). Hardy ordered Footman to execute a drive-by shooting

14

at a Bedford Avenue Crew member, which Footman attempted but without success. (T 1809-11).

In the early 1990s, the CMB had a violent feud with a crew operating around Marcy Avenue, which included "Chaka" and others (the "Razor Crew"). (T 185). The rivalry flared when a member of the Razor Crew shot at Hardy. In retaliation, Hardy sent Sessoms "to go and shoot them guys." (T 185). Sessoms shot at least one Razor Crew member. (T 185).

During these disputes, the CMB normally had to stop or drastically reduce its drug-selling operation because the street dealers, who stood outside, were vulnerable to being shot. (T 184). Granton, however, insisted on continuing to sell drugs. (T 184). He requested and was provided with a firearm and engaged in shootouts with rival crew members who came to Lafayette Gardens looking to attack CMB members. (T 184). Granton's actions increased his prestige in the gang. (T 184-85).

Also in 1992, a number of CMB members, including Bryant, Damion Hardy, Myron Hardy and Granton, were periodically incarcerated at Rikers Island Correctional Center, predominantly on drug-related charges. (T 205-07, 209, 639-40). In the CMB leaders' absence, a rival group -- the "Deuce Crew" and "Cock and Squeeze" -- led by Hardy's brother, Julian Hardy

15

("Highness"), began selling cocaine base in Lafayette Gardens. (T 210, 640).

A dispute arose because Julian Hardy was harassing the CMB workers who were attempting to sell drugs. (T 211). After being released from jail, Hardy sent CMB members to tell the Deuce Crew that they could not sell drugs in Lafayette Gardens. (T 1818). Hardy and Bryant made a plan to shoot Julian Hardy, which failed but resulted in Bryant's shooting of a Deuce Crew member. (T 213-15). Afterwards, the CMB leaders decided that the inevitable police attention from a turf war within Lafayette Gardens would harm the gang's drug business and the gang would therefore have to wait to settle its account with the Deuce Crew. (T 216).

Frustrated by the unavailability of an immediate violent resolution to the feud, Hardy and Bryant encountered one of the Hamilton Family's lieutenants, known as "Supreme," supervising drug workers in Lafayette Gardens. (T 217). After learning that the workers were selling the same-sized containers of drugs that the CMB was selling, Hardy declared that Supreme "got to go," laid out a plan for shooting him, and instructed Bryant to oversee it. (T 217, 500-01).

According to plan, Bryant gave a gun to an associate who was trying to work his way into the CMB and the associate shot Supreme, who was paralyzed as a result. (T 218-19, 1474).

16

After the shooting, Hardy banned the Hamiltons from selling drugs in Lafayette Gardens and declared that the CMB would be the only organization to sell there. (T 219, 500-01).

E.   The Murder of Troy Davis

On December 22, 1992, at Hardy's direction, Granton shot and killed Hamilton crew associate Troy Davis ("Crazy Troy") at a public telephone across the street from Lafayette Gardens.[3]  Troy Davis worked for the Hamilton organization as an enforcer and heroin dealer. (T 203, 637, 2296). Hamilton's heroin dealing was not an issue for the CMB, "until we started to want to sell heroin too." (T 203).

Hardy inquired with Troy's workers as to what they were selling, and Davis complained to Hardy about Hardy's interaction with the workers. (T 204). After the discussion, Hardy informed CMB's members that Davis "had to go," a phrase Hardy used to give an order to kill someone. (T 204-05, 2310). Hardy informed Dwayne Meyers that J.R. Hamilton was attempting to have Davis harm members of "the team," meaning CMB, and should be killed. (T 2392-94).

After Bryant, Hardy, "Peter Rabbit" and some associates made a failed attempt to shoot Davis, Granton and Hardy succeeded in murdering him. (T 207-08, 1821-22). Shortly

---

[3]   CMB member Dwayne Meyers was arrested for the murder after a witness identified him in a lineup, but the case against him was ultimately dismissed.

17

before the murder, Hardy contacted Dwayne Meyers, who had been friendly with Davis and happened to be standing near the pay phone where Granton shot Davis, and asked why Meyers was spending time with him. (T 2303-04, 2393). At the end of the conversation, to remove Meyers from the scene, Hardy asked Meyers to oversee one of the CMB's workers package drugs. (T 2304-05).

Looking from a window inside a building in Lafayette Gardens, Hardy saw Davis near the telephone and called Davis's pager, knowing that Davis would use the telephone to call back. (T 208-09, 503, 1822). Taking advantage of the distraction to Davis and his predictable whereabouts, Hardy sent Granton to shoot him. (T 209, 503-04, 1822). Granton killed Davis with a gunshot to the head. (T 208-09, 2169-70, 2309-10, 2393). The killing increased Granton's reputation with the gang. (T 639, 1822-23, 2310).

Both Hardy and Granton admitted their involvement in the murder to Bryant. (T 504).[4] Years later, Granton also admitted the murder to CMB associate Shelby Henderson while the two were leaving Granton's apartment in Coney Island. (T 1333-34). Granton told Henderson to keep quiet because Davis's family lived on the same floor. (T 1333-34, 1846-47).

---

[4] Lamont Johnson testified that Myron Hardy told him that Granton murdered Troy because Troy had made threats towards a woman. (T 639).

18

By 1995, the CMB had gained control of all of the drug dealing in Lafayette Gardens. (T 2311-12).

F.    Hardy's Threats to a Witness

On July 4, 1995, CMB member Jeffrey Nieves ("Porto") murdered Bless Jordan ("Buddha"). (T 541-43). The next day, Hardy telephoned Nieves's fiancée, Sheena Carter, to tell her that he was about to pick her up to take her to Nieves. (T 543-44). Instead, Hardy drove Carter to a hotel and threatened, "[I]f you get on the stand and testify, bitch, I will shoot you in your head." (T 543). Hardy was arrested for threatening Carter and pled guilty to felony witness tampering in a New York State court. (GX 137, 140).

G.    The Attempted Murder of Marcel Kennedy

On September 8, 1995, acting on Hardy's orders, Robert Footman shot and rendered paralyzed Marcel Kennedy, also known as "Munchie." By 1995, Footman had become a lieutenant, delivering drugs and collecting the proceeds from the street sellers and speaking with Hardy regularly concerning inventory. (T 1830-32, 1999).

Hardy learned that Kennedy was spending time with someone who had shot Hardy and was telling the CMB's street sellers to stop dealing drugs in Lafayette Gardens. (T 1856-57). On September 8, 1995, after CMB member Djabara McMillian refused Hardy's request to shoot Kennedy, Hardy instructed

19

Footman to secure a gun and drove with Footman to find Kennedy, informing Footman that he intended to take Kennedy to the nearby Marcy Houses public housing development and kill him. (T 1051-52, 1857-60). Footman shot Kennedy, paralyzing his lower body. (T 1052, 1861-65, 1962, 2133).

Footman was arrested, held in jail and stood trial twice for the shooting. (T 1869-71). The first trial ended in a hung jury and the second in an acquittal after Kennedy refused to testify. (T 1871). After being released from jail. Footman expressed anger at Hardy for not providing him with money or a lawyer while the case was pending, and Hardy responded, "I'm the reason why you home." (T 1872, 1963).

H. The Murder of Michael Colon

In about 1998, Hardy professed membership in the Bloods street gang as a contrivance to have young Bloods members commit crimes for him. (T 233-34, 653, 1889, 2324-26). On or about April 14, 1998, Hardy used a young Bloods member named Cleveland Walker ("Tookie") to murder Michael Colon, a security guard at the Rollerdome roller skating rink in Brooklyn. (T 234, 288-89, 526). Hardy later bragged, "I made that happen." (T 234).

On the night of the murder, Hardy and an associate, known as "Dubo," were refused entry to the Rollerdome for failure to produce proper identification, a scuffle with staff

20

ensued, and Hardy was forcibly ejected from the premises. (T 296-99, 301-304, 314, 321-24, 650, 2331). Being ejected from a club posed a danger to Hardy's reputation and carried the risk that other drug dealers would attempt to impinge on Hardy's territory. (T 2331-32). After being thrown out, one of the security guards heard Hardy state, "I'm coming back." (T 324).

The same night, Hardy appeared at Dwayne Meyers's apartment with his face scraped up and directed a return. (T 2332). As they were leaving Meyers's apartment building, Meyers and Hardy encountered Walker. (T 2334). Hardy instructed Meyers to wait with him while Walker retrieved a firearm. (T 2334-35). When Walker returned, the men drove to the rink, and Hardy instructed Walker, "[D]on't kill him. Just shoot him around in [the chest]." (T 2336).

Hardy waited in the car while Meyers and Walker walked towards the club. (T 2337-39). Walker approached the rink and fired multiple gunshots from the sidewalk into the rink's vestibule, striking Colon in the chest. (T 309-11, 327-31, 332-34, 527-30, 652, 2338-41). Afterwards, Hardy believed that Walker was speaking too publicly about what he had done and ordered Meyers to silence him, but Walker was arrested before Meyers could approach him. (T 2344-45).

21

I.    The Shooting at Uniformed Police Officers

On July 29, 1998, Hardy fired gunshots at a New York City uniformed police officer.  Drug user James Barnett knew Hardy from purchasing crack cocaine in Lafayette Gardens. (T 889-90).  That night, Barnett witnessed Hardy kicking a woman, telling her, "[D]on't be selling, sell your shit around my . . . place."  (T 992).  Hardy continued to kick the woman and fired a gunshot into the air.  (T 993-94).  Hardy fled on a bicycle, turning to shoot at an unidentified person.  (T 994-95).

At approximately midnight that night, two officers responded to a report of gunshots near Lafayette Gardens. (T 819, 827).  When the officers arrived at the scene, they observed Hardy with a gun in his hand pointed at another individual.  (T 819-24).  Hardy fled but as one of the officers was catching up to Hardy, Hardy shot at the officer from close range and escaped.  (T 822-25).  Hardy was arrested within days, pleaded guilty to the shooting on June 2, 1999, and was sentenced to two to four years' incarceration.  (T 822, 828). CMB associates were aware of the shooting, which furthered Hardy's reputation for ruthlessness and his authority in the organization.

22

J.     The Murder of Myron Hardy

When Damion Hardy was in jail, his brother Myron Hardy took over running the drug operation.  (T 1060, 2398-99).  At the time, many of the CMB's members were in prison, including Bryant and Granton.  (T 656-58).  On June 12, 1999, Hardy's brother Myron Hardy was murdered in Lafayette Gardens.  (T 659-60, 1065-66, 2404, 2410-11).

With Myron Hardy murdered, Damion Hardy was in intense contact from prison with CMB members to direct the gang's drug business and investigate and ensure revenge for Myron Hardy's death.  Under orders from Hardy, various CMB members, including Granton, Meyers and Bryant, assumed control of the drug dealing in Lafayette Gardens.  (T 238, 2322, 2416-17, 2430-31, 2454-55).

After a short time, however, Hardy sent Allen Cooke, also known as "Taz," an associate and drug dealer from the Bedford-Stuyvesant neighborhood, to take control of the CMB's drug operations.  (T 662-63, 848-49, 1068-69, 1910).  The gang's high-ranking members chafed at answering to an outsider but accepted Hardy's order "because World said he running it." (T 240, 665-66).  When some of the gang's drug workers refused to take instruction from Cooke, Hardy asked Meyers to ensure that the gang members followed Cooke's orders.  (T 2418-19).

23

K.    The Murder of Jerrod Mackens

Dwayne Meyers, a 250-pound boxer, worked as an enforcer and bodyguard for Myron Hardy and would ensure that the CMB's drug dealers worked during their assigned shifts and timely paid the full amount of money they owed.  (T 659, 857, 1063-64 (McMillian testifying that Meyers beat him for stealing drugs from Myron Hardy), 2316-17, 2400).  CMB members, however, suspected that Meyers was complicit in the murder of Myron Hardy because Meyers was nearby with Ivory Davis when Hardy was shot. (T 658-59, 2408-15).

On June 15, 1999, to prove his loyalty to CMB, Meyers killed Jerrod Mackens, also known as "Kojak."  After Myron Hardy was shot, CMB members heard rumors that Mackens had provided the gun that the shooter, Ramel Davis, used to kill Myron Hardy. (T 242, 667, 1296, 1382).  When Meyers told Hardy what he had discovered, Hardy told Meyers to "make sure you take care of that," meaning "to kill him."  (T 2422).

On the day of the murder, Meyers was in the lobby of an apartment building with Keith Smith, another CMB member. (T 2423-34).  Cooke, who was acquainted with Mackens from having served time in jail together, happened to arrive and lured Mackens into the lobby.  (T 2425).  Meyers shot Mackens numerous times, killing him.  (T 2426).  The murder eased the suspicion

24

of CMB members that Meyers had been involved in Myron Hardy's death. (T 2427).

L. Efforts to Kill Ivory Davis

Ivory Davis, also known as "Peanut," had grown up in Lafayette Gardens and was friends with some of CMB's members, having committed crimes, including robbery and drug dealing, with them as teenagers. (T 239, 587-88, 596-97). Myron Hardy and Davis, however, had an on-again, off-again relationship. (T 1850) (Footman believed the two were getting along when Davis surprised Footman by attempting to shoot him). Davis's cousin Ramel Davis, also known as "Nino," killed Myron Hardy. (T 661, 1067).

Hardy held Davis responsible for Myron's death because of Davis's familial relationship with Ramel, reasoning that, "[I]f [Davis] didn't stop it, he was a part of it." (T 239, 2450-51). From prison, Hardy told Bryant, "[I]t was really nothing to talk about. That Peanut was responsible and Peanut had to go." (T 239). Bryant's reaction was, "[I]t is whatever [Hardy] say[s]." (T 239).

Hardy was adamant that Ivory Davis had to be killed. Hardy likewise told Dwayne Meyers that "he didn't want to have to come home and deal with that situation [and that] we needed to take care of that," meaning to "kill Peanut." (T 2420,

25

2434). Granton embraced the mission, telling Footman, "Nut have to get it." (T 1920).

Davis was equally adamant that he had not been involved in Myron Hardy's death. Knowing that Bryant and Hardy communicated, Davis asked Bryant to transmit the message that Davis had not been involved. (T 244). Bryant told Hardy, to no avail. (T 244). Davis also visited Lamont Johnson at Johnson's home to deny involvement in the murder. (T 668).

Nonetheless, the CMB engaged in a campaign to hunt down and kill Davis. Granton attempted to shoot Davis but only succeeded in shooting Davis's car. (T 245, 2435). Later the same day, Davis went to Lafayette Gardens and became engaged in a shootout with CMB members, including Meyers. (T 246-53, 1559-61, 2425-38). Meyers's participation in the shootout enhanced his status with the gang. (T 2438-39). On another occasion, Bryant and Meyers attempted to shoot Davis, and a shootout ensued, but no one was hit. (T 251-53, 2441-42; see also 2439-40).

M.   Hardy's Return from Prison

CMB members met Hardy on the day he was released from prison, and lower-level gang members gave him money as tribute. (T 248, 676-77, 859, 1298). Hardy, however, chastised the gang members for not making more progress in avenging his brother's death. (T 250, 1299, 1921-22).

26

After Hardy returned home from prison, he chaired a series of meetings at a Brooklyn restaurant with CMB members to discuss the status of the efforts to avenge Myron Hardy's death. (T 2445-46). Hardy continued to express his frustration at the lack of progress towards killing Davis and came up with a list of additional targets. (T 2446).

Hardy believed not only that those involved in Myron Hardy's murder and those who helped the murderer should be killed but also that "if you was a friend of the enemy, you were the enemy." (T 256, 856 (Cooke reported that "when World would come out, it would be a lot of bloodshed.")).

Hardy believed that Darryl Baum, also known as "Homicide" and "Hommo," should be the first killed because of his close relationship with Davis and his reputation as "muscle." (T 256, 2446-47).[5] For Hardy, Darryl Baum sealed his fate during an encounter with Hardy at a barber shop in which Baum told Hardy that he had learned that Myron Hardy was Damian Hardy's brother yet continued to associate with Davis. (T 256-57, 260, 863, 1301-03, 1333, 2452-53).

Hardy also actively joined the efforts to kill Davis. On one occasion, Hardy was alerted that Davis was sitting in his car, dressed in a suit, with a gun on his lap, and instructed

---

[5] Shelby Henderson testified that Cooke also wanted to kill Daryl Baum because Baum was attempting to push Cooke out of a drug dealing location that Cooke ran. (T 1301, 1383-84).

27

Bryant to arm himself and accompany Hardy in shooting Davis. (T 255). Bryant protested because Davis's location was too public. (T 255). Hardy was upset, telling Bryant, "[T]hey don't even got to change him, they can put him in the box how he is right now. Give me the gun." (T 255). Bryant refused to give Hardy the gun. (T 255-56).

Hardy also encountered Davis outside a nightclub. (T 1902-03). The men argued, and Hardy demanded a gun from an associate to shoot Davis, although Hardy deferred the shooting. (T 1902-04).

N. The Murder of Lamel Lawson

On October 23, 1999, several CMB members, including Granton, attended a party in Brooklyn. (T 671-72, 1071, 1897). Another party attendee, Lamel Lawson, drew a pistol. (T 1074, 2484). Granton fired a .40 caliber weapon at Lawson, killing him. (T 1898-1900, 2014, 2484-85). Ballistics evidence revealed that the gun used by Granton at the Lawson murder matched the weapon eventually used by Granton to kill Ivory Davis. (T 1237-43, 2165-66, 2484).

O. The Murder of Daryl Baum

On June 10, 2000, shortly after midnight, Granton shot Darryl Baum in the head while Baum was standing in the street speaking with friends. (T 1439-44, 2142, 1720). Earlier that night, Cooke learned of Baum's whereabouts and instructed CMB

28

associate Zareh Sarkissian ("Puff") to kill Baum, but Sarkissian balked after Baum acknowledged him while he was scouting Baum's location. (T 867-68, 947-48, 1720).

Cooke next called Bryant, telling him that Sarkissian would arrive to drive Bryant to kill Baum. (T 260). Bryant did not check with Hardy that night because he already had been given the order to kill Baum. (T 272). Bryant and Sarkissian found Baum but did not shoot him because he was with a group of people. (T 261, 263-64, 276, 1324-26).

Sarkissian and Bryant telephoned Cooke, who was with Meyers, and Cooke instructed them to wait while he summoned Granton, whom the crew frequently used for acts of violence because his small stature and youthful appearance were disarming. (T 261, 264-65, 276, 490-91, 870, 953, 1305). Cooke and Meyers called Bryant back a few minutes later and instructed him to leave Sarkissian's car to provide cover for Granton, who was arriving. (T 265, 267). Granton approached Baum. (T 269, 492-93, 1305). Baum disappeared behind a car as Granton began firing. (T 266-69, 492-93, 1305, 1321, 2468-69). Granton and Bryant entered Sarkissian's car, and Sarkissian drove them away. (T 266, 493, 870, 152, 1721-22). On the ride, Granton said that he had "popped his head off," meaning shot Baum in the head, when Baum bent over to tie his shoe. (T 266, 870, 2156).

29

Granton later warned Footman to be careful because they had murdered Baum, and Baum's friends, including the professional boxer Mike Tyson, had offered a bounty for retaliation. (T 1912, 2473-74). Hardy told Bryant that he convinced Sarkissian to sell the getaway car because it was recognizable. (T 270, 494, 904).

Members of the CMB were concerned that Sarkissian's car was distinctive and could be used by police to tie them to the murder. (T 874, 1305-06). They decided that two CMB associates, Abu Bakr Rahim and Mohammad Ali, would drive the car to Baum's funeral, reasoning that no one who had actually been involved would be brazen enough to drive the getaway car to the funeral of the victim. (T 874-75, 1305-06, 1392).

The CMB wanted others to know that it was responsible for the murder because it enhanced the gang's reputation. (T 270). Hardy was pleased with the murder. (T 876).

P.    The Murder of James JR Hamilton

On August 1, 2000, Granton shot Hamilton multiple times while Hamilton was sitting inside a restaurant he owned. (T 1468-74, 1789-90). Hamilton died almost two weeks later of complications from the shooting. (T 1468-74). Hardy ordered the murder because of suspicions that Hamilton had helped Ramel Davis hide after he had killed Myron Hardy and because of his association with Ivory Davis. (T 250, 247-48, 272, 878, 1297).

30

Furthermore, after Darryl Baum was killed, the gang heard rumors that J.R. Hamilton had joined Tyson in offering the bounty for the murder of Baum's killers. (T 1315-16, 1394-95).

Before the murder, Hardy pressured CMB members to kill Hamilton. In one instance, Hardy told Bryant that he had seen Hamilton and instructed Bryant to send a CMB member to kill him. (T 273). Bryant sent CMB member Tion Weller, a lower-level CMB member who needed to prove himself to the gang. (T 273, 487). Weller returned, reporting that he had not made an attempt because there were too many people around. (T 274, 487, 2475-76).

In another instance, Hardy located Hamilton and sent a prison acquaintance who was trying to gain entry to the CMB to kill him, but that shooter also balked. (T 274-75, 487-88). Hardy also pressured CMB member James Sessoms to kill Hamilton. (T 2476-77).

Hardy was so persistent that Granton complained to other CMB members because Hardy demanded that he kill Hamilton under circumstances in which he was likely to be caught and was angry with Granton for not accomplishing the killing. (T 876-77, 1914-15). Granton assured Hardy that he would complete the job. (T 1415-16).

On the night of the murder, Cooke drove Granton and Henderson by Hamilton's restaurant to see if he was there.

31

(T 1309-10). They saw Hamilton inside his restaurant, and Cooke asked Granton, "[W]hat you want to do?" (T 1311-12). Granton replied, "Whatever, son." (T 1312).

Cooke drove to Cooke's residence, where Granton put on a bulletproof vest and armed himself. (T 1313, 2222-23). Abu-Bakr Raheem and CMB associate Abdul Azziz arrived at Cooke's home to drive Granton. (T 1314).

After arriving outside Hamilton's restaurant, Raheem waited in the car while Granton shot Hamilton as he sat in his restaurant with his back to the front window. (T 1470-72), 1225-28, 1232, 1780-81). Azziz provided backup. (T 351, 1332). Hardy gloated to Meyers, who had protested killing Hamilton. (T 2477-79).

Granton gave an account of the murder to Cooke, Henderson and Meyers. (T 1331, 2481-82). Granton explained that Hamilton was sitting in his restaurant with his back to the front window when Granton shot him through the window. (T 348, 890, 945, 2482). Granton said that his gun had jammed but that he cleared the jam, went inside the restaurant and continued shooting at Hamilton. (T 348-49, 1332, 1762-64, 2220-23, 2482). Granton warned Footman to be careful because they had killed Hamilton and there might be retaliation against CMB members. (T 1916-17).

32

Granton's determination increased his reputation dramatically. (T 349).

Q. The Murders of Ivory Davis and Johann Camitz

At approximately 4:00 on the morning of August 10, 2000, Granton shot Davis twice in the back as Davis sat in the driver's seat of his running sport utility vehicle parked in front of a Manhattan nightclub. (T 58, 2116-18, 2122-23, 2157-58, 2462-65). Davis lost control of the car, which travelled for several blocks on Spring Street, striking and killing a young film director, Johan Camitz, before flipping over. (T 58, 1122, 1129-30, 2118-22, 2465-66).

That night, Hardy contacted Meyers, instructing him to meet Hardy in a Manhattan nightclub. Meyers went to the club and spoke to Hardy from the parking lot by telephone but was unable to enter, so he returned to Brooklyn. (T 2486-99). Before he reached his car, someone exited the club, called to Meyers and gave him two handguns that the person said were from Hardy. (T 2489-90). One of the firearms was the same gun Meyers had given to Granton, which Granton used to shoot Lamel Lawson. (T 2490). Meyers returned to Lafayette Gardens. (T 359, 1924, 2011, 2158, 2490).

A short time later, Hardy telephoned Meyers again and said that he was at a different nightclub, where he had seen Ivory Davis, and instructed him to return to Manhattan.

33

(T 2490-92).  Meyers involved Granton, giving him the two guns he had received from Hardy earlier.  (T 68-69, 491-94, 2216-19).  Granton left for Manhattan first; Meyers went later, arriving just in time to see Granton sneak towards Davis's car and shoot into it.  (T 2130, 2493-98,).  Camitz was at a bar that night; as he and a young woman were walking home, Davis's SUV struck Camitz, killing him.  (T 1122, 1125, 1129-30, 1135).

Granton bragged about the killing and recounted that he approached Davis from behind as Davis was sitting in his car speaking to someone and shot him.  (T 69, 74-76, 357, 1335-37, 1923-26).  Granton said that Hardy was pressuring him to shoot Davis in a manner that could lead to Granton's being caught, but Granton accomplished the killing in "the smooth way."  (T 1926).

The next day, CMB members gloated about the killing to Davis's family.  (T 764-66, 798).  Approximately a month after the murder, Hardy told Ivory Davis's cousin, Uasia Davis, that the murder was "big boys' business," instructed her to "mind [her] business" and boasted that "my [expletive] E-Bay popped that," meaning killed Davis.  (T 765-66).

Hardy's mother later held a gathering at her home for CMB members, including Hardy and Granton, to celebrate Davis's death.  (T 362, 1337-38, 2501-02).  A news report of Davis's death had been recorded and was playing on the television at the party.  (T 362, 2502).

34

R.    The Conspiracy to Extort From Medical Clinics

In early 2001, Hardy hatched a plan to use CMB members and other associates drawn to him because of his status as the enterprise's leader to extort from Brooklyn medical clinics engaged in fraudulent accident schemes.  (T 888-89, 2530-31).  Specifically, Hardy gathered a number of enterprise members and associates (collectively, "his crew") in Brooklyn and informed them that they would enter the medical clinics and tell personnel at the clinics that they were required to pay a portion of their proceeds to the enterprise, and in exchange the enterprise members would provide protection and recruit people to pose as accident victims.  (T 889-91, 2531-32).  Hardy then led his crew to several such clinics to spread the message. (T 889-91).

During one encounter, a clinic manager informed Hardy that the clinic had already arranged for the same services with someone else.  (T 891-92).  That person arrived in the clinic and argued with Hardy and his group.  (T 892).  During the argument, one member of Hardy's group explained, "World runs Brooklyn."  (T 892).  The crew left the clinic, but Hardy ordered crew members to follow and shoot the man; CMB member Dwayne Meyers fired shots at him.  (T 892-94, 2534-36).

In early February 2001, Hardy and his crew approached another clinic, which frightened the staff and caused them to

35

call the police. (T 895, 2070). Detectives from the New York City Police Department arranged for a clinic employee to record telephone conversations with Hardy concerning the extortion scheme. (T 2070-71). During one such call, the employee agreed to Hardy's demand to meet in person but asked Hardy not to bring the entourage that had come into the clinic. Hardy explained, "[T]hat's my security." (T 2073; GX 5000). He further stated that, if the clinic agreed "to do business" with him, he would provide the "same security" to the clinic. (T 2073; GX 5000). On February 12, 2001, Hardy was arrested for his conduct, but the charges were dismissed. (T 2072, 2077).

S.    The Plot to Kill "Metly"

In 2002, Hardy installed an acquaintance named Kenwayne Jones, also known as "Stro," to run the drug dealing operation in Lafayette Gardens and ordered Footman to protect Jones and ensure that the drug workers fell in line. (T 367, 1930-31).

During this period, Jones had a conflict with a Lafayette Gardens resident known as "Metley," and Hardy gave Jones permission to kill him. (T 1940-41). Hardy's permission was necessary because "he was in charge." (T 1941). Footman begged Hardy to rescind the order because Footman and others were friends with "Metley." (T 1940-41).

36

At the time, certain drug dealers who had been selling for CMB started selling their own drugs while paying a tax to Hardy. (T 1947). Hardy agreed to rescind his permission to shoot "Metley" on the condition that Footman order them to stop selling their drugs in Lafayette Gardens. (T 1941-42). Footman gave the instructions and the dealers began working for Hardy under Jones's supervision. (T 1942). Eventually, however, the dealers chafed at Jones's management style and quit. (T 1943). Hardy ordered Footman to conduct the hand-to-hand selling; Footman refused, and Hardy ordered Footman to leave Lafayette Gardens under penalty of death. (T 1943).

T.   The Kidnapping Of Ashbudeen Sakoor

In July 11, 2002, CMB members, acting on Hardy's instructions, abducted drug dealer Ashabudeen Sakoor outside a strip club, hoping to steal his drugs. (T 376-80, 1158-61, 2177, 2183-96). Hardy directed the gang members to bring the dealer to an apartment a few blocks from Lafayette Gardens. (T 381-82, 1030, 2237-41, 2249). Neighbors called the police, who discovered the victim hog-tied on a bed. (T 1020-21, 2190-92). Several of the kidnappers were arrested, and police found an AK90 assault rifle at the scene. (T 383, 1026-27, 2192). Hardy hired a lawyer for a CMB member who was arrested so that the lawyer would inform Hardy if the gang member cooperated with authorities. (T 383, 1564-65).

37

U.    The Murder of Tyrone Baum

On July 25, 2003, three years after Darryl Baum was killed, Bryant, acting on Hardy's orders, shot his brother, Tyrone Baum, three times in the head at a construction site in in Brooklyn.  (T 1750-51).

Baum ("T-Rock") was incarcerated when Granton murdered his brother.  (T 387, 1342).  Hardy was concerned that Tyrone would retaliate against him and declared that Tyrone "had to go."  (T 387, 1343, 2544-45).  Hardy told Bryant that there was a reward for Tyrone's killing.  (T 388).

On the day of the murder, a number of CMB members, including Bryant, Cooke and Meyers, attended services at a mosque.  (T 390, 1344-45, 2545-46).  Afterwards, Meyers saw Tyrone, and he and Cooke called Bryant.[6]  (T 390).  Bryant went to meet them and called Hardy on the way to confirm that he would be paid for the killing; Hardy replied that Cooke would pay him.  (T 391).  Hardy instructed Meyers to ensure that Tyrone was killed.  (T 2550-51).

Bryant arrived at Cooke's automobile and promised to pay Bryant $5,000 immediately and additional money later. (T 391, 1351-52, 2552).  After waiting for Cooke's girlfriend to bring the murder weapon, Bryant rode with CMB associates Abu

_____

[6]    Cooke had an independent motive to kill Tyrone Baum because he believed Baum was involved in the murder of Cooke's father.  (T 405-06, 1272, 1343).

38

Bakr Rahim and Mohammad Ali, with Cooke and Meyers following in Cooke's car. (T 391-94, 1346-47, 1770, 2552). Hardy was in telephone contact with Meyers throughout the events. (T 2552-54). They saw Baum working at a construction site, and, after instructing Ali to leave the car to avoid having another witness to the crime, Bryant shot Baum in the back of the head at close range as Baum was speaking to a coworker. (T 395-97, 1222-24, 1250-52, 1346, 2555). Bryant and Cooke decided to tell Hardy that someone else had committed the murder, because they anticipated that Hardy would demand a cut of the bounty if Bryant had been the perpetrator; Bryant "should have been doing it for free" because "it was supposed to be a hit for the team." (T 401-02, 407, 469, 1349-50, 1403, 2553). Afterwards, Rahim declared the car stolen. (T 1770, 2080, 2173-74, 2557).

On July 19, 2005, agents from the Department of Homeland Security executed a search warrant at the apartment of Hardy's mother. The agents recovered numerous papers belonging to Hardy, including several lists of names and addresses with headings such as "chasers," "attorneys" and "clinics."

V. The Murder of Troy Singleton

After midnight on October 28, 2001, Granton shot and killed Troy Singleton in Queens, New York, as a murder for hire for Emmanuel Mosely and Kenneth McGriff, also known as "Supreme." (T 1456, 1697-98). Mosely had earned a reputation

39

on the street for his willingness to engage in acts of violence. (T 1498-99, 1510). After an introduction by a mutual friend, McGriff, the leader of a notorious drug gang in Queens, asked Mosely whether he would accept a contract to murder four people from Queens who were attempting to kill McGriff. (T 1506-10). McGriff offered a total of $25,000 for each murder and held out the possibility of a job for Mosely with a well-known music recording studio called Murder, Inc. as an additional incentive. (T 1512-14, 1570). McGriff explained that the targets were dangerous and that Mosely would need several men to accomplish the job. (T 1510-13). Mosely accepted.

Mosely hired four criminals to help with the murder of the first target, Eric Smith, also known as "E-Money Bags." (T 1516, 1520-21, 1600, 1611-13). McGriff supplied firearms, bullet-proof vests, an accomplice who was familiar with the area where the targets were known to frequent, and, because none of the hit team members lived in or was familiar with Queens, a place to stay there while they were searching for the target. (T 1514-16, 1519, 1524, 1616-20). On July 16, 2001, after several weeks of searching, the hit team located and murdered Smith. (T 1528-30, 1622-24, 1679).

Afterwards, Mosely turned his attention to the second target, Troy Singelton, also known as "Big Nose Troy." (T 1533, 1626). Mosely had to recruit a new hit man because one member

40

of the original hit team was out of town and another was untrustworthy, having balked and failed to fire at Smith during the first killing. (T 1531, 1533, 1535, 1624, 1633, 1685). Mosely had met Granton through the cousin of Dwayne Meyers and was aware of Granton's willingness to engage in acts of violence. (T 384, 1535-37, 2537-38). Granton agreed to join Mosely's crew for the murder. (T 1538).

Using the same safe house in Queens as a base, the crew searched for Singleton for several months, eventually receiving word that he had been spotted at a nightclub. (T 1536, 1540, 1571). Mosely drove three hit men, including Granton, to the club, where they spotted a car that matched the description of Singleton's SUV. (T 1541-43, 1627-29, 1686, 1456). Waiting in their car, they saw Singleton cross the street from the club towards the SUV. (T 1543-44, 1629, 1688).

Granton and the two other shooters left Mosely's car and approached Singleton. (T 1544-45, 1630-31). Granton fired first, shooting Singleton in the head. (T 1545-46, 1631). The other two hit men fired after Singleton fell to the ground. (T 1546, 1632, 1703, 1714, 2163, 2224-25). The shooters returned to Mosely's car and Mosely drove them to Brooklyn, where he dropped off Granton, who took the murder weapons and agreed to dispose of them. (T 1546-47, 1633-34).

41

Mosely met Granton a few days later and paid him a share of the $25,000 fee. (T 1549). The group's efforts stopped there when McGriff was arrested shortly after the Singleton murder. (T 1550-51).[7]

The testimony of Mosely and Smiley was corroborated by records of text messages sent between Mosely and Granton and Mosely and McGriff around the time of the Singleton murder. (T 1553; GX 8019). For instance, the records included a text message Granton sent to Mosely on the day of the murder asking to be picked up, and a message on the night of the murder from McGriff to Mosely alerting him to Singleton's presence at the nightclub where the murder occurred. (T 1572, 1540, 1570). Several additional messages reflected contact between Mosely and Granton, at times under the nickname "Cyrus the Virus," which Granton frequently used. (T 514, 880, 945, 1573-74, 1928). Granton admitted to Meyers that he had killed someone for Mosely in exchange for money. (T 2538-39).

During a consensual search of Rahim's house, police found telephone records and a business card for India House restaurant, which Henderson and Meyers testified the gang frequented. (T 1772, 2444-45). A search warrant executed at Hardy's mother's home on July 19, 2005 resulted in the seizure

---

[7]  McGriff was convicted of the Smith and Singleton murders.

42

of a number of documents, including telephone records and address books, documents connecting various CMB members to Hardy, such as a letter from Fruitquan Bailey to Hardy, and news clippings and a video recording of news coverage concerning the death of Ivory Davis. (T 2096-98; GX 6015).

43

ARGUMENT

POINT ONE

THE EVIDENCE WAS SUFFICENT TO
SUSTAIN THE CONVICTIONS ON ALL COUNTS

Granton argues that the evidence was insufficient to convict him of any count in the indictment. (GRBr. 57-58). Hardy claims that the evidence was insufficient to prove the existence of a single criminal enterprise spanning the time period alleged in the indictment. (HBr. 48-64). Both are incorrect; the evidence at trial against both defendants was overwhelming and the convictions should be sustained.

It is black letter law that "[a]n appellant who challenges the sufficiency of the evidence bears a heavy burden." United States v. Diaz, 176 F.3d 52, 89 (2d Cir. 1999). In reviewing a sufficiency challenge, this Court "must view the evidence, whether direct or circumstantial, in the light most favorable to the government and credit every inference that could have been drawn in its favor." Id. at 89 (citations omitted). The conviction must be affirmed so long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). "The ultimate question is not whether we believe the evidence adduced at trial established defendant's guilt beyond a reasonable doubt, but

44

whether any rational trier of fact could so find." United States v. Payton, 159 F.3d 49, 56 (2d Cir. 1998) (emphasis in original). Importantly, the evidence must be viewed "not in isolation but in conjunction." United States v. Thai, 29 F.3d 785, 817 (2d Cir. 1994). Judged by these standards, the defendants' sufficiency claims clearly fail.

The government's proof included the testimony of 59 witnesses over the span of 13 days. The government presented the testimony of nine cooperating defendants who were the defendants' co-conspirators in the charged crimes. The testimony of the cooperating defendants was corroborated by civilian witnesses, crime scene evidence, ballistics evidence and telephone records.

Together, the witnesses established that Hardy was the leader of the "Cash Money Brothers" criminal enterprise and that Granton rose through its ranks from being a street-level drug dealer to a lieutenant and later coordinator of the gang's drug business and its most prolific and ruthless hitman. Cooperating witnesses Allen Bryant, Robert Footman, Lamont Johnson and Djabarra McMillian gave consistent accounts of the formation and rise to power of the CMB through Hardy's resourcefulness, shrewdness and manipulation combined with the gang members' unwavering allegiance to him and willingness to use brute force to obtain the gang's goals. Each of the witnesses gave

45

consistent accounts of criminal episodes, the gang's activities and its membership, which included, according to each, Granton, James Sessoms, Fruitquan Bailey, Hastings Fersner, D. Williams, J. Nieves, Keith Smith, Tion Weller, and James Farrior. Significantly, each of them explained that the gang's leadership alternated between Damion and Myron Hardy, depending on which brother was incarcerated, but the gang members willingly accepted orders from both.

The cooperating witnesses also consistently explained the status gang members gained by committing acts of violence and indicated that the gang acted as one for purposes of disputes with rival gangs, both in committing violence and being the victim of violent acts at the hands of their rivals. (GA 9 (Sessoms's shooting of rival dealer increased his status), 349 (Granton's murder of J.R. Hamilton increased his prestige in the gang), 30, 51-52, (Granton's murder of Troy Davis increased his status in the gang), 53 ("[W]e all was considered as one. So, you know, it didn't matter who did it, whoever get caught gets it.") 71).

As to each racketeering act and count in the indictment, the evidence was thorough and indisputable. With respect to the narcotics trafficking conspiracy charged as Racketeering Act One and substantive counts Twenty-Three and Twenty-Four, the government presented evidence from cooperating

46

defendants and police witnesses that was corroborated by police seizures, prior narcotics distribution-related convictions of the defendants and testimony from civilian witnesses. (See, e.g., GA 8-9, 18, 25, 28, 31, 47, 48, 73-74). Together the evidence showed that the CMB, under Hardy's direction and with Granton's participation, both as a street-level seller, lieutenant and enforcer, engaged in large-scale crack cocaine trafficking for almost 15 years and protected its drug business with ruthless acts of violence. See id. Evidence of this crime was sufficient to sustain the jury's verdict.

With respect to the shooting of Theresa Gregory (Racketeering Act Two), the government presented testimony concerning the background of the shooting and the gang's efforts to discourage Gregory and other witnesses from testifying against CMB member Hastings Fersner for the murder of Lashawn Johnson. (GA 4-7, 7-8, 10, 25). Furthermore, the government presented evidence that Hardy instructed Bryant to orchestrate the shooting of Gregory and that a CMB member executed the order. (GA 5, 6, 7, 8, 10-11, 52). The jury was entitled to credit this evidence, and neither defendant offers any argument to the contrary. Hardy's conviction on Racketeering Act Two should therefore be confirmed.

The evidence was also sufficient to prove Hardy's involvement in the September 8, 1995 attempted murder of Marcel

47

Kennedy, also known as "Munchie," charged as Racketeering Act Three. Robert Footman testified in detail to his commission of the shooting in the Marcy Houses at Hardy's behest. (GA 34, 53-54, 58). Furthermore, Police Officer Edward St. John corroborated Footman's recollection that Hardy left him at the Marcy Houses and was pulled over in Footman's family station wagon. (GA 62-64). Crime scene evidence from the Marcy Houses further corroborated Footman's account. (Id.). This testimony and evidence is sufficient to affirm the conviction on Racketeering Act Three.

Similarly, there was more than sufficient evidence to sustain the jury's verdicts against Hardy and Granton for the murder of Daryl Baum (Racketeering Act Five and Count Four). Several cooperating witnesses testified to Hardy's order to kill Baum because of his relationship to Ivory Davis and Hardy's persistent pressure on his underlings to see his order through. (GA 14, 16, 77). Two eyewitness cooperating defendants, testified about the events leading up to the murder, including seeing Granton shoot Baum and escaping the scene with him. (GA 15-16, 27, 32, 33, 43). Their testimony was corroborated by eyewitness accounts of the location of the murder, Baum's activity just prior to being killed, and the shooter's path of flight. (GA 14, 15, 17, 32, 33, 44, 47). The evidence was

48

therefore sufficient to support Hardy's and Granton's convictions for the murder of Darryl Baum.

The jury's verdict should also be upheld with respect to the murder of J.R. Hamilton, charged as Racketeering Act Six and substantive Counts Five, Six, Sixteen and Seventeen. The evidence established that Hardy ordered Hamilton to be killed and pressured CMB members to murder him. (GA 13, 16-17, 26-27, 33, 43, 43-44, 44-45, 77, 78). Indeed, Hardy was so relentless that Granton complained to associates about the pressure Hardy placed on him. (GA 32-33, 56). Cooperating witnesses testified concerning the details they had learned from Granton about the murder, many of which were corroborated by ballistics and civilian evidence. (GA 38, 39, 45, 48). For instance, eyewitnesses testified concerning the presence of Ulysses Hamilton immediately before and after the killing, and Granton told Allen Bryant that Ulysses Hamilton had the same look on his face during a chance encounter in the street after J.R.'s murder as he had on the night of the killing. (GA 18). Moreover, Granton repeatedly bragged that he persisted in shooting Hamilton even though he was forced to clear several jams from his gun, and ballistics evidence confirmed the presence of unjammed bullets at the crime scene. The jury's verdict as to this murder, therefore, should be affirmed.

49

The murders of Ivory Davis and Johann Camitz, charged as Racketeering Act Seven and substantive Counts Seven, Eight, Eighteen and Nineteen, was equally well proven. Several cooperating witnesses testified that Hardy deemed from the outset that Davis would die in retaliation for Hardy's brother's murder. (GA 11, 56, 74, 75, 77). Furthermore, cooperating witnesses testified about the numerous unsuccessful attempts to kill Davis, testimony that was supported by ballistics evidence. (GA 12-14, 46, 75-77, 79-81). The testimony of cooperating eyewitness Dwayne Meyers was corroborated by numerous other eyewitnesses, testimony corroborating Granton's admission concerning the route he took home after the killing, admissions by Granton and Hardy to other cooperating witnesses, and materials seized during the search warrant for the home of Hardy's mother, including print and video news coverage of Davis's death. (GA 39-42, 61-62). Furthermore, ballistic evidence indicated that Granton used the same firearm to murder Lamel Lawson and Davis and to shoot at Davis during a shootout in Lafayette Gardens, corroborating Bryant's, Meyers's and Footman's testimony about the murder weapon. (GA 3, 19, 57, 58, 69, 80). Lastly, the evidence established that, after Granton shot Davis in the driver's seat of Davis's SUV, Davis lost control of the car and hit Johann Camitz, killing him. (GA 3, 35-36, 60-61, 77-78). The convictions on the counts

50

related to the murders of Ivory Davis and Johann Camitz should therefore be affirmed.

The July 2002 kidnapping and attempted robbery of Ashabudeen Sakoor, charged as Racketeering Act Nine and substantive counts Twelve, Thirteen, Fourteen, Fifteen and Twenty-Two, was presented through the testimony of several cooperating witnesses, including Isheen Campbell, who set up Sakoor, and Bryant, whom Hardy directed to ensure that the crime was carried out competently. (GA 19-20, 36-37, 65, 65-68, 84). The evidence was sufficient on those counts as well.

The July 25, 2003 murder of Tyrone Baum, charged as Racketeering Act Ten and substantive counts Ten, Eleven, Twenty and Twenty-One, was proven through the testimony of three cooperating witnesses, ballistics evidence, telephone records showing contact between Hardy and the gang members charged with carrying out the hit on the scene, and testimony connecting the getaway car to Abu Bakr Raheem, the getaway driver. (GA 21-25, 64-65, 82-83, 84). The evidence was therefore sufficient to affirm Hardy's conviction for murder of Baum.

Presented with overwhelming evidence of his guilt on all counts, Hardy does not take issue with the jury's finding that he committed the acts charged in the indictment but, rather, argues that instead of a single enterprise the evidence showed only "an assortment of alliances of convenience among

51

alleged drug dealers and other criminals, working in their own self-interest" (HBr. 48). His argument fails: the evidence overwhelmingly established that the "Cash Money Brothers" constituted a single enterprise that controlled Lafayette Gardens for over a decade, with marked continuity of leadership, operations and membership.

Title 18, United States Code, Section 1959(b)(2) defines an "enterprise" as, inter alia, a "group of individuals associated in fact . . . which is engaged in, or the activities of which affect, interstate or foreign commerce." The Supreme Court has explained that a RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct" the existence of which is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583 (1981); see also United States v. Coonan, 938 F.2d 1553, 1559 (2d Cir. 1991).

The facts at trial established the existence of a single enterprise. Cooperating witnesses and civilian witnesses identified the core of the CMB's membership over time, which included Damion and Myron Hardy, Granton, Bryant, Footman, Meyers, James Sessoms, Tion Weller and Keith Smith, among others. While some of the gang's members were either jailed, in

52

the case of Fruitquan Bailey and Hastings Fersner, or murdered, as in the case of Myron Hardy and "Peter Rabbit," most of its membership was remarkably consistent over time.

So was the gang's leadership. Damion and Myron Hardy led the gang from its inception, alternating direction of its activities as one or the other was imprisoned. And while, as is natural, certain members were closer to Myron or Damion, they all answered to both. (GA 28, 83).

Significantly, the gang considered itself a cohesive body, and its members stood up for each other in disputes. (GA 43, 44, 53 ("We all was considered as one. So, you know, it didn't matter who did it, whoever get caught gets it."), 1295, 1335 (Cooke, Granton, Henderson, Abu Bakr Raheem and Tariq Azziz assaulted people who had robbed Granton's sister)).

The fact that some of the gang's drug dealers began selling narcotics outside Lafayette Gardens, as they had always done (see, e.g., GA 71) (Myron Hardy was selling in Upstate New York before his death), does not show that the enterprise ceased to exist. Rather, as Bryant explained, the gang maintained its structure under Hardy's leadership: "I was always dealing [drugs] with the organization early on. We was all selling drugs together. But as it got older, we was able to have our own private and you had to sell for World if he gave you something." (GA 26). Whether a dealer was able to keep all of

53

the profits, "[d]epend[ed] on where I get the drugs from. If I got them from World, I had to give him some of the money. If I bought it from somewhere else, I would keep all of the money." (GA 26).

> Q: "And you could choose whether you bought drugs from World, let's say, or from somebody else; is that right?
>
> A: No. In the later times I can buy my own drugs. But if World gave me drugs, I gotta sell it."

(T 484).

Hardy also points to the fact that he assigned Kenwayne Jones ("Stro"), who was an outsider, to run the drug sales in Lafayette Gardens as evidence that the gang lacked structure. (HBr. 57). But Jones's appointment by Hardy proves the point. Hardy was able to assign a stranger to run his drug business because of his leadership in the gang (GA 19), picking Robert Footman to protect Jones to enforce his decision (GA 57). Hardy gave Jones permission to kill someone in Lafayette Gardens, and Footman's attempt to protect the intended victim resulted in Footman's banishment from the development under penalty of death. (GA 57). Hardy's appointment of Jones to run the drug trade in Lafayette Gardens, therefore, demonstrated the enterprise's existence.

Hardy similarly claims that his appointment of Edward Cooke to run the gang's drug dealing demonstrates that the

54

enterprise no longer existed. (HBr. 57-58). But his ability to appoint a near stranger, and the fact that the gang's more senior members, like Bryant and Meyers, would accept the decision, is further proof of the existence of the enterprise.

Hardy also argues that his professed affiliation with the Bloods street gang establishes that the criminal conduct proven at trial was not related to a single enterprise. (HBr. 58-59). The proof showed, however, that Hardy held himself out as part of the Bloods gang to leverage his, and by extension the CMB's, ability to commit further crimes. (GA 11, 72). Indeed, Hardy consulted Dwayne Meyers concerning his plan and they decided to carry it out. (GA 72).

Contrary to his argument (HBr. 59-60), Hardy's use of Bloods member Cleveland Walker, also known as "Tookie," to murder Michael Colon was simply an execution of the plan. Hardy murdered Colon because his ejection from the rollerskating rink harmed his reputation and jeopardized the CMB's control of its drug turf. (GA 73). He enlisted enterprise member Dwayne Meyers and they, in turn, used Walker to commit the murder, just as the two had planned when they decided to claim affiliation with the Bloods. Thus, Hardy's Bloods membership did not demonstrate the existence of multiple enterprises.

Lastly, Hardy argues that the murders that the CMB committed in the wake of Myron Hardy's death were a matter of

55

personal vengeance and therefore were not in furtherance of enterprise. Hardy is unable to cite a case in which a court has held that personal motives cannot be the driving force behind racketeering acts, and indeed he acknowledges the existence of authority to the contrary. (HBr. 60-61). While the murders had a personal component, they were also tied to the enterprise. They were carried out on orders from the enterprise's leader, at least in part to avenge the death of another leader. When taken in the context of the gang's need to protect its turf and preempt infringement on its territory by not showing any sign of weakness, the jury could easily have inferred that the murders were enterprise-related.

Hardy's sufficiency claim therefore should be rejected.

56

POINT TWO

THE DISTRICT COURT'S FINDING THAT
HARDY WAS COMPETENT SHOULD BE AFFIRMED

Hardy claims that the district court erred in finding him competent to stand trial. (HBr. 25-47). As we show below, the district court's finding was correct.

I.   The Factual Background

A.   Initial Stages

In approximately 2004, Hardy began exhibiting bizarre behavior marked by messianic delusions. His psychiatric illness and psychotic behavior manifested itself at his first appearances in court. He expressed belief that he was the rapper Clifford Harris, also known as "T.I.," the President of the United States, and other people. He also professed belief in something called "Ethou Law," which requires his immediate release from prison, and that his prosecution was illegal and based on a corrupt government conspiracy. He has been extremely violent, assaulting prison staff and fellow inmates, including by stabbing. He has undergone five evaluations, and the district court held three hearings concerning his competency, leading to his being held in some instances to be incompetent to proceed. (September 2004 (found competent), 2007 evaluation (incompetent), March 2008 evaluation (incompetent), November 2014 (competent), hearings 2009 and 2012). At the conclusion of

57

a multiple-day hearing in 2012, the district court concluded that Hardy should be forcibly medicated to ensure the safety of BOP staff and fellow inmates and to restore him to competency for trial, and this Court affirmed.  See United States v. Hardy, 724 F.3d 280 (2d Cir. 2013).

B.   The Hearing

After Hardy was treated for nearly a year, on November 18, 2014, the Bureau of Prisons issued an opinion finding him competent to stand trial.  Before trial began, on March 19, 2015, the district court ordered that Hardy be examined again for competency and presided over a March 24, 2015 hearing at which the psychiatrist for the Bureau of Prisons and Hardy's own expert psychiatrist testified.  In a written decision issued on April 1, 2015, the district court found Hardy competent to proceed.  (HA 208-12).

1.  Dr. Preston-Baecht

At the hearing, Dr. Leanne Preston-Baecht, a psychologist with the United States Bureau of Prisons, testified that she was assigned to be Hardy's primary clinical psychologist for four months in 2008 and from November 2011 to December 2014.  (HA 91-92).  In 2008, Dr. Preston-Baecht concluded that Hardy suffered from schizophrenia and was in need of treatment.  (HA 92-93).  In February 2009, she concluded that Hardy was incompetent to stand trial.  (HA 93).

58

Beginning in November 2011, Dr. Preston-Baecht saw Hardy weekly to monitor his status while awaiting the district court's decision on whether he would be forcibly medicated. (HA 92). After this Court's December 2013 decision affirming the district court's order authorizing forcible medication, Dr. Preston-Baecht met with Hardy routinely to monitor his response to medication and evaluate his educational needs, and she conducted a competency assessment culminating in a competency evaluation dated November 18, 2014. (HA 94, 96).

Hardy was medicated regularly from December 2013 to March 2015. (HA 95). Upon being medicated, Hardy "became much less preoccupied with the belief that he was someone else" and ceased his aggressive and threatening behavior. (HA 96). By the time of the hearing, Hardy had been placed in general population at the Metropolitan Correction Center rather than the Special Housing Unit. (HA 95-96).

At the court's direction, Dr. Preston-Baecht issued an opinion concerning Hardy's competency on November 18, 2014. To make her assessment, in addition to meeting with Hardy, Dr. Preston-Baecht reviewed a March 2014 motion to dismiss the indictment that Hardy had filed pro se, transcripts of court status conferences in which Hardy had participated, and recordings of telephone conversations Hardy had made from jail, and discussed with defense counsel their interaction with Hardy.

59

(HA 97-98). In a September 12, 2014 status conference, Hardy lucidly pointed out to the district court that the clerk's office had filed documents on his civil, rather than criminal, docket:

> Things I have been sent going to the civil case with the Eastern District of New York, with the case that I had. I clearly addressed Frederic Block. They sent it to the civil case to [District Judge] Sandra Townes and [then-Magistrate Judge] Joan Azrack. I received a docket sheet from them, and the letter I sent you is on their docket sheet. And, Judge Block, I sent you like four messages. Could you rule on me? I sent you like four motions. Could you rule on the motions?

(GA 1).

The district court responded, "We will take a look at it, but it's good to hear you make those requests because it sounds like you are improving with the medication." (GA 1).

On the recorded telephone calls, Hardy discussed strategies for his defense, the correction of his understanding of the statutory provision under which he had been charged, including the pleading requirements of an overt act in the statute with which he had mistakenly believed he was charged, and the results of his own legal research. (HA 98, 103). Dr. Preston-Baecht observed that, in a 15-minute telephone call between Hardy and his mother, "[H]e did not present with obvious symptoms of mental illness in that conversation," and in a

60

number of the telephone calls with his mother, the most recent of which were approximately one month before the March 2015 hearing, Hardy's communication skills were consistent and "nothing about those phone calls stood out to [Preston-Baecht] as reflecting psychosis or mental illness." (HA 102-04). From the calls, Dr. Preston-Baecht concluded that Hardy had "a good and rational factual understanding of what was going on [and] it was fair to conclude that he did have the ability to hear the information and retain it and understand it." (HA 98-99).

In her November 18, 2014 report, Dr. Preston-Baecht found Hardy competent based on three factors. (HA 96). First, Hardy was fully aware of the charges against him, including that he had been charged with racketeering for ordering murders as part of a large drug enterprise. (HA 96). Second, Hardy understood the potential consequences of his legal situation, including its seriousness, but also that he was no longer facing the death penalty. (HA 96). Third, Hardy indicated that he could assist in his defense by meeting with the prosecutors to obtain a deal. (HA 96-97). While not necessarily realistic, Dr. Preston-Baecht did not find Hardy's strategy delusional or based on "paranoid or delusional ideation" regarding his counsel. (HA 97).

On March 11, 2015, Hardy moved for a competency hearing. Counsel reported that Hardy obsessively insisted on

61

meeting with the government to explain "the truth," after which he was confident that the all charges against him would be dismissed, although he refused to inform counsel as to what he would discuss. Counsel stated that, because of Hardy's preoccupation with arranging the meeting, Hardy declined to discuss the evidence or review discovery. Counsel further proffered Hardy's belief that none of the obstacles mattered because "he will tell the truth and be exonerated, 'especially when the judge sees the papers,'" although Hardy refused to share the "papers" with counsel. (Hardy Comp. Mot. at 5). Counsel also stated that Hardy continued to adhere to some of the same delusional beliefs as in the past, such as the existence of "Ethou Law."

The district court granted Hardy's motion. The court ordered the BOP to conduct an updated assessment of Hardy prior to the hearing. On March 20, 2015, Dr. Preston-Baecht met with Hardy to assess his continued competency. (HA 100). After the meeting, Dr. Preston-Baecht found that Hardy continued to be competent to stand trial. (HA 114).

During the meeting, Hardy did not claim to be anyone else, answered all of the doctor's questions "relevantly" and presented himself as anxious about the impending trial. (HA 105). He did not reassert his claims under "Ethou Law," or any legal ruling that would result in his immediate release from

62

custody. (HA 106). Hardy said that he did not believe that he could prevail at trial and that such an agreement was his best hope of being released from prison. (HA 107). Hardy explained that there were numerous cooperating witnesses and "it's my word against all of theirs." (HA 112). Hardy also said he believed counsel should have made more of an effort to have his case dismissed on a technicality. (HA 107). Hardy explained that he intended to tell the government that some of its cooperating witnesses were responsible for some of the crimes he was accused of committing and to provide information about individuals unknown to the government who were involved in the charged enterprise. (HA 108, 128). Hardy further stated that Edward Cooke was the true leader of the charged enterprise (an argument his counsel made to the jury at trial) and that the cooperating witnesses were lying to obtain their own release from prison. (HA 109, 111, 130). Hardy said that he would consider pleading guilty to some criminal conduct if necessary to obtain a cooperation agreement. (HA 110).

When asked whether, "[I]if Hardy chose to do so, could he cooperate with his defense counsel?", Dr. Preston-Baecht said, "I think that at this point he is focused on an option that he views as being his best option, which is trying to cooperate with the government. And as a result, he doesn't think that there is a point in trying to assist in preparing for

63

trial. However, I think that if he chose to do so, he has the ability to do so." (HA 113). When asked, "In your opinion is the conflict between the strategy of Mr. Hardy and the strategy of Mr. Ruhnke the product of mental illness?," Dr. Preston-Baech responded, "At this point no. I think his mental illness is controlled with medication . . . I think that although it's probably very frustrating for his defense counsel to try to work with him, given his very stubborn fixation on this option, I don't think it's a result of an illness. I think it's more the result of his own weighing in that that's his best option." (HA 113-14).

Dr. Preston-Baecht said that, while Hardy has not ceased using the term "Ethou Law," the delusional beliefs about its nature that Hardy possessed when incompetent in 2009 were no longer present in 2014. (HA 122-23). "[H]e no longer has that really disorganized, difficult to understand definition of Ethou Law, and now he defines it differently. And he really, with me, has not focused on it for a reason for him to be released or not having to go to trial at all." (HA 124).

Dr. Preston-Baecht acknowledged that on September 9, 2014, Hardy told her that he was being incarcerated for no reason and that there was no evidence suggesting that he had committed a crime. (HA 135). On September 5, 2014, when asked about his case, Hardy said that he had been arrested illegally

64

and that Ethou Law applied to his case. (HA 135). According to Dr. Preston-Baecht, some individuals who are treated successfully are unlikely to admit that their delusional beliefs were the product of mental illness even though they no longer have them, but "what we're looking for is are they able to still discuss their case without relying upon that delusional belief . . . and the good news in this case that I don't think he does." (HA 137).

### 2. Dr. Dudley

The defense called Dr. Richard Dudley, who had been retained by the defense several years earlier and had testified on Hardy's behalf previously in connection with the forcible medication proceedings. He had evaluated Hardy for the first time in January 2015 and had spoken to Hardy for a total of four hours since first meeting him. (HA 165, 167). Dr. Dudley testified that Hardy was not competent to proceed but conceded that he had not reviewed all of the evidence bearing on the subject, including the recordings of telephone calls Hardy made from jail. (HA 162-63, 175).

### 3. The Court's Decision

On April 1, 2015, the district court issued a Memorandum and Order finding Hardy competent to stand trial. (HA 208-12). Specifically, the court found that Hardy's condition had improved after being medicated and that counsel

65

did not object to Dr. Preston-Baecht's November 2014 finding that Hardy was competent. (HA 209). The court found Hardy's position with respect to his chances of prevailing at trial compared to the potential benefits of a cooperation agreement and his assessment of the evidence against him to be logical and sophisticated. The court credited Dr. Preston-Baecht's assessment that Hardy was "no longer preoccupied with [delusional] beliefs to the extent that he cannot be re-directed or consider other possibilities." (HA 211). It also found her opinion corroborated by other evidence, including pro se motions presenting "logical (if incorrect) legal arguments in an articulate manner." (HA 211). The court further relied on its own observations of improvements in Hardy's behavior over time. (HA 211-12).

## II. The District Court's Finding that Hardy Was Competent Should Be Affirmed

The Due Process Clause bars the "criminal prosecution of a defendant who is not competent to stand trial." United States v. Quintieri, 306 F.3d 1217, 1232 (2d Cir. 2002) (quoting Medina v. California, 505 U.S. 437, 439 (1992)). To be found competent, "[t]he defendant must have (1) 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and (2) 'a rational as well as factual understanding of the proceedings against him.'" United States

66

v. Nichols, 56 F.3d 403, 410 (2d Cir. 1995) (quoting Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam)); see also Godinez v. Moran, 509 U.S. 389, 396 (1993); United States v. Morrison, 153 F.3d 34, 46 (2d Cir. 1998).

A district court determines competence by a preponderance of the evidence. Morrison, 153 F.3d at 46; Nichols, 56 F.3d at 410 (citing 18 U.S.C. § 4241(d)). In making this determination, the district court may properly rely on a number of factors, including medical opinions and its "observation of the defendant's comportment." Nichols, 56 F.3d at 411 (citing United States v. Hemsi, 901 F.2d 293, 295 (2d Cir. 1990)); see also United States v. Oliver, 626 F.2d 254, 258-59 (2d Cir. 1980).

Significantly, "[i]t is well-established that some degree of mental illness cannot be equated with incompetence to stand trial." United States v. Vamos, 797 F.2d 1146, 1150 (2d Cir. 1986); see also Nichols, 56 F.3d at 412. Rather, to support a finding of incompetency, "[t]he mental illness must deprive the defendant of the ability to consult with his lawyer 'with a reasonable degree of rational understanding' and to understand the proceedings against him rationally as well as factually." Nichols, 56 F.3d at 412 (quoting Dusky, 362 U.S. at 402). "Moreover, while the district court may consider psychiatric history in its deliberations, '[t]he question of

67

competency to stand trial is limited to the defendant's abilities at the time of trial.'" Nichols, 56 F.3d at 412 (quoting Vamos, 797 F.2d at 1150).

A district court's determination that a defendant is competent to stand trial following a competency hearing is factual and therefore reviewed only for clear error. See, e.g., Morrison, 153 F.3d at 46. "[D]eference is owed to the district court's determinations based on observation of the defendant during the proceedings." Vamos, 797 F.2d at 1150. "Where there are two permissible views of the evidence as to competency, the court's choice between them cannot be deemed clearly erroneous." United States v. Villegas, 899 F.2d 1324, 1341 (2d Cir. 1990); see also Morrison, 153 F.3d at 46 (deference owed to district court even where "record on competency may plausibly be read to indicate the defendant may not have been competent").

Here, the district court did not clearly err in assessing the facts and the parties' arguments and concluding that Hardy was competent by a preponderance of the evidence. To begin, the court fully developed the record with respect to competency. After the Bureau of Prisons began administering medication, the court required regular status reports from Hardy's treating physicians, which they created. The court authorized two additional rounds of evaluations, one in November 2014 and the other just before trial, in March 2015. The court

68

held an evidentiary hearing at which both parties' experts, including Hardy's treating psychologist, testified. Also introduced into evidence at the hearing were numerous recorded telephone calls Hardy made from prison. The court also took into account its own observations of Hardy's conduct during court appearances in the case. The court's careful development of the record placed it in the best position to assess the credibility of the witnesses, weigh the evidence and make its findings.

Furthermore, in weighing the evidence, the district court reasonably concluded that Hardy was competent. Hardy, for his part, emphasized to the court that he continued to mention some of the concepts that marked his delusional thinking during periods of incompetence, such as "Ethou Law," the existence of a decision by the United States Supreme Court requiring his release from custody, and his fixation on whether the government had pled an overt act in furtherance of the conspiracy with which he was charged. The government, in contrast, noted that Hardy's condition had drastically improved and that, while he may have mentioned "Ethou Law," he only did so when prompted, which the government's expert testified was typical of successfully-treated schizophrenics who do not want to admit that they are delusional.

69

Moreover, unlike before, Hardy did not adhere to the same fantastic explanation of "Ethou Law." Indeed, Hardy's treating psychologist testified that she did not think Hardy genuinely believed in the concept any more. The government also noted that Hardy acknowledged that he could not easily obtain his release from custody and would likely have to plead to some criminal conduct. The psychologist also emphasized that Hardy had a realistic assessment of the government's case and his likelihood of prevailing at trial and had formulated a strategy for his case, specifically, attempting to cooperate with the government. See United States v. Zhou, 428 F.3d 361, 380 (2d Cir. 2005) ("[I]t seems to us both reasonable and expeditious in this context to rely on the expertise of a forensic psychologist associated with the BOP, since psychologists working routinely in a penal setting are presumably familiar with patients similarly situated."). Hardy was also present during pretrial conferences and jury selection, and had no outbursts or instances of inappropriate behavior. Indeed, he consistently asked the judge to cease medicating him because he had not had any disciplinary incidents since the onset of treatment.

On appeal, Hardy emphasizes his psychiatrist's and counsel's observations at the expense of those of Hardy's treating psychologist from the Bureau of Prisons. The district court's decision to credit the government's expert and rely on

70

its own observations was well within the scope of permissible rulings.

The district court correctly found the government's expert more persuasive than Dr. Dudley, whose testimony was inconsistent. In the record was a report that Dr. Dudley had authored in January 2015, in which he found Hardy to be "at least minimally competent." (Dkt.Ent. 921-1, p.2). In an attempt to explain the written opinion at the March 2015 hearing, the defense elicited that in January 2015, Dr. Dudley observed that Hardy was "obviously better" but that they needed to wait to see if he would "cooperate in getting ready for a defense." (HA 188). Dr. Dudley's position suggests, contrary to his other testimony, that he did not reach an opinion as to Hardy's competency in January 2015 pending Hardy's interactions with counsel.

In addition, Dr. Dudley initially provided incorrect testimony about whether he had listened to any of the defendant's phone calls prior to issuing his opinion letter. During the hearing the government asked, "[H]ow many phone calls did you listen to of Damion Hardy's prior to issuing your March 10th report?" (HA 174-75). Dr. Dudley answered, "I listened to two of them and then some subsequent to that." (HA 175). After a convoluted exchange, the government sought to clarify and asked again, "Just to be clear, prior to the March 10th report,

71

did you listen to any BOP calls?" Dr. Dudley refused to directly answer the question and testified, "I listened to – I did not listen to the calls from Springfield until subsequent to that." (HA 175). Dr. Dudley's response did not address two recordings from the Metropolitan Correctional Center, so the government again sought to clarify and asked, "So in reaching your report then, you didn't listen to any of the BOP calls?" Finally, Dr. Dudley corrected his initial testimony, admitted he had not listened to any calls prior to writing his report, and stated, "That is correct." (HA 175).

Significantly, Dr. Dudley's opinion that Hardy was delusional because he believed that he could convince the government to dismiss the charges against him was directly contradicted by the interaction between Hardy and Dr. Preston-Baecht, during which Hardy accepted the unlikelihood of a dismissal and entertained the idea of pleading guilty to charges. (HA 161).

Moreover, Dr. Preston-Baecht had far more extensive dealings with Hardy than the defense expert and was better positioned to make an accurate assessment of his competency. Dr. Preston Baecht had been Hardy's primary clinical psychologist for years. (HA 91-92). She met with Hardy regularly and listened to a selection of his recorded phone calls, including calls from as recent as February 2015, prior to

72

issuing her psychological report.  (HA 98-100, 102-04). During the pendency of Hardy's case, Dr. Preston-Baecht demonstrated her independence by repeatedly finding Hardy not competent to proceed to trial in the past.

As Dr. Preston-Baecht stated, "At this point, I think that his illness is adequately controlled with medication, that he's completely in touch with reality in the sense of not claiming to be someone other than Damion Hardy.  He recognizes the charges against him.  And I think he's very desperate right now and very much in denial and overwhelmed by the reality that he could be going to trial."  (HA 151).  Based on the record, the district court properly found Hardy competent to proceed and his arguments to the contrary should be rejected.

73

POINT THREE

THE DISTRICT COURT PROPERLY EMPANELED AN
ANONYMOUS AND PARTIALLY-SEQUESTERED JURY

Granton asserts that the district court erred in empaneling an anonymous and partially-sequestered jury. (GRBr. 43-48). As we show below, he is wrong.

I.   The Factual Background

On January 9, 2015, the government moved for an anonymous and partially-sequestered jury, citing the defendants' history of retaliation against witnesses, Hardy's conviction for witness tampering in connection with the attempted murder of Theresa Gregory, the defendant's position of leadership in the CMB, the fact that at least one CMB member had publicly threatened cooperating witnesses in a YouTube posting, and the anticipated media attention of the trial, especially in light of the extensive prior coverage of the proceedings. On March 13, 2015, in an oral ruling, the district court granted the government's motion for an anonymous jury but denied the motion for partial sequestration. The court instructed jurors that their identities would be anonymous to protect their privacy due to the anticipated media attention of the trial.

On the government's motion, the district court ordered that the jury remain anonymous but declined to partially

74

sequester the jurors or to arrange for the United States Marshal Service to transport the jurors to and from court.

II.  Argument

The law in this Circuit has long been clear that "the use of an anonymous jury is constitutional, when there is 'strong reason to believe the jury needs protection' and the district court 'tak[es] reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected.'"  United States v. Wong, 40 F.3d 1347, 1376 (2d Cir. 1994) (alteration in original) (quoting United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991) (collecting cases)); see also United States v. Vario, 943 F.2d 236, 239 (2d Cir. 1991) ("[W]hen genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional rights.").  The district court has broad discretion to determine whether to grant an anonymous jury. United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995). This Court reviews a trial court's decision to use an anonymous jury for abuse of discretion, see United States v. Gotti, 459 F.3d 296, 345 (2d Cir. 2006), and looks to the record as a whole, rather than just those facts available at the time of empanelment, in conducting that review, see United States v. Quinones, 511 F.3d 289, 295 (2d Cir. 2007).

75

In determining whether or not a jury needs the protection of anonymity, the district court should consider:

> (1) the seriousness of the charges; (2) the dangerousness of the defendant[s]; (3) the defendant[s'] ability to interfere with the judicial process by [themselves] or through [their] associates; (4) previous attempts to interfere with the judicial process by the defendant[s] or [their] associates; and (5) the amount of public and media attention expected during the trial that might expose the jurors to extraordinary pressures that could impair their ability to be fair.

United States v. Cacace, 321 F. Supp. 2d 532, 534 (E.D.N.Y. 2004); see also Gotti, 459 F.3d at 346; United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995); United States v. Thai, 29 F.3d 785, 801 (2d Cir. 1994).

If a district court decides that a jury needs protection, precautions must be taken to minimize any potential prejudice to the defendant's interests in conducting meaningful voir dire and in maintaining the presumption of innocence. See United States v. Amuso, 21 F.3d 1251, 1264 (2d Cir. 1994). This Court has found that sufficient steps were taken where voir dire excluded only the jurors' names, addresses and employers, see Wong, 40 F.3d at 1377, and where the district court provided the jury with a plausible and non-prejudicial explanation for its anonymity, see Thai, 29 F.3d at 801.

All of the factors this Court has identified as relevant to the decision to empanel an anonymous jury supported

76

such empanelment in this case. The district court's decision, thus, was not an abuse of discretion and should be upheld.

1. Seriousness of the Charges

The seriousness of the charges, which included seven murders, attempted murder, kidnapping and robbery, conducted by an organized enterprise that existed for over 20 years, justified an anonymous jury in this case.

In other venues, Hardy had also been convicted of conspiring and attempting to murder a state-court witness against a fellow CMB member charged with murder. He had further been charged with kidnapping and robbing an individual in California, although the government elected not to proceed on those charges, and convicted of ordering and directing the kidnapping and attempted robbery of a drug dealer in Queens, New York. The latter kidnapping was carried out by a group that included James Sessoms and Kenwayne Jones, CMB members convicted of robbery and kidnapping charges after trial in the Eastern District of New York. See United States v. Sessoms, et al., Criminal Docket No. 04-706 (DGT).

For these crimes, the defendants were sentenced to numerous terms of life incarceration, including mandatory life sentences. See 18 U.S.C. § 1959(a)(1). The seriousness of the offenses and the risks the defendants faced "create[d] significant incentives to threaten jurors." United States v.

77

Gotti, No. 02 CR 743 (RCC), 2004 WL 2274712, at *2 (S.D.N.Y. Oct. 7, 2004) (empaneling anonymous jury). The district court properly assessed that this factor weighed in favor of empaneling an anonymous jury in this case.

### 2. The Defendants' Dangerousness

There was ample evidence of the defendants' dangerousness before the district court when it ordered an anonymous jury. The trial evidence not only established the defendants' membership in a violent criminal enterprise but also "depict[ed] a pattern of violence by the defendants and [their] associates such as would cause a juror to reasonably fear for his own safety." Vario, 943 F.2d at 241. The district court correctly assessed this factor as well.

### 3. The Defendants' Interference with the Judicial Process

At trial, the government presented evidence that Hardy and the CMB previously had attempted to interfere with the judicial process by attempting and threatening to kill witnesses. Indeed, Hardy was convicted of the attempted murder of Theresa Gregory in retaliation for her testimony against CMB member Fruitquan Bailey and the government presented evidence of a concerted effort by gang members, including Granton, to intimidate her before she testified. Furthermore, the government presented evidence that Hardy threatened the

78

girlfriend of Jeffrey Nieves, also known as "Porto," who had witnessed Nieves commit a murder. As the witness testified, Hardy unexpectedly took her to a hotel room and said, "[I]f you can get on the stand and testify, bitch, I will shoot you in your head." (GA 28).

Furthermore, on January 9, 1997, Hardy was convicted in state court of tampering with a witness, a class E felony. In addition, on July 30, 1998, Hardy pleaded guilty to attempted assault, a class E felony, for firing a gun at uniformed New York City Police Department officers. The government further presented testimony from former CMB members that the gang considered witness intimidation to be necessary to protect members from arrest and prosecution. (GA 29 (Testifying against a CMB member "was something you shouldn't do, something you couldn't do, something you better not do.")), see also GA 52, 71-72).

Moreover, the government presented evidence to the court that CMB associates remained at large and were loyal to both defendants, including (1) a co-defendant in the case who posted a video on YouTube ranting against and threatening cooperating witnesses, stating, "I'd rather kill you than put you in jail. [I'm] always in the street with [my] hammer," and (2) the individual against whom Theresa Gregory had testified, who served his sentence and was released soon before trial.

79

The existence of organization associates at large who could carry out acts of violence against or threaten jurors, and Hardy's demonstrated desire and ability to interfere with the judicial process through violence and threats he ordered others to carry out or carried out himself, strongly supported protecting the jurors' identities.

4. Media Attention

By virtue of Hardy's association with Lil' Kim, a popular rapper, and the serious nature of the charged crimes, the case received media attention from its inception. See, e.g., "Lil Kim's Ex Gets Indicted," New York Daily News, July 21, 2005; "Damion "World" Hardy, Lil Kim's Ex, Will Not Face Death Penalty in Brooklyn Murder Trial," New York Daily News, May 30, 2014; "Lil' Kim's Beau Forced Meds in Death Penalty Case," New York Daily News, July 9, 2012; "Lil Kim's Ex Must Take Psychiatric Drugs," New York Daily News, November 14, 2013. In addition to daily publications, the case had also garnered coverage from Black Entertainment Television and Don Diva, a popular hip-hop magazine. Don Diva, which is circulated extensively in the gang's community, published a lengthy article following the trial of gang members James Sessoms and Kenwayne Jones, during which the defendant Aaron Granton and Sessoms made extensive comments about cooperating witnesses. The district court therefore correctly concluded that media attention was

80

likely and that anonymity was appropriate to protect the jurors' privacy.

### 5. Procedural Protections

The district court provided the jury with a plausible, neutral and non-prejudicial explanation for its anonymity. The jury questionnaire included a discussion of why the jurors were not being asked to provide their names or addresses, which assured jurors that this was a routine practice and justified the practice solely on the basis of the extensive media coverage the case had generated. The questionnaire stated:

> It is a common practice followed in many cases in Federal court, especially where there may be media attention to the case, to keep the names and identities of the jurors in confidence. This is in no way unusual. To insure that your rights of privacy will be respected, only the second page of the attached questionnaire asks you to state your name and other identifying information. That page will be detached from the questionnaire when you have completed it and will be locked securely in the office of the Clerk of the Court to be disclosed only to appropriate court personnel as the judge directs. It will not be available to anyone, including the prosecutors, defendants, and their attorneys. On the remaining pages of the questionnaire, and in responding to questions, you are instructed not to give names or addresses or any information, not yours or anyone else's, that will permit anyone, even the judge, to identify you. (GA 2).

This Court, on several prior occasions, has approved of similar procedural measures as adequately providing the jury

81

with a non-prejudicial reason for its anonymity. See, e.g., Thai, 29 F.3d at 801 (approving following instruction: "[S]electing an anonymous jury is not an unusual practice and has been followed in many cases in Federal Court. Anonymity will ward off curiosity that might infringe on a juror's privacy."); Paccione, 949 F.2d at 1193 ("The court also adequately instructed the jury at the outset of the trial that the special precautions were designed to protect the jury from contacts by the media, thereby implying that the security measures were not the result of threats from the defendants."); United States v. Tutino, 883 F.2d 1125, 1133 (2d Cir. 1989) (approving following instruction: "It is a common practice followed in many cases in the Federal court to keep the names and identities of the jurors in confidence. This is in no way unusual.").

In addition, the district court's extensive and thorough voir dire, which spanned a written questionnaire and in-person follow-up questioning, more than "sufficiently enabled [the defendants] to exercise [their] challenges meaningfully and to obtain a fair and impartial jury." Vario, 943 F.2d at 241-42. The questionnaire contained 67 questions about the jurors' personal backgrounds, opinions, beliefs and biases, providing the defendants with more than ample information on which to base their for-cause and peremptory challenges. See Barnes, 604 F.2d

82

at 138 ("[T]he purpose of the voir dire is to ascertain disqualifications."). Indeed, this Court, on several prior occasions, has approved of similarly-extensive voir dire as sufficient to overcome any potential prejudice defendants might suffer as a result of not being able to learn potential jurors' names, addresses and employers. See, e.g., Thai, 29 F.3d at 801 (approving following voir dire procedure: "In order to protect defendants' interests in jury selection, the court fashioned, with the input of counsel, a 68-question juror questionnaire designed to elicit pertinent information as to possible bias. The questionnaire made extensive inquiries into the jurors' personal backgrounds; it explored possible bias resulting from prior involvement with the legal system or with any of the individuals involved in the case; and it examined other potential barriers to the rendering of a fair and impartial verdict."); Vario, 943 F.2d at 242 ("[A]s long as a defendant's substantial rights are protected by a voir dire designed to uncover bias as to issues in the cases and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal.") (quoting Barnes, 604 F.2d at 140); Tutino, 883 F.2d at 1133 ("Although the jurors' names, addresses, and places of employment were withheld, the jurors were questioned about their neighborhoods, marital status, employment, spouse's and children's employment, education,

83

ethnic background, military service, and, optionally, religious background, among other things. This probing inquiry was more than sufficient to enable the defendants to exercise their challenges meaningfully, and to obtain a fair and impartial jury.").

In the face of the overwhelming need for an anonymous jury, Granton argues that a district court case from the Northern District of Indiana rejecting a motion for anonymous jury calls for reversal of the defendants' convictions. See United States v. Briseno, Criminal Docket No. 11-77 (N.D. Ind. Sept. 30, 2014)(GRA 204-05) ("taken at face value, the [Seventh Circuit's] factors [concerning whether to empanel an anonymous jury] apply to almost every gang prosecution where someone is charged with violence and is facing a lengthy prison sentence if convicted."). (GBr. 46, 48). That case is not persuasive and should not be followed.

Unlike here, the case involved no charges of witness tampering. It involved no proof that the defendant was able to interfere with witnesses. It involved no gang members at large and able to carry out threats. As set forth above, those factors are all glaringly present in the instant case. Briseno, therefore, does not require a new trial here.

Granton also makes much of the government's restraint in not seeking an anonymous jury in prior trials related to the

84

instant matter. But here the defendant seeks to have it both ways. He lauds the Northern District of Indiana for raising (inaccurately) the specter that an anonymous jury could be viewed as legally appropriate in every gang case, yet uses against the government its own recognition, by not seeking an anonymous jury in the prior cases, that such measures are not always warranted. A more principled view is reflected in the government's position that courts should order anonymous juries only for the cases that satisfy the governing legal standard, which the instant prosecution easily does.

Indeed, the two prior cases stemming from this investigation, involving two kidnappers and a getaway driver, did not call for those protections. In contrast, the trial of the gang's leader, who ordered homicides, shootings, and witness retaliation who has been convicted of witness tampering, who has given orders from prison through intermediaries to other gang members, and one of the gang's hit men, and who is charged with five murders in the instant case, four of which he committed at the direction of his co-defendant, calls for significant protections for the jury. Indeed, it would be unfair and unreasonable to expose citizens summoned for jury duty to the harassment, retaliation and fear that is the signature of these defendants and their gang. See Vario, 943 F.2d at 241 (the "trial evidence will depict a pattern of violence by the

85

defendants and his [sic] associates such as would cause a juror to reasonably fear for his own safety").

The district court thus properly empaneled an anonymous jury.

86

POINT FOUR

THE DISTRICT COURT'S EVIDENTIARY
RULINGS WERE NOT AN ABUSE OF DISCRETION

Granton argues that the district court abused its discretion by admitting most of the government's "enterprise evidence" at trial. (GRBr. 49-52). Because the evidence was lawfully admitted to prove the existence of the charged enterprise and racketeering conspiracy, and much of it also applied to the charged narcotics trafficking conspiracy and the firearms charges in the indictment, Granton's claim should be rejected.

"A district court has broad discretion regarding the admissibility of evidence and its rulings will be disturbed only for an abuse of that discretion." United States v. Wong, 40 F.3d at 1378 (noting, in case in which district court admitted evidence of uncharged acts, "this evidence was probative of the existence, organization, and nature of the RICO enterprise, a central allegation in the indictment [and] [a]ccordingly, the fact that it may also have been probative of a separate uncharged crime is irrelevant.") (internal quotation marks omitted).

In so ruling, the district court followed a long line of directly applicable precedent of this Court. See, e.g., United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991)

87

(evidence of uncharged acts of extreme violence by members of RICO enterprise "was certainly probative of the existence of the charged enterprise"); United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992) ("[E]vidence of numerous crimes, including the routine resort to vicious and deadly force to eliminate human obstacles, was relevant to the charges against each defendant because it tended to prove the existence and nature of the RICO enterprise."); United States v. Brady, 26 F.3d 282, 287 (2d Cir. 1994) (evidence of murders not committed by defendants or charged against them was "relevant to demonstrate the existence of the RICO enterprise and the charged conspiracy by members of the Persico faction to kill members of the Orena faction"); Thai, 29 F.3d at 812 (uncharged acts admissible as evidence of "the existence and structure of the . . . enterprise"; such acts are not "other crimes" evidence governed by Fed. R. Evid. 404(b)); see also id. at 817 (in prosecution under 18 U.S.C. § 1959, Government "is required to prove . . . that the defendant's general purpose in committing the crime of violence was to maintain or increase his position in the enterprise"); Coonan, 938 F.2d at 1561 ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.") (citation omitted).

88

Granton specifically challenges the admission of a number of acts. First, he takes issue with Footman's testimony concerning two shootouts involving Granton. (GA 49-53). Both shootouts were a result of a war between CMB and a rival crew and constituted quintessential enterprise proof. The acts demonstrated that the CMB existed, had disputes as an entity in which all of its members were expected to participate and took direction from Hardy, who determined who were the CMB's enemies and how long the disputes would last. As Footman explained during the testimony concerning Granton's shooting of "Jeff":

> A: Jeff was selling drugs for a guy named Quan. . . . World told Quan he couldn't sell no more and he wasn't trying to hear it.
>
> .   .   .
>
> Q: So was there a problem that happened after that?
>
> A: Yeah.
>
> Q: What happened?
>
> A: There was a shootout.
>
> Q: Who participated in the shootout?
>
> .   .   .
>
> A: World -- well, it was a couple, there was more than just one. There was Deezo, P-Rab, E-Bay, Stack, Popsie.
>
> Q: Did there ever come a time with that beef with Quan and Jeff that you saw E-Bay shoot anybody?

89

A:    Yeah.

Q:    Who?

A:    Jeff.

(GA 51).  The testimony thus demonstrated the existence of the enterprise, Granton's membership in it and Hardy's leadership of the gang.  Indeed, Granton did not object to its admission at trial, and it was properly admitted.

Second, Granton argues that the court should not have admitted Meyers's testimony that Granton admitted to killing someone named "Troy" for "Dog."  (GRBr. 50).  This testimony was clearly admissible as an admission by Granton to the murder for hire of Troy Davis that was charged in the indictment.

Third, Granton challenges the admission of testimony from Lamont Johnson to committing a robbery with Granton in 1992.  (GRBr. 50).  Granton, however, did not object to the testimony; in any event, it was admissible to prove the association between Johnson and Granton and their possession of firearms in furtherance of the enterprise's activities.

Fourth, Granton alleges that Shelby Henderson should not have been permitted to testify that, after Granton's sister was robbed, he, Granton, Cooke, Abdul Azziz and Abu Bakr-Raheem beat up the robber.  (GRBr. 50).  Granton did not object to the admission of the testimony and, as with the other evidence Granton claims is unfairly prejudicial, the episode demonstrated

90

the existence of the charged enterprise its members' protection of one another's interests, including their families.

Fifth, Granton argues that the testimony concerning his murder of Troy Davis was unfairly prejudicial. (GRBr. 50-51). That murder was properly admitted because it constituted proof that the enterprise existed and was involved in drug dealing in 1992, near the beginning of the time period charged in the indictment. Specifically, the evidence proved that Hardy ordered the gang to kill Davis because Davis had threatened its drug business. (GA 9, 30, 70-71). After two CMB members failed in attempts to carry out Hardy's order, Granton successfully murdered Davis because "World had a problem with him." (GA 9, 51). The crime demonstrated Hardy's leadership of the enterprise and Granton's role as a shooter. Indeed, the killing increased Granton's position within the charged enterprise. (GA 30, 51-52, 71).

Sixth, Granton claims that the court should not have admitted testimony from Lamont Johnson that, after he had broken up a fistfight between Granton and someone named "Dub Dub," "about the s[a]le of a controlled substance, a narcotic, crack cocaine, on the strip," a young man who was attempting to join the CMB shot and killed "Dub Dub's" brother for threatening the CMB members. (GA 29). As with much of the other evidence he now challenges, Granton did not object to its admission at

trial.  Furthermore, the testimony showed that the CMB was engaged in drug dealing and considered "the strip," inside Lafayette Gardens, was its turf.  Moreover, the killing of "Dub Dub's" brother demonstrated that enterprise members would kill to eliminate a perceived threat.  Lastly, Johnson testified that after the shooting, Hardy sent the shooter to hide in Pennsylvania, demonstrating the role of the gang's leader in protecting its members after they committed crimes on the gang's behalf.  (GA 29).

Seventh, Granton argues that the district court impermissibly allowed Theresa Gregory to testify that, after the gang became aware that she would be a witness against Fruitquan Bailey for the murder of Lashawn Johnson ("Shaun"), Granton approached her in an elevator and asked whether she was testifying, and Hardy had her shot after she testified. (GRBr. 52).  The shooting of Theresa Gregory was charged in the indictment as a racketeering act, and the evidence of Hardy's participation in the crime was therefore admissible to prove it. Granton's questioning of Gregory was also admissible to show the existence of the charged enterprise and Granton's role in it; the testimony showed that Granton had an interest in one of his fellow gang member's legal situation even though Granton had nothing to do with the underlying crime.  The evidence also demonstrated that the CMB survived, in part, through its

92

willingness to deter witnesses from cooperating with authorities.

Lastly, Granton challenges the admission of testimony concerning his killing of Lamel Lawson at a party that a number of CMB members attended. (GRBr. 52). (See GA 30-31, 34, 55). The evidence showed that Lawson drew a large pistol and was waving it around, and that Granton thereupon shot him. (GA 34, 78). The evidence was properly admitted to prove that members of the CMB defended one another in the face of threats. Moreover, Granton used the same weapon to kill Lawson that he later used to shoot Ivory Davis. (GA 69). The Lawson murder therefore linked Granton to the gun and was proof of the charged Davis homicide. Lastly, the district court gave a detailed limiting instruction to the jury. (GA 55). The evidence was therefore properly admitted.

Even if the district court erred in admitting the evidence, it did not cause such unfair prejudice, either alone or taken together, as to require a new trial. Most of the episodes involved non-fatal shootings, a fistfight, and other offenses that, in context with the crimes, were relatively minor affairs. The two murders that were the subject of enterprise evidence were not belabored at trial, and Granton does not allege that the government used them to make unfair or improper arguments to the jury. Moreover, the murders were not more

93

sensational than the two killings for the CMB and the murder for hire of Troy Singleton.  Thus, any error was harmless.

94

POINT FIVE

THE DISTRICT COURT DID NOT ERR IN
POSING QUESTIONS TO GOVERNMENT WITNESSES

Granton contends that his conviction must be reversed because of two comments the district court made to cooperating defendants during the trial. (GRBr. 53-56). Because the comments themselves were not prejudicial, the trial as a whole was conducted in an unbiased manner, and, if there was error, it was harmless, Granton's argument should be rejected.

To give cause for reversal based on judicial misconduct, this Court must find that the district court's conduct denied the defendant a fair trial and that "the conduct of the trial had so impressed the jury with the trial judge's partiality to the prosecution that this became a factor in determining the defendant's guilt." See United States v. Pisani, 773 F.2d 397, 402 (2d Cir. 1985) (citing United States v. Guglielmini, 384 F.2d 602, 604 (2d Cir. 1967)). Furthermore, this Court has adopted the view that "a trial judge's duty to see the law correctly administered cannot properly be discharged if the judge remains inert." United States v. Filani, 74 F.3d 378, 385 (2d Cir. 1996). Thus, the trial court may "actively participate" at trial to aid the jury, and its participation may take the form of questioning and "giv[ing] its own impressions of the evidence." 74 F.3d at 385 (citing Oppenheim v. United

95

States, 241 F. 625, 629 (2d Cir. 1917)); see also United States v. DiTommaso, 817 F.2d 201, 221 (2d Cir. 1987) ("The trial court's participation in litigation is not restricted to that of a mere umpire or referee."). Judged by these standards, Granton's claim must fail.

Granton points to two colloquies between the district court and witnesses over the course of a two-and-one-half week trial. First, the court asked cooperating witness Allen Bryant to explain what he meant when he testified that Granton's shooting of J.R. Hamilton increased his prestige in the gang because "it takes a lot of heart to shoot like that." (GA 18).

The colloquy was as follows:

Q:   What did that gun jamming story do, if anything, for E-Bay's reputation?

A:   Oh, it raised his reputation up tremendously.

Q:   Tremendously?

A:   Yeah.

Q:   Why is that?

A:   Because it takes a lot of heart to shoot like that. And the gun jams and you step outside of that situation and unjam the gun and go back again, not once, but twice. I mean, it takes a lot of heart to do that.

Q:   When you say it "takes a lot of heart," what did you do mean?

MR. BEECHER: Objection.

96

THE COURT: No, overruled. It takes a lot of heart, they're not very sensitive about killing somebody. You don't mean that, do you? That's heart when you care about another human being.

THE WITNESS: No. I'm using in the slang term. Courage.

THE COURT: The slang term means that they don't care about whether they kill somebody or not, right?

THE WITNESS: No.

THE COURT: So you tell what "heart" means.

THE WITNESS: Heart means that it took a lot of courage for him to do that.

THE COURT: It took him a lot of courage to kill somebody?

THE WITNESS: No. For the gun.

THE COURT: To unjam it?

THE WITNESS: To unjam it and go back to the scene.

THE COURT: To unjam it and go back and shoot somebody?

THE WITNESS: Yes.

THE COURT: Next question.

(GA 18-19).

From this exchange, Granton asks this Court to infer that the district court expressed its belief in Granton's guilt and articulated a moral judgment about his actions. Such a strained reading is inaccurate. It is clear from the transcript that the court was seeking to clarify what the witness meant by

97

using the term "heart." At no time did the court indicate that it believed what the witness was saying or indicate to the jury that it had a view about Granton's conduct. Thus, the court did not err, let alone make it clear to the jury that it believed the defendants were guilty.

Granton also takes issue with a colloquy between the district court and cooperating defendant Robert Footman in which it reacted to Footman's testimony that he shot people with whom he had no personal conflict because Hardy ordered him to do so. The colloquy was as follows:

> Q: You said that you had a lot of problems, Mr. Herman went over them with you, where you shot different people. Munchie, Kelly and Hood, Wayne-O, people on Bedford and Grand, 470 DeKalb, Black. All of those shootings. Why did you do those shootings?
>
> A: For World.
>
> Q: Did you have problems with any of those people, your own problems?
>
> A: No.
>
>           .   .   .
>
> Q: And you had shot at all of these people on World's behalf. Did you consider yourself his hit-man?
>
> A: I don't, I don't know how to answer that.
>
> Q: Do you consider yourself a shooter?

98

A:    I guess. I don't know. I don't know how
      to answer that.

THE COURT:  Well, if World told you to shoot
somebody, you would do it; right?

THE WITNESS:  Yes.

THE COURT:  That was all you needed to know;
right?

THE WITNESS:  Yes.

MS. BARRETT:  Objection, Your Honor.

THE COURT:  I am just trying to get
clarification.  Who is objecting?  I just
want to get clarification that you would
just shoot people if somebody told you to
shoot people; right?  No compunctions about
that.  You are not going to do that today,
are you?

THE WITNESS:  No.

THE COURT:  That is in the past; right?

THE WITNESS:  Yes.

THE COURT:  You are out there, we do not
have to worry about you; right?

THE WITNESS:  No.

(GA 58).

Granton claims that his conviction should be reversed

because of the prejudice created by the district court's

implication that Footman is "completely rehabilitated."

(GRBr. 55).  He is incorrect.  The question did not bear on

Footman's credibility as a witness, nor did the court minimize

Footman's terrifying history of violent conduct.  It expressed

99

no view on whether the jury should credit Footman's testimony or find the defendants guilty. Moreover, Granton (through counsel) asked during the cross-examination of nearly all of the government's cooperating witnesses whether the witness believed he should be sentenced to time served, thus interjecting the theme of rehabilitation or lack thereof throughout the trial. It was within reason for the district court to touch on the theme with respect to a witness who was at liberty and had just testified to committing numerous shootings because Hardy had instructed him to.

Indeed, as the district court explained to defense counsel outside the presence of the jury, it did not find Footman's testimony credible:

> THE COURT: Ms. Barrett, with all due respect, I will tell the jurors not to pay attention to what I have said. Between you and me, what he said was just to me so incredible that I would be happy with the fact that his testimony was elicited the way it was. I don't think that the jury is going to give much credibility to this type of a witness. Maybe I am wrong. But I would think you would be happy with all that. But you are not. You are making a record. I understand.

(GA 59).

Furthermore, the court almost immediately provided curative instructions to the jury:

> THE COURT: Members of the jury, before we proceed with the next witness, let me

clarify something.  I told you early on that if I ask any questions, I have asked a few questions, it was solely for the purpose of trying to move things along, when I thought things were repetitious, I thought it was possibly confusing.  I also told you that I would ask those questions if I thought that if I were confused about something, maybe you folks were confused as well and you are not allowed to ask any questions.  I am your surrogate to that extent.  If I am confused, maybe you are confused.

But the last series of questions were designed to just clarify because I was confused.  Maybe you were.  Maybe you were not.  It is your recollection that counts, your analysis of the evidence that counts, not mine.  I was just trying to clarify since I heard so much about this person shooting people and I was not clear whether it was just World or other people would ask him to shoot people or whether it was then or now or whatever.  All of that is just trying to clarify that.

His credibility is for you to assess.  You have heard all of his testimony.  You will listen to all of his testimony and decide whether or not he was telling you the truth or not [sic] when he said that World told him to shoot.  You have to decide that for yourself.  I just wanted to find out what the shooting was all about since I thought there was some confusion.

You observed, sometimes it is difficult to understand what he is saying. There were a couple of times when I asked him to repeat and be a little more clear.  He to me just didn't sound like I could understand him all the time.  So I tried to interject with him maybe more than with the other witness since I had a hard time understanding him, asking him to repeat, to clarify things. You saw that happen on a number of indications.

The important thing for you to realize, once again, is that I am not telling you whom to believe or not to believe. I am just trying to get the information out so you have it all, for you to assess the witness's credibility and all the other witnesses' credibility. That's part of your fact finding responsibility. I have no opinion about that issue. Whether you believe him, whether you don't believe him, that's strictly up to you.

I just want to tell you that because his testimony at the end of this was a little bit focused and pointing in that direction. I don't want that to be a distortion. Look at the totality of his testimony to assess his credibility. I was just trying to be helpful at the end of a long, long trial and at the end of this particular day, at the end of lengthy questioning back and forth of this witness. That's the way it really works in the real world. There is cross-examination, there is redirect, there is recross. You saw that played out here. I was just trying to end it all and bring it altogether. I just want you to know that.

(GA 59). At the conclusion of the day, outside the presence of the jury, the district court asked, "Ms. Barrett, do you have any comments? Do you want to renew your objections?" Counsel replied, "I think once is enough." (GA 60. Counsel did not ask the court to amend or add to its comments.

The district court's instructions emphasized that it had no view on the witness's credibility and the issue was solely for the jury's determination. Reversal of Granton's convictions is therefore unwarranted.

102

Therefore, even if the comments were prejudicial taken in isolation, the district court instructed the jury at the beginning and the end of the trial that the jury was the sole judge of the credibility of witnesses and that it had no view on the subject. (GA 2 ("These credibility assessments are really a part of the fact-finding responsibilities. I'm not going to make those determinations. You are going to make those determinations. I have no view of this case. I'm totally neutral.")). Furthermore, the witness was subject to thorough cross-examination concerning prior crimes, his guilty plea in state court to a crime he did not commit and the lies and perjury that accompanied it and extensive violent conduct. Footman was just one of numerous cooperating witnesses and eyewitnesses in a case of overwhelming proof against the defendants. Any error therefore was harmless.

103

CONCLUSION

For the reasons stated above, the judgments should be affirmed in all respects.

Dated:     Brooklyn, New York
           February 3, 2017

                              Respectfully submitted,

                              ROBERT L. CAPERS,
                              United States Attorney,
                              Eastern District of New York.

                    By:    _____/s/_____
                              PETER A. NORLING
                              Assistant U.S. Attorney


PETER A. NORLING
MATTTHEW AMATRUDA,
Assistant United States Attorneys,
      (Of Counsel).

CERTIFICATE WITH RESPECT TO COMPLIANCE WITH TYPE-
VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-
STYLE REQUIREMENTS

1. This brief does not comply with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 21,458 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). By order of the Court dated January 30, 2017, leave to file a brief of no more than 25,000 words was granted.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a monospaced typeface using Microsoft Word in 12-point Courier New font.

Dated: Brooklyn, New York
February 3, 2017

/s/
Peter A. Norling
Assistant U.S. Attorney

A P P E N D I X

TABLE OF CONTENTS

Page

Excerpts from Transcript of Status Conference,
   United States v. Hardy and Granton, 04-CR-706 (FB),
   Dated September 12, 2014...................................GA 1

Excerpts from Jury Questionnaire,
   United States v. Hardy and Granton, 04-CR-706 (FB).........GA 1

Excerpts from Transcript of Trial,
   United States v. Hardy and Granton, 04-CR-706 (FB),

   Dated April 1, 2015.......................................GA 2

   Dated April 1, 2015.......................................GA 3

   Dated April 6, 2015.......................................GA 18

   Dated April 7, 2015.......................................GA 27

   Dated April 8, 2015.......................................GA 32

   Dated April 9, 2015.......................................GA 34

   Dated April 10, 2015......................................GA 37

   Dated April 14, 2015......................................GA 45

   Dated April 15, 2015......................................GA 47

   Dated April 16, 2015......................................GA 55

   Dated April 20, 2015......................................GA 60

   Dated April 21, 2015......................................GA 73

   Dated April 22, 2015......................................GA 82

---

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x
UNITED STATES OF AMERICA,

                    Plaintiff,          Docket No.:
                                        04 CR 706 (FB)
          versus
                                        U.S. Courthouse
DAMION HARDY and AARON GRANTON,         225 Cadman Plaza East
                                        Brooklyn, NY 11201
                    Defendants.
-------------------------------------x
                                        September 12, 2014
                                        11:00 a.m.

        Transcript of Criminal Cause for Status Conference

Before:   HONORABLE FREDERIC BLOCK,
                            District Court Senior Judge

                         APPEARANCES

For the Government:         LORETTA E. LYNCH, ESQ.
                            United States Attorney
                            Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York 11201
                            BY:  JAMES P. LOONAM, ESQ.,
                                 MATTHEW AMATRUDA, ESQ.
                                 Assistant U.S. Attorneys

For Defendant Hardy:        FRANCISCO CELEDONIO, ESQ.
                            DAVID RUHNKE, ESQ.

For Defendant Granton:      ROBERT BEECHER, ESQ.
                            CARL HERMAN, ESQ.

Court Reporter:             MICHELE NARDONE, CSR, RPR, CRR
                            Official Court Reporter
                            Phone:  718-613-2601
                            Fax:  718-613-2631
                            Email:  Mishrpr@aol.com

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

MICHELE NARDONE, CSR, RPR, CRR – Official Court Reporter

---

USA v. Hardy/Granton

Mr. Ruhnke, we will do whatever he has to do, but we are going to have to march forward.  This is 2004.  I have got to do it.

MR. LOONAM:  Yes, sir.

THE COURT:  The down side is this, you know, we have, you know, three weeks for one trial, three weeks of another trial.  The up side is that after ten years we have got to disburse of it.

MR. LOONAM:  I just didn't want to -- it would be a month for one trial and then two months for another trial.

THE COURT:  I understand.

MR. LOONAM:  Yes, sir.

THE COURT:  But I'm balancing all these things.  Your competent co-counsel here, he can handle one case and you can handle another.

MR. LOONAM:  Yes, sir.

THE COURT:  Thanks a lot, and we will see you folks again on November.

THE CLERK:  12th at 11:30.

MR. LOONAM:  Your Honor, we request that time be excluded in the interests of justice.

THE COURT:  You don't even have to say that.  It's complex litigation and time is excluded.

DEFENDANT HARDY:  Things I have been sent going to the civil case with the Eastern District of New York, with the case that I had.  I clearly addressed Frederic Block.  They sent it

MICHELE NARDONE, CSR, RPR, CRR – Official Court Reporter

---

USA v. Hardy/Granton

to the civil case to Sandra Townes and Joan Azrack.  I received a docket sheet from them, and the letter I sent you is on their docket sheet.

        And, Block, I sent you like four messages.  Could you rule on me?  I sent you like four motions.  Could you rule on the motions?

        THE COURT:  We will take a look at it, but it's good to hear you make those requests because it sounds like you are improving with the medication.  Thank you.

        DEFENDANT HARDY:  The medication is not -- I can't hear.

        (End of proceedings.)

                    o O o

Certified to be a true and accurate transcript.
/s/ Michele Nardone
MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

MICHELE NARDONE, CSR, RPR, CRR – Official Court Reporter

---

JUROR#_____

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------X

**UNITED STATES OF AMERICA**

                                        **04CR706(FB)**

            -v-

**DAMION HARDY & AARON GRANTON**

**UNITED STATES DISTRICT JUDGE
FREDERIC BLOCK**

**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK
225 CADMAN PLAZA EAST
BROOKLYN, NEW YORK**

**JURORS ARE INSTRUCTED TO CALL:  1-800-522-5100**

**ON MONDAY, MARCH 30th, 2015 AFTER 7:00 P.M.**

**FOR FURTHER REPORTING INSTRUCTIONS.**

JUROR # _____

## JUROR QUESTIONNAIRE
## PRELIMINARY INSTRUCTIONS

Upon your oath or affirmation, you must give true and complete answers to all questions. These questions are not meant to ask unnecessarily about personal matters. Rather, these questions will help the Court determine whether you can be fair and impartial in deciding this case and will also provide information about you as a juror to help the parties select a jury. Part of the selection process depends on your ability and promise to follow the law as it is explained by the Court. Thus, some of the questions include descriptions of legal principles and ask whether you can conscientiously follow them.

Please answer each question by placing an "X" next to the correct response or by providing the information requested. Please answer **all** questions, writing as legibly as possible, and answering as accurately, completely, and as reasonably as you can. If a question does not apply to you, fill in the space with an "N/A" for "not applicable." **Do not leave any answer blank.**

All of your responses will remain completely confidential. Do not discuss the questions or answers with anyone, including your fellow jurors. It is extremely important that your answers be your own, individual answers.

It is a common practice followed in many cases in Federal court, especially where there may be media attention to the case, to keep the names and identities of the jurors in confidence. This is in no way unusual. To insure that your rights of privacy will be respected, only the second page of the attached questionnaire asks you to state your name and other identifying information. That page will be detached from the questionnaire when you have

1

---

JUROR # _____

completed it and will be locked securely in the office of the Clerk of the Court to be disclosed only to appropriate court personnel as the judge directs. It will not be available to anyone, including the prosecutors, defendants, and their attorneys. On the remaining pages of the questionnaire, and in responding to questions, you are instructed not to give names or addresses or any information, not yours or anyone else's, that will permit anyone, even the judge, to identify you.

This is a criminal prosecution by the United States. The defendants, Damion Hardy, also known as "World," and Aaron Granton, also known as "E-bay," are charged in an indictment with criminal offenses. An indictment is simply the means by which the government gives the defendants notice of the charges against them and brings them before the court. The indictment is merely an accusation, and nothing more. It is not evidence and is not to be considered by the jury in arriving at a verdict. In response to the indictment, each defendant pled "not guilty." Each defendant is presumed to be innocent unless and until his guilt has been proven by the government beyond a reasonable doubt. If you are selected as a juror in this case, it will be your duty to determine whether based on the evidence presented at the trial, the government has proven beyond a reasonable doubt that each defendant is guilty of the crimes charged in the indictment. If the government does not meet its burden of proof for a defendant, you must find that defendant not guilty.

In this criminal case, the defendants are charged by way of an indictment. The indictment in this case charges that the defendants were members of a criminal enterprise, and accuses the defendants of committing crimes in in furtherance of that enterprise. In this case, the indictment charges that the enterprise went by the name "Cash Money Brothers" and is alleged to have operated in and around the Lafayette Gardens Housing Project in Brooklyn.

2

---

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------x
UNITED STATES OF AMERICA,
          Plaintiff,

                              04 CR 706(S-2)

          versus          United States Courthouse
                          225 Cadman Plaza East
                          Brooklyn, N.Y.  11201
DAMION HARDY, AARON GRANTON,

          DEFENDANTS.

------------------------------------------x
                          April 1, 2015
                          2:20 p.m.
          TRANSCRIPT OF TRIAL
Before:  HON. FREDERIC BLOCK,

                    DISTRICT COURT JUDGE

          APPEARANCES

LORETTA LYNCH
United States Attorney – Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York  11201
BY:      MATTHEW AMATRUDA, ESQ.
         SOUMYA DAYANANDA, ESQ.
         RENA PAUL, ESQ.
Assistant United States Attorneys


ATTORNEY FOR DEFENDANT:

DAVID RUHNKE, ESQ.
JEAN BARRETT, ESQ.
For Hardy


ROBERT BEECHER, ESQ.
CARL HERMAN, ESQ.
For Granton

---

12

### Opening by the Court

The other important factual aspect of the case is that people are going to testify, you are going to have to size up their credibility; do you believe them, do you not believe them, do you believe some of the testimony, not other parts of the testimony.

So these credibility assessments are really a part of the fact-finding responsibilities. I'm not going to make those determinations. You are going to make those determinations. I have no view of this case. I'm totally neutral. You are neutral also in terms of the fact you have no ax to grind but you should really be able to size up the believability of the witnesses. That is an important part of the fact finding responsibility.

People will be coming in and out of the courtroom and you are going to be just like me, you are going to look to see who is coming in because that is a natural curiosity.

Why is it that they are allowed to do that? Because in is a public forum and the court is open to everybody so people can come in and out and you are probably going to take a look and see who those people are. You may find a lot of people coming in and out of the courtroom.

When you leave, I already told you not to talk to the lawyers nor anybody else. Just by yourselves, go home. You can talk to your family not about the case of course but if you pass anybody in the hallway, if you see anybody who you

GA03

Sheptuk/Direct/Dayananda 58

A    I was scheduled to work from 2 p.m. on the 9th to 8 a.m. on the 10th.

Q    Direct your attention to about 5:55 in the morning of August 10th.  Did you respond to a crime scene in Manhattan?

A    Yes.

Q    Where did you arrive to?

A    Sixth Avenue and Spring Street.

Q    Is that Lower Manhattan?

A    Yes.

Q    Can you describe to the jury what you learned when you arrived to that crime scene?

A    Mr. Ivory Davis was shot while in his vehicle.  After he was shot, he proceeded to drive west -- eastbound on Spring Street, where during that ride he struck a pedestrian.  The car continued east on Spring Street to where it crashed on the corner of Spring Street and Sixth Avenue.

Q    And did you learn where the initial shooting had taken place?

A    Yes.

Q    Where was that?

A    Hudson Street and Spring Street.

Q    You mentioned Hudson and Spring as well as Spring and Sixth Avenue; is that correct?

A    Yes.

Q    Did you respond to both of those locations?

SHERRY BRYANT, RMR, CRR   Official Court Reporter

---

Sheptuk/Direct/Dayananda 68

40 feet wide.

Q    Starting with 801H, can you tell us what this is a photo of?

A    It's an overall view of the area around Spring Street with the camera facing west.

Q    And 801I?

A    It's an overall view of the area on Spring Street with the camera facing east.

Q    I just want to draw your attention here to the left-hand corner.  Can you tell the jury what this is a photo of and actually what the yellow tape indicates?

A    The tape was to cordon off the area, and those cups, underneath the cups are discharged shells.

Q    Are you responsible for putting the cups up?

A    No.

Q    Who does that, the first officers, again?

A    It could be the first officer.

Q    801J?

A    That's an overall view of the ballistics evidence, the discharged shells.

Q    And the markers there, can you explain what that is?

A    I placed the markers there to show where the shells were.

Q    And how many shells did you recover on the scene?

A    Four.

Q    Do you know the caliber of those shells?

SHERRY BRYANT, RMR, CRR   Official Court Reporter

---

Sheptuk/Direct/Dayananda 69

A    .40 caliber.

Q    And once you recover that ballistics evidence, what do you do with it?

A    The shells were processed for latent fingerprints.  They were marked, packaged, and then given to Police Officer Hunt.

Q    And then were they vouchered?

A    Yes.

Q    In addition to these ballistics evidence, did you also find ballistics evidence in the car?

A    Yes.

Q    I'm going to show you 801K, starting with K.  Can you tell the jury what this is a photo of?

A    That's an overall view of the rear of the vehicle.

Q    Now, obviously, this is not of the same scene that we saw before.  Can you tell us what happened?

A    The vehicle was towed to the 1st Precinct.

Q    And for what purpose?

A    To process the vehicle for additional evidence.

Q    Showing you 801M as in Mary, can you tell us what we see here?

A    That's an overall view of the property damage, the bullet holes in the seat of the vehicle.

        THE COURT:  So 801M is now in evidence?

        MS. DAYANANDA:  Yes.

        MR. HERMAN:  No objection.

SHERRY BRYANT, RMR, CRR   Official Court Reporter

---

86

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - X

UNITED STATES OF AMERICA,        : 04-CR-706(FB)
                                 :
                                 :
          -against-              : United States Courthouse
                                 : Brooklyn, New York
                                 :
                                 :
DAMION HARDY & AARON             : Thursday, April 2, 2015
GRANTON,                         :
                                 :
          Defendants.            :
                                 :
- - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES SENIOR DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government: LORETTA E. LYNCH, ESQ.
                    United States Attorney
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201
                BY: SOUMYA DAYANANDA, ESQ.
                    MATTHEW S. AMATRUDA, ESQ.
                    RENA PAUL, ESQ.
                    Assistant United States Attorney

For the Defendant    DAVID RUHNKE, ESQ.
Hardy:               JEAN BARRETT, ESQ.

For the Defendant    ROBERT BEECHER, ESQ.
Granton:             CARL HERMAN, ESQ.


Court Reporter:  Richard W. Barry, RPR
                 Official Court Reporter
                 E-mail: rwbarrycourtreporter@gmail.com
Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.

RB    OCR

Gregory - Direct - Paul     101

Q   Where were you when Wise approached you?

A   I believe I was on DeKalb, DeKalb Avenue.

Q   What happened?

A   He was coming across the street, and he told me, oh, you know, you still walking around, right.

Q   What did you understand that to mean?

A   Like you still alive.

Q   Did you have a relationship with Wise such that you talked to him frequently?

A   No.  But I knew him.

Q   So was that typical of something that he would say or unusual to you?

A   That was unusual.

Q   What was your reaction?

A   You know, just to keep going where I was going.  Get away from him.

Q   Did there come a time that anyone else approached you?

A   Yes, World approached me.

Q   Where were you when that happened?

A   I believe I was coming down the stairs and they were-- World, I remember was Mousey, and Carl, and Mousey pulled the staircase door closed and World started talking to me.

Q   Which building were you in?

A   At 325, the building I lived in and World lived in.

Q   So, can you just-- were you coming up the stairs or down

RB    OCR

Gregory - Direct - Paul     102

the stairs?

A   I believe coming down the stairs, I lived on a high floor.

Q   You talked about somebody named Mousey, you didn't describe that person for us yet.  Was that one of World's friends?

A   One of his friends, yeah.

Q   So what happened?

A   He-- Mousey closed the staircase door and World started questioning me about testifying.

Q   When you say, closed the staircase door, did that block your way from walking out?

A   Yeah, I guess it was just, wanted me to stand there till they finished saying what they were saying.

Q   What did they say?

A   World said, are you going to testify.  Question me about testifying.

Q   What did you say?

A   I said, no.  I was in the staircase.  Make sure, I was going to get out of there, I wasn't going to say, yes.

Q   Was there another time someone approached you -- well, before we get that.

So after you said, yes, what happened?

A   They left.

Q   Where did they go or how did you get away?

RB    OCR

Gregory - Direct - Paul     103

A   I went out the building, out the door.

Q   When that happened, were you alone or with anybody else?

A   No, I was with my daughter.

Q   What happened?

A   One of the guys, which name is Carl, took her outside the building.

Q   And Carl, that is -- if I may approach, Your Honor.

You indicated Carl was Government Exhibit 12?

A   Yes.

Q   So, what did Carl do with your daughter?

A   Took her out of the building.

Q   How old was she at that point?

A   I believe she was about four.

Q   So, when you were in the stairwell and World and Mousey were speaking with you, where was your daughter and Carl?

A   In front of the building.

Q   So when you were -- originally came down the stairs, were you with your daughter?

A   No.  I had to go out the building, I was looking.

Q   No, let me backup.  I'm sorry.

Before World and Mousey approached you, were you with your daughter?

A   Yes, they came in the building with my daughter.

Q   So what happened, that made Carl go outside with your daughter?

RB    OCR

Gregory - Direct - Paul     104

A   I don't know what was going to happen.  But I know they stopped to talk to me and whatever was going to happen, they didn't want my daughter to be standing there.

Q   So Carl took your daughter out and you stayed with World and Mousey, is that what you are saying?

A   Yeah, because Mousey closed the door, staircase door.

Q   So after you went out, you reunited with your daughter?

A   Yes.

Q   What did you do?

A   We went back, you know, went where we was going.

Q   Did there come a point where anyone else approached you?

A   Yes.

Q   Who was that?

A   E-Bay.

Q   Where were you when that happened?

A   I was going into my building, 325, and the elevator was about to close, elevator door was about to close and he jumped in the elevator.

Q   Were you alone or with anybody else?

A   I was alone.

Q   What happened?

A   He questioned me about testifying.

Q   What did he say?

A   He needed to know, was I testifying.

Q   What did you say?

RB    OCR

Gregory - Direct - Paul          105

A    At first I wasn't saying anything, but he kept saying, he needed to know.  He needed to know this.

Q    Did you respond?

A    Yeah, I told him that I wasn't.

Q    What happened next?

A    Then I got off on seven and he went up, up in the elevator.

Q    Did there come a point that you did testify at the trial of Fruitquan Bailey?

A    Yes.

Q    When was that in relationship to these incidents you just described?

A    I don't understand what you mean.

Q    I mean, how soon after Wise, E-Bay, World, Carl and Mousey approached you, telling you not to testify, did you go?

A    I end up testifying, yes.

Q    Do you know if as a result-- after your testimony, Fruitquan Bailey was convicted?

A    Yes.

Q    After the trial, did you return to Lafayette Gardens?

A    Yes.

Q    You told us that you moved in about '93.  When you moved, did anybody of your family stay in Lafayette Gardens?

A    Yes, my mother, she still lived there.

Q    Was that in the same building?

RB     OCR

---

Gregory - Direct - Paul          106

A    Yes, that is the same building.

Q    Around that time, did there come a time that something happened to you after that trial?

A    Yes.

Q    What happened?

A    I was shot.

Q    Where were you when that happened?

A    On DeKalb.

Q    Tell us what happened.

A    I was on DeKalb Avenue, talking to my sister and one of her friends and we were standing there.  And I see World on a bike, riding in circles, because where we live at, in the area, is like a big flower garden.  He was just riding around it.  I was standing there talking to my sister and her friend and we started to walk down DeKalb toward Franklin, and then the next thing you know, I hear a shot, and we all was on the floor and I could not get up.

Q    Where had you been shot?

A    Shot me in my butt, but it came out my thigh.

Q    What happened at that time?

A    At that time, I had to have surgery.

Q    Well, when you were shot, you said you fell, what happened after you fell?

A    I could not get up and before I was going to pass out, a police officer from the 88th Precinct ran to me.  He like

RB     OCR

---

Gregory - Direct - Paul          107

caught me before I passed out.

Q    Where did you wake up?

A    In the ambulance.

Q    Where did they take you?

A    Bellevue Hospital.

Q    What happened there, what sort of treatment did you get?

A    Surgery.

Q    How long did you end up staying in the hospital?

A    Wow, almost a month, about three weeks to a month.

Q    Today, do you have any effects from that shooting?

A    Minor, you know, numbing, aches in the knee, but --

Q    Just to back up, before you were shot, why don't you show us first of all where you were when you were shot.

        THE COURT:  Do you think it is really necessary?

        MS. PAUL:  Okay.

        THE COURT:  I don't think so.

BY MS. PAUL:

Q    I want to talk to you about right before you were shot.  Why did you come to Lafayette Gardens?

A    I came to Lafayette Gardens because I just had a baby.

Q    When did you have that baby?

A    In '94.

Q    How soon before you got shot did you have that baby?

A    Like a month later.

Q    A month before?

RB     OCR

---

Gregory - Direct - Paul          108

A    A month after the baby.

Q    So where did you go within Lafayette Gardens when you got there?

A    To visit my mother.

Q    Why did you-- did you bring the baby with you?

A    Yeah, I bring the baby.

Q    What happened?

A    That's -- I took the baby to her house and then, you know, I came outside for a little while.

Q    That is when you were talking to your sister?

A    Yes.

Q    Now, you told-- did there ever come a point when you saw World again after that?

A    When I was talking to my sister?

Q    After you were shot.

A    I believe so.  I really can't remember.

Q    You talked to us about-- you mentioned Peanut.  I will show you Government Exhibit 17.  Can you tell us what you saw relating to Peanut and World?

A    I believe they all was friends.

Q    That was in the early 90's, as you have described?

A    Yeah.

Q    Did you come here today-- were you given a subpoena to testify here today?

A    Yes.

RB     OCR

Gregory - Cross - Barrett 109

Q    What is a subpoena?

A    You are ordered to come to court.

Q    Other than that, do you have any sort of agreement with the government to testify here today?

A    No.  No.

    MS. PAUL:  No further questions.

    THE COURT:  Any questions, I guess we will go first with you Ms. Barrett.

    MS. BARRETT:  Yes, Your Honor.

CROSS EXAMINATION BY MS. BARRETT:

Q    Morning Ms. Gregory.

A    Good morning.

Q    Ms. Gregory, I just wanted to clarify a little bit of timing here.  You first talked about in terms of chronology of events, you talked about your friend Sean being murdered and that was in 1992; is that right?

A    Yeah.

Q    And then in 1992, I believe it was May 15th, of 1992, was-- does that ring a bell for you?  The date of her killing?

A    Yeah.

Q    And then you went to the police department and gave a statement the next day, right, do you remember giving a statement to the police?

A    Yes.

Q    And, in that statement, you were interviewed and then

RB    OCR

---

Gregory - Cross - Barrett 110

later on, you were interviewed by an Assistant District Attorney about that case, correct?

A    Yeah.

Q    And, was that trial in 1993, does that sound right?

A    In the 90's.

Q    So, it would have to be after 1992?

A    '92, '93.

Q    It would have to be before your daughter was born, right?  Do you remember at the time of the trial, were you pregnant when you were testifying?

A    I can't remember the dates.

Q    Well, do you remember if you were pregnant?

A    I was pregnant in '94.  If it was in '94, yes.

Q    And, then you testified against Mr. Bailey?

A    Yes.

Q    And then you then testified on direct examination about the shooting in 1994; is that right?

A    Yes.

Q    And that was a month after your daughter was born, correct?

A    Yes.

Q    And is that April 27th, 1994, sound about right to you?

A    Yes, pretty much.

Q    And, at the time that you were-- gave a statement to the police; is that right?

RB    OCR

---

Gregory - Cross - Barrett 111

A    Yes.

Q    Do you remember where you were when you gave that statement?

A    No, I talked to so many detectives.

Q    Did you talk to them-- did you talk to police officers at the scene, at DeKalb Avenue before you went into the ambulance if you recall?

A    At which incident, when I was hit in the face with a gun?

Q    No, when you were shot in 1994?

A    When I was shot-- no.

Q    You didn't talk to them then?

A    No.

Q    Do you remember being interviewed by the police?

A    I believe-- I believe the officer that was-- that was holding me before I passed out, was questioning me.  But like I was passing out and he said, he said, what happened, who shot you.  I can't really remember.

Q    Do you remember telling him that you were walking down the street on DeKalb Avenue, towards Franklin Avenue when you heard two shots-- gunshots from an unknown direction?  Do you remember telling him that?

A    I believe I said that, that I heard a shot.

Q    And then, do you remember saying that then you felt pain in your right leg?

A    Yeah.

RB    OCR

---

Gregory - Cross - Barrett 112

Q    Do you remember at the time, not telling him that you didn't see the person who shot you?

A    Yes.

Q    And in fact, you never did see the person who shot you, correct?

A    Correct.

Q    The shot-- it just came from out of the blue?

A    Right.

Q    And then, after that, you went to the hospital and then no one was ever prosecuted for this; is that right?

A    Right.

Q    And then the next time that you talked to anybody about this in law enforcement was in January of 2005; is that right?

A    I don't know these dates.  But I know I talked to a lot of police.

Q    Do you remember talking to an Assistant United States Attorney in Brooklyn about this and testifying before a Grand Jury?

A    Yes.

Q    And that was in January of 2005?

A    Yes, I believe so.

Q    At that time, that was the first time that you told law enforcement that you had seen Mr. Hardy on a bicycle; is that right?

    MS. PAUL:  Objection.

RB    OCR

Gregory - Cross - Barrett                 113

A    No.

THE COURT:  Overruled.

Q    Do you recall telling the Assistant United States Attorney and the Grand Jury, that you saw Mr. Hardy on a bicycle?

A    I can't remember.  I don't remember if I said or not.

MR. BARRETT:  May I approach?

THE COURT:  With what?

MR. BARRETT:  With the Grand Jury testimony.

THE COURT:  Why don't you ask her-- she doesn't remember.  All right.

MR. BARRETT:  I'm asking to refresh her recollection with the Grand Jury testimony.

THE COURT:  You can come forward.

While that is happening, let me explain to the jurors what this is all about.  You just relax.

So, if somebody is testifying they are saying, they don't remember, then counsel can show the witness any piece of paper, it is not in evidence.  Just for the sole purpose of seeing whether or not that that might jog her recollection.  That is what is happening here.  We call that refreshing somebody's recollection.  You may see this happening often during the course of the trial.

So don't-- you know, read it.  Just look at what Ms. Barrett is showing you, point to what you think might refresh

RB      OCR

---

Gregory - Cross - Barrett                 114

her recollection and then after you look at that, Ms. Gregory, tell the jury whether now you remember, so you can answer that question.

THE WITNESS:  Okay.

Q    Ms. Gregory, I will show you a transcript of the Grand Jury testimony on January 20th, 2005.  Does that sound about right to you?

A    Ah-hum.

Q    I will show you direct-- direct your attention to page 13.  I will ask you to read the last-- beginning of the last paragraph on the page.

A    Right here?

Q    Yes.  Starting with-- not out loud.  Just to yourself.

(Pause.)

A    Yes.

Q    Does that help you remember what you told the Grand Jury?

A    Right.

THE COURT:  So now is your recollection refreshed after looking at this?  That happened sometime ago, I can understand that.

Ask the question again and let's see now whether she remembers.

THE WITNESS:  That is the same question my lawyer asked, the D.A. asked.

THE COURT:  Ask the question again Ms. Barrett so we

RB      OCR

---

Gregory - Cross - Barrett                 115

are focused.

Q    Do you remember testifying before the Grand Jury and telling the grand jurors, that you saw Damion Hardy on a bicycle, with somebody on the back in 2005?

A    Yes, riding.

THE COURT:  What was that?

THE WITNESS:  Riding in a circle.

THE COURT:  Riding in a circle.

THE WITNESS:  Riding in a circle.

THE COURT:  Somebody was on the back?

THE WITNESS:  I believe so.

Q    Do you remember who was on the back or anything about that?

A    No.

Q    In terms of again, when you heard the gunshot and felt the pain in your leg.

A    Yes.

Q    You didn't see any-- you did not identify anybody, you didn't know who shot on you?

A    No.

MR. BARRETT:  Thank you.

THE COURT:  Anybody wish to question the witness any?

Mr. Beecher, do you have any questions?

MR. BEECHER:  Yes, Your Honor.

RB      OCR

---

Gregory - Cross - Beecher                 122

mentioned, and this is 13 years after Fruitquan Bailey's arrest and prosecution for the murder of Sean, 13 years later, that you mentioned feeling intimidated by anybody.  I mean that's correct, isn't it?

A    Explain it.  I'm not getting it.

You said I was just now being threatened, what do you mean?

Q    No, no.  I'm sorry, I didn't phrase it correctly.

You have told us just a few moments ago, that while you were being prepared for trial, by the District Attorney's office in Brooklyn here, that you told them you did not want to testify.  But you also did not tell them that you felt threatened by anybody, regarding your upcoming testimony.  You told us that that was the case.

Now, we go forward to 2005, in January, and you are here at the United States Attorney's office, with one of the Assistant United States Attorneys, and that is the first time that you mentioned that you felt threatened, wouldn't that be fair to say?

A    I always felt threatened.  I never wanted to testify. Always felt threatened, always been scared.  But, you subpoena, you are here.

Q    I'm sorry.  I interrupted and I didn't hear your answer. Please repeat it.

A    I always felt threatened, I always been scared.  I never

RB      OCR

Gregory - Redirect - Paul          123

wanted to testify, but what could you do, you are subpoenaed.

Q    But my question was --

A    I always been threatened.

Q    But the first time that you mentioned it to any law enforcement official, that was in a position to do something about it, was in 2005?

        MS. PAUL:  Objection, Your Honor.

        THE COURT:  Sustained.  It is argumentative.

        When I say "sustained", you don't have to answer the question, ma'am.

        MR. BEECHER:  I think I'm finished, I would like to consult with counsel.

        THE COURT:  Go ahead.

        (Pause.)

        MR. BEECHER:  I have no further questions, Your Honor.

        THE COURT:  Any redirect?

        MS. PAUL:  Briefly, Your Honor.

REDIRECT EXAMINATION BY MS. PAUL:

Q    Ms. Gregory, you just told us that you have been afraid-- you were afraid to testify against Fruitquan.  Are you afraid to testify today?

        MR. RUHNKE:  Objection.

A    Yes.  Yes, I'm always afraid.

        THE COURT:  Overruled.

        RB      OCR

---

Gregory - Redirect - Paul          124

Q    And, you just briefly spoke with Mr. Beecher about meeting with E-Bay in the elevator.  Did you feel intimidated at that point?

A    He jumped in the elevator when it was closing, I didn't think anybody was coming in the elevator.  I was startled, you know.  But, then he just talked.  He didn't -- he didn't threaten me or nothing.

Q    Did you feel intimidated?

A    He scared me, you know, at first, jumping in the elevator and you are in the elevator by yourself.

Q    And is today, the first time that you have ever testified in a court proceeding about being shot, not the Grand Jury, but in front of the jury?

A    No, no.  Not-- maybe the second time.

Q    About you being shot, not about Fruitquan Bailey?

A    About me being shot?  Yeah, probably two times.

Q    When was the other time?

A    I can't get the dates.  In the 90's, '92 or something.

Q    Now, you talked about World riding on a bike and you said that somebody was on the back of that bike.  Can you tell us when he was riding around, where was he in relation to you?

A    I was on DeKalb and-- in front of 456, more to the street.  And he was going in circles, like I told you.  It was like a flower pot.  But you know, you can go around it.  That is what he was doing, riding past, going around.

        RB      OCR

---

Gregory - Redirect - Paul          125

Q    That was around you, around where you were?

A    It was where I was.  But not going around me.  Because I was more to the curve.  He was in the middle.

Q    How close in distance were you?

A    As he come around, he is coming right passed me.

Q    Right.  And the person on the back, how were they on the back?

A    I believe somebody was on pegs, but I forgot about that.  It has been so long.

Q    How soon after that happened did you get shot?

A    When I started walking, headed towards Franklin, walking down DeKalb.

Q    How soon in time was that?

A    Maybe like ten minutes, something, five minutes, ten minutes.

        MS. PAUL:  Nothing further.

        THE COURT:  Let me ask you a question.  You described somebody was on the back of it.  Was it a two seater bike?  How did somebody be on the back?

        THE WITNESS:  They put pegs.

        THE COURT:  What?

        THE WITNESS:  It the pegs, the little bars, that is on the back of a bike.  You can stand.  A person can pedal and a person can also stand on the back.

        THE COURT:  That was the type of bike it was, right?

        RB      OCR

---

Bryant - direct - Dayananda          147

A    He's just carried himself with confidence and people seemed to see it and gravitate towards it.

Q    Was E-Bay a member of the Cash Money Brothers?

A    Yes.

Q    Was E-Bay -- did he live in Lafayette Gardens?

A    Not originally, but he moved there, yes.

Q    Do you know where he moved from?

A    Yes.

Q    Where is that?

A    Coney Island section of Brooklyn.

Q    What was E-Bay's role in Cash Money Brothers?

        MR. HERMAN:  Can we have a time frame?

        THE COURT:  Just a second.  You want a time frame?

        MR. HERMAN:  Yes, your Honor.

        THE COURT:  Just focus in on what range of time you're talking about

BY MS. DAYANANDA:

Q    About what time period about E-Bay join Cash Money Brothers?

A    In '92.

Q    In '92 can you describe what his role was?

A    He sold drugs for us.

Q    Did it change from just selling drugs?

A    Yes.

Q    To what?

        ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Bryant - direct - Dayananda                148

A    He became a shooter for us.

Q    Now, were there other roles as far as members of Cash Money Brothers?

A    Were there other who?

Q    Roles as far as what people did for the group.

A    Yes, you had guys selling drugs.  You had a guy like myself that picked up the money and dropped off the drugs. You had guys that packaged the drugs and you had the guy that bought the drugs.

Q    Who was the guy that bought the drugs?

A    World.

        MS. DAYANANDA:  Your Honor, if I could just put the board up at this time.

Q    Mr. Bryant, there's a number of photos that are -- that you see now on that board.  Can you see them?

A    Yes.  I can see them.

Q    Have you seen these photos prior to coming to court?

A    Yes.

Q    Now, generally, of the ten photos that you currently see, who are these folks?

A    You want me to name them?

Q    You can name them?  In general, are these people you sold drugs with?

A    Yes.

Q    Were they all members in different ways of Cash Money

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

---

Bryant - direct - Dayananda                203

think that when they come to where we supplied it, they might get, not get what they looking for.

Q    And what was that individual's name who was selling the fake crack?

A    Gus.

Q    And did Popsie actually shoot Gus?

A    Yes.

Q    Was he injured?

A    Yes.

Q    Did he live?

A    Yes.

Q    Did you discuss this with World?

A    No.

Q    And after that, did Popsie gain some status within CMB?

A    Yes.

Q    Mr. Bryant, you heard a person with the nickname of Crazy Troy?

A    Yes.

Q    Can you tell the jury who that is?

A    He was an enforcer for the Hamiltons.

Q    And where did he work?

A    He started selling heroin out of Lafayette Gardens.

Q    Was that a problem?

A    Not until we started to want to sell heroin, too.

Q    And then what happened?

CMH    OCR    RMR    CRR    FCRR

---

Bryant - direct - Dayananda                207

A    '92 and '93.

Q    Now, during that time at Rikers Island, do you see, did you run into other CMB members?

A    Eventually, yes.

Q    And who was that?

A    When I first came in, it was Fruit and Stack and Porto and then World came, Deezo came, Peter Rabbit came, Popsie came, Stack, Stack was there, and E-Bay came.

Q    You mentioned -- was Wise also at Rikers?

A    Yes, but he adolescent so he wasn't with us.

Q    So this is 1992.  How old are you then?

A    I believe I'm 16, 16, 17, one of those.

Q    Did you learn why World was in jail at that time?

A    Yes.

Q    Why was he in jail?

A    Because the police had rushed the apartment we had in 325 and he threw some drugs and guns out the window.

Q    And as a result, who ended up in jail from that raid?

A    Him, Wise, Deezo, I think two females.

Q    During now, during this time, did you learn if anything had happened to Troy?

A    Yes.

Q    What did you learn?

A    That E-Bay killed Troy.

        MR. HERMAN:  Objection, unless we know the source,

CMH    OCR    RMR    CRR    FCRR

---

Bryant - direct - Dayananda                208

Judge.

        THE COURT:  Sustained.  I don't know what the basis of that is.

        So objection sustained.  Disregard the answer.

Q    Did you learn from E-Bay what, if anything, occurred as relating to Troy?

A    Oh, E-Bay told me he killed him.

        THE COURT:  E-Bay said that to you?

        THE WITNESS:  Yes.

        THE COURT:  Okay.

Q    Did he describe what happened?

A    Yes.

Q    Can you tell us what occurred?

A    Well, as far as the shooting, he described that he, while Troy was on the phone outside the store, that he walked into the store as if he was going in and he was in the doorway, he registered a bullet into the chamber of a TEC-9 and turned, like, around and walked toward the phone booth and shot him.

Q    Did you also speak to World about this?

A    Yes.

Q    What, if anything, did World say about what happened to Troy?

A    World told me that he was standing across the street from the pay phone and he was up inside the building at a female's house looking down at him and he called his, well, beeped him

CMH    OCR    RMR    CRR    FCRR

Bryant - Direct - Dayananda                  228

Q    Was there a trial?

A    Yes.

Q    And, did you become aware of who the witnesses would be at that trial?

A    Yes.

Q    Who were the witnesses?

A    Patrice, Theresa and Red.

Q    Were there any attempts to discourage them from testifying?

A    Yes.

Q    Explain what happened?

A    Well, Patrice-- Porto, befriended her and she was hiding from the prosecutor so they could not find her.

Q    Let me just back up.  Porto is the CMB person we see up there; is that correct?

A    Yes.

Q    Whose idea was it for Porto to start dating, was it Red?

A    No, Patrice.

Q    I'm sorry?

A    I don't know whose idea it was.

Q    What happened as a result of Porto dating Patrice?

A    She didn't go testify.

Q    What happened with Red?

A    We didn't get a chance to see Red, the one time that any of us saw her, E-Bay waited in the building for her and she

RB      OCR

Bryant - Direct - Dayananda                  229

didn't come out.  So nothing happened to Red.

Q    What about Theresa?

A    We didn't see her the whole time, so she took the stand too.

Q    Did you attend the trial?

A    Yes.

Q    Who did you go with?

A    Trouble.

Q    He is up there as well; is that right?

A    Yes.

Q    Where did that trial take place?

A    Downtown Brooklyn, Supreme Court.

Q    You mentioned that Fruit was the top member of CMB at that time.  What was World's reaction to him getting arrested?

A    He didn't like that Fruit went to that extreme in the street, but it was-- we got to protect him.

Q    Whose idea was it to talk to the witnesses before the trial?

A    I don't think that is something like we had to discuss, that was just like something like that was natural.  He was part of CMB, so we was going to protect each other, period.

Q    Now, directing your attention to-- did there come a time when you saw Theresa after this, after the trial?

A    I didn't see her, no.

Q    Did you learn that she had come back to Lafayette

RB      OCR

Bryant - Direct - Dayananda                  230

Gardens?

A    Yes.

Q    And about how much time had passed from the trial until you learned she was back in Lafayette Gardens?

A    It was a little while, I don't remember the exact time span, but it was after Fruit had blew trial.  It was-- we wasn't really thinking about her.

Q    When you say, blew trial, was he convicted?

A    Yes.

Q    Did you learn at some point that Theresa was back in Lafayette Gardens?

A    Yes.

Q    Who did you learn it from?

A    World.

Q    Can you tell us what happened?

A    I was in the back of the projects one evening with-- watching Dante, he was working for us.  And World came back there and told me that Theresa is in the front of the projects.  She is selling a coat or sweater or something.  She walking back this way, with I think her mother and her sister and I should have Dante hit her when she get back there.

Q    So what did you do?

A    I got Dante a hoodie, I believe.  I gave him a gun and I told him that she was coming down DeKalb and I-- he should hit her once she get to DeKalb and Kent.

RB      OCR

Bryant - Direct - Dayananda                  231

Q    Do you remember where that initial conversation was with World?

A    I believe it was in the middle of the projects in the back, on the strip basically.

Q    And can you describe his demeanor?

A    He was like he was in a rush telling me she coming back here right now.  Have Dante hit her.  Let me get in the car and leave before you do it.  You know, that was it.

Q    How soon after that did you give Dante a gun?

A    I didn't have the gun on me.  I had to take him in the building and give him the gun.  I think I gave him a hoodie too and--

Q    What kind of gun did you give him?

A    A 380.

Q    Where did he go?

A    He went towards DeKalb where she was-- where he was standing before and where she was walking.

Q    Do you know if he shot her?

A    Yes.

Q    Were you present when it happened?

A    No.

Q    Now, when you had that conversation with World, this was after the trial, correct?

A    Yes.

Q    After the conviction?

RB      OCR

GA11

Bryant - Direct - Dayananda                    232

A    Yes.

Q    Why was it important to shoot at Theresa at that time?

A    To show that she couldn't get away with what she did.

Q    Which was what?

A    She testified against a member of CMB.

Q    And was the intent to shoot her to injure her or kill her?

A    He was supposed to kill her.

Q    Now, Mr. Bryant soon after this incident with Theresa, did you get arrested for the shooting of William?

A    Yes.

Q    And, did you plead guilty to that?

A    Yes.

Q    What did you plead guilty to?

A    I believe it was weapons possession.

Q    How much time did you get?

A    Two and a half to five.

Q    Did you serve two and a half to five?

A    No, I served 5 years and 10 months.

Q    Why was that?

A    I caught another charge in jail.

Q    Which was what?

A    Promoting prison contraband.

Q    What does that actually mean?

A    I got caught with a razor.

RB        OCR

---

Bryant - Direct - Dayananda                    233

Q    As a result of having a razor in jail, did you get additional time to the original sentence?

A    A one and a half to three.

Q    When did you-- while you were in jail, did you stay in touch with World?

A    Sometime.  I spoke to him a few times.

Q    Did he ever discuss the Bloods with you during that time?

A    Yes.

Q    Can you tell the jury what that conversation was about?

A    I was hearing on the street that he had gotten down with the Bloods, that he was the leader of the Bloods in Bed Sty Brooklyn, and I thought it was stupid and I told him so.  I told him that, the Bloods is like an automatic RICO in the Feds, and that he should leave it alone.  He act surprised, like he didn't know that, and I heard he left it alone.

Q    Before you went into jail, had he had any litigation with the Bloods?

A    No.

Q    And did he tell you about what if anything he had done with Bloods members?

A    After I came home?

Q    Yeah.

A    Yes.

Q    What was that?

A    He told me that they was praising him and so he ran with

RB        OCR

---

Bryant - Direct - Dayananda                    234

it, and that is how he was able to get them to do stuff for him.  And he told me that he had a little guy shoot the bouncer at a roller skating rink that tried to disrespect him.

Q    You said a little guy, did you mention who-- what that person's nickname was?

A    Tookie, I believe.

Q    Did you know who that individual was?

A    No.

Q    Did you know if he had any of his family?

A    Did I know any of his family?

Q    Did you know any of Tookie's family?

A    Yes.

Q    Who was that?

A    From seeing, I knew his sisters and his brother, he had a brother Prince and I don't remember his sister's names.

Q    Did he live in Lafayette Gardens?

A    Yes.

Q    When he told you this, what was kind of his demeanor when he explained to you what happened with that?

A    The roller skating shooting?

Q    Yes.

A    He was in his regular demeanor.

Q    Which was what?

A    Which was like, I made that happen.

Q    Now, is Tookie a CMB member?

RB        OCR

---

Bryant - Direct - Dayananda                    239

A    Yes.

Q    What did you discuss once you had gotten out of jail?

A    The first time I spoke to him, he congratulated me from coming home.  He-- we automatically talked about Wise and he told me that it was really nothing to talk about.  That Peanut was responsible and Peanut had to go.

Q    Can you explain to the jury why Peanut was responsible in terms of what World believed for Wise's death?

A    The shooter was supposed to be Peanut's cousin and World said if he didn't stop it, he was apart of it.

Q    Meaning if Peanut hadn't stopped it?

A    Yeah.

Q    What was your response to World's saying Peanut got to go?

A    It is whatever he say.

Q    Did you know Peanut?

A    Yeah, I know him.

Q    From where?

A    I grew up with him.

Q    In Lafayette Gardens?

A    Yes.

Q    What building did he grow up in?

A    433.

Q    During that first discussion with World on the phone, did he mention who was running CMB?

RB        OCR

Bryant - Direct - Dayananda    245

Q   Can you tell the jury about that.

A   Well, I heard that he was on DeKalb and Bedford one night.  So I went over there to try to catch him.  He wasn't there.

Q   How did you learn about that?

A   I can't remember who told me but somebody told me he was over there.

Q   Is World out of jail or still in jail at this time?

A   World is in jail.

Q   Did Peanut ever make any attempts to shoot at you?

A   Yes.

Q   Can you tell the jury what happened?

A   Probably a couple of weeks after that, I was standing on the side of 433 with Thor and E-Bay and Peanut came from behind 433, and he fired, he fired at us.  His gun jammed up after it went off one time.  He started running.  One of the guys that was with me, was running too, he knocked me down.  Thor was started firing back at Peanut.  When I got up, I really could not see where he was, but I started firing in the direction that Thor was firing.

Q   Let me back up.  Before this attempt where Nut is shooting at you guys at 433, were there other attempts that had been made at Nut shooting wise?

A   Before I came home, I heard E-Bay and he had somebody else with him, he shot a truck up or something that was in --

RB    OCR

---

Bryant - Direct - Dayananda    246

Q   That Peanut was in?

A   Yes.

Q   And, did Nut ever speak to you about E-Bay?

A   Yeah, when he was calling me at the same time he was telling me that to tell World he had nothing to do with it, he telling me he wanted E-Bay.

Q   Why is that?

A   He just was cussing about how E-Bay wasn't nobody and he had shot at him and he-- like he had no business shooting at him.  He wanted E-Bay for that.

Q   Meaning Peanut wanted E-Bay for that?

A   Yes.

Q   So that conversation you had with Peanut was after E-Bay had taken a shot at him; is that right?

A   Yes.

Q   Why was Peanut having these discussions with you?

A   Like I said, I knew him, I grew up with him.  He knew how close I was to World.  He knew that World was calling me.  So he wanted World to know what he was telling me.

Q   Getting back to the incident where Peanut shot at you guys.  I will show you Government Exhibit 108-D.

      Are the T.V. screens?

      COURTROOM DEPUTY:  There you go.

Q   Can you tell us what we see here.

A   You see where me, E-Bay and Thor were standing when

RB    OCR

---

Bryant - Direct - Dayananda    247

Peanut shot at us.  We were standing right here leaning against this fence.

Q   Can you show us how you were leaning against the fence, can you demonstrate it?

A   Leaning against the fence like this, facing in the parking lot.

Q   So for the record, the witness just put both of his hands across his chest horizontally, is that right, Mr. Bryant?

A   Yes.

Q   That is how you were leaning with who?

A   E-Bay and Thor.

Q   And, who started shooting first?

A   Peanut shot at us.

Q   How many times?

A   Once.

Q   Did anyone get injured?

A   No, it hit the fence.

Q   Which fence?

A   The fence we were leaning against.

Q   Is that what we see there in Government Exhibit 108-D?

A   Yes, this black fence.

Q   Did you fire back?

A   Yes.

Q   What gun did you have at that time?

A   A 380, I believe.

RB    OCR

---

Bryant - Direct - Dayananda    248

Q   Do you remember if Thor fired?

A   Yes.

Q   Do you know what kind of gun he had?

A   A 40-caliber.

Q   Did E-Bay fire?

A   No.

Q   Did he have a gun?

A   No.

Q   None of you were injured; is that right?

A   Correct.

Q   Now, at some point, does World get out of jail?

A   Yes.

Q   Do you remember when that was?

A   A few months after me, I don't remember the month.

Q   So is this in 2000?

A   Yes, I believe so.

Q   Do you see him on the day he gets out of jail?

A   Yes.

Q   Can you tell us what happened?

A   Taz went to pick him up and I met him downtown on the side of the mall where I was with his mother.  And Taz pulled up and he got out.

Q   You say, downtown, where do you mean?

A   Downtown Brooklyn.

Q   You said Taz picked him up?

RB    OCR

Bryant - Direct - Dayananda          249

A     Yes.

Q     So who was all there when you first met with him?

A     Me, his mother, Taz, I believe Thor.

Q     What did you guys talk about then?

A     Nothing in particular I can remember.

Q     Did you meet up with him after that?

A     Yeah, all of them.

Q     Where was he living at that time?

A     In Manhattan.

Q     Where?

A     In Harlem, Manhattan.

Q     Why was he living in Harlem?

A     He had parole stipulations that banned him from Brooklyn.

Q     Did he still come to Brooklyn?

A     Yeah.

Q     Now, you had mentioned that Taz had been put in charge to manage Lafayette Gardens; is that right?

A     Yes.

Q     What happened once World returned home, who took over?

A     World.

Q     Once World gets out of jail, how often are you seeing him?

A     Every other day.

Q     Were there discussions to-- about Wise's death?

A     Yes.

RB     OCR

---

Bryant - Direct - Dayananda          250

Q     Was he upset-- was Nut still alive?

A     Yes.

Q     How did World feel about that?

A     That we needed to take care of that as soon as possible.

Q     Did he mention anyone else at that time initially as far as who had to be held responsible for his brother's death?

A     Yeah, Junior Hamilton.

Q     Who is Junior Hamilton? JR Hamilton.

A     He's one of the Hamiltons from 433.

Q     Why is that?

A     Because he was-- Nut-- any time somebody seeing him, he was driving in a truck that belonged to Junior and the word was that he helped hide the guy who shot Wise, Nut's little cousin.

Q     Who told you about that?

A     I seen the truck myself and it was common-- it was common knowledge that he was hiding the kid.

Q     The kid, meaning who?

A     The one who shot Wise.

Q     And, when you say JR Hamilton, did he still live in Lafayette Gardens?

A     No.

Q     Was there anyone else mentioned by World as to who-- who should be held responsible?

A     At that time, no.

RB     OCR

---

Bryant - Direct - Dayananda          251

Q     Now, were there other attempts to shoot at Peanut?

A     Yes.

Q     Can you describe-- did you participate in any of those shootings?

A     Yes.

Q     Can you tell the jury what shooting you attempted to make at Peanut?

A     I seen him driving up Lafayette and-- in Junior's truck, and he made a turn on Franklin. I figured he was going to come back around and come up Classon, so I went to cut him off at Classon and so I could catch him at the light on Lafayette and Classon. But he didn't make the turn. He kept going down Grand Avenue.

Q     Were you with anyone when you saw him that day?

A     I was by myself at first.

Q     Then what?

A     I went back in the projects and I got Thor. I told him that Peanut was down on Grand, and I need him to back me up. That I'm going to go hit Peanut on Grand.

Q     So what happened?

A     We grabbed some bikes from some kids out there and we rode down there. I came the opposite way from Lafayette, Lafayette Gardens. I came in Saint James way and while I was coming towards Peanut, he started reaching in his waistband like he had a gun. So I started firing from where I was

RB     OCR

---

Bryant - Direct - Dayananda          252

standing. I had dropped the bike where I was standing, I started firing. And Thor started firing from across the street.

Q     Did you hit him?

A     No.

Q     Did you hit anything?

A     The truck I got. The truck I think.

Q     Ultimately where did you start shooting at, what were the cross streets?

A     On Clifton, between Saint James and Grand.

Q     I will show you again, you have seen it many times as Government Exhibit 101. So when you first saw the truck, you said he was in Junior Hamilton's truck; is that right?

A     Yes.

Q     Was that coming down Lafayette?

A     Yeah.

Q     Towards Classon, you said, is that right?

A     No.

Q     Toward Franklin?

A     Yes.

Q     Then you expected him to turn, to make the turn so you would see him at Classon?

A     Yes.

Q     You said you grabbed the bikes and went down what street?

A     I went down Lafayette the opposite way and turned on

RB     OCR

Bryant - Direct - Dayananda        253

Saint James and came down Clifton.

Q    Did you see anyone you knew at Clifton?

A    Yes.

Q    Who was that?

A    The girl I was dealing with mother.

Q    When you say, dealing with, what do you mean?

A    My girlfriend's mother.

Q    Where was she?

A    She was on Saint James and Clifton.

Q    You said that at some point Peanut got out of the car?

A    Yeah, when I came around the corner, he was already out the car.

Q    Then what happened?

A    He was standing in front of it.  Talking to some guys on Grand Avenue and I dropped the bike and started walking towards him.

Q    And did he ever attempt to shoot at you at that time?

A    He reached in his waistband like he had a gun.

Q    But did he shoot?

A    Later on, the guys down here said he shot.  I didn't know he shot.

Q    Do you remember what gun you had that day?

A    Yes.

Q    What did you have?

A    A 9.  A 9-millimeter.

RB      OCR

---

Bryant - Direct - Dayananda        256

the gun.

Q    Who was in the car with you at that time?

A    Me, him and Heimie.

Q    Who is that?

A    His cousin.

Q    What did he mean when he said he didn't have to go change him?

A    Meaning that he was dressed for a funeral right there.

Q    Is there any attempt made at Nut by World on that day, any shooting?

A    No.

Q    Now, in addition to Nut, did World hold-- you mentioned JR, you mentioned Nut.  Did World hold anyone else responsible for the death of Wise?  Later on, did you learn?

A    Not holding responsible, but if you was a friend of the enemy, you were the enemy.

Q    Did you learn about a new friend of the enemy from World?

A    Yes.

Q    Who was that?

A    Hommo.

Q    H-O-M-M-O.

    What was Hommo's real name?

A    Darryl Baum.

Q    Can you explain how he became a friend of the enemy as you said?

RB      OCR

---

Bryant - direct - Dayananda        261

Q    What happened next?

A    They sent a guy Puffy to come pick me up.  Puffy picked me up and bring me to Quincy and Marcy.  He pulls over.  He tell me that Hommo was in the block.  So I get out the car and I walk through the block.  I don't see him.  So I walk back through the block and get back in the car and I tell him I don't seen him.  He said he right on the corner behind me.  I turn around and look and I see him on the corner but there's a lot of guys standing around him.  So I told him, I said, I'm not getting out of the car and hit him in front of all these guys.  I said I don't who's got guns and who don't.  And they not going to let me walk up on them like that.

    So, me and him got into a debate about what he heard about me and what I do and why I'm scared and we wind up calling Thor and Taz and I related to them what my concerns were and they said stay right there, we going, we going to get E-Bay.

Q    Let me just stop you right there.

    You mentioned a person by the name of Puff.  Who was that?

A    He had started dealing with us through, through Taz.

Q    An was he -- did you know him before you went to jail in '93?

A    No.

Q    I show you what's not been entered into evidence as of

CMH      OCR      RMR      CRR      FCRR

---

Bryant - direct - Dayananda        262

yet, Government Exhibit 16.

    MR. RUHNKE:  No objection.

    THE COURT:  16 in evidence now.

    (So marked.)

    (Exhibit published.)

Q    Can you tell us who this is?

A    That's Puffy.

Q    Now, prior to this day, had you socialized with Puffy before?

A    Yes.

Q    And who is he usually with?

A    Taz.

Q    And you said he picked you up while you were at your girlfriend's place, is that right?

A    Yes.

Q    And do you remember what kind of car he was driving?

A    Yes, a Mercedes-Benz, a CLK.

Q    Is that a distinct car?

A    Yes.

Q    Why is that?

A    He had a custom drop, drop top.  They didn't make them at the time so his car stood out from other Benzes at the time.

Q    What color was it?

A    Silver, gray.

Q    And you say he went to the corner of Quincy and Marcy, is

CMH      OCR      RMR      CRR      FCRR

GA15

Bryant - direct - Dayananda        263

that right?

A    Yes.

Q    I'm showing you what's not been entered into evidence yet.  It's Government's Exhibit 602.

MR. RUHNKE:  No objection.

THE COURT:  602 in evidence.

(So marked.)

(Exhibit published.)

Q    Can you tell us where you pulled up to there initially with Puff?

A    Right there.  (Indicating.)

Q    Okay.  So just to be clear, Marcy Avenue is facing Lexington, is that right?

A    Yes.

Q    And is that approximately where your car was, where you marked there?

A    Yes.

Q    And did you get out of the car at that time?

A    Yes.

Q    Where did you walk to?

A    I walked towards Quincy and turned down Quincy.

Q    Can you show us the path you took?

A    (Indicating.)

Q    And who did you see at that point?

A    Nobody.

CMH      OCR      RMR      CRR      FCRR

---

Bryant - direct - Dayananda        264

Q    Okay.  And what did you do then?

A    I came back to the car.

Q    Can you show us on the map?

A    The same path.  (Indicating.)

Q    And at that point, is it just you and Puff?

A    Yes.

Q    And what did you say to Puff at that time?

A    That I don't see him.

Q    So what did you do then?

A    He told me that he was behind me, he was standing on the corner.

Q    And then did you turn around?

A    Physically, I turned around the car and looked and seen that he was there.

Q    At that point, did you see Hommo?

A    I seen the crowd.

Q    And where was that crowd?

A    On the corner of Marcy and Quincy there.  (Indicating.)

Q    Did you get out of the car at that time?

A    No.

Q    What did you say?

A    I told him it was a crowd there and I wasn't comfortable walking into that crowd.

Q    And at that point, who do you speak to?

A    Taz and Thor.  They was, they always together so I'm not

CMH      OCR      RMR      CRR      FCRR

---

Bryant - direct - Dayananda        265

sure which one.  We was on speakerphone so I was probably talking to both of them at the same time.

Q    Do you remember if it was anything special about the speakerphone?

A    Yes, the speakerphone was in the steering wheel of the car.

Q    And at that point, did you relay your concerns to Taz and Thor?

A    Yes.

Q    What was the response?

A    They said, Stay right there, we're going to get E-Bay.

Q    What happened next?

A    I waited and they, they called back and they said, Get out of your car and hold him down.  He coming right now. E-Bay coming right now.

Q    Who's "they"?  Who told you that?

A    The same, the same situation.  Taz and Thor, I don't know which one I'm talking to.  I'm on speakerphone.  Probably talking to both of them at the same time.

Q    So what happens when they say -- first of all, when they say, Hold him down, can you explain to the jury what you mean by that?

A    It's basically cover him, cover his back while he do what he have to do.  I'll make sure nobody don't do nothing to him.

Q    So did you get out of the car?

CMH      OCR      RMR      CRR      FCRR

---

Bryant - direct - Dayananda        266

A    Yes.

Q    What did you do?

A    I walked towards Quincy.

Q    Do you see E-Bay at some point?

A    Yes.

Q    Where is he coming from?

A    He's coming from -- he's on Marcy coming down Marcy towards Quincy from the Gates way.

Q    What do you see happen?

A    I see him walking towards the crowd from behind.  He started skipping and a car was in front of him so Hommo disappeared, I couldn't see him, but I see E-Bay firing over and E-Bay come towards me.  I don't have my gun out.  I'm pointing towards the crowd.  E-Bay comes past me, goes towards the car.  I back up all the way until we get to the car.

Q    Do you both get into the car?

A    Yes.

Q    What happens then?

A    I asked him did he hit him.  He said yeah.  I asked him where.  He said in the head.  That's it.

Q    Did E-Bay tell you what he was doing when he hit him, when he fired?

A    He thought he was tying his shoe.

Q    Did you fire that day your gun?

A    No.

CMH      OCR      RMR      CRR      FCRR

Bryant - direct - Dayananda                267

Q    Mr. Bryant, I just want to get back to 602.  Now, you said when you got out to hold him down, meaning to hold E-Bay down, where did you walk to?

A    I walked to the corner of Marcy and Quincy.  I may have stepped in the street a little bit, but I was on the corner of Marcy and Quincy.

Q    And which way did you see E-Bay coming from?

A    Gates.  Coming from the Gates way but on Marcy.

Q    Can you show me his path?

A    (Indicating.)

Q    And about how far away were you were you from him when he fired at Darryl Baum?

A    About as far as me and this jury.

Q    When you say the jury, can you tell us which, as far as the first juror?

A    The first one.

Q    So from the length of where you're seated from the first juror, is that right?

A    Yes, the first or the second.

Q    And is that where E-Bay was or is that where Darryl Baum was?

A    That's where both of them were.

Q    How far away was E-Bay from Darryl Baum?

A    He was close enough to touch him.  He was right on top of him.

CMH    OCR    RMR    CRR    FCRR

Bryant - direct - Dayananda                268

Q    And at the point where you are, you said you were holding him down.  Specifically what were you doing?

A    I was standing there with my gun pointed at the crowd.

Q    And was there -- you said you saw Hommo bend down, is that right, Darryl Baum?

A    Yes.

Q    And were you able to see when he was doing when he bent down?

A    No.

Q    Why is that?

A    There was a car in between.

Q    And were you able to see all of E-Bay's body when he was firing?

A    No.

Q    Why is that, because the car?

A    Because of the car.

Q    Did you see how many times or hear how many times he fired?

A    I think it was three but I'm not positive.

Q    Do you know what kind of gun E-Bay used that day?

A    Yes.

Q    What kind of gun is that?

A    A .380.

Q    And when you saw him coming down Marcy towards Quincy, can you describe how he was walking?

CMH    OCR    RMR    CRR    FCRR

Bryant - direct - Dayananda                269

A    When he was doing what?

Q    When he was coming towards Darryl Baum, how was he walking?

A    He wasn't.  He was skipping.

Q    Where did you guys go once you got into the car?

A    He dropped me off back where he picked me up.

Q    At your girlfriend's?

A    Yes.

Q    And do you know where -- did you get dropped off first?

A    I can't remember.

Q    Did you talk to World that day?

A    I don't remember talking to World that day.

Q    Do you remember talking to him about what happened at some point?

A    I mean, I'm sure I did, but I don't remember the conversation.

Q    Do you remember, when you spoke to him, did he know about what happened to Darryl Baum?

A    Yes.

Q    How do you know that?

A    Because he wasn't going to -- he wasn't on the list anymore.  He wasn't somebody we had to get.

Q    Now, you mentioned this car that was used that was driven by Puff that night.  Did you and World discuss anything about what happened with that car?

CMH    OCR    RMR    CRR    FCRR

Bryant - direct - Dayananda                272

Q    Where in relation to where the murder occurred did Kim live?

A    (Indicating.)

Q    Marking between, I guess, on the right-hand side here.  And the murder occurred on the corner of Quincy and Marcy, is that right?

A    Yes.

Q    Now, Mr. Bryant, when you got that initial call from Taz before that night that they had a line on Hommo, did you talk to World at that time?

A    No.

Q    Why not?

A    He already gave me the order to hit Hommo so I didn't need to call him.

Q    But you talked about it afterwards, is that right?

A    Yes.

Q    You also mentioned JR, is that right?

A    Yes.

Q    And after Darryl Baum was murdered, did JR still remain on the list of people that had to go?

A    Yes.

Q    Did you make any attempts to kill JR Hamilton?

A    Yes.

Q    Can you tell the jury about your attempts?

A    World called me to tell me that JR was on the corner of

CMH    OCR    RMR    CRR    FCRR

Bryant - direct - Dayananda                273

Bedford and DeKalb in front of, like, a real estate office and that I should send somebody over there to hit him. And Tion was with me so I gave him the gun and told him to go do it.

Q    And just so we're clear, Tion is on the board there, is that right?

A    Yes.

Q    Do you have any relation to Tion in terms of family relation?

A    Yes. He's my brother-in-law.

Q    He's married to your sister?

A    Yes.

Q    And when you decided to send him, was he a lower level of CMB at that time?

A    Yes.

Q    Why did you decide to send him?

A    Because he needed to prove himself.

Q    Did you give him a gun?

A    Yes.

Q    And where did you send him to?

A    I sent him to DeKalb and Bedford.

Q    What happened?

A    I stayed in the projects. He came back and told me that it's a bunch of guys with him and they got guns on him and he didn't do it.

Q    Did you tell World?

CMH    OCR    RMR    CRR    FCRR

Bryant - direct - Dayananda                274

A    Yes.

Q    What was his response?

A    He was upset.

Q    Is there another time that you learned where JR Hamilton was?

A    Yes.

Q    Can you tell us about that time?

A    World said that they, they had, they had a line on him in, on Myrtle in front of a barbershop and that he had a guy named Black James about to hit him.

Q    Who is Black James?

A    He was a guy that World introduced me to from jail basically and he was trying to be down with the crew.

Q    So what happened?

A    So I was in the car with Troub and I rode over there to see and when I rode over there, I seen JR sitting in, like, a beach chair in front of the barbershop and he had a couple of guys on the side of him and a couple of stores down, Black James was just standing there. So I motioned, I motioned to him like do it now. And he was standing there looking nervous so I rode around the corner, me and Troub, and --

Q    Was World in the area?

A    World was around the other corner.

Q    Was he in a vehicle?

A    Yes.

CMH    OCR    RMR    CRR    FCRR

Bryant - direct - Dayananda                275

Q    Do you remember what vehicle?

A    A Lexus Land Cruiser like.
         And he, he -- I spoke to him and Black James is back with him. He didn't do -- he was back with World and World was telling him how he was going to dump him on Coney Island beach for not doing it and he was basically, like, begging, like, he was just begging basically.

Q    Who was begging?

A    Black James.

Q    How did you hear World telling him this?

A    Because I'm on the phone with World and he's saying this and I hear Black James in the background and I didn't think he really was going to do it. It was, like, a joke basically, I thought.

Q    That who wasn't going to do it?

A    I didn't think that he was really going to do that to him. I thought he was just trying to scare him.

Q    I'm sorry. Meaning World was going to try to scare him by saying, I'm going to dump him?

A    Yes.

Q    Did you see Black James try to shoot JR that day?

A    No, I just seen him standing a couple doors down.

Q    Before we break for the day, I just wanted to go back to one thing, Mr. Bryant. You mentioned that on that day of Darryl Baum's murder that you had noticed that he was with a

CMH    OCR    RMR    CRR    FCRR

Bryant - direct - Dayananda                276

group of people and you said you weren't going to do it. Is that right?

A    Yes.

Q    Why is that?

A    Because it was a crowd and I didn't know who was armed in the crowd and they wouldn't -- I didn't think they would let me, like, get close enough to him to do it, that crowd wouldn't let me get close enough to him to actually shoot him.

Q    Is there a difference between you approaching that crowd and E-Bay approaching that crowd?

A    Yes, I thought so and we thought so, that E-Bay looked less menacing and that people would let him get up on him like that and they wouldn't allow me to do that.

Q    Are you -- back then when this happened, are you taller than E-Bay?

A    I think so.

Q    And about how much time passed from the time that you said you weren't going to do it and the time that E-Bay appeared coming down?

A    It was a short time, shorter than I expected.

Q    Now, on the day, did you learn that JR Hamilton was ultimately murdered?

A    Yes.

Q    Were you in Brooklyn on the day that happened?

A    I don't think so.

CMH    OCR    RMR    CRR    FCRR

GA18

Bryant - direct - Dayananda          277

Q    Did you learn about it?

A    Yes.

Q    Who told you about it?

A    A couple of people.  Taz.  Thor.  E-Bay.

Q    Can you tell us what E-Bay told you happened on the day of JR Hamilton's death?

A    We had a few conversations about it.  I can't remember him actually talking about the shooting with me.  I don't remember that conversation I had with him.  I remember the conversation that we had pulled up on JR's other brother and we was trying to make sure that Popsie was all right because he had pulled up on Popsie and when we pulled up, his other brother Ulysees was like looking with a, like, wide-eyed stare and E-Bay says, yes, that's how he was looking when I ran up on his brother.

Q    What did that mean to you?

A    That meant that that's how Ulysees is looking when he killed JR.

Q    Was Ulysees present when JR was killed?

A    Yes.

THE COURT:  Mrs. Dayananda, I think that it's about 4:30 and that's as far as we are going to go today.  It seems that this is a reasonable time for you to break.  We will pick it up on Monday and you've indicated to me that you are going to complete the direct examination on Monday morning, I

CMH     OCR     RMR     CRR     FCRR

---



283

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,          :   04-CR-706
                                   :   (FB)
           -against-               :
                                   :   United States Courthouse
                                   :   Brooklyn, New York
DAMION HARDY,                      :
AARON GRANTON,                     :
                                   :   Monday, April 6, 2015
           DEFENDANTS.             :   10:00 a.m.
- - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES SENIOR DISTRICT COURT JUDGE

A P P E A R A N C E S :

| For the Government: | LORETTA E. LYNCH, ESQ.<br>United States Attorney<br>BY: **SOUMYA DAYANANDA, ESQ.**<br>    **MATTHEW S. AMATRUDA, ESQ.**<br>    **RENA T. PAUL, ESQ.**<br>Assistant United States Attorneys |
| For the Defendant<br>Damion Hardy: | BY: **DAVID A. RUHNKE, ESQ.**<br>    **JEAN D. BARRETT, ESQ.** |
| For the Defendant<br>Aaron Granton: | BY: **CARL JORDAN HERMAN, ESQ.**<br>    **ROBERT M. BEECHER, ESQ.**<br>    **KENDRA PANNITTI, ESQ.** |

Courtroom Deputy: **Mike Innelli**

Court Reporter:  **Mary Agnes Drury, RPR**
                 Official Court Reporter
                 E-mail:  Mad78910@yahoo.com

Proceedings recorded by computerized stenography.  Transcript produced by Computer-aided Transcription.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

A. BRYANT - DIRECT BY MS. DAYANANDA        344

wasn't there.

Q    Is that because you were in prison?

A    No, I was one the run I was Upstate.

Q    Number 11?

A    Tion.

Q    What role, if any, did he have?

A    He worked for Wise.

Q    And number 42?

A    KB, he hustled.

Q    Is there a difference between who hustles and would who bagged up?

A    Yes.

Q    What is that?

A    The people who hustled for us, that's just what they done, they stood outside and sold drugs.  And if you bagged up, that's all you did, you just bagged up and that was it, as far as Phil was concerned.

Q    I just want to get back to when you said E-Bay would work as a hustler.  Did he get paid for that?

A    Yeah, sometimes.

Q    And how much was he getting paid?

A    He would get $20 off of each bomb.

Q    And that's what you describe; if it's $150 bomb, the seller would get $20; is that right?

A    Yes.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

A. BRYANT - DIRECT BY MS. DAYANANDA        349

Q    If you're shooting someone as you've done, is that a problem?

A    Yes.

Q    What's the problem?

A    The problem is that it stops firing.  And if they have a gun or something, it gives them time to react.

Q    What did that gun jamming story do, if anything, for E-Bay's reputation?

A    Oh, it raised his reputation up tremendously.

Q    Tremendously?

A    Yeah.

Q    Why is that?

A    Because it takes a lot of heart to shoot like that. And the gun jams and you step outside of that situation and unjam the gun and go back again, not once, but twice.  I mean, it takes a lot of heart to do that.

Q    When you say it "takes a lot of heart," what did you do mean?

MR. BEECHER:  Objection.

THE COURT:  No, overruled.  It takes a lot of heart, they're not very sensitive about killing somebody. You don't mean that, do you?  That's heart when you care about another human being.

THE WITNESS:  No.  I'm using in the slang term. Courage.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

A. BRYANT - DIRECT BY MS. DAYANANDA    350

THE COURT:  The slang term means that they don't care about whether they kill somebody or not, right?

THE WITNESS:  No.

THE COURT:  So you tell what "heart" means.

THE WITNESS:  Heart means that it took a lot of courage for him to do that.

THE COURT:  It took him a lot of courage to kill somebody?

THE WITNESS:  No.  For the gun.

THE COURT:  To unjam it?

THE WITNESS:  To unjam it and go back to the scene.

THE COURT:  To unjam it and go back and shoot somebody?

THE WITNESS:  Yes.

THE COURT:  Next question.

BY MS. DAYANANDA:

Q    And you spoke to E-Bay about this as well; is that correct?

A    I'm quite sure that I did, but I don't remember the particulars of the shooting I spoke about with him, except for what I testified to Thursday.

Q    Which was?

A    That he told me that's how his brother's eyes looked when he ran in there on him.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

A. BRYANT - DIRECT BY MS. DAYANANDA    359

Q    So what was the point of taunting the girlfriend of Peanut at that point?

A    To let them know we got him.

Q    Did you learn how the -- the details of how E-Bay shot Peanut later that day or the next day?

A    Yes.

Q    Who did you learned that from?

A    E-Bay.

Q    Can you tell the jury what E-Bay told you about what happened the night that Peanut died?

A    He told me that Nut was parked, and he was talking to somebody.  And he walked up and started shooting him from -- I guess from behind while he was sitting in the driver's seat of his truck.

Q    Did E-Bay tell what you kind of gun he used?

A    I don't know if he told me, but I already knew.

Q    Why that was?

A    Because Thor also told me that he gave him a 40-caliber.

Q    And did he tell you -- did E-Bay tell you where this happened?

A    Where what happened?

Q    Where the shooting happened?

A    Yeah, by the club.

Q    Did you know which club it was?

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

A. BRYANT - DIRECT BY MS. DAYANANDA    367

A    No.

Q    When did you get out after that year, do you remember?

A    '02, around summer.

Q    Summertime of 2002?

A    Yeah.

Q    Where did you go at that time?

A    I paroled to my mother-in-law's house.

Q    Where was that?

A    345 Classon.

Q    That's back in LaFayette Gardens; is that right?

A    Yes.

Q    Now, what's the -- what's kind of the state of Cash Money Brothers at that time?

A    It's kind of divided.

Q    What do you mean by that?

A    Everybody's kind of breaking off into their own little thing.

Q    Was there anyone who was in LaFayette Gardens on behalf of World?

A    Yes, I believe it was Stro.

Q    Who is Stro?

A    Some new guy World started bringing around.

Q    Did you know him before you went to jail?

A    No.

Q    Let me show you what's been marked for identification

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

A. BRYANT - DIRECT BY MS. DAYANANDA    376

A    Yes.  Most likely, yes.

Q    Now, did you also start -- did you have any -- start using heroin around this time?

A    Yes.

Q    Can you tell us how that came about?

A    How that came about?

Q    Yes.

A    I tried it and I started using it, like, two or three times a week.

Q    Did World ever find out about that?

A    Yes.

Q    Did you have a conversation with him about it?

A    Yeah.  My wife told him she thought I was getting high.  So he came to the projects to see me, and he questioned me about it.  And I told him that it's not an issue, I'm not abusing it, and that was it.

But, like, a day or two later, he drove up and I was standing next to Taz, and he was yelling about it.  And -- but I figured that just his way of stop hustling the projects, he wanted to put Stro there.

Q    During that conversation was he concerned about using it?

A    Yeah.  That's my friend.  I think so.

Q    What was your response?

A    I'm going to stop.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

A. BRYANT - DIRECT BY MS. DAYANANDA          377

Q     Did you stop?

A     Yeah.

Q     Eventually?

A     Yeah.

Q     I'm going to direct your attention to July of 2002. Did you participate in a kidnapping at that time?

A     Yeah.

Q     Who participated in that with you?

A     Me, Tion, Stro, Popsie, and Tion had some guy named Brown with us.

Q     Did you know who Brown was?

A     Well, I seen him with Tion out of town before.

Q     I'm going to show you what's been marked for identification as Government Exhibit 33.

        MR. RUHNKE:  We're not going to object, Judge.

        THE COURT:  All right.  That's the photo, right?

        MS. DAYANANDA:  Yes.

        THE COURT:  In evidence.

        (Government Exhibit 33 is admitted into evidence.)

Q     Do you recognize this photo, Mr. Bryant?

A     Yes.

Q     Who is that a photo of?

A     Brown.

        MS. BARRETT:  That's not what we have for 33.

        THE COURT:  33 is the head shot of brown you say

---

A. BRYANT - DIRECT BY MS. DAYANANDA          378

it.

        MR. RUHNKE:  The confusion is we have another 33, but we have a different headshot for 33.

        MS. DAYANANDA:  We'll clarify.

        THE COURT:  We clarified that.  This is the headshot of Brown that you identified as 33, right?

        MS. DAYANANDA:  Yes, your Honor.

        THE COURT:  All right.  That would be in evidence now.

BY MR. DAYANANDA:

Q     Mr. Bryant, how did you learn about this kidnapping? How did you get involved?

A     Tion spoke to World about it.  I guess World told Tion about it.

        MR. RUHNKE:  Your Honor, I object to "I guess."

        THE COURT:  Yeah.

        THE WITNESS:  World told Tion --

        THE COURT:  You know this?

        THE WITNESS:  Yes.  Tion told me World told him about it.  World told me to hold him down, he wanted me to be there.

BY MS. DAYANANDA:

Q     Hold him down, meaning?

A     Make sure that it goes down the way it's supposed to go down.

---

A. BRYANT - DIRECT BY MS. DAYANANDA          379

Q     So what did you do?

A     I ran with him.

Q     To where?

A     I rode with -- in Tion's car with him to Queens, outside the guy's apartment, and the guy happened to be coming out when we got there and we followed him.

Q     Who was the guy?

A     I don't know.

Q     Did you -- what was -- did you know what you were going to be robbing him of?

A     Yes, drugs.

Q     So you went to Queens.  You said you were in a car with Tion?

A     Yes.

Q     Were there other people there that were participating?

A     Yes, the other people in the other vehicles, it was a van.

Q     Okay.  And what happened once you got to Queens?

A     We information Queens the whole time following him.

Q     Did you -- at some point did you see the person who you were going to kidnap?

A     Yes.  He got into a cab, and we followed the cab.

Q     And then what happened?

A     He went to some type of bar or something and we waited outside for him.

---

A. BRYANT - DIRECT BY MS. DAYANANDA          380

Q     Did anyone go inside the bar?

A     Yeah.  We was getting impatient, so Tion went inside to coach him out.

Q     Coach him out?

A     Yeah, bring him out.

Q     And then what happened?

A     After a long time, Tion wound upcoming outside the bar with the guy.  And Stro ran across the street and then grabbed him and through him in the van.

Q     Is that the vehicle that you were in or a different vehicle?

A     I was in the car.

Q     So now who is all in the van?

A     Popsie, the driver who I can't remember who the driver was, if it was a female.  I think it was a female driver. Brown, Stro.  But I walked over to the van and made sure they tied him up properly.  And when they closed the van up, I went and got back in the car with Tion and we followed the van.  The van followed the car back into -- we drove around Queens for a little while.  And he showed us the location where the drugs was supposed to be.

        It looked like a real nice neighborhood, we didn't know how we were going to go in that house.  So we contact World, and World told us where to bring him so we could stash him at least for the night.

A. BRYANT - DIRECT BY MS. DAYANANDA          390

leaving the mosque, I got a call from Taz or Thor, one of them, they always together, I get confused which one was calling me, but they told me they had a line on T-Rock.

Q    What does that mean?

A    They can see him.  They know where he's at.  So they told me meet them.

Q    And where were you at the time?

A    On Bedford Avenue in Brooklyn coming out of the mosque.

Q    Were you with anyone?

A    Yes.

Q    Who were you with?

A    A guy named Hetto (phonetic).

Q    Who is Hetto?

A    He worked for us sometimes.

Q    And when they called you, Taz and Thor, where were they?

A    They was at -- they was coming from another mosque on by Malcolm X.

Q    Did you go to that location?

A    Yes.

Q    And who was there when you went to that location?

A    Taz, Thor and they had a guy from Virginia in the car with them.

Q    Do you know that person's name?

A    John.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

A. BRYANT - DIRECT BY MS. DAYANANDA          391

Q    Do you know what kind of car they were in?

A    Four Runner.

Q    Now, from where you were on your way there, did you speak to World at any point?

A    Yeah.  Before I got in the cab to go to meet them, I called World.

Q    Why was that?

A    Because I wanted to know if the money was still good.

Q    Did you ask him that?

A    Yes.

Q    What was his respond?

A    He said, yeah, get it from Taz.

Q    What happened when you meet up with Taz and Thor?

A    I get in the car with Taz and he told me that T-Rock is working around the corner at a construction site.  And so I tell him, where that money at?  World told me to get the money.  So he's like, I got 5,000 right now, and I'm going to get the rest to you.  So I said all right.  But he didn't have a gun.

Q    Did you have a gun on you?

A    No.  He told me to walk around the corner.  When I walked around the corner with him, his wife was parked there.  We got in the car with his wife.  And he got in the back.  I got in the front passenger seat and she gave me the gun.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

A. BRYANT - DIRECT BY MS. DAYANANDA          392

(Continued on the next page.)

*Mary Agnes Drury, RPR*
*Official Court Reporter*

BRYANT - DIRECT - DAYANANDA          393

BY MS. DAYANANDA:

Q    Do you remember his wife's name?

A    Kissie.

Q    What kind of gun did she give you?

A    A .9.

Q    So at that point, who is all in the car?

A    Me and Taz and Kissie.

Q    It was at Kissie's car?

A    Yes.

Q    Then what happened?

A    I got out of the car and I walked to the location he told me, and nobody was there.  So I called him and told him that there's nobody here.  So he said go around the other corner and he had another one -- one of his other friends was parked there, Abu Bakr.  So I going to Abu Bakr's van, and they called and said he right around the other corner, he ran around the other corner, working again.

So Moo was in the car, too, with Abu Bakr.  So I told Moo to get out, and Abu Bakr pulled over to around the corner from where T-Rock was working.  I get out of the car and I walked towards him.

Q    Let me stop you right there.  Now, you mentioned Abu Bakr.  Did you know him?

A    Taz.

Q    Was he one of Taz's friends?

*Lisa Schwam, RPR, CRR, RMR*
*Official Court Reporter*

BRYANT - DIRECT - DAYANANDA    394

A    Yes.

Q    I'm showing you Government Exhibit 15.

MS. DAYANANDA:  One-five, your Honor.

THE COURT:  Is that in evidence yet?

MS. DAYANANDA:  I don't believe so.

MR. RUHNKE:  No objection.

THE COURT:  It's in evidence.

(Government Exhibit 15 received in evidence.)

BY MS. DAYANANDA:

Q    Who is this a photo of?

A    Abu Bakr.

Q    And you said he was in the car with Moo; is that right?

A    Yes.

Q    And that's who we saw here in Government Exhibit 3?

A    Yes.

Q    What kind of car was that?

A    It was a caravan.

Q    Just to clarify, you initially went there, there was one car that had Thor, correct?

A    Correct.

Q    And Kissie comes in another car; is that right?

A    Yes.

Q    When did you first see the car with Abu Bakr and Moo?

A    After I went past the first scene and T-Rock wasn't there.

*Lisa S. Schwam, RPR, RMR, CRR*
*Official Court Reporter*

---

BRYANT - DIRECT - DAYANANDA    395

Q    And then where were they parked?

A    Who?

Q    You said that you asked Moo to get out of the car; is that right?

A    Yes.

Q    Why is that?

A    Because I felt there was no need for him to see, be a witness.

Q    A witness to what?

A    To the murder I'm about to commit.

Q    Okay.  So then what happens after you get out of the van?  Does he get out, by the way, Moo?

A    Yes.

Q    Okay.  Go ahead.

A    Moo get out the van.  Abu Bakr pulls off and he pulls around the corner from where T-Rock was working.  And I got out of the van, and I walked to the construction site where T-Rock was at.  And I really wanted to see if I still remember his face.  I seen him.  I remembered him.  I walked past him.  I went to a store.  I came back out the store and walked past him -- walked towards him again and he was -- I don't know -- he was talking to someone.  I don't think he was arguing.  I think he was just talking loud.  And I shot him in the back of his head, and I shot him twice when he fell.

*Lisa S. Schwam, RPR, RMR, CRR*
*Official Court Reporter*

---

BRYANT - DIRECT - DAYANANDA    396

Q    Now, was he working at that time?

A    He was working.

Q    Where was he working?

A    At the construction site.

Q    Was he talking to another construction worker?

A    Yeah, I think so.

Q    I'm going to show you what's been -- well, let me just back up.

You said you walked past him and went into a store; is that right?

A    Yes.

Q    Why is that?

A    I don't know.  I just -- first I walked past him just to see if I knew who he was.  Then I went into the store.  I don't know.  I don't know.

Q    Once you walked out of the store, was he still at the same place?

A    Yes.

Q    And did you walk up from behind or did you walk up in front of him?

A    I walked up from behind.

Q    And you said you shot him.  Where did you shoot him first?

A    In the head.

Q    And then what happened once you shot him in the head?

*Lisa S. Schwam, RPR, RMR, CRR*
*Official Court Reporter*

---

BRYANT - DIRECT - DAYANANDA    397

A    He fell.

Q    And then what did you do?

A    I shot him two more times.

Q    What did you do after you shot him twice, two more times?

A    I walked away.

Q    Where did you walk to?

A    I went back towards the van where Abu Bakr was parked, around the corner.

Q    What time of day was this, Mr. Bryant?

A    It was -- well, the mosque end at 1:00 so it was between 1:00 and 2:00, I believe.  It was broad daylight.

Q    Was there people around?

A    Yes.

Q    Did you do anything after you shot him in terms of hiding your face?

A    Well, I remember a couple people walking towards me so while I was walking towards them, I put my shirt on my face like that (indicating) like briefly.

Q    And then what did you do?

A    I just kept walking towards the van.

Q    And who was in the van at that time?

A    Abu Bakr.

Q    Where did you go after that?

A    He drove me back to Lafayette Gardens.

*Lisa S. Schwam, RPR, RMR, CRR*
*Official Court Reporter*

BRYANT - DIRECT - DAYANANDA          398

BY MS. DAYANANDA:

Q   Do you remember how Abu Bakr left that location driving?

A   Oh, he drove off faster than I would like and he got caught in some traffic, and he went down a wrong way street.

Q   And where did you end up?

A   At Lafayette Gardens.

Q   Did he drop you off there?

A   Yes.

Q   What did you do with your gun?

A   I took it to an apartment where Trouble stashes some stuff at in 433.

Q   And why was that?

A   Because I knew Troub stashed stuff there, he had a safe there.  And I felt it would be safe there.

Q   Mr. Bryant, I'm going to show you what we've marked as Government Exhibit 1010.

        THE COURT:  1010.  No objection.  In evidence.

        (Government Exhibit 1010 received in evidence.)

BY MS. DAYANANDA:

Q   Can you tell us what this is a map of, Mr. Bryant.

A   Bed-Stuy.

Q   Is it the location of where you met up with Taz and Thor shown here?

---

BRYANT - DIRECT - DAYANANDA          399

A   I can't tell by that map.

Q   Okay.  I'm going to show you what hasn't been admitted yet into evidence as Government Exhibit 1001-A and 1001-B.

        MR. RUHNKE:  Are those more maps?

        MS. DAYANANDA:  No.  These are crime scene photos.

        MR. RUHNKE:  That's fine.

        THE COURT:  Any objection to this?  These are crime scene photos, I take it.

        MR. RUHNKE:  No objection.

        THE COURT:  Go ahead.  Show him the crime scene photos.

        (Government Exhibit 1001-A and 1001-B received in evidence.)

BY MS. DAYANANDA:

Q   Showing you Exhibit 1001-A.  Do you recognize that photo?

A   Yes.

Q   Can you tell us what that's a photo of.

A   The construction site.

Q   And can you tell us which way you walked, the construction site where Tyrone Baum was?

A   From this picture, I can show you the store that I went in.

Q   Okay.  Can you show us that.

A   Here (indicating).

---

BRYANT - DIRECT - DAYANANDA          400

Q   Now, after you went to that store, which way did you walk?

A   I came back here (indicating).

Q   I'm showing you Government Exhibit 1001-B, as in "boy."

        THE COURT:  What's your question?

BY MS. DAYANANDA:

Q   Can you tell us what that's a photo of?

        THE COURT:  That's another photo of the crime scene, right?  You recognize that?

        THE WITNESS:  Yes.

BY MS. DAYANANDA:

Q   Now, if you can just describe to us when you first -- when you learned about the van.  Where was it, the corner where this occurred?

A   Where the van was parked?

Q   No.  Where the actual shooting took place.

A   Here (indicating).

Q   Can you mark it on your screen.

A   I just did.

Q   I'm sorry.  Is it showing up?

A   Yes, on mine.

Q   Okay.  Sorry.  And I'm sorry, the right-hand corner here; is that right?

A   Yes.

Q   Once you did that, which way did you walk in towards of

---

BRYANT - DIRECT - DAYANANDA          401

getting back into the van?

        THE COURT:  What difference does it make?  He already said he shot him in cold blood.  What more do you need to induce?

        Next question.

BY MS. DAYANANDA:

Q   Do you remember the van that you got into, Mr. Bryant?

        THE COURT:  Is that relevant, too?

        MS. DAYANANDA:  It is.

        THE COURT:  You say so.  I'll listen carefully.

        THE WITNESS:  Yes.

        THE COURT:  What was the van that he went into?

        THE WITNESS:  Caravan.

        THE COURT:  The what?

        THE WITNESS:  A caravan.

        THE COURT:  A caravan.

BY MS. DAYANANDA:

Q   Now, after you dropped the gun off at you said Troub's place, at some point did you meet up with Taz concerning the murder that had just occurred?

A   Yes.

Q   And what happened?  Did you talk about what had occurred?

A   Yes.

Q   And what was discussed at that time?

BRYANT - DIRECT - DAYANANDA           402

A    We met up at the Indian house restaurant we normally meet at, and he told me that I didn't have to tell World about the rest of the money.  I would be able to keep it for myself if I just wait for him to give me the rest and he would take me out of town.  I could flip it and get more money.

Q    And what was the reason to not tell World?

A    Because I don't think he had all the money at the time.  And he was convincing me that I wouldn't have to split it or give it to World and have World give me what he wanted to get me out of it.

Q    Did you go along with that plan?

A    Yes.

Q    And did you -- did World learn that T-Rock had actually died?

A    Yes.

Q    And was it mentioned to him who actually did it?

A    Yeah.  Taz also told me that we could just say Azziz did it.  So I told him when I got there Azziz had already did it.

Q    And you told that to World?

A    Yes.

Q    Now, did you end up getting money from Taz for this murder?

A    Yes.

*Lisa S. Schwam, RPR, RMR, CRR*
*Official Court Reporter*

---

BRYANT - DIRECT - DAYANANDA           403

Q    And you said you went out of town with him; is that right?

A    Yes.

Q    Where did you go?

A    Virginia.

Q    And where in Virginia exactly?

A    Lynchburg.

Q    Who did you do go with?

A    Taz.

Q    And was anyone else there?

A    In Lynchburg?

Q    Yes.

A    Thor came sometimes.  Taz wife.

Q    And what were you -- did you start drug dealing there as well?

A    Yes.

Q    And what were you selling?

A    We sold weight basically, meaning -- how you say?  Wholesale coke.

Q    And this is in Virginia; is that right?

A    Yes.

Q    Now, once you moved to Virginia, did you still stay in touch with World?

A    Yes.

Q    I'm going to direct your attention to February 18th of

*Lisa S. Schwam, RPR, RMR, CRR*
*Official Court Reporter*

---

BRYANT - DIRECT - DAYANANDA           404

2004.  Did you get arrested that day?

A    Say what day?

Q    February 18th of 2004.

A    Yes.

Q    Can you tell us what led up to your arrest.

A    Me and Taz had came back to Brooklyn, and he had been telling me that some guy supposed to bring some drugs for us and charge us 10,000 a k, which was a lot less than what we was paying.  So we were sitting in the car and he told me the guy called him right now.

So we went towards Kennedy Airport, and we stopped in the parking lot outside of there to meet the guy.  Taz got out of the car to talk to the guy, and the Feds came.

Q    And you got arrested at that time?

A    Yes.

Q    And were you on parole at that time?

A    Yes.

Q    Did you get arrested also for a parole violation?

A    Yes.

Q    Now, what happened -- how much time did you receive for that?

A    It was some months.  I don't remember how many months it was, but it was a few months.

Q    And did you stay in jail?

A    Yes.

*Lisa S. Schwam, RPR, RMR, CRR*
*Official Court Reporter*

---

BRYANT - DIRECT - DAYANANDA           405

Q    At some point did federal agents come talk to you?

A    Yes.

Q    And did they -- at some point were you arraigned here in Brooklyn in the federal court?

A    Yes.

Q    What were you arraigned on, what charges?

A    It was a drug conspiracy, 50 grams or more drug conspiracy.

Q    Were you charged with any murders at that time?

A    No.

Q    And who was present for that arraignment?

A    Me and World.

Q    I just wanted to go back to one thing concerning that van, Mr. Bryant.  Did you learn what had happened?  Whose van was that?

A    Abu Bakr's.

Q    And did you learn what, if anything, happened to that van?

A    We met up with him, and he said that they was looking for it.  He had detailed it, he said, but then he decided to get rid of it.

Q    And did you learn where he got rid of it at?

A    In Pennsylvania.

Q    I also want to go back to T-Rock's murder.  Did you learn from Taz if he had any motive in terms of T-Rock?

*Lisa S. Schwam, RPR, RMR, CRR*
*Official Court Reporter*

GA25

BRYANT - DIRECT - DAYANANDA          406

A     Yes.

Q     What was that?

A     That T-Rock was supposedly somehow involved with his father's death.

Q     And do you remember who you learned that from?

A     Moo.

Q     And in terms of -- do you remember when you learned that?

A     No.

MS. DAYANANDA:  Can I have a minute, your Honor?

THE COURT:  Do you think we can finish before our lunch break?  It would be a good thing to do if we could.

How much more do you have?

MS. DAYANANDA:  Probably ten minutes, your Honor. I just need to gather my thoughts.

THE COURT:  It's not that it's critical, but it's an actual break.

MS. DAYANANDA:  I agree.  One second.

(Brief pause.)

BY MS. DAYANANDA:

Q     I just wanted to clarify one thing that you mentioned before concerning a shootout that occurred in front of 433 with Peanut.

A     Yes.

Q     Do you remember that?  You described it as being the

---

BRYANT - DIRECT - DAYANANDA          407

gate?  Do you remember that?

A     Yes.

Q     Do you remember who was present or when that shooting occurred?  Did you shoot right away?

A     No.

Q     Why is that?

A     Because I got knocked down.  When the shooting happened when people started running and Tion, my brother-in-law, he knocked me down.  So I didn't see where Peanut ran.

Q     Okay.  And then you mentioned this conversation concerning the T-Rock murder, you mentioned this conversation with Taz about splitting up the money with World, you didn't have to do that if you tell him that you didn't do it; is that right?

A     Yes.

Q     Why would you have to split up the money with World?

A     Because World told me about the hit.  It's basically's World's hit and I'm doing it so the money would come to him. And he would split it with me or give me what he felt I was supposed to get.

Q     If Azziz had done it and gotten the money, would World have a right to split that money with him?

A     No.

Q     Now, soon after this federal arrest, did you decide to cooperate with the government?

---

BRYANT - CROSS - HERMAN          461

stopped.

Q     And you wanted to be part of the crew?

A     Yes.

Q     And you wanted to be respected; is that right?

A     Yes.

Q     In fact, you wanted to be feared, right?

A     Yes.

Q     You liked having the reputation that people were afraid of you, right?

A     Yes.

Q     That you were a force to be reckoned with on the street?

A     Yes.

Q     That people would be afraid to cross you, right?

A     Yes.

Q     And you told us that one of your workers was E-Bay, right?

A     Yes.

Q     It started off he was selling -- you said he was selling drugs hand to hand, $20 he was making on a bomb?

A     Yes.

Q     Now, by the way, there came a time when E-Bay was in the hospital.  Do you remember that?

A     For what?

Q     Well, in February 2004.

---

BRYANT - CROSS - HERMAN          476

A     Yes.

Q     Fortunately he lived and you got a five-year sentence, right?

A     Yes.

Q     Which got extended when you got the street charge for the rape; is that right?

A     Yes.

Q     You were involved with Dante who was trying to kill Theresa.  Do you remember that?

A     Yes.

Q     And Theresa had testified against your friend Fruitquan, right?

A     Yes.

Q     And you and some of your fellows in the gang tried to convince the women who were potential witnesses against Fruitquan not to testify, right?

A     Yes.

Q     And one of them struck up a dating relationship with one of the women, right?

A     Yes.

Q     But Theresa, no one could ever get to Theresa before the trial, right?

A     Correct.

Q     So she testified, right?

A     I believe so.

GA26

BRYANT - CROSS - HERMAN 483

they are still trying to work out some accommodation if that's possible. And I shared that with my client, and he is appreciative.

THE COURTROOM DEPUTY: All rise.

(Jurors enter the courtroom.)

THE COURT: All right. Continue with your cross-examination, Mr. Herman.

MR. HERMAN: Thank you, Judge.

BY MR. HERMAN:

Q Mr. Bryant, to your knowledge, in terms of drug dealing, did World and Wise, his brother, did they sell drugs together?

A No.

Q And there were times in terms of drug dealing that you were dealing drugs then on your own; is that right?

A Yes.

Q So sometimes you would deal drugs for the organization, sometimes you would deal on your own; is that right?

A No. I was always dealing with the organization early on. We was all selling drugs together. But as it got older, we was able to have our own private and you had to sell for World if he gave you something.

Q All right. So your connection would be World as you said, right?

A Yes.

BRYANT - CROSS - HERMAN 484

Q But when you sold the drugs, if you sold the drugs, you would keep the money; is that right?

A Depending on where I get the drugs from. If I got them from World, I had to give him some of the money. If I bought it from somewhere else, I would keep all of the money.

Q And you could choose whether you bought drugs from World, let's say, or from somebody else; is that right?

A No. In the later times I can buy my own drugs. But if World gave me drugs, I gotta sell it.

Q Some you gave to World and some you kept?

A Yes.

Q And when you were in Schenectady, were you dealing drugs on your own at that time?

A Sometimes.

Q Okay. So it was kind of a mixture of sometimes you'd have to kickback money and sometimes you could keep the money; is that right?

A Yeah.

Q Now, you've told us what you know about when Peanut got murdered, right?

A Yes.

Q What you know is what other people told you, right?

A What I know is what the shooter told me.

Q But you weren't present when Peanut was killed, right?

BRYANT - CROSS - HERMAN 487

Q And you had been involved on prior occasions in an effort to kill JR Hamilton; is that right?

A Yeah. I send someone, yeah.

Q You sent Tion Weller with a gun to kill him?

A Yes.

Q At the corner of Bedford and DeKalb, right?

A Yes.

Q And Tion Weller came back and said there were too many people around that he couldn't do it, right?

A Yes, yes.

Q And there was a second time when JR Hamilton is sitting outside a barbershop like on Myrtle Avenue near -- in a beach chair or something, right?

A Yes.

Q You saw it, right, you drove by?

A Yeah.

Q Were you driving or a passenger?

A I was a passenger.

Q Who was driving?

A Troub.

Q What kind of car or vehicle did Troub have?

A He had a few vehicles. I don't know what vehicle we was in that day.

Q Okay. Did he get the vehicles as far as you know from dealing drugs?

BRYANT - CROSS - HERMAN 488

A I don't know.

Q Did he have -- did Troub have a job?

A No.

Q And there was a fellow named Black James who was around, right?

A Yes.

Q And he was supposed to shoot JR Hamilton, right?

A Yes.

Q And you were part of that plan; is that accurate to say?

A No.

Q Well, you were spotting JR Hamilton for -- so that someone could shoot him, right?

A No.

Q You had nothing to do with that?

A No. World called me and told me what plan he had in motion. I was in the area with Troub so we drove by to see. I wanted to see it happen.

Q All right. You were interested in maybe JR Hamilton being killed, right?

A Yes.

Q But Black James, he didn't shoot him that day, right?

A No.

Q So that was two attempts which were unsuccessful; is that right?

BRYANT - CROSS - HERMAN                    489

A    Say again.

Q    Well, two times that somebody set in motion a plan to kill JR Hamilton that didn't work out, right?

A    Yes.

Q    And the third time you weren't around, right?

A    Right.

Q    Now, with regard to Darryl Baum, who was known as "Hommo," you were present for that murder, right?

A    Yes.

Q    And you were armed at that time, right?

A    Yes.

Q    And were you driving a vehicle around that time?

A    No.

Q    That was the corner of Marcy and Quincy, right?

A    Yes.

Q    There was a crowd of people around?

A    Yeah.

Q    And you wanted to kill him, right?

A    Yes.

Q    And Hommo, that was short for "Homicide"?

A    Yes.

Q    Was he known as someone who might kill somebody?

A    Yes.

Q    Darryl Baum?

A    Yes.

*Lisa S. Schwam, RPR, RMR, CRR*
*Official Court Reporter*

---

BRYANT - CROSS - HERMAN                    492

A    Right.

Q    So you don't know how they supposedly got in touch with E-Bay, right?

A    No.  And I told you I don't remember ever calling E-Bay.

Q    You never called E-Bay?

A    I don't remember calling him so I don't know a number for him or nothing.

Q    No.  I'm not even asking you a number.  But I think what you told us very distinctly is as far as you can remember, you never called E-Bay, right?

A    Yeah.  I can't remember ever calling him.

Q    But your recollection is they must have somehow gotten in touch with E-Bay?

A    Yeah.

Q    And E-Bay shows up, right?

A    Yeah.

Q    And he is skipping, right?

A    Yes.

Q    And he has a weapon, right?

A    Yes.

Q    What kind of weapon was it; do you know?

A    A .380.

Q    And where did he get the .380?  Do you know that?

A    He kept the .380.

*Lisa S. Schwam, RPR, RMR, CRR*
*Official Court Reporter*

---

BRYANT - CROSS - HERMAN                    493

Q    That was his .380?

A    Again, any one of us could use it but he had it. That's the .380 he had with him most of the time.  I had the .9 with me most of the time.  Thor had a .40 with him most of the time.

Q    But other people have said -- you told us other people in the CMB could use the weapons, right?

A    Could use them, of course.

Q    Your recollection is that E-Bay, did he take the train or did he drive?  How did he get there to the scene?

A    I don't know how he got there.  I don't know if they went and got him.  I don't know how he got there.

Q    But your recollection is E-Bay shows up with the .380, skips up to Darryl Baum, shoots him and then skips away?

A    No.  I said he skipped up to him, shot him and he started walking my way.

Q    And then where did he go?

A    He got in the car with Puff and me.

Q    And then you drove away; is that right?

A    Yes.

Q    So you didn't shoot Hommo, right?

A    No.

Q    You say E-Bay shot Hommo, right?

A    Yes.

Q    Now, that car, that Mercedes, did that get sold?

*Lisa S. Schwam, RPR, RMR, CRR*
*Official Court Reporter*

---



523

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,        :
                                 :    04-CR-706
                                 :    (FB)
        -against-                :
                                 :
                                 :    United States Courthouse
                                 :    Brooklyn, New York
DAMION HARDY,                    :
AARON GRANTON,                   :
                                 :    Tuesday, April 7, 2015
        DEFENDANTS.              :    10:00 a.m.
                                 :
- - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES SENIOR DISTRICT COURT JUDGE

A P P E A R A N C E S :

For the Government:    LORETTA E. LYNCH, ESQ.
                       United States Attorney
                       BY: **SOUMYA DAYANANDA, ESQ.**
                           **MATTHEW S. AMATRUDA, ESQ.**
                           **RENA T. PAUL, ESQ.**
                       Assistant United States Attorneys

For the Defendant      BY: **DAVID A. RUHNKE, ESQ.**
Damion Hardy:              **JEAN D. BARRETT, ESQ.**

For the Defendant      BY: **CARL JORDAN HERMAN, ESQ.**
Aaron Granton:             **ROBERT M. BEECHER, ESQ.**
                           **KENDRA PANNITTI, ESQ.**

Courtroom Deputy: **Mike Innelli**

Court Reporter:  **Mary Agnes Drury, RPR**
                 Official Court Reporter
                 E-mail: Mad78910@yahoo.com

Proceedings recorded by computerized stenography.  Transcript produced by Computer-aided Transcription.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

GA28

S. CARTER - DIRECT BY MS. DAYANANDA    543

eventually?

A    Yes, Jeffrey Nieves.

Q    Was he arrested immediately after July 4th, 1995?

A    No.

Q    Directing your attention to the next day, July 5, 1995, did you see World that day?

A    Yes.

Q    Can you tell the jury what happened?

A    He called me on the corner of a pay phone and he asked me, he was coming to pick me up, that he was going to take me to see Jeffrey Nieves, because after the murder -- I went with him and he came and took me to the hotel.  I don't remember everything, it's been so many years ago, I'm just going to tell what I remember.  He took me to a hotel and he said to me, if you can get on the stand and testify, bitch, I will shoot you in your head.

Q    Ms. Carter, you said that you got a phone call at the corner of where?

A    Willoughby and Throop.

Q    Was that a pay phone?

A    Yes.

Q    And when you answered the phone, who was on the phone?

A    World.

Q    And did he come pick you up then?

A    Yes.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

L. JOHNSON - DIRECT BY MS. PAUL    568

membership in the group?

A    Yes, we did.

Q    What did you wear?

A    We wore diamond earrings, two earrings in the left ear.

Q    Did World have any brothers or sisters that were in CMB?

A    Just one.

Q    Who was that?

A    Myron Hardy.

Q    Does he have a nickname?

A    Yes.

Q    What's his nickname?

A    Wise.

    MS. PAUL:  If I may approach, your Honor.

    THE COURT:  You may.

Q    I'm going to show you now, Mr. Johnson, Government Exhibit 23.  Who is that?

A    That's Myron Hardy.

Q    That's Wise.  Was Wise older or younger than World?

A    He was older.

Q    By how much?

A    A few years.

Q    Were you closer in age to World or closer in age to Wise?

A    I was closer in age to Wise.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

L. JOHNSON - DIRECT BY MS. PAUL    569

Q    And what about in relationship, were you closer with World or closer to Wise?

A    I was closer to Wise.

Q    And in CMB, what was the relationship between World and Wise?

A    They were brothers, you know.  They were partners.  They were close.

Q    And in terms of being partners, were they on the same level?

A    Yes.

Q    Was there a difference in the leadership that made one of them more of a leader at certain times and the other one more of a leader at certain times?

A    No.

Q    Okay.  Would there -- if one of them was incarcerated, for example, what sort of position would that give to the other?

A    If one was incarcerated, the position of the other one was to -- he was the boss, he was the leader, he was the controller, he controlled everything.

Q    All right.  Was everybody in the group the same age, around the same age?

A    No.

Q    Was there a divide in age between the people in the group?

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

L. JOHNSON - DIRECT BY MS. PAUL    572

So if we had to give back $100, we would have $130 in each bomb, so we could have our $30.  And then we would have to pay -- give back the $100 to the lieutenant.

Q    All right.  And so the lieutenant -- after the lieutenant collected that money, where would that money go?

A    It went to the lieutenant.  The lieutenant would have to give the money to the boss.

Q    And who would that be?

A    World.

Q    Now, you said that E-Bay was a person that also held it down.  What do you mean when you say "held it down"?

A    He stayed out there, you know, he stayed on the strip or he stayed on the turf.  You know, he looked out for the people that was selling for bombs or, you know, he protected us.

Q    And was there any sort of -- anything that he used to do that?

A    Yes.

Q    What that was?

A    A gun.

Q    You also said that E-Bay was an enforcer.  What's an enforcer?

A    Someone who you could say was called upon, you know, to protect someone, who would be -- we could depend on.

Q    All right.  So before you got the bombs and sold the

*Mary Agnes Drury, RPR*
*Official Court Reporter*

L. JOHNSON - DIRECT BY MS. PAUL          620

A     Her sister and her friend Theresa.

Q     Did you know Theresa?

A     Yes, I did.

Q     Do you know her full name?

A     Theresa Gregory.

Q     How did you know her?

A     I went to school with her.  I grew up with her.

Q     In terms of testifying at a trial, what was World's attitude towards somebody who was testifying at a trial against someone in the CMB?

A     It was something you shouldn't do, something you couldn't do, something you better not do.

Q     And did there come a point when you learned anything that happened to Theresa Gregory?

A     Yes.

Q     What happened to her?

A     She was shot.

Q     By whom?

A     I don't remember.

Q     At that point what was your -- were you still tight with the CMB?  When I say "tight" I mean close?

A     Kind of.  No.

Q     Why not?

A     I was shot later on that summer.

Q     Do you do something to cause you to have a change in

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

L. JOHNSON - DIRECT BY MS. PAUL          621

your relationship with the Cash Money Brothers?

A     Yes.

Q     What did you do?

A     I told someone that was shot that shot me.

Q     Who was that person?

A     I guy named Rab.

Q     Rab, R-a-b?

A     Yes.

Q     And who was Rab?

A     He was like an older guy from a rival crew.

Q     Where was his crew?

A     It was on Grand Ave.

Q     Before we move on, I'm going to show you what's already in evidence as Government Exhibit 37.  Who is that?

A     That's Theresa Gregory.

Q     And Government Exhibit 43?

A     That's Rab.

Q     Prior to you getting shot, which we're going to speak about in a moment, did there come a point where you witnessed a person named Fonzo shoot somebody else?

A     Yes.

Q     Who was Fonzo?

A     He was a CMB member.  He was a young guy; 14, 15 years old who had -- he had dreamed of being a drug dealer.

Q     What happened on the date -- when did he shoot somebody

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

L. JOHNSON - DIRECT BY MS. PAUL          622

that you saw?

A     He was hanging out with us most of that day, and he -- me and him walked up on E-Bay having a fight with somebody.

Q     What was the fight about?

A     It was -- the fight was about the sell of a controlled substance, a narcotic, crack cocaine on the strip.  He had a fight with another person.

Q     First of all, what year did this happen?

A     1992.

Q     And you said that you're in the strip, so that's in the middle of LaFayette Gardens that we saw?

A     Yes, it is.

Q     So after -- when you say they had a fight, E-Bay and this other person, was that a verbal fight or a physical fight?

A     It was a physical fight.

Q     What happened next?

A     Me and the person that he was fighting, his brother, we broke the fight up.

Q     What happened next?

A     Words was exchanged, and they said roughly, like, you guys aren't the only guys with guns.

Q     Who said that?

A     The person who E-Bay was fighting, his brother.

Q     So why don't you give some names so we can be clear.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

L. JOHNSON - DIRECT BY MS. PAUL          623

Who was E-Bay fighting?

A     Oh, Dub Dub.

Q     And it was Dub Dub's brother?

A     Yes.

Q     Who was that?

A     Wilbert.

Q     When you say that this person said you're not the only person that has guns, that's Wilbert?

A     Yes.

Q     What happened after he said that?

A     Fonzo shot him.

Q     Do you know where Fonzo got the gun that he used to shoot Wilbert?  Do you know where he got it from?

A     No, I don't.

Q     What happened after you saw that shooting?

A     Say that again?

Q     First of all, did Wilbert survive?

A     No, he didn't.

Q     He died?

A     Yes, he did.

Q     As a result of that shooting?

A     Yes, he did.

Q     And what happened to Fonzo, did he stay in LaFayette Gardens?

A     No, he didn't.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

L. JOHNSON - DIRECT BY MS. PAUL        624

Q   Where did he go?
A   He ran and he was sent down to Harrisburg, Pennsylvania.
Q   By whom?
A   By World.
Q   So when you say Harrisburg, Pennsylvania, that's the same place E-Bay sent Fruitquan after he killed Shawn?
A   Yes.
Q   And around the same time?
A   Yes.
Q   So around that time you said that you were shot?
A   Yes.  I was shot later that summer.
Q   Can you tell us about that?
A   I got into an altercation with a guy, and we had a fight and --
Q   What was the name of that guy?
A   His name is Nookie.
Q   And in terms of Nookie, did he have a relationship with Rab?
A   Yes, he did.
Q   What was his relationship with Rab?
A   They were cool.  That's his friend.
Q   They were both from Grand Avenue?
A   Yes.
Q   What happened after you got into a fight with Nookie?

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

L. JOHNSON - DIRECT BY MS. PAUL        637

Q   When did that happen?
A   1999.
Q   Okay.  So let's keep it to right.  After you got shot, in the immediate aftermath '92 /'93, did you end up going back to sell for World or Wise?
A   No, I didn't.
Q   I'm going to direct your attention to December of 1992. Were you still living in LaFayette Gardens?
A   Yes, I was.
Q   Did you know a person named Troy?
A   Yes, I did.
Q   Did you call him by any other name?
A   Yes.  We called him Crazy Troy or 730.
Q   730?
A   Yes.
Q   Do you know what that -- why you called him 730?
A   Yeah, he was -- it was just a nickname.  It was something that we called him.  We called him Crazy.
Q   Do you know who Troy was in relationship to the drug selling in LaFayette Gardens?
A   Yeah, that was JR's man.  That was Junior Hamilton's friend.
Q   Who was Junior Hamilton?
A   The Hamiltons.  He was an older guy.  He was in the area that, you know, he was, like, he looked up, we looked

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

L. JOHNSON - DIRECT BY MS. PAUL        639

about the death of Crazy Troy?
A   Yes, he did.
Q   What was that?
A   He told me that Troy had a fight with Shawn, and that after the fight Troy started making threatening gestures and that E-Bay shot her.
Q   Did that have any affect on E-Bay's reputation?
A   Yes, it did.
Q   What was that?
A   It boosted his reputation.
Q   Now, I want to move to 1993.  Did there come a point that you learned that World's home had been raided?
A   Yes.
Q   What does that mean?
A   It means, like, when the police kick in your door, they run in your house.
Q   At that point were you working for him or close to people in the CMB?
A   No, I wasn't.
Q   Do you know, if anyone, who was arrested around that time?
A   Yes.
Q   Who?
A   Him, Deezo and his brother Wise.
Q   After they were arrested, what happened to them?

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

L. JOHNSON - DIRECT BY MS. PAUL        671

A   We were standing out there and it was broad daylight, it was early, and Peanut came out the back door of 470.  And we was standing around in the crowd, you know, talking and he just fired at us.
Q   Who was there?
A   Me, Kazeem (phonetic), Jimbo, Thor, Keith.  There was a few of us.
Q   Was there a response from the people that you were with?
A   No, everybody just ran.
Q   You told us you had -- you were at the friend's house when you had a talk with World on the phone?
A   Yes.
Q   Who was that friend?
A   His name was Pumpkin.
Q   Did there come a point that you went to a party that was thrown for Pumpkin?
A   Yes.  Yes.  Yes.
Q   What year was that?
A   I think it was 2000.
Q   Did you learn somebody got killed at that party?
A   Yes.
Q   Who?
A   A friend of ours, his brother, Fish's brother.
Q   And you were at the party?

*Mary Agnes Drury, RPR*
*Official Court Reporter*

L. JOHNSON - DIRECT BY MS. PAUL            672

A    Yes, I was.

Q    Who were you with?

A    I was with my little brother and my girlfriend at the time.

Q    Was there anyone from CMB there?

A    Yes.

Q    Who?

A    Boo, Tion, E-Bay, Popsie, DJ.  There was a lot of us there.

Q    While you were at that party, did you carry a firearm?

A    Yes, I did.

Q    Did anyone else that you knew carry a firearm?

A    Say that again?

Q    Was there anyone else there that you knew was carrying a firearm?

A    Yes.

Q    Who?

A    A guy that -- he had a gun inside the party.  And I didn't know his name firsthand, but he wasn't supposed to have a gun on him at that party.

Q    What did you do with that gun?

A    I took it from him.

Q    Did you do anything at the party that caused anyone to be upset with you?

A    Yes.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

L. JOHNSON - CROSS BY MR. BEECHER            712

A    Yes.

Q    That's a like a family vehicle, right?

A    Yes, it was.

Q    Okay.  Now, you told us that you had -- well, let me rephrase this.

     I'd like, you if you could, look at the board again and tell us who was a lieutenant and an enforcer, okay?  Could you just -- going from your left from the top, I know that you told us Mr. Granton was a lieutenant, he was a worker and hustler and then he became a lieutenant, correct?  That's what you told us?

A    Mr. Granton meaning?

Q    E-Bay.  I'm sorry, I'll refer to him as E-Bay.  It will be easier.

A    Okay.

Q    E-Bay is on the top left, and then we have Mr. Sarkissian underneath him, right?  Do I have that right?  Who is that?  Deezo.  I'm sorry, I can't see.  Even with the glasses I can't see down that far.

     Okay.  So if you could just go from the left starting with E-Bay down, tell us who was a lieutenant, who was an enforcer?

A    Deezo was a worker and a lieutenant.  Jimbo was a worker, became a lieutenant.  Boo was an enforcer.  He was a boss.  Troub was a worker who became a lieutenant.  Myself,

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

JOHNSON - BEECHER - CROSS            718

     THE WITNESS:  Yes.

     THE COURT:  15 minutes and then we'll start with the cross-examination.

     MR. AMATRUDA:  I also want to raise something, not a substantive issue, which is that for our next -- we have one more witness and then for the next cooperating defendant, there are a couple of issues that are outstanding.  I don't want to raise them now.

     THE COURT:  We're doing just great.  Let's just wait until 5 o'clock and we can discuss whatever you like, okay?

     MR. AMATRUDA:  All right.

     THE COURT:  I'm proud of you all acting professionally representing your clients to the best of your abilities and you're doing a good job.

     MR. AMATRUDA:  Thank you, your Honor.

     THE COURT:  You know, I'm not going to hold it against you that you got stuck with a difficult judge, but under the circumstances, you're doing quite well.

     MR. AMATRUDA:  We appreciate your understanding.

     THE COURTROOM DEPUTY:  All rise.

     (Jurors enter the courtroom.)

     THE COURTROOM DEPUTY:  You may all be seated.

     THE COURT:  Continue, Mr. Ruhnke.  Go ahead.  Sorry.

*Lisa Schwam, RPR, CRR, RMR*
*Official Court Reporter*

---

JOHNSON - CROSS - RUHNKE            719

     MR. RUHNKE:  Thank you.

CROSS-EXAMINATION

BY MR. RUHNKE:

Q    Mr. Johnson, do you think you're ready to come out of prison and rejoin society?

A    Yes, I do.

Q    Do you think you've earned that?

     MS. PAUL:  Objection, your Honor.

     THE COURT:  Sustained.

BY MR. RUHNKE:

Q    You've hurt a lot of people in your life, correct?

A    Yes.

Q    You've shot people, correct?

A    Yes.

Q    You've terrified people on the subway and on the streets, correct?

A    Yes, I have.

Q    Is that a yes?

A    Yes.

Q    You murdered people or at least one, right?

A    Yes.

Q    And what you're hoping is that despite all that, you'll come out of prison after how many years?

A    I did nine years, nine months.

Q    You just come out of prison doing five to ten, correct?

*Lisa Schwam, RPR, CRR, RMR*
*Official Court Reporter*

785

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

           -against-

DAMION HARDY,
AARON GRANTON,

           DEFENDANTS.

    : 04-CR-706
    : (FB)
    :
    :
    : United States Courthouse
    : Brooklyn, New York
    :
    :
    : Wednesday, April 8, 2015
    : 10:00 a.m.
    :

- - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES SENIOR DISTRICT COURT JUDGE

A P P E A R A N C E S :

For the Government:    LORETTA E. LYNCH, ESQ.
                       United States Attorney
                       BY: **SOUMYA DAYANANDA, ESQ.**
                            **MATTHEW S. AMATRUDA, ESQ.**
                            **RENA T. PAUL, ESQ.**
                       Assistant United States Attorneys

For the Defendant    BY: **DAVID A. RUHNKE, ESQ.**
Damion Hardy:             **JEAN D. BARRETT, ESQ.**

For the Defendant    BY: **CARL JORDAN HERMAN, ESQ.**
Aaron Granton:           **ROBERT M. BEECHER, ESQ.**
                   **KENDRA PANNITTI, ESQ.**

Courtroom Deputy: **Mike Innelli**

Court Reporter:  **Mary Agnes Drury, RPR**
                 Official Court Reporter
                 E-mail: Mad78910@yahoo.com

Proceedings recorded by computerized stenography.  Transcript produced by Computer-aided Transcription.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

867

A    Yes.

Q    By the way, when I say you went to Taz's girlfriend, were you driving your car to go there?

A    Yes, yes.

Q    So please continue.  Taz told you that --

A    Said that Hommo was on the corner and, you know, that he's one of the guys that's responsible for Wise's murder.  He's right here right now.  I can't kill him because he'll recognize me, he says.

Q    I'm sorry.  At that point, how did you know that because someone was responsible for Wise's murder there was going to be a threat or attempt on their life?

A    Because of everything that Taz had told me and things that World that told me up to that point.

Q    All right.

A    Before World came out, Taz, as I described earlier, had told me the whole story about, you know, Wise's death and how there was some retaliation before then, before World had even come out, I believe, I was told about some form of retaliation.  There was a guy that was shot or killed in LG.  And then when World came out, too, when I -- for instance, that night, when I saw them talking, Hommo and him and he said, oh, this is one of the people that's responsible for my brother, and I said, wow.  And he told me, oh, well, you know, he tried to deny it.

*Lisa Schwam, RPR, CRR, RMR*
*Official Court Reporter*

---

868

And I said, oh, wow, that's crazy.  And he said it's okay because everyone is going to pay.  Everyone had a part in it.  So by pay, I figured, you know, drop dead.

Q    So Taz told you that one of the people who was responsible for Wise's death was down the street?

A    Yes.

Q    So what did he ask you to do?

A    So he said I can't go kill him because he'll recognize my face, meaning Taz.  So he says you go and do it.  So I was like, okay, me?  I had never been asked to do anything like that before.  I didn't want to sound like a coward.  And I wasn't intending to do it, but I said, okay, I'm going to go down the street and if I can get a shop, then I'll take it.

But I just walked down the street all the way to the corner and I saw Hommo there.  I could have killed him, but I wasn't going to.

Q    You had a gun with you?

A    Yeah, I had a gun on me.  I just went --

Q    Did you have any kind of interaction that you recall with Hommo?

A    I believe that when I turned after either right before or after the bodega stop on the corner which is right across the street from where he was, he may have seen me.  He just nodded like, you know, recognizing me and I nodded back.

*Lisa Schwam, RPR, CRR, RMR*
*Official Court Reporter*

---

876

Q    And did he report back to you what he did?

A    Yeah.  He said that he went there with the car and he spoke to people, and he assured them that we had nothing to do with it whatsoever.

Q    Did you speak to World about what had happened?

A    Yeah.  I spoke to World.  I told him, man, you know that night, you know, that's the guy, you know.  Even though I'm sure you're pleased and he was like, yeah, I mean.  Like I said before, what has to be done what has to be done.  I said, yeah, I understand that, but, you know, I want told anything.  Taz, why didn't he do it?  I was a little pissed off that Taz didn't do it and he was pushing me to go do it that night and I was thrown in the mix a little bit.  But that's the conversation I had with World, you know.  He was pretty happy that it was done.

Q    Okay.  And afterwards, did you continue to spend time with World?

A    I started actually spending more time with World.

Q    Let me just stop you.  One question, which is when you were doing this driving in the car, if you had refused to do it, would the people in the gang from LG have continued to spend time with you?

MR. RUHNKE:  Objection, your Honor.

THE COURT:  Yes, sustained.  It's speculative.  Disregard the answer.  The answer was yes, Lisa.

*Lisa Schwam, RPR, CRR, RMR*
*Official Court Reporter*

877

BY SPEAKER2:

Q   Yeah, Lisa.

Q   Why did you act as the getaway driver?

A   I was already in with Taz for that money.  And I didn't want to distance myself from the group while that money was still owed to me.  If I had, you know, refused to drive that night, you know, I would have been deemed a coward, you know, might have been given an extra reason to beat me out of my money.  At that point, I hadn't come to the realization yet that I was actually con does out of the money.  So I wanted to stick with the group.

Q   Do you know the name JR?

A   Yes.

Q   Do you know what happened to JR?

A   Yes.

Q   What happened?

A   He was killed.

Q   Did you ever do any -- was he murdered?

A   Yes.

Q   Did you ever do anything to bring about the murder of JR?

A   Well, one time I was with World and he said that let's swing by, I believe it was Myrtle Avenue.  He said that-

Q   Why did he want to go there?

878

A   He said that JR's wife supposedly had a salon, beauty salon or something there.  And he said let's go check it out because I want to verify, you know, see if I see her there or maybe he's even spending time there.

Q   Okay.  And what was your understanding of why you were going to see if he was there?

A   Well, yeah, because JR was part of the few people that World and the rest of these guys believe that, you know, were responsible for wise getting WALKED.  So he went there because he wanted to pretty much, you know, find out the whereabouts, you know, this guy JR, find out where he stays.  Where his wife is.  Whack D, Lisa.

Q   Before the murder of JR, did you overhear any conversations about -- after -- before the murder happened, did you overhear any discussions about that, about the murder before it happened?

A   Before it happened?

Q   Yeah.

A   No.

Q   Did you hear anybody complaining about anything?

A   Oh, yeah.  I remember E-Bay was complaining one time because World, it was like a broad -- it was broad daylight one day and someone had told World or World had seen JR out in front of his real estate place, real estate office that he owned.  And he got on the phone and was calling E-Bay

SARKISSIAN - CROSS - HERMAN          947

Q   And "out there" being where?

A   In front of his house.

Q   Where was that?

A   On Quincy, Quincy Street.

Q   And Taz tells you what?

A   Hommo's down there on the corner.  You know Hommo.  Hommo, you know, with World, situation with World.  I can't go.  This guy has to go right now.  I can't go.  I can't do it.  If I run up, he's going to know it's me.  He knows me.  He says you go do it.

Q   "Do it," meaning kill Hommo?

A   Kill Hommo, yeah.

Q   What did you say?

A   I said so he's down there.  I said, okay, well, I'm going to try.  I'm going to go down there.  And if I can get a shot at him, then I'll do it.

Q   What was the reason you agreed to do it?

A   I didn't really agree to do it inside, like, it didn't click in my head, yes, I'm agreeing to do it, I'm going to go and do it.  I just agreed to him because I was going to walk down the block and not do it and come back.  But I didn't want to look like a coward right then and there because, as I described before, I had money invested with him so if I seem like a coward or I didn't do something like a gang initiation might or something, you know, I'd really

SARKISSIAN - CROSS - HERMAN          948

be out of the money.  At least then I had a good enough hope that I might get the money back soon.

So I walked down the block, and I saw Hommo right there.  I could have shot him, but I didn't want to and I didn't.  And I went to the bodega and purchased something and walked back and told Taz, listen, I couldn't do it.  I was, like, halfway up the block and the guy seen me.

Q   All right.  Did you have a gun at that point?

A   Yes, I did.

Q   And were you -- with regard to Taz, were you kind of pretending that you were going to shoot Hommo but without really the intention of doing it?

A   Yeah.  Well, I said I would go down and I would attempt it.  I would see if there was a window that I -- you know, an opportunity.

Q   And was it your intention if you had the opportunity to shoot and kill Hommo?

A   No, no.

Q   Never?

A   No.

Q   So what happened when you went back to Taz?

A   I told him that, like I just explained, I said that Hommo recognized me.  He had turned a certain way where he saw me approaching, you know, almost half a block away so I couldn't do it.

1015

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,
      : 04-CR-706
      : (FB)
 -against-  :
      : United States Courthouse
      : Brooklyn, New York
DAMION HARDY,
AARON GRANTON,
      : Thursday, April 9, 2015
 DEFENDANTS. : 10:00 a.m.

- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES SENIOR DISTRICT COURT JUDGE

A P P E A R A N C E S :

For the Government: LORETTA E. LYNCH, ESQ.
      United States Attorney
      BY: **SOUMYA DAYANANDA, ESQ.**
       **MATTHEW S. AMATRUDA, ESQ.**
       **RENA T. PAUL, ESQ.**
      Assistant United States Attorneys

For the Defendant BY: **DAVID A. RUHNKE, ESQ.**
Damion Hardy:  **JEAN D. BARRETT, ESQ.**

For the Defendant BY: **CARL JORDAN HERMAN, ESQ.**
Aaron Granton:  **ROBERT M. BEECHER, ESQ.**
      **KENDRA PANNITTI, ESQ.**

Courtroom Deputy: Mike Innelli

Court Reporter: **Mary Agnes Drury, RPR**
     Official Court Reporter
     E-mail: Mad78910@yahoo.com

Proceedings recorded by computerized stenography. Transcript
produced by Computer-aided Transcription.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

D. McMILLIAN - DIRECT BY MS. DAYANANDA 1052

A He just asked me to shoot Munchie. I told him I wasn't going to because me and Munchie were friends. And he said, I don't know why, because he be trying to -- he be trying shoot you. It will get you shot. And I'm like, no, that's impossible, because we always together.

Q And did Damion Hardy tell you why he wanted you to kill Munchie?

A No.

Q And when you responded, did he explain to you -- when he told you he thought Munchie wanted you to get shot, what was your reaction?

A I just didn't believe it, because me and Munchie were pretty close.

Q And what was your response -- what was Damion Hardy's response when you said you weren't going to do it?

A He was a little aggravated, but he just moved on in the conversation with me telling him I wasn't going to do it.

Q Did you later learn what if anything happened to Munchie?

A Yeah, he got shot and paralyzed.

Q And how soon after World asked you to do that did you learn about Munchie getting shot?

A Maybe not even a month later.

Q Did you learn if anyone got arrested for that?

A Yeah, Troub got arrested for it.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

D. McMILLIAN - DIRECT BY MS. DAYANANDA 1071

15 minutes, if we can. How much more do you have on your direct?

MS. DAYANANDA: Not much. Maybe 20 minutes or so.

THE COURT: Let's see how it goes.

MS. DAYANANDA: Okay.

BY MS. DAYANANDA:

Q Mr. McMillian, directing your attention to October of 1999, did you attend a party on Gates Avenue?

A Yes.

Q Who did you go with?

A I went with Griff and Sambo's younger brother.

(Pause.)

MS. DAYANANDA: One second, your Honor.

(Pause.)

Q I'm sorry, you said you went with Griff?

A Yes.

Q Who is Griff?

A Griff was somebody who lived in 325, an older guy?

Q And Sambo's brother?

A Correct.

Q Were there other members of CMB there at the party?

A Correct.

Q Who was there?

A Stack, Sambo, Jimbo, Popsie, E-Bay. That's it.

Q What happened at the party?

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

D. McMILLIAN - DIRECT BY MS. DAYANANDA 1074

What did Sambo do?

A Yeah, I saw them all just playing around. Sambo was actually just throwing cake, playing around.

Q And I'm going to show you 3001K. Do you recognize this?

A I don't recognize that part of the room.

Q At some point did you hear gunshots at the -- when you were at the party?

A Yeah, I believe it was, like, one or two shots.

Q Where were you at the time?

A I was, like, right where he's laying, but more like back here (indicating.)

Q Okay. Did you see anyone with a gun at that time?

A Only the person that's laying on the floor dead.

Q Do you remember what kind of gun it was?

A I believe it was a TEC or a MAK.

Q And did you learn if anyone took that gun?

A Popsie took the gun.

Q Once you heard those gunshots fired, what did you do?

A We all dived on the back where that stage part was, all the way in the back where I'm pointing (indicating.)

Q That's the stage in the back there you said?

A Yeah. We all dived in one pig pile right on top of each other.

Q Did the party end at that point?

*Mary Agnes Drury, RPR*
*Official Court Reporter*

KURLAND - DIRECT - AMATRUDA 1129

THE WITNESS: Yeah.

THE COURT: You can tell the jury what you observed.

THE WITNESS: Okay. I was walking. In the end, he ended up on the curbside. We were on the sidewalk. And there was very quickly, very peripheral of my vision, I saw the car --

BY MR. AMATRUDA:

Q Before you saw that, did you hear anything at some point?

A It's really hard to tell. I saw the car. I got pushed over and then Johann was gone. And then I got up and I looked for him. It's weird. I can't actually say that I saw him being hit. I saw all of a sudden -- you know, I was looking straight ahead.

Q I'm asking you to step back a moment from the time when Johann went out of your vision but before that, did you and Johann hear anything? Did you have a discussion about hearing something?

A Oh, yeah. A while before that, I mean, I don't know how many -- a couple minutes before that we heard what sounded like shots. And we discussed it and decided that it was fireworks because there's -- it was close to 4th of July and people in the summer like fireworks.

Q And you said you were brushed aside; is that right?

KURLAND - DIRECT - AMATRUDA 1130

A Yeah.

Q And you didn't see Johann when you recovered your senses?

A Yeah. I mean, I didn't get knocked out, but I was pushed over and disoriented. And within seconds -- I mean, it was, like, very quick. I looked for him, called his name.

Q What did you see?

A I saw a shoe. I saw one of his shoes first.

Q Did you even eventually see him?

A I eventually saw him.

Q Can you explain where you found him.

A He was -- there was, like, a little street right before 6th Avenue and he was across that little street in the -- it was, like, a meridian area with parking meters and he was -- he had been -- he was lying with a parking meter between his legs unconscious.

Q And what did you do at that point?

A I panicked. I don't remember if I screamed or called out, but the car had continued going. There were a lot of people on the street.

THE COURT: The question is -- Ms. Kurland, have you ever testified in court before?

THE WITNESS: I haven't.

THE COURT: Listen to me. You're a little hyper.

KURLAND - DIRECT - AMATRUDA 1131

Count to ten to yourself.

THE WITNESS: Okay.

THE COURT: Can you do that? Tell me when you're finished. Listen to the question and just answer it directly.

THE WITNESS: Okay.

THE COURT: I think the question about time is what did you do.

MR. AMATRUDA: Yeah.

BY MR. AMATRUDA:

Q When you saw Johann, where did you go?

THE COURT: Where did you go?

THE WITNESS: I ended up leaving at the point when the police and the ambulance were there. I didn't leave right away.

THE COURT: The police came, ambulance came. You were there for a little while. How much time passed before the police and/or the ambulance came while you were there?

THE WITNESS: It was a long time ago. It felt like really quick.

THE COURT: Okay. So it seemed quick. That's your best recollection?

THE WITNESS: Yes.

THE COURT: You wanted to know where she went after that.

KURLAND - DIRECT - AMATRUDA 1132

BY MR. AMATRUDA:

Q Yeah. Where did you go?

A I went to the Amtrak station and went to a good friend of mine's house who lived in Great Barrington.

Q Did you speak with the police before you left?

A No.

Q Okay. What caused you to leave without speaking to the police?

A I was in a total panic.

Q Okay. And eventually did you go back and speak with the police?

A Yeah. I think it was, like, the next day or maybe -- yeah. So that was the 10th. It was probably the 11th.

Q If I can just show you what's been marked as 809 in evidence, which is a map. Take a second to orient yourself with the map.

And if you could just -- do you recall approximately where the bar was that you walked out of?

A Approximately.

Q Okay. Can you point it on the screen. If you touch the screen, it will leave a little mark.

A Oh. It was, like, here (indicating) or maybe -- yeah.

Q And do you recall where you were when you heard what sounded like shots? It's okay if you don't remember.

KURLAND - DIRECT - AMATRUDA 1133

A   I feel like we were here (indicating). Can I redraw that?

Q   Sure.

A   Oh, God. I did it terrible. In here (indicating).

Q   And then lastly, where were you -- well, not second to lastly. Where were you --

THE COURT: There's no question. You don't want me to tell you to count to ten again, do you? Just listen to the question and answer the question directly.

Do you have any other questions of the witness?

MR. AMATRUDA: Yes, your Honor.

BY MR. AMATRUDA:

Q   If you can just point to where you were when you were brushed over.

A   (Indicating).

Q   And lastly, do you recall where you walked to -- where you saw Johann?

A   (Indicating). Can I redraw that?

Q   Sure.

A   It's not really right. It's not on the street. But it's in the middle of it.

Q   Is it in that intersection?

A   It's, like, in the in-between area.

Q   Is it in this narrow space that is between the street here that I'm making marks on?

KURLAND - DIRECT - AMATRUDA 1134

A   Yeah.

Q   Okay. And I'm going to show you just two photographs -- or actually I think I can do it with one. I'm going to show you what's been marked as Exhibit 801-A in evidence.

And just looking there, do you recognize that location?

A   Yes.

Q   What is that? What are we looking at?

A   That is the shoe that I described and the point of view where the camera is, there was a building there is where I was knocked over. And where you see the red brick covering on the ground, there is where Johann was, those parking meters on the far side of that meridian area.

Q   Okay. So let me just -- I'm just going to mark here the lower center of the screen. Is that the shoe you were talking about?

A   Yes.

Q   And that's where you were approximately when you were brushed over?

A   Further back and to the right, but yeah.

Q   And over here (indicating), I'm pushing towards the lower-center right of the screen. Is that the area where you mentioned you saw Johann?

A   Yeah.

Q   Okay. And did you actually see afterwards a car, the

KURLAND - DIRECT - AMATRUDA 1135

car that had hit?

A   Yes.

Q   What kind of car was it?

A   It was a black SUV. I don't know what kind.

MR. AMATRUDA: Okay. I don't have any further questions. Thank you.

THE COURT: Any cross-examination?

MR. RUHNKE: We have no questions.

MR. HERMAN: No questions.

THE COURT: Ms. Kurland, you can step down.

THE WITNESS: Thank you.

(Witness exits the courtroom.)

THE COURT: I think this might be the appropriate time unless you have a short, short witness. We can take a break now.

Who do we have next, Mr. Amatruda?

MR. AMATRUDA: Your Honor, we have an in-custody witness, LeSean Campbell.

THE COURT: So I think that this might be the time to take our lunch break. When we return promptly at 2:00, we'll have that next witness available, correct?

MR. AMATRUDA: Thank you, your Honor.

THE COURTROOM DEPUTY: All rise.

(Jurors exit the courtroom.)

THE COURT: All right. 2:00.

CAMPBELL - DIRECT - PAUL 1158

that he was in my area, to come to where he was at. It was on West 11th and Avenue X -- yeah, West 11th and Avenue X.

I came over there to see him and at that time he was asking me, he was, like, yo, let's go take care of that right now. And I was, like, no, no, I'm not ready. And he was, like, so where he live at? I said I don't know where he live at, but I know how to get there. And at that point, Popsie and Tion got out of the car, and I felt a little bit pressured so I just went along.

Q   When you say you weren't ready, why weren't you ready?

A   Because I didn't really do any planning for the robbery. I didn't do any planning. I knew -- I felt like that's what I wanted to do, but I didn't do any planning for it.

Q   What sort of planning did you feel you would have had to do?

A   I mean, I would say if you're going to rob somebody and you gotta go in their house, you need to do some planning.

Q   Why?

A   Make sure what you want is there. Make sure there ain't no children around, you know. Pretty much that's it.

Q   So you said that Stro was there. Just describe for us where you were having this meeting.

A   I was in Marlboro project outside on West 11 and Avenue X.

CAMPBELL - DIRECT - PAUL                    1159

Q    And this was standing outside of a car?

A    Standing outside of a car, yes, ma'am.

Q    You said he was there.  And who else?

A    It was Popsie, Stro and Tion.  And it was also another van that was, like, right next to them.  But I didn't look inside the van to see who was there.

Q    All right.  So there were two cars?

A    Yes, ma'am.

Q    What's the car that Stro was in and Popsie and Tion?

A    Like a red Firebird or something.  I don't remember exactly.  It was red.

Q    What about the other car?

A    It was a green van -- a minivan.

Q    So you said that you felt pressured to do it at that moment so you decided to go with them?

A    Yes, ma'am.

Q    What happened when you decided to go?

A    We drove to Queens.  Took us about 45 minutes.  We got there.  And when we got there, they asked me to knock on the door.  And at that point, I made up my mind that I wasn't knocking on the door because I felt like if I did, I'd be a victim.

Q    Just to back up for a moment.  When you were driving that 45 minutes, did you discuss with Stro, Popsie and Tion what you were going to do?

CAMPBELL - DIRECT - PAUL                    1160

A    No, not really.  We just spoke, just random conversation.

Q    Did you hear them speak with anybody else by phone?

A    Not until we finished stopping and after we followed Ashab.

Q    You said you got to Ashab's house and they asked you to knock on the door?

A    Yes, ma'am.

Q    Why did you feel that you were going to be a victim if you went to knock on the door?

A    Because I'm the only person that knew them and knew Ashab.

Q    Why is that?  Why would that make you a victim?

A    Because I could have possibly got murdered.

Q    What happened after you were waiting for -- trying to decide whether or not you were going to go knock on the door?

A    It just so happened that a cab pulled up in front of Ashab's apartment and he walked out, got in a car and we followed him.

Q    When you say "we," is that both cars?

A    To my knowledge, yes, ma'am.

Q    Well, were you able to see whether or not there was a van --

A    I didn't see the green van.  Once again, I seen the

CAMPBELL - DIRECT - PAUL                    1161

green van once we stopped.  I wasn't looking behind to see if it was following us.  Once we stopped, I seen it.

Q    Where did you go?

A    I don't remember the exact address or block we stopped on, but it was, like, a strip bar on the block.  He got out.  We stayed in the car.  They seen him go in.  At that point, I was getting a lot of phone calls for, you know, for drug sales and I didn't really feel comfortable so I got out of the car.  I started smoking a cigarette.

And at that point, I called a cab.  And when I called the cab, I walked across the street, they was like, no, get back in the car, we're going to drive you back to Brooklyn.  I was, like, no, I'm good.  You just call me and tell me what happened.  And I left.

Q    How long would you say that you were there waiting with them until you left?

A    Approximately, 10 to 20 minutes.

Q    During that time, did you see anybody else from the van who was in the van?

A    No, ma'am.

Q    Could you tell how many people were in the van?

A    No, ma'am.

Q    Was it more than one?

A    Yes, ma'am.

Q    And you said they were watching him.  Did you see where

1212

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,           : 04-CR-706
                                    : (FB)

        -against-                   :
                                    : United States Courthouse
                                    : Brooklyn, New York
DAMION HARDY,
AARON GRANTON,                      :
                                    : Friday, April 10, 2015
        DEFENDANTS.                 : 10:00 a.m.

- - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES SENIOR DISTRICT COURT JUDGE

A P P E A R A N C E S :

For the Government:    LORETTA E. LYNCH, ESQ.
                       United States Attorney
                       BY: SOUMYA DAYANANDA, ESQ.
                           MATTHEW S. AMATRUDA, ESQ.
                           RENA T. PAUL, ESQ.
                           Assistant United States Attorneys

For the Defendant      BY: DAVID A. RUHNKE, ESQ.
Damion Hardy:              JEAN D. BARRETT, ESQ.

For the Defendant      BY: CARL JORDAN HERMAN, ESQ.
Aaron Granton:             ROBERT M. BEECHER, ESQ.
                           KENDRA PANNITTI, ESQ.

Courtroom Deputy: Mike Innelli

Court Reporter:   Mary Agnes Drury, RPR
                  Official Court Reporter
                  E-mail: Mad78910@yahoo.com

Proceedings recorded by computerized stenography.  Transcript produced by Computer-aided Transcription.

J. DAVIS - DIRECT BY MS. DAYANANDA          1225

THE COURT:  Just a minutes.  Davis you say?

MS. DAYANANDA:  Yes, your Honor.

(Witness takes the witness stand.)

**JAMES DAVIS**, called by the Government, having been first duly sworn, was examined and testified as follows:

COURTROOM DEPUTY:  Can you please state and spell your name.

THE WITNESS:  James Davis, J-a-m-e-s D-a-v-i-s.

COURTROOM DEPUTY:  Thank you, Mr. Davis.

THE COURT:  Your witness.

MS. DAYANANDA:  Thank you.

DIRECT EXAMINATION

BY MS. DAYANANDA:

Q    Good morning, Mr. Davis.

A    Good morning.

Q    Can you tell the jury how old you are?

A    60.

Q    What do you do for a living?

A    HVAC services; air conditioning refrigeration.

Q    Air conditioning and refrigeration?

A    Correct.

Q    Mr. Davis, do you know a JR Hamilton?

A    Yes.

Q    How do you know him?

---

J. DAVIS - DIRECT BY MS. DAYANANDA          1226

A    As a social friend.  Just being a friend that I know from being in the air conditioning business and seeing him in the barber shop.

Q    Were you present on the day that he was shot?

A    Yes, ma'am.

Q    I'm going to show you what's not been -- what's been marked as Government Exhibit 705 and not in evidence as of yet?

COURTROOM DEPUTY:  It's not or is?

MS. DAYANANDA:  No.

COURTROOM DEPUTY:  Okay.  Thank you.

Q    Do you recognize that photo?

A    Yes.

Q    Who is this?  Do you recognize that person?

A    There is nothing here present.

Q    Pardon?

A    There is nothing on the screen.

MR. RUHNKE:  Your Honor, if it helps, we're not going to object to the exhibit.

THE COURT:  Which exhibit is this?

MS. BARRETT:  705, your Honor.

THE COURT:  All right.  705.

(Government Exhibit 705 is admitted into evidence.)

Q    Do you see it now?

---

J. DAVIS - DIRECT BY MS. DAYANANDA          1227

A    Yes, ma'am.

Q    Who is that?

A    JR.

Q    Now, you said you had a social and business relationship with him; is that right?

A    Correct.

Q    Do you know what types of business he was involved in?

A    The only business I know that he had was the fish fry. I've heard that he had real estate, he was in the real estate business.

Q    Directing your attention to August 1st of 2000, that evening, where were you on that day?

A    I was inside the store, the restaurant.

Q    And what were you doing there?

A    I was doing repair on the refrigeration case.

Q    And what was the -- if you know, what the role was of JR in relation to the restaurant?

A    I believe he was the owner.

Q    What was the name of the restaurant?

A    Fish Sole, if I recall.

Q    Sorry?

A    I think it was called Fish Sole or Sole Fish.

Q    Can you tell us what happened around 11:00 that evening?

A    Okay.  I was there doing repairs on the refrigeration

---

J. DAVIS - DIRECT BY MS. DAYANANDA          1228

case.  And after I did the repairs, everybody was cleaning up and mopping and there was a young lady and myself and two other employees.  And as I spoke to JR and told him everything was finished I was getting ready to leave, and he asked me to stay so we could just chat.  And he went to get some liquor and he sat down and he had offered me some liquor.  He knew I didn't drink.  And he sat down.  And as he was sitting down, I took the newspaper, I was directly across him.  And when I was reading the paper, a fire shot.

When the fire shot, I seen some of the little glass hit my paper, and I locked and he turned around and he said, wow, it looks like there is a shooting.  And moments after that two other shots rang and he got up and said, "I got hit."

So when he got hit, he fell towards me.  And the restaurant is not that big, so I kind of like dragged him around the refrigeration case that I had repaired and he laid him down on the ground and I was trying to revive him.

And I noticed seeing the young lady that was on the pay phone, she slid down, I thought she was shot.  But later on I find out she just fainted.

And I believe, like I said, the floor was wet, so that kind of broke my fall, and he was kind of stocky anyway.  And two of the other -- well, I guess the employees, they ran to the bathroom.

---

*Mary Agnes Drury, RPR*
*Official Court Reporter*

GA39

J. DAVIS - DIRECT BY MS. DAYANANDA    1232

Q   Now, just to clarify, you said when you were speaking to JR he was facing you?

A   Yes.

Q   And after you heard that first shot, what did he say at that time?

A   "I think somebody shooting."

Q   And then --

A   He turned.  I'm sorry.

Q   I'm sorry.  Go ahead.

A   He turned towards the window.

Q   When he turned towards the window what happened then?

A   Two other shots rang out.  That's when he said he was hit.

Q   Were you able to see where the shots were coming from?

A   Through the window.

Q   And at that point you said you -- did he immediately hit the ground after those two shots?

A   No.

Q   What happened after that?

A   He came towards me.

Q   What did you do then?

A   At that time, like I said, I was standing by the counter past that silver case here, this is where we slipped, here, and we went behind that case (indicating.)

Q   Let me show you a little bit better, 701G?

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

S. FEEKS - DIRECT BY MS. PAUL    1244

Q   Now, based on your experience, did you draw any conclusions about where the shooting must have occurred within this basement?

A   The placement of the discharged shells would indicate that both -- there were two different weapons, because they do not -- the two weapons would not be able to have the same caliber bullets.  So obviously it's indicative that in this area where F1 and F2 is a .380 caliber weapon was fired. And in this area here, it's indicative that a -- the .40 caliber weapon was fired (indicating.)

Q   And with regard to the ballistics, what did you do with them after you collected them or what happened after they were collected?

A   After collection, I marked them with the numbers F1 through 9 respectively.  They were given to a Police Officer Crowley from the 79th precinct who would then be entrusted to voucher them and have them sent to the ballistic lab for further examination.

Q   Was there a specific number that you assigned to the crime scene unit that was associated then with those ballistics?

A   The crime scene number was 99, which is over here, and 2195 would be the run number, which is a consecutive number as we take in our cases.

Q   All right.  And there is just one additional photograph

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

S. FEEKS - DIRECT BY MS. PAUL    1245

that I think -- well, we may not have entered it into evidence yesterday, but I don't think there is an objection today.

MS. BARRETT:  Nope.

THE COURT:  Which document is this?

MS. PAUL:  It's 3001K, your Honor.

THE COURT:  All right.  3001K.  I have it in evidence yesterday.

MS. PAUL:  I think there was some question of whether or not it went in, but anyway it is in now.

THE COURT:  All right.  It's no now.

(Government Exhibit 3001K is admitted into evidence.)

Q   Just tell the jury what part of the crime scene is 3001K.

A   This is the area of the kitchen, which is in the back, I'll say the left-hand side of that basement area.

Q   So if we look at 3001A, that's the back left? (Indicating.)

A   Yeah, this area here.  (Indicating.)

MS. PAUL:  All right.  I have no further questions.

THE COURT:  Any cross-examination?

MR. RUHNKE:  Not from us, your Honor.

MR. BEECHER:  I have a few questions.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

S. FEEKS - CROSS BY MR. BEECHER    1246

CROSS-EXAMINATION

BY MR. BEECHER:

Q   Good morning.  My name is Robert Beecher, I represent Mr. Granton.

You're working for GEICO now?

A   Yes, sir.

Q   Have you tested out that 15-minute promotional?

A   I've heard good reports.

Q   I just have a very few questions.

Now, when you went to this crime scene or any other crime scene, you find that the scene has been safeguarded by uniformed officers?

A   Yes, sir.

Q   First officers on the scene, correct?

A   Yes.  That's part of their responsibility.

Q   That's part of their responsibility.

Now, if before the first officers arrived on the scene, somebody removed something from the crime scene, that would be unknown, wouldn't it?

A   That's correct.

Q   So if somebody, for example, removed a firearm from the crime scene, it wouldn't be there for you to examine it?

A   That's correct.

Q   Obviously if it's been taken away, you don't get to see it and examine it, right?

*Mary Agnes Drury, RPR*
*Official Court Reporter*

S. FEEKS - CROSS BY MR. BEECHER          1247

A    No, sir.

Q    Now, if my reading of your report is correct, there were no less than nine shots fired.  Would that be correct?  Or just educate me if I'm wrong.  Just looking at the ballistics.

A    No.  In my estimation it would indicate that there were five shots fired, because that's the amount of discharged shells that I can count for.

Q    Oh, okay.

A    The other ballistics evidence, the deformed led is -- we'll call that a product of shots being fired.

Q    All right.  So there were five shots fired, but for purposes of your report, that's five shots based on the shell casings and nine ballistic evidence based on the deformed led with the shell casings?

A    Correct.

          MR. BEECHER:  That's all I have.  And enjoy your retirement.

          THE WITNESS:  Thank you, sir.

          THE COURT:  Anything else?

          MS. PAUL:  I just want to clarify.

          THE COURT:  All right.  Go ahead.

REDIRECT EXAMINATION

BY MS. PAUL:

Q    Just in terms of the number of shots that are fired at

S. FEEKS - REDIRECT BY MS. PAUL          1248

a crime scene, as you just testified, from your belief there are five shots.  When you look at pieces of led, are you able to always tell for sure how many shots are fired at a crime scene just by checking the ballistics?

A    No, because as counsel had pointed out, if there was a weapon there and it was removed, it wouldn't be there for my examination.  The same would hold true for any ballistic evidence, it could have been picked up or could have been removed from the scene prior or a shot, you know, it went in into the wall that I missed or the ceiling and it is unaccounted for.

Q    I just meant to clarify with regard to the pieces of ballistics, those could have come from one or two or are you able to tell how many in terms of the pieces of led?

A    I am not able to tell that, no.

          MS. PAUL:  Okay.  Thank you.

          THE COURT:  Anything else?

          MR. RUHNKE:  No, sir.

          THE COURT:  All right.  You may step down.

          (Witness leaves the witness stand.)

          MS. DAYANANDA:  Your Honor, could we have just a short break.  We have three more witnesses that are here, we just need to gather some exhibits together before we plow through to 1:00 straight.

          THE COURT:  All right.  So we'll take a little

PROCEEDINGS          1249

early break here for about 15 minutes.  We'll be back at 20 after 11:00.

          COURTROOM DEPUTY:  All rise.

          (Jury is out of the courtroom at 10:55 a.m.)

          COURTROOM DEPUTY:  You all can be seated.

          (Proceedings were recessed and recalled.)

          (Honorable Frederic Block takes the bench.)

          COURTROOM DEPUTY:  All rise.

          (Jury enters the courtroom at 11:29 a.m.)

          COURTROOM DEPUTY:  You all may be seated.

          (Witness takes the witness stand.)

          THE COURT:  Who do we have here now?

          MS. PAUL:  Your Honor, we have Michael Nelson.

          COURTROOM DEPUTY:  Good morning, Mr. Nelson.  If you can please stand and rise your right hand.

**MICHAEL NELSON**, called by the Government, having been first duly sworn, was examined and testified as follows:

          COURTROOM DEPUTY:  I ask you to please state and spell your name.

          THE WITNESS:  Michael Nelson.

          THE COURT:  Michael Nelson is it?

          THE WITNESS:  Yes.

          THE COURT:  What number do we have here?

          MS. DAYANANDA:  I think it's number 44, your

M. NELSON - DIRECT BY MS. PAUL          1250

Honor.

          THE COURT:  Let me catch up to you.  Michael Nelson, N-e-l-s-o-n.  All right.  Keep your voice up.  You're okay.  The mic is working pretty well.  Your witness.

DIRECT EXAMINATION

BY MS. PAUL:

Q    Mr. Nelson, can you tell us if you're familiar with the intersection of Halsey Street and Malcolm X Boulevard?

A    Yes.  I used to have a beauty supply store there on Halsey Street.

Q    Do you have business anymore?

A    No.

Q    In July of 2003, did you have that business?

A    Yes.

Q    I'm going to direct your attention now to July 25th, 2003.  Do you remember what you were doing on that day?

A    Yes.  At about 3:00 I was standing at the bus stop on Halsey Street going east talking to a friend.

Q    And what happened?

A    We heard, like, an explosion, you know, a big bang, and there was people running going south on Malcolm X Boulevard.

Q    What happened next?

A    Well, there was this -- I can't say how many people was there, but there was one individual running, and it looked like a male, because I could not see his face, but he had a

M. NELSON - DIRECT BY MS. PAUL          1251

big towel, like, a beach towel, you know, covering his head and he was going south on Malcolm X Boulevard, and he made a right turn on Halsey Street going west.

There was a minivan parked at the corner, at the bus stop going west on Halsey Street, and this individual, you know, hopped in the van and the van went, it would be west, on Halsey Street.

Q    So that individual that you took notice of, could you tell us anything else about him, maybe his height?

A    I would say he was about 6'2".

Q    And you said a towel, he had a towel obstructing his face?

A    Yes.

Q    Do you remember the color of that towel?

A    It looked like a multicolored towel, I couldn't say the exact colors.

Q    And you say that you were standing at a bus stop and there was a van that that gentleman got into?

A    Yes.

Q    Where was the van in relation to you standing at the bus stop, what was the distance?

A    The distance?  I would say 100.

Q    Let me show you an exhibit, Government Exhibit 1010 already in evidence.  Can you see that there on your screen?

A    Yes.

M. NELSON - DIRECT BY MS. PAUL          1252

COURTROOM DEPUTY:  It's 1010?

MS. PAUL:  1010, yes.

COURTROOM DEPUTY:  Okay.

Q    Can you see the intersection of Malcolm X and Halsey on that map?

A    Yes.

Q    Can you just press your finger there?

A    (Witness complies.)

Q    Where were you standing more or less when you were at the bus stop?

A    Yeah.  I was at the bus top going east on Halsey Street.

Q    So when you say --

A    Going towards Patchen.

Q    And this is Patchen?

A    Yeah, that's Patchen.

Q    All right.  So when you were standing on the bus stop, where was the van in relation to you, if you can show us on the map?

A    That would be here, like here, (indicating.)  Not the bottom one, the top.

Q    All right.  I'm just going to cross it off.

A    The bus stop going -- the bus stop going west.

Q    So west is -- I'm drawing a line on Halsey.

A    Yes.

M. NELSON - DIRECT BY MS. PAUL          1253

Q    I'm going to draw a line on Halsey.  So west is to the left side of this picture?

A    Where is Halsey?  Yeah, it was the bus stop going towards -- it would be going west on Halsey Street.  This would be across the street, because Halsey is a two-way street.

Q    All right.  And what kind of a van was it?

A    It looked like a grey, probably -- possibly like a Dodge Caravan or something like that.

Q    And you said the man whose face was obstructed got into that van; what happened after that?

A    The van went towards Stuyvesant.

Q    This is Stuyvesant?  (Indicating.)

A    Yes.

Q    Were you able to see anything else about the people inside of that van?

A    No, I wasn't able to see.

Q    Just the man get in?

A    Yes.

Q    Were you able to see which part of van he jumped into?

A    No, I'm not sure if it was the back or the front, but I know that, you know, he hopped in the van.

MS. PAUL:  I have no further questions -- or no, I'm sorry.

THE COURT:  Does anybody wish to inquire?

M. NELSON - DIRECT BY MS. PAUL          1254

MS. PAUL:  One moment.

(Pause.)

BY MS. PAUL:

Q    Just to clarify, I think you just said, but you were unable to see which part of the van the man jumped in?

A    I was not able to tell.

Q    When you saw him initially, which direction was he coming from?

A    Was he coming from?

Q    Um-huh.

A    From Hancock going towards Stuyvesant.

Q    So this is Hancock?

A    Yes.  But he was on Malcolm X, so he came from the Hancock direction and came towards Stuyvesant and made a right turn on Halsey, and the bus stop was right there.

Q    And then continued on Halsey into the van?

A    Yes.

MS. PAUL:  Okay.  Thank you.

MR. RUHNKE:  Your Honor, we have no questions.

THE COURT:  Any questions, Mr. Beecher?

COURTROOM DEPUTY:  Mr. Herman and Mr. Beecher, do you have any questions?

MR. HERMAN:  No, sir.

THE COURT:  All right.  So you can step down.

(Witness leaves the witness stand.)

K. GLOVER - DIRECT BY MR. AMATRUDA          1255

THE COURT:  Next witness.

MR. AMATRUDA:  Your Honor, the government calls Kenneth Glover.

THE COURT:  Could you give me the number, please?

MR. AMATRUDA:  76, Judge.

THE COURT:  Why don't you get into the habit of giving me the number each time.

MR. AMATRUDA:  Yeah, that's a good idea.  No, it's 77.

(Witness takes the witness stand.)

**KENNETH GLOVER**, called by the Government, having been first duly sworn, was examined and testified as follows:

COURTROOM DEPUTY:  Please state and spell your name.

THE WITNESS:  Kenneth Glover, K-e-n-n-e-t-h, G-l-o-v-e-r.

DIRECT EXAMINATION

BY MR. AMATRUDA:

Q   Mr. Glover, you've been subpoenaed to testify here today?

A   Yes.

Q   Did you ever go by the nickname Shey Black?

A   Yes.

Q   Have you ever lived in LaFayette Gardens?

---

K. GLOVER - DIRECT BY MR. AMATRUDA          1256

A   Yes.

Q   And about the summer of 2000 who did you work for?

A   UPS.

Q   Where did you actually work for them?

A   New Jersey.

Q   Do you remember what shift you usually worked?

A   Night, and sometimes in the morning time.

Q   And when you say the night shift; generally, what were your hours?

A   From, like, 11:00 until 2:00, or 11:00 to 1:00, it depends.

Q   And if you had overtime how --

A   Overtime, I could stay until the next day.

Q   And did you always leave work right at 2:00 or 1:00?

A   No.  It depends if my ride comes.  It depends.

Q   And did you ever leave around 3:00 or -- 3:00 in the morning?

A   3:00 in the morning, exactly?  Not that I know of.  No.  Sometimes, like, the bus usually come maybe 2:00, 2:15 maybe, something like that.

Q   And once the bus would come, how would you get back from work?

A   I would take the Path to the "G" train, to the "A" train.  Sometimes I might take the "J" train.  Sometimes I might take a bus.  Sometimes I might get a ride.

---

K. GLOVER - DIRECT BY MR. AMATRUDA          1257

Q   Did you ever take the "C" train?

A   No.

MR. AMATRUDA:  Okay.  I think I'm done.

(Pause.)

BY MR. AMATRUDA:

Q   Okay.  When you would take the Path train, does that go to Penn Station?

A   I think it goes to Chambers.  I think it goes to Chambers.

Q   And what train line do you join up there?

A   Huh?

Q   What train line do you join up with there?

A   The Path train.

Q   I know, but what subway is that?

A   If I'm not mistaken, I think it's the "A".  I think it's the "A" train.

Q   Is the "C" train also at Chambers?

A   I think the "C" train runs local.

Q   And then you take the "G" from there?  Or after the A/C you get on the "G"?

A   Yeah.  If I was to take that way home, yeah.  Yeah.

Q   And you're married, right?

A   Well, you can say that, yeah.

Q   And your wife is related to someone named Wendy?

A   That's her sister, yeah.

---

K. GLOVER - DIRECT BY MR. AMATRUDA          1258

Q   And was Wendy ever involved with someone named Boo from LG?

A   I don't know.  I'm not from LG.  I wasn't born there, so I really don't know the history about who messed with who, I don't know.

MR. AMATRUDA:  Okay.  That's fine.  Thank you.  No further questions.

THE COURT:  Anybody wish to inquire?

MR. RUHNKE:  No, thank you.

MR. HERMAN:  No.

THE COURT:  Okay.  You may step down.

COURTROOM DEPUTY:  Thank you.

(Witness leaves the witness stand.)

THE COURT:  The next witness.

MR. AMATRUDA:  Your Honor, the government calls Shelby Henderson.

THE COURT:  49?

COURTROOM DEPUTY:  45, Shelby Henderson.

(Witness takes the witness stand.)

COURTROOM DEPUTY:  Good morning, Mr. Henderson, take the witness stand.  I ask if you can remain standing and raise your right hand.

**SHELBY HENDERSON**, called by the Government, having been first duly sworn, was examined and testified as follows:

*Mary Agnes Drury, RPR*
*Official Court Reporter*

GA43

S. HENDERSON - DIRECT BY MR. AMATRUDA     1295

was.

THE WITNESS:  The statement was made, "we got busy with this gun," which means either they killed somebody or they robbed somebody.

BY MR. AMATRUDA:

Q   And what did they want you to do with the gun?

A   They wanted me to stash the gun for them.

Q   Now, at another point did something happen to E-Bay's sister?

A   Yes.

Q   What?

A   Some fools robbed her.

Q   And what did you -- what did you do?

A   Well, we caught up with them and we --

Q   Stop.  Who is "we"?

A   We, Abdul Azziz, Abubakr, Taz and E-Bay.

Q   What did you do?

A   We whooped their ass.

Q   Why did you do that?

A   Because they robbed E-Bay's sister.

Q   Because of your relationship with E-Bay?

A   Yes.

Q   And did you ever hold drugs while you were associating with CMB?

A   I was given drugs and I had to pass them off.

S. HENDERSON - DIRECT BY MR. AMATRUDA     1297

Q   Did you learn from Thor and Taz whether -- what if any role Peanut had in Wise's murder?

A   He orchestrated it.

Q   Did you know the name JR Hamilton?

A   Yes.

Q   You actually knew JR Hamilton, correct?

A   Yes, I did.

Q   I'm going to show you Government Exhibit 25.  Do you recognize that?

A   Yes, I do.

Q   What is that?

A   That's JR Hamilton.

Q   How did you know JR Hamilton?

A   We came to be friends over the years.

Q   And did you learn anything from Taz and Thor about JR Hamilton and Wise?

A   Yes.  He was part of -- he was part of the get away from Ivery Davis, Peanut, after they murdered Wise.

Q   Do you remember the first conversation you had with World?

A   Yes.

Q   What were you doing when that conversation happened?

A   What was I doing?

Q   Yeah.

A   I was in the house with Taz.

S. HENDERSON - DIRECT BY MR. AMATRUDA     1305

A   He said that E-Bay had -- was dressed in a hoodie, and that he was acting like a -- like a young boy, he was skipping.  And then when he came upon Darryl Baum, Darryl Baum was tieing his shoelaces and he pumped him in the head twice.

Q   Did Taz tell you how E-Bay got away from that murder?

A   Yes.

Q   How?

A   He jumped into the car with Zach, a silver Mercedes Benz CLK 320 I believe it was.

Q   What was Taz' -- did Taz share his view about Zach's use of his car, Zach's car that night?

A   He thought it was one of the most stupidest things he ever knew in his life.

Q   What did Taz say was stupid about it?

A   Because it could connect him to the killing.

Q   Did you go to the burial of Darryl Baum?

A   Yes, I did.

Q   Who did you go with?

A   Abubakr Abdul Raheem.

Q   How did you get there?

A   We went into the same car that they used as a getaway, the Mercedes Benz.

Q   Zach's car?

A   Yes.

S. HENDERSON - DIRECT BY MR. AMATRUDA     1315

A   Yes.

Q   And did you, in fact, agree with other people that he should die?

A   Yes.

Q   And in terms of agreeing that he should die, did you -- you mentioned a mole before.  Did information that you heard from -- through the mole have an effect on your decision to agree that he should die, that JR Hamilton should die?

A   He wanted to kill him.  I felt they had a right. Illegally, they had a right to defend themselves.

Q   And the fact that -- or JR Hamilton's desire to kill them, who is "them"?

A   World and Taz.

Q   Okay.  And how was it that you learned that JR Hamilton wanted to kill Taz and World?

A   Through Taz and Dwayne Meyers.

Q   And did they tell you -- well, let's start with Dwayne Meyers.  Did Dwayne Meyers tell you how he knew that JR Hamilton wanted to kill World and Taz?

A   This was the information that he had received.

Q   From where?

A   From his sources.

Q   Okay.  How about Taz?

A   The same thing.  The same thing.

Q   All right.  And what was the information that they had

GA44

S. HENDERSON - DIRECT BY MR. AMATRUDA    1316

received?

A   That a bounty had been placed upon World and Taz' head of $50,000.

Q   By whom?

A   By Muhammad Noor, Mike Tyson and JR Hamilton.

Q   I'm going to show you what's been marked as Government Exhibit 21, which is in evidence.  Who is that?

MR. AMATRUDA:  Your Honor, I'm not sure Muhammad Noor is in evidence.  I'll just ask the witness, do you recognize that person?

THE WITNESS:  Yes, I do.

BY MR. AMATRUDA:

Q   Who is that?

A   That's Muhammad Noor.

MR. AMATRUDA:  Your Honor, I'll move Exhibit 21 into evidence.

MR. RUHNKE:  Without objection.

(Government Exhibit 21 is admitted into evidence.)

THE COURT:  Give me an idea how long it will take, it's quarter to 1:00 now.

MR. AMATRUDA:  It's going to be awhile.

THE BREAK:  So maybe this will be a time to break, okay?  And you have what, another half hour of direct examination or roughly?

MR. AMATRUDA:  Depending on objections, half an

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

T. SMALL - DIRECT BY MS. DAYANANDA    1321

June 10th of 2000.  Did you witness a shooting that day?

A   Yes, in front of Quincy.

Q   I'm going to ask you to keep your voice up.  Can you tell the jury where you were?

A   I was in my car on Quincy Street.

Q   And what were the cross streets of where you were?

A   Between Nostrand and Marcy.

Q   Now, before you got to your car, what had you done before that?

A   I took my son -- the reason why I was on Quincy, I took my son over to stay at a girlfriend's house to stay with her son.

Q   What's your girlfriend's name?

A   Kim.

Q   Do you know her full name?

A   Kim Underwood.

Q   Do you know who she was dating around that time?

A   A young man named Taz.

Q   And where did she live on Quincy?

A   She lived on Quincy, between Nostrand and Marcy, I don't know the address.

Q   Okay.  I'm showing to you what's been marked in evidence as Government Exhibit 1004I.  Do you recognize that photo?

A   Yes.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

S. HENDERSON - DIRECT BY MR. AMATRUDA    1335

A   In front of my house.

Q   Where was your house?

A   202 Clifton Place.

Q   And did you pass the drugs along to E-Bay?

A   Yes, I did.

Q   Do you know how E-Bay found you to get drugs?

A   He came to the house.

Q   You said that at some point you and some others took action in reaction to somebody doing something to E-Bay's sister; is that correct?

A   Yes, sir.

Q   And who was it that you took action with?

A   Abdul Azziz, Abubakr Abdul Raheem, Taz, myself and E-Bay.

Q   And you said that you beat up the kids or a kid, which was it?

A   It was more than one.  It was more than one, definitely, and we threw them over the bannister.

Q   You said you knew the name Peanut, correct?

A   Yes.

Q   Did anything happen to Peanut?

A   He was murdered.

Q   How did you learn of his death?

A   On television.

Q   Did you ever hear a description of what happened during

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

S. HENDERSON - CROSS BY MR. HERMAN    1394

kill World and kill Taz, right?

A   Yes.

Q   And so it was your understanding this was going to be kind of an anticipatory strike; is that right?

A   Be more specific, counselor.

Q   Well, I think you said it was -- I think you said it was kind of street self-defense or something, illegal self-defense you said, right?

A   Yes.

Q   What did you mean by that?

A   Meaning, it was kill or be killed.

Q   All right.  And who was going to be killed?

A   Who was going to be killed?

Q   Who was your understanding was going to be killed?

A   Their desire was to kill World and to kill Taz.

Q   And that's because the mole, who you didn't know, right?

A   Yes.

Q   And where was the mole, inside the other -- the enemy camp?

A   In the Hamilton camp.

Q   So your understanding was that somebody in the Hamilton camp leaked the information to Taz that those people wanted to kill him, right?

A   Yes.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

S. HENDERSON - CROSS BY MR. HERMAN          1395

Q   And therefore, that was the motivation to kill JR Hamilton, right?

A   Yes.

Q   And this was discussed at St. John's; is that right?

A   You mean --

Q   Beforehand?

A   It could have been St. John's, it could have been other places.

Q   Well, when you were discussing this, when you were hearing this, where were you?

A   I was in the car.

Q   On the day that you scoped out the restaurant?

A   Be more specific, counselor, because now you are confusing me.

Q   I'm not intending to confuse you.  When did you hear about this information about the mole who was providing information?

A   That's before.  That's before the night that he was shot.

Q   And when was that?  How much before?

A   A while ago.  Like, you know, maybe weeks, two weeks.

Q   Okay.  And you were involved with the plan to kill JR Hamilton; is that right?

A   I'm not involved in the plan, I went along with it.  I didn't plan anything.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

---

1435

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      : 04-CR-00706(FB)
                               :
                               :
          -against-           : United States Courthouse
                               : Brooklyn, New York
                               :
                               : Tuesday, April 14, 2015
DAMION HARDY                   : 10:00 a.m.
AND AARON GRANTON,             :
                               :
          Defendant.           :

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S :

For the Government: LORETTA E. LYNCH, ESQ.
                    United States Attorney
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201
                BY:  SOUMYA DAYANANDA, ESQ.
                    MATTHEW S. AMATRUDA, ESQ.
                    RENA PAUL, ESQ.
                    Assistant United States Attorney

For the Defendant:   BY:DAVID A. RUHNKE, ESQ.
Damion Hardy

For the Defendant:   BY:ROBERT M. BEECHER, ESQ.
Aaron Granton        BY:CARL JORDAN HERMAN, ESQ.
                     BY:KENDRA PANNITTI, ESQ.

Court Reporter:   VICTORIA A. TORRES BUTLER, CRR
                  225 Cadman Plaza East/Brooklyn, NY 11201
                  VButlerRPR@aol.com
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription.

VB     OCR     CRR

---

Jamison - direct - Paul          1470

A   On Saratoga and Decatur.

Q   At that point, when JR had that restaurant, do you know whether or not he was still living in Lafayette Gardens?

A   No, he wasn't.

Q   You said that the restaurant -- when had the restaurant opened?

A   I don't know the actual day.

Q   Well, let me direct your attention to August 1st, 2000.  What happened on August 1st, 2000, from your memory?

A   Me and JR was having conversation and there was a shooting and he got shot and...

Q   Okay, so I'm going stop you for a moment.  Before that happened, how long had the restaurant been opened?

A   Maybe for about a week, yes.

Q   Okay.  I'm going to show you now what is in evidence as Government's Exhibit 701-A.  If you look there you can see it far away or close up on your screen?

A   I can see.

Q   What is that?

A   That's the restaurant.

Q   All right.  So, why don't you tell us what happened the night that JR was shot.

A   Me and JR was talking, I was leaning against the door, he was sitting in one of those two chairs and shots went off.  And as we tried to run to the back, he slipped and fell, I

VB     OCR     CRR

---

Jamison - direct - Paul          1471

fell on top of him.  I ran in the bathroom and as I came out, when things calmed down, when I came out, JR was just laying on the floor in pain.

Q   When the shooting happened, who else was in the restaurant with you, apart from JR?

A   A refrigerator repair guy.

Q   Do you know his name?

A   James.  I'm not sure of his last name.  And a cook by the name of Sissy.

Q   And what about Ulysses Hamilton, was he there?

A   He wasn't there when the shooting happened.

Q   Had he been there earlier that day?

A   Yes.

Q   How much earlier before the shooting happened?

A   A couple of minutes.  He walked out.

          (Continued on following page.)

VB     OCR     CRR

Jamison - direct - Paul                  1472

BY MS. PAUL:

Q    All right.  And so, you said that you were standing next to the door.  Can you point for us in this photograph where you were?  That's the door to the restaurant?

A    Yes.

Q    It's open in this picture.  It was closed when you were standing there?

A    Yes, this was closed.

Q    When the shooting happened, where was it coming from?

A    From outside.

Q    When that happened, did you know where J.R. was?

A    He was sitting in one of the two chairs.  I'm not really sure, but he was sitting there.

Q    I'm going to show you 701-E.  Are those the two chairs in that exhibit that you were referring to?

A    Yes.

Q    So, you said that shots went off while you were leaning on that door.  What did you hear?

A    When J.R. screamed, they shooting.  As he ran to the back, he slipped and fell, and I fell on top of him.  And as I jumped up and ran in the bathroom, I thought -- but he never came in there, and when I came out the bathroom, he was just laying on the ground -- I mean, laying on the floor.

Q    I'm going to show you 701-G in evidence.  The bathroom that you are talking about, do you see it in this picture?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

---

Marston - direct - Dayananda              1559

J A M E S   M A R S T O N,

       called by The Government, having been

       first duly affirmed, was examined and testified

       as follows:

       THE COURTROOM DEPUTY:  Thank you, please have a seat.  Please, state and spell your name.

       THE WITNESS:  My name is Police Officer James Marston -- M-A-R-S-T-O-N.

       THE COURT:  Your witness.

       MS. DAYANANDA:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. DAYANANDA:

Q    Good afternoon, Officer Marston.

A    Good afternoon.

Q    Can you tell us where you are currently working?

A    I work right now in Queens at the auxiliary police section, which is headquarters for all the auxiliary police officers in the city of New York.

Q    How long have you been there?

A    Approximately two-and-a-half years.

Q    When did you start with the police department?

A    June 1995.

Q    And are you retiring, soon?

A    I am.

Q    Directing your attention to May of 2000, where were you

VB        OCR        CRR

---

Marston - direct - Dayananda              1560

assigned?

A    I was assigned to PSA-3 or Police Service Area Number 3.

Q    Okay.  What is the Police Service Area?

A    That's the precincts that cover the housing developments in the city of New York and I cover Brooklyn North.

Q    And does Brooklyn North and PSA-3, does that cover Lafayette Gardens?

A    Yes.

Q    I'm going to show you what's already been entered into evidence as Government's Exhibit 101.  The jury has seen this many times.

       Do you recognize this?

A    Yes, I do.

Q    And what is that?

A    It's a map of Lafayette Gardens houses.

Q    I'm going to direct your attention to May 11th of that year.  Around 3:30 in the afternoon did you respond to a complaint of shots fired?

A    I did.

Q    And can you tell us what you did?

A    I responded.  There was a vehicle with bullets in it.  I vouchered the spent shells and the bullet fragments.

Q    And did you fill out a voucher for those bullets that you recovered?

A    Yes, I did.

VB        OCR        CRR

---

Marston - direct - Dayananda              1561

Q    Okay.  Do you remember the voucher number?

A    No, I do not.

Q    And before that, do you remember where specifically in Lafayette Gardens you responded to, to recover those bullets?

A    I believe it was in the parking lot somewhere near 415 Lafayette.

Q    Can you show is where 415 is?

A    I believe it's right there.

Q    Great.  And 415 is what you filled out as part of your paperwork; is that right?

A    Yes.

Q    Okay.  I'm showing you, for the witness only to refresh your recollection, on the voucher.  Do you recognize this, Officer Marston?

A    I do.  Because there is my signature on the bottom.

Q    Okay, great.  Is this the voucher K-385011?

A    Yes.

Q    And can you tell the jury what you recovered on that day?

A    Nine 40-caliber spent shell casings and one bullet fragment.

Q    And once you recovered that, you vouchered those bullets?

A    Yes.

Q    And were they then sent to a lab for testing, as far as you know?

A    As far as I know, yes.

VB        OCR        CRR

1653

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,    : 04-CR-00706(FB)
                             :
                             :
    -against-                : United States Courthouse
                             : Brooklyn, New York
                             :
                             :
DAMION HARDY                 : Wednesday, April 15, 2015
AND AARON GRANTON,           : 10:00 a.m.
                             :
        Defendant.           :

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: LORETTA E. LYNCH, ESQ.
                    United States Attorney
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201
            BY:  SOUMYA DAYANANDA, ESQ.
                 MATTHEW S. AMATRUDA, ESQ.
                 RENA PAUL, ESQ.
                 Assistant United States Attorney

For the Defendant:  BY:DAVID A. RUHNKE, ESQ.
Damion Hardy          JEAN D. BARRETT, ESQ.


For the Defendant:  BY:ROBERT M. BEECHER, ESQ.
Aaron Granton       BY:CARL JORDAN HERMAN, ESQ.
                    BY:KENDRA PANNITTI, ESQ.

Court Reporter:    VICTORIA A. TORRES BUTLER, CRR
                   225 Cadman Plaza East/Brooklyn, NY 11201
                   VButlerRPR@aol.com
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription.

VB     OCR     CRR

---

Atkinson - direct - Amatruda          1720

Q   Who was that?

A   Tonya Baums -- I mean Tonya Smalls.

Q   Thank you.  And what happened when you were sitting there?

A   We was sitting there talking -- arguing, we had a dispute, you know what I mean?  And then Darryl had came over there and was talking to us, and then he had went across the street and started talking to somebody else.

Q   Do you remember anything about the person he talked to?

A   Yeah, it was a white guy.

Q   And what happened after that?

A   Then he came back over there and was talking to me and Tonya, and then my uncle then pulled up, so he start -- he went over there start talking to them.  And then when he was talking to them, somebody just walked up just start shooting.

Q   And what did you do when you heard the shots?

A   I ducked.

Q   What did you see after that?

A   I grabbed my girlfriend, we ducked.  Then when I got up off the ground, Darryl was laid down.

Q   Laid down where?

A   Laid by the car, by my uncle.

Q   On the street?

A   Yeah, on the street.

Q   Okay.  And what did you see after that, anything?

SAM     OCR     CRR     RPR

---

Lopez - direct - Dayananda          1738

        THE WITNESS:  Well --

        MS. DAYANANDA:  Your Honor --

        THE WITNESS:  Sorry?

        MR. DAYANANDA:  I'm sorry.

        THE COURT:  Do you want to ask another question?

        MS. DAYANANDA:  Sure.  I think we are going to get there.

Q   Officer Gorman, did he provide you with some items?

A   Yes.

Q   Where were those items from?

A   I --

        MR. RUHNKE: Your Honor, this is -- that's the point of the objection.

        THE COURT:  Overruled.

        You can answer what items he provided you.

A   He provided me with two firearms and also a bag of what appeared to be narcotics.

        THE COURT:  That's not hearsay, in my opinion.  I overrule the objection.

        Next question.

Q   Was Officer Gorman one of the officers assigned to the outside of apartment 11-B?

A   Yes.

Q   Is that where the items were recovered from?

        MR. RUHNKE:  Objection, Your Honor.

GR     OCR     CM     CRR     CSR

---

Lopez - direct - Dayananda          1739

        THE COURT:  Overruled.

A   Yes.

        THE COURT:  If you know.  You know where the item was recovered from?

        THE WITNESS:  Yes.

Q   Where?

A   He indicated that they were thrown out of the window of the eleventh floor.

        MR. RUHNKE:  Your Honor, this --

        THE COURT:  This is based upon what he told you?

        THE WITNESS:  Correct.

        THE COURT:  You don't know this of your own personal knowledge?

        THE WITNESS:  No.

        THE COURT:  Objection is sustained.  Disregard the answer.

        MR. RUHNKE:  Can we disregard the earlier answer?

        THE COURT:  No.  The other one is fine.  This one is not.

Q   Mr. Lopez, you said that when Officer Gorman gave you these items -- were individuals still inside the apartment?

A   We believed there was, yes.

Q   At some point you said you called for emergency services?

A   Yes.

        They arrived and a short time later and they

GR     OCR     CM     CRR     CSR

Bruinsma - direct - Dayananda          1762

A    Correct.

Q    And that matches up what we would see here, outside the restaurant, number two?

A    Here, yes.

Q    And what, based upon your experience as a police officer and 25 years with the department, what's the live round signify?

A    Live round indicates that it misfired or, you know, it, in the easy terms, the round didn't go off and it was, the gun was, the slide was racked.

Q    What do you call that, you're making a motion?

A    I'm sorry, an automatic works on a -- loss of words here for a second.

Q    It's okay.

A    It's mechanical and the chamber, to chamber a round to get it into the barrel, the mechanism.  To fire it, you have to chamber the round by racking the slide or whatever type of mechanism it is to load it.

Q    So, if a live round is recovered, is that round fired?

A    No, it's not.

Q    Okay.  Why is that?

A    Generally, it's because of a misfire.

Q    A misfire meaning?

A    Meaning the trigger was pulled, the gun didn't go off, there is either something wrong with bullet or something wrong

VB     OCR     CRR

---

Bruinsma - direct - Dayananda          1763

with the firearm.  You now have to re-cock it, pull the slide back, the mechanism, to eject that round and get another live round into it.

Q    Is that called jamming?

A    Yes.

Q    Okay.  And how do you know that's a live round versus a round that is fired?

A    Because the projectile is still attached to the shell itself.

Q    And what's the shell?

A    That would be the brass casing.

Q    How about we show you Government's Exhibit 701?

A    Perfect.  You have a live round to the left here, and you have a spent round here.

Q    Just can you explain what the difference is, what's a spent round?

A    The spent round is missing its lead projectile.  The bullet.  The bullet is gone.

Q    Does mean it's been fired?

A    It's been fired, yes.

Q    And the live round we see on the left side, that's not been fired?

A    That's correct.

Q    So, either the gun jammed for the live round; correct?

A    Correct.

VB     OCR     CRR

---

Bruinsma - direct - Dayananda          1764

Q    Or, I mean, possibly someone dropped the bullet there; is that right?

A    Anything is possible at that point.

Q    Okay.  And just so we're clear then, we saw a live round in number two that you showed us; is that right?

A    Yes.

Q    And we also see the live round at three and -- well, at number four; is that right?

A    Okay, that's right.

Q    And just so it's somewhat career, but in terms of where markers two, three and four are, can you tell us where they are in relation to the window that's there?

A    Directly in front of the window.

Q    This is probably a better view of it; right, 701-A?

A    Yeah.

Q    And Government's Exhibit Number 7, can you tell us what that is?

A    That's also a live round.

Q    Government's Exhibit 8?

A    Live round.

        MS. BARRETT:  I'm sorry, you're mixing up the numbers, here.

        MS. DAYANANDA:  I'm sorry.

Q    701-L is marker number seven; right, Detective?

A    Yes.  Live round.

VB     OCR     CRR

---

Footman - direct - Paul          1795

A    Yes.

Q    And after that, what would happen with that money?  What was your understanding at that time?

A    Say that again.

Q    After the money went back to the lieutenants, where would the money go?

A    They had it.

Q    The lieutenants?

A    Yeah.

Q    And what was the money then used for?

A    They give it to World when they finish, when he want it.

Q    At the time did you work a shift?

A    Yes.

Q    Do you remember what were the shifts?

A    Like 7:00 to 3:00, 3:00 to 11:00 and the graveyard shift.

Q    Okay.  What shift did you work?

A    I worked 3:00 to 11:00.

Q    And what about E-Bay?  What was E-Bay -- was E-Bay working a shift?

A    Yes.

Q    What shift did E-Bay work?

A    The graveyard.

Q    And during one shift, how many bombs would you sell, on average?

A    I don't know.  I didn't keep count.

VB     OCR     CRR

Footman - direct - Paul    1811

there?

A    Lucky Zade.  He was part of Sherrod's team.

Q    Okay.  Did you know what the problem was with Sherrod and his team at that point?

A    No.

Q    Or with Lucky?

A    No.

Q    But you went and shot up the corner where they were standing because of why?

A    That's what World told me to do.  That's what he wanted to do.  It just was problems, I don't know what the problems was about.

Q    Did you ever have a shoot-out when you were with E-Bay near Weed's spot?

A    Yes.

Q    At around the same time?

A    Yeah, but it was a shoot-out.

Q    What happened?

A    It's a block called Skillman.  It's got a weed gate on that block.  That block sits between Franklin and Bedford.  And we crossed through the yard at the time, and I went down into the weed gate to get the weed, E-Bay was holding me down to make sure they don't come and then he saw Zade, and Zade started firing, E-Bay started firing, we ran back to LG.

Q    You said that E-Bay was holding you down, what does that

Footman - direct - Paul    1812

mean?

A    Meaning that while I'm down in weed gate trying to buy the weed, he creep up and shoot me down there.

Q    Who that you were concerned about?

A    Zade or Lucky or, you know, on Bedford.

Q    That was because you were in their territory?

A    We was in the middle, yeah.

Q    So who had a gun?

A    E-Bay.

Q    Did you have a gun?

A    No, not that day.

Q    And you got shot at, is that what I understand you're saying?

A    We got shot you at.

Q    You and E-Bay?

A    Right.

Q    What happened?

A    He shot back at them and we ran.

Q    Did you get hit?

A    No.

Q    Did E-Bay get hit?

A    No.

Q    Did E-Bay hit anybody when he shot at them?

A    No.

Q    All right.  I'm going to show you Government Exhibit 43.

Footman - direct - Paul    1813

Do you recognize that person?

A    Yes.

Q    Who is that?

A    That's Rab.

Q    Did you ever learn about a problem with Rab?

A    Yes.

Q    Did you know what the problem was about?

A    No.

Q    How did you learn about the problem with Rab?

A    Through World and the rest of the guys.

Q    After you learned about that problem, did you go down to anywhere to shoot anybody?

A    Yes.

Q    What happened?

A    Oh, go down you said?  Go down?

Q    Can you go anywhere to shoot anybody?

A    In the projects, we shoot out in the project.

Q    What happened?

A    It came through, they was shooting, we was shooting back with them and everybody ran.

Q    So you're saying they.  Who is that?

A    Me and Grand.

Q    So is that Rab and his crew?

A    Rab and his peoples.

Q    And who was shooting for your CMB side?

Footman - direct - Paul    1814

A    Lot of us.  Like, can't remember everybody at the time.  It's a long time ago, but it was a lot of us.

Q    That's okay.  Can you name some that you can remember, if you can remember?

A    Boo, Fazo, me.  It's been a long time.

Q    How many shoot-outs like that were there with Rab's crew?

A    Several.

Q    Did you ever learn that Sambo had been shot during one of those shoot-outs?

A    Yes.

Q    How did you find out about that?

A    It's when they came back they said Sambo got hit.

Q    Who's they?

A    The members of the rest of the team, you know.

Q    Okay.  And when you learned that he had been hit or shot, did you learn where that had happened?

A    Yeah, down on Grand.

Q    Was that during one of the shoot-outs back and forth that you just talked about?

A    Yes.

Q    All right.  And after Sambo was shot the first time, did you learn anything about what happened to him after that?

A    Yeah, he went to hospital and maybe a day or two later he went back down there and he got shot again.

    (Continued on following page.)

Footman - direct - Paul          1815

(Continuing)

DIRECT EXAMINATION

BY MS. PAUL:

Q    Did you know a person by the name of Wayno?

A    Which Wayno?

Q    In the early '90s, did you know a person named Wayno?

A    Yes.

Q    Was Wayno a part of the CMB?

A    Yes.

Q    And did there come a time that changed?

A    Yes.

Q    What happened?

A    All I know is that Wayno started -- he went with Rab and them, when Wayno started he got down with them.  All I know is just that we was just going them too.

Q    How did you -- well, okay, so you said that he went to get down with Rab, he had been with CMB previously?

A    Yes.

Q    So after he went and got down with them, what does that mean got down with them?

A    I mean he joined -- he joined Rab crew and I don't know why, what happened, whatever, that's all I know.

Q    And did you hear anything from World about that?

A    Excuse me?

Q    Did you hear anything from World about that?

SAM    OCR    CRR    RPR

---

Footman - direct - Paul          1816

A    Meaning that Wayno is not down with us no more, so he gets it.  That's about it.  That he's not down with us no more, so he gets it with everybody else.

Q    When you say he gets it, what does that mean?

A    Meaning that, you know, we going to war or so, you know. We catch him, he get it, too.  He get shot, too.

Q    Did you ever try to shoot at Wayno?

A    Yes.

Q    Were you successful?

A    No.

Q    How many times did you try to shoot at Wayno after he left CMB?

A    Once.

Q    Around the same time in the early -- in this 1990 to '93 period did you know a person named Black, did you meet a person named Black?

A    Yes.

Q    And did there ever come a time when there was a problem with Black?

A    Yes.

Q    What happened?

A    Black was selling dummies on the script.

Q    What's a dummy?

A    Like fake drugs.

Q    And in terms of business, how is business affected if

SAM    OCR    CRR    RPR

---

Footman - direct - Paul          1817

somebody is selling dummies in the same place where you're selling real drugs?

A    Well, the customers kept complaining about him taking they money and giving them fake drugs and stuff, so World gave him a warning, tell him don't do it again.  And he kept doing it.

Q    World gave Black a warning not to do it and Black kept doing it?

A    Yeah.

Q    Okay, what happened after that?

A    After that, Popsie shot him.

Q    Did he survive?

A    Yes.

Q    Did you ever know of a crew that was called Deuces?

A    Yes.

Q    Who was in charge of that crew?

A    Highn.

Q    Who's Highn?

A    That's World brother.

Q    And where in this time period were Deuces selling drugs?

A    Where they were selling it at?

Q    Yes.

A    The 470.

Q    Okay, I'm going to put the map back up again, government Exhibit 101.

SAM    OCR    CRR    RPR

---

Footman - direct - Paul          1818

        (Exhibit published.)

        Could you tell us where is 470?

A    (So marked.)

Q    All right, you've indicated.  And were there any problems between World and his brother's crew because of this drug selling?

A    This is going -- he just is making us go over here and like shake them up a little bit, whatever.

Q    What does that mean?

A    Just like, you know, scare them a little bit.

Q    How would you do that?

A    Like go over there with guns and just be telling them whatever World said that, like y'all can't sell no more.

Q    Did that ever come do a shootout?

A    No.

Q    Just talk and showing your guns?

A    (No response.)

Q    Did they stop selling?

A    Yeah, on they own.

Q    And what happened instead?

A    Huh?

Q    What happened instead of them selling on their own?

A    You said did it ever stop?

Q    Let me go back.

        You said that the Deuces crew was selling in 470?

SAM    OCR    CRR    RPR

GA51

Footman - direct - Paul 1819

A    Right.

Q    And after you went to shake them down and tell them that they couldn't sell there anymore because World said so, did they stop?

A    No.

Q    Right.  Were there problems?

A    I mean they -- they brothers.  They ain't too much you -- ain't too far you gonna go with it, you know what I mean.

Q    Did you know a person by the name of Jeff?

A    Yes.

Q    And was there any beef that the CMB had with Jeff around that time?

A    Yeah, Jeff was selling drugs for a guy named Quan.

Q    Where were they working?

A    The middle buildings, one of them was 415 and 411.  I just got 'em mixed up.  They face each other.

Q    Could you point to us the buildings that you're talking about on government Exhibit 101?

A    Sure.

Q    I think you pushed one, which was 415 it says on the map.  And where was the other one?

A    From what I know they -- they sold out of that one building.

Q    Oh, okay.  So the one --

A    Just the numbers on the buildings, just I don't know

SAM    OCR    CRR    RPR

Footman - direct - Paul 1820

which one is which.  I know it's 415 and 411, one out of these two.

Q    You've indicated the building closest to 433?

A    Right.

Q    So what happened as a result of them selling drugs in 415?

A    Well, all I know is that World told Quan he couldn't sell no more and he wasn't trying to hear it.  And that's all I know.

Q    So World told Quan who was selling in 415 that he couldn't sell no more, and when you said he didn't want to hear it, that's Quan?

A    Right.

Q    So was there a problem that happened after that?

A    Yeah.

Q    What happened?

A    There was a shootout.

Q    Who participated in the shootout?

A    Um --

Q    Who did the shootout?

A    World -- well, it was a couple, there was more than just one.  There was Deezo, P-Rab, E-Bay, Stack, Popsie.

Q    Did there ever come a time with that beef with Quan and Jeff that you saw E-Bay shoot anybody?

A    Yeah.

SAM    OCR    CRR    RPR

Footman - direct - Paul 1821

Q    Who?

A    Jeff.

Q    Where were you when you saw that?

A    I was -- I was in -- I was in an apartment, my apartment.

Q    And where was he shooting Jeff?

A    Outside.  I was in the window.

Q    You and you saw it from the window?

A    Yeah.

Q    Did you hear about a person by the name of Troy?

A    Yeah.

Q    Did there come a time where Troy was killed?

A    Yeah.

Q    Where were you when Troy was killed?

A    I was in my apartment.

Q    How did you learn that he was killed?

A    I learned it 'cause E-Bay came and -- and the fellow he was talking about, he was named Troy, got killed.

MR. HERMAN:  Judge, I'm going to ask for an instruction at this time, it's an enterprise act.  My client is not charged with that.

THE COURT:  We'll take it up later.

MR. HERMAN:  Thank you, Judge.

BY MS. PAUL:

Q    And I'm sorry, because I didn't understand a portion of your answer.

SAM    OCR    CRR    RPR

Footman - direct - Paul 1822

So what happened that you learned about Troy being killed?

A    All right, I don't know Troy.  I never seen Troy before.  All I remember is that shots was fired and E-Bay came up to my apartment and we was looking out the window and he was like -- he was like:  There's this -- I mean this kid Troy.  I was like:  Who Troy?

Q    Okay.  And did you then talk to him later about who had killed Troy?

A    Yes.

Q    And what did he say about who had killed Troy?

A    He said he had caught him on a pay phone and he shot him.

Q    Okay, so E-Bay said that E-Bay caught him on a pay phone, is that what you're saying --

A    Yes.

Q    -- and shot him.  Did E-Bay tell you why he killed Troy?

A    He said -- he said World had a problem with him.

Q    Did he tell you what kind of problem that he had with Troy?

A    No.

Q    And in terms of E-Bay's reputation, did it change after he killed Troy?

A    Yes.

Q    How?

A    He would just -- it was -- I don't know, it was like --

SAM    OCR    CRR    RPR

Footman - direct - Paul                1823

it was like they respected him more and they was afraid.

Q   Did you know a person framed Fruitquan?

A   Yes.

Q   Did there come a time that you learned that he killed somebody?

A   Yes.

Q   Who did he kill?

A   A girl named Shawn.

Q   Were you there when it happened?

A   No.

Q   Did you learn that he had been arrested after that?

A   Yes.

Q   And charged with the murder?

A   Yes.

Q   Did you ever go to any of those -- any of his trial when he was on trial?

A   Yes.

Q   What did you do when you were there?

A   Nothing.

Q   Did you sit in the audience?

A   Yes, once.

Q   And watch the witnesses testify?

A   No.

Q   Who did you go with?

A   World.

SAM    OCR    CRR    RPR

Footman - direct - Paul                1824

Q   Did you ever talk to anybody in CMB about putting in any work about the Fruit trial?

A   Say that again.

Q   Did you ever talk to anybody -- let me ask you differently.  Do you know a person named Dante?

A   Yes.

Q   Did you ever talk to Dante about putting in some work related to a girl?

A   Yes.

Q   And when I say putting in work, what do you understand that to mean?

A   Meaning, you know, shot somebody or something like that.

Q   Okay.  And Dante was a member of the CMB early on?

A   Yes.

Q   What did he tell you about putting in work?

A   No, he just said that he shot some female, that was it.

Q   Did he say why?

A   It wasn't -- it had -- it was part of what was going on with Fruitquan trial at the time.

Q   Did he tell you anything more specific about that?

A   No.

Q   You told us that Fonzo was a member of CMB, right?

A   Yes.

Q   And did there come a time when he killed somebody?

A   Yes.

SAM    OCR    CRR    RPR

Footman - direct - Paul                1825

Q   What happened?

A   Well, what I could remember he got beat up and he just came back and shot the guy.

Q   At some point did you learn about Sambo talking to police about Fonzo?

A   Yes.

Q   What did you -- did you learn that from CMB members?

A   Yes.

Q   Did you also see him?

A   Yes.

Q   What happened?

A   Nothing, I mean police locked him up.  It he was in Sambo's apartment.

Q   Who is he that you're talking about?

A   Fonzo.

Q   So the police arrested Fonzo and he was in Sambo's apartment to your memory?

A   Yes.

Q   And had you learned that Sambo had told the police anything about that crime?

        MS. BARRETT:  Your Honor, objection to the leading nature of this examination.

        THE COURT:  Well, rephrase the question.

        MS. PAUL:  Sure.

BY MS. PAUL:

SAM    OCR    CRR    RPR

Footman - direct - Paul                1826

Q   Did you ever learn about Sambo speaking with the police?

A   Yeah, I heard -- I heard -- I heard that a lot.  I don't know if it was true or not, but yeah, that's what they were saying.

Q   And just --

        MS. BARRETT:  Objection, move to strike.  He doesn't know if it was true or not.

        THE COURT:  All right, motion granted.  Disregard the answer.  Next question.

        MS. PAUL:  Well, Judge, it's not offered for its truth, I'm going to get there in a moment.

        THE COURT:  I understand.

BY MS. PAUL:

Q   So in terms of Sambo's reputation after that, how did that affect it?

A   It didn't look good.

Q   What is the problem with cooperating with the police?

        MS. BARRETT:  Objection, Your Honor.

        THE COURT:  Sustained.

Q   Well, did the CMB have -- how did the CMB look upon people that cooperated with the police?

A   No respect.

Q   Did you ever bail any other members of CMB out of jail?

A   Yes.

Q   Who?

SAM    OCR    CRR    RPR

Footman - direct - Paul                1827

A    Rab and Popsie.

Q    When you say Rab, is that Rab from Grand --

A    No.

Q    -- or a different Rab?

A    Peter Rabbit.

Q    Peter Rabbit?

A    Yes.

Q    How did you go about bailing them out of jail?

A    I gave the money to Ms. Hardy and she went and got them out.

Q    Who is Ms. Hardy?

A    World mother.

Q    And with your money they got bailed out?

A    Yes.

Q    All right, so you told us that you went to jail at some point in late 1993.  What had you been arrested for?

A    I was arrested for drugs.  I had a drug charge and a gun charge.

Q    Let's start with the drug charge.  Where had you been selling drugs that you got arrested?

A    Well, I got arrested in Coney Island, but at the time I was selling the drugs out of G, but it was my brother's drugs.

Q    Okay, so when you got arrested in Coney Island it was your brother's drugs?

A    Right.

SAM    OCR    CRR    RPR

---

Footman - direct - Paul                1828

Q    So what happened that you got arrested for it?

A    When I went over to my grandmother house, when I got there, like five minutes later when I walked through the door the police rushed the apartment and they found the drugs in the apartment and stuff.  It was me, him, a girl and my grandmother was there.

So they put us all in cuffs and stuff and my brother was telling me that he couldn't do time.  So I took the weight for his drugs.  And I had a gun charge also.

Q    When you say you took the weight, what does that mean?

A    Meaning I took the charge.  I told them it was mines and I did --

Q    Go ahead, sorry.

A    -- and I did the time for it.

Q    So did you plead guilty?

A    Yes.

Q    So when you went to plead guilty, did you tell the Judge that you had committed that crime, when, in fact, you had not?

A    Yes.

Q    So you lied at that time?

A    Yes.

Q    And that was to keep your brother out of jail?

A    Yes.

Q    When you took the -- when you said you had a gun charge, what happened with the gun charge, where had you been

SAM    OCR    CRR    RPR

---

Footman - direct - Paul                1849

A    It's from what -- whatever CMB was doing at the time to people.

Q    Okay, and why was that?

A    (No response.)

Q    Why would someone try to do something to you from what other CMB members were doing?

A    Because we all was considered as one.  So, you know, it didn't matter who did it, whoever get caught gets it.

Q    From the opposing --

A    Right.

Q    -- team?  And when you say that you didn't know what was going on around or people didn't tell you things, who were you talking about?

A    I'm talking about World, I'm talking about at the time Wise, like when they get -- and problems like, they -- they -- they wouldn't tell you exactly what it's about, you know what I'm saying?  And sometimes, you know, you'd just be left without knowing what's going on.

Q    All right, and would that have any -- would that cause you any harm sometimes?

A    Yes.

Q    How?

A    It's like with Nut -- when Wise and Nut had the drama.  And, all right, it's like this, let's say, it was like Wise and Nut, right, they was cool.

SAM    OCR    CRR    RPR

---

Footman - direct - Paul                1861

sit in the front.  We rode to Marcy projects.

Q    What happened next?

A    We parked up.  We went up to -- we parked up, walked to the building.  We got in the elevator.  World was signalling to me to soot him in the elevator.  I froze.  I didn't shoot.  Then we -- we got to JB floor.  World knocking on the door.  Whatever.  And he was trying to signal me to shoot him then.  I still froze.  He was kind of pissed off.  Whatever.  But he was -- pretending like he was pissed off at JB for not answering door.

So we went downstairs.  We went back downstairs.  He jumped on the pay phone.  He was pretending like he was talking to JB.  Yo, we just came up there.  The f'g door, whatever.  Go back up there.  He hung up the phone.  The quarter came back out.  He say go up there and get that.  Munchie go with him.  Don't be bullshitting, man.  I'll be right here when you come back down.

I said all right.  We went upstairs.  We went back upstairs.  We got off the elevator.  I went towards the door.  He was behind me.  I turned around, shot him.  Then I ran past him.  Ran down the stairs.  I came out the building.  World was sitting there.  I started to go towards the car.  He pulled off.  I went the opposite direction to another building.  I threw the gun in an incinerator and then I just made my way back to LG on foot.  When I got to LG, I grabbed

GR    OCR    CM    CRR    CSR

Footman - direct - Paul          1862

the garbage bags full of money, called a cab and left.

Q   I will stop you for a moment.

To back up to Marcy, before you -- before Munchie got in the car, apart from telling you that you were going to kill him, did you make a plan with World about how that was going to happen?

A   Say that one more time.

Q   Apart from -- when World told you you were going to kill Munchie, did you make a plan about how to do it?

A   When Munchie went upstairs to take his aunt stuff up there, he said this is what we are going to do.  We are going to take him to Marcy, kill him at Marcy so they think Marcy niggas killed him.

Q   Who is they?

A   Police.

Q   Did you talk about how you were going to do it?

A   That's what he said.

Q   Okay.  You had a gun?

A   Right.

Q   Did he have a gun?

A   No.

Q   You said there was a signal.  Did you talk about the signal?

A   He just -- he just was nodding his head like when he was standing behind Munchie.

GR    OCR    CM    CRR    CSR

---

Footman - direct - Paul          1863

Q   All right.  The first time that you got that signal was in the elevator?

A   Elevator and it was like more -- when he was in the hallway, it was -- he wasn't able to do it.  He was more or less with the eyes, you know what I'm saying?  I still didn't -- I didn't do it.  I froze.

Q   You are just making a gesture nodding your head to the left, rolling your eyes to the left.

That was the signal?

A   Yes.

Q   Okay.  When you got upstairs to JB's house, it was you and World and Munchie?

A   Yes, the first time.

Q   So after you went outside, you said that he went to the pay phone.

Who is that?

A   World.

Q   Tell us what happened at the pay phone again.

A   World went to the pay phone.  He pretended like he called JB.  He was talking, I was just up there at the door, the f'g door.  I'm saying Trouble back up there now.  Hung up the phone.  Quarter came back down.  He told me go up there right now and get that, man.  Munchie was thinking we was going to get the weed from JB.

Q   You said the quarter came out.  Does that mean anything

GR    OCR    CM    CRR    CSR

---

Footman - direct - Paul          1864

to you?

A   Yes.  Like he wasn't really on the phone.  But Munchie didn't see that.

Q   When you went back inside of the building, World stayed outside?

A   Yes.

He was like, I am going to stay in the car.  I am going to be right here when you come back down.  He said, hurry up.  Don't be bullshitting.

Q   What did you take that to mean?

A   Meaning like get it done.

Q   When you went -- you went inside with Munchie.  How did you go up?  The elevator again?

A   Yes.

Q   Did you talk to him?

A   No.  He was quiet.

Q   When you got upstairs you said you shot him.

How many times did you shoot him?

A   I don't remember.

Q   Was he hit?

A   Yes.

Q   Do you know where you hit him?

A   No.

Q   Did he survive?

A   Yes.

GR    OCR    CM    CRR    CSR

---

Footman - direct - Paul          1865

Q   Do you know how badly injured he was?

A   Yes; he got paralyzed behind it.

Q   When you ran downstairs after you shot him, you said World was outside in the car; what car?

A   In my family's station wagon, Caprice.

Q   The same car you had been driving?

A   Yes.

Q   When he told you he was going to wait for you, what did you understand that to mean?

A   Meaning that after I -- after I shoot Munchie, I was going to come get in the car and we was going to drive off.

Q   Did that happen?

A   No.

Q   What happened instead?

A   When I came down, I saw -- I started heading in that direction, he pulled off.

Q   Drove away from you?

A   Yes.

Q   What did you do?

A   I just went the other direction after that.

Q   Where did you throw the gun?

A   In the incinerator of another building, the next building.

Q   In Marcy?

A   Yes.

GR    OCR    CM    CRR    CSR

GA55

---

1885

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,     : 04-CR-00706(FB)
                              :
                              :
        -against-             : United States Courthouse
                              : Brooklyn, New York
                              :
                              :
                              : Thursday, April 16, 2015
DAMION HARDY                  : 10:00 a.m.
AND AARON GRANTON,            :
                              :
        Defendant.            :

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S :

For the Government: LORETTA E. LYNCH, ESQ.
                    United States Attorney
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201
                BY: SOUMYA DAYANANDA, ESQ.
                    MATTHEW S. AMATRUDA, ESQ.
                    RENA PAUL, ESQ.
                    Assistant United States Attorney

For the Defendant:  BY:DAVID A. RUHNKE, ESQ.
Damion Hardy           JEAN D. BARRETT, ESQ.


For the Defendant:  BY:ROBERT M. BEECHER, ESQ.
Aaron Granton       BY:CARL JORDAN HERMAN, ESQ.
                    BY:KENDRA PANNITTI, ESQ.

Court Reporter:    VICTORIA A. TORRES BUTLER, CRR
                   225 Cadman Plaza East/Brooklyn, NY 11201
                   VButlerRPR@aol.com
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription.

VB     OCR     CRR

---

Footman - direct - Paul          1897

the jury to determine if he was a member of the CMB and his involvement in this whole world.

MS. BARRETT: Well, Your Honor, I believe the Court has to make a legal ruling about hearsay.

THE COURT: My legal ruling is that the objection is denied.

MS. BARRETT: Thank you, Your Honor.

MS. PAUL: All right.

Q    I'm going ask you a different question. I'm going to direct your attention to October of 1999. Did you go to a party on Gates Avenue during that time?

A    Yes.

Q    What kind of party?

A    A basement party.

Q    Who was there?

A    LG, everybody was there.

Q    Who was there with you?

A    Everybody from LG.

Q    When you're saying everybody from LG can you name some of them?

A    It was me, Popsie, Tion, Stack, E-Bay, my brothers and some of the females from the projects. And some other people from the projects.

Q    All right. I'm going to show you Government's Exhibit 3001-A, it's in evidence.

VB     OCR     CRR

---

Footman - direct - Paul          1901

THE WITNESS: Yes.

THE COURT: Next question.

MR. HERMAN: We're asking for a limiting instruction since this is not a charged shooting or situation. This is an enterprise act.

THE COURT: All right.

So apparently I haven't looked at the indictment recently, but this is not a particular charge in the indictment?

MS. PAUL: It's not a charge, no.

THE COURT: So, this is just part of the whole dynamics dealing with whether or not this was part of enterprise activity and you probably have heard that word a lot now during the course of the trial, I'm going to be explaining all of that to you.

But one of the elements that you are going to have to be satisfied with, whether you believe it is proved beyond a reasonable doubt, is whether this was an enterprise or what constitutes enterprise activity. I will tell you about statements of co-conspirators, you are going to have to make some determinations about that, you will hear all of that.

But for present purposes the comments by Mr. Herman are correct, this is going to be considered by you on the issue of whether or not this is part of the enterprise activity that you will be hearing about when I explain the law

VB     OCR     CRR

---

Footman - direct - Paul          1902

to you, all right?

Go ahead.

Q    All right. Now, when Wise was killed, where was World?

A    He was locked up.

Q    Did he come home after that?

A    Yeah, at some point.

Q    Do you remember how long after Wise was killed that World came home?

A    No.

Q    When you got out, did you see him?

A    Yes.

Q    Where did you see World?

A    Well, we went out to a club in Manhattan.

Q    What happened? First of all, tell us who was there. Who was with you?

A    It was me, World and Kelly.

Q    Before you move on, can you just tell us who Kelly was?

A    One of World's friends.

Q    All right. Go ahead.

A    And we was at some, it was a Tuesday night. We in front of the club and Nut pulled up and got out the truck. When he came around he was like, he was like, what's up Troub. I was like, ain't shit.

And then he turned to World and was like, he was like, he asked World what's up. World said my brother what's

VB     OCR     CRR

Footman - direct - Paul          1914

Q    Same building as you?
A    Yes.
Q    Did you ever hear World talk about JR Hamilton?
A    Yes.
Q    Who was there when that happened?
A    It was one time, it was me, World.  E-Bay and World was basically just yelling at E-Bay about he bullshitting.  He say JR still, you know, still walking around and shit and he's not getting dealt with.  He didn't get dealt with yet.
Q    Let's start with when this happened.  Do you remember when?
A    No, I don't remember the time and date.
Q    Was it before Wise was killed or after?
A    Wise was killed already.
     THE COURT:  Do you remember whether it was before or after Wise was killed, that's the question.
     THE WITNESS:  Yes.
     THE COURT:  Yes, what; you remember?
     THE WITNESS:  Yes.
     THE COURT:  When was it, before or after?
     THE WITNESS:  After.
     THE COURT:  Okay, that is his answer.
     Next question.

     (Continued on following page.)

                    VB    OCR    CRR

---

Footman - direct - Paul          1915

EXAMINATION CONTINUES
BY  MS. PAUL:
Q    He said -- you said that World said that he was bullshitting.
     What did you understand that to mean?
A    Meaning that he didn't get the job done killing him.
Q    Did you hear E-Bay say anything in response?
A    Yes.
Q    What did he say?
A    He said all right.  I'm on top of it.  I'm handling it.
Q    I'm on top of it?
A    Yes.
Q    Before that conversation, had you ever talked to World about JR?
A    I mean, it was another --
     THE COURT:  The question is whether you ever spoke to him, yes or no?
     THE WITNESS:  Yes.
Q    What happened?
A    I mean, he just -- the same thing.  He was saying that yo, you didn't get this done like.  Bullshitting.
Q    When you had that talk, who was there?
A    Second time we was out like outside and me and E-Bay and World and somebody else.  I don't remember.
Q    That's -- are you saying that that's after the first time

              GR    OCR    CM    CRR    CSR

---

Footman - direct - Paul          1920

A    No.
Q    Did you ever talk to E-Bay about World during that time?
A    During the time that --
     THE COURT:  The question is, either yes or no.
     THE WITNESS:  I'm trying to understand the question.
     THE COURT:  Did you ever talk to E-Bay about World, was the question.  Listen to the question and answer it directly.  Okay?  That's yes or no, either you spoke to him or you did not speak to him.
Q    If you don't understand my question, please just ask me to say it in a different way.  Okay?
A    Okay.
Q    All right.  Let me go back.
     Before Nut was killed, did you talk to him about -- to E-Bay about him?
     THE COURT:  Yes or no?
A    Yes.
Q    Can you tell us what you heard E-Bay say about Peanut before Peanut was killed?
A    That Nut have to get it.
     THE COURT:  That what?
     THE WITNESS:  Nut have to get it.
     THE COURT:  Nut have to get?
     THE WITNESS:  Get it.
     THE COURT:  That's what you heard E-Bay say to you?

              GR    OCR    CM    CRR    CSR

---

Footman - direct - Paul          1923

     THE COURT:  Let's see whether we can wrap it up.  It's getting repetitious.
     You can focus.  If you want to ask him about one or two other incidents where either the defendant said anything to him, you can just guide him along and ask direct questions, what was said, by whom, what was said.  That's what you are trying to elicit, I think.  Right?
     Let's move it along.
     MS. PAUL:  I will ask a question.
     THE COURT:  Let's move it along.
Q    Please tell me if you don't understand my question, all right?
A    Yes.
Q    You had a second conversation with E-Bay after Peanut was killed?
A    Yes.
Q    What did E-Bay say?
A    He said we just knocked your boy Tito off.
Q    Who is Tito?
A    Nut.  Like a nickname.
Q    He said we just knocked your boy Tito off; what did you understand that to mean?
A    Same thing as any other time.
Q    Which was that?
A    Meaning him, World and rest of the members of the CMB.

              GR    OCR    CM    CRR    CSR

GA57

Footman - direct - Paul          1924

Q   Knocked him off means kill him?
A   Right.
Q   Did you see him with anything in his hands at that time?
A   Yes; he had a gun.
Q   What kind of gun did he have?
A   40 cal.
Q   Where were you when this happened?
A   My grandmother's house.
Q   So what happened?
A   Well, I was in the back room with my brother.  Came to the back.  What's up.  Like he was like we just knocked your boy Tito off.  Like what?  He's like yeah.  All right.  That was it.  He was like -- no, no, no.  He was like yeah, I got -- Son wanted me to get rid of this gun.  But I need some money.  I need to sell it.
Q   So Son wants him to get rid of the gun.
        That's World?
A   Right.
Q   But he wants to make some money, he wants to sell it?
A   He needs some money.  He wants to sell it.
Q   That gun, that 40-caliber gun that E-Bay had in his hand that day, had you seen it before?
A   Yes.
Q   Where?
A   LG.

GR     OCR     CM     CRR     CSR

---

Footman - direct - Paul          1930

A   Yes.
Q   How did that happen?
A   I saw him and he's with Stro.  That's when I first met Stroe.  He was like yo, I want you to hold Stro down while we get the fees back pumping.
Q   The fees of the project?
A   Right.
        I was like, all right.
Q   Was that the first time you met Stro?
A   Yes.
Q   What happened after that?
A   He started selling drugs in the project.
Q   When you did so, when you went back to Lafayette Gardens, was anybody else selling there?
A   Yes.
Q   Who?
A   Jimbo, Deezo -- I mean, excuse me.  DJ.  I believe Popsie.
Q   I am going to show you Government Exhibit 13, which is in evidence.
A   Stro.
Q   You said that Jimbo, DJ and other people were selling drugs at that time?
A   Yes.
Q   Were they selling for World or for someone else?

GR     OCR     CM     CRR     CSR

---

Footman - direct - Paul          1931

A   No.  Everybody was their own work.
Q   When you started to sell, how did that start?
        Who were the workers?
A   It was me, Stro and Popsie.  Popsie had got some workers from the first floor.  He was selling the work for us.
Q   You were the lieutenants?
A   Yes.
Q   Where were the workers selling drugs?
A   In the front of 433 and around the building also.
Q   Again, it was crack cocaine?
A   Yes.
Q   Was it the same way when you had been a lieutenant back in 1995 or a worker in the early nineties, was it done the same way?
A   No.
Q   What was different?
A   We didn't have as much.  We -- we bagged up different places.
Q   Where did you bag up?
A   Either bag up at Stro house or -- or time we bagged up at my house.  Stuff like that.
Q   How about cooking, was cooking the same?
A   World cook it.  He cooked it at Stro house before.  We cooked it in -- in another place.  Somewhere in one of the apartments.

GR     OCR     CM     CRR     CSR

---

Footman - direct - Paul          1943

        Shortly after that, the workers we had, they didn't want to hustle for us no more because they didn't like how Stro was treating them.  So they left.  They stopped hustling.  Then Stro came.  Stro, listen, they don't want to hustle no more.  So he got on the phone with World.  World was telling him, tell Trouble he got to sell it.  No, no, I ain't selling.  I got on the phone with him.  All right.  You get the fuck out of the hood before I hurt you.  I said all right.  No problem.  And I left.
Q   Just to clarify one thing about that conversation.  When he's telling you to sell it, does that mean for you to hand-to-hand sell it?
A   Right.
Q   At that time you were not hand-to-hand selling?
A   No.
Q   After he told you to get out of the projects, did you leave?
A   Yes.
Q   Why?
A   I didn't want to be bothered with it.  He wanted me to sell the work.  I didn't want the situation no more.
Q   Where did you go?
A   I went back to Coney Island.
Q   Did you continue to see E-Bay?
A   Yes.

GR     OCR     CM     CRR     CSR

Footman - cross - Herman                 1962

right?

A    Yes.

Q    But you actually did shoot Munchie; didn't you?

A    Yes.

Q    And as a result of your shooting Munchie, he's now spending the rest of his life in a wheelchair; right?

A    Yes.

Q    And was Munchie the guy that you, when you got $100 once, you gave him the money?

A    Yes.

Q    And Munchie was the guy that you shot on the first day that you met him; right?

A    Yes.

Q    He supposedly was threatening some workers, right?

A    Yes.

Q    And this is the -- you shot Munchie, you threw the gun in the incinerator; right?

A    Yes.

Q    And at some other point you run into Munchie and he's in a wheelchair; right?

A    Yeah, when I came home.

Q    You came home from being locked up for shooting Munchie; right?

A    Yes.

Q    Now, why did Munchie lie and say you didn't do it?

                    VB    OCR    CRR

---

W. Name - direct/cross - Atty              2011

A    That's before, yes.

Q    And there was something about we got to get rid of the gun or something sell the gun?

A    He said someone needed to get rid of the gun, but I need some money, I need to sell this.

Q    And what did that have to do with you, did that have anything to do with you?

A    He was just saying he just wanted to get rid of -- he wanted to sell the gun basically, that's it.

Q    And was the gun sold, do you know?

A    Yeah, something happened with the gun, I'm really not too clear on it.  He got some type of money for the gun.  I don't know if we sold it to somebody or we kept it or whatever, but yeah.

Q    And after Peanut -- now, Peanut was someone that a lot of people knew, right?

A    Yes.

Q    And you had been trying to kill Peanut as well, right?

A    Yes.

Q    And was that like a big topic of conversation among people after Peanut got killed?

A    Yes.

Q    And a lot of people talking about it?

A    Yes.

Q    Now, you also told us about that.  I mean there was a

                    SAM    OCR    CRR    RPR

---

Footman - redirect - Paul                 2051

Q    Did you have problems with any of those people, your own problems?

A    No.

Q    And you talked about 456 DeKalb, a robbery that you did, and you gave the drugs away to somebody else?

A    Yes.

Q    Who did you give the drugs to?

A    To World brother, Deckie.

Q    And you had shot at all of these people on World's behalf.  Did you consider yourself his hit-man?

A    I don't, I don't know how to answer that.

Q    Do you consider yourself a shooter?

A    I guess.  I don't know.  I don't know how to answer that.

        THE COURT:  Well, if World told you to shoot somebody, you would do it; right?

        THE WITNESS:  Yes.

        THE COURT:  That was all you needed to know; right?

        THE WITNESS:  Yes.

        MS. BARRETT:  Objection, Your Honor.

        THE COURT:  I am just trying to get clarification.

        Who is objecting?

        I just want to get clarification that you would just shoot people if somebody told you to shoot people; right?  No compunctions about that.  You are not going to do that today, are you?

                    VB    OCR    CRR

---

Footman - redirect - Paul                 2052

        THE WITNESS:  No.

        THE COURT:  That is in the past; right?

        THE WITNESS:  Yes.

        THE COURT:  You are out there, we do not have to worry about you; right?

        THE WITNESS:  No.

        THE COURT:  Next question.

BY MS. PAUL:

Q    All right.  You talked about your curfew when you were out on bail and you said that you had a job.  What time did that job start?

A    I had to leave like, 6:00 o'clock in order to get there on time.

Q    In the morning?

A    Yes.

Q    And how did you feel about working?

A    I felt good about working.

Q    Why?

A    I had --

        MS. BARRETT:  Objection, Your Honor.

        THE COURT:  How did you feel about working; is that what the question was?

        MS. PAUL:  Yes, Judge.  We're talking about his job and how he felt about working.

        THE COURT:  I do not know that this was even covered

                    VB    OCR    CRR

2061

now. Go ahead. What else?

MS. BARRETT: Your Honor, I would ask that -- first of all, I object strenuously to the notion that the Court would be taking the position in front of the jury that the government's witness who has led a heretofore life of crime --

THE COURT: Ms. Barrett, with all due respect, I will tell the jurors not to pay attention to what I have said. Between you and me, what he said was just to me so incredible that I would be happy with the fact that his testimony was elicited the way it was. I don't think that the jury is going to give much credibility to this type of a witness. Maybe I am wrong. But I would think you would be happy with all that. But you are not. You are making a record. I understand.

Anything else?

The government objects to this also?

MS. DAYANANDA: No, not at all.

THE COURT: What else? You are doing a good job for your client. What else?

MS. BARRETT: That's the -- that's what we object to, Your Honor.

THE COURT: I understand that. Okay.

MS. BARRETT: And the implication of rehabilitation is that the jury -- that he is not lying on the stand.

THE COURT: There was so much that was asked of this witness. I don't want to go over it. The jury heard it all.

GR    OCR    CM    CRR    CSR

---

2066

THE COURT: Okay. 3:45.

(Recess taken.)

(The following occurred in the absence of the jury.)

THE COURT: Bring the jurors back in.

You have this all lined up ready to play?

MR. AMATRUDA: Yes, Your Honor. It will be seamless, Your Honor.

(Jury present.)

THE COURT: Members of the jury, before we proceed with the next witness, let me clarify something.

I told you early on that if I ask any questions, I have asked a few questions, it was solely for the purpose of trying to move things along, when I thought things were repetitious, I thought it was possibly confusing.

I also told you that I would ask those questions if I thought that if I were confused about something, maybe you folks were confused as well and you are not allowed to ask any questions. I am your surrogate to that extent. If I am confused, maybe you are confused.

But the last series of questions were designed to just clarify because I was confused. Maybe you were. Maybe you were not. It is your recollection that counts, your analysis of the evidence that counts, not mine. I was just trying to clarify since I heard so much about this person shooting people and I was not clear whether it was just World

GR    OCR    CM    CRR    CSR

---

2067

or other people would ask him to shoot people or whether it was then or now or whatever. All of that is just trying to clarify that.

His credibility is for you to assess. You have heard all of his testimony. You will listen to all of his testimony and decide whether or not he was telling you the truth or not when he said that World told him to shoot. You have to decide that for yourself. I just wanted to find out what the shooting was all about since I thought there was some confusion.

You observed, sometimes it is difficult to understand what he is saying. There were a couple of times when I asked him to repeat and be a little more clear. He to me just didn't sound like I could understand him all the time. So I tried to interject with him maybe more than with the other witness since I had a hard time understanding him, asking him to repeat, to clarify things. You saw that happen on a number of indications.

The important thing for you to realize, once again, is that I am not telling you whom to believe or not to believe. I am just trying to get the information out so you have it all, for you to assess the witness' credibility and all the other witness' credibility. That's part of your fact finding responsibility. I have no opinion about that issue. Whether you believe him, whether you don't believe him, that's

GR    OCR    CM    CRR    CSR

---

2068

strictly up to you.

I just want to tell you that because his testimony at the end of this was a little bit focused and pointing in that direction. I don't want that to be a distortion. Look at the totality of his testimony to assess his credibility. I was just trying to be helpful at the end of a long, long trial and at the end of this particular day, at the end of lengthy questioning back and forth of this witness. That's the way it really works in the real world. There is cross-examination, there is redirect, there is recross. You saw that played out here. I was just trying to end it all and bring it altogether. I just want you to know that.

Whom do we have now?

MR. AMATRUDA: Your Honor, we have Marko Vulich. I believe he's number 25.

THE COURT: Okay. Go ahead.

THE CLERK: Good afternoon.

Please stand and raise your right hand.

(Witness affirmed by clerk.)

THE CLERK: Please have a seat. Please state and spell your name.

THE WITNESS: Detective Marko Vulich, M A R K O, V U L I C H.

THE CLERK: Thank you.

MR. AMATRUDA: Your Honor, just so the record is

GR    OCR    CM    CRR    CSR

2104

Judge.

THE COURT: We will try to get a draft of the charge. Maybe we will send it off to you tomorrow sometime during the day.

Mr. Ruhnke, what is it that you wish to say?

MR. RUHNKE: No. I am just standing up, Your Honor. Sorry.

THE COURT: Ms. Barrett, do you have any comments? Do you want to renew your objections?

MS. BARRETT: I think once is enough.

MR. RUHNKE: I do think it is possible that the government is going to be pressed to rest by Tuesday.

THE COURT: It seems that's the case.

MS. DAYANANDA: I --

MR. RUHNKE: We are so far ahead of schedule. I am not worried about it.

MS. DAYANANDA: We are. There are a couple of more other witnesses, Your Honor.

THE COURT: That's okay. We will have the gentlemen who Mr. Beecher wants to talk to here Monday morning. We will have ample opportunity for you to speak with them. So everything is proceeding nicely. But defense would be well advised to be prepared for your case such as it may or may not be by Tuesday.

MR. RUHNKE: Yes, sir.

GR        OCR        CM        CRR        CSR

---

2109

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, )
                   Plaintiff, ) 04CR00706 (FB)
                                    )
V.                                  ) United States Courthouse
                                    ) Brooklyn, New York
DAMION HARDY AND ARRON  ) MONDAY, APRIL 20, 2015
GRANTON,                         ) 10:00 a.m.
                   Defendants. )
_____)

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
SENIOR UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:
FOR THE GOVERNMENT:        LORETTA LYNCH
                                           United States Attorney
                                           Eastern District of New York
                                           BY: SOUMYA DAYANANDA
                                           BY: MATTHEW S. AMATRUDA
                                           BY: RENA PAUL
                                           Assistant United States Attorneys
                                           271 Cadman Plaza East
                                           Brooklyn, New York 11201

FOR DEFENDANT HARDY:     RUHNKE & BARRETT
                                           BY: JEAN D. BARRETT, ESQ.
                                           BY: DAVID A. RUHNKE, ESQ.
                                           47 Park Street
                                           Montclair, New Jersey 07042

FOR DEFENDANT GRANTON:  LAW OFFICE OF ROBERT M. BEECHER
                                           BY: ROBERT M. BEECHER, ESQ.
                                           67 Wall Street, Suite 2211
                                           New York, New York 10005

NICOLE CANALES, CSR, RPR

---

Simon - Direct - Dayananda        2118

the sidewalk.

Q    What happened then?

A    Then three shots -- I heard three shots, and I kind of ducked to the left side of the wall where the club was and hopped in my truck, and that's when he pulled off. And halfway down the block I noticed that his car had flipped over.

Q    Mr. Simon, I'm going to show you what's been entered already into evidence as 801I. Do you recognize this photo?

A    Yes.

Q    Can you tell us what this is a photo of?

A    This is actually the block of the club. The club is on the left-hand side, and I believe that's actually Spring Street that I'm looking down.

Q    Okay. And if you touch the screen --

A    Okay.

Q    -- you can actually show us, if you think -- if you could show us about where your car was parked, where you saw Peanut on the morning of August 10th, 2000?

A    Okay. My car is parked on the left -- right here (indicating). That's where my car is. And then his car was parked -- pulled up in front of that car, so in that space right there (indicating.)

Q    Is there a reason why your car was parked there, at that time?

NICOLE CANALES, CSR, RPR

---

Simon - Direct - Dayananda        2119

A    Yes, because there's a door to the club that the VIPs leave through, that door that's in front of those cars.

Q    You can mark the door.

A    So the door is right here (indicating.) That's the VIP door.

Q    Is there a separate entrance to the club as well?

A    Yes, there's another entrance on this far side, more to the left.

Q    And would that be Hudson?

A    Yes, that would be Hudson. There's a door on Hudson also.

Q    From what we're seeing, you said this is Spring Street; is that right?

A    Yes, that is.

Q    When you said you were talking to Peanut, you said you were in the driver's side window?

A    Yes.

Q    Was anyone else inside the car?

A    No, he was by himself.

Q    Were you facing him through the front or to the side?

A    I was --

Q    You can demonstrate.

A    Well, I was actually in the window with my side facing down Spring, so my back is to Hudson.

Q    Okay. So to be clear, your back is to that corner that

NICOLE CANALES, CSR, RPR

Simon - Direct - Dayananda                    2120

we see here?

A    Yes.

Q    Now, when you heard the, you said, three gunshots, where were they coming from?

A    From the back of me.

Q    That would be Hudson?

A    Yes.

Q    And at the time you heard the gunshots, what did you do?

A    I actually moved over into that corner that's right here. There's like a little crevice.  There's crevices in those corners that you can actually stand, so I kind of moved over to that left until I could get to my car.

Q    What did you see Peanut do?

A    By that time, he had already pulled off from the -- he screeched off from the sidewalk.

Q    When you said screeched off, what do you mean?

A    Like, he pulled off very fast, very, very, very, fast.

Q    And once you saw him pull off, then did you go to your car?

A    Yes, I did.

Q    And what did you see then?  What did you do then?

A    Everybody was kind of in a -- you know, in a scurry for the shots, so I was kind of -- at the time, my friends were still waiting -- were in the club, but they came out at that time, like when they heard the shots.  We all hopped in the

NICOLE CANALES, CSR, RPR

Simon - Direct - Dayananda                    2121

car, and then we tried to get off the block, but by that time, you know, the accident had already happened, so we couldn't go too much further.  And I also stopped to make sure he was okay, at that time.

Q    He, meaning who?

A    Peanut.

Q    Okay.  And did you see the car flip, at that point?

A    Yes, I did.

Q    Now, using that photo, generally, can you tell us where that happened?

A    Yes, I'm still in my car here, and he flips here.

Q    And do you remember what street corner that was?

A    I want to believe -- that's actually better I can, corner of Varick.

Q    And what happened once you got to that location?

A    He was hanging out the window, and there were people trying to rob him, at that time.

Q    Did you -- rob him of what?

A    He had his jewelry, his watches, you know.  He had a lot of expensive things on that night, so as he's halfway out the window, people are trying to take his watch and jewelry off.

Q    Now, at that time -- what time would you estimate this incident occurred?  I know it's been a long time, but at the end of the club night?

A    I want to say around 4:00 --

NICOLE CANALES, CSR, RPR

Simon - Direct - Dayananda                    2122

Q    A.m.?

A    A.m., in the morning.

Q    The corner of Spring Street and Hudson, was it crowded at that time?

A    Yes.

Q    From the clubgoers?

A    Yes, from the clubgoers.

Q    And at that corner, where you saw the car had ultimately crashed, was it crowded there as well?

A    Yes, it had -- it wasn't crowded at first, but by the time I got in my car and drove to the scene, it was extremely crowded.

Q    Let me show you Government Exhibit 801A.  Do you recognize that photo?

A    Yes.

Q    And what's that a photo of?

A    That's a photo of -- actually the corner of 6th Avenue and Spring, but it's from -- it's from the actual -- it's from -- it's actually the picture but closer, now that it's closer now.

Q    And is that where the crash happened that you saw?

A    Yeah, close to -- maybe a little higher.  Maybe a little closer.  Maybe in the middle of the block.  Not so much right there.  Maybe closer, in the middle of Spring, because this is the actual corner of -- closer to 6th.

NICOLE CANALES, CSR, RPR

Simon - Cross - Beecher                    2129

Q    Now, when you got over to where the Range Rover was flipped over, you mentioned that there were some people, basically, robbing Mr. Davis as he hung out of the window?

A    Yes.

Q    That's what you saw?

A    Yes.

Q    Did you tell the police about that?

A    Yes.

Q    Does the name Puerto Rican Mike mean anything to you, anything at all?

A    No.

Q    And you saw them taking his watch off, and he was wearing other jewelry?

A    Yes.

Q    Did you see them run up to him, or were they just there when you got there?

A    They were actually leaving when I got there.

Q    They were leaving?

A    They were, like, scattering when I got there.

         MR. HERMAN:  I don't have any further questions.

         THE COURT:  Anything further from the government?

         MS. DAYANANDA:  Yes, two things, your Honor.

REDIRECT EXAMINATION

BY MS. DAYANANDA:

Q    Mr. Simon, you were asked about what you thought Peanut's

NICOLE CANALES, CSR, RPR

Simon - Redirect - Dayananda          2130

relationship was with Lil' Kim.  Where had you seen them together?

A    I had seen them in Brooklyn together, and, plus, I had seen them in videos.  He's a primary, I want to say, aspect of -- in her first video coming out with Biggie Smalls, so --

Q    What video was that?

A    I want to say "Get Money."

Q    And when you say a primary person, he's featured in that music video?

A    He's featured in the music video.

Q    Back in August 2000, did you speak to the police that day?

A    Yes, I did.

MS. DAYANANDA:  Thank you.

THE COURT:  All right.  Next witness.

MS. PAUL:  Next witness will be Edward St. John.

THE CLERK:  Good morning.

THE WITNESS:  Good morning.

THE CLERK:  Ask you to remain standing, and if you could raise your right hand.  Do affirm to tell the truth?

THE WITNESS:  I do.

THE CLERK:  Thank you.  Please have a seat.  Please state and spell your name.

THE WITNESS:  Edward St. John.

NICOLE CANALES, CSR, RPR

---

St. John - Direct - Paul          2131

EDWARD ST. JOHN,

called as a witness by the government, having been first duly sworn, was examined and testified as follows:

THE COURT:  Your witness.

MS. PAUL:  Thank you.

DIRECT EXAMINATION

BY MS. PAUL:

Q    Good morning.

A    Good morning.

Q    Are you employed?

A    Yes, I am.

Q    Where?

A    North Carolina, for a contract security company.

Q    Where did you work before that?

A    New York City Police Department.

Q    How long were you a police officer with the NYPD?

A    Ten years a police officer, ten years a detective, for a total of 20.

Q    All right.  And what grade detective were you when you retired?

A    Third grade.

Q    When did you retire?

A    June of 2008.

Q    In September of 1999, what precinct were you working in?

A    79 Precinct in Brooklyn.

NICOLE CANALES, CSR, RPR

---

St. John - Direct - Paul          2132

Q    The 79th Precinct?

A    Yes, ma'am.

Q    I'm going to direct your attention to September 8th of '95.  Were you working that day?

A    Yes, I was.

Q    Were you working alone or with somebody else?

A    I was working with my partner, Police Officer Dillon.

Q    What was your job that day?

A    We were assigned to patrol in a marked up police car.

Q    At about -- what tour were you working?

A    It was a midnight shift.  It was 23:15 hours by 07:50 in the morning.

Q    Okay.  So that's 11 --

A    11:15 p.m. to 7:50 a.m.

Q    Military time?

A    Sorry.

Q    So at about 1 o'clock, 1:50 in the morning, what happened?

A    We received a call for a person shot at 534 Marcy Avenue.

Q    What happened after you got that call?

A    My partner and I responded to the sixth floor hallway at that location.

Q    And that location, is that within the Marcy Housing Projects?

A    Yes, it is.

NICOLE CANALES, CSR, RPR

---

St. John - Direct - Paul          2133

Q    So when you got to the sixth floor stairwell, what did you see?

A    I observed a male black, probably about 17, 18 years old, and had a numerous gunshot wounds.

Q    Did you later learn his name?

A    Yes, I did.

Q    What was his name?

A    Damion Hardy -- I'm sorry.  Marcel Kennedy.  I'm sorry.

Q    Did you speak to him?

A    Yes, I did.

Q    How long was your conversation with him?

A    I might have been up there for maybe a minute.

Q    And did he say anything to you during that minute that caused you to do something else?

MR. RUHNKE:  Your Honor, I'm going to object to that.

THE COURT:  Sustained.  Rephrase the question.

Q    What did he say to you?

MR. RUHNKE:  Objection.

THE COURT:  What was the question again?

MS. PAUL:  I'm asking if he said anything --

THE COURT:  If who?  Who said?

MS. PAUL:  Marcel Kennedy said anything to the detective that caused him to do something else, your Honor.

THE COURT:  What's the nature of your objection?

NICOLE CANALES, CSR, RPR

St. John - Direct - Paul                2134

MR. RUHNKE:  The nature of the objection is that this is obvious -- hearsay.

THE COURT:  Well, all right.  So my apologies.  I'm preparing for another trial, so I wasn't paying as much attention as I should have.  So this is another situation where at the very least the question is being asked of the witness not necessarily for the truth, but to see whether as a result of getting that information he then took some action.  So, once again, it's another example of that type of situation.  He can testify as to what was said to him.

And if, in fact, you needed that information to do something else, right?

THE WITNESS:  Yes.

THE COURT:  We're allowing it for that purpose.  My apologies for not paying attention.

Go ahead.

Q    What was that that he told you that caused you to do something else?

A    He told me -- he said "World" did it.

Q    And at the time you were working at the 79th Precinct, were you familiar with a person by the name of "World"?

A    Yes.

Q    Did you know his real name?

A    Yes, I did.

Q    What was his real name?

NICOLE CANALES, CSR, RPR

---

St. John - Direct - Paul                2135

A    Damion Hardy.

Q    And as a result of what Mr. Kennedy said to you, what did you do next?

A    We knew that Damion resided -- or we assumed he resided in Lafayette Gardens, so we proceeded towards that location.

Q    While you were proceeding to that location, did you get additional information that caused you to look for anything in particular?

A    We had a description of a vehicle that might have been used in connection with a grey station wagon.

Q    What happened next?

A    We were driving towards Lafayette Gardens.  I don't remember what street we were on.  I think it was Myrtle Avenue.  We observed the grey station wagon pull away from the side of the curb, occupied by two male blacks.

Q    What happened next?

A    We followed the vehicle for several blocks, and we finally stopped it on, I believe Nostrand Avenue, just off on of the Willoughby Avenue.

Q    When you stopped the car, what kind of car was it?

A    It was grey, I believe, Chevy station wagon.

Q    You said there were two people in the car.  Did you later learn who they are?

A    Yes.

Q    Who were they?

NICOLE CANALES, CSR, RPR

---

St. John - Direct - Paul                2136

A    The driver was Damion Hardy; the passenger was James Sessoms.

Q    All right.  So after you stopped the car, what happened next?

A    I'm sorry.

Q    After you stopped the car, what happened next?

A    We removed both people from the car.

Q    Okay.  I'm going to show you Government Exhibit 302.

MS. PAUL:  Which is not yet in evidence, your Honor.  It's 302, and it may not be on your list, your Honor.

THE COURT:  Trying to find it.  Go ahead.  What's your question?

Q    I'm going to show it to you.  Do you recognize it?  You can't see it very well.  I can walk it up to you.

A    I can see it.  It's the vehicle voucher for the '91 Chevy Caprice station wagon that I vouchered for the scene.

MS. PAUL:  I'm going to offer it, at this time.

THE COURT:  Any objection?

MR. RUHNKE:  No objection.

THE COURT:  The voucher is in evidence.

(Government's Exhibit 302  was received in evidence.)

MS. PAUL:  Thank you.

Q    I'm sorry.  You said it was a '91 Chevy Caprice.  And did you indicate a license plate number?  I don't know if you can

NICOLE CANALES, CSR, RPR

---

St. John - Direct - Paul                2137

read that on your copy.  It's a grainy copy of the voucher.

A    It looks like K2M2599.  I can't really see it on this copy.

Q    All right.  So after you stopped Mr. Hardy and Mr. Sessoms, what happened next?

A    I asked them their names, and the driver told me he was Damion Hardy; the passenger told me James Sessoms.  At the time, we transported both of them to Elmhurst Hospital.

Q    What happened there?

A    We did a show-up with the victim?

Q    What's a show-up, for the jury?

A    He was shot numerous times.  We weren't sure if he was going to live or not, so we brought both people to -- basically to the hospital, and asked them -- Mr. Kennedy if he can ID them.

Q    What was Mr. Kennedy's -- apart from being in the hospital and shot up, do you know where he was in the hospital when that happened?

A    I believe the emergency room; he was on the stretcher.

Q    All right.  Were you the arresting officer on this case?

A    Yes.

Q    What does that mean?

A    I placed both subjects into custody.

Q    Apart from that, do you also fill out paperwork as the arresting officer?

NICOLE CANALES, CSR, RPR

St. John - Direct - Paul                2138

A    Yes, I did.

Q    Did you do so related to your stop of Mr. Hardy and Mr. Sessoms?

A    Yes.

Q    And the shooting of Marcel Kennedy, was part of that -- as part of that, did you collect information about the arrest?

A    Yes, I did.

Q    Were you giving a voucher for ballistics recovered at the scene of the shooting?

A    Yes, ma'am.

Q    And do you remember the voucher number as you sit here?

A    No, I do not.

MS. PAUL:  If I can just for the witness --

THE COURT:  Is this in evidence, by the way?

MS. PAUL:  It's not.  I'm showing 3500ES4, which is just for -- not to be offered.  Just to refresh his memory.

THE COURT:  This is not going to be put in evidence. It's just to refresh your memory.  Take your time to see whether it jogs your recollection now.

THE WITNESS:  It's good like that.  Yes, that was vouchered by, I believe, a housing officer, in regards to the shooting.

Q    Okay.  Is your memory refreshed about the number?

A    That's the voucher connection with the case, yes.

Q    Well, I'm showing you -- let me bring it up to you so

NICOLE CANALES, CSR, RPR

---

St. John - Direct - Paul                2139

that you can see it.

THE COURT:  What are you trying to adduce here?

MS. PAUL:  The voucher number, your Honor.

THE COURT:  You need the voucher number?

MS. PAUL:  Yes.

THE COURT:  Is that voucher in evidence?

MS. PAUL:  No.

THE COURT:  So why do you need the number, then?

MS. PAUL:  Your Honor, it's regarding ballistics.

THE WITNESS:  Okay.

Q    Okay.  I see you also have your memo book there.  If it's easier for you to refresh your memory with your memo book --

A    You need me to read the voucher number?

Q    Yes.

A    It's G044950.

Q    And you said that you arrested Mr. Hardy and Mr. Sessoms. After that, do you know what happened to the case?

A    No, I do not.  I believe it was deferred.

Q    What does that mean, "deferred"?

A    That the D.A.'s Office didn't want to prosecute, at that time.

MS. PAUL:  No further questions.

THE COURT:  Any cross-examination?

MR. RUHNKE:  Yes, your Honor.

NICOLE CANALES, CSR, RPR

---

St. John - Cross - Ruhnke                2140

CROSS-EXAMINATION

BY MR. RUHNKE:

Q    Good morning.

A    Good morning.

Q    This shooting, as you told us, occurred on the sixth floor of the projects?

A    I believe so.

Q    And, as you say, the case was not prosecuted against Damion Hardy, correct?

A    That's correct.

Q    And the case was prosecuted, though, against a guy named Robert Footman; is that correct?

A    I do not know.

Q    Okay.  And you testified that Mr. Kennedy, Marcel Kennedy, was 17 years old at the time he was shot?

A    Approximately.

Q    Do you know how many times he was shot?

A    In my memo book I wrote eight to ten times.

Q    Eight to ten times?

A    I do not know exactly.

Q    It's refreshed by your book?

A    Yes.

Q    This is 20 years ago, right?

A    Yes.

MR. RUHNKE:  Nothing further.

NICOLE CANALES, CSR, RPR

---

White - Direct - Paul                2173

been sitting in front of his property for the last three weeks.  So I investigate by running the tags through NCIC, PCIC.  Information came back it was wanted for leaving the scene of a homicide in New York.

Q    Okay.  And you just said NCIC and PCIC.  Are those databases that you use?

A    That's correct.  Also radioed, and also we have an MDT inside our vehicle that we use, too.

Q    All right.  So those -- that's where you learned of the alert that this car was related to a homicide in New York?

A    That's correct.

Q    And you said that off-duty Officer Jones saw the car sitting on his property.  That's his home?

A    In front of his property.

Q    I'm going to show you one exhibit that is not yet in evidence 1,006B.  Do you recognize that?

A    Yes, that's the tag.

Q    That's the tag of the vehicle that you found on August 23rd, 2003?

A    Yes, that is.

MS. PAUL:  I'll offer it, at this time.

THE COURT:  All right.  In evidence.

(Government's Exhibit 1006B  was received in evidence.)

Q    I'm going to show you 1,006A and B, together on the

NICOLE CANALES, CSR, RPR

GA65

Proceedings 2174

screen there. Can you tell us what that is?

A Yes, the top picture is the vehicle, the minivan investigated, and also the tag that was on top on the vehicle.

Q All right. So after you saw the vehicle, did you observe the outside of the vehicle?

A Yes, I looked on the exterior of the vehicle, and then I notified the detective relative to the information I received over the police radio, and also on my computer inside the vehicle, in reference to the information I received.

Q And from the outside of the vehicle, was there anything to you that indicated that it had been broken into, in any way?

A No.

MS. PAUL: Nothing further.

THE COURT: Any questions of this witness?

MS. BARRETT: No, your Honor.

MR. HERMAN: No, your Honor.

THE COURT: You may step down. I think we can take our mid-morning break, about 15 minutes now, and then when you return, we'll have more witnesses. Don't talk about the case.

THE CLERK: All rise.

(Recess in proceedings.)

(Outside the presence of the jury.)

THE COURT: Let's bring the jurors back. Do we have a witness ready to come into the court?

NICOLE CANALES, CSR, RPR

---

Proceedings 2177

be testifying, perhaps, most of the afternoon, if not all of the afternoon. And then there will be a few more witnesses, probably, maybe tomorrow morning, so I think the way we're proceeding is that the government probably will rest, as the saying goes, in other words, will have presented all of the evidence it wishes you to consider sometime tomorrow morning. And be patient if we have to deal with these types of issues that do crop up from time to time.

In the meantime, we're ordering lunch for you today. Its a rainy day. And, Mr. Innelli, I guess you were pretty good at coordinating things, so lunch will be here at 12:30. And you can relax and not go out into this terrible weather today. Let's see who we have now.

MS. DAYANANDA: Ashabudeen Sakoor, Number 17 on your list.

THE CLERK: Good afternoon, Mr. Sakoor. Ask you to please stand, and raise your right hand. Do you affirm to tell the truth?

THE WITNESS: Yes.

THE CLERK: Please state and spell your name.

THE WITNESS: Ashabudeen Sakoor, A-s-h-a-b-u-d-e-e-n; last name is S-a-k-o-o-r.

ASHABUDEEN SAKOOR, called as a witness by the government, having been first duly sworn, was examined and testified as follows:

NICOLE CANALES, CSR, RPR

---

Sakoor - Direct - Dayananda 2183

Q Did there come a time when you and Shawn entered a drug transaction?

A Yes.

Q Can you tell the jury what led to that?

A He asked me if I could help him get some heroin for a friend of his, and I got him ten grams of heroin.

Q Were you involved in drug selling, at that point?

A Yes.

Q And this would be in early 2002; is that right?

A Yes.

Q Did you meet anyone else with Shawn?

A The guy that bought the drugs, but I don't remember his name.

Q And were you paid for that, those ten grams of heroin?

A Yeah.

Q Do you remember where you provided that to him?

A Excuse me?

Q Do you remember where you gave that to Shawn?

A I think it was in College Point, by my house.

Q He had been to your house; is that right?

A Yes.

Q Now, at that time, this is early 2002, were you involved in heroin and cocaine or just selling heroin?

A A little bit of both. A little bit of both.

Q And did you mention that to Shawn?

NICOLE CANALES, CSR, RPR

---

Sakoor - Direct - Dayananda 2184

A Yes.

Q Going to direct your attention to July 11th of 2002. What happened to you that day, Mr. Sakoor?

A I was kidnapped.

Q Can you tell the jury, first of all, where that occurred?

A That occurred at a topless bar called Good Vibrations in College Point.

Q What time did you get to the bar that evening?

A Around 12:00, 12:30.

Q That would be 12:30 a.m.?

A 12:30 a.m., yes.

Q Before you got to the club, where were you?

A Home.

Q Home, College Point?

A Yes.

Q Do you remember how you got to the club that day?

A I think a friend of mine's gave me a ride.

Q When you got to that club, did you speak to anyone inside?

A When I was inside, yeah, I spoke to a couple -- an individual.

Q Did you know that person?

A No.

Q Do you remember what you talked about while you were inside?

NICOLE CANALES, CSR, RPR

GA66

Sakoor - Direct - Dayananda                    2185

A    We were just talking, just basically about the girls on stage, and I think shoes, and that's about it.

Q    Did there come a point when you left the club?

A    Yes.

Q    Can you tell the jury what happened?

A    I borrowed a bouncer's phone and went outside to call a cab, and go home, and two gentlemen approached me on both sides with guns out, and they put it to my back and told me to go across the street.

Q    This is standing outside the club; is that right?

A    Yes.

Q    You said two gentlemen.  Had you seen those two individuals before?

A    No.

Q    Did they each have a gun?

A    Yes.

Q    Did you see the guns?

A    Yes.

Q    Can you describe either of them?

A    Just both of them were black.

Q    Were they large guns or smaller?

A    They was like handguns, about this big (indicating).

Q    What did you do when they approached?

A    I walked across the street.

Q    What did you do?

NICOLE CANALES, CSR, RPR

Sakoor - Direct - Dayananda                    2186

A    We walked across the street, and then the van door opened, and there was another gentleman with a machine gun in the backseat, and they pushed me in the van.  I tried to fight them off, and I couldn't.  And they grabbed me and duct-taped my hands and feet, and threw me in the van.

Q    Now, you said there were two individuals who first approached you, right?

A    Yes.

Q    And was there another person with the gun?

A    It was a driver, and then I think there was one in the back.

Q    So how many people in total were in that van?

A    Four.  And then the guy from inside came out later.

Q    The guy from inside?

A    That I was speaking to, yes.

Q    He also entered the van?

A    Yes.

Q    And you said there was a guy holding a machine gun; is that right?

A    Yes.

Q    Could you describe that gun?

A    It was like this big, black, with a -- with wood on it, wood grip.

        THE COURT:  About two feet?

        THE WITNESS:  Yeah, it was like an AK-47.

NICOLE CANALES, CSR, RPR

Sakoor - Direct - Dayananda                    2187

Q    And for the record, you had -- about two feet up, is that -- was that the length of it, you said?

A    Yeah, about this big.

Q    Once you were in the van, you said you started fighting a little bit?

A    Before I got into the van, yes.

Q    Then what happened?

A    They all wrestled me into the van.

Q    What happened inside the van?

A    They duct-taped me and put me on the floor.

Q    When they duct-taped you, what did they duct tape?

A    Excuse me?

Q    What part of your body did they duct tape?

A    My hands, and my feet, and then they later duct-taped my eyes up.

Q    Were your hands in front of you or behind you?

A    I think they were in front of me.

Q    Now, once you were in the van and you were duct-taped, is that when they put the duct tape on your eyes, you said?

A    Yeah, they put me in supine, and then was asking me questions, and then they duct-taped my eyes.

Q    What types of questions were they asking you?

A    That they wanted $250,000, and I had to take them to where the money was at.

Q    Did you notice any other vehicles in the area, at the

NICOLE CANALES, CSR, RPR

Sakoor - Direct - Dayananda                    2188

time?

A    Not at the time, but later, yes.

Q    Where is that?

A    We stopped somewhere, and another car pulled up, and somebody jumped into the van.  And the person that jumped in the van was on the phone talking to someone, and they were saying, listen, we know you got the money, we know you got the money.  And then they decided to take me to my sister's house.  When he got out the van, went back into the other car, and drove me to my sister's house, then I informed them my sister worked for the police.  And that's when they got angry, put me back in the van, took me to Brooklyn.  I don't know it was Brooklyn until later, though.

Q    Let me stop you there.  You said another person entered the van and was on the phone; is that right?

A    Yes.

Q    Did you hear what, if anything, that person was saying on the phone?

A    He was talking to somebody on the phone, saying, listen, we got him, and he's saying he doesn't have the money.  And I guess the other person was telling him that he has the money, he has the money.

Q    And at that point, you were still in the van, right?

A    Yes.

Q    Now, from the club, you said you went to your sister's

NICOLE CANALES, CSR, RPR

Sakoor - Direct - Dayananda                2189

neighborhood?

A    Yes.

Q    Where is that?

A    Flushing, Queens.

Q    Was that nearby?

A    Yeah, about 10, 15 minutes.

Q    What kind of neighborhood is Flushing?

A    It's a nice neighborhood.

Q    Why did you end up at your sister's place?

A    Because they though the money was there.

Q    Did you direct them to your sister's place?

A    I think they knew where it was, and I might have told them it was in Flushing.

Q    Did you tell them then that your sister works for the police department?

A    Yes.

Q    What happened then?

A    They got angry and threw me back in the van.

Q    Then what happened?

A    We drove for awhile, and then we stopped.  We stopped somewhere.  It was by a highway, because I know I heard the cars, and they let me use the bathroom.  And then we proceeded somewhere, and then they took me out and carried me into a building.

Q    Did you know where you were, at that point?

NICOLE CANALES, CSR, RPR

---

Sakoor - Direct - Dayananda                2190

A    No, not yet.

Q    How many people were with you, at that point?

A    I don't know.

Q    Where did you go once you got --

A    I was blindfolded still.

Q    Where did you go once you got to that building?

A    We went upstairs, some stairs, and then into an apartment, and they threw me in a room on a bed.

Q    At that point, how many people were there?

A    I'm not sure.  I just heard maybe, like, three, four people talking.

Q    Then what happened?  About what time do you think this was?

A    I don't know, like, two, three hours, after they got me in front of the club.

Q    You said they threw you on a bed?

A    Yes.

Q    And were you still tied up, at that point?

A    Yes, I was duct-taped.

Q    What happened next?

A    It got quiet, and then as the night -- as the night went on, the duct tape stopped sticking on my hands, and when I got one of my hands free, I lifted up the one that was over my eyes, and I seen the guy sitting in the doorway with the gun on his lap.  So I seen the scissors on the floor, and I picked

NICOLE CANALES, CSR, RPR

---

Sakoor - Direct - Dayananda                2191

up the scissors and cut myself free, and I tried to leave the apartment.  When I tried to leave the apartment, he had a fan blowing on him, and I bumped into a wire, and he jumped up and pulled the gun up on me.  And when he pulled the gun up on me, I put it under my armpit, and me and him wrestled for the gun for about half an hour to an hour threw this apartment.  When I dragged him to the door, and I got the door open, and I seen a neighbor, and told the neighbor if they could call the cops for me.

Q    What happened then?

A    His associate came, and they wrestled me back down and hogtied me in the bedroom.  And then, like, ten minutes later the cops kicked the door in and rescued me.

Q    So Mr. Sakoor, I just want to clarify here, Government Exhibit 38, Shawn, did you see him at all the night you were kidnapped?

A    No.

Q    Showing you Government Exhibit 33, do you recognize this person this has been entered into evidence?

A    He looks familiar, but not off the top of my head right now.

Q    I'm going to show you what's also been entered into evidence as Government Exhibit 900G.  Do you recognize that photo?

A    Yeah, that's the apartment.

NICOLE CANALES, CSR, RPR

---

Sakoor - Direct - Dayananda                2192

Q    Is that the bed that you said that they threw you on?

A    Yes.

Q    So to back up, you said at some point the duct tape wasn't sticking anymore?

A    Yeah, it was hot in this apartment.

Q    Do you remember when?

A    July 11th.

Q    At that point, when you were able to see who was left in the apartment, was there more than one person?

A    I couldn't see behind him, I could just see him in the doorway.

Q    And you said there was a gun on his lap; is that right?

A    Yes.

Q    I'm going to show you what's been entered as Government Exhibit 903A, which has not been entered as of yet.  I'm going to show you Government Exhibit 903A.  Do you recognize this photo?

A    Yeah, that's the machine gun.

        MS DAYANANDA:  The government moves to admit 903A into evidence, at this time.

        THE COURT:  All right.  No objection.  In evidence.

        (Government's Exhibit 903A  was received in evidence.)

Q    Now that the jury can see it, can you tell us what that is?

NICOLE CANALES, CSR, RPR

Sakoor - Direct - Dayananda                2193

A    That's the gun that the guy had in the backseat, and he also had it in the lap -- in his lap, when I got free.

Q    You say you started wrestling him; is that right?

A    Yes.

Q    At some point was it him by himself or someone else was able to --

A    No, first it was just me and him.  And I took him in every direction in the apartment, until I found the door.

Q    Then what happened?

A    I opened the door, and one of the neighbors was coming up --

THE COURT:  He already said that.  He already said that.  What else you want to ask?

Q    Tell us what happened after the police officers arrived.

A    They cut me free, and they took me to the precinct.

Q    And did you tell the police at that time what had happened?

A    Yes.

Q    Did you tell the police that you were involved in selling drugs, at that time?

A    No.

Q    Did you learn where you were being held that day, on July 11th, 2002?

A    Yeah.  When they came out, yeah.

Q    Where were you?

NICOLE CANALES, CSR, RPR

---

Sakoor - Direct - Dayananda                2194

A    In Brooklyn.

Q    And as part of talking with the police, did you view photo arrays?

A    Yes.

Q    I'm going to show you what hasn't been entered yet.  This will be Government Exhibit 904.  Do you view more than one photo array, Mr. Sakoor?

A    Yes.

Q    I'm going to show you this.  Do you see that on your screen?

A    Yes.

Q    Do you recognize this?

A    Not really.

Q    Do you recognize your signature there?

A    Yes, I recognize my signature.

Q    Is this one of the photo arrays that you were shown on July 21st of 2002?

A    Yes.

THE COURT:  Did you pick out anybody at these arrays at all?  Did you identify anybody?

THE WITNESS:  Yes.

THE COURT:  So who did you identify?  Go ahead.

MS. DAYANANDA:  Your Honor, the government moves to admit Government Exhibit 904.

THE COURT:  904 in evidence.

NICOLE CANALES, CSR, RPR

---

Sakoor - Direct - Dayananda                2195

(Government's Exhibit 904  was received in evidence.)

Q    And just to -- now that the jury can see, can you tell us who you identified in this photo array, which number?

A    Number 6.

Q    That's this gentleman; is that right?

A    Yes.

Q    Is that right, Mr. Sakoor?

A    Yes.

THE COURT:  You identify him as one of the people whom you saw that night?

THE WITNESS:  In the van, yes.

THE COURT:  In the van, one of the people in the van?

THE WITNESS:  Yes.

Q    And you mentioned that there was the van and another car did.  You see any females?

A    There was a female voice in the other car, yeah.  I never got to see her.

Q    Did you see Shawn after this incident at all?

A    One time, at parole.

MS. DAYANANDA:  I have nothing further.  Thank you.

THE COURT:  Any cross-examination, Mr. Barrett?

MS. BARRETT:  Yes, your Honor.  Just briefly, your Honor, once the witness is done testifying, we would like

NICOLE CANALES, CSR, RPR

---

Sakoor - Direct - Dayananda                2196

to raise something about Exhibit 904, because I think there's something based on testimony that needs to be redacted.

THE COURT:  I'm sure counsel will agree something on that will be redacted, I suspect.  Go ahead.

MS. BARRETT:  Thank you, your Honor.

THE COURT:  Something redacted from the photo array?

MS. BARRETT:  No, your Honor.  There's writing on the bottom of it.

THE COURT:  Writing on the bottom of the photo away, there's no problem with the government redacting that.  It will be redacted.  Go ahead.

MS. BARRETT:  Thank you, your Honor.

CROSS-EXAMINATION

BY MS. BARRETT:

Q    Good morning, sir.

A    How are you doing?

Q    Okay.  And you?

A    I'm all right.

Q    Good.  You testified on direct examination that you identified an individual in a particular photo array; is that correct?

A    Yes.

Q    You identified more than one person in connection with this case; is that right?

A    Yes.  I think so, yeah.

NICOLE CANALES, CSR, RPR

DiCostanzo - direct - Paul                    2216

one gun, that the .380 calendar cartridge casings were from the same gun, the three .40 caliber bullets -- excuse me, the four .40 caliber bullets were fired from the same gun.

Q    And in your comparison of those .40 caliber bullets, was one of those recovered from the body and others from the scene -- from the morgue, I'm sorry, and others from the scene?

A    Yes, a bullet and a piece of lead was recovered from the morgue, everything else was from the scene.

Q    All right.  I'll ask you now to go to 7003.  Are those in connection with a shooting at 415 Lafayette on May 11, 2000?

A    Yes.

Q    What did the lab receive?

A    Nine .40 caliber cartridge casings and a piece of copper jacketing.

Q    Did you test that evidence?

A    I did.

Q    What why your conclusion?

A    That all nine cartridge casings were fired from the same firearm.

Q    And that's a .40 caliber?

A    Yes.

Q    All right.  Let's move on to Government Exhibit 7004 and 7005.  Are those --

MS. BARRETT:  Excuse me, Ms. Paul, if it is more

---

DiCostanzo - direct - Paul                    2217

than one page, could you let us know; are these one page documents?

MS. PAUL:  Yes, 7004 and 7005.

MS. BARRETT:  Okay, because I have lots of extra pages.

Q    All right.  So, are both of those exhibits related to the homicide of Ivery Davis?

A    Yes.

Q    Okay.  And there are two exhibits, is one of them from the morgue and one from the scene?

A    Yes.

Q    What did the laboratory receive from the morgue and scene?

A    7004 being the morgue evidence, you have five bullets, three one caliber and two others of different calibers.

Q    Starting with the ones of the same caliber?

A    We have .40 caliber brass bullets, three of them, two of them .40 class and one piece of a bullet and all three of those matched each other.  Then we have one .22 caliber bullet and one 9mm size .38 caliber bullet.

Q    Okay.  Is there a marking that distinguishes them from the Medical Examiner, the .40 caliber ones being what they call new bullets and the 9mm and .22 being old?

A    On the -- yes.

Q    From the Medical Examiner?

---

DiCostanzo - direct - Paul                    2218

A    Yes, on the packaging.

Q    Okay.  That's the evidence that you received from the morgue.

Let's talk about the scene.

A    We have four .40 caliber cartridge casings that were fired from the same gun, a piece of a bullet and another 9mm bullet which could not be compared to each other because one of them was unsuitable.

Q    What does that mean just to be unsuitable?

A    Unsuitable being there's not enough or no individual markings that could be used for a comparison.

Q    All right.  So, you found .40 caliber casings on the scene and .40 caliber bullets from the morgue, were you able to compare those?

A    No; the casings to the bullets, no.

Q    For the reasons that you said earlier?

A    Correct.

Q    Okay.  Did you do comparisons though between the .40 caliber casings and bullets that were recovered from the scenes and the morgue at the Ivery Davis murder, the Lamale Lawson murder and the car shooting on May 11, 2000?

A    Yes.

Q    What were your results?

A    That the cartridge casings from all three scenes were fired from the same gun, the bullets from all three scenes

---

DiCostanzo - direct - Paul                    2219

were fired from the same gun.

Q    All right.  Let's move on to 7006.  Is that the evidence from a homicide at Quincy and Marcy on June 10, 2000?

A    Yes.

Q    What did the laboratory receive?

A    One bullet and a firearm.

Q    And within the firearm were there additional bullets?

A    Yes, there was a magazine that was loaded with 15 cartridge casings -- cartridges, unfired cartridges.

Q    What type of gun?

A    It was a 9mm Ruger.

Q    And you said there was a bullet, is that a discharged bullet?

A    Yes.

Q    What type of bullet?

A    It's a 9mm caliber class bullet but the weight on it is more of a .380.

Q    Did you test this evidence?

A    I did.

Q    And did you conclude anything?

A    The bullet on its own was inconclusive to the firearm submitted.

Q    Okay.  Government Exhibit 7007, is this related to James Hamilton on August 2nd, 2000?

A    Yes.

Myers - Direct - Amatruda                2292

while they boost.  My job was basically if they were to get caught, and a security guard would try to detain them, I would stop the security guard.

Q    So you were to fight with the security guard?

A    Yes.

Q    And you were arrested on one occasion while that was happening?

A    Yes.

Q    So what did you actually plead guilty to?

A    Robbery.

Q    What sentence did you get?

A    Two to four.

Q    And do you recall -- that was in 1989, correct?

A    No, that was when I pled guilty to the drugs.  When I pled guilty to the robbery, it was in '93.

Q    All right.  So let's start with you pled guilty to the drugs, and did you do some time in jail?

A    Yes.

Q    And did you get out towards the end of 1991?

A    Yes, sir.

Q    When you came home, did you see Wise?

A    Yes.

Q    Do you remember what he was doing, at that time?

A    The normal thing that he had been doing, selling drugs.

Q    And during this time, did you see World at all?

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                2293

A    Yes.

Q    Can you explain -- can you explain the context that you saw World?

A    When I came home, I was hearing a lot about these different factions that were being established in the projects.  It was -- when I went to prison, it was more so like guys who had the money to purchase cocaine and turn it into cocaine crack or basically just selling crack.  Now, when I came home, it was more so of crews.

Q    So what were some of the crews that you saw in Lafayette Gardens, at that time?

A    It was a few.  It was CMB, Cock and Squeeze.  It was some guys who used to call themselves the Deuces.

Q    And you said CMB.  Who was -- who were some of the people associated with CMB, at that time?

A    Wise, World, Popsie, Ebay, Trugg, Boo, Hastings.

Q    I'm going to show you what's been marked as Government Exhibit -- well, first, let me ask you, CMB, do you know what that stands for?

A    Cash Money Brothers.

Q    Do you know where that name came from?

A    I was in prison when they adopted that name, but I got the knowledge that it came from a movie.

Q    First I'm going to show you Government Exhibit 5 in evidence.  Ask you if you recognize that person?

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                2294

A    Yes, sir.

Q    Who is that?

A    That's Boo.

Q    And do you recall what Boo's relationship was with World during that time?

A    I knew World and Boo was being real close friends.

Q    Okay.  Next, I'm going to show you Government Exhibit 2, which I know you've already identified, but --

A    Ebay.

Q    And how did you meet Ebay?

A    1989, it was a girl by the name of Katrice.  She was well known in the projects.  She got into an argument with a female, and she wanted to have a fight with this particular girl.  But someone was stopping her from having the fight with this girl, so she came and she got us.  When we went to --

Q    Us who is us?

A    It was me, Wise -- I just remember -- I just remember Wise being present.  Other people, their names are not coming to me, at this point.

Q    So what happened?

A    We went to the apartment, and the apartment had been the apartment where Robert Footman lives.  And when we knocked on the door, Ebay and Trugg answered the door, so we told them what was going on, and they explained that the girl had been there with them.  And they basically stood up and said that

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                2295

they wasn't going to throw the girl out to the wolves.

Q    So that's how you met Ebay?

A    Yes.

Q    Now, do you know if there were any other people that you said -- you mentioned Popsie; is that correct?

A    Yes, sir.

Q    And first I'm going to show you what's been marked Government Exhibit 8.  It's in evidence.  Who is that?

A    That's Trugg.

Q    And how about Government Exhibit 24?

A    Stack.

Q    Seven?

A    Popsie.

Q    Thirty-five?

A    Dezo (phonetic).

Q    Were you -- were those people you mentioned as spending time with World, at that time?

A    Yes, sir.

Q    I'm just going to show you one more, 56.  Who is that?

A    Porto.

Q    Who did he hang out with?

A    World.

Q    Were there some people who hung out more with Wise, as opposed to the people I just mentioned to you about World?

A    Well, most of those individuals were close in age to

NICOLE CANALES, CSR, RPR

Myers - Direct - Amatruda                    2296

World. Wise knew all of those individuals, but all of those guys were more or so of the people that World hung out with, basically.

Q   Who hung out with Wise, then? Who were the older guys?

A   Un. Another guy named Shy.

Q   Can you describe what the situation was with respect to drug-dealing, at that time, in Lafayette Gardens?

A   Which time?

Q   Around 1991, when you came home from your drug charge?

A   When I came home, it was a lot of different individuals, like I said, selling drugs. You even had guys coming from as far as Grand and Clifton.

Q   Who was the guy that came -- who came from Grand and Clifton that you remember?

A   I remember Rab, and Slink, and those guys coming to the projects a lot.

Q   Okay. Now, on February 21st of 1992, were you arrested?

A   Yes.

Q   That was the robbery, then?

A   Yes.

Q   With the boost thing; is that right?

A   Yes.

Q   Did you end up pleading guilty in that case?

A   Yes, sir.

Q   What was your sentence?

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                    2310

THE JUROR: World. When I finally saw him, I remember him explaining to me that Troy had to go. He was describing how he was mentally off, and how dude was going to try to use him to basically assault someone in the team.

Q   And did you have an understanding based on your participation in the drug-dealing from CMB and other activities as to what, if any, effect killing somebody who have on your status within the group?

A   It would definitely make -- lift the individual's status up in that organization.

Q   In fact, did you observe anything about Ebay's status after the murder of Crazy Troy?

A   Yes.

Q   What was that?

A   I mean, he was more revered as an individual who would get the job done.

Q   When World said to you that Troy had to go, what did you understand that to mean, based on your --

A   That he had to die.

Q   You went -- now, so that was in December of 1992. Eventually you went to state prison; is that correct?

A   Yes.

Q   And that was on the charges -- I guess, it was the robbery charge; is that right? You've been on bail for that?

A   Yes.

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                    2311

Q   And how long were you sentenced to, at that point?

A   Two to four.

Q   Okay. So do you remember what year you got out in from that?

A   '95.

Q   And where did you go when you got out?

A   To Lafayette Gardens.

Q   Do you remember where you lived at that time when you were released?

A   Yes, sir, 456.

Q   At some point did you move to Queens?

A   Come again?

Q   At some point did you move to Queens?

A   Yes, sir.

Q   When was that?

A   Probably a year after I was home.

Q   Okay. And when you came home, where was Wise?

A   When I first came home, Wise was hustling upstate New York.

Q   And was -- who was selling, if anybody, in Lafayette Gardens hustling?

A   There was a slew of individuals, but I knew that World was the one controlling.

Q   And when you say control, what does that mean to you, as far as drug deals goes?

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                    2320

that used to be around his younger brother. When I came home from prison, is when I met Tion. I didn't know Tion until I came home from state prison the first time.

Q   Did you know anything about whether or not he was part of CMB?

A   Yes, sir.

Q   Do you know he was or not?

A   Yes, he was.

Q   Okay. And what, if any, role did he play in CMB? What did he do?

A   I remember him selling drugs. I remember him carrying firearms, and shooting, things like that.

Q   Okay. How about Jimbo? Was he part of CMB?

A   Yes, sir.

Q   What, if any, role what did he do as part of CMB?

A   His role was primarily that of like an accountant. Wise and World entrusted him with their money, because he was an individual who was straightforward. You didn't have to worry about whether he was going to play games with your money. A very quiet, reserved individual, someone they both depended on.

Q   And how about Sambo, what, if anything, did he do?

A   There was a time when Sambo himself was an individual who had a very wild reputation in the projects. Once while I was in prison, a situation transpired where a young man was

NICOLE CANALES, CSR, RPR

GA72

Myers - Direct - Amatruda                    2321

murdered, and the word was that Sambo had snitched on some individuals, so his standing in the projects wasn't as solid as it was when I had previously known him.

Q    Specifically within CMB, what would it do to your reputation if someone was considered to be a snitch?

A    Alienated.  I mean, I've heard talk of what should have been done to him.

MR. RUHNKE:  Your Honor, it's getting a little vague here.

THE COURT:  Yes, when you say I heard talk, you have to focus him on being more specific than that.

Q    So was this -- and just if you answer yes or no, so I can establish the basis.  Did you -- were these CMB members who were talking about Sambo?

A    Yes.

Q    Do you remember any of the people with specifics that you were talking to about Sambo?

A    No, I just remember conversations in the summertime, when everybody was talking about the fact that he had snitched, and he couldn't be trusted, and shouldn't be allowed to be walking around the projects.

Q    Okay.  Government Exhibit 14, which is in evidence, who is that?

A    DJ.

Q    That's the individual that you assaulted?

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                    2324

happen.

Q    Did you ever get involved in informing anybody that they couldn't sell?

A    I never had to.

Q    What do you mean by that?

A    Like I said, you had individuals that used to come from different neighborhoods, looking to get rid of their drugs in a quick fashion.  But when they would get to the projects, they would realize that it was no room for anyone outside of the CMB organization.

Q    And they would leave?

A    Yes.

Q    In 1998, did you become a Blood?

A    Yes, sir.

Q    Can you -- do you remember the day that you decided to become Blood?

A    I remember the day.  I couldn't tell you the date, but I remember the day.

Q    That's fine.  Did you have a conversation with anybody about that on the day you made that decision?

A    Yes, sir.

Q    Who is that?

A    World.

Q    And where did you talk to World about that?

A    We were standing on the corner of Lafayette and Clausen,

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                    2325

in front of the rent building attached to Lafayette Gardens.

Q    Looking at the map, where was that?  Lafayette and Clausen?  Okay.  So you were standing there.  What was the -- was anybody else talking with you, or was it just you and World?

A    There was other people around, but I just remember me and him speaking.

Q    Okay.  And what was the conversation -- what do you remember about the conversation?

A    He brought up to me the fact that there were a lot of young guys who were under the impression that he was what the Bloods call a big homie.  He had did a stint on Riker's Island, so some guys who had been on Riker's Island during the time that he was there, seem to have been under the impression that he was a high-ranking member of the Blood organization.  And that word started fluctuating around, and he didn't deny it.  He would laugh about it.  And that particular day, we were standing there.  We were talking, and I remember him expressing to me that these young dudes is willing to do anything to be part of this organization.

Q    Okay.  And did World express anything about that, then?

A    Yes, he explained his plan to me about -- because initially I told him -- I said, listen, I don't want to be part of no gang.  That's corny.  And he was, like, well, you're not going to be a part of gang.  You know, we just

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                    2326

going to act like we -- they want to put me in that position saying I'm the big homie, saying that -- the phrase was what's called 101.  So it's 101, 102, to 103, 101 being the highest ranging, 102 being second in command.  He said to me they think I'm the big homie, so I'm going to make you my 102, and what's going to happen is these dudes is going to fall in line, and blindly just be obeying commands.

Q    And what was -- what did you say in response to that?

A    I thought it was a hell of a plan.  I agreed to it.

(Proceedings continued on the following page.)

NICOLE CANALES, CSR, RPR

*Meyers - direct - Amatruda* 2331

A    I mean a lot of the times they were reporting to him pertaining to Blood activity and I wasn't being present because I didn't really pick up the lingo.

Q    Okay.  I'm going to now talk about April 15th of 1998 which was the day Michael Colon was killed.  That evening what were you doing?

A    That evening in front of 456 when I heard of the incident pertaining to World --

Q    What was the incident that you learned of?

A    We heard that he had been 86-ed out of Empire Skating Rink.

Q    What does 86-ed mean?

A    To be aggressively ejected from the club.

Q    And based on your understanding at that point, what, if anything, did that do to World's reputation?

A    It was -- at that point it didn't do anything to his reputation because it happened.  The consequence to his reputation would have been if he hadn't have done anything in retaliation.

Q    And what would have been the consequence?

A    I mean he wouldn't have been looked at as this individual who is known for being a violent individual who controls these projects, who controls these --

Q    Based on your experience in the drug trade, what might happen to somebody's drug territory if their reputation slips

*HOLLY DRISCOLL, CSR*
*OFFICIAL COURT REPORTER*

---

*Meyers - direct - Amatruda* 2332

in that way?

A    Guys from different areas who didn't have the courage to migrate into the projects looking to take over would basically, you know, sense some type of weakness in him and want to move in on the projects.

Q    So, that evening did you actually see World?

A    I went upstairs to my apartment, I don't know how long afterwards after I heard about it but I had went upstairs to my apartment and it wasn't very long after that my sister informed me that World was at the door.

Q    What did you do?

A    I went to the door to find out what he wanted and when I got there, I recall him having some abrasions to the face and his shirt was in disarray.

Q    What did World say to you, if anything, at that point?

A    I looked at him, I remember looking at him and smiling and he had another individual with him who thought the whole situation was funny and World he said to me, he said, yo, you heard what happened, you heard what happened.  So, I said, yeah, you got kicked out the club.  He said yes.  So, I went to ask him about what happened and he basically didn't want to talk about why he was getting kicked out the club, he was just like, yo, we going back up there.

Q    And what, if anything, did he ask you to do?

A    At that particular point he didn't ask me to do anything.

*HOLLY DRISCOLL, CSR*
*OFFICIAL COURT REPORTER*

---

2371

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,       )
                Plaintiff,      )   04CR00706 (FB)
                                )
V.                              )
                                )   United States Courthouse
                                )   Brooklyn, New York
DAMION HARDY AND AARON          )   TUESDAY, APRIL 21, 2015
GRANTON,                        )   10:00 a.m.
                Defendants.     )
_____)

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:
FOR THE GOVERNMENT:      LORETTA LYNCH
                         United States Attorney
                         Eastern District of New York
                         BY:  SOUMYA DAYANANDA
                         BY:  MATTHEW S. AMATRUDA
                         BY:  RENA PAUL
                         Assistant United States Attorneys
                         271 Cadman Plaza East
                         Brooklyn, New York 11201

FOR DEFENDANT HARDY:     RUHNKE & BARRETT
                         BY:  JEAN D. BARRETT, ESQ.
                         BY:  DAVID A. RUHNKE, ESQ.
                         47 Park Street
                         Montclair, New Jersey 07042

FOR DEFENDANT GRANTON:   LAW OFFICE OF ROBERT M. BEECHER
                         BY:  ROBERT M. BEECHER, ESQ.
                         67 Wall Street, Suite 2211
                         New York, New York 10005

NICOLE CANALES, CSR, RPR

---

2373

(The following takes place out of the presence of the jury.)

(Defendants enter the courtroom.)

THE CLERK:  Criminal cause on trial, the United States of America versus Damion Hardy and Aaron Granton.  All parties and counsel are present.

THE COURT:  I think we're looking for Mr. Meyers.

THE CLERK:  He's s running late so they have other witnesses.

THE COURT:  Really.

THE CLERK:  He's stuck in traffic coming from the MDC.

THE COURT:  So, tell me what we have here, Mr. Amatruda -- all right, bring somebody in.

MR. AMATRUDA:  I'm sorry?

THE COURT:  Tell me what's going on.  If you have somebody, bring that person in.

MS. BARRETT:  Judge, do you want to --

MR. HERMAN:  Judge, your microphone isn't on.

THE COURT:  How is this?

MS. BARRETT:  Better.

THE COURT:  Give me a clue as to what's going on, the jury is ready to come in.  We have Mr. Meyers who is en route apparently, right, he's had some problems getting here.  We have some other people now in the meantime, okay.  So, who

*HOLLY DRISCOLL, CSR*
*OFFICIAL COURT REPORTER*

2374

do we have?

MS. DAYANANDA: We have Daniel Melendez, a very short witness.

THE COURT: A short witness. Hopefully we'll be ready for Mr. Meyers after that.

MR. AMATRUDA: Yes, Your Honor.

(Witness takes the stand.)

THE COURT: Ms. Barrett, what do you have on your mind?

MS. BARRETT: Judge, I did file a motion to strike, we can deal with that later on.

THE COURT: Yes.

Do you have any other witnesses in addition to this gentleman, Mr. Amatruda?

MR. AMATRUDA: Judge, we have one other witness who is en route, he's been subpoenaed so he's on his way, and then -- but I think if he doesn't get here, we'll just start with Mr. Meyers.

THE COURT: No, no, I'm just getting a sense of things.

MR. AMATRUDA: Oh, I see. Well, in that respect, yes, we have this officer, we have one more civilian witness and then Mr. Meyers and the telephone woman.

THE COURT: All right. Because we're going to work until three o'clock today.

*HOLLY DRISCOLL, CSR*
*OFFICIAL COURT REPORTER*

---

*Mendez - direct - Dayananda* 2375

(Jury enters courtroom.)

THE CLERK: You all may be seated.

THE COURT: All right. Good morning, folks.

So, Mr. Meyers is en route from the Metropolitan Detention Center, sometimes they have some traffic problems getting here, so this is maybe the last or the penultimate witness, in addition to Mr. Meyers, who we have right now while hopefully he'll be here shortly. All right.

Ms. Dayananda, go ahead, who do we have here.

MS. DAYANANDA: Your Honor, Daniel Melendez.

THE COURT: Is he on your list?

MS. DAYANANDA: Yes -- No, Your Honor.

(Witness sworn by the clerk.)

D A N I E L   M E N D E Z, having been first duly sworn was examined and testified as follows:

THE COURT: He's not on your list?

MS. DAYANANDA: He's not, Your Honor.

THE CLERK: Please state and spell your name.

THE WITNESS: Daniel Mendez, M E N D E Z.

MS. DAYANANDA: Mendez, I apologize, not Melendez.

DIRECT EXAMINATION

BY MS. DAYANANDA:

Q    Good morning, Mr. Mendez.

A    Good morning.

Q    Are you retired from the New York Police Department?

*HOLLY DRISCOLL, CSR*
*OFFICIAL COURT REPORTER*

---

*Mendez - direct - Dayananda* 2376

A    Yes.

Q    When did you retire?

A    April 30th, 2011.

Q    How long were you with the police department?

A    Twenty years.

Q    Directing your attention to January 11th of 1993, where were you assigned at that time?

A    I was assigned to PSA-3 and New York City Police Department.

Q    That was in Brooklyn, New York?

A    Yes.

Q    Does that cover 325 Classon Avenue, Lafayette Gardens?

A    Yes.

Q    Directing your attention to around ten p.m. that evening of January 11th, 1993, did you respond to 325 Classon Avenue?

A    Yes.

Q    What did you do when you got there?

A    I was directed by a supervisor to go to the rear of the building.

Q    To the rear of the building?

A    Yes.

Q    To do what there?

A    To keep sight of the window of the apartment.

Q    Do you remember what floor that apartment was on?

A    11th.

*HOLLY DRISCOLL, CSR*
*OFFICIAL COURT REPORTER*

---

*Meyers - direct - Amatruda* 2420

do was speak with guys here and there, make sure that they was on their shifts, I wasn't gonna be the one to run around behind dudes or beating dudes up. He didn't know at the time that I had been going uptown with Wise and bringing drugs back so I didn't have to explain to him that I wasn't going to participate in that part. I just told him that the most that I could do was make sure that guys would be outside on their shifts.

Q    And did you in fact do that?

A    Yes, I did.

Q    All right.

Now, during again between when Wise was shot and when he passed away, did you have any other conversations with World about Peanut?

A    We had a lot of conversations. I mean a lot of times he would call and he would just generally just ask me what was going on, did I happen to see a dude or, you know, things like that.

Q    And what, if anything, did he express to you about Peanut?

A    He basically let it be known that he didn't want to have to come home and deal with that situation, he was saying that, you know, we needed to take care of that.

Q    What did he mean by "take care of that"?

A    To kill Peanut.

*HOLLY DRISCOLL, CSR*
*OFFICIAL COURT REPORTER*

Myers - Direct - Amatruda                2434

A    This building (indicating).

Q    433 Lafayette?

A    Yes.

Q    Okay.  And what did you see Ivery Davis do when he went to the parking lot?

A    A number of times he had pulled in, made a U-turn inside of the parking lot, and stayed for about 10, 15 seconds, and then would pull out.  Other times we would come out, and he had been there for a longer period of time.  And when he would know that we were coming, he would leave.

Q    Okay.  And did you have any discussions with other members of CMB about Peanut during that point, between 1999, and when World came home in 2000?

A    Yes.

Q    And do you remember any specific members that you had conversations with about Peanut?

A    Yes.  Keith, Boo, E-Bay.

Q    And what did you talk about with CMB members?

A    Revenge, basically.  It was thought that Wise being killed was a direct result of something that he wanted to happen.

Q    Who is he?

A    Peanut.

Q    Okay.  Were there any incidents of shooting with Peanut that you were involved in?

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                2435

A    Yes, sir.

Q    Can you explain the first incident that you remember of shooting with Peanut?

A    Me, E-Bay, Boo, we were walking up Lafayette Avenue, and Peanut was making a right onto Lafayette Avenue, going towards Franklin, and we saw him, he saw us, and --

Q    Just showing you, is that on this map here?

A    Yes.  Right here (indicating).

Q    All right.  So please continue.

A    So E-Bay pulled out a firearm and went, like, towards the vehicle, and Peanut took off, so he ran -- he got to Franklin and Lafayette.  E-Bay came back, so then we was talking about the situation, and I told him -- I said he gonna come back.

Q    Who were you talking with?

A    I was talking to Boo and E-Bay.  So then we proceeded to the middle of the projects, and we were standing next to 433?

Q    Where were you standing?

A    Right here.

Q    Okay.  And what's there?

A    That's a parking lot.

Q    And how were you actually physically standing?

A    All of us were facing the street with our arms on top of the gate.

Q    And I'm going to show you what's been marked as Government Exhibit 108D that's in evidence.  Do you see what

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                2436

that is there?  We'll move these marks.

A    Yes.

Q    What's that?

A    That's the gate we were leaning on.

Q    Okay.  So which direction were you facing?

A    We were facing forward.

Q    Okay.  So as if you were looking from the back of the van towards the front of that van?

A    Yes, sir.

Q    All right.  And this parking area there, where the van is parked, can you just point where that is on this map?

A    (Indicating).

Q    Okay.  And does that drawing in your experience show how far the parking lot goes relative to 433?

A    Yes.

Q    That's about right?

A    Yes.

Q    Okay.  So go ahead, then.

A    So we were standing there, looking towards Lafayette Avenue, and I recall having the thought to myself that -- I looked at all of the individuals that were lined up on the gate.

Q    Who was that?

A    Me, Boo, E-Bay, Tion, and we're facing Lafayette, and I thought -- I said to myself, this is crazy.  We're all looking

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                2437

towards Lafayette.  Somebody can come from behind and shoot one of us in the head, and before I could complete that thought, gunfire.

Q    What direction did the gunfire come from?

A    It was coming from behind me, but when I turned around and looked, it was more diagonal.

Q    What did you see when you turned around and looked?

A    Initially, I tried to run to get some cover.

Q    Could you see who was shooting?

A    Yes.

Q    Who?

A    Peanut.

Q    And you tried to run to get some cover?

A    Yes, but Tion had pushed Boo to get out the way, and Boo fell, so I had to jump over him, so when I jumped over him --

Q    You jumped over Boo?

A    Yes.

Q    Okay.

A    I reached for the weapon, and I realized if somebody was running down on us, bearing down on us, Boo would be killed, so I felt I had to make a stand right there.  So I turned around, and I fired a couple wild shots.  But when I turned around and fired those shots, I saw Peanut standing -- like, there's a small park right here (indicating).

Q    Okay.

NICOLE CANALES, CSR, RPR

Myers - Direct - Amatruda                    2438

A    Firing a weapon.

Q    And what happened?

A    No one was hit.  He ran inside of the back of this particular building right here.  We ran this way, and then came back around and walked through the projects.

Q    So you made a circle from 433 -- from right to left, on Lafayette, you took a right on Clausen and circled back around the front of 345, is it?

A    Yes.

Q    And entered into the center of the projects from there?

A    Yes.

Q    And did you see Peanut?

A    No.

Q    Was anybody hit during that shootout?

A    No.

Q    Did you hear or see anybody say anything about -- from CMB say anything about your participation in the shootout as a result?

A    Yeah, Peanut had called Boo.  This was the first conversation that the two of them had had, and he was explaining to Boo that he wasn't shooting at him.  He told Boo that he wasn't shooting at me.  He told Boo that he was shooting at E-Bay; he wanted to cripple E-Bay.

Q    Okay.  And what about your shooting during that shootout, is there anything that you recall about that?

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                    2439

A    Yeah, he said he wanted to know why I fired on him.

Q    What I'm trying to ask you, among CMB members, did anybody say anything about -- that you heard about your performance during that shootout?

A    Yeah.  Boo was getting into a lot of arguments with people, because they was -- people was running around.  Yeah, Peanut came through the projects and chased them through the projects.  And Boo, just coming home, had been hearing a lot of stories, so up until that time, he's just basically hearing stories.  So now he's seeing that all the stories are one-sided.  What he said to them was, yeah, y'all talking about how he came through here shooting, but y'all not talking about how Thor was clapping back at him.

Q    Was there another shootout or shooting involving Peanut?

A    Yes.

Q    Can you describe what happened during that one?  And, again, I'm talking about the time period before World came home in 2000?

A    We was in the projects, and someone came and told us that they had seen Peanut on Willoughby Avenue, in between Kent and Taffy, parked in a vehicle, just sitting there.  So me, E-Bay, Popsie, and Keith put together a plan to go and fire shots at him.

Q    What was the plan?

A    We knew that he was on Willoughby, between Kent and

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                    2440

Taffy, so E-Bay, and Keith was going to go up Kent, and me and Popsie was going to go up Taffy and converge.

Q    So who had to walk further?

A    Me and Popsie, because we actually went to the next block.  Instead of Taffy, we went to Clausen.  We went to the next block.

Q    As you and Popsie were walking towards where you were going to do this movement, what happened?  What did you hear?

A    Popsie started complaining about his firearm slipping in his waist.  There was a building that -- he said he was going to dip in the building right quick to adjust the firearm in his waist.  He ran up the stairs, went in the building.  By the time he was stepping back down the stairs of the building, we heard the gunfire.

Q    And what did you do, at that point?

A    We turned around and started going back towards the projects.

Q    Did you see E-Bay at some point after that?

A    I seen him later but not initially.

Q    Did you have any conversation about what happened?

A    No.

Q    Was there any other shootouts involving Peanut?

A    Yes.

Q    And what was that?

A    At the nightclub.

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                    2441

Q    Okay.  Did you ever have any other episodes involving Boo?

A    Yes.

Q    Can you explain that one?

A    One hot summer day, like I said, Peanut used to come and pull into the parking lot of 433, so I was in my apartment, in 456, and Boo came to my apartment.  And he said to me look out the window.  So I go to the window.  I look out the window.  I say what I'm looking for?  And he said you don't see "Nut" truck?  And I said no.  He said he must have left.  So I'm like all right.  So he said I bet you I know where he went.  I bet you I know where he goin'.

Q    So what'd you do?

A    So I said where?  He said to Grand and Clifton.  He was like come on.  Let's go over there.  So we went downstairs.  We were going to walk over there, but when we came out the building, there were two little kids in front of the building on bikes.  And I gave them both a couple of dollars to use their bikes, and we got on the bikes and road up DeKalb Avenue to Hall Street, made a left on Hall Street, went up until we got to Clifton and then made a left.

Q    What'd you see when you made that left?

A    Close to the corner, Boo was dealing with a female who recognized him.  At that point, we were on bikes.  She started calling his name.  She didn't realize our intentions for why

NICOLE CANALES, CSR, RPR

Myers - Direct - Amatruda 2442

we were on that block, so he was ignoring her. We were riding up the block, and she kept calling his name, and I guess he got anxious from hearing somebody call his name, that he started firing the gun from quite a distance.

Q What direction? Did you see what direction he was firing in?

A Straightforward.

Q What was he firing towards?

A Towards Peanut.

Q Had you seen -- you saw Peanut then?

A Yes, he was parked; he was double-parked on Clifton.

Q What did you do when Boo started firing?

A I pulled out my firearm and started firing as well.

Q What ended up happening as a result of that shootout?

A From my understanding, nothing new. We just fired some shots and left.

Q Now, at a certain point, did you meet -- you said that Taz fell back. Did you still continue to see him, or did you just not see him at all?

A I was seeing him sparingly. It wasn't like he was in the projects every single day now. It was like I would see him once in a blue.

Q During the time before World came home, did you meet anybody through Taz?

A I met a couple of individuals.

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda 2446

Q And when you say World felt this way, was this something that World said?

A Yes.

Q And did World express anything at all about the efforts that had been made before he came home?

A He basically said that whatever was going down, dudes was bullshitting -- excuse my language -- but he was home now, and we was going hard. The complaint was, you know, different people in the neighborhood that -- like guys that we knew was coming at individuals, would see people and not let us know that they saw, and he was saying that was going to change. And from this point on, being he was home, if somebody saw him, they were going to give us a call.

Q Somebody saw who?

A Peanut.

Q Did any other names come up during those early discussions after World came home?

A Yes.

Q What names were those?

A Hommo, JR, and then eventually Black-O Mack-O.

Q And what did members of CMB discuss about Hommo?

A At the time, it was trying to be understood what part he played in all this, and everyone knew his reputation as being, you know, this revered tough guy in the neighborhood. And we knew that him and Peanut had a close affiliation with one

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda 2447

another.

Q Okay. And what types of things did you know -- how did you know about their affiliations? Do you know?

A There was a lot of times that Peanut would bring Hommo through the projects with him.

Q And what, if anything, did CMB discuss, other than the fact that Hommo was affiliated with --

A It was brought up that, you know, Peanut wasn't really the threat, that it didn't make no sense making a move on Peanut and having Hommo running around, trying to knock dude's heads off. If we were going to make a move, Hommo had to be the individual, because he was the bigger danger.

Q Showing you Government Exhibit 18 in evidence, do you recognize who that is?

A Yes.

Q Who is that?

A That's Hommo.

Q Were there any other names that came up during the conversations among CMB members after World came home?

A JR.

Q And what was discussed about JR?

A World was explaining how all of the individuals that had played a part in the situation had to be dealt with, and trying to understand what part he played. It was explained to me that JR had supposedly transported Neno outside of the

NICOLE CANALES, CSR, RPR

---

Ashby - Direct - Dayananda 2465

the car.

Q Do you remember how many shots you heard?

A I don't know. Probably a couple. Maybe three. Maybe four. I'm not sure.

Q Okay. And from where you were, to where your friend Dale was, where was the shooter in relation?

A He was in between me and the car.

Q The car where you were standing?

A Say again.

Q Between you and where Dale was standing?

A Yes, uh-huh.

Q And you said you saw a muzzle flash; is that right?

A Yeah, because it was dark outside, so you can see, like, the fire.

Q Did you see anything else about the shooter?

A No.

Q And what did you do once you heard the gunshots?

A Like I said, I ducked and waited until -- you know, until the coast was clear. And I ran over to see if Dale was cool, because it was like -- it looked like he got shot, but he was cool.

Q And then what happened?

A And then me and Dale, we jumped in our trucks, and we drove down the street; because the guy that got shot, he drove down the street, so we went down to see if everything was all

NICOLE CANALES, CSR, RPR

Ashby - Direct - Dayananda                    2466

right.  And we seen some other guy in the street, and I guess
he must have got hit by the truck the other guy was driving,
so we made sure to see if he was okay.  And then went to the
scene.  The car was flipped over, the truck.

Q    Was that the same truck you had seen your friend Dale
talking to?

A    Yeah.

Q    And you said it had crashed.  Do you know where it ended
up?  Do you remember the streets?

A    It was -- I don't remember what street it was, but
whatever -- Avenue of the Americas, over there.  Somewhere
over there he crashed.

Q    You said you saw another person.  Can you describe who
that person was?

A    No.  Oh, what do you mean, another person?

Q    You saw a person who you said you thought got hit?

A    Oh, yes, some white guy was laying in the street.

Q    A white guy was laying in the street?

A    Yeah.

Q    How far was he in relation to the car crash?

A    I think he was around Varick.

Q    And did you see if that person was injured, the white
guy?

A    He was definitely, yeah, in bad shape.

Q    Did you stick around and talk to the police that day,

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                    2476

is what we're going to do.  Have him call me, and I just tell
him that it's too many people outside to do that, and we'll
just say you couldn't do it, because it was too many people to
do it.

Q    Did you receive a call from World at all?

A    We called him, and I told him that it was a lot of people
outside, and it wouldn't be a good time for Popsie to do
something like that.

Q    And what was World's reaction?

A    He said all right.

Q    Were there any other attempts that you were aware of?

A    Yeah, because Popsie had spoke about that around some
individuals, and it was another time where -- it's ironic
that -- it's probably in the same area, and I saw Tion, and he
came to me with the same gripe:  Yo, this dude want me to go
down here and hit JR, and I don't want to do it.  So I started
laugh --

Q    Did you understand who he meant by this dude?

A    Yes.

Q    Who was that?

A    World.

Q    Go ahead.

A    I started laughing, because I saw a trend.  I was being
used to constantly get out of -- them doing this deed.

Q    So what did you do?

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                    2477

A    I told him -- I said, look, we're going to call him and
tell him it's a lot of people outside, man.  That's the only
way he not going to -- the only way he's going to be cool with
the fact that you don't go and do it.

Q    And did you do that?

A    Yes, I did.

Q    You told World there were too many people?

A    Yes.

Q    What was World's reaction?

A    I don't recall the second time.  It was like -- it was
just over again.

Q    Suffice it to say, did Tion actually go and try and kill
JR?

A    Say again.

Q    Did Tion actually go and try and kill JR?

A    No.

Q    After that, how did you learn that JR had actually been
murdered?

A    I was standing in front of 456, and World pulled up.  He
was in the vehicle with two other individuals, and he told me
to get in.

Q    Did you know those people?

A    I knew one of the individuals.

Q    And what happened when you got in?

A    I got inside the car.  I think it was an SUV, and we

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                    2484

went down.  So I'm like what you mean?  He started describing
to me how while they were at the party, the DJ, Fish's
brother, became inebriated and very aggressive against him and
Tion, and they ultimately had an argument with this
individual.  He said that the guy pulled out an automatic
weapon, at one point, and then put it back in his waist, and
went to walk off; and him and Tion looked at each other, and
they decided at that point that they were going to fire on
him, and they did.

Q    Did he say what happened to the person?

A    From the description that he gave me, he was like, yo,
he's dead.

Q    Okay.  And what, if anything, did E-Bay ask you to do, as
far as the gun went?

A    He wanted to give it back to me at that particular time,
and I was reluctant because he was telling me that he
basically murdered someone with it.

Q    Did you take it?

        MR. BEECHER:  Objection.  What does basically mean?

        THE COURT:  I don't know what basically means.
Disregard the answer.  Ask another question.

Q    Did E-Bay tell you what he did with the gun?

A    He told me that he had shot him.  He had already told
me --

        THE COURT:  He told you that?  That's what he told

NICOLE CANALES, CSR, RPR

Myers - Direct - Amatruda          2486

A    I was home.

Q    What were you doing at home?

A    At the time that -- well, the situation happened --

THE COURT:  What were you doing at home?  Watching television?

THE WITNESS:  I was home with a girlfriend.

THE COURT:  You were with a girlfriend?

THE WITNESS:  And I got a phone call.

THE COURT:  That's what you were doing at home, home with a girlfriend.

THE WITNESS:  Yes, sir.

THE COURT:  Just listen to the question, answer it directly, and we'll start moving things along a little bit.  I haven't interrupted much, but it's getting extended, and you're talking on and on.  I want to focus you to answer the questions directly.  Do not offer more than what you're asked.  This is how it goes from now on.

Mr. Amatruda.

MR. AMATRUDA:  Thank you, your Honor.

Q    Did you receive a telephone call from anyone?

A    Yes, sir.

Q    Who was the call from?

A    World.

Q    And what did World say?

A    He said that he was at Club Cheetah, and I need to get

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda          2487

there.

Q    Do you remember -- what did you do, at that point?

A    We spoke briefly.  I got some information from him, and I made my way to Club Cheetah.

Q    Did you have an understanding of what World wanted you at Club Cheetah for?

A    No, he didn't explain, at the time.

THE COURT:  He didn't tell you why he wanted you to go there for, did he?

THE WITNESS:  No.

THE COURT:  That's the answer.  Next question.

Q    So what did you do from that point after you left?

A    I got to Club Cheetah.

Q    How did you get that?

A    Initially when I got there, I had paid this -- there's this guy around the neighborhood who uses drugs, who we would pay --

THE COURT:  How did you get there?  By car?

THE WITNESS:  I drove.

THE COURT:  Next question.

Q    When you went to Club Cheetah, where did you leave -- did you leave the car?

A    Yes.

Q    Where?

A    In the parking lot.

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda          2488

Q    And what did you do?

A    I walked over to the club.

Q    And did you actually go in the club?

A    I didn't get the opportunity to make it inside the club.

THE COURT:  The answer is no.

Q    What did you do instead?

A    I was standing there waiting, because the club was --

THE COURT:  Not because.  What did you do?

THE WITNESS:  I stood there.

THE COURT:  That's your answer.

Next question.

Q    Did you end up speaking to World?

A    I spoke to him through the telephone.

Q    Okay.  So through a cell phone or a pay phone?

A    It was a pay phone outside.

Q    And what did World say to you?

A    He was telling me that there was an individual inside of the club walking around with a lot of expensive jewelry on and a lot of money that he wanted to rob.

Q    And what did you do, at that point?

A    I was ready to leave, because that's not --

THE COURT:  What did you do?  Did you do anything?

THE WITNESS:  No, I didn't do anything.

THE COURT:  Next question.

Q    Well, let me ask you this, did you -- after the

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda          2489

conversation with World, did you stay outside the club?

A    Yes, I did.

Q    And what was your intention to do, at that point?

A    I was waiting, because he said he was going to pay a bouncer to have me -- have them sneak me inside of the club, because the club was being shut down.  The activity was being --

Q    Did World actually tell you that or someone else?

A    Someone else told me.

Q    So someone else told you, and they passed you a message from World?

A    Yes.

Q    And when you were outside, what did you decide to do, at that point?

A    I decided to leave.

Q    So where did you go?

A    I went towards the parking lot.

Q    And what happened on your way to the parking lot?

A    I'm walking towards the car, and the individual starts calling my name.

Q    And what did that -- did you talk to that individual?

A    Yes, I stopped, and he was like, yo, World told me to give you something.

Q    And what was that?

A    Two firearms.

NICOLE CANALES, CSR, RPR

GA80

Myers - Direct - Amatruda                    2490

Q    Did you recognize the guns that that person gave you?
A    One of them.
Q    What gun did you recognize?
A    One I recognized as a .40-caliber.
Q    Is that the same .40-caliber you had given to E-Bay?
A    Yes.
Q    And did that surprise you, to see that .40-caliber again?
A    It did.  But at the same time -- I mean, it's happened before.
Q    And what did you do once you took the two firearms from this person?
A    I got in the vehicle and left.
Q    And where did you go?
A    Home.
Q    So you drove back to LG?
A    Yes.
Q    And what did you do when you got there?
A    Immediately when I got there, World was calling me again, asking me what happened, where did I go, things like that.
Q    Okay.  And did you have any further discussion with World, at that point?
A    Yes, he said to me guess who I'm behind, guess who I'm behind right now?
Q    And who did he say he was behind?
A    I asked him who?  And he said Peanut.

NICOLE CANALES, CSR, RPR

Myers - Direct - Amatruda                    2492

A    Just letting him know that I was going to be calling, reenforcing it, that I was not just coming by myself.
Q    What happened after that?
A    I went to Jimbo's house, because I couldn't really find out where E-Bay was at, and I knew that Jimbo probably had a number to a young lady -- a house that E-Bay frequented, so I went to speak with Jimbo to see if he can contact him.
Q    Did Jimbo contact E-Bay?
A    Yes.
Q    What happened?  Did you see E-Bay after that?
A    He came to my apartment.
Q    So you went to Jimbo's and asked him to get in touch with E-Bay, and then went back to your apartment?
A    Yes, I lived on 17th, and it was on 19th.
Q    What did you talk about with E-Bay?
A    Came to the apartment.  I explained to him what had happened, that I had already went to Manhattan, and then World called me and said he's behind Peanut, and about the description of where World said he was going to be, to meet up with him when we got to Manhattan.
Q    And what did E-Bay say to you?  Did he agree?
A    Yes.
Q    And what did you do next, as far as your plan with E-Bay?
A    At that particular time, I didn't really believe the information that World was giving me.  I thought he was trying

NICOLE CANALES, CSR, RPR

Myers - Direct - Amatruda                    2493

to --
        THE COURT:  The question is what did you do?
        THE WITNESS:  I gave the firearms to E-Bay so I could --
        THE COURT:  That's what you did?  You gave the firearm to E-Bay.  This is an example where I'm trying to get you to listen to me.
        THE WITNESS:  Yes, sir.
        THE COURT:  By not talking about more than you're asked.  You don't have to go into explanations, you see.  You have a tendency to do that.  I'm trying to cut it down so we can get through with your testimony in a proper way.
        THE WITNESS:  Yes, sir.
        THE COURT:  I'm trying to give you some warnings now.
        Let's have the next question.
Q    So did you decide to go immediately to Manhattan with E-Bay?
A    No.
Q    What caused you not to go with E-Bay?
A    I wasn't sure that the situation was what was being described to me.
Q    What was it you thought the situation might be?
A    That he was basically trying to get us to Manhattan to rob some individuals that he wanted robbed.

NICOLE CANALES, CSR, RPR

Myers - Direct - Amatruda                    2494

Q    So you said that you gave E-Bay two firearms?
A    Yes.
Q    And were those the same firearms that you had received earlier that night?
A    Yes.
Q    Once you gave E-Bay the firearms, did you have any more conversation with him?
A    No.
Q    Did you have a cell phone that night?
A    He had a cell phone that I got from him, so I can get in contact with him once I got to Manhattan.
Q    And what did you tell E-Bay about your decision on whether to go with him or not?
A    That I didn't want to be traveling like that again.  I was already traveling once tonight with firearms, and I didn't want to do it again, but I was going to meet him up there.
Q    Did E-Bay leave, at that point?
A    Yes.
Q    At some point after that, did you decide to go to Manhattan?
A    Yes.
Q    And what made you decide ultimately to go?
A    Thinking about the situation, and everything that had transpired previous to that, and not wanting to be behind the 8-ball, looked as this individual that didn't want to

NICOLE CANALES, CSR, RPR

Myers - Direct - Amatruda                2495

participate in getting revenge for Wise's murder.

Q    So did you leave for Manhattan, at some point?

A    Yes.

Q    How long -- do you recall how long it was after E-Bay left that you did?

A    Probably 15 minutes, 15, 20 minutes afterwards.

Q    How did you get to Manhattan?

A    Initially, I took -- I took the train there.

Q    Okay.  And what train did you take, by the way?

THE COURT:  Do we really care about that?

MR. AMATRUDA:  Actually, we do, Judge.

THE COURT:  A, B, C, D, E, or F?  I mean, is that really relevant, what train he took?

MR. AMATRUDA:  I'd be happy to explain it to you later.

THE COURT:  You got to the scene; is that what you want to question him about?

MR. AMATRUDA:  It takes longer for us to --

Q    What train did you take?

A    The G train.

THE COURT:  You want to know what the color of the train was also?  How many seats it had?

MR. AMATRUDA:  No, your Honor, that's not necessary.

Q    Other than the G Train, did you take another train?

A    Yes, I transferred to the A Train.

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                2496

Q    And once you got there, what did you do?

A    I came out of the train station and proceeded to walk to -- trying to find the direction of the club, because I didn't know which direction it was from the train station.

Q    Did you eventually find your way towards the club?

A    Yes.

Q    Okay.  And once you were finding your way towards the club, did you talk to anybody?

A    I called the cell phone that World had called me from.

Q    So once you called World, where were you when you called him?

A    I can't explain exactly where I was.  I don't remember.

Q    Let me ask you this, you remember where NV was that night?

A    I remember --

Q    I'm trying to figure out where you were based on the club.  Could you see the club when you were talking to World?

A    Well, it was nighttime.  Like I could see the block that the club was on.  I couldn't distinguish anything.

Q    So what happened when you were talking to World?

A    I was walking up the street, and he was basically saying to me --

THE COURT:  You see, the word "basically," counsel objected to that word the last time, so try to avoid the word "basically".

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                2497

THE WITNESS:  I was walking, and he was describing the vehicles.

Q    World was describing the cars?

A    Yes.

Q    Do you remember what description he gave?

A    He was asking me do I see a black truck.

Q    And did you see a black truck?

A    Yes, I did.

Q    And what happened after -- what did he say after that?

A    I was walking towards the truck, and one of the doors opened, and E-Bay got out of the vehicle.

Q    What door did you see E-Bay get out of?

A    Back passenger vehicle.

Q    And that back passenger door, was that closer to the street or the sidewalk?

A    The street.

Q    And were there any other -- and what did you see E-Bay do, at that point?

A    He went towards the back of the vehicle, and went around the back of the vehicle.

Q    So he went around the back of the black truck?

A    Yes.

Q    And where did he end up?

A    He came up on right-hand side, which would be the driver's left-hand side.

NICOLE CANALES, CSR, RPR

---

Myers - Direct - Amatruda                2498

Q    So you were looking straight on into -- almost into traffic, essentially?

A    Yes, but the vehicle --

THE COURT:  You saw what happened.  You had a clear view what happened?

THE WITNESS:  Yes.

THE COURT:  Would you like him to tell the jury what happened?

MR. AMATRUDA:  I would love that.

Q    Why don't you tell the jury what you saw.

A    As I was walking towards the vehicle, I heard the loud report of gunfire, and saw the flash from behind the vehicle, so I turned around, and I started going back the other way.

Q    And did you see where E-Bay was standing when the gunfire went off?

A    I couldn't see him.

Q    Did the gun -- could you tell whether the gunfire came from the street or from the sidewalk?

A    It was in between the sidewalk and the street.  It was like the car was more so like in a double-parked fashion.

Q    And what did you do after that?

A    I left.

Q    Where did you go?

A    I went home.

Q    And once you went home --

NICOLE CANALES, CSR, RPR

2525

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,        )
              Plaintiff,         )    04CR00706 (FB)
                                 )
    V.                           )    United States Courthouse
                                 )    Brooklyn, New York
                                 )
DAMION HARDY AND AARON           )    WEDNESDAY, APRIL 22, 2015
GRANTON,                         )    10:00 a.m.
              Defendants.        )
_____)

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:
FOR THE GOVERNMENT:      LORETTA LYNCH
                         United States Attorney
                         Eastern District of New York
                         BY:  SOUMYA DAYANANDA
                         BY:  MATTHEW S. AMATRUDA
                         BY:  RENA PAUL
                         Assistant United States Attorneys
                         271 Cadman Plaza East
                         Brooklyn, New York 11201

FOR DEFENDANT HARDY:     RUHNKE & BARRETT
                         BY:  JEAN D. BARRETT, ESQ.
                         BY:  DAVID A. RUHNKE, ESQ.
                         47 Park Street
                         Montclair, New Jersey 07042

FOR DEFENDANT GRANTON:   LAW OFFICE OF ROBERT M. BEECHER
                         BY:  ROBERT M. BEECHER, ESQ.
                         67 Wall Street, Suite 2211
                         New York, New York 10005

NICOLE CANALES, CSR, RPR

---

*Myers - Direct / Amatruda*                            2552

the one to do it.  So he had Abu Bakr go and get Boo.

Q    And what kind of car did Abu Bakr drive that day?

A    I'm not recalling.

Q    What happened, did you see Kizzy at that point?

A    Yes, Kizzy pulled up in a taxicab.

Q    And what, if anything, did Kizzy have with her?

A    She had a firearm.

Q    And what, if anything, at that point did Taz do?

A    Taz took the gun and he had asked me to stay until Kizzy got there.  So when Kizzy got there, I told him that I was going to leave --

     THE COURT:  What did Taz do, is the question.

A    Oh, we had went -- he told her wait.  We got in the vehicle and waited for Boo.

Q    Did you have a conversation with Taz at that point?

A    Yeah, we -- we were speaking --

     THE COURT:  The answer is "yes."

A    Yes.

Q    Do you remember what you discussed?

A    At one point, Taz was talking about paying Boo $4,000 to shoot T Rock.

Q    Did you talk to World at all at that point?

A    Yes.

Q    What did you talk about?

A    He asked me who was going to be the individual who

*Marie Foley, RMR, CRR*
*Official Court Reporter*

---

*Myers - Direct / Amatruda*                            2553

actually put the work in.

Q    And what did you say?

A    By that time, Boo had been there and Boo didn't want me to tell World --

     THE COURT:  What did you say to him?

A    I told him that Desperado was going to be the individual to actually do the shooting.

Q    And what was your conversation with Taz about what you would say to World, or with Boo about what you would say to World?

A    He was sitting there when I told World 'cause he asked me not to tell World that he was getting paid to do it.  He didn't want World to know that he was getting paid because he should have been doing it for free.

Q    I'm sorry, I've been distracted by the judge interrupting you.

     Can you repeat that answer?

A    Yes.  Boo asked me to tell World that Desperado was going to be the one to do the shooting because he didn't want World to know that Taz was going to actually pay him because he wasn't supposed to be getting paid for this.  It was supposed to be a hit for the team because T Rock had been talking about killing World and then Taz --

     THE COURT:  He was trying to keep that information away from World.

*Marie Foley, RMR, CRR*
*Official Court Reporter*

---

*Myers - Direct / Amatruda*                            2554

     THE WITNESS:  Exactly.

     THE COURT:  Okay, next question.

Q    Did you speak to World at all at that point?

A    That's all I remember from that point telling him about --

     THE COURT:  The question is did you speak to World at that time, yes or no?

     THE WITNESS:  Yes.

Q    And at what point did -- and so you had told World that Desperado was going to do it; is that right?

A    Yes, sir.

Q    What happened after that?

A    We went to where the block that we had saw T Rock go up, but he wasn't there.  The construction team had been gone.  So before we were leaving, we were talking about the situation and Abu Bakr said you know what, it was two construction sites over here.  Maybe he's at the other one.  So he went to check to see if he was at the other construction site, which was like two blocks away.

Q    And who were you with at that point?

A    I had Taz's girlfriend Kizzy in the vehicle with me.  I had a guy that who had traveled with us from Lynchburg, Virginia named Jonathan in the vehicle at that time.  I think my cousin was there as well.

Q    Which cousin?

*Marie Foley, RMR, CRR*
*Official Court Reporter*

GA83

*Myers - Direct / Amatruda* 2555

A His name is Hedda.

Q And who was with Abu Bakr, did you see?

A Boo.

Q And where was Taz?

A Taz was in with Ty.

Q So what happened after that?

A We were all communicating with each other via phone and I was going up the block, I can't remember what's the name of the street, and I decided to make a U-turn and go back in the opposite direction. Once I made that turn, it came through the Nextel that they actually saw T Rock on the corner. By the time I got to the intersection, the light was red. Boo was coming out of the store. I saw T Rock on the right-hand side of the block on the corner speaking to two individuals. Boo crossed the street. He had a soda in his hand. He had his hand in back of him and he was crossing the street and he ran behind T Rock and fired shots.

Q Did you see what happened to T Rock?

A I just seen him fall.

Q What did you do at that point?

A I was sitting at the light, so I had to wait for the light to turn green, and the area became congested at that time with the people and the cars. So slowly I made my way past and then I left and went to the projects.

Q Did you see what Boo did after he shot T Rock?

*Marie Foley, RMR, CRR*
*Official Court Reporter*

---

*Myers - Direct / Amatruda* 2556

A He ran up the street towards where Abu Bakr's vehicle was.

Q Did you speak again with World that day?

A I don't recall.

Q Did you speak with World about T Rock after that?

A Yes.

Q What did you discuss?

A We just discussed the situation in its entirety. At that particular time, World had been saying things to me like, "Check," like during our conversation, and I didn't understand what he was saying at the time. I thought he was saying like check another individual off the list.

Q So what did he say?

A Like I said, we just had a general conversation. I don't remember the specifics of the conversation. I just remember that --

Q When he said the "check" to you, did that ever change what he said, or only "check"?

A Well, later on it became "checkmate."

Q Later on when?

A After Peanut.

Q Did you have a conversation with Abu Bakr about what had happened?

A Yes. We spoke with Abu Bakr, me and Taz, because someone had taken down the license plates of Abu Bakr's vehicle when

*Marie Foley, RMR, CRR*
*Official Court Reporter*

---

*Myers - Direct / Amatruda* 2557

Boo got inside of the vehicle and they had -- his parole officer had went to his house looking for him questioning him about the vehicle. So he called Taz and explained Taz that he needed to do something with the vehicle. So him and Taz put together a plan to go and have somebody to go into a check-cashing place and be speaking to the cashier and have the vehicle parked where the cashier could actually see them and for someone to walk in and go, "Yo, somebody's stealing your vehicle," so the cashier could witness that he was actually inside the establishment while somebody was taking his vehicle to say that the vehicle wasn't in his possession.

Q And do you know did they tell you whether that happened, Taz and Abu Bakr?

A Yes.

Q What did they say?

A They said they had got it done.

Q And had World discussed anything to you about what he wanted to do with the car?

A No.

Q Do you know whether Boo got paid for T Rock?

A Yes. At that time when Taz --

THE COURT: The question is do you know whether he got paid.

THE WITNESS: Yes, sir.

Q And who paid him?

*Marie Foley, RMR, CRR*
*Official Court Reporter*

---

*Myers - Cross / Ruhnke* 2566

Q And really there were two different crews, according to your testimony; there were those who dealt with Wise and those who dealt with World?

A Yes.

Q And although they sometimes helped each other out, it really was the Wise crew and then there was the World crew, correct?

A Well, all of these individuals would sell for either Wise or World. World had a different rapport with a different range of individuals. Wise dealt with the younger guys. World dealt with the guys that grew up with him.

Q Now, going back to this fake cop thing you had going with Puff, Zareh Sarkissian.

During one of those things someone was killed, right?

A Yes, sir.

Q The plan was to buy PlayStations at a time when they were very expensive, right?

A Yes.

Q And did Puff tell you that he had talked to the seller and thought that the seller might be kind of not on the up-and-up too? Do you remember having that conversation?

A I don't recall that conversation.

Q But you were armed during that encounter, correct?

A Yes, I was.

*Marie Foley, RMR, CRR*
*Official Court Reporter*

GA84

Spaeth - Direct - Amatruda                2674

A   Yes.

Q   What do those arrows and writing mean?

A   They represent the individual calls for that time period.

Q   Between the numbers, correct?

A   Yes.

Q   And the red writing gives the date and time of the calls; is that right?

A   Yes.

Q   And there are also arrows at the bottom of -- I'm sorry. Each one is an arrow with a dot at the top and the arrow on another side.  What does that represent?

A   The dot represents the beginning of the communication, and the arrow represents the ending of the communication.

Q   And then there's one line in this chart that ends. What's the significance of that?

A   That means that the communication for that telephone ended during starting that time period, so it ended before February 12th, 2001.

MR. AMATRUDA:  I'm not going to take up too much time, because Ms. Dayananda is going to spend time on these in her summation.

Q   But 8021 and 8022 is from July 10th of 2002, which is when we heard some evidence about a kidnapping.  Again, you charted the communications between the various numbers there?

A   Yes.

NICOLE CANALES, CSR, RPR

Spaeth - Direct - Amatruda                2675

Q   And with respect to the number here, which is 4028, that number, did you do any review of the records for that time period for that number?

A   Yes.

Q   And what was it that you were able to learn from looking at those records, with respect to that number's communication with the other numbers?

A   It was in communication with multiple numbers for that time period.

Q   Okay.  And, lastly, I'll show you 8024, which is from July 25th, 2003, which we heard testimony about the murder of Tyrone Baum that day, and, again, your chart shows the communication between various telephones for that?

A   Yes.

Q   Okay.  And let me just ask you, again, with respect to the number ending in 4028, was there anything unique about that number?

A   In regards to?

Q   What other numbers it was in contact with?

A   It was in contact with 3911 -- excuse me.  917-548-3911, and 718-773-2501.

Q   Okay.

MR. AMATRUDA:  Thank you very much.

THE COURT:  Any questions?  Ms. Barrett, do you wish to inquire?

NICOLE CANALES, CSR, RPR